**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DELAGE LANDEN FINANCIAL - SERVICES, INC., | : : : | |
| Plaintiff, | : : | |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC. | : : : | CIVIL ACTION NO. 2:02CV2810 |
| Plaintiff/Intervenor, | : : | JURY DEMAND |
| v. | : : | |
| DESOTO DIAGNOSTIC IMAGING, LLC, RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC | : : : : : | |
| Defendants and Counter-Claimants | : : : | |

<u>DEFENDANTS' FIRST AMENDED AFFIRMATIVE
DEFENSES AND FIRST AMENDED COUNTERCLAIMS</u>

Defendants, Desoto Diagnostic Imaging, LLC. ("DDI"), Randon J. Carvel ("Mr. Carvel"), Lynn T. Carvel ("Dr. Carvel"), Delta Radiology, P.C. ("Delta") and Zobar Properties, LLC ("Zobar") (collectively, "Defendants"), assert their First Amended Affirmative Defenses and their First Amended Counterclaims against DLL and Toshiba American Medical Systems, Inc. ("TAMS") and hereby state, answer, and allege the following:

<u>**AFFIRMATIVE DEFENSES**</u>

1.    DLL's and TAMS' Complaints fail to state a claim upon which relief can be granted against any Defendant.

2.      The actions brought by DLL and TAMS are barred by the doctrine of estoppel and/or waiver.

3.      The actions brought by DLL and TAMS are barred by the doctrine of laches.

4.      Any alleged non-performance by any Defendant as alleged by DLL and/or TAMS is excused due to failure of consideration.

5.      Any alleged non-performance by any Defendant is excused due to DDI's timely rejection and/or revocation of acceptance of nonconforming goods.

6.      Any alleged non-performance by any Defendant is excused due to DLL's and/or TAMS' prior material breach of the alleged agreements.

7.      The Defendants are not bound to pay under the lease or otherwise because TAMS and/or DLL failed to deliver goods in conformity to the lease contract.

8.      The Defendants are not bound to pay under the lease or otherwise because TAMS and/or DLL repudiated the lease contract.

9.      The Defendants are not bound to pay under the lease or otherwise because DDI rightfully rejected the equipment.

10.     The Defendants are not bound to pay under the lease or otherwise because DDI justifiably revoked acceptance of the equipment.

11.     The Defendants are not bound to pay under the lease or otherwise because the value of the whole lease contract was substantially impaired by TAMS' and/or DLL's actions.

12.     The Defendants are not bound to pay under the lease or otherwise because DDI rightfully cancelled the agreements as a result of TAMS' and/or DLL's repudiation, breach, default, and breach of warranty.

13.     Defendants are not liable to TAMS for reasons set out herein and within the Defendants' Counter Claims, and is likewise not liable to DLL because, as an purported assignee of TAMS, DLL took its alleged assignment from TAMS subject to all defenses and counterclaims of DDI and the Defendants herein.

14.     Neither TAMS nor DLL has been harmed by any action or inaction on the part of any Defendant.

15.     DLL's and TAMS' damages, if any, are due solely to third parties or other causes and matters that are not related to the actions of any Defendant.

16.     To the extent that DLL and/or TAMS has incurred damages as a result of any act or omission of any Defendant, or their agents or employees, which is denied, Defendants are entitled to discharge or modify the underlying agreements in whole or in part because of impracticability, public policy, non-occurrence of a condition precedent, and/or present or prospective failure of performance by TAMS and/or DLL.

17.     To the extent that TAMS and/or DLL has incurred damages as a result of any act or omission of any Defendant, or their agents or employees, which is denied, Defendants are entitled to a setoff against DLL's and/or TAMS' claim for damages caused by DLL's and/or TAMS' breaches of the contracts at issue.

18.     The actions brought by DLL and TAMS are barred due to fraud on the part of TAMS and/or DLL, in that, TAMS and/or DLL made material misrepresentations as set forth above and below in order to fraudulently induce DDI into entering the Master Lease and related documents.

19.     The Defendants have fully performed their obligations, and have fully paid all monies due and owing.

20.     No Defendant is liable to DLL or TAMS because each Defendant fully performed every duty they were bound to perform under the agreements at issue, or is excused from performing as a matter of law.

21.     The agreements on which DLL and TAMS are now proceeding were procured through fraud and are void and/or voidable by the Defendants.

22.     DLL's and TAMS' actions are barred by the doctrine of unclean hands.

23.     The Master Contract Finance Program Agreement was not executed on behalf of TAMS by an authorized party as set forth below and is thus invalid and void and/or voidable by the Defendants.

24.     The Master Lease Agreement was not executed on behalf of TAMS by an authorized party as set forth below and thus invalid and void and/or voidable by the Defendants.

25.     The Master Contract Finance Program Agreement and the Master Lease Agreement are invalid and void and/or voidable by the Defendants and therefore DLL and TAMS lack standing to sue Defendants.

Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during the discovery proceedings in this case and hereby reserve their respective rights to amend this pleading and assert such further defenses.

## <u>COUNTERCLAIMS</u>

1.     In the fall of 1999, Dr. Carvel and her husband, Mr. Carvel, began working on plans to open a full service diagnostic imaging center in Olive Branch, Mississippi to be named Desoto Diagnostic Imaging, LLC, which would include the following modalities for service: Magnetic Resonance Imaging (MRI), Computed Tomography (CT), Nuclear Medicine, X-Ray and Fluoroscopy, Ultrasound and Mammography.

2.    Dr. Carvel knew it was necessary to obtain top of the line equipment for each modality of service in order to compete with the established hospital services in the regional area of Memphis, Tennessee and North Mississippi.

3.    Dr. Carvel made contact with various diagnostic equipment vendors in an effort to obtain competitive quotes. Dr. Carvel and Paul King, the administrator for DDI, chose General Electric ("GE"), Phillips and Toshiba as the top three possible vendors. Dr. Carvel and Paul King chose to do business with Phillips initially but were disappointed to learn in January of 2000 that the Phillips financing source, CitiGroup, was offering a contingency approval plan for all the necessary equipment, subject to DDI receiving its Certificate of Need (CON) approval for use of the Magnetic Resonance Imaging equipment.

4.    Instead of agreeing to the Phillips' contingency approval plan, Dr. Carvel immediately re-contacted Toshiba because she had been told by a TAMS' sales representative that Toshiba could provide the sales, service and financing without involving any outside sources.

5.    Dr. Carvel later spoke with TAMS regarding finalizing an equipment deal. Dr. Carvel asked TAMS' sales representative, David Steiff, if TAMS would provide the financing for the equipment and Mr. Steiff responded "yes, that financing would not be a problem." David Steiff also stated to Dr. Carvel that, "Toshiba was a single source for sales, service and financing and that TAMS would select the state of the art equipment to meet DDI's needs".

6.    TAMS' sales representatives selected for DDI the Toshiba Excelart 1.5T MRI System; Toshiba Asteion CT System; Toshiba GCA 7200 Nuclear Camera System and the Toshiba DUA 450 R&F System.

7.      Upon information and belief, Toshiba Corporation, Medical Systems Company headquartered in Tochigi, Japan, ("Toshiba Japan") is the manufacturer of the equipment referenced in paragraph 6.

8.      Upon information and belief, TAMS is a United States subsidiary of Toshiba Japan.

9.      TAMS presented the equipment it selected to Dr. Carvel as "state of the art equipment" which she approved on behalf of DDI. The TAMS' representatives then asked Dr. Carvel to be a "Toshiba Show Site" where other possible customers may visit. Dr. Carvel at the time felt certain she was receiving Toshiba's top of the line "state of the art" equipment.

10.     Dr. Carvel, Mr. Carvel and Paul King traveled to Pensacola, Florida to visit a Toshiba show site where they thought they were viewing Toshiba's state of the art equipment in an operational capacity. The Carvel's and Paul King were only allowed to view diagnostic images provided and selected by the site host via the computer's picture archive communication system (PACS). The images viewed by the Carvel's and Paul King via the PACS appeared to be of good quality.

11.     Upon information and belief, Defendants did not receive TAMS' and/or Toshiba Japan's top of the line "state of the art" equipment as evidenced by the fact that TAMS, DLL and/or Toshiba Japan had secretly instituted a marketing/advertising campaign to use DDI and other sites as "show sites" for potential customers that could not afford state of the art equipment but could still use other TAMS and/or Toshiba Japan's equipment to start a business. TAMS selected equipment for DDI with the specific intent to accommodate TAMS' and/or Toshiba Japan's marketing/advertising campaign to promote more affordable equipment to start up out-patient diagnostic businesses, while not informing any Defendant of such campaign.

12.     Several persons purporting to be TAMS' representatives traveled to Memphis, Tennessee to meet with Dr. Carvel and her husband, Mr. Carvel.   One of the purported TAMS' representatives, Dave Begy, explained that TAMS had approved DDI for financing of the state of the art equipment at approximately 2.5 million dollars.  Dr. Carvel then asked who would be the contact should problems with the equipment arise.  The TAMS' representatives informed Dr. Carvel that TAMS was the single source for sales, service and financing, and that sales, service or credit would respond to her equipment needs.  Therefore, Dr. Carvel agreed to purchase the equipment on behalf of DDI.

13.     TAMS presented Dr. Carvel with a form document to sign for the purchase of the equipment entitled Master Lease Agreement with other related documents, namely Blanket Personal Guarantees, Corporate Resolutions and Corporate Guarantees (collectively, the "Master Lease" and attached hereto as Exhibit "A").

14.     Upon being presented with the Master Lease, Dr. Carvel, DDI's chief manager, telephoned one of the purported TAMS' representatives, Dave Begy, with numerous questions regarding the legal meaning and effect of these documents, but her questioning was cut off.  She was informed that the terms of the documents were non-negotiable.  Dr. Carvel then mentioned seeking an attorney's advice and Mr. Begy responded that the documents would not be changed because these prepared contracts were "take it or leave it" contracts prepared by TAMS' attorneys.  TAMS assured Dr. Carvel that if any problems arose, TAMS would be eager to fix them, especially since DDI would be a Toshiba national show site.  Discovery in this case has revealed that the Master Lease was actually drafted by DLL, who instructed and directed its agent/partner/joint venturer, TAMS, to present such documents to TAMS' customers as TAMS' documents.

-7-

15.     The Master Lease was not the result of any bargained-for exchange and is a contract of adhesion.  Dr. Carvel was given no opportunity to negotiate the terms of the Master Lease or the forum selection clause in the Master Lease.

16.     Dr. Carvel was faced with either signing the Master Lease or not being able to obtain the necessary equipment in order to generate income to timely meet the committed monthly debt for the real estate and construction of the DDI facility.  Therefore, on June 9, 2000, Dr. Carvel signed the Master Lease on behalf of DDI believing that TAMS was the Lessor, Supplier and Manufacturer of the equipment.

17.     On December 29, 2000, Lisa Sparta signed the Lease on behalf of Toshiba America Medical Systems, Inc. ("TAMS") as a Director of TAMS.  Upon information and belief, Lisa Sparta has never been a Director of Toshiba America Medical Systems, Inc., nor an authorized representative of TAMS with authority to execute the Master Lease or related documents on behalf of TAMS, nor an employee of TAMS at any time.  Lisa Sparta was an employee of DLL when she signed the Master Lease on behalf of TAMS and without proper authority to do so.

18.     Nothing in the Master Lease allows for the lease payments to be paid to anyone other than the Lessor, TAMS, without first providing notice to the Lessee, DDI.  The Lessee, DDI, never received notice of an assignment from Lessor, TAMS, nor did the Lessor, TAMS, ever direct that DDI should make lease payments to DLL.

19.     Upon information and belief, on or about July 19, 1996, TAMS and Tokai Financial Services, Inc. ("Tokai") entered into a Master Contract Financing Program Agreement (the "Financing Agreement") whereas TAMS desired to make lease and/or rental agreements for the acquisition of medical equipment and licensing of any associated software for commercial or

business purposes available to its customers known as Lessees.  See Financing Agreement attached as Exhibit "B"

20.    The Financing Agreement was executed by Masamichi Katsurada, an allegedly duly authorized representative of TAMS, who listed himself as President of TAMS.  Upon information and belief, Mr. Katsurada has never been the President of TAMS nor an authorized party entitled to execute the Financing Agreement on TAMS' behalf.

21.    Upon information and belief, Tokai assigned the Financing Agreement to DLL upon DLL's acquisition of Tokai in or around March of 1999.

22.    Pursuant to the Financing Agreement as set forth in the recital of facts, Tokai (DLL's alleged predecessor of all right, title and interest to the Financing Agreement) desired to purchase the lease contracts from TAMS and to service the lease contracts in the name of TAMS upon the terms and conditions of the Agreement.  Section One of the Financing Agreement then provides that "Notwithstanding anything to the contrary contained herein, the parties agree to operate the business of leasing equipment as provided in this Program Agreement using the Program Identifier, Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc."  The parties then agreed in Section Six of the Financing Agreement that "TFS will service all Contracts on a private label basis in the name of TAMS so that the lease will at all times appear to Lessees to be a proprietary program of TAMS."

23.    TAMS and DLL, as the alleged successor in interest to Tokai, intentionally concealed from Defendants the existence of the Financing Agreement and in following the Financing Agreement intentionally concealed that DLL was involved in the equipment transaction between TAMS and DDI.  Upon information and belief, this was done, *inter alia*, so

as to prevent Defendants from learning that TAMS was not a single source for sales, service and financing, as had been previously warranted.

24.     DLL sent several letters to Defendants, dated March 15, 2002, which was approximately one month after the equipment had been removed from DDI's facility, and wherein DLL introduces itself to Defendants for the first time and states in part that "Be advised Toshiba Medical Credit has assigned your lease to De Lage Landen Financial Services, Inc. (DLL)", "your account is in default", and "Demand is hereby made for immediate payment of the accelerated balance …. to DLL".  See March 15, 2002, Letters attached as Exhibit "C".

25.     Both DLL and TAMS in their respective Complaints state that "TAMS" leased certain equipment to DDI and that "TAMS" assigned to DLL all of its right, title and interest in and to the Master Lease and the guarantees.  Despite the statements by both TAMS and DLL that identify TAMS as the Lessor of the equipment and despite the Master Lease itself specifically identifying Toshiba America Medical Systems, Inc. ("TAMS") as the Lessor, DLL illogically and deceitfully claimed in the above mentioned March 15, 2002 letters sent to Defendants that the entity "Toshiba Medical Credit" (apparent alleged Lessor) had assigned the lease(s) to DLL.

26.     DLL's deceitful actions to confuse Defendants as to the identity of the Lessor continued whereas on or about March 15, 2003, over a year after the equipment was removed from DDI's facility and well into the current litigation, DDI received two letters from "Toshiba America Medical Credit."  The letters were undated, unsigned and did not have a return address; however, the envelopes were stamped with a postmark of March 14, 2003 and showing a return address of Account Processing Center, PO Box 6608, 1111 Old Eagle School Road, Wayne Pennsylvania 19087, which is actually a DLL address as shown on Exhibit "C" mentioned above.  Both letters purported to advise DDI that a Lease with Toshiba America Medical Credit,

a program of Toshiba America Medical Systems, had been assigned to DLL.  The letters closed with typed language 'Sincerely, Toshiba America Medical Credit," but did not reflect a hand written signature of any kind whatsoever.  The letters on their face purported that Toshiba America Medical Credit (as the apparent Lessor) was attempting to notify DDI that it had assigned a lease with DDI to DLL. See March 2003 letters and envelopes attached as Exhibit "D".  The answers to interrogatories in this litigation have revealed that DLL was doing business as (d/b/a) under the name of "Toshiba America Medical Credit" and thus, any purported assignment from "Toshiba America Medical Credit" to DLL is an intentional attempt by DLL to deceive Defendants into believing that DLL could have somehow assigned a lease to itself by use of a d/b/a name.

27.    Both the March 15, 2002 letters (Exhibit "C") mentioned above and the letters received on or about March 15, 2003 (Exhibit "D") exemplify DLL's intentional deceitful conduct in trying to create the appearance to Defendants that an assignment from a separate entity had occurred in an attempt to make the purported assignment appear valid.

28.    DLL's deceptive conduct in claiming to have received an assignment from itself, d/b/a "Toshiba America Medical Credit", is even more disturbing when considering that DLL itself admitted in its Complaint that Toshiba America Medical Systems (TAMS) was the Lessor, not "Toshiba America Medical Credit".  As stated above, the Lessee, DDI, never received notice of an assignment from Lessor, TAMS, nor did the Lessor, TAMS, ever direct that DDI should make lease payments to DLL.  Furthermore, neither TAMS nor DLL have been able to produce any documentation in this litigation to support an assignment of the Master Lease from TAMS to "Toshiba America Medical Credit" nor any documentation to support an assignment from "Toshiba America Medical Credit" to itself DLL.

29.     Despite the signature page of the Master Lease identifying Toshiba America Medical Systems (TAMS) as the only Lessor of the Master Lease and both DLL and TAMS confirming the same in their respective complaints, the Master Lease itself is indicative of DLL's intent to deceive Defendants as to their true identity inasmuch as the top left header of the first page of the Master Lease document reflects the name "Toshiba America Medical Credit" and the introductory language of the Master Lease identifies "Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc. with a Lease processing Center located at 1055 Westlakes Drive, Berwyn, Pennsylvania 19312 ("Lessor")," as the Lessor of the Master Lease.  DDI learned through discovery in this litigation that 1055 Westlakes Drive, Berwyn, Pennsylvania was actually an address for DLL and thus confirming DLL's and TAMS' concerted effort to intentionally conceal the identity of the true finance company from Defendants.

30.     Upon information and belief, DLL and TAMS agreed that DLL would use the name "Toshiba America Medical Credit" because it appeared to be part of the Toshiba organization and would most likely not raise a concern or issue with the Defendants or any other customer as to whether Toshiba was actually the finance company as represented.  Such actions further confirm that any purported assignment from "Toshiba America Medical Credit" (DLL's d/b/a name) to itself as DLL is an impossibility and a fraud.  Thus the above mentioned letters purporting to provide DDI with notice of a lease assignment from "Toshiba America Medical Credit"(DLL's d/b/a name) to DLL was DLL's dishonest and bad faith attempt to deceive Defendants as to the identity of the Lessor of the Master Lease.

31.     Upon information and belief, TAMS and DLL agreed not to disclose their Financing Agreement and also agreed not disclose DLL's identity, so that TAMS could

intentionally misrepresent and portray itself to Defendants, as well as other customers, that Toshiba is a single source for sales, service and financing.

32.     Upon information and belief, TAMS and DLL also did not disclose their relationship and the Financing Agreement to Defendants to prevent Defendants from learning about a points payment from DLL to TAMS for TAMS securing the Master Lease.  Upon information and belief, TAMS generated the undisclosed points payment at the direction of DLL by intentionally inflating the Master Lease interest rate paid by the Defendants.

33.     Upon information and belief, DLL has in the past used TAMS in this undisclosed manner to lease medical equipment to customers throughout the United States and continues to do so.

34.     Upon information and belief, TAMS was acting as an agent/partner/joint venturer for and/or with DLL at all times relevant to these counterclaims.

35.     On or about October of 2000, TAMS prematurely supplied and delivered the equipment to DDI's unfinished facility in Olive Branch, Mississippi.  TAMS insisted on placing the equipment in the unfinished building.  DDI's general contractor instructed TAMS to wait until the building was finished so that the equipment would be properly protected but TAMS refused to listen and placed the equipment in the unfinished facility.

36.     Under the terms of the Master Lease, TAMS was obliged to properly deliver in good working order certain medical diagnostic equipment to be installed by TAMS at DDI's facility.

37.     After the equipment was delivered to DDI, it began manifesting substantial problems.  TAMS' agents informed Defendants that TAMS would take all actions necessary to make certain that the equipment performed as warranted in, *inter alia*, brochures provided to

Defendants, operating manuals, and other written and oral representations made by TAMS to Defendants.

38.      Defendants continued to have problems with the equipment and submitted numerous requests to TAMS to repair the equipment.

39.      The nuclear medicine radiological equipment malfunctioned to a degree that caused injury to one patient and potential injury to other patients.  These incidents resulted in unwarranted legal liability on Defendants, as well as injury to Defendants' reputation among its patients and the community as a high-quality health care center dedicated to delivering the best care to patients, and physicians desiring services from Defendants.

40.      TAMS promised Defendants that if the equipment failed to perform as warranted, that TAMS would repair the equipment at no cost to Defendants, or replace the failing equipment, also at no cost to Defendants.

41.      Upon information and belief, TAMS' representatives knew that they did not know how to repair the problems with the MRI "Excelart AG" piece of equipment provided to Defendants but never disclosed such information to Defendants and continued to inform Defendants that they (TAMS) would and could fix the problems.

42.      Upon information and belief, within a few months after the equipment sale to DDI, TAMS began marketing an upgraded version of their MRI called the "Excelart XG" that did not have the continuous problems of the "Excelart AG".

43.      Dr. Carvel asked TAMS to upgrade DDI to the new MRI "Excelart XG" to eliminate Defendants' serious problems with the "Excelart AG", but TAMS refused to honor such request.  Upon information and belief, TAMS refused to upgrade Defendants to the MRI

"Excelart XG" so as not to jeopardize their marketing campaign targeted toward promoting more affordable equipment for start-up businesses.

44.    TAMS and/or Toshiba Japan made express warranties to Defendants regarding the performance and reliability of the equipment prior to, during, and after the Master Lease was entered into, including, but not limited to: 1) repeated written and oral warranties, promises, and assurances that the equipment would be highly sensitive and reliable for consistent imaging performance; 2) that the equipment would produce "high resolution images" and "uncompromised image quality"; 3) that the equipment would provide "fast scanning techniques" and "truly high field clinical performance while optimizing productivity with a truly multi-tasking and graphical user interface"; and 4) that the equipment would provide "subsecond scanning" that makes "extraordinarily fast examinations possible" and deliver "high image quality, excellent operability and straightforward, accurate diagnosis at high speed, all of which improve total productivity".

45.    Throughout all phases of TAMS' and DLL's relationship with the Defendants, TAMS and/or DLL warranted that the equipment would provide high image quality at high speeds while remaining simple and easy to operate.

46.    TAMS and/or DLL also expressly warranted, before, during, and after Defendants signed the Master Lease and related documents, that the equipment provided to Defendants would be "state-of-the-art," "on the leading edge of technology," superior to other diagnostic equipment available in the market, and capable of producing the highest-quality medical diagnostic images.

47.    Despite the express warranties that the goods would perform as described, the equipment never performed as warranted, and could not be consistently relied upon by

Defendants for its intended use, such that the failure of the equipment undermined the entire purpose for which Defendants acquired the equipment.  The deficiencies of the equipment resulted in numerous service calls from Defendants to TAMS and/or DLL's technical support staff, which failed to repair the serious deficiencies of the equipment.

48.     DDI and TAMS executed individual service agreements and an addendum, collectively the "Service Agreement", for each piece of equipment included in the Master Lease. A true and correct copy of the Service Agreement is attached as Exhibit "E" and incorporated by reference.

49.     In addition to the above warranties, promises, and assurances that TAMS and/or DLL provided to Defendants, Defendants were also informed that in the event that the equipment failed to perform and/or operate as warranted, that TAMS and/or DLL would provide timely technical support to Defendants by sending highly trained and capable technicians to the DDI facility who would restore the equipment to its warranted condition in a prompt manner.

50.     Nevertheless, service persons who were not fully trained to repair and service the equipment, and who proved incapable of correcting, or repairing the multitude of problems with the equipment, were sent to the DDI facility.

51.     In fact, one service repair person used baby oil to attempt to repair the MRI equipment at DDI.

52.     TAMS and/or DLL also warranted, before installation of the equipment, and afterwards, that TAMS and/or DLL would provide prompt telephone support by individuals trained to assist Defendants in the use and repair of the equipment.

53.     Despite the promises, assurances, and warranties, TAMS and/or DLL failed to provide prompt telephone support, resulting in further loss of the use of the equipment.

54.     During the approximately 14 month period that the equipment was installed at the DDI facility, Defendants placed over 200 service calls to report the equipment failed to operate as warranted and failed of its essential purpose which substantially impaired its value to Defendants in that it did not produce high-quality diagnostic images and caused undue hardship on Defendants' business.

55.     TAMS had a duty to deliver equipment in conformity with the express and implied warranties as set out in these counterclaims.

56.     The equipment failed to conform to the express and implied warranties in that 1) the equipment was not reliable, but repeatedly malfunctioned or broke down; 2) the equipment was unreliable and did not consistently produce quality images; and 3) the equipment was not simple and/or easy to operate, but required constant supervision and support by DDI personnel; and 4) the equipment was inferior to other diagnostic imaging equipment available in the market despite TAMS' representations that the equipment was "state of the art".

57.     Defendants promptly notified TAMS of the nonconformities after receiving the equipment.

58.     TAMS failed to cure the equipment's nonconformities within a reasonable time.

59.     After TAMS' failed to cure the nonconformities, Dr. Carvel requested that TAMS remove the equipment in a letter to a TAMS officer, dated October 8, 2001. A true and correct copy of the October 8, 2001 letter is attached as Exhibit "F" and incorporated herein by reference.

60.     On October 16, 2001, Dr. Carvel e-mailed TAMS again demanding the removal of the equipment from the DDI facility. See Exhibit "G".

61.     In a letter dated October 24, 2001, TAMS refused to remove the equipment. See Exhibit "H".

62.     In November of 2001, numerous persons purporting to be TAMS' representatives met with Defendants at the DDI facility where Defendants again expressed their problems and dissatisfaction with the equipment. TAMS' representatives again assured Defendants that the equipment would be seasonably cured and performing properly within sixty (60) days. Unbeknownst and undisclosed to Defendants at the time was that one of the individuals who participated in the meeting as a representative of TAMS was actually a DLL employee.

63.     At the end of the sixty (60) day period, Defendants notified TAMS that there had been "no improvement in equipment performance" and that "the situation has continued to deteriorate." See Exhibit "I".

64.     Defendants performed all obligations under the Master Lease and related documents in that it made timely lease payments until such time as Defendants requested removal of the equipment because TAMS had breached the Master Lease and Service Agreements as set forth above and below.

65.     On or about March 12, 2002, Dr. Carvel received a voice mail message from Jake Hornung who identified himself as an employee of "Toshiba Medical Credit" and requested payment for the equipment.

66.     On March 18, 2002, Dr. Carvel returned Mr. Hornung's voice mail message and explained to Mr. Hornung that she had received a default letter from him on behalf of DLL which was dated March 15, 2002. Dr. Carvel then asked Jake Hornung if he was with Toshiba Medical Credit and his response was "No." Mr. Hornung went on to state that "I said that originally because there was some debate as to whether or not we were going to disclose the

private label agreement that was in effect but the decision came down later to disclose that so

that's why we sent that letter out well, <u>and uh there's actually some questions on this end</u> and we

think it would be best at this point if we could sit down and everybody trying to at least work it

out from our end here at De Lage Laden."

67.    As mentioned above, Defendants became aware of DLL for the first time in the

letter from DLL to DDI dated March 15, 2002, which alleged for the first time that there had

been a purported assignment of the lease as explained in detail above.

68.    The DLL employee, Mr. Hornung, then requested that Dr. Carvel call him back to

discuss the March 15, 2002 letter with other DLL employees and Dr. Carvel agreed.  During the

ensuing telephone call on the afternoon of March 18, 2002, other DLL employees joined in the

conversation. One of the DLL employees named Ray Crouse stated "We, as you know, we broke

our private label and informed you of who we were, De Lage Laden, which is the Lessor on this

piece of equipment. We hold the paper and we have no, are not able to do any resolve as far as

the technical part of the equipment".  Mr. Crouse's comment, in addition to the discovery

obtained in this case, further confirms that DLL and TAMS intentionally deceived and

misrepresented to Defendants the identity of the Lessor as for the reasons explained with

particularity above.

69.    The March 18, 2002 conversations between DLL and Dr. Carvel along with

discovery obtained in this case confirm that TAMS and DLL were undisclosed partners in the

sale and financing of the equipment under a so-called private label agreement entitled Master

Contract Program Financing Agreement as previously referenced herein as the Financing

Agreement.

70.     At all times prior to the March 18, 2002 conversations with DLL, Defendants believed and relied upon the representation of TAMS that TAMS was a single source for sales, service and financing.  In reliance upon the TAMS' representation that TAMS was a single source for sales, service and financing along with the express representations by TAMS that TAMS was the Lessor of the Master Lease for the equipment and the fact that the written Master Lease document listed TAMS as the Lessor, Defendants entered into the Master Lease.

71.     As stated above, Defendants are informed and believe that DLL and TAMS are agents, partners, and joint ventures, and upon that belief allege that the acts of TAMS are imputed to DLL and vice versa.

## COUNTERCLAIM I

### (Breach of Contract:  Delivery of Nonconforming Goods
### Against TAMS)

72.     Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

73.     TAMS had a duty to comply with terms of the Master Lease and post-agreement warranties, promises, assurances, and representations made by TAMS to Defendants.

74.     The Master Lease obligated TAMS to deliver goods and equipment that conformed to the warranties represented by TAMS as set out previously.

75.     TAMS breached its duty to deliver conforming goods to Defendants by delivering nonconforming equipment to Defendants.

76.     Soon after TAMS installed the equipment at the DDI facility, Defendants discovered that the goods failed to perform in accordance with the Master Lease in that the equipment did not perform the essential purpose for which it was intended, and failed to

consistently perform to the level of quality as expressly promised, warranted, and represented by TAMS to Defendants.

77.     Soon after discovering the goods were nonconforming, DDI notified TAMS of Defendants' intention of rejecting the nonconforming equipment. Thereafter, TAMS assured Defendants that the flawed equipment would be seasonally cured, or promptly repaired, and that TAMS would take the necessary action to ensure that the equipment began performing at the level as warranted by TAMS, within a reasonable time.

78.     Despite these further assurances, and warranties set out above, TAMS failed to cure and/or correct the equipment and failed to perform under its warranties, as a result of which the equipment remained substantially nonconforming, resulting in damage to Defendants.

79.     On or about October 8, 2001, and within a reasonable time after Defendants discovered the substantial defects amounting to a default under the lease agreement and TAMS failed to cure, Defendants again notified TAMS, in writing, that the goods delivered were defective, and that Defendants were revoking acceptance of the goods, and furthermore, that TAMS was in default under the Master Lease for tendering faulty and defective equipment and failing to seasonally correct the critical and substantial defects. See Exhibit "F".

80.     The serious and substantial nonconformities in the equipment substantially impaired its value to Defendants such that Defendants' revocation of acceptance was justified due to the difficulty of discovery of the nonconformity before acceptance, and the post-discovery assurances, promises, representations, and warranties by TAMS to Defendants that the equipment would be seasonally cured.

81.     During the entire time that the equipment remained in Defendants' possession, or under its control, Defendants held the nonconforming goods with studied and reasonable care.

82.     After notifying TAMS of its desire that the equipment be removed from its facility, and despite multiple and repeated requests to TAMS, Defendants received no instructions for the disposition of the flawed equipment.

83.     After justifiable rejection of the goods, and in a commercially reasonable manner, Defendants, in good faith, obtained non-defective medical diagnostic equipment from another supplier.

84.     Defendants acquisition of new non-defective equipment was made in a good faith and commercially reasonably manner.

85.     TAMS, through its actions against Defendants as set out and described herein, has breached the implied duty of good faith and fair dealing in its contracts and is liable for the damage resulting from this breach.

86.     As a direct result of TAMS' actions, Defendants have incurred and will continue to incur damages, costs, and expenses, including attorney fees.

WHEREFORE, Counter-claimants/Defendants demand judgment against TAMS for the actual, incidental, and consequential damages suffered as a result of the actions herein described, as well as attorney fees, interest as permitted by law, and any other and further relief deemed proper.

## COUNTERCLAIM II

### (Breach of Express and Implied Warranties
### Against TAMS)

87.     Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

88.     In entering into the Master Lease and afterwards, Defendants relied on TAMS' express and implied warranties and representations described previously.

89.     The express warranties and representations were made orally and in writing which described the equipment as having the capacity to perform in accordance with Defendants' requirements, which were communicated directly to TAMS both before and after the initial lease agreement.

90.     At the time the Master Lease Agreement was executed, TAMS knew of the particular purpose for which Defendants intended to use the goods described in the Master Lease, and warranted that the equipment was fit for that purpose. TAMS was informed and knew, or had reason to know, that Defendants required the equipment for providing state-of-the-art diagnostic images for patients and area doctors.

91.     TAMS impliedly warranted to Defendants that the equipment was merchantable, such that the equipment must have been able to pass without objection.

92.      TAMS impliedly warranted that the equipment was merchantable, such that the equipment was required to be fit for the ordinary purposes for which it was to be used by Defendants.

93.     TAMS delivered equipment that failed to pass without objection by Defendants, and which proved to be unfit for the ordinary purposes for which the equipment was intended to be used by Defendants.

94.     Defendants relied on TAMS' expertise, skill, and judgment in TAMS' selection of and furnishing of the equipment under the Master Lease.

95.     The goods delivered to Defendants were not fit for Defendants' purposes in that the subject equipment routinely produced poor images that were not consistently capable of being used by the physicians for diagnostic purposes.

96.     The goods delivered to Defendants were not fit for Defendants' purposes in that the equipment continuously manifested errors, or otherwise failed to reliably operate in its intended manner such that the equipment was unavailable for extended and intermittent periods during which the equipment was not timely repaired and which undermined Defendants ability to consistently use the equipment for its intended purposes.

97.     In entering the Master Lease, and in continuing to perform its obligations under it for a period after the Master Lease was entered, Defendants at all times directly relied upon the express warranties and affirmations given by TAMS' representatives (and purported TAMS representatives) to Defendants, such representations being made before, during, and after the Master Lease Agreement was entered into.

98.     TAMS breached its express warranties to Defendants by, *inter alia*:  1) providing equipment to Defendants that was not reliable, but repeatedly malfunctioned or broke down; 2) providing equipment that did not consistently produce quality images and thus proving incapable of producing the high-quality images that were promised and furthermore unacceptable for the purposes for which the equipment was obtained; and 3) providing equipment that was not simple and/or easy to operate, but required constant supervision and support by DDI personnel; 4) knowingly providing equipment that was substantially inferior to other diagnostic imaging equipment available in the market despite TAMS representations that the equipment was "state of the art"; and 5) failing to provide prompt and effective service and/or service personnel.

-24-

99.     TAMS, in taking those actions set out and described herein, breached the implied duty of good faith and fair dealing in every commercial contract and is bound for the damage resulting from this breach.

100.     TAMS' actions set out herein breach its express and implied warranties to Defendants, as a result of which Defendants have been damaged.

WHEREFORE, Counter-claimants/Defendants demand judgment against TAMS for the actual, incidental, and consequential damages it has suffered as a result of the actions herein described, interest as permitted by law, and any other and further relief deemed proper.

## **COUNTERCLAIM III**

### **(Breach of Contract as to the Service Agreements Against TAMS)**

101.     Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

102.     TAMS had a duty to comply with the terms and conditions of the service agreements and the addendum, attached as Exhibit "E", both of which were, upon information and belief, drafted solely by TAMS and/or Toshiba Japan.

103.     TAMS breached its duty under the service agreements by providing inadequate service to the equipment as mentioned above.

104.     As a result of TAMS' breach of the service agreements, Defendants have been damaged in its business.

WHEREFORE, Counter-claimants/Defendants demand judgment against TAMS for the actual, incidental, and consequential damages it has suffered as a result of the actions herein described, interest as permitted by law, and any other and further relief deemed proper.

## COUNTERCLAIM IV

**(Third Party Beneficiary Claim:  Breach of Master Contract Financing Program Agreement Against TAMS and DLL)**

105.    Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

106.    On or about July 19, 1996, TAMS entered into a Master Contract Financing Program Agreement, (hereafter the "Financing Agreement"), with Tokai Financial Services, Inc. ("Tokai"). A copy of the Financing Agreement is attached hereto as Exhibit "B".  Upon information and belief, DLL subsequently assumed Tokai's rights and obligations under the Financing Agreement.

107.    The agreement between TAMS and Tokai was made in contemplation of future sales or leases of TAMS' equipment whereby TAMS could solicit its potential customers by offering financing to prospective buyers/lessees, while at the same time creating an obligation for Tokai, upon the satisfaction of certain conditions, to assist TAMS in financing the sale/lease.

108.    The Financing Agreement was made for the express benefit of the prospective buyers/lessees in that it created a means for the prospective buyers/lessees to acquire equipment from TAMS, over which TAMS warranted to Tokai, prospective buyers/lessees, and future assignees, among other things, that the equipment was fit for its intended purpose.

109.    By the express terms of the Financing Agreement, TAMS was bound to supply equipment to the prospective buyers/lessees that conformed to the express and implied warranties set out herein.

110.    The Financing Agreement was intended to benefit the contemplated prospective buyers/lessees in that it created warranties as to the quality and performance of the TAMS

equipment, required TAMS, Tokai, and any assignees to conduct all duties and obligations reasonably, fairly, and in good faith, all of which were intended to inure to the benefit of the prospective buyers/lessees whom were expressly contemplated by the agreement.

111.    The Financing Agreement was further intended to benefit those prospective buyers/lessees in that within it TAMS undertook the duty to perform such maintenance and service and provide supplies and warranties as would later be agreed to by TAMS and the prospective buyers/lessees.

112.    TAMS was bound to honor express and implied warranties and other duties flowing from the TAMS/Tokai Financing Agreement in favor of Defendants, an intended beneficiary of the Financing Agreement.

113.    TAMS has breached its obligations under the Financing Agreement by failing to meet its duty to provide equipment that conforms to the express and implied warranties represented by TAMS as set out herein, in that, *inter alia*, the equipment was not suitable for its intended purpose, was not timely or adequately repaired, and failed to produce high-quality diagnostic images, as represented and warranted by TAMS in the Financing Agreement, and elsewhere.

WHEREFORE, Counter-claimants/Defendants demand judgment against DLL and TAMS for the actual, incidental, and consequential damages it has suffered as a result of the actions herein described, as well as attorney fees, interest as permitted by law, and any other and further relief deemed proper.

## COUNTERCLAIM V

### (Fraud Against TAMS and DLL)

114.     Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

115.     As set forth above, TAMS and DLL made representations to Dr. Carvel that TAMS was the single source for equipment sales, service and financing and that TAMS sales, service or credit would respond should problems arise with the equipment.

116.     At the time TAMS and DLL made these representations they did so knowing that TAMS was not the single source for equipment sales, service and finance and that only TAMS' service would respond should problems arise with the equipment.

117.     At the time TAMS and DLL made these representations, TAMS and DLL did so knowing them to be false, and with the intent to induce Defendants to commit to purchasing or leasing the equipment and enter into related documents for the benefit of TAMS and DLL.

118.     Defendants reasonably relied on the statements made by TAMS and DLL, that TAMS was the single source for sales, service and financing of the equipment and that TAMS sales, service or credit would respond to equipment needs should problems arise.

119.     TAMS and DLL intentionally concealed from Defendants their relationship so as to deceive Defendants into believing and relying upon that Defendants would be contracting with one entity, TAMS, and thereby defrauding Defendants as set forth above and below.

120.     TAMS and DLL intentionally concealed their relationship from Defendants and, upon information and belief, worked secretly with DLL to secure an inflated interest rate finance

deal for DLL and to secure an undisclosed points payment for TAMS, thereby defrauding Defendants as set forth above and below.

121.    Dr. Carvel, in reliance upon the representations made by TAMS and DLL, agreed to purchase the equipment by entering into a Master Lease and related documents and went forward with plans to make DDI a Toshiba equipment show site.

122.    As a direct and proximate result of the fraudulent representations and actions of TAMS and DLL, Defendants have suffered substantial damages

WHEREFORE, Counter-claimants/Defendants demand judgment in their favor and against TAMS and DLL for compensatory and punitive damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for Plaintiffs' failures to perform and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in connection with this action, along with such other and further relief as this Court deems just and proper.

## COUNTERCLAIM VI

### (Civil Conspiracy to Commit Fraud
### Against TAMS and DLL)

123.    Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

124.    At all times material hereto, TAMS and DLL agreed by and between themselves to intentionally misrepresent themselves to Defendants as a single source for sales, service and financing in order to secure Defendants purchase or lease of the equipment and thereby defraud Defendants as set forth above.

125.    Upon information and belief, TAMS and DLL intentionally concealed their relationship and obligations to each other and worked secretly to *inter alia*, secure an inflated interest rate finance deal and an undisclosed points payment as mentioned above and thereby defraud Defendants as set forth above and below.

126.    The actions of TAMS and DLL, as set forth above, were done so intentionally, willfully, maliciously, outrageously and in bad faith.

127.    The actions of TAMS and DLL, as set forth above, constituted an unlawful act to defraud Defendants.

128.    As a direct and proximate result of the unlawful conspiracy between TAMS and DLL, Defendants have suffered substantial damages.

WHEREFORE, Counter-claimants/Defendants demand judgment in their favor and against DLL and TAMS for compensatory and punitive damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for fraud and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in connection with this action, along with such other and further relief as this Court deems just and proper.

## COUNTERCLAIM VII

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against TAMS and DLL)

129.    Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

130.    TAMS made express and implied warranties to Defendants regarding the equipment.

131.    TAMS breached the implied covenant of good faith and faith dealing by:

a.    breaching its duty of loyalty;

b.    failing to disclose and intentionally concealing its relationship with DLL;

c.    failing to disclose and intentionally concealing the intentionally inflated Master Lease interest rate;

d.    failing to disclose and intentionally concealing the points payment from DLL to TAMS;

e.    failing to provide reliable equipment as promised;

f.    failing to repair the equipment as promised;

g.    failing to replace the equipment as promised;

h.    failing to service the equipment with properly trained service technicians as promised;

i.    failing to honor the warranties and representations as set forth herein above;

j.    failing to disclose the identity of the manufacturer of the equipment;

k.    intentionally misrepresenting itself as a single source for sales, service and finance;

l.    intentionally misrepresenting itself as Toshiba America Medical Credit; and

m.    such other actions and/or inactions as yet unknown but which may become known during pretrial discovery or trial.

132.    As a direct and proximate result of TAMS' breaches of the implied covenant of good faith and fair dealing, Defendants have suffered damages.

133.    DLL breached the implied covenant of good faith and faith dealing by:

    a.    breaching its duty of loyalty;

    b.    failing to disclose and intentionally concealing its relationship with TAMS;

    c.    intentionally directing a DLL employee to execute the Master Lease on behalf of the TAMS, the identified Lessor in the Master Lease, without authority from TAMS to do such act .

    d.    failing to disclose its identity as Toshiba America Medical Credit;

    e.    intentionally misrepresenting itself as Toshiba America Medical Credit;

    f.    failing to disclose and intentionally concealing the intentionally inflated Master Lease interest rate;

    g.    failing to disclose and intentionally concealing the points payment from DLL to TAMS;

    h.    failing to honor the warranties and representations as set forth herein above;

    i.    intentionally misrepresenting TAMS as a single source for sales, service and finance;

    j.    such other actions and/or inactions as stated herein above and below; and

    k.    such actions and/or inactions as yet unknown but which may become known during pretrial discovery or trial.

134.    As a direct and proximate result of DLL's breaches of the implied covenant of good faith and fair dealing, Defendants have suffered damages.

WHEREFORE, Counter-claimants/Defendants demand judgment in their favor and against TAMS and DLL for compensatory damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for Plaintiff's failure to perform and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in prosecuting this action, along with such other and further relief as this Court deems just and proper.

## <u>COUNTERCLAIM VIII</u>

### (Tennessee Consumer Protection Act Claim<br>Against DLL and TAMS)

135.    Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

136.    The conduct by TAMS and DLL set forth in the preceding paragraphs constitutes unfair or deceptive acts or practices within the meaning of the Tennessee Consumer Protection Act, T.C.A. §§ 47-18-101 et seq. and 1001 et seq.

137.    Defendants suffered an ascertainable loss of money or property as a result of TAMS' and DLL's conduct.

138.    Defendants are entitled to recover its actual damages and up to three times the actual damages sustained.  Defendants' actual damages are described in the preceding paragraphs.

139.    The counterclaim-defendants are subject to liability for damages caused to Defendants by the wrongful acts of their agents, who were acting in the ordinary course of counterclaim-defendants' business or with authority of counterclaim-defendants to do so.

WHEREFORE, Counter-claimants/Defendants seek from DLL and TAMS, and each of them jointly and severally, damages in excess of $100,000, before trebling, cost of suit, attorneys fees, interest and such further relief as the court deems proper.

## COUNTERCLAIM IX

### (Declaratory Judgment Against TAMS and DLL)

140.    Counter-claimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

141.    TAMS and its agent/partner/joint venturer, DLL, had a duty to deliver equipment in conformity to the express and implied warranties as set out previously in this Counterclaim.

142.    TAMS had a duty to sell to Defendants equipment in conformity to the express and implied warranties as set out previously in this Counterclaim.

143.    The nonconformity of the equipment substantially impaired its value to Defendants in that it did not produce high-quality diagnostic images and caused undue hardship on the Defendants' business.

WHEREFORE, Counter-claimants/Defendants request that this Court enter a Declaratory Judgment in its favor and against TAMS and DLL to the effect that:

a.    Defendants properly revoked acceptance of the equipment and are entitled to the same rights and duties with regard to the equipment as if Defendants had rejected the equipment.

b.    Defendants are entitled to the same rights and remedies with respect to the Master Lease Agreement as a buyer who has rightfully rejected nonconforming goods.

## DEMAND FOR JURY TRIAL

Counter-claimants/Defendants hereby demand a trial by jury of all issues so triable.

Respectfully Submitted,

By:_____

William Matthews
For SAUL EWING, L.L.P.
Center Square West
1500 Market Street
Philadelphia, PA 19102-2186
(215) 972-7106

Kyle P. Tate, AR Bar No. 95097
for TATE LAW FIRM
9085 Sandidge Center Cove
Olive Branch, MS 38654
(662) 893-8833

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the foregoing has been served upon the attorney of record for all other parties in this proceeding and upon parties not represented by attorneys by telefax or by delivering a copy of this pleading to the attorney or party personally, or to the offices of such attorney or party, or by placing a copy in the U.S. Mail addressed to such attorney or party named below at his office with sufficient prepaid postage on this _____ day of September, 2003.

Ms. Rosetta B. Packer
MCCARTER & ENGLISH, LLP
Mellon Bank Center, Suite 700
1735 Market Street
Philadelphia, PA 19103-7501

Mr. John Chesney
Ms. Julianne Peck
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

_____

William Matthews