# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DELAGE LANDEN FINANCIAL       :
SERVICES, INC.,                 :
           Plaintiff,       :
                        :

TOSHIBA AMERICA MEDICAL      :
SYSTEMS, INC.                 :
       Plaintiff/Intervenor,    :

         v.                :

DESOTO DIAGNOSTIC IMAGING,    :
LLC., RANDON J. CARVEL, LYNN T.   :
CARVEL, DELTA RADIOLOGY, P.C.    :
and ZOBAR PROPERTIES, LLC      :
                        :

         Defendants.      :

CIVIL ACTION NO. 2:02CV2810

HON. RONALD L. BUCKWALTER

### TOSHIBA AMERICA MEDICAL SYSTEMS, INC.'S
### REPLY BRIEF IN SUPPORT OF
### <u>MOTION TO COMPEL DISCOVERY DIRECTED TO DEFENDANTS</u>

In their Opposition to TAMS' Motion to Compel Discovery, Defendants engage in considerable bobbing and weaving in an effort to evade the conclusion that they have seriously defaulted on their discovery obligations. None of the shifts to which Defendants have been put in an effort to excuse their conduct stands up under examination.

## I.    "Medicare Fraud" Is Irrelevant To the Instant Motion

DeSoto's first gambit is to attempt to divert the Court from the issues actually involved in the motion – whether TAMS is entitled to, and whether Defendants have improperly withheld, the discovery that is actually the subject matter of the motion. Thus, DeSoto argues that TAMS seeks this discovery "in a vain attempt of finding evidence of its made-up Medicare fraud claims" that will force DeSoto "into an unfavorable settlement under the ridiculous threat" of Medicare and similar audits. Response to Toshiba America Medical Systems, Inc.'s Motion to

Compel Discovery Directed to Defendants (herein "Defendants' Opposition") at 2.  There are only two difficulties with this "argument".[1]  First, the idea that DeSoto has engaged in Medicare fraud is *not* "made up".[2]  Second -- and more to the present purpose -- the documents that TAMS seeks in this motion have *nothing to do with* the question of whether DeSoto has engaged in Medicare fraud.[3]

## II.    Production of Information Only in Response to TAMS' Motion to Compel Is Not Compliance With Discovery

DeSoto's next diversionary tactic is to argue that TAMS' motion is without merit because Defendants have, in or along with their Opposition, finally provided answers to some of the discovery that is the subject matter of that motion.  For example, with regard to Interrogatory No. 3(e), which asked whether there were any complaints made by referring physicians with regard to the Medical Equipment, DeSoto's Opposition attaches Affidavits from two physicians.  The

---

[1] Or three, if one counts the fact that it is difficult to see how a "ridiculous threat" could force a party into an unfavorable settlement.

[2] Although DeSoto has improperly withheld from production many of the documents that are needed to demonstrate definitively the scope of DeSoto's misconduct (*see* TAMS' Motion to Compel and for Expedited Relief, filed October 23, 2003), even those documents it has produced demonstrate a pattern consistent with the fact that DeSoto is employing improper and fraudulent billing practices to inflate its earnings and profits artificially.  *See* Expert Report of Claudia Murray (attached hereto as Exhibit "A").

[3] The information that TAMS seeks in this motion falls into the following categories: (1) the alleged warranties and promises that TAMS made with regard to the equipment (First and Second Interrog. No. 7); (2) the identity of any person, entity, physician or medical group who refused to pay for services rendered by DeSoto as a result of the equipment allegedly malfunctioning (First Interrog. No. 4); (3) the identify of DeSoto employees (Third Interrog. No. 1); (4) information relating to the replacement equipment (Second Interrog. Nos. 1, 6-8, First Request for Prod. No. 22); (5) DeSoto's contentions as to all instances where the Toshiba equipment did not perform as warranted or as set forth in the operating manuals, and identification of how TAMS' maintenance technicians failed to alleviate the alleged deficiencies (Second Interrogs. 10, 11, 12); (6) documents relating to the de-installation and removal of the equipment (First Request for Production No. 13); (7) DeSoto's financial information (First Request for Production No. 15); and DeSoto's damages (Second Interrog. No. 15).

information contained in those affidavits is directly responsive to the Interrogatory and establishes – months after the information was due – (1) that only two out of over 450 referring physicians ever complained to Dr. Carvel about the images produced by her center and (2) that such images were "diagnostic", that is, able to be used for the medical purposes for which they were created. This response should have been provided in response to the Interrogatory, not in response to TAMS' motion to compel! That way, TAMS would have had the opportunity to determine whether it would be appropriate to conduct follow up discovery with regard to these two physicians in a timely way.[4] Similarly, DeSoto failed to produce the images and x-rays taken by the replacement equipment (First Request for Production, No. 23), until after this motion was filed. These images (which consisted of 327 compact discs) were not produced until October 29, 2003, *over six months after they were requested*, and on the very day expert disclosures were due.[5]

The Federal Rules expressly contemplate that providing responses only after requiring an opponent to file a motion to compel is *not* compliance with discovery, it is a violation of the

---

[4] For example, the physician affidavits offer no views or conclusions as to what "poor but diagnostic" image quality means, offer no information as to whether DeSoto *did* correct any perceived deficiencies in image quality, fails to identify specific images or studies that were "poor" in quality and provides no information as to whether the physicians in question had a view, or had any basis for forming a view, as to whether the images were "poor" because of equipment malfunction or because less than optimal parameters or protocols were employed in conducting the studies.

[5] It is becoming increasingly clear not only that DeSoto has engaged in bad faith discovery conduct – proffering cooperation, but not producing information, then pleading lack of resources as a "small operation", re-affirming a willingness to cooperate, but *still* not producing information – but that DeSoto is fully persuaded that such conduct can be engaged in with impunity. DeSoto's conduct in respect of the images produced by the replacement, Siemens, MRI machine is a classic case in point. Incredibly, although DeSoto did not turn these images over to TAMS until the very day expert witness reports were due, *it had previously made them available to its own proposed expert witness*, who has purported to opine on how these images compare to images generated by the Toshiba equipment! *See* Exhibit "B." This is *precisely* the kind of bad faith conduct that Rule 37 is designed to punish.

discovery rules *and* does not mitigate the offending party's obligation to pay sanctions. "[I]f the disclosure or requested discovery is provided after the motion [to compel] was filed, the court shall, after affording an opportunity to be heard, require the party . . . to pay the moving party the reasonable expenses incurred in making the motion." Fed. R. Civ. P. 37.

### III.    DeSoto's Claims That It Fully Responded To Some of the Discovery In Question Prior to the Filing of TAMS' Motion to Compel Are Untrue

DeSoto's next attempt at "spin doctoring" involves its contention that it had *already* answered some of the discovery at issue before TAMS filed its motion. For example, Defendants point to twelve pages in their document production, *implying* that they have fully responded to Request No. 13. Request No. 13 seeks all documents relating to the removal of the medical equipment from DeSoto's facility. DeSoto has nowhere represented, however – not even in its Opposition! – that this dozen pages constitutes *all* responsive information. Indeed, DeSoto's formal response to this request – which it has not amended – is that it is unaware of *any* such documents, a statement that it now admits is untrue. *See* Exhibit "W" (DeSoto's Supplement Response).[6]

Similarly, Defendants claim to have fully responded to TAMS' Interrogatory No. 4, but, in fact, they have not. Defendants acknowledge that this interrogatory seeks "the identity of any person, physician or medical group who refused to pay for services rendered by DeSoto" based upon problems with the TAMS equipment (Opposition at 5). Defendants admit that they first provided only a partial response addressed to third-party payors (Opposition at 5). They also

---

[6] With regard to TAMS' request for the personnel file of Paul King (Second Request for Production No. 4), DeSoto stated that it would produce the requested documents. Only after, and in response to, this motion did DeSoto acknowledge that it has no intention of producing the file it said it would produce because, it claims, the file does not exist.

admit that their supplemental response addresses only "self-pay" patients (*Id.*). DeSoto *still* has

not provided any information with regard to physicians or medical groups.[7]

### IV.    DeSoto's Claim That Certain Discovery Seeks "Expert Opinion" Has Now Been Shown To Be A Fraud

Another DeSoto tactic in resisting discovery was to argue that certain requests sought

expert opinion which was not due when discovery responses were filed.  *See* Response to Second

Set of Interrogatories Nos. 10, 11, and 12, seeking DeSoto's contentions as to all instances where

the Toshiba equipment did not perform as warranted or as set forth in the operating manuals, and

identification of how TAMS' maintenance technicians failed to alleviate the alleged serious

deficiencies of the equipment.  These objections were meritless when made – the discovery is

addressed to DeSoto's contentions as they relate to the equipment's failure to meet warranties,

including the alleged oral warranties that Dr. Carvel claims were made to her by various people.

That information could and should have been provided, because contention interrogatories are

perfectly proper and because DeSoto – without expert witness testimony – unilaterally de-

installed and ejected the equipment on the basis of whatever its contentions actually are!

The bad faith nature of DeSoto's position in this regard has now been made particularly

apparent, however, by the arrival of the expert disclosure deadline, October 29, 2003.  DeSoto

submitted three purported expert reports.[8]  Not one of them included information responsive to

---

[7] It may well be that these groups have not withheld any payments from DeSoto, either.  The point is, however, that TAMS is entitled to know this so that it can present to the trier of fact, among other evidence bearing upon whether the Toshiba equipment functioned in a commercially acceptable way, the fact that *no one* ever refused payment for services rendered through the use of that equipment.  DeSoto's attempt to play games by doling out information piece by piece, but never completely, is highly inappropriate.

[8] The reference to these reports as "purported" expert reports is not intended to demean the individuals who wrote them.  Rather, it is meant merely to confirm that the question of whether they will pass muster under the *Daubert* standard has not yet been addressed.

these Interrogatories. *See* Exhibits "B", "C" and "D." Thus, the only available conclusions are (1) that DeSoto has no information to support these contentions, having included none in its expert witness reports, in which case those portions of its claims and defenses based upon such contentions should be dismissed or (2) that DeSoto has such information, but has deliberately tried to conceal it, in which case it should be required to provide the information and sanctioned.

### V.    Providing Information in a Deposition Does Not Excuse A Party from Answering Proper Written Discovery

DeSoto argues that it is excused from responding to Interrogatory No. 7 in both TAMS first and second set of interrogatories, which ask for a description of all warranties, promises or assurances that TAMS allegedly made with regard to the equipment, because Dr. Carvel has undergone five days of depositions. (Opposition Brief at 6). However, an interrogatory cannot be answered by referring to deposition testimony. *Tabb v. Philip Morris, Inc.*, No. 98-CV-3223, 1999 U.S. Dist. LEXIS 4334, at *5 (E.D. Pa. April 2, 1999); *DiPietro v. Jefferson Bank*, 144 F.R.D. 279, 282 (E.D. Pa. 1992); *Hilt v. Blackston*, No. 92-2482, 1993 U.S. Dist. LEXIS 2632, at *8-9 (E.D. Pa. Feb. 18, 1993) (citing *Ferrara v. Balistreri*, 105 F.R.D. 147, 150 (D. Mass. 1985); *Rector Church Wardens v. Heatube Co.*, No. 91-7310, 1993 U.S. Dist. LEXIS 1798, at *5 (E.D. Pa. Feb. 4, 1993). *See also, Newcourt, Inc. v. Laminators, Inc.,* No. 86-5911, 1987 U.S. Dist. LEXIS 9960, at *2 (E.D. Pa. Oct. 30, 1987). Further, DeSoto does not point to any testimony during Dr. Carvel's deposition that it claims provides a complete answer to these questions. Instead, DeSoto advances the novel objection to discovery that the Court should simply accept that DeSoto is right and TAMS wrong in this lawsuit *and* that TAMS knows it -- "TAMS well knows its culpability" says DeSoto (Defendants' Opposition at 6), and therefore *does not need* this information. While not without its humorous aspect, this objection is an example of the utter bad faith with which defendants have approached their discovery obligations in this action.

**VI.    DeSoto's Argument that the Remainder of TAMS' Discovery Requests are Irrelevant Has No Basis**

Lacking anything better to say, DeSoto argues that the remainder of TAMS' requests are "irrelevant", that is, unlikely to lead to the discovery of admissible evidence.  In large part, this is an elaboration of the "TAMS well knows its culpability" argument discussed briefly above. Basically, DeSoto advises the Court that this case is about -- and only about -- DeSoto's Counterclaims against plaintiffs, TAMS and DLL.  True to this philosophy, DeSoto has steadfastly refused to produce all manner of information that it has no good faith basis for trying to conceal.[9]

For example, DeSoto has refused to provide the identities of *all* of its employees, including those that were employed there at the time the Toshiba equipment was installed.  *See* Third Set of Interrogatories No.  1.  While it has provided the names of some of the technologists who worked on the equipment (it also omitted some), it has not provided the identities of the radiologists (other than Dr. Carvel) who interpreted the images produced by the Toshiba or the replacement equipment.  Nor has it identified any of the other DeSoto employees who could have knowledge regarding this case.  There simply is no good faith basis to withhold this information, or to argue that it is irrelevant.  For example, former DeSoto physicians other than Dr. Carvel who worked with the Toshiba equipment would be in an excellent position to testify as to whether her contentions are true or false.[10]

---

[9] Among its most astonishing acts of bad faith, Defendants have absolutely refused -- even in response to this motion -- to identify and quantify their claimed damages.  Indeed, they do not even offer an excuse for this recalcitrance -- or even address it -- in the Opposition!  *See* Response to Second Set of Interrogatories No. 15.  Certainly, this blatant stonewalling cannot have been because Defendants felt only "expert witness opinion" could address this issue, because Defendants did not offer any expert report addressed to their damages.

[10] In yet another example of the pervasive bad faith that has informed DeSoto's conduct throughout this litigation, DeSoto has withheld key information -- such as the identities of former

Equally meritless is DeSoto's refusal to provide financial information -- information that will demonstrate the many ways in which defendants profited greatly from the use of the very Toshiba equipment that they now claim failed to meet its essential purpose. DeSoto's excuse is that it has produced its tax returns. DeSoto's tax returns are not, however, the only relevant financial information. DeSoto's returns do not break down information so as to allow anyone to tell what revenues were obtained from what sources. Further, they relate only to monies generated from the *technical* component of DeSoto's services. Dr. Carvel earned additional money, for which she billed separately through her professional corporation, Lynn T. Carvel, PLLC. For obvious reasons, Defendants want to conceal the fact that they made very considerable profits from the equipment that they now claim worked so poorly that they were entitled to reject it after having used it for fourteen months. In addition, the detailed financial records that Defendants are seeking to withhold will provide information from which trends can be discerned with regard to the use of the equipment that may shed light on Desoto's true motives for removing it.

Finally, other than images, DeSoto has refused to produce any information relating to the replacement equipment, such as: (1) information relating to when and with what DeSoto decided to replace the Toshiba equipment; (2) how much DeSoto spent to replace the equipment; and (3)

---

DeSoto physicians -- while trying to take discovery in a manner that has been grossly predatory. For example, in a blatant attempt to intimidate DeSoto's former Administrator, Paul King, DeSoto has subpoenaed Mr. King's wife -- who has never worked at DeSoto -- for a deposition to begin promptly upon the conclusion of Mr. King's deposition. Similarly predatory and improper, for reasons that will be explained in response to DeSoto's motion, is DeSoto's effort to have this Court compel the attendance at deposition of Mr. David Bennett, a TAMS employee who is a non-party, a person who had no substantive involvement with the Toshiba equipment installed at DeSoto (one DeSoto service call was passed along to him while he was serving as an emergency "on call" engineer, but he never even got through to DeSoto to speak with anyone there). These tactics, as well as those addressed in TAMS' pending Motion for Terminating Sanctions and other relief, reflect a degree of contempt for proper conduct that is quite unusual.

whether the replacement equipment met the expectations that Dr. Carvel claims she had with regard to the Toshiba equipment.

In defense of its position, DeSoto advances an argument that is simply nonsense. Analogizing itself to a customer who bought a Maytag washing machine, expecting a deluxe spin cycle and extra-large capacity, but ending up only with ruined clothes, DeSoto argues that Maytag would never insist upon knowing what the customer replaced the washing machine with. This is not a case about a Maytag washing machine. Rather, one of the things that DeSoto claims this case is about is this: Did Dr. Carvel tell TAMS and DLL personnel that she needed "top of the line" and "state of the art" equipment in order to meet her competition, and did she receive, from the people she claims gave them to her (including Dave Begy of DLL and Mike Smith, a former TAMS employee) oral "warranties" and "representations" that that is what she would receive? To put it neutrally, Mr. Begy and Mr. Smith disagree with Dr. Carvel's contentions about what they allegedly said. Obviously, if Dr. Carvel replaced Toshiba equipment with equipment that was *less* "top of the line" or *less* "state of the art" than the Toshiba equipment -- as she has admitted that she did in at least one case[11] -- that fact could be considered highly relevant to whether Dr. Carvel on the one hand, or Messrs. Begy and Smith on the other, should be believed.[12] Unless DeSoto has something to hide, there simply is no reason not to produce this information.

---

[11] Among Dr. Carvel's claims is the contention that she "thought" she needed and would be receiving a variable dual head nuclear camera that would "do hearts in fifteen minutes", but that she in fact received a fixed dual head camera that would not "do hearts" in fifteen minutes. When DeSoto de-installed the Toshiba nuclear camera, it replaced it with a single head camera, which not only could not "do hearts in fifteen minutes" but could do most procedures only half as quickly as the fixed dual head camera it replaced.

[12] While DeSoto claims that TAMS knows that it is in the wrong, TAMS in fact has a quite different view of what happened than that proffered by Defendants. TAMS believes that DeSoto de-installed the equipment soon after the warranty period ended simply because DeSoto would at

For the reasons set forth herein, and in its opening Memorandum of Law, TAMS respectfully requests that this Court grant its Motion to Compel and for Sanctions.

Respectfully Submitted,

Dated: October 30, 2003

*Julianne Peck*
John Chesney (Attorney I.D. No. 24458)
Julianne Peck (Attorney I.D. No. 79966)
Jonathan Sturz (Attorney I.D. No. 88153)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-1996
Attorneys for Plaintiff/Intervenor
Toshiba America Medical Systems, Inc.

---

that point have been required to begin paying for service.  By breaching its lease, it avoided payments under both the lease and service agreements and furthered what the evidence suggests has been a larger scale pattern designed, in order to line the pockets of DeSoto's principals, to defraud those with whom DeSoto deals, whether it be TAMS, DLL, third-party payors or others.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that today I caused a true and correct copy of

**Toshiba American Medical Systems, Inc.'s Reply Brief in Support of Motion To Compel**

**Discovery Directed To Defendants** and the Exhibits thereto to be served upon counsel of record

for all of the other parties to this proceeding as follows:

### VIA FEDERAL EXPRESS

Kyle P. Tate, Esquire
9085 Sandidge Center Cove
Olive Branch, Mississippi 38654

### VIA HAND DELIVERY

Rosetta B. Packer, Esquire
MCCARTER & ENGLISH
Mellon Bank Center, Suite 700
1735 Market Street
Philadelphia, PA 19103-7501

### VIA FEDERAL EXPRESS

William Matthews, Esquire
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102

Dated:  October 30, 2003

Julianne Peck

# Exhibit A

NS



# Provider Practice Analysis, LLC

2612 Greene Road  Suite 102
Baldwin, Maryland  21013

Telephone: 410-663-0057
Facsimile :  410-663-0171

Claudia Murray
Linda Watson
Dorothy Callahan, RN

Via Facsimile And First Class Mail

October 29, 2003

Julianne Peck, Esquire
Drinker, Biddle & Reath, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996

Re: Delage Landan Financial Services, Inc. and Toshiba America Medical Systems, Inc v.
DeSoto Diagnostic Imaging, LLC, etal, U.S.D.C. Eastern District of Pennsylvania, C.A.
No. 2:02CZ2810.

Dear Ms. Peck,

You have asked my company, Provider Practice Analysis, LLC (PPA) to review billing records information produced by defendant DeSoto Diagnostic Imaging, LLC, relating to radiological services by DeSoto between December 18, 2000 and February 28, 2002, to determine whether DeSoto fraudulently over-billed for services performed.

Based on our review of an electronic sample of 1,636 line-item services relating to Medicare patients and 1,192 line-item services relating to Medicaid, Blue Shield, other insurers and self-pay patients, we have identified various billing patterns that are consistent with DeSoto having overbilled for (a) unnecessary services, and/or (b) services it did not perform.  The degree, however, to which this can be definitively proven, requires the review of documents that we understand have been requested, but not yet produced, in this litigation.  These documents include the radiology requisitions from the referring physicians and the radiology reports for each service in question.

The billing patterns we identified that are consistent with unlawful overbilling include:
- High volume skull xrays with no apparent relationship to other same-day tests,
- Xrays routinely billed with MRI's and CT scans,
- Reconstruction routinely billed with MRI's and CT scans,
- Stress test supervision codes billed with SPECT perfusion studies,
- Bone density studies routinely billed in combination with xrays,
- Questionable combinations of Duplex Scans and Doppler studies,
- Services billed to patient after denial by Medicare as not medically necessary.

Another factor that indicates over-billing is the excessive number of services billed per patient. Based on the sample reviewed, the service/patient ratio at DeSoto was 3.61 for Medicare patients and 3.06 for all other insurers and self pay patients.  The current average radiology service/pt ratio, based upon ten years of multi-state paid claims database sampling for medical record review by PPA, is 2.0 - 2.5.

These practices, if proven by subsequent review of the underlying documents violate numerous Federal statutes and regulations, including: 42 C.F.R. Section 410.32(a) (relating to services performed without an order from a referring physician); and 42 U.S.C.A. Section 1320c-5(a) (relating to services that were not medically necessary).   These practices also violate Medicare carrier local medical review policies for radiology, CPT Coding Guidelines For Radiology Services, as published by the American Medical Association, Standards Of Appropriateness as published by the American College or Radiology, ICD-9-CM Diagnosis Coding Guidelines For Diagnostic Tests, as found in the Medicare Carriers Manual, Section 15021, and the Official ICD-9 Coding Guidelines.

Sincerely yours,

Claudia Murray, CEO

## Claudia Murray, Chief Operating Officer, University of Maryland, BA

Summary
Over twenty-five years in healthcare field, including:
- Eight years as a Healthcare Consultant with PPA, and
- Twenty years with a Medicare Carrier as a Medical and Utilization Review Specialist, Technical Trainer, Education Specialist, Professional Relations Representative and HCFA Liaison

Experience
*With PPA:* Started and grew a successful service company, assisted with the development of proprietary software and other products, including the RBMA and PPA Compliance Implementation Toolkit ™, the HIPAA Workbook for Privacy and Security, negotiated and coordinated client contracts, provided on-site review and educational seminars.

*Board of Advisors*: "Radiology Administrator's Compliance Reimbursement Insider",

*Contributing Author:* RBMA and PPA Compliance Implementation Toolkit ™, the HIPAA Workbook for Privacy and Security, "Credit & Collection" For the Medical Group Practice / The Hospital Business Office Manager (VISA), and *a monthly contributor for the* RBMA Bulletin and the quarterly "Medicare Report" as well as Special Reports for the provider community.

*Presentations / Seminars*:
National RBMA 1995-2003, and RBMA Toolkit™ and HIPAA Workbook Seminars
National Healthcare Affiliated CPA Network
Healthcare Lawyers Association
State CPA, RBMA and MGMA chapters
State Medical Societies
National Association of Freestanding Radiation Oncology Centers (AFROC)
Society of Cardiovascular & Interventional Radiology (SCVIR) Cybersession Series

*With a Medicare Carrier:* Instructed medical billing companies, ambulatory surgical centers and physician practices in ICD-9, CPT and HCPCS coding, proper medical record documentation, Medicare medical policy and federal regulations. Trained claims processing personnel, service and professional relations representatives and the Fraud and Abuse Department in correct ICD-9, CPT and HCPCS coding, medical policy and the Medicare Carriers Manual

Conducted seminars, liaison meetings for HCFA policy and implementation, authored or co-authored training, service and processing instructional manuals, the quarterly "Medicare Report" as well as Special Reports for the provider community. Focused Medical Review Committee Member for post-payment auditing and overpayment recovery

**Member**: Health Care Compliance Association (HCCA), Medical Group Management Associations, (MGMA), Privacy Officer's Association (POA) and Radiology Business Management Association (RBMA) where she is a member of both the Education and Editorial Committees.

*Previous Cases:* Deposed in December, 2002 by MedQuest Associates, Inc.

Exhibit B

NS

## REPORT OF DEFENDANTS' EXPERT
### Rendered Under Rule 26(a)(2)(B)
### Federal Rules of Civil Procedure

### October 24, 2003

Tate Law Firm
9085 Sandidge Center Cove
Olive Branch, MS 38654

### Nature of Engagement

I was engaged by you to render an opinion as to the quality of the radiological images produced by both the Toshiba medical equipment and the replacement medical equipment in the matter of De Lage Landen Financial Services, Inc. and Toshiba America Medical Services, Inc. v. DeSoto Diagnostic Imaging, LLC, Randon J. Carvel, Lynn T. Carvel, Delta Radiology, PC, and Zobar Properties, LLC, pending in the US District Court, Eastern District of Pennsylvania, No. 2:02CV2810.

### Information Considered

The specific information and documents relied upon in reaching my conclusions are set forth in Appendix A to this report. With the exception of my interviews with Dr. Lynn Carvel, the remaining information consisting of discovery in this matter may also be used as exhibits at trial and/or at deposition in support of my opinion.

In performing my analyses and in reaching my conclusions, I have also relied upon my knowledge, training and professional experience as a Radiologist.

### Qualifications and Previous Testimony

A summary of my qualifications, including all publications within the past ten years, and previous testimony in the last four years, is presented in Appendix B to this report.

### Compensation

My compensation is not contingent in any way on the outcome of this litigation, and is based upon normal hourly rates in effect for my services. To date, I have spent approximately 36 hours in reviewing the images taken during medical exams performed on the Toshiba medical equipment and images taken on the replacement equipment, together with the "Information Considered" as specified above, to be billed at $250.00 per hour, for a total of $9,000.00.

## Opinions

In reviewing the images taken during medical exams performed on the Toshiba medical equipment, I reviewed the Toshiba images set forth in DDI V0001 through DDI V0180, and the electronic images from exams taken on replacement equipment were viewed on-site at DeSoto Diagnostic Imaging, LLC. To a reasonable degree of medical /radiological certainty, I recognized in the Toshiba images at least the following abnormalities which occurred in unusually high numbers, which in my opinion cannot be attributed to radiological technician error, including, but not limited to: white dot artifacts, unusual amounts of background noise, ghosting and overall poor image quality. My further opinion is that these abnormalities were caused by the Toshiba equipment. I have compiled a list representing examples of images in which the foregoing abnormalities have occurred, attached hereto as Appendix C to this report. This list is not intended to be comprehensive, but is rather sampling of abnormalities I have recognized in the Toshiba images. To the extent that an image is not included in this list, it should not be taken as an indication that the image is, in my opinion, acceptable.

While the images were of the quality that could be considered diagnostic, it is my opinion that overall, the Toshiba images were of an uncommonly poor quality for a 1.5 Tesla MRI. My review also consisted of a review of the brochures and specifications for the separate modalities and in light of the image quality promised of such equipment, it is my opinion that the images produced fell below that which a reasonable radiologist could have expected from this equipment.

In my review of the images taken on the replacement equipment, I found these images to be of a very high quality, with little or no abnormalities as seen in the images taken on the Toshiba equipment.

Should additional information or facts be made available to me that would cause any modification to my opinions, I will promptly update this report and resubmit it to all parties in this litigation.

Respectfully Submitted,

Jason K. Morris, MD

-2-

**Appendix A**
**Information Considered**
**EXHIBITS**

Interviews, Lynn T. Carvel, MD, on-site at DeSoto Diagnostic Imaging, LLC and via telephone

Volumes I and II, 30(B)(6) Deposition of DeSoto Diagnostic Imaging, LLC, by Lynn T. Carvel, MD, taken July 21 and 22, 2003

- In addition to the deposition transcripts themselves, I considered deposition exhibits, specifically, Exhibit 11 to Volume I, setting forth warranty information, modality Quotation Order/Order Summaries, and brochures on the medical equipment

Information regarding specifications of Toshiba medical equipment and replacement medical equipment

- DDI 001082 through 001094, Toshiba Excelart MRI Quotation Order/Order Summary
- DDI 000796 through 000800, Toshiba Image Maker Services materials
- DDI 001015 through 001026, Toshiba Asteion VF CT Scanner Quotation Order/Order Summary
- DDI 001115 through 001132, Asteion/VI KW CT Scanner Quotation Order/Order Summary
- DDI 001157 through 001162, Toshiba Fluoroex Dua-450D EPS System, Quotation Order/Order Summary
- DDI 001185 through 001198, Toshiba Gamma camera, Single Head Spect Quotation Order/Order Summary
- DDI 001212 through 001215, Toshiba Powervision 6000 Digital Ultrasound System Quotation Order/Order Summary

Electronic images from exams taken on Toshiba equipment, including MRI, Ultrasound and X-Ray, DDI V0001 through DDI V0180

Electronic images from exams taken on replacement equipment, including MRI, Ultrasound and X-Ray, viewed on-site at DeSoto Diagnostic Imaging, LLC

Summary of Toshiba's Poor Quality Images From DeSoto Diagnostic Imaging, prepared by Lynn Carvel, MD, DDI 7000 through 7023

-3-

**Appendix B**
CURRICULUM VITAE

# JASON K. MORRIS, MD

**ADDRESS:**  618 Frederick Drive
Cleveland, Mississippi 38732

**BUSINESS ADDRESS:**  Bolivar Medical Center
Highway 8 East
Cleveland, Mississippi 38732

**TELEPHONE NUMBERS:**  662-846-8989 (home)
662-846-2593 (office)
662-846-1187 (office fax)

**DATE OF BIRTH:**  July 4, 1967

**MARITAL STATUS:**  Married: Lori. Children: Natalia, Christina and
Hannah.

**EDUCATION:**

**RESIDENCY:**
1993 – 1997         Diagnostic Radiology
Baptist Memorial Hospital, Memphis TN
Program Director: Robert D. Ferguson, M.D

**MEDICAL SCHOOL:**
1989 – 1993         Mercer University School of Medicine, Macon,
Georgia

**UNDERGRADUATE:**
1985 – 1989         Mercer University, Macon, Georgia
Bachelor of Science, Cum Laude, Biology

Honors:         Southern Medical Association Scholarship Award
1990
Kappa Alpha Order Scholarship Award (2) – 1989
Beta Beta Beta Honor Fraternity Historian – 1988 –
1989
Gamma Sigma Epsilon Honor Fraternity – 1988 –
1989
National Deans List – 1985 – 1989

-4-

**EMPLOYMENT:**

| | |
|---|---|
| 2000 – Present | Bolivar Medical Center, Cleveland Mississippi<br>Chief of Radiology, Radiation Safety officer |
| 1999 – Present | South Sunflower County Hospital, Indianola, Mississippi |
| 1999 – Present | North Sunflower County Hospital, Ruleville, Mississippi |
| 1998 – Present | Greenwood Leflore Hospital, Greenwood, Mississippi<br>Prior Chief of Radiology, Radiation Safety officer, CME Director |

**MEMBERSHIP/<br>PROFESSIONAL SOCIETIES:**   American College of Radiology
Radiological Society of North America
American Roentgen Ray Society
American Medical Association
Mississippi State Medical Association
American Society of Nuclear Cardiology
Society of Cardiovascular and Interventional Radiology
Society of Nuclear Medicine
American Academy of Pain Medicine
International Spine Injection Society

**BOARD CERTIFICATION:**   National Boards Certification, 1993
Diplomat, American Board of Radiology, 1997

**MEDICAL LICENSURE:**   Arkansas, issued 1995
Tennessee, issued 1994
Mississippi, issued 1995
Georgia, issued 1995

**AREAS OF SPECIAL<br>COMPETENCE:**   MRI, interventional radiology, pain management

**MAJOR PROJECTS:**   Chairman Health Committee for Cleveland Chamber of Commerce
Vice President of Delta Jazz Society

**PROFESSIONAL AND<br>BUSINESS CREDENTIALS:**   CEO M-RAD Diagnostic Imaging Specialists

-5-

**PUBLICATIONS WITHIN
PRECEDING TEN YEARS:**          None

**COURT AND DEPOSITION
TESTIMONY WITHIN
PRECEDING TEN YEARS:**          None

-6-

**Appendix C**
**Sampling of Abnormalities Occurring in Toshiba Equipment Images\***

### Table 1. White Dot Artifacts

|     | Date    | Exam                | Patient ID |   |
|-----|---------|---------------------|------------|---|
| 1.  | 4/18/01 | MRI Lumbar Spine    | 2968       |   |
| 2.  | 4/20/01 | MRI Thoracic Spine  | 3502       |   |
| 3.  | 4/21/01 | MRI Lumbar Spine    | 23463      |   |
| 4.  | 4/24/01 | MRI Cervical Spine  | 3550       |   |
| 5.  | 4/26/01 | MRI Lumbar Spine    | 3598       |   |
| 6.  | 4/26/01 | MRI Lumbar Spine    | 3625       |   |
| 7.  | 4/25/01 | MRI Lumbar Spine    | 3570       |   |
| 8.  | 5/1/01  | MRI Lumbar Spine    | 3688       |   |
| 9.  | 5/4/01  | MRI Lumbar Spine    | 3779       |   |
| 10. | 5/4/01  | MRI Lumbar Spine    | 3675       |   |

\* As previously stated, this table is not intended to be, nor should it be construed as, a comprehensive listing of each and every abnormality within each and every Toshiba image. Rather, it is simply a sampling of abnormalities I recognized within the Toshiba images. To the extent that an image is not included in this table, it should not be taken as an indication that the image is, in my opinion, acceptable.

-7-

Table 2. Inadequate Fat-Saturation

|     | Date    | Exam          | Patient ID |
|-----|---------|---------------|------------|
| 1.  | 7/2/01  | MRI SHOULDER  | 4547       |
| 2.  | 12/3/01 | MRI Knee      | 6357       |
| 3.  | 1/3/02  | MRI Knee      | 9372       |
| 4.  | 7/2/01  | MRI SHOULDER  | 4547       |
| 5.  | 3/26/01 | MRI SHOULDER  | 3003       |
| 6.  | 5/2/01  | MRI ORBITS    | 3731       |
| 7.  | 7/11/01 | MRI SHOULDER  | 4712       |
| 8.  | 7/13/01 | MRI KNEE      | 4802       |
| 9.  | 8/4/01  | MRI SHOULDER  | 5188       |
| 10. | 6/4/01  | MRI KNEE      | 4199       |

-8-

Table 3. Ghosting

|     | Date     | Exam                | Patient ID |     |
|-----|----------|---------------------|------------|-----|
| 1.  | 12/12/01 | MRI BRAIN           | 9081       |     |
| 2.  | 1/8/02   | MRI CERVICAL SPINE  | 9458       |     |
| 3.  | 1/10/02  | MRI BRAIN           | 9622       |     |
| 4.  | 1/25/02  | MRI BRAIN           | 10191      |     |
| 5.  | 12/11/02 | MRI BRAIN           | 8749       |     |
| 6.  | 2/7/02   | MRI CERVICAL SPINE  | 22535      |     |
| 7.  | 7/2/01   | MRI SHOULDER        | 4547       |     |
| 8.  | 8/6/01   | MRI BRAIN           | 5373       |     |
| 9.  | 12/27/01 | MRI CERVICAL SPINE  | 9207       |     |
| 10. | 8/24/01  | MRI BRAIN           | 6078       |     |

Table 4. Poor Quality Images with Variety of Problems

|     | Date     | Exam                | Patient ID |  |
|-----|----------|---------------------|------------|--|
| 1.  | 3/16/01  | MRI LUMBAR SPINE    | 2850       |  |
| 2.  | 8/13/01  | MRI THORACIC SPINE  | 5446       |  |
| 3.  | 11/5/01  | MRI LUMBAR SPINE    | 8355       |  |
| 4.  | 11/5/01  | MRI THORACIC SPINE  | 8355       |  |
| 5.  | 7/24/01  | MRI BRAIN           | 4846       |  |
| 6.  | 12/18/01 | MRI LUMBAR SPINE    | 9148       |  |
| 7.  | 2/21/02  | MRI LUMBAR SPINE    | 10828      |  |
| 8.  | 3/16/01  | MRI BRAIN           | 2868       |  |
| 9.  | 8/7/01   | MRI LUMBAR SPINE    | 5309       |  |
| 10. | 9/12/01  | MRI CERVICAL SPINE  | 6720       |  |

-10-

Exhibit C

NS

October 28, 2003

Mr. Kyle Tate
Tate Law Firm
9085 Sandidge Center Cove
Olive Branch, MS 38654

RE:    De Lage Landen Financial Services, Inc., Plaintiff, Toshiba America Medical
       Systems, Inc., Plaintiff/Intervenor, v. DeSoto Diagnostic Imaging, LLC, Randon J.
       Carvel, Lynn T. Carvel, Delta Radiology, PC, and Zobar Properties
       USDC No. 2:02CV2810

Dear Mr. Tate:

At your request I have reviewed the materials set forth in Appendix A, and conducted
an on-site inspection of the Toshiba medical equipment located in Tustin, California and
at the O'Neil relocation in Garden Grove, California including the (1) Toshiba
Powervision 6000 Ultrasound unit, (2) Toshiba Fluorex DUA-450D R&F system, (3)
Toshiba GCA-7200 Gamma camera, (4) Toshiba Asteion CT Scanner and the (5)
Toshiba Excelart MRI for the purpose of providing the opinions herein. The actual
magnet for the Toshiba Excelart MRI was not available for inspection and I have
learned that the magnet itself is apparently located at an Oxford Magnet facility in
Cartaret, New Jersey. Should you desire that I conduct an inspection of the magnet, I
will be available, and will supplement this report accordingly.

My investigation has been directed toward providing you with opinions on (1) the value
of the Toshiba medical equipment at the time the equipment was removed from DeSoto
Diagnostic Imaging, LLC in Olive Branch, Mississippi, and (2) the service issues
presented in this case, including whether the Toshiba America Medical Systems, Inc.
Field Service Engineers were properly trained to install, maintain and service the
Toshiba medical equipment, whether the Toshiba medical equipment as sold would
perform basic imaging functions as would be expected by a typical client, and whether
premature installation could, in fact, lead to long-term mechanical problems with the
Toshiba medical equipment.

All opinions I express in this report are based upon my experience, education, and
training and are stated within a reasonable degree of service-engineering certainty. I
have attached a statement of my qualifications as Appendix B. My compensation is not
contingent in any way on the outcome of this litigation. To date I have been paid
$2,585.25 for my time, which is billed at $135.00 per hour. I have never provided expert
testimony, nor been consulted as an expert witness in any matter.

## OPINIONS

I. Equipment Evaluation

**INSPECTION**

**Toshiba SSA-370A-30**
**PowerVision 6000 Ultrasound System**
Located at TAMS Tustin, CA

System is in average condition, however was quite dirty. All transducers in very good condition. The system powers up and functions properly with the exception of 16cm, 20cm, and 24cm TGC LED indicators. The plasma display and touch screen function properly. CRT has no noticeable raster burn. Contrary to the report of West Valley Imaging, my investigation showed that physiologic cables, PCG microphone, system software, system manuals, and some spare small hardware were in fact present.

**Toshiba Flourex DUA-450 R/F System**
Located at O'Neil Relocation Garden Grove, CA

The system is in below average cosmetic condition, and was already uncrated when I arrived. The OTC was packed upside down on a pallet with the x-ray tube and collimator assembly attached. The image intensifier assembly was poorly packed on its side with the output objective lens still attached. The R/F table was packed on a pallet with various pieces of unmarked hardware laying at its base. The spot film device was not attached to the table. The system cables I inspected appeared to be in good condition. The tomo attachment was packed poorly on its side. The system x-ray generator cabinets were covered in plastic without covers. The chest stand appeared to be intact. The monitor suspension system is present as are the high-resolution monitors, digital system, and manuals.

**Toshiba GCA-7200/PI Gamma Camera**
Located at O'Neil Relocation Garden Grove, CA

The system is in average cosmetic condition. The system detector assemblies appeared to be packed in thermally insulated crates. The control desk and processing computer were packed together in the same crate and the detector electronics were laid on top of the control desk in a helter-skelter fashion totally unprotected. The patient table was present. QC and bar phantoms were found. Collimator stand and crate marked "collimators" were found. No cables or manuals noted.

**Toshiba Asteion CT Scanner**
Located at O'Neil Relocation Garden Grove, CA

2

The CT system is in average cosmetic condition, however massive amounts of black dust/soot noted on the front cover and on the inside of the gantry, enclosed in shrink wrap. The system appears to have been left uncovered or unpacked and stored in a dirty location after removal from DDI, and then shrink wrapped without first being cleaned to remove the dust/soot. I cannot tell how long the CT has been stored in this condition. The patient table was located as were system control cabinets and control desk. No manuals, phantoms, or software noted. Accessories and other miscellaneous items noted. System slice count is 121,178. X-ray tube count is unknown.

**Toshiba Excelart MRI System**
Located at O'Neil Relocation Garden Grove, CA

The MRI system was crated and the magnet and cryogen systems are at the Oxford location in New Jersey. The items present for inspection appeared to be in average cosmetic condition. Noted on site were the gradient cabinets, system covers, computer system, chiller, and patient table. Noted were two containers with system cables. Also noted were the body, head, spine, shoulder, and circular coils in good condition. Accessories and miscellaneous items noted packed in crates. No overt damage to any item was noted.


## VALUATION

Prior to its removal from DDI, the equipment was first properly deinstalled. The Toshiba equipment was then removed from DDI on April 9-12, 2002. It is my opinion that the valuation of the equipment should have been performed at that time by the owner of this equipment, De Lage Landen Financial Services, Inc., or by TAMS, as it appears this equipment has been under TAMS' control since being removed from DDI. To my knowledge this was not done. If the owner of this equipment was interested in mitigating any damage or potential loss of re-sale value, then it would have been reasonable for the owner to have performed a valuation prior to the removal of the equipment. It is my opinion that the owner of the equipment, in not doing so, fell below the reasonable industry standards.

Based upon the information I have reviewed, the first valuation of this equipment was performed by West Valley Imaging at the request of De Lage Landen Financial Services on January 9, 2003, almost a year after the equipment was removed.

Based upon my inspection of the equipment, it appears that some of the equipment was packaged or crated improperly and stored improperly. Further, based upon my inspection it appears that the equipment was not properly staged, or prepared for remarketing, at the time of its removal, which indicates that the equipment was not being prepared to be resold or remarketed, as is customary in the industry. It is my opinion that DLL and/or TAMS have failed to act in a commercially reasonable manner in allowing the equipment to sit in a storage facility for over a year without properly

3

maintaining the equipment, and that they have further failed to take commercially reasonable steps to remarket or resell the equipment.

That being said, after having been stored improperly for such a great length of time, it is highly probable that there will have to be repairs made, parts replaced, and updates performed to put this equipment into sellable condition that, had the equipment been properly staged, would not now be necessary. Staging and repair of this equipment must be performed prior to resale. Monetary consideration for warranty and installation and any sales commission and net gain must be included in the final price. The foundation of my valuation of the medical imaging equipment is based this, and upon the following criteria I use to determine the value of any used or refurbished imaging equipment:

1. Age of equipment
2. Condition of equipment
3. Functionality of equipment
4. Manufacturer of equipment (marketshare/popularity of equipment)
5. The end-user price (with or without warranty, installation cost, or commission costs)

Upon performing my inspection, the only system capable of power up and function testing was the Toshiba SSA-370A-30 Ultrasound system. All other equipment was/is disassembled and crated or partially crated, and was not in a condition that I could actually power up or perform function testing. Due to the conditions under which I examined the equipment and TAMS' failure to power up the equipment (other than the ultrasound system), it is impossible to evaluate the functional or imaging capabilities of the equipment located at O'Neil Relocation to give a current value of the equipment in its present condition. In the event that TAMS will agree to power up the equipment to allow me to perform function testing, I will promptly update this report and resubmit it to all parties in this litigation.

That being said, I submit the following valuation, and note that all prices include system cost, service and repair, installation, warranty, commission, and net profit **as of April, 2002:**

| | |
|---|---|
| Toshiba ExcelArt MRI System | $775,000.00 to $805,000.00 |
| Toshiba Asteion CT System | $265,000.00 to $295,000.00 |
| Toshiba GCA-7200A Dual Gamma Camera | $185,000.00 to $205,000.00 |
| Toshiba DUA-450 R/F System | $ 95,000.00 to $104,000.00 |
| Toshiba PowerVision 6000 Ultrasound | $ 69,000.00 to $ 75,000.00 |

4

It is my opinion that TAMS' and/or DLL's intentional failure to properly prepare the equipment for remarketing or re-sell at the time of its removal from DDI has caused the value of the medical imaging equipment to substantially, and unnecessarily, decrease due to no fault of DDI. It is also my opinion that the West Valley Imaging "as-is/where-is" evaluation of the medical imaging equipment is irrelevant, because at the time the equipment was removed from DDI the equipment had been stored improperly in a warehouse. No preventative maintenance was performed on the equipment, due to no fault of DDI, and further, an "as-is/where-is" valuation fails to provide an proper evaluation of the equipment at the pertinent time. DDI should not be punished by TAMS and/or DLL's failure to act, in this case by their failure to capture the value of the equipment at the relevant time of its removal.

## II. Service Issues

From my review of these materials, it appears that from the time the Toshiba medical equipment was prematurely delivered and installed, Desoto Diagnostic Imaging had an unusually large number of service-related problems with the medical equipment, ranging from the less-serious to crucial or critical problems, that Toshiba was ill-equipped to address or resolve.

In order for a manufacturer or distributor of medical equipment to provide its customers with adequate service and technical support on any imaging modality, it is imperative that the support personnel are properly trained, which would mean that the support personnel has, at a minimum, completed training on the modality upon which he or she is required to work and supervised on-the-job training. From my review of these materials, it is apparent that this minimum criterion was not met with local support personnel sent from Toshiba to service the medical equipment at DeSoto Diagnostic Imaging. For example, Toshiba's own disclosures reveal that a service technician that was sent to DDI to work on their Excelart MRI had not even completed a basic training course for servicing that specific equipment, and was completely ill equipped to handle problems of the nature or type that DDI was having. "There is no substitute for having a fully trained engineer in the immediate area." (TAMS 5550). It is my opinion that the Toshiba America Medical Systems, Inc. Field Service Engineers were not properly trained to install, maintain and service the Toshiba medical equipment.

It has been my experience in working with diagnostic imaging equipment that equipment meeting certain specifications can reasonably be expected to perform consistently with similar equipment with the same specifications, i.e., any MRI with a 1.5 Tesla magnet should produce a certain consistent quality image regardless of the manufacturer. Based upon my review of the documents mentioned above, I believe that the equipment DDI received was incapable of providing the consistent image quality that a reasonable client could expect from a magnet of that power, and is supported by Toshiba's own MRI Applications Site Reports.

5

In my opinion, it is entirely reasonable to expect undistorted body studies, consistently, without the necessity of purchasing additional medical equipment. If Toshiba understood that a specific coil was necessary in order to produce acceptable body images, as is evidenced by Toshiba's own MRI Applications Site Reports, then it is reasonable to expect that coil to have been included with the purchase of the MRI system, or at least disclosed to the buyer that this coil was needed in order to produce acceptable body images.

Lastly, and notably, Toshiba's own time line states that "systems delivered to a construction site with no heat/electricity and few windows. Installation of all systems were completed by the required deadline to achieve financing objectives." (TAMS 182) In my professional experience, I have witnessed the destructive effect that drastic temperature changes and dust and debris can have on such sensitive medical equipment. It is my opinion that the premature delivery of the equipment at Toshiba's insistence could have lead to the long-term problems DDI had with the Toshiba medical equipment. It is well known within the industry that equipment should never be delivered to an unfinished site for these reasons. I believe with reasonable certainty that delivery of the equipment into a suitable environment would have reduced the probability of technical problems and equipment malfunctions with the Toshiba medical equipment.

Should additional information or facts be made available to me that would cause any modifications to my opinions, I will promptly update this report and resubmit it to all parties in this litigation.

Sincerely,

Danny Strain

6

Appendix A
MATERIALS REVIEWED
EXHIBITS

1.  MRI Applications Site Reports
2.  Chronological time line of Desoto Diagnostic Imaging Events
3.  Toshiba America Medical Systems, Inc. Historical Activity Reports
4.  Toshiba America Medical Systems, Inc. Work Orders, Service Worksheets, and Work Order Inquiries
5.  Toshiba America Medical Systems, Inc. Field Service Reports and Field Service Subcase Reports
6.  Toshiba America Medical Systems, Inc. Case Reports
7.  Toshiba America Medical Systems, Inc. Potential Complaint Report Forms
8.  Toshiba Warranty Information
9.  Toshiba Quotation/Order - Order Summary, Order Detail, Service Agreement and Addendum to Service Maintenance Agreement for each modality
10. Desoto Diagnostic Imaging Nuclear Medicine Journal
11. Desoto Diagnostic Imaging X-Ray Journal
12. Desoto Diagnostic Imaging MRI Journal
13. Transcript from deposition of Lynn T. Carvel
14. Compact discs containing operational manuals. Note: this was a substantial amount of information and was not provided to me until on or about October 8, 2003. I have been unable to thoroughly review these materials, and reserve the right to supplement this report should my examination reveal additional information which would change my opinions expressed herein
15. January 15, 2003 Equipment Evaluation from West Valley Imaging
16. Memorandum from Gary Hall to Phil Schneck regarding Desoto Equipment and Eisenberg CT (DLL 001075-77)
17. Various e-mails, written correspondence and memoranda disclosed in this matter which includes TAMS 1575 – 77, TAMS 286, TAMS 360 – 67, TAMS 550, TAMS 1490 – 1492, DLL 001096, DLL 000406 – 407, DLL 000404 – 5, DLL 001102 – 3, DLL 406 – 7, DLL 001074, DLL 000355, DLL 000185, DLL 000948 – 9, DLL 000938, and DLL 001078-79.
18. Digital photographs taken during physical inspection of equipment, submitted simultaneously with this report

7

Exhibit D

NS

October 28, 2003

Mr. Kyle Tate
Tate Law Firm
9085 Sandidge Center Cove
Olive Branch, MS 38654

RE:    *De Lage Landen Financial Services, Inc. and Toshiba American
        Medical Systems, Inc. v. DeSoto Diagnostic Imaging, L.L.C. et. al.
        Case No. 2: 02CV2810 United States District Court for the Eastern
        District of Pennsylvania*

Dear Mr. Tate:

I have reviewed the Toshiba Excelart MRI images obtained at DDI
and the service records for the period of 12/00 through 2/02, together
with the information set forth in Exhibit A. Based upon my training and
experience with MRI images produced by MRI equipment including but
not limited to, the Siemens 1.5T Symphony, Siemens 1.5T SP, Siemens
1.0T SP, Siemens 1.5T Vision, GE 1.5T 4X, GE 1.5T 5X, GE 1.0T LX, GE
1.5T LX Echospeed, Hitachi 0.3T MRP 7000, Siemens 0.2T Viva and GE
0.2T Profile, it is my opinion to a reasonable degree of radiologic
technologist certainty that there were inherent problems with DDI's
Excelart MRI throughout its existence in the facility. Some of these
problems that appeared to be inherent in the Toshiba medical
equipment, regardless of the skills of the radiologic technologists,
included severe ghosting, white dot artifact, inadequate DWI sequences,
homogeneity problems and overall poor image quality.

It is also my opinion to a reasonable degree of radiologic
technologist certainty that these are not problems that could have been
created or caused by the MRI technologists. The role of a radiologic
technologist is to produce, to the extent possible with the equipment
available, a readable film for the radiologist to interpret. Based upon my
review of the applications site reports, the Toshiba Applications
Specialists were sent in several times in an attempt to "properly train"
the technologists at DDI. The documents I reviewed showed that the
Application Specialists were faced with the same problems that the
radiologic technologists had encountered. In my experience, the
Applications Specialists are considered the experts in (1) setting up
application protocols for all the various MRI exams (2) educating the MRI
technologists on how to use the system and on (3) how to improve image
quality with difficult patient exams.

Some of a MRI technologist's responsibilities include: (1) working directly with the radiologist to acquire the desired sequences for each examination, (2) notifying the radiologist when experiencing problems with the MRI, including, but not limited to artifacts, degradation of image quality, inaccurate shimming and inhomogeneity of the magnetic field, (3) if the technologist is unable to remedy the problem(s), then he/she would then be responsible for placing a service call to the MRI vendor. It is not the responsibility of a technologist to interpret studies or make the final determination as to adequacy of image quality.

Additionally, my review the Expert Report of Dr. Jason Morris and his Sampling of Abnormalities Occurring in Toshiba Equipment Images prepared by Dr. Morris, together with the Interrogatory responses of DeSoto Diagnostic Imaging, indicates that many of the radiologic technologists employed by DeSoto who worked on the Toshiba medical equipment also worked on the replacement equipment after the Toshiba equipment was removed. Based upon the report of Dr. Morris and the interrogatory responses of DeSoto, there does not appear to be a radical change in radiologic technologists to which the improvement in replacement equipment images can be attributed.

Per your request, I have provided the above opinion on the performance and reliability of the Toshiba medical equipment, specifically the Toshiba MRI, as well as technologist responsibilities and the likelihood that the poor image quality was caused by radiologic technologist error. In performing my analyses and in reaching my conclusions, I have relied upon my knowledge, training and professional experience as a registered MRI, CT and radiologic technologist.

A summary of my qualifications, including all publications within the past ten years, and previous testimony in the last four years, is presented in Exhibit B to this report. My compensation is not contingent in any way on the outcome of this litigation, and is based upon $100 per hour spent for my services.

Sincerely,

J. Chris Long

2

**Exhibit A**

## INFORMATION CONSIDERED - EXHIBITS

1. MRI Applications Site Reports, including but not limited to TAMS 214
– 216, 1126 – 1129, 1149 – 1151, 1155, 2473 – 2492, 2900 – 2911,
3267, 6113, 6126

2. Field Service Subcase Reports and service worksheets, including but
not limited to TAMS 1590 – 1662, 3277

3. Historical Activity Reports, including but not limited to TAMS 4116

4. Interviews with Dr. Lynn Carvel

5. Defendants' Response to First Set of Interrogatories Propounded by
Toshiba America Medical Systems, Inc., interrogatory number 1.

3