## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : | CIVIL ACTION NO. 2:02CV2810 |
| Plaintiff, | : | |
| | : | HON. RONALD L. BUCKWALTER |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC. | : | |
| Plaintiff/Intervenor, | : | |
| | : | |
| v. | : | |
| | : | |
| DESOTO DIAGNOSTIC IMAGING, LLC., RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC | : | |
| Defendants. | : | |

### REPLY BRIEF IN SUPPORT OF
### PLAINTIFF/INTERVENOR'S MOTION FOR TERMINATING SANCTIONS AGAINST DEFENDANTS AND FOR REVOCATION OF THE *PRO HAC VICE* ADMISSION OF, AND FOR THE DISQUALIFICATION OF, KYLE P. TATE, ESQUIRE

### Introduction

As shown below, Defendants' response to this motion does nothing whatever to call into question the fact that Mr. Tate and Dr. Carvel have been engaged in an ongoing, concerted effort to distort testimony, to intimidate and bribe witnesses and to undermine the judicial process. Indeed, this conclusion is buttressed by additional evidence that has been uncovered since the motion was filed and, remarkably, by conduct that Dr. Carvel has *continued* to engage in since that motion was filed.

Basically, Defendants and Mr. Tate contend that they should not be sanctioned based upon the following arguments:

(1) Although Mr. Tate concededly lied to opposing counsel by stating that he had produced all witness tapes while he was consciously concealing the tape of his conversation with Mr. Mike Smith, Mr. Tate was entitled to lie;

(2) Despite Mr. Tate's admitted untruthfulness, the Court should prefer his and Dr. Carvel's self-serving -- and frequently *hearsay* -- contentions to the sworn declarations of *five* disinterested parties who are no longer affiliated with any party to this litigation, as well as to the concededly unsworn, but unsolicited, message from Mr. Barry McAllister expressing concern that his employees were being harassed;

(3) The Court should believe that Defendants, despite the assiduity with which they surreptitiously recorded their conversations with third parties -- to the point of taping what Defendants characterize as a mere social call between Dr. Carvel and Pam Kure[1] -- accidentally and unintentionally did *not* tape *any* of the conversations that bear directly on the subject matter of this motion.[2]

As shown below, Defendants' self-serving "explanations" in many respects actually *confirm* the positions that TAMS set forth in its opening papers[3], in many respects rely upon partial and misleading accounts of the facts[4] and in many respects are inherently implausible.[5]

---

[1] See Defendants' Opposition at 7-9. The point is there is no transcript of the call where Carvel made her "pitch", but evidence that Carvel was getting frantic after she made it. *See* Defendants' Exhibit "4" (Transcript of September 26, 2003 call).

[2] TAMS suggests that the record shows that either of two alternative conclusions would be much more plausible: Either those conversations were not taped *deliberately*, so as not to create a record of their content, or any tapes that were made were not retained or at least have not been produced.

[3] For instance, Mr. Tate does not dispute that on July 9, 2003, he told counsel for TAMS that he was representing Mr. Paul King in connection with this litigation, that at least by July 15, 2003 he knew that he would *not* be representing Mr. King, and that he purposely failed to disclose this to counsel for TAMS.

[4] *See, e.g.,* the discussion of communications between counsel regarding settlement at pages 25-27, *infra.*

[5] *See, e.g.,* Defendants' claim that they were "concerned" that the testimony of former DeSoto technologists in this action might violate their HIPAA obligations despite the fact that HIPAA information revealed in this action is fully

Also, as mentioned above, not *one* of the independent witnesses -- Pam Kure, Brian Gibbs, Cindi Holmes, Mike Smith and Paul King -- has taken an affidavit to support Defendants' contentions, and there is not *one* tape recording to corroborate Defendants' characterizations of the key communications.

Even more tellingly, since TAMS' motion was filed, *additional* evidence of Defendants' misconduct has been uncovered *and* there is evidence that Defendants have *continued* their efforts to influence the testimony of witnesses. In particular, and as discussed below, Defendants have had improper dealings with former TAMS employee David Steiff and have -- *after the instant motion was filed* -- persisted in illuminating how they attempt to influence witnesses by contacting a former DeSoto technologist, Ms. Erin Singer. The evidence that Defendants have been engaged in a concerted effort to prevent a fair trial is not only clear, it continues to grow. In the egregious circumstances present in this case, and in the face of Defendants' arrogant assurance that they can violate the rules of fair play with impunity, the only meaningful sanction is the entry of judgment against Defendants and Mr. Tate's removal from all further proceedings in this action.

### A.    Mr. Tate's Improper Dealings With Michael Smith Are Undisputed.

#### 1.    *Mr. Tate Falsely Stated That He Had Produced All Tapes of Conversations with Potential Witnesses While Deliberately Concealing a Recorded Conversation with Mr. Smith*

There is one item of conduct that Defendants can neither deny nor effectively "spin", because it was recorded as part of the deposition of TAMS employee Donnie Jenkins in this action. It is undisputed that Mr. Tate falsely represented to opposing counsel that he had produced all tape recorded conversations with witnesses when, in fact, he was concealing the

---

covered by a Protective Order that the parties negotiated, and the Court signed, in order to allow discovery of such information without violation of the statute.

surreptitiously taped conversation with former TAMS employee, Mr. Smith. Mr. Tate does not claim that this was an inadvertent misrepresentation. To the contrary, he concedes (as he must, having stated as much to counsel for TAMS and DLL in an off the record conversation during Mr. Smith's deposition) that he withheld the tape deliberately. Chesney Dec. ¶¶ 4-6 (attached as Exhibit "V" to TAMS' Motion); Boyer letter (attached as Exhibit "U" to TAMS' Motion).

Mr. Tate's after-the-fact "defense" is that the tape constituted work product. A number of things about this "defense" are worthy of comment, but the most significant is that it is *irrelevant*.[6] An attorney is unquestionably entitled to withhold material from discovery on grounds of work product, but an attorney -- equally unquestionably -- is *not entitled* to lie about whether material has been withheld and to misrepresent that material that he has in fact withheld either has been produced or does not exist! Mr. Tate did not tell opposing counsel that he was withholding the tape of his conversation with Mr. Smith on work product or any other grounds. Rather, he claimed -- falsely -- that he was *not* withholding it and that, if any such tape existed, it had been produced.

---

[6] Two others are that the "defense" is wrong and implausible. As shown in TAMS' opening papers, Mr. Tate obtained Mr. Smith's statements under false pretenses and in violation of his ethical obligations. Thus, the tape is not work product. *See Gotch v. Ensco*, 168 F.R.D. 567, 572-73(E.D. La. 1996) (holding that counsel's identical failure to disclose the existence of a tape recording of a third-party was an ethical violation sufficient to vitiate any work product protection). *See also Ward v. Maritz, Inc.*, 156 F.R.D. 592, 595 (D.N.J. 1994) (holding that work product doctrine is "qualified" and that protection may be vitiated by the unprofessional and unethical behavior of an attorney or a party); *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) (remanding and holding that a lawyer's unprofessional conduct in obtaining discovery may vitiate the work product privilege). Further, Mr. Tate's claim that he withheld the tape because it was "work product" (which would be no excuse for misrepresenting that it did not exist) is entirely implausible. First, he produced all other similar tapes without making any such contention and without conditioning his doing so on any "non waiver" argument. Second, he arrived at Mr. Smith's deposition armed with a portable tape recorder for purposes of playing the tape into the record. Mr. Tate withheld the tape (and lied about whether he had withheld it) for strategic reasons, in order to "spring it" on Mr. Smith and other counsel, not because he intended to maintain it as "work product".

**2.** *Mr. Tate Did Not Disclose His Role as Counsel for Defendants Prior to the Surreptitious Recording, But Rather Sought To Mislead Mr. Smith Both As to Mr. Tate's Relationship to the Case and Motivation.*

Mr. Tate claims that, contrary to Mr. Smith's deposition testimony and declarations, he *did* disclose to Mr. Smith that he was counsel for Defendants in this case but that there is no tape recording of any such statement. Indeed, Mr. Tate claims that he left Mr. Smith a voicemail on July 8, 2003, stating that he was counsel for Dr. Carvel and DeSoto in the Toshiba case[7] and that when Mr. Smith returned his call he stated that he was returning "Counsel for Defendants'" call.

Here, Mr. Tate offers his word against that of Mr. Smith. There are a significant number of factors that suggest that Mr. Tate's recollection of events is not worthy of belief. They include the following:

(1) As noted in the preceding section of this memorandum, it is beyond dispute (and, in fact, undisputed) that Mr. Tate has been untruthful before in this litigation[8];

(2) As the tape recording of Mr. Tate's July 14 conversation with Mr. Smith makes clear, it was always Mr. Tate's intention to tape *the entirety* of his conversation with Mr. Smith *and* to make sure that he would be able to *prove* that he had done so. Thus, during Mr. Smith's deposition, Mr. Tate made a considerable show of asking the Court Reporter to reflect that the recording was full and complete, stating that the record should reflect the fact that the tape began with dialing tones as Mr. Tate called Mr. Smith. Thus, it is inherently implausible that Mr. Tate (not knowing that he would be sent to voicemail) would have failed to make a tape of his original attempt to contact Mr. Smith.

---

[7] Mr. Tate offers no basis for his failure to record this alleged voicemail. Given that he intended to record the conversation, and had no way of knowing that the call would be answered by a machine as opposed to Mr. Smith himself, there is no reason to believe that at least a portion of this alleged call was not taped.

[8] As discussed below in paragraph (5), it is also beyond dispute that he was untruthful during the course of his recorded conversation with Mr. Smith.

(3) For at least two reasons, it is equally implausible that such a tape, once made, would not have been retained had it contained the information Mr. Tate claims it contained. First, according to Mr. Tate, the tape would have reflected Mr. Tate's communication to Mr. Smith of crucial information that he was obliged to communicate, *i.e.,* the fact that he represented Defendants in this action, as a predicate to discussing the case with him. Second, the record confirms that DeSoto in fact made and retained a number of tapes that contain neither substantive discussions nor crucial, or even relevant, information. *See* Exhibit "1" hereto; Defendants' Exhibit "4."

(4) Mr. Smith, who is no longer affiliated with TAMS -- and who clearly bears no malice to DeSoto, given the freedom with which he spoke to Mr. Tate in July of 2003 -- has no reason to be untruthful. Mr. Tate, by contrast, is not only counsel for Defendants in this action but is also the brother of DeSoto's principal, Dr. Carvel, and DeSoto's CEO.

(5) The July 14 tape of Mr. Tate's conversation with Mr. Smith contains strong internal evidence that Mr. Smith's account of what he knew and understood is the one that is accurate. First, the tape lends plausibility to Mr. Smith's recollection that Mr. Tate did not tell him he was Defendants' lawyer by confirming that Mr. Tate did not tell Mr. Smith a variety of things that he was required to tell him as Defendants' lawyer. For example, Mr. Tate does not ask Mr. Smith if he is represented[9], does not tell Mr. Smith that he has no obligation to speak to Mr. Tate and does

---

[9] It should be noted that Mr. Tate *does* claim that he asked Mr. Smith, in a brief, unrecorded call, prior to the recorded July 14 conversation, whether Mr. Smith had ever been contacted by the attorneys for TAMS and that Mr. Smith told him that he had not. Again, Mr. Tate's claim is not plausible and is simply an effort to make his dealings with Mr. Smith appear less improper than they were. Mr. Smith denies that Mr. Tate asked him any such question and, in addition, attests to the fact that he met with counsel for TAMS (John Chesney, Esq. and Julianne Peck, Esq.) in Atlanta, Georgia, long before Mr. Tate's call. Smith Dec. II ¶¶ 3-5 (attached hereto as Exhibit "2"). There is no plausible reason why Mr. Smith would not have disclosed this fact had he been asked.

not tell Mr. Smith that he has a right to his own attorney if he is not represented.[10] Nor does Mr.

Tate explain to Mr. Smith that he is an advocate and, therefore, an interested party.[11] Instead,

Mr. Tate intentionally, and repeatedly, sought to lead Mr. Smith to believe (as Mr. Smith has

testified he in fact *did* believe) that Mr. Tate was simply a concerned brother trying to offer

objective family advice to his sister. *See* Smith Recorded Conversation, attached to Defendants'

brief as Exhibit "16," *passim.* Indeed, Mr. Tate seeks Mr. Smith's cooperation by telling him

that his purpose is to be objective. *Id.* at 10 ("I have to be objective, that's the thing"). Mr. Tate

*never* refers to himself as Dr. Carvel's lawyer, but only as her brother, *see Id.* at 2 ("being my

sister's younger brother"). Nor does he ever refer to himself as DeSoto's lawyer and he only

refers to Dr. Carvel as his sister, never as his client. *Id.* at 18 ("Well do you think my sister knew

that?"); *Id.* at 22 (I just picture this coming in and you know getting training on the job at, at my

sister's expense and she is a perfectionist, so I have to chuckle at that whole situation."). Most

tellingly, Mr. Tate deliberately seeks to mislead Mr. Smith by pretending not to know who DLL,

the plaintiff in this action, is! *Id.* at 23 ("Real quick, I know you gotta [go], who's DLL, *I can

not figure out who DLL is.*") (Emphasis supplied). Obviously, Mr. Tate's claim not to know who

DLL is was untruthful. Perhaps more significantly for present purposes, however, it is not

something that Mr. Tate could conceivably have made to Mr. Smith had he *already revealed* that

he was counsel for Defendants in the action in which DLL is the plaintiff!

---

[10] *See Pritts v. Wendy's of Greater Pittsburgh, Inc.*, 37 Pa. D.&C. 4th 158, 166 (1998) (holding that attorney contacting an adversary's former employee must immediately disclose: (1) his or her capacity to the former employee, (2) that the former employee has a right to refuse to be interviewed and (3) that the former employee, if they wish, can be interviewed with the company's counsel present) (citing Pennsylvania Bar Association's Committee on Legal Ethics and Professional Responsibility, Formal Opinion No. 90-142).

[11] Nor does Mr. Tate, in posing as a concerned family member, tell Mr. Smith that he is the CEO of the principal defendant in this action.

*3.    Mr. Tate Does Not Deny That, After Learning That Mr. Smith Was Represented by Counsel for TAMS, Mr. Tate Purported to Advise Him That Such Representation Was Not in His Best Interest.*

When Mr. Tate again contacted Mr. Smith, on September 10, 2003, Mr. Smith had been informed that Kyle Tate was not simply Dr. Carvel's brother, but her counsel. It is undisputed that Mr. Smith told Mr. Tate during that call that he was represented by counsel for TAMS. According to Mr. Smith, Mr. Tate then suggested to Mr. Smith that such representation was not in his best interest. Such an attempt to interfere with existing representation -- and to offer "advice" to a witness represented by an adverse party -- was grossly improper conduct. Remarkably, Mr. Tate does not even deny it. *See* Tate Aff. ¶ 6(d) and (e).

8

### 4.     TAMS' Perfectly Proper Contact With Mr. Paul King Does Not Excuse Mr. Tate's Behavior in Dealing Improperly With Mr. Smith

Having no real way to avoid the conclusion that Mr. Tate's dealings with Mr. Smith involved grave improprieties, Defendants seek to deflect it. Specifically, they claim that it was TAMS' counsel's perfectly proper conduct with Mr. Paul King, DeSoto's former administrator, that was improper and that Mr. Tate's improper dealings with Mr. Smith were excusable because he was a "non-managerial" employee.

Defendants misconstrue the law and, once more, misrepresent the facts. Both Mr. Smith and Mr. King are *former* employees. As Defendants concede, contacting former employees and discussing litigation with them *as prescribed by the rules* is proper so long as confidential attorney-client privileged information is not disclosed. *See* Defendants' Opposition Brief at 24; *Stabilus v. Haynsworth, Baldwin, Johnson & Greaves*, 1992 U.S. Dist. Lexis 4980, *4-6 (E.D. Pa. March 31, 1992). Given that these potential witnesses are *former* employees, the distinction that Defendants seek to draw between managerial and non-managerial employees is irrelevant. And, even if it were not, Mr. Smith was no less a managerial employee than Mr. King.[12] Here, there is no claim or evidence that TAMS sought from Mr. King, or that Mr. King disclosed, any confidential attorney-client information.

---

[12] Defendants's contention that Mr. King was a managerial employee while Mr. Smith was more akin to a cafeteria worker is just one more example of Defendants' blatant refusal to play it straight, even with the Court. At the time of his first involvement with DeSoto, Mr. Smith was the CT Modality Manager who was involved in the initial contract negotiations at issue in this case. In that capacity, Mr. Smith had to provide approval to TAMS salesmen before CT sales with which he was involved could be consummated. Steiff Dep. at 156-58, 221 (attached hereto as Exhibit "3"). More importantly, Mr. Smith was promoted to Area Sales Manager soon after DeSoto leased the Toshiba equipment and fulfilled, as his title would suggest, a managerial role in connection with TAMS' dealings with DeSoto. Smith Dep. at 11-12 (attached hereto as Exhibit "4"). Defendants' deliberate attempt to misrepresent Mr. Smith's position in support of their specious "managerial/non-managerial" distinction violates their duty of candor to the tribunal.

TAMS is not complaining about *the fact* that Mr. Tate contacted Mr. Smith. Rather, the issue is how Mr. Tate conducted himself in dealing with Mr. Smith. Those issues, and Mr. Tate's multiple failures to comply with Model Rule 4.1, have been discussed at length above and need not be repeated here.

**B.    It Has Recently Come To Light That Mr. Tate and DeSoto Have Had Improper Dealings With Another Former TAMS Employee, Mr. David Steiff.**

When TAMS filed the instant motion, it was unaware that Mr. Tate, Dr. Carvel and her husband had engaged in a number of dealings with a key, former TAMS employee, Mr. David Steiff that were, as to Mr. Tate, unquestionably improper and, as to Dr. and Mr. Carvel, strongly supportive of the proposition that DeSoto's strategy in this case is to influence the testimony of key witnesses.

Mr. Steiff is unquestionably a key witness. He is a former Account Executive, that is to say equipment salesman, with TAMS. Mr. Steiff headed up the sales effort that led to DeSoto's lease of the Toshiba equipment that is the subject matter of this litigation. He left TAMS in March of 2003 and took up a sales position with GE. Prior to that time, Mr. Steiff had been represented by TAMS' counsel in this action as a TAMS employee. In early April of 2003, counsel for TAMS met with Mr. Steiff who, at that time, confirmed that he wished to be represented by counsel for TAMS in connection with discovery proceedings in this action.

In July, 2003, having learned that Mr. Tate had called former TAMS employee Mike Smith, counsel for TAMS called Mr. Steiff (among other people) in order to determine whether he had spoken with DeSoto or its counsel. At that time, Mr. Steiff said that he had not been contacted by DeSoto's counsel but that Randon Carvel, Dr. Carvel's husband, had called him about a possible sale. At the same time, Mr. Steiff confirmed his understanding that TAMS

counsel intended to represent him in connection with this matter and that he wished TAMS

counsel to do so.

Shortly before his deposition in this action, on October 23, 2003, Mr. Steiff advised

counsel for TAMS that he had changed his mind and that he did not want to be represented by

counsel in connection with this matter. See attached e-mail from David Steiff dated October 23,

2003 (attached hereto as Exhibit "5"); Steiff Dep. at 6-7 (attached hereto as Exhibit "3"). At his

deposition, Mr. Steiff acknowledged that, while he had been thinking about the matter for a

while, he had only reached the conclusion that he did not want to be represented by TAMS

counsel, or anyone else, shortly before so advising TAMS' counsel of that fact. *Id.* at 7. In

summary, Mr. Steiff was represented by TAMS counsel as a TAMS employee until March,

2003, confirmed in April, 2003 his wish to be represented by TAMS counsel after his departure,

reconfirmed that wish in July of 2003 and advised counsel for TAMS that he had changed his

mind about being represented by TAMS counsel via e-mail on the evening of October 23,

2003.[13]

Mr. Steiff's deposition was scheduled for November 6, 2003. The day before that

deposition, Mr. Tate provided to counsel for TAMS copies of two affidavits that Mr. Steiff had

executed, one in June, 2003, the other apparently in September, 2003. In his deposition, Mr.

Steiff provided the history of how these affidavits came into being.

According to Mr. Steiff, he had a chance encounter with Dr. Carvel and Mr. Carvel in the

parking lot of a restaurant sometime after leaving TAMS and joining GE. They advised him of

an opportunity to sell radiological and fluoroscopic equipment to a second clinic that Dr. Carvel

---

[13] Mr. Steiff's e-mail was sent on the evening of October 23, 2003. On October 24, 2003, counsel for TAMS
advised opposing counsel in this action that Mr. Steiff had elected no longer to be represented by counsel for TAMS.
Exhibit "6" (October 24, 2003 e-mail from Julianne Peck to Kyle Tate and Peter Boyer).

had opened, Southhaven Diagnostic Center. Steiff Dep. at 91-92, 166. According to Mr. Steiff's

recollection, he closed the deal to sell Dr. Carvel the equipment in question in late June, about a

couple of weeks after signing the initial affidavit prepared for him by Mr. Tate. Steiff Dep. at

91-92. When Mr. Steiff went to Southhaven, he met Mr. Tate, whose offices were there, and

they discussed the case. *Id.* at 86-88, 209-212. Mr. Tate had a particular interest in, and asked

Mr. Steiff some questions about, the negotiations leading up to DeSoto's lease of the Toshiba

equipment. *Id.* at 89-90, 209-212. Mr. Tate then drafted, and Mr. Steiff later went to Dr.

Carvel's other facility and signed, the affidavit dated June 12, 2003. *Id.* at 86. Within a couple of

weeks thereafter, Dr. Carvel awarded Mr. Steiff a sale worth almost $300,000. *Id.* at 91-92.[14]

Mr. Steiff acknowledged in his deposition that the affidavit Mr. Tate had prepared, and that he

had signed, described a number of key facts inaccurately even after Mr. Steiff had requested, and

obtained, changes to it. Steiff Dep. at 86-90.

　　Obviously, all of these events took place *before* Mr. Steiff's reconfirmation, in July, that

he wished to be represented by counsel for TAMS in connection with this litigation. Later -- but

still long before Mr. Steiff advised counsel for TAMS that he had changed his mind about such

representation -- Mr. Tate engaged in additional substantive discussions with Mr. Steiff

concerning the case in connection with Mr. Steiff's execution of a new affidavit. Later, but still

long before Mr. Steiff advised counsel for TAMS that he had changed his mind about being

represented by them in connection with this litigation -- in August or September, 2003, or

perhaps both -- Mr. Tate engaged in further substantive discussions with Mr. Steiff in

conjunction with preparing a new affidavit to correct some of the errors in the original, June 12,

---

[14] Mr. Steiff stated that he received no direct commission benefit from this sale, since he was on a guarantee with
GE. Steiff Dep. at 173. He admitted, however, that the sale helped move him towards the point at which he would
be able to make more than the guarantee cite and that he did not have many sales when he was awarded the
Southhaven Diagnostic business. *Id.* at 174.

2003 affidavit. *Id.* 92-94, 99. In fact, as Mr. Steiff acknowledged in his deposition, even those changes that Mr. Steiff was able to prevail upon Mr. Tate to make to the affidavit in September did not alter the fundamental inaccuracies in that document. Steiff Dep. at 103-108.[15]

At no point did Mr. Tate contact counsel for TAMS or otherwise take steps to comply with Rule of Professional Conduct 4.2 dealing with "Communication with Person Represented by Counsel".[16] Instead, Mr. Tate discussed the subject matter of this litigation with Mr. Steiff on multiple occasions, prevailed upon Mr. Steiff to execute affidavits that Mr. Tate drafted and that Mr. Steiff was subsequently constrained to admit during his deposition stated the operative facts incorrectly in a number of crucial respects (Steiff Dep. at 99-108) and then kept the improperly obtained affidavits in his hip pocket until the day before Mr. Steiff's deposition, at which point there discovery was inevitable.

The inaccuracies in these affidavits are not trivial, nor is Mr. Tate's apparent involvement in maintaining those inaccuracies. For example, *both* the June and September affidavits are drafted so as to buttress Dr. Carvel's facially rather incredible claim that neither she nor DeSoto had any role in deciding which equipment DeSoto would buy and that that was a decision made exclusively by TAMS. Carvel Dep. (July 21, 2003) at 141 (attached hereto as Exhibit "7"). The June affidavit says, in this regard, simply that Mr. Steiff selected the equipment that would not exceed the 2.5 million financing allowance. Steiff Aff. (June 2003) ¶ 8 (attached hereto as Exhibit "8"). To similar effect, the September affidavit says that Mr. Steiff, on behalf of

---

[15] *See* Rule of Professional Conduct 4.3(b) relating to the prohibition against counseling or assisting a witness to testify falsely.

[16] Rule 4.2 provides that "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The Comment to the rule confirms that "This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question."

Toshiba, selected the equipment for DeSoto. Steiff Aff. (Sept. 2003) ¶ 5 (attached hereto as Exhibit "9").

In his deposition, Mr. Steiff testified that this was one of the respects in which he was most concerned that the June, 2003 affidavit was inaccurate and needed to be changed. Steiff Dep. at 92-93. As is readily apparent, however, from a comparison of the two documents, Mr. Tate resisted making any material changes in the September affidavit, which he, and not Mr. Steiff, drafted. When required to respond to questions under oath, rather than to regurgitate Mr. Tate's story, Mr. Steiff's recollection differed markedly from the version of events reflected in Mr. Tate's affidavits and was much more consistent with intuitive reality. Mr. Steiff confirmed that the process of selecting equipment was a joint one that involved him, the relevant "modality managers" from TAMS *and* the customer, in the persons of Dr. Carvel and her then administrator-to-be, Paul King. Mr. Steiff acknowledged that the features and components of the equipment were discussed in great detail, that both the "letter quotes" and ultimate purchase orders signed by Dr. Carvel were gone over in great detail with the customer, that the customer's needs were discussed and that the equipment was selected jointly by TAMS and DeSoto to fit DeSoto's needs *and to fit within DeSoto's budget*. Steiff Dep. at 103-105, 116, 135-138. (This latter point is not insignificant, because Dr. Carvel claimed, in her deposition, that she never understood that there was any budgetary limitation on what she could buy).[17]

To summarize, at a time when Mr. Steiff was represented by counsel for TAMS: (1) Mr. Tate discussed the substance of this case with him without TAMS knowledge while Mr. Steiff

---

[17] Mr. Steiff's affidavit differs in other critical respects from Mr. Steiff's deposition testimony. For example, the affidavit quotes Mr. Steiff as stating something he does not recall saying, Steiff Dep. at 100-101. His affidavit also states that when Mr. Steiff called Dave Begy (a DLL employee), Mr. Begy represented himself to Mr. Steiff [as] an employee of the credit side of TAMS. Exhibit "9" ¶ 6. However, as Mr. Steiff confirmed in his deposition, Dave Begy made no representations to him. Rather, Mr. Steiff simply assumed that TAMS was a part of TAMS, as opposed to a separate corporate entity. Steiff Dep. at 105-106.

was at Southhaven Diagnostic Center at the invitation of Dr. and Mr. Carvel, ostensibly to pursue

a possible sale ; (2) Mr. Tate drafted an inaccurate affidavit and prevailed upon Mr. Steiff to sign

it on June 12, 2003; (3) about two weeks later, Dr. (and Mr.?) Carvel awarded Mr. Steiff a

substantial sale; (3) Mr. Tate, despite Mr. Steiff's concerns that his June 12 affidavit was

inaccurate in suggesting that he alone selected the equipment for DeSoto, kept that statement in

the subsequent affidavit that he drafted for Mr. Steiff in September; and (4) Mr. Tate kept these

affidavits concealed until the day before Mr. Steiff's deposition took place.

### C.    Dr. Carvel Does Not Deny That She Bribed Pam Kure And The Record Reflects That, *Within The Last Week*, She Has Tried To Begin The Process of Neutralizing Another Potential Witness, Erin Singer

Dr. Carvel admits that on or about September 24, 2003, after TAMS informed DeSoto of

its intention to depose non-party witnesses in Memphis, she offered a former DeSoto

technologist, Pam Kure, a significant pay raise and a trip to Cancun if she would return to

DeSoto. Dr. Carvel is careful not to mention (but does not dispute) that, in addition to these

generous terms, she offered Ms. Kure *lifetime employment*. Dr. Carvel asks this court to ignore,

however, both the timing and substance of this offer, because, she says, Defendants have no

incentive to interfere with Mr. Kure's testimony and there would be no advantage to them if Ms.

Kure were a current employee whom Mr. Tate would be able to represent at her deposition.

In fact, given Mr. Tate's advice to Paul King and Brian Gibbs, two former DeSoto

employees, that one advantage of having him represent them would be that he could discuss with

them what they should and should not say (King Dec. ¶ 3, Gibbs Dec. ¶ 5, attached to TAMS'

Motion as Exhibits "P" and "J"), it is not hard to discern the advantage DeSoto might see to

having Ms. Kure back under its control. It is certainly possible that, as Ms. Kure said in her

September 22, 2003 telephone discussion with Dr. Carvel, TAMS might not get the results it

would like if she were subpoenaed (*i.e.,* forced) to testify in this action. That might not be, however, because she has nothing to say that would be useful to TAMS. It might be, as Mr. McAllister's voicemail suggests, because Ms. Kure is afraid to testify even though she "would be a good witness [for TAMS] if [TAMS] could persuade her to tell what she knows, which is quite a lot."

In this regard, Defendants' reliance on the -- concededly -- bland tape of Dr. Carvel's September 22, 2003 conversation with Ms. Kure is utterly transparent. Dr. Carvel *made* the call bland. On the other hand, although the call was supposedly just a casual, almost social, conversation, with Dr. Carvel expressing a casual interest in whether Ms. Kure would come back to work at DeSoto, *Dr. Carvel taped it!* By contrast, when Dr. Carvel called Ms. Kure on July 24, 2003, to put the "full court press" on her by offering her a substantial raise, a trip to Cancun *and* lifetime employment, there is no tape. The absence of a tape of the material communication is, under the circumstances, at least as astonishing as the existence of a tape of the supposedly casual September 22 conversation -- or would be, if the September 24 conversation was innocent as Defendants would have the Court believe. Equally dramatic is the short tape of Dr. Carvel's call to Ms. Kure's place of employment on September 26, 2003, two days after she made her pitch to Ms. Kure. In that call, Dr. Carvel presses to speak with Ms. Kure -- asking to wait on the line -- and, when that proves unavailing, leaves an "urgent" message for Ms. Kure to call her. Defendants' Exhibit "4." When Ms. Kure proves unamenable to that pressure, Dr. Carvel sends her minion, Jennifer Sneed, around to Ms. Kure's *home*, where she makes up a cock-and-bull story to the effect that the problem is that *Baptist*, not Dr. Carvel, is putting pressure on Ms. Kure.

Remarkably, Dr. Carvel has attempted a repeat performance within *another* former DeSoto employee *within the last week*! The circumstances surrounding this incident, which involves Ms. Erin Singer, are particularly significant and shed considerable light on Dr. Carvel's true motives with regard to Ms. Kure.

On November 6, 2003, Dr. Carvel left a voicemail for Ms. Singer asking if she would be interested in coming back to work for Dr. Carvel. Singer Declaration attached hereto as Exhibit "10." Ms. Singer had worked for DeSoto on a PRN (part-time) basis for two to four months prior to September 11, 2001. After leaving, she had had no contact with DeSoto or the Carvels other than having made a call to Randon Carvel in the fall of 2002 because she was curious about a rumor that they had installed a new "magnet" (MRI). *Id.* Dr. Carvel cannot plausibly claim, as she claims with respect to her importuning of Ms. Kure, that (1) in calling Ms. Singer she was merely trying to bring back within the fold a valued former employee or (2) she has nothing to fear from what Ms. Singer might say if she is not under DeSoto's control.

As to the first point, DeSoto did not even identify Ms. Singer as being among its former technologists in its sworn interrogatory answers in this matter, *see* Exhibit "11", and Mr. Tate, on November 5, 2003 -- the day before Dr. Carvel called her! -- came very close to denying that Ms. Singer had ever worked for DeSoto. O'Barr Dep. at 335-336 (dirty transcript attached hereto as Exhibit "12"). In fact, the reason Dr. Carvel called Ms. Singer on November 6 is that a TAMS engineer, Mike O'Barr, testified on November 5, 2003, that Erin Singer had expressed concerns to him, while she was working at DeSoto, about how Dr. Carvel cut corners in operating her practice. O'Barr Dep. at 323-325.

It is a fair, if not inevitable, inference that Dr. Carvel tried to contact Ms. Singer to control her testimony either by bringing her back under DeSoto's control or by making the threats that she and Mr. Tate made to at least four other former DeSoto technologists.

**D.    Defendants Threatened at Least Four Former Technologists With Their Licenses Should They Testify in This Case.**

Three former DeSoto technologists, Pam Kure, Brian Gibbs, and Cindi Holmes, have all signed declarations that either Kyle Tate or Jennifer Sneed (DeSoto's current office manager) told them that they would be at risk of losing their licenses if they were to testify in this action. Barry McAllister (Mr. Gibbs' and Ms. Kure's boss), relayed this fact to TAMS via a voice mail message on September 26, 2003. Mr. Gibbs has stated in a sworn statement that Mr. Tate admitted making the same threat to a fourth former technologist, Rick Stobaugh.[18] Defendants claim, however, that this did not happen, and that all four of these individuals -- *none* of whom has anything to gain as a result of the outcome of this litigation -- are lying.[19]

---

[18] Mr. Tate admits that he contacted Mr. Stobaugh, and that he raised the issue of his ARRT licensure. Tate Aff. ¶ 4. He claims however that Mr. Stobaugh categorically denies the substance of his conversations with Julianne Peck. According to Mr. Tate, Mr. Stobaugh did not tell her on September 26 and 29 -- the two days Mr. Tate admits to having spoken with Mr. Stobaugh -- that he did not want to testify, that he did not tell her that he had retained an attorney, and that he told her that he had been contacted by Mr. Tate. All of Mr. Tate's statements directly contradict Ms. Peck's Declaration, and none of them are supported by an affidavit from Mr. Stobaugh.

[19] According to Defendants', Mr. McAllister's voice mail message cannot be believed because he got the date wrong with regard to when Dr. Carvel attempted to bribe Ms. Kure. However, Dr. Carvel admits that she contacted Ms. Kure at work on September 26, 2003 -- the day that Mr. McAllister contacted TAMS, see Opposition Brief at 11, and it makes complete sense that that would be the day that Mr. McAllister first learned of Dr. Carvel's offer. That he may have been incorrect about the date on which the offer was made does not render the substance of his statements untrue, particularly given that Ms. Kure's testimony supports it and even Dr. Carvel admits some of the content of Mr. McAllister's affidavit. Defendants similarly contend that Mr. Gibbs should be disbelieved because his declaration as to his conversation with Dr. Carvel differs marginally from Dr. Carvel's secretly recorded tape of the conversation. Again, these differences are immaterial and unsurprising in that Mr. Gibbs had only his memory to go on, as opposed to a recorded conversation. Nor does the fact that Mr. Gibbs testified that Mr. Tate told him that he was sitting with Dr. Carvel when he called him on September 26 (a call Mr. Tate does not deny, but did not record) make Mr. Gibbs a liar. Mr. Gibbs had no way of knowing whether Mr. Tate was *actually* sitting with Dr. Carvel and whether he was or was not has nothing to do with whether he told Mr. Gibbs. There simply is no motive for Mr. Gibbs to have fabricated his statement. Moreover, it is possible that Mr. Tate said, I "was" sitting here with Dr. Carvel, as opposed to I "am" sitting here with Dr. Carvel, but that makes little difference.

Curiously, Ms. Sneed does not deny that she made this threat to Pam Kure. Compare

Kure Dec. ¶ 3 to Sneed Aff., *passim*. And Ms. Sneed, like Mr. Tate, admits to having raised the

issue of licensure with another technologist. Sneed Aff. ¶ 12; Tate Aff. ¶¶ 3(d), 4(h).

Defendants seek to "spin" these communications, however, by suggesting that their goal was to

"protect" the former technologists due to concerns: (a) about (unidentified and unexplained)

patient confidentiality issues; (b) that TAMS is "blaming" the technologists for the poor image

quality, Opposition Brief at 12; and (c) that TAMS is "blaming" technologists for putting the

patients in a dangerous position. Sneed Aff. ¶ 12; Tate Aff. ¶ 3(c)(d).

Defendants fail to articulate any plausible basis for these "concerns", which is not

surprising in that there are none. Patient confidentiality issues are fully protected by the

comprehensive Confidentiality Order that the parties to this case negotiated, and the Court

signed. Nor does TAMS "blame" technologists for "poor" images and, even if it did, there is no

conceivable way that doing so could affect their licenses. In this regard, Dr. Carvel and Desoto

have now admitted that the images produced by the relevant equipment were "diagnostic", that

is, were adequate to allow Dr. Carvel, presumably in accordance with professional standards, to

read them and to make necessary diagnoses. Thus, whether it was the equipment or how it was

used that created (to the extent either did create) less than optimal images with which Dr. Carvel

was aesthetically dissatisfied, has no conceivable bearing on the technologists licenses. In any

event, TAMS does not seek to "blame" the technologists for operator induced image quality

issues. TAMS has no quarrel with the competence of the technologists. Its quarrel is with Dr.

Carvel who experienced huge turnover, failed to provide replacement technologists with the

equipment-specific applications training necessary to optimize image quality and failed to

develop consistent protocols for performing the various procedures that an imaging center is

called upon to perform.[20]  Finally, the only technologist whom TAMS contends positioned a

patient dangerously or in any way that might affect her license is Ms. May Vokaty.  Ms. Vokaty

is not, however, a *former* technologist.  Rather, she is still employed by DeSoto.  *See* Opposition

Brief at 12.[21]  Evan as to Ms. Vokaty, TAMS has been required to put her actions at issue only

because Defendants (untruthfully) contend that the Toshiba nuclear medicine camera

malfunctioned, causing injury to one patient and potential injury to others.  Defendants' First

Amended Counterclaims ¶ 39.

Defendants' true concern is that technologists may lend support to TAMS contention that

many of them left, not because of dislike of the Toshiba equipment as Dr. Carvel claims, but

because they developed concerns about how Dr. Carvel conducted herself and her practice,

including concerns that Dr. Carvel's conduct was inconsistent with the law.  Concern that former

technologists will confirm these facts – which will also support TAMS' position that fraud is Dr.

Carvel's regular *modus operandi* and that it was she who fraudulently induced TAMS and DLL

to enter into the agreement at issue in this case, as opposed to the other way around – is what

really motivated Defendants threats to DeSoto's former employees.[22]  There simply is no reason

to credit Mr. Tate's contention that they are not telling the truth and every reason to believe that

Defendants' proffered explanations for their behavior are pretextual.

**E.**    **Defendants' Improper Conduct vis a vis Paul King**

---

[20] Astonishingly, DeSoto has produced no "protocol books" or similar documents that would allow its technologists to replicate good quality scans with consistency.  This is a fairly astonishing deficiency, but it is one for which Dr. Carvel, not the technologists, is ultimately responsible.

[21] An explanation of the incident Ms. Vokaty was involved in is explained in TAMS' Memorandum of Law, page 7, n. 8.

[22] In this regard, TAMS will shortly seek leave to amend its pleadings to conform to the evidence that it has developed, absent the consent of the other parties.  The anticipated amendments will not require any additional discovery, nor will they affect the existing pretrial or trial deadlines in any way.

Defendants devote four pages to the argument that it was perfectly all right for Mr. Tate to maintain the pretence that he represented Mr. King long after he knew that he did not. The key points are, however, (1) that on July 9, 2003 Mr. Tate told counsel for TAMS that Mr. Tate would be representing Mr. King in connection with this matter; (2) that Mr. Tate knew, no later than July 15, 2003, that Mr. King did not want his representation (Tate Aff. ¶ 5(h)); (3) that Mr. Tate, despite this, *never* informed TAMS of this fact; and (4) that Mr. Tate made it clear to Mr. King – and this is a fact that Mr. Tate does not deny in his affidavit and Defendants do not deny in their brief – that he wanted to keep the fact that he did not represent Mr. King from TAMS because he did not want counsel for TAMS contacting Mr. King (King Dec. ¶ 4).

In a vain effort to sully Mr. King and suggest that he should not be believed, Defendants engage in *yet another* set of half-truths and falsehoods. Thus, Mr. Tate says that Mr. King interviewed for a sales position with TAMS and that this should persuade the Court that he is "biased". Mr. Tate does not advise the Court of all the facts, however. Mr. King had an interview with TAMS for a sales position in or about June 2003, but he did not get the job. See Declaration of Paul King attached hereto as Exhibit "13." The position was filled in or about July 2003, and Mr. King is not now, and never has been, associated with TAMS. Frankly, it is somewhat bizarre to hear Defendants arguing that, on the one hand, offering "lifetime employment" to former employees should not be considered something that might influence testimony, but that failing to offer employment to someone who has never worked for TAMS should. There simply is no basis for the ludicrous proposition that the fact that Mr. King was not offered a job by TAMS would predispose him to testify falsely in TAMS' favor. By contrast, the record establishes that in multiple instances Mr. Tate *has* acted dishonestly and that he has -- as

DeSoto's lawyer, CEO and as Dr. Carvel's brother -- numerous motivations that might impel him to do so in an effort to prevail in this case.

### F.    TAMS Filed This Motion To Remedy the Prejudicial Effect of Defendants' Subversion of the Judicial Process, Not for Improper Purposes.

TAMS did not decide to bring this motion lightly and it did not bring it for improper purposes. As shown above and in TAMS' opening papers, Defendants and their counsel have engaged -- and continue to engage – in a full-blooded campaign aimed at undermining the integrity of the process. Shortly after TAMS made it clear that it intended to depose former DeSoto technologists in October, Defendants' conduct escalated to the level of witness intimidation and bribery.[23] That is what led to this motion.

In an effort to obscure this reality, Defendants advance two basic arguments. One is that TAMS filed this motion to avoid losing the case on the merits. The other is that TAMS filed the motion to create improper pressure on Defendants to make a bad settlement or else face meritless claims. Both arguments lack merit, but at least the first one makes logical sense.

First, in the context of this motion, the Court's task is not to attempt (what would in any event be impossible) to decide which side has the better case. As TAMS pointed out in its opening papers, the issue, where one party has destroyed the integrity of the judicial process, is whether the injured party's claims or defenses have legal merit as reflected in the pleadings. (Otherwise, a Court could be put in the position of rejecting an otherwise meritorious motion for terminating sanctions on the illogical basis that the "proof" that remained available after the

---

[23] Defendants try to make much of the fact that TAMS did not identify the range of witnesses it wished to depose, but the only witnesses left were DeSoto's former employees, and the only former employees that defendants have identified to date are technologists. Thus, Defendants knew perfectly well the class of witnesses that TAMS intended to depose. The fact that Defendants "contacted" these witnesses came as no surprise to TAMS, but the lengths to which Defendants' went to control or prevent their truthful testimony did.

process had been subverted would not sustain the position of the injured party). Here, TAMS'
claims obviously have merit under this standard.

Further, if the Court were to look at the merits of the case, it is in fact Defendants, not
TAMS, who face devastation from the testimony that Defendants have sought to undermine.
These witnesses will, TAMS believes, provide evidence to support TAMS' position that Dr.
Carvel did not act in good faith in her dealings with TAMS, that she only bought Toshiba
equipment because she could not afford the equipment she wanted, that she never intended to
keep the Toshiba equipment for the five year lease term, that her only interest was in making a
dollar (legally or illegally) and that her goal was to find a way to get rid of the Toshiba
equipment once she had enjoyed the free warranty period.

The existing evidence also confirms that the equipment in question produced fully
diagnostic images and that DeSoto did not lose profits as a result of using the Toshiba
equipment. Indeed, DeSoto grossed over $2.4 million using that equipment during its start-up
year, just for the imaging aspect of work done with the equipment. This figure does not include
the amounts that Lynn T. Carvel, PLLC grossed in connection with the professional component
of interpreting the images produced by the equipment, which was billed separately.[24]

Against the overwhelming evidence that the Toshiba equipment was fully, effectively and
profitably usable, DeSoto offers merely the argument that there were over 230 service calls in
fourteen months. By itself, this "statistic" is meaningless. First, these calls cover five
modalities, so that 230 calls over fourteen months equates, on average, to only one call per
modality per week. Second, the customer controls the volume of service calls – if the customer
calls, a service call is recorded, whether the problem is with the equipment or not. Third,

---

[24] To date, Defendants have refused to produce any information or documents relating to Lynn T. Carvel, Inc.,
claiming that, as a non-defendant, any documents relating to this separate corporation are not relevant.

DeSoto's former Administrator, Mr. King, admitted to Mr. O'Barr, a TAMS engineer, that Dr.

Carvel's intention was to "kill" TAMS with service calls O'Barr Dep. at 227-28. Fourth, many

of the calls are in fact demonstrably and beyond any dispute related to things other than

equipment problems, including *installation* of the equipment, problems resulting from power

failures in the Olive Branch area, problems with *plumbing* connected to the equipment and

applications or operator issues. In short, Defendants' claim that TAMS' motion is motivated by

fear of losing the case is a complete canard. Indeed, a number of Desoto's former employees, far

from supporting Dr. Carvel's claim that they left because the equipment was so bad, have

testified that the equipment and service were not bad at all. *See* Declaration of Brian Gibbs ¶¶ 4,

5; Declaration of Debra Powers ¶ 5; Declaration of Erin Singer ¶ 6 (all attached hereto as Exhibit

14).[25] Others also informed TAMS that DeSoto's conduct was unwarranted but would not sign

Declarations, and others (such as Pam Kure) would not speak to TAMS about the substance of

this litigation at all. Thus, TAMS has not made any "enormous leap" in concluding that but for

Defendants' tampering these witnesses would testify that the equipment functioned adequately.

Likewise, TAMS has more than a good faith basis to believe that but for such tampering some or

all of these witnesses would testify that they developed very serious concerns about the nature

and legality of Dr. Carvel's conduct of her practice. *See* Gibbs Dec. ¶ 6; Powers Dec. ¶¶ 13-14;

Singer Dec. ¶¶ 8-10),[26] and that she did so, in part, to accelerate revenues so as to allow her to

replace the Toshiba equipment as soon as possible. Powers Dec. ¶ 6; Singer Dec. ¶ 7.[27] Far

---

[25] These declarations were given *before* Defendants' campaign to subvert testimony.

[26] Also attached hereto as Exhibit "15" is the expert report of Claudia Murray, which confirms the statements of insurance fraud made by these employees.

[27] Dr. Carvel's wish to replace the equipment had nothing to do with the performance of the equipment, but rather resulted from the fact that she initially could not afford the equipment that she really wanted. Powers Dec. ¶ 6, 7; Singer Dec. ¶ 7.

from being an *ad hominem* attack based on speculative overreaching designed to bolster a flagging case, this motion is, in fact, one that Defendants might well be better off losing!

Finally, TAMS notes that as one final act of misrepresentation, Defendants seek to suggest that the instant motion was filed simply to force Defendants to make a bad settlement under threat of frivolous Medicare fraud claims.[28] To that end, Mr. Tate in his declaration and Defendants in their brief yet again mischaracterize and provide an incomplete account of communications between counsel in this action.

Thus, Defendants correctly state that, on October 10, 2003, counsel for TAMS and DeSoto discussed settlement possibilities. Defendants seek to imply, however, that in those discussions counsel somehow used this motion to pressure Defendants into a "bad" settlement. Defendants' Opposition brief at 37-38. Defendants' account is neither accurate nor complete.

On October 1, 2003, counsel for DeSoto advised counsel for the other parties that Mr. Paul King would be deposed on October 10, 2003. That date was then changed, by agreement, to October 13, to accommodate counsel's schedule. Chesney Dec. ¶ 2 (attached hereto as Exhibit "16").

On October 10, 2003, counsel for TAMS contacted counsel for DeSoto to discuss whether it would make sense to pursue settlement discussions before taking the depositions of Mr. King and other former DeSoto employees. In the course of that discussion, counsel for TAMS suggested, and DeSoto's counsel agreed, that after Mr. King's deposition there would, one way or another, be a lot of "blood on the floor" and that positions might harden as a result.

---

[28] It would, of course, seem unlikely that frivolous claims of anything could force a party to make a bad settlement. Here, however, there is, despite Defendants Herculean, and ongoing, efforts to withhold the relevant documentation, credible evidence -- from DeSoto's documents, from DeSoto's former employees and in the form of TAMS' expert witness report -- that DeSoto has engaged in such conduct. There is also evidence that DeSoto did so in part in order to accelerate revenues so that it could more quickly dump the Toshiba equipment that it had pretended it wished to lease for five years.

After that discussion, there were some communications with counsel for DLL that led counsel for DeSoto to ask whether in fact it would make more sense to go forward with or to postpone Mr. King's deposition. Counsel for TAMS responded that TAMS would go along with whatever DeSoto thought best, counsel for DeSoto expressed the view that postponing the depositions made the most sense and, after some further communications, that was agreed on. *Id.* ¶¶ 3,4.

In the course of the October 10 telephone discussion relating to these issues, counsel for TAMS asked counsel for DeSoto if he had received TAMS' motion for terminating sanctions and disqualification. This question was raised for two perfectly proper reasons. First, Mr. King had taken an affidavit that TAMS had used in support of its motion. Thus, to have raised the issue of whether Mr. King's deposition might profitably be postponed without ensuring that DeSoto's counsel had had the opportunity to review that affidavit, and second, to determine whether postponing Mr. King's deposition might somehow prejudice DeSoto, could arguably have been misleading. Second, and relatedly, had DeSoto entered into settlement discussions without knowing that this motion had been filed, it might have felt that TAMS had not been sufficiently forthright, a conclusion that could have affected adversely the parties' ability to reach a settlement. *Id.* ¶ 5.

In fact, the October 10 discussion between counsel for TAMS and DeSoto as it related to the instant motion was relatively brief. Counsel for DeSoto expressed the view that the motion was not meritorious. Counsel for TAMS expressed a contrary view, but said that the motion need not impede settlement because it was not motivated by any personal animus but was, as counsel for DeSoto correctly recalls, "just business". *Id.* ¶ 6.

With regard to the motion's effect on settlement, counsel for DeSoto advised counsel for TAMS on multiple occasions after their initial discussion on October 10 that DeSoto, far from

feeling "pressured" to settle by the pendency of this motion, was untroubled by it but viewed its

pendency as an *impediment* to settlement, expressed the view that withdrawing the motion

without prejudice would help facilitate settlement and asked counsel for TAMS to withdraw it

without prejudice. Despite DeSoto's counsel's statement that *withdrawing* the request would in

fact facilitate settlement, TAMS did not feel able to accede to DeSoto's request. *Id.* ¶ 7.

## CONCLUSION

For the reasons set forth herein, as well as in TAMS' Memorandum of Law in support of

this motion, TAMS respectfully requests that this Court grant its Motion for Terminating

Sanctions Against Defendants and for Revocation of the *Pro Hac Vice* Admission of, and for the

Disqualification of, Kyle P. Tate, Esquire.

Respectfully submitted,

Date: November 14, 2003

John Chesney (Attorney I.D. No. 24458)
Julianne Peck (Attorney I.D. No. 79966)
Jonathan Sturz (Attorney I.D. No. 88153)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-1996

Attorneys for Plaintiff/Intervenor
Toshiba America Medical Systems, Inc.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that today I caused a true and correct copy of

**Toshiba American Medical Systems, Inc.'s Reply Brief in Support of Motion For**

**Terminating Sanctions Against Defendants and for Revocation of the Pro Hac Vice**

**Admission of, and for the Disqualification of, Kyle P. Tate, Esquire** to be served upon

counsel of record for all of the other parties to this proceeding, by first class mail, postage pre-

paid, as follows:

> Kyle P. Tate, Esquire
> 9085 Sandidge Center Cove
> Olive Branch, Mississippi 38654
>
> Rosetta B. Packer, Esquire
> MCCARTER & ENGLISH
> Mellon Bank Center, Suite 700
> 1735 Market Street
> Philadelphia, PA 19103-7501
>
> William Matthews, Esquire
> SAUL EWING LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA 19102

Dated: November 14, 2003

Julianne Peck