UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. 2:02CV2810 |
| | : | |
| | : | HON. RONALD L. BUCKWALTER |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC. | : | |
| Plaintiff/Intervenor, | : | |
| | : | |
| v. | : | |
| | : | |
| DESOTO DIAGNOSTIC IMAGING, LLC., RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR PROTECTIVE ORDER UNDER Fed.R.Civ.P. 26(c)**

Plaintiff DeLage Landen Financial Services, Inc., ("DLL") by its undersigned attorneys, hereby files this Memorandum of Law in Opposition to Defendants' Motion for an Emergency Protective Order to limit the scope of discovery and prohibit inquiry into the billing practices of DDI. In order to place the current motion in context, a brief summary of the underlying facts and procedural history is in order.

**I.     Procedural History and Summary of Claims.**

Defendant DeSoto Diagnostics, Inc. ("DDI") is a Mississippi corporation with a place of business in Olive Branch, Mississippi. Pl.'s Complaint at ¶ 2. On June 9, 2000, through its chief manager, Defendant Lynn T. Carvel ("Lynn Carvel"), DDI signed a Lease Agreement ("Master Lease") to lease certain radiological equipment from Toshiba American Medical Systems Inc.

("TAMS" or "Plaintiff/Intervenor"). Defs.' Countercl. at ¶ 2. The Master Lease was for a term of 63 months, during which time DDI was to make 60 monthly payments to TAMS.

On June 9, 2000, the day Lynn Carvel signed the Master Lease, she and Defendant Randon J. Carvel ("Randon Carvel") each executed and delivered Personal Guarantees of DDI's obligations to TAMS under the Master Lease. On that same day, Defendants Delta Radiology, P.C. ("Delta") and Zobar Properties, LLC ("Zobar") each also executed and delivered Guarantees of DDI's obligations to TAMS under the Master Lease.

In accordance with the terms of the Program Agreement between TAMS and DLL's predecessor, Tokai Financial, simultaneously with the execution of the Master Lease and Guarantees, TAMS assigned all of its rights, title and interest under the Master Lease and Guarantees to Plaintiff DeLage Landen Financial Services, Inc. ("DeLage" or "DLL"). Following this assignment to DLL, TAMS entered into an agreement with DDI to continue to maintain and service the leased equipment.

On February 1, 2002, DDI defaulted upon its obligations to DLL by failing to make lease payments when due, and also by dismantling and removing the leased equipment prior to the end of the lease term. DDI claims that the equipment never functioned properly, and asserts that, as a result, it was under no obligation to continue making payments. Defs.' Countercl. at ¶¶ 21, 23. DLL demanded that DDI pay all amounts due and owing under the Master Lease, but DDI refused. As a result, DLL filed suit against Defendants. DDI continues to deny that it has defaulted under the Master Lease, even though there is no dispute that it stopped making payments beginning with the payment due on February 1, 2002. Subsequent to the filing of the suit by DLL, TAMS joined the action as an Intervenor Plaintiff. DLL has asserted cross claims against TAMS.

PH1: 469903.01

DDI filed separate answers and counterclaims to the complaint filed by DLL and to a separate complaint filed by TAMS. The original counterclaim against DLL parroted the allegations of the counterclaim against TAMS, asserted no specific affirmative acts of wrongdoing by DLL, and limited its theory of liability against DLL to the following allegations:

> 37. Counter-Defendants are informed and believe that TAMS and DLL are joint ventures, and/or partners, and upon that belief allege that the acts of TAMS are imputed to DLL and that DLL is accountable for TAMS' improper acts as set out above and below.
>
> 38. Prior to DLL taking assignment of TAMS' obligations to DDI, DLL either knew about, or through the use of due diligence should have discovered, that its joint venture/partner, TAMS, had already breached the agreements with DDI, such that neither TAMS nor its assignee DLL is entitled to further payment from DDI.

In September of 2001 DDI moved to amend its affirmative defenses and counterclaim to assert new claims and to significantly expand the claims asserted against DLL. Over DLL's objection, the Court granted leave to amend and DDI filed its Amended Affirmative Defenses and Counterclaims.

Among the claims set forth in the amended counterclaims are the following:

### COUNTERCLAIM I
### BREACH OF CONTRACT DELIVERY OF NON-CONFORMING GOODS

> 76. Soon after TAMS installed the equipment at the DDI facility, defendants discovered that the goods failed to perform in accordance with the Master Lease in that <u>the equipment did not perform the essential purpose for which it was intended</u>, and failed to consistently perform to the level of quality as expressly promised, warranted, and represented by TAMS to defendant.

### COUNTERCLAIM II
### BREACH OF EXPRESSED AND IMPLIED WARRANTY AGAINST TAMS

> 95. <u>The goods delivered to defendants were not fit for defendants' purposes in that the subject equipment routinely</u>

PH1: 469903.01

<u>produced poor images that were not capable of being used by the physicians for diagnostic purposes</u>.

### COUNTERCLAIM IV
### BREACH OF MASTER CONTRACT FINANCING PROGRAM AGREEMENT AGAINST TAMS AND DLL

113.   TAMS has breached its obligations under the financing agreement by failing to meet its duty to provide equipment that conforms to the express and implied warranties represented by TAMS as set out herein, in that, <u>inter</u> <u>alia,</u> <u>the equipment was not suitable for its intended purpose, was not timely or adequately repaired, and failed to produce high quality diagnostic images,</u> as represented and warranted by TAMS in the financing agreement and elsewhere.

### COUNTERCLAIM IX
### DECLARATORY JUDGMENT AGAISNT TAMS AND DLL

143.   The non-conformity of the equipment substantially impaired its value to defendants in that it did not produce high quality diagnostic images <u>and caused undue hardship of the defendants' business</u>.  (emphasis supplied)

Incorporating their factual allegations relating to alleged defects in the equipment, defendants also assert claims against DLL and TAMS of fraud (Counterclaim V), civil conspiracy (Counterclaim VI), and breach of an implied covenant of good faith and fair dealing (Counterclaim VII).  In Count IX they seek a declaratory judgment that defendants properly revoked acceptance of the goods and that they are entitled to the same rights and remedies with respect to the Master Lease Agreement as a buyer who has rightfully rejected non-conforming goods.

**II.     Argument**

At the heart of DDI's Answer and Counterclaim is the assertion that the medical equipment that it leased from DLL was defective and did not perform properly[1]. The evidence with respect to the nature and extent of these claimed defects is hotly disputed. While plaintiffs seek to characterize the defects as ongoing and material, TAMS contends that many of the problems were the result of operator error and inadequate training of DDI's technical staff. TAMS also contends that those equipment issues that were not attributable to operator error were resolved by TAMS.

One of the ways of measuring whether, in fact, the equipment failed to perform as alleged by defendants is to examine evidence of the extent to which DDI was in fact hindered in the operation of its business.[2] DDI's business is medical imaging. The equipment that is claimed to have been not suitable for use and incapable of rendering images suitable for diagnosis was used by DDI in the operation of its business. Discovery of DDI's financial and billing records for the time period both before and after the equipment was removed is clearly calculated to lead to the discovery of relevant admissible evidence as to this issue.

Defendants are resisting not only production of billing and financial records, but also any testimony by former employees of De Soto as to dissatisfactions and the reasons why they left. Such evidence is relevant to TAMS' contention that the equipment performed properly, but that DDI's employees did not receive adequate training and/or were told to operate the equipment in

---

[1] DLL does not concede that any such defects, if in fact they are proven to exist, excuse performance by DDI under the terms of the Master Lease. However, that issue is for another day.

[2] As noted above, DDI specifically alleges, as a basis for the declaratory relief it seeks in Count IX of the Amended Counterclaims, that:

> 143.     "The non conformity of the equipment substantially impaired its value to defendants in that it did not produce high quality diagnostic images and caused undue hardship of the defendants' business."

a manner inconsistent with protocols established by the manufacturer. The question at Mr. King's deposition that prompted counsel for DDI to interrupt the questioning and call the Court for guidance was a question having nothing to do with billing records, but was simply an open ended question regarding Mr. King's knowledge regarding the reasons for the high turnover of technical personnel at DDI.

Defendants make much of the fact that they are now asserting, in response to other motions filed by plaintiff/intervenor Toshiba, that they are not seeking to recover lost profits or lost revenues from the operation of their business as part of their claim[3]. They make this assertion in an apparent effort to shield disclosure of the billing records which are the subject of various outstanding discovery requests and of defendants "Emergency Motion" for protective order.

For the reasons set forth herein, the evidence sought is relevant not only to defendants' counterclaims, but also to DLL's affirmative claims. DDI contends that it is not in default of the Lease and disclaims liability for the remaining amount due under the lease based on the contention that the equipment did not perform properly. Moreover, even with the belated withdrawal of defendants' lost profit claims, defendants continue to assert claims for damages as to which the information sought is relevant. Attached hereto as Exhibit "A" is a true copy of Defendants' Second Supplemental Responses to TAMS' Second Set of Interrogatories detailing Defendants' Claimed Damages, based upon defendants' assertion that the equipment did not perform properly.

---

[3] This assertion resulted, in part, from the inability of Dr. Carvel, at her deposition, to respond to detailed questions about the loss of business and damage to reputation claimed.

PH1: 469903.01

For example, item V, entitled Initial Marketing and Advertising Costs, seeks to recover $5,543.19 in expenses associated with additional marketing and advertising of the DDI facility on the claimed basis that defendants were unable to provide services as advertised by reason of equipment failures and malfunctions.  Whether and the extent to which defendants were in fact unable to provide those services will be reflected in the billing and accounting records sought, as each procedure is subject to detailed billing and accounting procedures.  In addition, the extent of and reasons for high turnover among DDI's technical staff will also bear on this issue.

Item VIII of defendants' specification of damages is entitled "Reduction in Lease Payments" and provides as follow:

> Defendants incurred damages in an amount consistent with a United States District Court for the Eastern District of Pennsylvania jury award on the issue of <u>what would have been reasonable lease payments for the TAMS medical equipment that failed of its essential purpose, which was to perform as warranted</u>.  Defendants continued to make regular, full lease payments on TAMS medical equipment, despite the fact that it failed to perform as warranted for the entire time the equipment was operative at the DDI facility.  <u>The actual percentage by which regular lease payments should be reduced to account for the reduced capabilities of the equipment is a question of fact</u>, which should properly be decided by the jury in this matter.  (emphasis supplied).

DLL vigorously contends that defendants are entitled to no reduction and that in fact plaintiff is entitled to recover the full accelerated balance of the lease under the terms of the Lease Agreement with defendants.  However, given defendants' contention with respect to damages, plaintiff is entitled to test those contentions by examining the billing records for procedures performed on the equipment during a period of time in which defendants are alleging it "failed to perform as warranted".  Neither plaintiff nor TAMS should be forced to accept Dr. Carvel's testimony at trial without having the opportunity to test her assertions and shine a bright light on the evidence that might corroborate or refute those assertions.  In a case in which

defendants seek to be relieved of an obligation of in excess of $2,000,000 on the lease at issue as well as to recover affirmative compensatory and punitive damages on the counterclaim, both the spirit and the letter of the Rules of Civil Procedure and the scope of pretrial discovery demand as much.

Dr. Carvel has already testified under oath, and without objection, about her billing practices and her compliance with Medicare procedures, as well as about the turnover in technical personnel. (Dep of L. Carvel, Rule 30(b)(6) September 9, 2003, relevant portions of which are attached as Exhibit "B"). In light of this sworn testimony, there is no reason to shield defendants from this discovery, particularly in light of the probative nature of the evidence as to defendants own counterclaims in the action and the fact that there is in place a Stipulation and Confidentiality Order which permits defendants to designate evidence as confidential.

The evidence sought will do one of two things:

(a) Support DDI's contention that the equipment failed to perform properly; or

(b) Support TAMS' contention that the equipment performed in accordance with the manufacturer's specifications.

If the evidence supported DDI's position, one would reasonably expect DDI to be disclosing the evidence and seek to rely upon it at trial. Instead DDI seeks through its "Emergency Motion" to prevent this evidence from seeing the light of day.

A motion for protective order is not intended to enable a party to shield evidence harmful to its position. DDI's "Emergency Motion" does nothing more than assert broad conclusory allegations of harm unsubstantiated by specific factual references and examples. It falls far short of meeting the heavy burden required for the relief it seeks, which is to foreclose discovery of evidence that is clearly relevant and material to issues framed by defendants' own pleadings.

See, e.g., Merit Industries, Inc. v. Fever, 201 F.R.D. 382 (E.D.Pa. 2001); Frank v. County of Hudson, 924 F.Supp. 620 (D.N.J. 1996).

### III. Conclusion

For the foregoing reasons, it is respectfully requested that Defendants' Emergency Motion for Protective Order be denied.

                                               Respectfully submitted,

                                               **McCarter & English, LLP**

                                               _____
Peter J. Boyer (Attorney ID No. 25517)
Rosetta B. Packer (Attorney ID No.28357)
McCarter & English, LLP
Mellon Bank Center
1735 Market Street, Suite 700
Philadelphia, PA 19103

Attorneys for Plaintiff
De Lage Landen Financial Services

Dated: November 25, 2003

# CERTIFICATE OF SERVICE

I, Peter J. Boyer, Esquire, hereby certify that on November 25, 2003 I caused a true and correct copy of the within **Answer to Emergency Motion for Protective Order, Memorandum of Law in Opposition to Defendants' Emergency Motion for Protective Order Under Fed.R.Civ.P. 26(c), Proposed Order and this Certificate of Service** to be served upon counsel of record in the manner indicated below:

> Kyle P. Tate (Via Overnight Courier)
> TATE LAW FIRM
> 9085 Sandidge Center Road
> Olive Branch, MS 38654
>
> William Matthews, Esquire (By Hand)
> SAUL EWING LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA 19102
>
> John Chesney, Esquire (By Hand)
> Drinker Biddle & Reath, LLP
> One Logan Square
> 18th & Cherry Streets
> Philadelphia, PA 19103

Dated: November 25, 2003

_____
Peter J. Boyer