**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. 2:02CV2810 |
| | : | |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC., | : | |
| Plaintiff/Intervener, | : | |
| | : | |
| v. | : | |
| | : | |
| DESOTO DIAGNOSTIC IMAGING, LLC, RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC. | : | |
| Defendants and Counter-Claimants | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2004, upon consideration of Defendants' Motion for Leave to Amend Affirmative Defenses and Counterclaims, and any response thereto, it is hereby ORDERED that such Motion is GRANTED. Defendants shall file their Second Amended Affirmative Defenses and Counterclaims in substantially the same form as Exhibit 1 to their Motion for Leave to Amend Affirmative Defenses and Counterclaims within 5 days from Defendants' receipt of this Order.

BY THE COURT:

_____
HON. RONALD J. BUCKWALTER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. 2:02CV2810 |
| | : | |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC., | : | |
| Plaintiff/Intervener, | : | |
| | : | |
| v. | : | |
| | : | |
| DESOTO DIAGNOSTIC IMAGING, LLC, RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC. | : | |
| Defendants and Counter-Claimants | : | |
| | : | |

## DEFENDANTS' MOTION FOR LEAVE TO AMEND AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

For the reasons set forth in the accompanying Memorandum of Law, Defendants Desoto Diagnostic Imaging, LLC ("Desoto"), Randon J. Carvel ("Mr. Carvel"), Lynn T. Carvel ("Dr. Carvel"), Delta Radiology, P.C. ("Delta") and Zobar Properties, LLC ("Zobar") (collectively, "Defendants") request leave to amend their Affirmative Defenses and Counterclaims against Plaintiff De Lage Landen Financial Services, Inc. ("DLL") and Intervenor Toshiba America Medical Systems, Inc. ("TAMS") and to add Toshiba Corporation as a Counterclaim Defendant.

Respectfully Submitted,

By:_KT823_____
    Kyle P. Tate
    for TATE LAW FIRM
    9085 Sandidge Center Cove
    Olive Branch, MS 38654
    (662) 893-8833

Lynanne B. Wescott
William Matthews
For SAUL EWING, L.L.P.
Center Square West
1500 Market Street
Philadelphia, PA 19102-2186
(215) 972-7106

Attorneys for Defendants DeSoto Diagnostic
Imaging, LLC, *et al*

Dated: January 20, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. 2:02CV2810 |
| | : | |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC., | : | |
| Plaintiff/Intervener, | : | |
| | : | |
| v. | : | |
| | : | |
| DESOTO DIAGNOSTIC IMAGING, LLC, RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC. | : | |
| Defendants and Counter-Claimants | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE TO AMEND AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

### I.    INTRODUCTION

Defendants Desoto Diagnostic Imaging, LLC ("Desoto"), Randon J. Carvel ("Mr. Carvel"), Lynn T. Carvel ("Dr. Carvel"), Delta Radiology, P.C. ("Delta") and Zobar Properties, LLC ("Zobar") (collectively "Defendants") seek to amend their Counterclaims pursuant to Federal Rules of Civil Procedure 15(a), 15(c) and 13(f), to allow Defendants to add more detail to their counterclaims, to conform their counterclaims to the evidence, to assert additional claims of fraud and negligence against Intervenor Toshiba American Medical Systems, Inc. ("TAMS") and De Lage Landen Financial Services, Inc. ("DLL") which have been uncovered in discovery, to add Toshiba Corporation as a Counterclaim Defendant with regard to the proposed additional counterclaims against TAMS and DLL as well as to the existing counterclaim of Violation of Tennessee Consumer Protection Act and to assert additional affirmative defenses.

As the Court knows, this case was initiated by DLL, who claimed that it was the assignee of a lease between TAMS and Desoto relating to certain medical equipment. The medical equipment broke down repeatedly, and required Desoto to place over 200 service calls into TAMS during the approximately 14 month period in which the equipment was located at Desoto's facility in Olive Branch, Mississippi. Desoto continued to make payments on its lease obligations while TAMS continued to make promises that it would cure the deficient equipment, which it never did. Ultimately, Desoto asked TAMS to remove the faulty equipment.

In discovery, Defendants learned that TAMS, the supplier of the medical equipment, and Toshiba Corporation, the manufacturer of the medical equipment, knowingly made false material misrepresentations regarding the capabilities of the equipment and their ability to remedy the equipment problems before, during and after the sale of the medical equipment to Desoto. Instead of properly disclosing to Desoto the known equipment and service problems, both TAMS and Toshiba Corporation intentionally concealed the known problems from Desoto in an attempt to hide the truth. Throughout this litigation, TAMS has attempted to place blame for the equipment failures upon operator error and lack of operator training. Discovery has revealed that other Toshiba customers with the same or similar Toshiba equipment at issue in the case experienced the same or similar equipment problems that Desoto complained of. This information is important to Defendants' defense and counterclaims because it confirms the inherent Toshiba equipment problems, and clearly refutes TAMS' arguments of operator error and lack of operator training.

For the Court's convenience, Defendants have attached as Exhibit 1 to this pleading a proposed Second Amended Affirmative Defenses and Second Amended Counterclaims. If the

Court grants Defendants' Motion, Defendants intend to file its amended pleading in substantially the same form as Exhibit 1 to this Motion.

## II.    ARGUMENT

### A.    TAMS and DLL

Federal Rule of Civil Procedure 13(f) provides a flexible means by which a pleader may amend or add to its counterclaims: "When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." Fed. R. Civ. P. 13(f). Similarly, Rule 15 permits a party to amend a pleading by leave of court or by written consent of the parties, and provides that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Although language of Rules 13(f) and 15(a) is slightly different, "this variation has not led to significantly different standards for granting leave to amend…. If anything, the clause 'when justice requires' is especially flexible and enables the court to exercise its discretion and permit amendment whenever it seems desirable to do so." Nathanson v. Aetna Cas. & Sur. Co., Civ. No. 01-CV-3377, 2001 U.S. Dist. LEXIS 18248 (E.D. Pa. Nov. 7, 2001).

Defendants sought the consent of both DLL and TAMS to amend their affirmative defenses and counterclaims, but both TAMS and DLL refused to consent, resulting in this Motion. TAMS' counsel has indicated that it will amend as well if the Court grants the Defendants' Motion for Leave. Rule 15 of the Federal Rules of Civil Procedure openly contemplates allowing proposed amendments to, *inter alia,* amplify a previously alleged claim, change the theory of the case, state additional claims, increase the amount of damages, and to add parties to the action:

> Motions to amend under Rule 15(a) may be filed to cure a
> defective pleading, to correct insufficiently stated claims, to
> amplify a previously alleged claim, to change the nature or theory
> of the case, to state additional claims, to increase the amount of
> damages sought, to elect different remedies, or to add, substitute or
> drop parties to the action.

Wolfson v. Lewis, 168 F.R.D. 530, 533 (E.D. Pa. 1996) (Broderick, J.) (citing L. Charles Alan

Wright et al., Federal Practice and Procedure: Civil 2d § 1474 (1990)).

The standard to be applied has been clearly set forth by the Supreme Court and routinely

applied by this Court:

> If the underlying facts or circumstances relied upon by the Plaintiff
> may be a proper subject of relief, he ought to be afforded an
> opportunity to test his claim on the merits. In the absence of any
> apparent delay, bad faith or dilatory motive on the part of the
> movant, repeated failure to cure deficiencies by amendment
> previously allowed, undue prejudice to the opposing party by
> virtue of allowance of the amendment, futility of the amendment,
> etc. – the leave sought, should, as the rules require, be 'freely
> given.'

Wolfson, 168 F.R.D. at 533 (quoting Forman v. Davis, 371 U.S. 178, 182 (1962)).

The Third Circuit has held that undue prejudice to the non-moving party is "the

touchstone for the denial of the leave to amend." Id. (quoting Coventry v. United States Steel

Corp., 856 F.2d 514, 519 (3d Cir. 1998)). Defendants' proposed amendments do not pose any

risk of undue prejudice to DLL or TAMS. There is no fact or defense that DLL or TAMS would

be precluded from presenting as a result of the timing of this amendment. During the November

18, 2003 deposition of Paul King, a discovery dispute prompted a telephone call to Judge

Buckwalter, who in turn suspended any further discovery until after the December 1, 2003

discovery conference. As a result of that discovery conference, counsel for the parties have been

working toward an agreed upon scheduling order to allow the parties to complete their discovery.

At this time, however, the parties do not have in place the new discovery schedule.

Based on the parties' busy schedules, the remaining discovery motions to be filed and the number of combined depositions necessary for all parties to properly complete discovery, it seems only reasonable that at least an additional three months will be necessary to complete discovery, if not more. Thus neither DLL nor TAMS will suffer any prejudice as a result of this amendment, as the majority of the evidence to support the specifically asserted equipment and service fraud claims is complete with some of the remaining evidence being the subject of a Motion to Compel to be filed with the Court promptly.

### B.    <u>Toshiba Corporation</u>

Defendants and Counterclaimants seek leave to amend to add Toshiba Corporation as a Counterclaim Defendant in this case. In doing so, Defendants rely on Rule 15(c)(3) of the Federal Rules of Civil Procedure which requires that (1) the claim asserted in the amended pleading must arise out of the conduct, transaction, or occurrence set forth in the original pleading; (2) that the party added by the amendment must receive, "within the period provided by law for commencing the action against [it]," such notice of the institution of the action that it will not be prejudiced in maintaining its defense on the merits; and (3) within the same time constraints, the new party must have known or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against it. <u>Johnson v. Goldstein</u>, 850 F.Supp. 327, 329 (1994) (citing <u>Saviour v. City of Kansas City, Kan.</u>, 793 F.Supp. 293, 296 (D.Kan.1992)).

Defendants' proposed amended pleading simply incorporates Toshiba Corporation, who manufactured and warranted the equipment supplied to DeSoto, as revealed through discovery herein. It is evident that the claims asserted against Toshiba Corporation clearly arise out of the

conduct, transaction, or occurrence set forth in the original pleading, thus Rule 15(c)(3)'s first requirement is clearly met.

Pursuant to controlling authority, the second requirement, or the notice requirement, of Rule 15(c)(3) is met if Toshiba Corporation and TAMS have an "identity of interest." "Identity of interest generally means that the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." 6 Wright & Miller, Federal Practice and Procedure § 1499 at 244 (Supp.1985). Moreover, Toshiba Corporation's receipt of notice of Defendant's counterclaims need not be formal. See Fed.R.Civ.P. 15 Advisory Committee Notes.

In construing Rule 15(c)(3), courts have held that a plaintiff need only show that two corporations are sufficiently interrelated, because notice of a pending action to one serves as notice to the other. Swann Oil Co. Inc. v. M/S Vassilis, 91 F.R.D. 267, 269 (E.D.N.C.1981). Courts have also held that a plaintiff need not show that two corporations are in a parent and subsidiary relationship to establish an "identity of interest". Bernstein v. Uris Building Corp., 50 F.R.D. 121, 122 (S.D.N.Y.1970). TAMS and Toshiba Corporation work together daily as supplier and manufacturer with respect to selling, servicing and warranting the Toshiba medical equipment located in medical facilities throughout the United States. TAMS and Toshiba Corporation also work together on a daily basis with respect to customer complaints and equipment problems. Toshiba Corporation, as the manufacturer of the equipment, is responsible for teaching the TAMS engineers how to provide service to the medical equipment. In fact, without Toshiba Corporation, there would be no TAMS as TAMS is an operating company of Toshiba America, Inc. ("TAI"), a wholly owned subsidiary of the Toshiba Corporation. The corporate relationship between Toshiba Corporation with nothing more would satisfy the

"identity of interest" standard. See 6 Wright & Miller, Federal Practice and Procedure § 1499 at

518 (1971) (the relationship needed to satisfy the identity of interest test exists between a parent

and a wholly-owned subsidiary).

When considering Toshiba Corporation's direction and control over TAMS together with

Toshiba Corporation's and TAMS' intercorporate relationship, the "identity of interest"

necessary to satisfy the notice requirement of Rule 15(c)(3) is clearly met. See Johnson v.

Goldstein, at 330 (citing Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., 801 F.Supp.

1450 (E.D. Pa. 1992)).

While a literal reading of Rule 15(c)(3) might suggest that the element concerning a

mistake regarding the identity of the proper party only applies to misnamed or misdescribed

parties, "the Rule is widely-understood to allow the addition of new parties that were never

originally named or described." Wine v. Emsa Limited Partnership, 167 F.R.D. 34, n7 (E.D. Pa.

1996) (citing Heinly v. Queen, 146 F.R.D. 102, 107 (E.D. Pa. 1993)). The third requirement of

Rule 15 (c)(3) is closely related to the second, and provides for the "relation back" of the

amendment. This requirement ensures that the defendant to be added, knew or should have

known all along that joinder was a possibility. Taliferro v. Costello, 467 F.Supp. 33, 36

(E.D.Pa.1979). Toshiba Corporation had notice, at a minimum, per satisfying the second

requirement of Rule 15(c)(3) that Desoto counterclaimed against TAMS for breach of contract

and warranty claims as well as fraud claims regarding its Toshiba manufactured and warranted

medical equipment. Toshiba Corporation was certainly aware that the claims against TAMS

involved Toshiba Corporation, as Toshiba Corporation manufactured and warranted the

knowingly deficient medical equipment provided to Desoto.  Accordingly, it is also evident that

the third requirement of Rule 15(c) has been met and thus Defendants should be granted leave to

add Toshiba Corporation as a Counterclaim Defendant in this action.

As set forth above, the requirements of Rule 15(c)(3) have been satisfied to add Toshiba Corporation as a party to this action. Furthermore, Toshiba Corporation would also be properly added as a party necessary for the just adjudication of this matter pursuant to Rule 19(a)(1) of the Federal Rules of Civil Procedure.  Defendants have recently learned in TAMS' untimely objections to Defendants' Fourth Request for Production of Documents that TAMS refuses to disclose certain requested documents, including Toshiba Field Reports, Toshiba National Service Support Reports, Toshiba memos re: meetings, Toshiba Work Orders, Toshiba "Product Issues", Toshiba District Support Monthly Reports of Complaints and Toshiba Historical Activity Reports & Summaries, that were received by or exchanged between TAMS and Toshiba Corporation, and that would demonstrate the known inherent problems with the equipment prior to and after the sale of the equipment to DeSoto. But for Defendants' mistaken assumption that TAMS would produce those documents within its possession, custody or control, Defendants would have moved to add Toshiba Corporation as a Counterclaim Defendant at an earlier stage in this action to ensure that the necessary discovery requests would be answered. See <u>E.I. duPont de Nemours & Company v. Phillips Petroleum Company</u>, 621 F. Supp. 310, 314 (1985).

The above mentioned Toshiba Corporation documents are absolutely relevant and required to be disclosed for Defendants to have viable means of defending against claims that the equipment failed due to operator error and lack of operator training.  Such documents will also demonstrate the knowledge of the equipment problems before and after the sale to Desoto, and further confirm the fraud as pled in the proposed Second Amended Affirmative Defenses and Counterclaims attached hereto. Therefore, in the absence of Toshiba Corporation as a party to

this action from whom relevant and proper discovery can be obtained, complete relief cannot be accorded to the Defendants.  See FRCP 19(a)(1).

Defendants submit the attached proposed amended pleading in good faith, and submit that the attached proposed amended pleading will neither cause prejudice to any party nor cause any undue delay in the disposition of the case.

### III.    CONCLUSION

For the reasons set forth in this Memorandum, Defendants respectfully request that their Motion for Leave to Amend be granted.

Respectfully Submitted,

By:_KT823_____
Kyle P. Tate
for TATE LAW FIRM
9085 Sandidge Center Cove
Olive Branch, MS 38654
(662) 893-8833

Lynanne B. Wescott
William Matthews
For SAUL EWING, L.L.P.
Center Square West
1500 Market Street
Philadelphia, PA 19102-2186
(215) 972-7106

Attorneys for Defendants DeSoto Diagnostic
Imaging, LLC, *et al*

Dated: January 20, 2004

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am this day serving a copy of the attached Defendants' Motion for Leave to Amend Affirmative Defenses and Counterclaims upon the persons and in the manner indicated below:

Service by *<u>facsimile and by first-class mail</u>*, postage prepaid to:

Mr. Peter Boyer
Ms. Rosetta B. Packer
MCCARTER & ENGLISH, LLP
Mellon Bank Center, Suite 700
1735 Market Street
Philadelphia, PA 19103-7501

Mr. John Chesney
Ms. Julianne Peck
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

_KT823_____
Kyle P. Tate

Dated: January 20, 2004

**Exhibit 1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC., | : |
| | : CIVIL ACTION NO. 2:02CV2810 |
| Plaintiff/Intervenor, | : JURY DEMAND |
| | : |
| v. | : |
| | : |
| DESOTO DIAGNOSTIC IMAGING, LLC, RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC | : |
| | : |
| Defendants and Counterclaimants, | : |
| | : |
| v. | : |
| | : |
| TOSHIBA CORPORATION | : |
| | : |
| Counterclaim Defendant | : |

---

**DEFENDANTS' SECOND AMENDED AFFIRMATIVE
DEFENSES AND SECOND AMENDED COUNTERCLAIMS**

Defendants, Desoto Diagnostic Imaging, LLC, ("DDI"), Randon J. Carvel ("Mr. Carvel"), Lynn T. Carvel ("Dr. Carvel"), Delta Radiology, P.C. ("Delta") and Zobar Properties, LLC ("Zobar") (collectively, "Defendants"), assert their Second Amended Affirmative Defenses and their Second Amended Counterclaims against Delage Landen Financial Services, Inc. ("DLL"), Toshiba American Medical Systems, Inc. ("TAMS") and Toshiba Corporation, and hereby plead the following:

## AFFIRMATIVE DEFENSES

1.      DLL's and TAMS' Complaints fail to state a claim upon which relief can be granted against any Defendant.

2.      The actions brought by DLL and TAMS are barred by the doctrine of estoppel and/or waiver.

3.      The actions brought by DLL and TAMS are barred by the doctrine of laches.

4.      Any alleged non-performance by any Defendant as alleged by DLL and/or TAMS is excused due to failure of consideration.

5.      Any alleged non-performance by any Defendant is excused due to DDI's timely rejection and/or revocation of acceptance of nonconforming goods.

6.      Any alleged non-performance by any Defendant is excused due to DLL's, TAMS' and/or Toshiba Corporation's material breach of the express and/or implied warranties provided to Defendants.

7.      Any alleged non-performance by any Defendant is excused due to DLL's, TAMS' and/or Toshiba Corporation's material breach of the Master Lease and related documents.

8.      The Defendants are not bound to pay under the Master Lease or otherwise because TAMS, Toshiba Corporation and/or DLL failed to deliver goods in conformity with the Master Lease and pursuant to other related documents, namely Blanket Personal Guarantees, Corporate Resolutions and Corporate Guarantees (collectively, the "Master Lease" and attached hereto as Exhibit "A") and Master Contract Financing Program Agreement (the "Financing Agreement"). See Financing Agreement attached as Exhibit "B".

9.      The Defendants are not bound to pay under the Master Lease or otherwise because TAMS, Toshiba Corporation and/or DLL breached the Master Lease.

10.    The Defendants are not bound to pay under the Master Lease or otherwise because DDI rightfully rejected the equipment.

11.    The Defendants are not bound to pay under the Master Lease or otherwise because DDI justifiably revoked acceptance of the equipment.

12.    The Defendants are not bound to pay under the Master Lease or otherwise because the value of the Master Lease was substantially impaired by TAMS', Toshiba Corporation's and/or DLL's actions.

13.    The Defendants are not bound to pay under the Master Lease or otherwise because DDI rightfully cancelled the agreements as a result of TAMS', Toshiba Corporation's and/or DLL's repudiation, breach, default, breach of warranty, deceit, concealment, misrepresentations and fraud.

14.    Defendants are not liable to TAMS for reasons set out herein and within the Defendants' Counterclaims, and are likewise not liable to DLL because, as a purported assignee of TAMS, DLL took its alleged assignment from TAMS subject to all defenses and counterclaims of DDI and the Defendants herein.

15.    Neither TAMS nor DLL has been harmed by any action or inaction on the part of any Defendant.

16.    DLL's and TAMS' damages, if any, are due solely to third parties or other causes and matters that are not related to the actions of any Defendant.

17.    To the extent that DLL and/or TAMS has incurred damages as a result of any act or omission of any Defendant, or their agents or employees, which is denied, Defendants are entitled to discharge or modify the underlying agreements in whole or in part because of

impracticability, public policy, non-occurrence of a condition precedent, and/or present or prospective failure of performance by TAMS, Toshiba Corporation and/or DLL.

18.    To the extent that TAMS and/or DLL has incurred damages as a result of any act or omission of any Defendant, or their agents or employees, which is denied, Defendants are entitled to a setoff against DLL's and/or TAMS' claim for damages caused by DLL's, TAMS' and or Toshiba Corporation's actions set forth herein.

19.    The actions brought by DLL and TAMS are barred due to fraud on the part of TAMS, Toshiba Corporation and/or DLL, in that, TAMS, Toshiba Corporation, and/or DLL made material misrepresentations as set forth above and below in order to fraudulently induce DDI into signing the Master Lease and related documents.

20.    The actions brought by DLL and TAMS are barred due to fraud on the part of TAMS, Toshiba Corporation and/or DLL and thus making the entire Master Lease and any and all provisions within such Master Lease void and ineffective.

21.    The agreements and all provisions within those agreements on which DLL and TAMS are now proceeding were procured through fraud, deceit and concealment and are ineffective, void and/or voidable by the Defendants.

22.    The Defendants have fully performed their obligations, and have fully paid all monies due and owing.

23.    No Defendant is liable to DLL or TAMS because each Defendant fully performed every duty they were bound to perform under the agreements at issue, or is excused from performing as a matter of law.

24.    DLL's and TAMS' actions are barred by the doctrine of unclean hands.

-4-

25.    The Master Lease was not executed on behalf of TAMS by an authorized party as set forth below, and is thus invalid and void and/or voidable by the Defendants.

26.    The Financing Agreement and the Master Lease are invalid and void and/or voidable by the Defendants and therefore DLL and TAMS lack standing to sue Defendants.

27.    TAMS was acting as an agent/partner/joint venturer of DLL at all times relevant to the claims, counterclaims and defenses set forth in this action and both TAMS and DLL are responsible for the fraudulent actions and warranty breaches set forth herein, or pleading in the alternative, TAMS and DLL have disregarded the corporate form and were operating as one entity vis-à-vis the Defendants at all times relevant to the claims, counterclaims and defenses set forth in this action, thus the corporate veil has been pierced, and both TAMS and DLL are responsible for the fraudulent actions and warranty breaches set forth herein.

28.    TAMS was acting as an agent/partner/joint venturer of Toshiba Corporation at all times relevant to the claims, counterclaims and defenses set forth in this action and both TAMS and Toshiba Corporation are responsible for the fraudulent actions and warranty breaches set forth herein, or pleading in the alternative, TAMS and Toshiba Corporation have disregarded the corporate form and were operating as one entity vis-à-vis the Defendants at all times relevant to the claims, counterclaims and defenses set forth in this action, thus the corporate veil has been pierced, and both TAMS and Toshiba Corporation are responsible for the fraudulent actions and warranty breaches set forth herein.

29.    To the extent that TAMS and DLL have suffered damages as a result of the alleged claims against any Defendant, which is hereby denied, TAMS' and DLL's claims against Defendants are barred or limited due to TAMS' and DLL's failure to mitigate and/or minimize their damages.

30.     To the extent that DLL has suffered damages as a result of the alleged claims against any Defendant, which is hereby denied, and for which monetary damages are awarded, Defendants are entitled to an offset of such damages as a result of the actions of TAMS, Toshiba Corporation and DLL as set forth above and below or shall be entitled to seek reimbursement from TAMS and Toshiba Corporation for their actions as set forth above and below.

31.     The Defendants are not bound to pay under the Master Lease or otherwise because the Master Lease is unconscionable and unenforceable.

32.     The Defendants are not bound to pay under the Master Lease or otherwise because the Financing Agreement is unlawful, unconscionable and unenforceable.

33.     The Defendants are not bound to pay under the Master Lease or otherwise because the Financing Agreement between TAMS and DLL has been breached by TAMS.

34.     To the extent that the Master Lease and/or Financing Agreement is found to be ineffective, void, voidable, invalid or rescinded, Defendants are entitled to invoke all of the rights and protections afforded to buyers pursuant to the Uniform Commercial Code ("UCC").

35.     Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during the discovery proceedings in this case and hereby reserve their respective rights to amend this pleading and assert such further defenses.

## COUNTERCLAIMS

1.     In the fall of 1999, Dr. Carvel and her husband, Mr. Carvel, began working on plans to open a full service diagnostic imaging center in Olive Branch, Mississippi to be named Desoto Diagnostic Imaging, LLC, which would include the following modalities for service:

Magnetic Resonance Imaging (MRI), Computed Tomography (CT), Nuclear Medicine, X-Ray and Fluoroscopy, Ultrasound and Mammography.

2.      Dr. Carvel knew it was necessary to obtain top of the line equipment for each modality of service in order to compete with the established hospital services in the regional area of Memphis, Tennessee and North Mississippi.

3.      Dr. Carvel made contact with various diagnostic equipment vendors in an effort to obtain competitive quotes. Dr. Carvel and Paul King, the administrator for DDI, chose General Electric ("GE"), Phillips and Toshiba as the top three possible vendors. Dr. Carvel and Paul King chose to do business with Phillips initially but were disappointed to learn in January of 2000 that the Phillips financing source, CitiGroup, was offering a contingency approval plan for all the necessary equipment, subject to DDI receiving its Certificate of Need (CON) approval for use of the Magnetic Resonance Imaging equipment.

4.      Instead of agreeing to the Phillips' contingency approval plan, Dr. Carvel immediately re-contacted Toshiba because she had been told by a TAMS' sales representative that Toshiba could provide the sales, service and financing without involving any outside sources.

5.      Dr. Carvel later spoke with TAMS regarding finalizing an equipment deal. Dr. Carvel asked TAMS' sales representative, David Steiff, if TAMS would provide the financing for the equipment and Mr. Steiff responded "yes, that financing would not be a problem." David Steiff also stated to Dr. Carvel that, "Toshiba was a single source for sales, service and financing and that TAMS would select the state of the art equipment to meet DDI's needs". See Exhibit "C" (September 11, 2003 Affidavit of David Steiff, ¶4). Based on Mr. Steiff's representations,

Dr. Carvel proceeded with the process of the purchase of the Toshiba equipment on behalf of DDI.

6.      Upon information and belief, TAMS is an operating company of Toshiba America, Inc. ("TAI"). TAI is a holding company overseeing six operating companies including TAMS, and is a 100% owned subsidiary of the manufacturer of the equipment, Toshiba Corporation. Discovery has confirmed that Toshiba Corporation was the only manufacturer of the medical equipment.

7.      On behalf of DDI, Dr. Carvel, Mr. Carvel and Paul King traveled to Pensacola, Florida, to visit a Toshiba show site where they thought they were viewing Toshiba's state of the art equipment in an operational capacity. The Carvel's and Paul King were only allowed to view diagnostic images provided and selected by the site host via the computer's picture archive communication system (PACS). The images viewed by the Carvel's and Paul King via the PACS appeared to be of good quality.

8.      TAMS' sales representatives selected for DDI the Toshiba Corporation manufactured Toshiba Excelart 1.5T MRI System; Toshiba Asteion CT System; Toshiba GCA 7200 Nuclear Camera System and the Toshiba DUA 450 R&F System.

9.      TAMS selected and presented the Toshiba equipment to Dr. Carvel as "state of the art equipment" which she approved on behalf of DDI. Based on the representations of TAMS, Dr. Carvel believed and understood that the Toshiba equipment selected and presented by TAMS was Toshiba's top of the line "state of the art" equipment capable of providing the highest quality of images then available.

10.     Several persons purporting to be TAMS' representatives traveled to Memphis, Tennessee to meet with Dr. Carvel and her husband, Mr. Carvel. One of the purported TAMS'

representatives, Dave Begy, explained that TAMS had approved DDI for financing of the state of

the art equipment at approximately 2.5 million dollars. Dr. Carvel then asked who would be the

contact should problems with the equipment arise. The TAMS' representatives informed Dr.

Carvel that Toshiba was the single source for sales, service and financing, and that sales, service

or credit would respond to her equipment and/or financing needs. In reliance upon these and

other representations, Dr. Carvel, on behalf of DDI, agreed to move forward with the purchase of

the equipment. The TAMS' representatives then asked Dr. Carvel to be a "Toshiba Show Site"

where other possible Toshiba customers may visit and view the "state of the art" Toshiba

equipment in its operational capacity and Dr. Carvel agreed.

      11.    TAMS presented Dr. Carvel with a form document to sign for the purchase of the

equipment entitled Master Lease with other related documents, namely Blanket Personal

Guarantees, Corporate Resolutions and Corporate Guarantees (collectively, the "Master Lease").

      12.    Upon being presented with the Master Lease, Dr. Carvel, DDI's chief manager,

telephoned one of the purported TAMS' representatives, Dave Begy, with numerous questions

regarding the legal meaning and effect of these documents, but her questioning was cut off. She

was informed that the terms of the documents were non-negotiable. Dr. Carvel then mentioned

seeking an attorney's advice and Mr. Begy responded that the documents would not be changed

because these prepared contracts were "take it or leave it" contracts prepared by TAMS'

attorneys. TAMS assured Dr. Carvel that if any problems arose, TAMS would be eager to fix

them, especially since DDI would be a Toshiba national show site. Discovery in this case has

revealed that the Master Lease was actually drafted by DLL, who instructed and directed its

agent/partner/joint venturer or alter ego, TAMS, to conceal the identity and involvement of DLL

and present such documents to TAMS' customers as TAMS' documents.

13.     The Master Lease was not the result of any bargained-for exchange and is a contract of adhesion. Dr. Carvel was given no opportunity to negotiate the terms of the Master Lease or the forum selection clause in the Master Lease.

14.     Dr. Carvel was faced with either signing the Master Lease or not being able to obtain the necessary equipment in order to generate income to timely meet the committed monthly debt for the real estate and construction of the DDI facility. Therefore, on June 9, 2000, Dr. Carvel signed the Master Lease on behalf of DDI believing that TAMS was the Lessor, Supplier and Manufacturer of the equipment.

15.     On December 29, 2000, Lisa Sparta signed the Lease on behalf of Toshiba America Medical Systems, Inc. ("TAMS") as a Director of TAMS. Discovery has confirmed that Lisa Sparta has never been a Director of Toshiba America Medical Systems, Inc., nor an authorized representative of TAMS with authority to execute the Master Lease or related documents on behalf of TAMS, nor an employee of TAMS at any time. Lisa Sparta was an employee of DLL when she signed the Master Lease on behalf of TAMS without proper authority to do so, and concealed the identity and involvement of DLL.

16.     Nothing in the Master Lease allows for the lease payments to be paid to anyone other than the Lessor, TAMS, without first providing notice to the Lessee, DDI. The Lessee, DDI, never received notice of an assignment from Lessor, TAMS, nor did the Lessor, TAMS, ever direct that DDI should make lease payments to DLL.

17.     Upon information and belief, on or about July 19, 1996, TAMS and Tokai Financial Services, Inc. ("Tokai") entered into a Master Contract Financing Program Agreement (the "Financing Agreement") whereas TAMS desired to make lease and/or rental agreements for

the acquisition of medical equipment and licensing of any associated software for commercial or business purposes available to its customers known as Lessees.

18.     Upon information and belief, Tokai assigned the Financing Agreement to DLL upon DLL's acquisition of Tokai in or around March of 1999.

19.     Pursuant to the Financing Agreement as set forth in the recital of facts, Tokai (DLL's alleged predecessor of all right, title and interest to the Financing Agreement) desired to purchase the lease contracts from TAMS and to service the lease contracts in the name of TAMS upon the terms and conditions of the Agreement. Section One of the Financing Agreement then provides that "Notwithstanding anything to the contrary contained herein, the parties agree to operate the business of leasing equipment as provided in this Program Agreement using the Program Identifier, Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc." The parties then agreed in Section Six of the Financing Agreement that "TFS will service all Contracts on a private label basis in the name of TAMS so that the lease will at all times appear to Lessees to be a proprietary program of TAMS."

20.     TAMS and DLL, as the alleged successor in interest to Tokai, intentionally concealed from Defendants the existence of the Financing Agreement and in following the Financing Agreement intentionally concealed that DLL was involved in the equipment transaction between TAMS and DDI. Upon information and belief, this was done, *inter alia*, so as to prevent Defendants from learning that Toshiba was not a single source for sales, service and financing, as had been previously warranted.

21.     DLL sent several letters to Defendants, dated March 15, 2002, which was approximately one month after the equipment had been removed from DDI's facility, and wherein DLL introduces itself to Defendants for the first time and states in part that "Be advised

Toshiba Medical Credit has assigned your lease to De Lage Landen Financial Services, Inc. (DLL)", "your account is in default", and "Demand is hereby made for immediate payment of the accelerated balance .... to DLL". See March 15, 2002, Letters attached as Exhibit "D".

22.     Both DLL and TAMS in their respective Complaints state that "TAMS" leased certain equipment to DDI and that "TAMS" assigned to DLL all of its right, title and interest in and to the Master Lease and the guarantees. Despite the statements by both TAMS and DLL that identify TAMS as the Lessor of the equipment and despite the Master Lease itself specifically identifying Toshiba America Medical Systems, Inc. ("TAMS") as the Lessor, DLL illogically and deceitfully claimed in the above mentioned March 15, 2002 letters sent to Defendants that the entity "Toshiba Medical Credit" (apparent alleged Lessor) had assigned the lease(s) to DLL.

23.     DLL's deceitful actions to confuse Defendants as to the identity of the Lessor continued whereas on or about March 15, 2003, over a year after the equipment was removed from DDI's facility and well into the current litigation, DDI received two letters from "Toshiba America Medical Credit." The letters were undated, unsigned and did not have a return address; however, the envelopes were stamped with a postmark of March 14, 2003 and showing a return address of Account Processing Center, PO Box 6608, 1111 Old Eagle School Road, Wayne Pennsylvania 19087, which is actually a DLL address as shown on Exhibit "D" mentioned above. Both letters purported to advise DDI that a Lease with Toshiba America Medical Credit, a program of Toshiba America Medical Systems, had been assigned to DLL. The letters closed with typed language "Sincerely, Toshiba America Medical Credit," but did not reflect a hand written signature of any kind whatsoever. The letters on their face purported that Toshiba America Medical Credit (as the apparent Lessor) was attempting to notify DDI that it had assigned a lease with DDI to DLL. See March 2003 letters and envelopes attached as Exhibit

"E". The answers to interrogatories in this litigation have revealed that DLL was doing business as (d/b/a) under the name of "Toshiba America Medical Credit" and thus, any purported assignment from "Toshiba America Medical Credit" to DLL is an intentional attempt by DLL to deceive Defendants into believing that DLL could have somehow assigned a lease to itself by use of a d/b/a name.

24.    Both the March 15, 2002 letters (Exhibit "D") mentioned above and the letters received on or about March 15, 2003 (Exhibit "E") exemplify DLL's intentional deceitful conduct in trying to create the appearance to Defendants that an assignment from a separate entity had occurred in an attempt to make the purported assignment appear valid.

25.    DLL's conduct in claiming to have received an assignment from itself, d/b/a "Toshiba America Medical Credit", is also deceptive because DLL itself admitted in its Complaint that Toshiba America Medical Systems (TAMS) was the Lessor, not "Toshiba America Medical Credit". The Lessee, DDI, never received notice of an assignment from Lessor, TAMS, nor did the Lessor, TAMS, ever direct that DDI should make lease payments to DLL. Neither TAMS nor DLL have been able to produce any documentation in this litigation to support an assignment of the Master Lease from TAMS to "Toshiba America Medical Credit" nor any documentation to support an assignment from "Toshiba America Medical Credit" to DLL.

26.    The signature page of the Master Lease identifies Toshiba America Medical Systems (TAMS) as the only Lessor of the Master Lease and both DLL and TAMS alleged the same in their respective complaints. The top left header of the first page of the Master Lease document reflects the name "Toshiba America Medical Credit" and the introductory language of the Master Lease identifies "Toshiba America Medical Credit, a program of Toshiba America

Medical Systems, Inc. with a Lease processing Center located at 1055 Westlakes Drive, Berwyn,

Pennsylvania 19312 ("Lessor")," as the Lessor of the Master Lease. DDI learned through

discovery in this litigation that 1055 Westlakes Drive, Berwyn, Pennsylvania was actually an

address for DLL. DLL and TAMS engaged in a concerted effort to intentionally conceal the

identity of the true finance company from Defendants.

27.    Upon information and belief, DLL and TAMS agreed that DLL would use the

name "Toshiba America Medical Credit" because it appeared to be part of the Toshiba

organization and would most likely not raise a concern or issue with the Defendants or any other

customer as to whether Toshiba was actually the finance company as represented. Any purported

assignment from "Toshiba America Medical Credit" (DLL's d/b/a name) to itself as DLL is a

legal impossibility. The letters purporting to provide DDI with notice of a lease assignment from

"Toshiba America Medical Credit"(DLL's d/b/a name) to DLL shows bad faith and deception as

to the identity of the Lessor of the Master Lease.

28.    Upon information and belief, TAMS and DLL agreed not to disclose their

Financing Agreement and also agreed not disclose DLL's identity, so that TAMS could

intentionally misrepresent and portray itself to Defendants, as well as other customers, that

Toshiba is a single source for sales, service and financing in order to, *inter alia*, attempt to

strengthen TAMS' ability to compete for sales in the marketplace by misleading Defendants and

other customers into relying on representations that they would not be dealing with a third party

or outside lender, and would only be dealing with Toshiba as the financier.  TAMS and DLL

informed Defendants that they would deal with one entity, Toshiba, throughout the entire

business transaction and relationship, and that Toshiba would always be responsible for any

possible future equipment or financing issues.  Defendants relied on such representations and

believed that all the same available remedies and recourse for any possible equipment issues or finance issues could successfully be addressed with Toshiba, whether it be through sales, service or finance, when in fact such representations were not true.

29.     Upon information and belief, TAMS and DLL also did not disclose their relationship and the Financing Agreement to Defendants to prevent Defendants from learning about a points payment from DLL to TAMS for TAMS securing the Master Lease. Upon information and belief, TAMS generated the undisclosed points payment at the direction of DLL by intentionally inflating the Master Lease interest rate paid by the Defendants.

30.     Upon information and belief, DLL has used its agent/partner/joint venturer, or in the alternative, its alter ego, TAMS, in this undisclosed manner to lease medical equipment to the defendants and other Toshiba medical equipment customers throughout the United States.

31.     On or about October of 2000, TAMS and Toshiba Corporation prematurely supplied and delivered the equipment to DDI's unfinished facility in Olive Branch, Mississippi. TAMS insisted on placing the equipment in the unfinished building. DDI's general contractor instructed TAMS to wait until the building was finished so that the equipment would be properly protected but TAMS refused and placed the equipment in the unfinished facility. Delivery of equipment into a suitable environment may have reduced the probability of technical problems and equipment malfunctions with the Toshiba medical equipment.

32.     Under the terms of the Master Lease and Financing Agreement, TAMS and Toshiba Corporation were obliged to properly deliver in good working order certain medical diagnostic equipment to be installed by TAMS at DDI's facility.

33.     After the equipment was delivered to DDI and put into operation, it began manifesting substantial problems. Despite knowing that no known remedies for these problems

were available, representatives of TAMS and Toshiba Corporation informed and assured

Defendants that TAMS and Toshiba Corporation would take all actions necessary to make

certain that the equipment performed as warranted in, *inter alia*, brochures provided to

Defendants, operating manuals, written express warranties and representations made by TAMS

and Toshiba Corporation to Defendants as well as oral express warranties and representations

made by TAMS and Toshiba Corporation to Defendants.

34.    Defendants continued to have problems with the equipment and submitted

numerous requests to TAMS to remedy the Toshiba equipment problems. Defendants questioned

TAMS and Toshiba Corporation as to whether they could fix the Toshiba equipment problems.

Despite internal e-mails showing that no real remedies were known and that merely guessing and

trial and error were the only possible solutions, TAMS and Toshiba Corporation assured and

promised Defendants that they knew how and could repair and fix the equipment problems.

35.    On June 1, 2001 Tony Gay of TAMS sent Roy Johnson of TAMS and others an e-

mail stating that, "I am told that the direction from Japan [Toshiba Corporation] are suggestions

to try with no definitive action/direction."

36.    Kevin Smith of TAMS sent to Dan Smith of TAMS and others an e-mail June 4,

2001 stating that, "I wish, as an organization, we had more knowledge and experience on the

ExcelArt [MRI equipment], but the fact is this is a new product. Per Pat Bonner, there are

presently only seven installed in this country. With a base that size there is, as yet, no deep well

of problems/fixes in which to dip for a quick solution.… Although only seven systems exist here

how many others are installed world wide from which we can learn …. Roy will be onsite

Wednesday and a Japanese presence has been requested."

-16-

37.    Hirokazy Noguchi of Toshiba Corporation sent Jeff Badel of TAMS and others an e-mail on June 12, 2001 stating that, "we are thinking the cause of this problem will be BUS or Signal cable. Roy-san will receive Bus Cables tomorrow, however will not receive Signal Cable immediately. If he cannot fix RM-Error problem, we will dispatch engineer as soon as possible."

38.    Toshiba Corporation and TAMS never informed defendants of their inability to repair the equipment problems and chose to conceal from the Defendants the fact that they could not live up to their promises, TAMS and Toshiba Corporation continued to make unattainable assurances that the equipment problems could and would be remedied.

39.    The nuclear medicine radiological equipment malfunctioned to a degree that caused injury to one patient and had the potential to injure other patients. These incidents resulted in unwarranted legal liability on Defendants, as well as injury to Defendants' reputation among its patients and the community as a high-quality health care center dedicated to delivering the best care to patients, and physicians desiring services from Defendants.

40.    A TAMS service engineer, Donny Jenkins, confirmed the problems with the nuclear medicine camera in his deposition testimony which referenced a telephone conversation with Dr. Carvel, wherein he stated with regard to the nuclear medicine camera that "And in time, hopefully, they'll fix the crap."

41.    At the time DDI complained of poor image quality and other problems with the medical equipment, TAMS and Toshiba Corporation were aware of similar problems complained of by other Toshiba customers, but concealed such information from Defendants. TAMS and Toshiba Corporation made assurances and promises to DDI that the equipment problems could be repaired knowing that other Toshiba customers' similar equipment problems had not been repaired.

42.     Defendants specifically requested that TAMS provide the names of other Toshiba customers so that Defendants could contact such entities to explore if they, too, were having the same equipment problems that Defendants were experiencing. TAMS refused to provide other customer names for many months. At a November 14, 2001 meeting, the DDI administrator, Paul King, again requested from TAMS the names of other Toshiba customers with the same model equipment as DDI. Brian Turnbull, a TAMS' Vice President of Service, promised to provide such information. Some time after that November 14, 2001, meeting, Brian Turnbull responded to Mr. King that it was against Toshiba company policy to provide more than two customer names, and then identified Mike Feldman, Director of Integrated Services at Great Plains Regional Medical Center and John Carrol, Chief Technologist at Open MRI of Garden City as possible contacts. Mr. King immediately contacted both referenced customers and discovered that they were also experiencing the same or similar type problems with their Toshiba equipment. See Exhibit "F", Exhibit "G", Exhibit "H" and Exhibit "I".

43.     TAMS and Toshiba Corporation knew of specific problems with the specific equipment before the sale to DDI but intentionally failed to disclose such information to Defendants in order to make a sale. TAMS and Toshiba Corporation did not intend to follow through with the promises to repair the problems with the medical equipment because they knew the medical equipment had inherent problems and that they could not remedy the defects. At the time TAMS and Toshiba Corporation sold the Toshiba medical equipment to DDI as "state of the art" equipment, they knew at a minimum that the information available to it did not support that assertion, and those facts were particularly within TAMS' and Toshiba Corporation's knowledge. Dr. Carvel relied on TAMS' and Toshiba Corporation's assurances and understood that they knew of no facts incompatible with those statements.

-18-

44.     TAMS' representatives prepared and submitted equipment quotation sheets to DDI setting forth in line item the details of the Toshiba equipment and its capabilities. TAMS representatives promised and represented to Defendants that the Toshiba equipment quotation sheets were accurate and that Defendants would receive all the items and capabilities as listed on the equipment quotation sheets. Despite such representations, TAMS knew that Defendants would not receive all of the items and capabilities set forth on the equipment quotation sheets.

45.     As reflected on the MRI equipment quotation sheets, TAMS and Toshiba Corporation promised that at the time of installation of the equipment Defendants would receive the following items and/or capabilities, some of which were not received upon installation, some of which were never received, and some of which never performed as represented: (1) Cardiac Gating Unit; (2) DICOM, Query/Retrieve; (3) Future Upgrades; (4) Clinical Education Program; (5) DICOM Modality Worklist Management (identified as DICOM, MEM SKU KIT); (6) QuadScan advanced digital RF capabilities; (7) Advanced Fat Suppression Techniques; (8) Diffusion Weighted Imaging; (9) Homogeneity and Auto Active Shimming; (10) High level of signal to noise; and (11) RF Subsystem auto-tuned coils.

46.     As reflected on the Nuclear Medicine equipment quotation sheets, TAMS and Toshiba Corporation promised that at the time of installation of the equipment Defendants would receive the following items and/or capabilities, though they never performed as represented: (1) DICOM Modality Worklist; (2) DICOM, Query/Retrieve – Ethernet output (Advanced); (3) Robocontour; (4) Pendant switch; and (5) Auto Switch Panel.

47.     As reflected on the R&F equipment quotation sheets, TAMS and Toshiba Corporation promised that at the time of installation of the equipment Defendants would receive the following items and/or capabilities, though they never performed as represented: (1) Tomo

Attachment – DUA Series or Barless Tomography; (2) Bucky Tray; and (3) BLR – 15AA/U Auto Collimator.

48.     Upon information and belief, within a few months after the equipment sale to DDI, TAMS began marketing an upgraded version of their MRI called the "Excelart XG" that did not have the problems of the "Excelart AG".

49.     Dr. Carvel asked TAMS to upgrade DDI to the new MRI "Excelart XG" to eliminate Defendants' serious problems with the "Excelart AG", but TAMS refused to honor such request. Upon information and belief, TAMS refused to upgrade Defendants to the MRI "Excelart XG" so as not to jeopardize their marketing campaign targeted toward promoting affordable equipment for start-up businesses.

50.     TAMS and Toshiba Corporation made express written warranties to Defendants regarding the Product Warranty and Services Coverage wherein TAMS and Toshiba Corporation warranted to Defendants, *inter alia*, that the product(s) (Toshiba equipment) "to be delivered hereunder will be free from defects in material, manufacturing, workmanship, and title." Such warranty for the equipment was originally set for a 12 month period commencing from the date of installation. Because of the enormous number of equipment problems and the fact that the equipment never worked properly from the time of installation, Defendants requested from TAMS that the warranty period be extended until the equipment problems were resolved and the equipment functioned properly. TAMS refused to honor Defendants' warranty extension request but instead agreed to extend the warranty period for just 60 days, after which time Defendants would be required to begin paying for service coverage. TAMS assured Defendants that the equipment problems would be fixed within that time frame, although TAMS knew that the equipment problems were incapable of being remedied.

51.    TAMS and Toshiba Corporation made additional express warranties to Defendants regarding the performance and reliability of the Toshiba equipment prior to, during, and after the sale of such, including, but not limited to: (1) repeated written and oral warranties, promises, and assurances that the equipment would be "state of the art", highly sensitive and reliable for consistent imaging performance; (2) that the equipment would produce "high resolution images" and "uncompromised image quality"; (3) that the equipment would provide "fast scanning techniques" and "truly high field clinical performance while optimizing productivity with a truly multi-tasking and graphical user interface"; (4) that the equipment would provide "subsecond scanning" that makes "extraordinarily fast examinations possible" and deliver "high image quality, excellent operability and straightforward, accurate diagnosis at high speed, all of which improve total productivity"; and (5) that the equipment would perform at high speeds while remaining simple and easy to operate with auto-tuning and auto-shimming features.

52.    TAMS, Toshiba Corporation and/or DLL also expressly warranted, before, during, and after Defendants signed the Master Lease and related documents, that the equipment provided to Defendants would be "state-of-the-art," "on the leading edge of technology," superior to other diagnostic equipment available in the market, and capable of producing the highest-quality medical images, and in doing so, held itself up to a standard of quality higher than that the medical equipment would simply be marketable.

53.    Despite the express warranties that the goods would perform as described, the equipment never performed as warranted, and could not be consistently relied upon by Defendants to produce the high-quality images that were promised and for which Defendants acquired the equipment.

54.     Defendants did not receive TAMS' and/or Toshiba Corporation's top of the line "state of the art" equipment, nor even properly functioning equipment, as evidenced by the equipment problems over an approximately fourteen month period, and as further evidenced by the fact that TAMS and/or Toshiba Corporation had secretly instituted a marketing/advertising campaign to use DDI and other sites as Toshiba "show sites" for potential customers who could use TAMS and/or Toshiba Corporation's equipment that was not "state of the art" to start a business. See Exhibit "J".

55.     Upon information and belief, TAMS selected equipment for DDI with the specific intent to accommodate TAMS' and/or Toshiba Corporation's marketing/advertising campaign to promote more affordable equipment to start-up out-patient diagnostic businesses, while concealing that fact from the Defendants and in fact, representing to Defendants that their equipment was "state of the art" all the while knowing that it was not.

56.     TAMS failed to provide safe, high quality, reliable, "state of the art" medical equipment capable of performing at a level that would be expected from a "flagship show site" such as DDI, and TAMS' promises of high quality images were not realized at any time after the sale of the medical equipment. See Exhibit "K".

57.     The deficiencies of the equipment resulted in numerous service calls to TAMS technical support staff, which failed to repair the serious deficiencies of the equipment.

58.     DDI and TAMS executed individual service agreements and an addendum, collectively the "Service Agreement", for each piece of equipment included in the Master Lease. A true and correct copy of the Service Agreement is attached as Exhibit "L" and incorporated by reference.

59.    In addition to the above warranties, promises, and assurances that TAMS and Toshiba Corporation provided to Defendants, Defendants were also informed that in the event that the equipment failed to perform and/or operate as warranted, that TAMS or Toshiba Corporation would provide Defendants with a quick response by sending local, highly trained and capable service engineers who had received specialized training on each specific piece of equipment to the DDI facility to perform repairs. TAMS and Toshiba Corporation further assured Defendants that there were a number of specialized service engineers available to provide coverage for any particular piece of equipment at all times.

60.    Despite such representations, warranties, promises and assurances, TAMS and Toshiba Corporation knowingly sent service persons to the DDI facility who were not fully trained to repair and service the equipment, and who proved incapable of correcting, or repairing the multitude of problems with the equipment. On one occasion, a TAMS service repair person used baby oil to attempt to repair the MRI equipment which caused irreparable damage to a very expensive, and essential, component of the MRI system.

61.    On another documented occasion, TAMS clearly confirmed their shortage of service engineers problem by being incapable of providing a service engineer to respond to an equipment problem service call regarding the MRI. TAMS' severe problems with providing service are documented in internal communications.

62.    On May 25, 2001 Charles Ryan of TAMS sent Kevin Smith of TAMS and others an e-mail stating, "Kevin, it is all too true that we are without a trained Excelart engineer in the Memphis area. Ray Ruskowski resides in Alabama, 4-4.5 hr. drive from our customer DeSoto Diagnostic Imaging. I concur that Ray and Mike O'Barr have put forth great effort working with

the customer, but there is not substitute for having a fully trained engineer in the immediate area."

63.    Charles Ryan of TAMS sent Kevin Smith of TAMS and others an e-mail on June 4, 2001 stating, "Relative to your specific request for outside support of Desoto, while this seems a logical step the facts are there are only six engineers Excelart trained engineers remaining in the field. Of the six, three are region specialists, Roy Johnsen being one. The three actual customer engineers all have primary Excelart Systems assigned. Kevin, simply the resources are not there."

64.    Also on June 4, 2001, Dan Smith of TAMS sent Michael Parker of TAMS and others an e-mail stating that, "This is what we face when we don't have sufficient training availability prior to selling and installing new products. We talk a good NPI game but ignore critical components or milestones when we have the opportunity sell and install new systems. We just don't have the luxury or unlimited $'s to send people in to baby-sit and that would also leave any Excelart they service exposed, as well.".

65.    TAMS and Toshiba Corporation knew of the untrained service engineer problem, the shortage of service engineer problem and telephone service problems before, during and after the sale of the Toshiba equipment to DDI. TAMS and Toshiba Corporation chose to conceal such information from Defendants in order to make a sale. TAMS and Toshiba Corporation continued to make assurances that service issues were not a problem despite their knowledge. After the equipment was installed, TAMS and Toshiba Corporation learned of other equipment problems that were not disclosed to Defendants.

66.    TAMS and Toshiba Corporation also warranted, before installation of the equipment, and afterwards, that TAMS and Toshiba Corporation would provide prompt

telephone support by individuals trained to assist Defendants in the use and repair of the equipment. Despite the promises, assurances, and warranties, TAMS and Toshiba Corporation failed to provide prompt telephone support. On at least one documented occasion, Kevin Smith of TAMS Service confirmed in an e-mail sent to Charles Ryan of TAMS and others on May 25, 2001, that the TAMS telephone support service, Assist Center, responded to a telephone call from DDI "stating something to the effect that 'we don't know anything about Excelart [MRI], please contact your local CE'."

67.    During the approximately 14 month period that the equipment was installed at the DDI facility, Defendants placed over 200 service calls to report that the equipment failed to operate as warranted which substantially impaired its value to Defendants in that it did not produce high-quality images and caused undue hardship on Dr. Carvel.

68.    TAMS had a duty to deliver equipment in conformity with the express and implied warranties.

69.    Defendants promptly notified TAMS of the nonconformities.

70.    TAMS failed to cure the equipment's nonconformities within a reasonable time.

71.    After TAMS failed to cure the nonconformities, Dr. Carvel requested that TAMS remove the equipment by letter to a TAMS officer, dated October 8, 2001. A true and correct copy of the October 8, 2001 letter is attached as Exhibit "M" and incorporated herein by reference.

72.    On October 16, 2001, Dr. Carvel e-mailed TAMS again demanding the removal of the equipment from the DDI facility. See Exhibit "N".

73.    In a letter dated October 24, 2001, TAMS refused to remove the equipment. See Exhibit "O".

74.    In November of 2001, numerous persons purporting to be TAMS or Toshiba Corporation representatives met with Defendants at the DDI facility where Defendants again discussed their problems and expressed dissatisfaction with the equipment. The TAMS or Toshiba Corporation representatives assured Defendants that the equipment would be cured and performing properly within sixty (60) days, although TAMS and Toshiba Corporation already knew that it could not do so. Unbeknownst and undisclosed to Defendants at the time was that one of the individuals who participated in the meeting as a representative of TAMS or Toshiba Corporation was actually a DLL employee.

75.    Near the end of the sixty (60) day period, Defendants notified TAMS and Toshiba Corporation that there had been "no improvement in equipment performance" and that "the situation has continued to deteriorate." See Exhibit "P".

76.    Defendants performed all obligations under the Master Lease and related documents in that it made timely lease payments until such time as Defendants requested removal of the equipment because TAMS had breached the Master Lease and Service Agreements as set forth above and below.

77.    On or about March 12, 2002, Dr. Carvel received a voice mail message from Jake Hornung who identified himself as an employee of "Toshiba Medical Credit" and requesting payment for the equipment.

78.    On March 18, 2002, Dr. Carvel returned Mr. Hornung's voice mail message and told Mr. Hornung that she had received a default letter from him on behalf of DLL which was dated March 15, 2002. Dr. Carvel then asked Jake Hornung if he was with Toshiba Medical Credit and his response was "No." Mr. Hornung went on to state that "I said that originally because there was some debate as to whether or not we were going to disclose the private label

agreement that was in effect but the decision came down later to disclose that so that's why we sent that letter out well, <u>and uh there's actually some questions on this end</u> and we think it would be best at this point if we could sit down and everybody trying to at least work it out from our end here at De Lage Laden."

79.     Defendants became aware of DLL for the first time in the letter from DLL to DDI dated March 15, 2002, which disclosed for the first time that there had been a purported assignment of the TAMS lease.

80.     The DLL employee, Mr. Hornung, then requested that Dr. Carvel call him back to discuss the March 15, 2002 letter with other DLL employees and Dr. Carvel agreed. During a telephone call on the afternoon of March 18, 2002, other DLL employees joined in the conversation. One of the DLL employees named Ray Crouse stated "We, as you know, we broke our private label and informed you of who we were, De Lage Laden, which is the Lessor on this piece of equipment. We hold the paper and we have no, are not able to do any resolve as far as the technical part of the equipment". Mr. Crouse's comment confirms that DLL and TAMS intentionally misrepresented to Defendants the identity of the Lessor.

81.     The March 18, 2002 conversations between DLL and Dr. Carvel confirm that TAMS and DLL were undisclosed partners in the sale and financing of the equipment under a so-called private label agreement referenced herein as the Financing Agreement.

82.     At all times prior to the March 18, 2002 conversations with DLL, Defendants believed and relied upon the representation of TAMS that Toshiba was a single source for sales, service and financing. In reliance upon TAMS' representation that Toshiba was a single source for sales, service and financing along, with the express representations by TAMS that TAMS

was the Lessor of the Master Lease for the equipment and the fact that the written Master Lease document listed TAMS as the Lessor, Defendants signed the Master Lease.

83.     As stated above, Defendants are informed and believe that TAMS and DLL are agents/partners/joint ventures or in the alternative alter-egos at all times relevant to these counterclaims and defenses set forth herein, and upon that belief allege that the acts of TAMS are imputed to DLL and vice versa.

84.     As stated above, Defendants are informed and believe that TAMS and Toshiba Corporation are agents/partners/joint ventures or in the alternative alter-egos at all times relevant to these counterclaims and defenses set forth herein, and upon that belief allege that the acts of TAMS are imputed to Toshiba Corporation and vice versa.

## COUNTERCLAIM I

### (Breach of Contract: Delivery of Nonconforming Goods
### Against TAMS and Toshiba Corporation)

85.     Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

86.     TAMS and Toshiba Corporation had a duty to comply with terms of the Master Lease and post-agreement warranties, promises, assurances, and representations made by TAMS and Toshiba Corporation to Defendants.

87.     The Master Lease and Financing Agreement obligated TAMS and Toshiba Corporation to deliver goods and equipment that conformed to the warranties represented by TAMS and Toshiba Corporation.

88.     TAMS and Toshiba Corporation breached their duty to deliver conforming goods to Defendants by delivering nonconforming equipment to Defendants.

89.     Soon after the equipment was installed at the DDI facility, Defendants discovered that the goods failed to perform as warranted and represented by TAMS and Toshiba Corporation.

90.     After discovering the goods were nonconforming, DDI notified TAMS of Defendants' intention of rejecting the nonconforming equipment. Thereafter, TAMS assured Defendants that the flawed equipment would be seasonably cured, or promptly repaired, and that TAMS would take the necessary action to ensure that the equipment began performing at the level as warranted by TAMS and Toshiba Corporation, within a reasonable time.

91.     TAMS and Toshiba Corporation failed to cure and/or correct the equipment problems despite their further assurances and warranties. The equipment continued to remain substantially nonconforming and Defendants were damaged as a result thereof.

92.     On or about October 8, 2001, and within a reasonable time after Defendants discovered the substantial defects amounting to a default under the lease agreement and TAMS and Toshiba Corporation failed to cure, Defendants again notified TAMS, in writing, that the goods delivered were defective, and that Defendants were revoking acceptance of the goods, and furthermore, that TAMS was in default under the Master Lease for tendering faulty and defective equipment and failing to seasonably correct the critical and substantial defects. See Exhibit "M".

93.     The serious and substantial nonconformities in the equipment substantially impaired its value to Defendants such that Defendants' revocation of acceptance was justified due to the difficulty of discovery of the nonconformity before acceptance, and the post-discovery

assurances, promises, representations, and warranties by TAMS and Toshiba Corporation to Defendants that the equipment would be seasonably cured.

94.     During the entire time that the equipment remained in Defendants' possession, or under its control, Defendants held the nonconforming goods with studied and reasonable care.

95.     After notifying TAMS of its desire that the equipment be removed from its facility, and despite multiple and repeated requests to TAMS, Defendants received no instructions for the disposition of the flawed equipment.

96.     After justifiable rejection of the goods, and in a commercially reasonable manner, Defendants, in good faith, obtained non-defective medical diagnostic equipment from another supplier.

97.     Defendants' acquisition of new non-defective equipment was made in a good faith and commercially reasonably manner.

98.     TAMS and Toshiba Corporation, through their actions against Defendants, have breached the implied duty of good faith and fair dealing in their contracts and are liable for the damage resulting from this breach.

99.     As a direct result of TAMS and Toshiba Corporation's actions, Defendants have incurred and will continue to incur damages, costs and expenses.

WHEREFORE, Counterclaimants/Defendants demand judgment against TAMS and Toshiba Corporation for the actual, incidental, and consequential damages suffered as a result of the actions herein described, as well as interest as permitted by law, and any other and further relief deemed proper.

## COUNTERCLAIM II

### (Breach of Express Warranties
### Against TAMS, Toshiba Corporation and DLL)

100.     Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

101.     Defendants relied on TAMS', Toshiba Corporation's and DLL's express warranties and representations with respect to all aspects of the purchase of the Toshiba equipment.

102.     Defendants relied on TAMS' expertise, skill, and judgment in TAMS' selection of and furnishing of the equipment under the Master Lease.

103.     Defendants at all times directly relied upon the express warranties and affirmations given by TAMS, Toshiba Corporation or undisclosed DLL representatives (and purported TAMS representatives) to Defendants.

104.     TAMS, Toshiba Corporation and DLL breached their express warranties to Defendants by, *inter alia*: (1) providing equipment to Defendants that was not "state of the art" and not reliable, but repeatedly malfunctioned or broke down; (2) failing to provide all of the items and capabilities as set forth on the equipment quotation sheets; (3) providing Defendants with equipment that was not free from defects, but that required constant service; (4) providing equipment that failed to consistently produce quality images and that proved incapable of producing the high-resolution images with "uncompromised image quality" that was promised; (5) providing equipment that did not perform fast, high-speed scanning techniques or optimize productivity, but regularly increased the time spent on patient procedures and impaired

Defendants' total productivity; (6) providing equipment that was not simple and/or easy to operate with auto-tuning and auto-shimming features, but required constant supervision and support by DDI personnel; (7) knowingly providing equipment that was substantially inferior to other diagnostic imaging equipment available in the market despite TAMS and Toshiba Corporation's representations that the equipment was "state of the art", "on the leading edge of technology" and capable of producing the highest-quality medical images; (8) failing to remedy the known problems involving untrained service engineers, the shortage of service engineers, and inadequate telephone service and support; and (9) failing to remedy Defendants' equipment problems despite their assurances that Defendants' equipment problems would be seasonably cured and Defendants' equipment would perform properly.

105.    TAMS', Toshiba Corporation's and DLL's actions set out herein breach their express warranties to Defendants, as a result of which Defendants have been damaged.

WHEREFORE, Counterclaimants/Defendants demand judgment against TAMS, Toshiba Corporation and DLL for the actual, incidental, and consequential damages it has suffered as a result of the actions herein described, interest as permitted by law, and any other and further relief deemed proper.

## COUNTERCLAIM III

### (Breach of Implied Warranties
### Against TAMS, Toshiba Corporation and DLL)

106.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

107.    In signing the Master Lease and afterwards, Defendants relied on TAMS', Toshiba Corporation's and DLL's implied warranties and representations.

108.    At the time the Master Lease was executed, TAMS and DLL knew of the particular purpose for which Defendants intended to use the goods described in the Master Lease, and warranted that the equipment was fit for that purpose. TAMS and DLL were informed and knew, or had reason to know, that Defendants required the equipment for providing state-of-the-art diagnostic images for patients and area doctors, in fact, TAMS chose the equipment for the Defendants.

109.    TAMS, Toshiba Corporation and DLL impliedly warranted to Defendants that the equipment was merchantable, such that the equipment must have been able to pass without objection.

110.    TAMS, Toshiba Corporation and DLL impliedly warranted that the equipment was merchantable, such that the equipment was required to be fit for the particular purposes for which it was to be used by Defendants.

111.    TAMS, Toshiba Corporation and DLL delivered equipment that failed to pass without objection by Defendants.

112.    Defendants relied on TAMS' expertise, skill, and judgment in TAMS' selection of and furnishing of the equipment under the Master Lease.

113.    The goods delivered to Defendants were not fit for Defendants' purposes in that the equipment continuously manifested errors, or otherwise failed to reliably operate in its intended manner such that the equipment was unavailable for extended and intermittent periods during which the equipment was not timely repaired and which undermined Defendants ability to consistently use the equipment for its intended purposes.

-33-

114.     In signing the Master Lease, and in continuing to perform its obligations under it for a period after the Master Lease was signed, Defendants at all times directly relied upon the implied warranties and affirmations given by TAMS, Toshiba Corporation and DLL representatives (and purported TAMS representatives) to Defendants, such representations being made before, during, and after the Master Lease was signed.

115.     TAMS, Toshiba Corporation and DLL breached their implied warranties to Defendants by, *inter alia*: (1) providing equipment to Defendants that was not reliable, but repeatedly malfunctioned or broke down; (2) providing equipment that did not consistently produce quality images and thus proving incapable of producing the high-quality images that were promised; and (3) providing equipment that was not simple and/or easy to operate, but required constant supervision and support by DDI personnel.

116.     TAMS, Toshiba Corporation and DLL, in taking those actions set out and described herein, breached the implied duty of good faith and fair dealing in every commercial contract and are bound for the damage resulting from this breach.

117.     TAMS', Toshiba Corporation's and DLL's actions set out herein breach their implied warranties to Defendants, as a result of which Defendants have been damaged.

WHEREFORE, Counterclaimants/Defendants demand judgment against TAMS, Toshiba Corporation and DLL for the actual, incidental, and consequential damages it has suffered as a result of the actions herein described, interest as permitted by law, and any other and further relief deemed proper.


## COUNTERCLAIM IV

### (Breach of Contract as to the Service Agreements
### Against TAMS)

-34-

118.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

119.    TAMS had a duty to comply with the terms and conditions of the service agreements and the addendum, attached as Exhibit "L", both of which were, upon information and belief, drafted solely by TAMS and/or Toshiba Corporation.

120.    TAMS breached its duty under the service agreements by sending unqualified and untrained service engineers to service the equipment sold to DDI. TAMS further breached its duty under the service agreements by failing to have available qualified and trained local service engineers to service the equipment in a timely manner when requested.

121.    As a result of TAMS' breach of the service agreements, Defendants have been damaged in its business.

WHEREFORE, Counterclaimants/Defendants demand judgment against TAMS for the actual, incidental, and consequential damages it has suffered as a result of the actions herein described, interest as permitted by law, and any other and further relief deemed proper.


## COUNTERCLAIM V

### (Third Party Beneficiary Claim: Breach of Master Contract Financing Program Agreement Against TAMS and DLL)

122.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

123.    On or about July 19, 1996, TAMS entered into the Financing Agreement with Tokai Financial Services, Inc. ("Tokai"). Upon information and belief, DLL subsequently assumed Tokai's rights and obligations under the Financing Agreement.

124.    The agreement between TAMS and Tokai was made in contemplation of future sales or leases of TAMS' equipment whereby TAMS could solicit its potential customers by offering financing to prospective buyers/lessees, while at the same time creating an obligation for Tokai, upon the satisfaction of certain conditions, to assist TAMS in financing the sale/lease.

125.    The Financing Agreement was made for the express benefit of the prospective buyers/lessees in that it created a means for the prospective buyers/lessees to acquire equipment from TAMS, over which TAMS warranted to Tokai, prospective buyers/lessees, and future assignees, among other things, the equipment would provide high image quality at high speeds while remaining simple and easy to operate.

126.    By the express terms of the Financing Agreement, TAMS was bound to supply equipment to the prospective buyers/lessees that conformed to the express and implied warranties.

127.    The Financing Agreement was intended to benefit the contemplated prospective buyers/lessees in that it created warranties as to the quality and performance of the TAMS equipment, required TAMS, Tokai, and any assignees to conduct all duties and obligations reasonably, fairly, and in good faith, all of which were intended to inure to the benefit of the prospective buyers/lessees whom were expressly contemplated by the agreement.

128.    The Financing Agreement was further intended to benefit those prospective buyers/lessees in that within it TAMS undertook the duty to perform such maintenance and

service and provide supplies and warranties as would later be agreed to by TAMS and the prospective buyers/lessees.

129.    TAMS was bound to honor express and implied warranties and other duties flowing from the TAMS/Tokai Financing Agreement in favor of Defendants, an intended beneficiary of the Financing Agreement.

130.    TAMS has breached its obligations under the Financing Agreement by failing to meet its duty to provide equipment that conforms to the express and implied warranties represented by TAMS as set out herein, in that, *inter alia*, the equipment was not timely or adequately repaired, and failed to produce high-quality images, as represented and warranted by TAMS in the Financing Agreement, and elsewhere.

WHEREFORE, Counterclaimants/Defendants demand judgment against DLL and TAMS for the actual, incidental, and consequential damages it has suffered as a result of the actions herein described, as well as interest as permitted by law, and any other and further relief deemed proper.

## COUNTERCLAIM VI

### (Fraud Against TAMS and DLL)

131.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

132.    As set forth above, TAMS and DLL made representations to Dr. Carvel that Toshiba was the single source for equipment sales, service and financing and that Toshiba sales,

service or credit would be responsible should problems with the equipment and/or financing arise.

133.    At the time TAMS and DLL made these representations they did so knowing that Toshiba was not the single source for equipment sales, service and finance and that Dr. Carvel on behalf of DDI would rely on those representations.

134.    At the time TAMS and DLL made these representations, TAMS and DLL did so knowing them to be false, and with the intent to induce Defendants as set forth herein above to commit to purchasing or leasing the equipment and signing related documents for the benefit of TAMS and DLL.

135.    Defendants reasonably relied on the statements made by TAMS and DLL, that Toshiba was the single source for sales, service and financing of the equipment and that Toshiba sales, service or credit would be responsible for should problems with the equipment and/or financing arise.

136.    TAMS and DLL intentionally concealed from Defendants their relationship so as to deceive Defendants into believing and relying upon that Defendants would be contracting with one entity, TAMS, and thereby defrauding Defendants as set forth above and below.

137.    TAMS and DLL intentionally concealed their relationship from Defendants and, upon information and belief, worked secretly with DLL to secure an inflated interest rate finance deal for DLL and to secure an undisclosed points payment for TAMS, thereby defrauding Defendants as set forth herein.

138.    Dr. Carvel, in reliance upon the representations made by TAMS and DLL, agreed to purchase the equipment, signed the Master Lease and related documents and went forward with plans to make DDI a Toshiba equipment show site.

139.    The actions of TAMS and DLL were done intentionally, willfully, maliciously, outrageously and in bad faith.

140.    As a direct and proximate result of the fraudulent representations and actions of TAMS and DLL, Defendants have suffered substantial damages.

WHEREFORE, Counterclaimants/Defendants demand judgment in their favor and against TAMS and DLL for compensatory and punitive damages in an amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for Plaintiffs' failures to perform and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in connection with this action, along with such other and further relief as this Court deems just and proper.

## COUNTERCLAIM VII

### (Civil Conspiracy to Commit Fraud
### Against TAMS and DLL)

141.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

142.    At all times material hereto, TAMS and DLL agreed by and between themselves to intentionally misrepresent themselves to Defendants as a single source for sales, service and financing in order to secure Defendants' purchase or lease of the equipment and thereby defraud Defendants as set forth above.

143.    Upon information and belief, TAMS and DLL intentionally concealed their relationship and obligations to each other and worked secretly to *inter alia*, secure an inflated

interest rate finance deal and an undisclosed points payment as mentioned above and thereby defraud Defendants as set forth above and below.

144.     The actions of TAMS and DLL, as set forth above, were done so intentionally, willfully, maliciously, outrageously and in bad faith.

145.     The actions of TAMS and DLL, as set forth above, constituted an unlawful act to defraud Defendants.

146.     As a direct and proximate result of the unlawful conspiracy between TAMS and DLL, Defendants have suffered substantial damages.

WHEREFORE, Counterclaimants/Defendants demand judgment in their favor and against DLL and TAMS for compensatory and punitive damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for fraud and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in connection with this action, along with such other and further relief as this Court deems just and proper.

## COUNTERCLAIM VIII

### (Fraud Against TAMS and Toshiba Corporation)

147.     Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

148.     As set forth above, TAMS and Toshiba Corporation made false representations of material facts to Defendants regarding the capabilities, performance and reliability of the medical equipment before, during, and after Defendants signed the Master Lease and related documents to purchase the Toshiba Corporation equipment.

149.    At the time TAMS and Toshiba Corporation made these representation they did so knowing that the medical equipment had inherent problems, and also knew that they could not remedy the defects.

150.    At the time these representations were made, TAMS and Toshiba Corporation intended that Defendants rely on them.

151.    TAMS and Toshiba Corporation defrauded Defendants by, *inter alia*: (1) representing that Defendants would receive "state of the art" and reliable equipment, when in fact that was known to be false; (2) representing that Defendants would receive all of the items and capabilities as set forth on the equipment quotation sheets, when in fact that was known to be false; (3) representing that Defendants would receive equipment that was free from defects, when in fact that was known to be false; (4) representing that Defendants would receive equipment that would consistently produce high-resolution images with "uncompromised image quality", when in fact that was known to be false; (5) representing that Defendants would receive equipment that would perform fast, high-speed scanning techniques and optimize productivity, when in fact that was known to be false; (6) representing that Defendants would receive equipment that was simple and/or easy to operate with auto-tuning and auto-shimming features, when in fact that was known to be false; and (7) representing that Defendants would be provided with qualified and trained local service engineers and qualified telephone service support, when in fact that was known to be false.

152.    TAMS and Toshiba Corporation lacked the intention to live up to their statements regarding the performance and reliability of the medical equipment as set forth herein above and below, and knew at a minimum that the information available to them did not support their assertions.

153.    Additionally, TAMS and Toshiba Corporation knew at that time that other Toshiba customers were experiencing and complaining of the same types of problems that Defendants were experiencing, and that the problems were incapable of repair. TAMS and Toshiba Corporation had a duty to disclose the existence of complaints from other Toshiba customers concerning image quality and similar problems as those complained of by Defendants, but failed to do so.

154.    TAMS' and Toshiba Corporation's intent was to deceive and to induce Defendants to commit to purchasing or leasing the equipment and sign related documents for the benefit of TAMS and Toshiba Corporation, and to delay the rejection of the nonconforming equipment and/or the revocation of acceptance of the goods for the benefit of TAMS and Toshiba Corporation.

155.    TAMS and Toshiba Corporation intentionally concealed from Defendants the existence of similar complaints from other Toshiba customers so as to deceive Defendants into believing and relying upon the assurances that the equipment problems were capable of repair, thereby defrauding Defendants.

156.    Defendants reasonably relied on the representations made by TAMS and Toshiba Corporation regarding the performance and reliability of the medical equipment, and continued to try to utilize the defective Toshiba medical equipment.

157.    The actions of TAMS and DLL were done intentionally, willfully, maliciously, outrageously and in bad faith.

158.    As a direct and proximate result of the fraudulent representations and actions of TAMS and Toshiba Corporation, Defendants have suffered substantial damages

WHEREFORE, Counterclaimants/Defendants demand judgment in their favor and against TAMS and Toshiba Corporation for compensatory and punitive damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for Plaintiff's failures to perform and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in connection with this action, along with such other and further relief as this Court deems just and proper.

## COUNTERCLAIM IX

### (Civil Conspiracy to Commit Fraud
### Against TAMS and Toshiba Corporation)

159.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

160.    At all times material hereto, TAMS and Toshiba Corporation agreed by and between themselves to intentionally misrepresent the capabilities, performance and reliability of the medical equipment in order to make the sale of Toshiba equipment to DDI.

161.    Upon information and belief, TAMS and Toshiba Corporation intentionally concealed the existence of complaints from other Toshiba customers concerning image quality and similar problems as those complained of by Defendants in order to deceive and to induce Defendants to delay rejection of the nonconforming equipment and/or delay Defendants' revocation of acceptance of the goods thereby defrauding Defendants as set forth above and below.

162.    The actions of TAMS and Toshiba Corporation, as set forth above, were done so intentionally, willfully, maliciously, outrageously and in bad faith.

-43-

163.    The actions of TAMS and Toshiba Corporation, as set forth above, constituted an unlawful act to defraud Defendants.

164.    As a direct and proximate result of the unlawful conspiracy between TAMS and Toshiba Corporation, Defendants have suffered substantial damages.

WHEREFORE, Counterclaimants/Defendants demand judgment in their favor and against TAMS and Toshiba Corporation for compensatory and punitive damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for fraud and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in connection with this action, along with such other and further relief as this Court deems just and proper.

## COUNTERCLAIM X

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against TAMS, Toshiba Corporation and DLL)

165.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

166.    TAMS, Toshiba Corporation, and DLL made express and implied warranties to Defendants regarding the equipment.

167.    TAMS breached the implied covenant of good faith and faith dealing by:

a.      breaching its duty of loyalty;

b.      failing to disclose and intentionally concealing its relationship with DLL;

c.      failing to disclose and intentionally concealing the intentionally inflated Master Lease interest rate;

d.     failing to disclose and intentionally concealing the points payment from DLL to TAMS;

e.     failing to provide reliable equipment as promised;

f.     failing to repair the equipment as promised;

g.     failing to replace the equipment as promised;

h.     failing to service the equipment with properly trained service technicians as promised;

i.     failing to honor the warranties and representations as set forth herein above;

j.     failing to disclose the identity of the manufacturer of the equipment;

k.     intentionally misrepresenting itself as a single source for sales, service and finance;

l.     intentionally misrepresenting itself as Toshiba America Medical Credit;

m.     intentionally misrepresenting to Defendants that Toshiba was the financier and actual funding source for the equipment and that Defendants would not be dealing with a third party bank/lender.

n.     intentionally misrepresenting to Defendants that any equipment problem issues that may arise could be dealt with or remedied through Toshiba finance.

o.     failing to disclose and intentionally concealing the equipment problems and service problems from the Defendants; and

p.     such other actions and/or inactions as yet unknown but which may become known during pretrial discovery or trial.

168.    As a direct and proximate result of TAMS' breaches of the implied covenant of good faith and fair dealing, Defendants have suffered damages.

169.    Toshiba Corporation breached the implied covenant of good faith and faith dealing by:

      a.      breaching its duty of loyalty;

      b.      failing to provide reliable equipment as promised;

      c.      failing to repair the equipment as promised;

      d.      failing to service the equipment with properly trained service technicians as promised;

      e.      failing to honor the warranties and representations as set forth herein above;

      f.      failing to disclose and intentionally concealing the equipment problems and service problems from the Defendants; and

      g.      such other actions and/or inactions as yet unknown but which may become known during pretrial discovery or trial.

170.    As a direct and proximate result of Toshiba Corporation's breaches of the implied covenant of good faith and fair dealing, Defendants have suffered damages.

171.    DLL breached the implied covenant of good faith and faith dealing by:

      a.      breaching its duty of loyalty;

      b.      failing to disclose and intentionally concealing its relationship with TAMS;

c.     intentionally directing a DLL employee to execute the Master Lease on behalf of the TAMS, the identified Lessor in the Master Lease, without authority from TAMS to do such act .

d.     failing to disclose its identity as Toshiba America Medical Credit;

e.     intentionally misrepresenting itself as Toshiba America Medical Credit;

f.     failing to disclose and intentionally concealing the intentionally inflated Master Lease interest rate;

g.     failing to disclose and intentionally concealing the points payment from DLL to TAMS;

h.     failing to honor the warranties and representations as set forth herein above;

i.     intentionally misrepresenting itself as a single source for sales, service and finance;

j.     intentionally deceiving Defendants into relying on representations that Toshiba was the financing source for the equipment and that any equipment issues maybe remedied through Toshiba finance.

k.     such other actions and/or inactions as stated herein above and below; and

l.     such actions and/or inactions as yet unknown but which may become known during pretrial discovery or trial.

172.    As a direct and proximate result of DLL's breaches of the implied covenant of good faith and fair dealing, Defendants have suffered damages.

WHEREFORE, Counterclaimants/Defendants demand judgment in their favor and against TAMS, Toshiba Corporation and DLL for compensatory damages in amount to be

determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for Plaintiff's failure to perform and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in prosecuting this action, along with such other and further relief as this Court deems just and proper.

## COUNTERCLAIM XI

### (Negligent Misrepresentation
### Against TAMS and DLL)

173.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

174.    TAMS and DLL had a duty of care in making affirmative representations to Dr. Carvel that, *inter alia*, Toshiba was the single source for equipment sales, service and financing, that she would be dealing with just Toshiba throughout the entire business transaction and relationship, and that and that Toshiba sales, service or credit would respond should problems arise with the equipment and/or financing.

175.    TAMS and DLL affirmatively represented to Dr. Carvel that, *inter alia*, Toshiba was the single source for equipment sales, service and financing, that she would be dealing with just Toshiba throughout the entire business transaction and relationship, and that and that Toshiba sales, service or credit would respond should problems arise with the equipment and/or financing.

176.    TAMS and DLL were negligent in the assertion of their false statements to Dr. Carvel that, *inter alia*,  Toshiba was the single source for equipment sales, service and financing, that she would be dealing with just Toshiba throughout the entire business transaction and

relationship, and that Toshiba sales, service or credit would respond should problems arise with the equipment and/or financing.

177.    TAMS and DLL made these false representations to Dr. Carvel with the intention of having Dr. Carvel rely upon them. TAMS and DLL wanted to assure Dr. Carvel that Toshiba was the single source for equipment sales, service and financing, that she would be dealing with just Toshiba throughout the entire business transaction, and that Toshiba sales, service or credit would be responsible should problems with the equipment or financing arise so that Dr. Carvel, on behalf of DDI, would sign the Master Lease and related documents.

178.    TAMS and DLL knew or should have known that Dr. Carvel would rely upon, and in fact, did rely upon these negligent representations.

179.    Dr. Carvel, in justifiable reliance upon the statements by TAMS and DLL, agreed to sign the Master Lease and related documents.

180.    As a result of the negligent misrepresentations made by TAMS and DLL, Dr. Carvel has suffered substantial damages.

WHEREFORE, Counterclaimants/Defendants demand judgment in their favor and against TAMS and Toshiba Corporation for compensatory damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for Plaintiff's failure to perform and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in prosecuting this action, along with such other and further relief as this Court deems just and proper.

### COUNTERCLAIM XII

**(Negligent Misrepresentation
Against TAMS and Toshiba Corporation)**

181.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

182.    TAMS and Toshiba Corporation had a duty of care in making affirmative representations to Dr. Carvel that: (1) the medical equipment was "state of the art"; (2) that Defendants would receive all of the items and capabilities as set forth on the equipment quotation sheets; (3) that the medical equipment would be free from defects; (4) that the medical equipment would produce high-resolution images with "uncompromised image quality"; (5) that the medical equipment would perform fast, high-speed scanning techniques and optimize productivity; (6) that the medical equipment would perform at high speeds while remaining simple and easy to operate with auto-tuning and auto-shimming features; (7) that the medical equipment would be "on the leading edge of technology," superior to other diagnostic equipment available in the market, and capable of producing the highest-quality medical images; (8) that Defendants would receive a quick response to equipment problems from local, highly trained and capable service engineers who had received specialized training on each specific piece of equipment; and (9) that Defendants' equipment problems would be seasonably cured and the equipment would perform properly.

183.    TAMS and Toshiba Corporation affirmatively made these representations to Dr. Carvel.

184.    TAMS and Toshiba Corporation were negligent in the assertion of these false statements to Dr. Carvel.

185.    TAMS and Toshiba Corporation made these false representations to Dr. Carvel with the intention of having Dr. Carvel rely upon them so that Dr. Carvel would sign the Master Lease and related documents.

186.    TAMS and Toshiba Corporation knew or should have known that Dr. Carvel would rely upon, and in fact, did rely upon these negligent representations.

187.    Dr. Carvel, in justifiable reliance upon the statements by TAMS and Toshiba Corporation, agreed to sign the Master Lease and related documents.

188.    As a result of the negligent misrepresentations made by TAMS and Toshiba Corporation, Dr. Carvel has suffered substantial damages.

WHEREFORE, Counterclaimants/Defendants demand judgment in their favor and against TAMS and Toshiba Corporation for compensatory damages in amount to be determined at trial, together with prejudgment interest thereon, and for an order rescinding the Lease for Plaintiff's failure to perform and awarding Defendants all of their costs and expenses, including reasonable attorney's fees incurred in prosecuting this action, along with such other and further relief as this Court deems just and proper.


## COUNTERCLAIM XIII

### (Violation of Tennessee Consumer Protection Act
### Against TAMS, Toshiba Corporation and DLL)

189.    Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

190.     The conduct by TAMS, Toshiba Corporation and DLL set forth in the preceding paragraphs constitutes unfair or deceptive acts or practices within the meaning of the Tennessee Consumer Protection Act, T.C.A. §§ 47-18-101 et seq. and 1001 et seq.

191.     Defendants suffered an ascertainable loss of money or property as a result of TAMS', Toshiba Corporation's and DLL's conduct.

192.     Defendants are entitled to recover its actual damages and up to three times the actual damages sustained. Defendants' actual damages are described in the preceding paragraphs.

193.     The Counterclaim Defendant is subject to liability for damages caused to Defendants by the wrongful acts of their agents, who were acting in the ordinary course of Counterclaim Defendant's business or with authority of Counterclaim Defendant to do so.

WHEREFORE, Counterclaimants/Defendants seek from TAMS, Toshiba Corporation and DLL, and each of them jointly and severally, damages in excess of $100,000, before trebling, cost of suit, attorneys fees, interest and such further relief as the court deems proper.


## COUNTERCLAIM XIV

### (Declaratory Judgment Against TAMS, Toshiba Corporation and DLL)

194.     Counterclaimants/Defendants repeat and incorporate herein by reference the preceding paragraphs of these Counterclaims, and the Affirmative Defenses listed previously, as fully as if the same were set forth at length herein.

195.     TAMS, Toshiba Corporation and DLL had a duty to deliver equipment in conformity to the express and implied warranties as set out previously in this Counterclaim.

196.    TAMS and Toshiba Corporation had a duty to sell to Defendants equipment in conformity to the express and implied warranties as set out previously in this Counterclaim.

197.    The nonconformity of the equipment substantially impaired its value to Defendants in that it did not produce high-quality images and caused undue hardship on Dr. Carvel.

WHEREFORE, Counterclaimants/Defendants request that this Court enter a Declaratory Judgment in its favor and against TAMS, Toshiba Corporation and DLL to the effect that:

a.   Defendants properly revoked acceptance of the equipment and are entitled to the same rights and duties with regard to the equipment as if Defendants had rejected the equipment.

b.   Defendants are entitled to the same rights and remedies with respect to the Master Lease Agreement as a buyer who has rightfully rejected nonconforming goods.

## DEMAND FOR JURY TRIAL

Counterclaimants/Defendants hereby demand a trial by jury of all issues so triable.

Respectfully Submitted,

By:_____
        Kyle P. Tate
        for TATE LAW FIRM
        9085 Sandidge Center Cove
        Olive Branch, MS 38654
        (662) 893-8833

        Lynanne B. Wescott
        William Matthews
        For SAUL EWING, L.L.P.
        Center Square West
        1500 Market Street
        Philadelphia, PA 19102-2186
        (215) 972-7106

-53-

Attorneys for Defendants DeSoto Diagnostic
Imaging, LLC, *et al*

Dated: January _____, 2004

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am this day serving a copy of the attached Defendants' Second Amended Affirmative Defenses and Second Amended Counterclaims upon the persons and in the manner indicated below:

Service by *<u>facsimile and by first-class mail</u>*, postage prepaid to:

Mr. Peter Boyer
Ms. Rosetta B. Packer
MCCARTER & ENGLISH, LLP
Mellon Bank Center, Suite 700
1735 Market Street
Philadelphia, PA 19103-7501

Mr. John Chesney
Ms. Julianne Peck
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

_____
Kyle P. Tate

Dated: January _____, 2004