**Exhibit "K"**

Not Reported in Cal.Rptr.2d    Page 1
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

▶

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

Court of Appeal, Second District, Division 2, California.

TORRANCE MEMORIAL MEDICAL CENTER, Plaintiff and Appellant,
v.
TOSHIBA AMERICA MEDICAL SYSTEMS, INC., et al., Defendants and Appellants.

**No. B141060.**
**(Los Angeles County Super. Ct. No. YC030213).**

March 26, 2002.

Buyer brought action against manufacturer of cardiac catheterization laboratory equipment. The Superior Court, Los Angeles County, No. YC030213, Jean Matusinka, J., entered judgment on jury's verdict awarding buyer $1,850,830, plus $98,650 in interest, for breach of express warranty and for misrepresentation, fraud, or concealment, and the trial court awarded buyer $302,363 for additional prejudgment interest and $537,567.08 for attorney fees. Cross-appeals were taken. The Court of Appeal, Nott, J., held that: (1) evidence established scienter element of fraud claim alleging manufacturer's lack of intent to perform its contract; (2) manufacturer made representation of material fact actionable as fraud, rather than non-actionable expression of opinion about future performance; (3) evidence established post-sale fraud; (4) evidence established fraudulent concealment; (5) evidence did not establish buyer's acceptance of the equipment; (6) damages limitation clause precluded consequential damages and economic loss damages; and (7) the amounts awarded for attorney fees and costs were not an abuse of discretion.

Affirmed, with directions.

West Headnotes

**[1] Appeal and Error ☞1064.1(6)**
30k1064.1(6) Most Cited Cases

Any error was harmless in giving instruction that an express warranty may be oral or in writing, though buyer of cardiac catheterization laboratory equipment had dismissed its oral warranty count; before reading the instruction, the trial court told the jury that the buyer was claiming breach of express written warranties, making it less likely that jury was misled by inclusion of word "oral" in the instruction, and jury's rejection of manufacturer's cross-complaint demonstrated that jury found buyer's terms and conditions, including written warranties, controlled the transaction. BAJI No. 9.50.

**[2] Sales ☞447**
343k447 Most Cited Cases

Jury's verdict that manufacturer of cardiac catheterization laboratory equipment did not breach its contract with buyer was not inconsistent with jury's verdict that manufacturer breached express warranties; jury could have found against buyer on the contract claims other than the express warranty claims, which would have been consistent with jury's finding of no breach of implied warranties.

**[3] Appeal and Error ☞757(3)**
30k757(3) Most Cited Cases

Manufacturer waived appellate review of claim that evidence did not establish fraud relating to manufacturer's lack of intent to perform its contract with buyer because manufacturer knew the cardiac catheterization laboratory equipment did not have clear fluoroscopic image and manufacturer knew it could not remedy the defect, where manufacturer failed to provide appellate court with fair statement of all of the evidence; clerk's transcript contained more than 5,300 pages and reporter's transcript contained more than 4,200 pages.

**[4] Fraud ☞4**

Not Reported in Cal.Rptr.2d Page 2
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

184k4 Most Cited Cases

Evidence established scienter element of fraud claim alleging manufacturer's lack of intent to perform its contract with buyer because manufacturer knew the cardiac catheterization laboratory equipment did not have clear fluoroscopic image; a former manager of manufacturer stated that he first knew that manufacturer's equipment was experiencing fluoroscopic image quality problems two years before manufacturer's contract with buyer, allowing an inference that when manufacturer represented the equipment was capable of providing the highest quality fluoroscopic image, it knew at a minimum that the information available to it did not support its assertion. West's Ann.Cal.Civ. Code § 1572.

**[5] Fraud 13(1)**
184k13(1) Most Cited Cases

Assuming that jury found that the cardiac catheterization laboratory equipment constituted merchantable goods fit for their particular purpose, such finding did not preclude buyer's recovery for false statement of material fact; manufacturer represented the equipment would provide a fluoroscopic image of the highest quality then available, which was an express warranty of a higher standard of quality than that of merchantable goods fit for their particular purpose.

**[6] Evidence 434(11)**
157k434(11) Most Cited Cases

Parol evidence rule did not preclude buyer of cardiac catheterization laboratory equipment from proving that manufacturer orally made false statements of material fact that the equipment was capable of providing the highest quality fluoroscopic image, though the equipment was purchased pursuant to an integrated written contract, where such representations did not contradict the written contract. West's Ann.Cal.C.C.P. § 1856.

**[7] Fraud 11(1)**
184k11(1) Most Cited Cases

Statement by manufacturer of cardiac catheterization laboratory equipment, that its equipment would be at least as good as the equipment the buyer was currently using, was a representation of material fact actionable as fraud, rather than a non-actionable expression of opinion about future performance; knowledge of the qualities of the equipment and of manufacturer's inability to remedy the products' failings were facts peculiarly within manufacturer's knowledge, and manufacturer's assurances implied that it knew of no facts incompatible with its statements.

**[8] Fraud 31**
184k31 Most Cited Cases

Commercial Code provisions regarding the effect of acceptance of goods and revocation of acceptance did not apply to, and did not preclude buyer from bringing, action against manufacturer of cardiac catheterization laboratory equipment for post-sale fraud, relating to manufacturer's post-sale assurances that the unsatisfactory fluoroscopic image quality would be improved by manufacturer. West's Ann.Cal.Com. Code § § 2607, 2608.

**[9] Fraud 27**
184k27 Most Cited Cases

Evidence established post-sale fraud of manufacturer of cardiac catheterization laboratory equipment; for three years following sale, manufacturer represented to buyer that fluoroscopic image quality would be improved, as a result, buyer delayed rejecting the equipment, buyer suffered economic harm because it was losing business to rival hospital, and manufacturer knew at time of representations that it could not improve fluoroscopic image quality while using charged coupled device (CCD) camera.

**[10] Fraud 16**
184k16 Most Cited Cases

Manufacturer's failure to disclose to buyer of cardiac catheterization laboratory equipment the existence of other buyers' complaints regarding the equipment was fraudulent concealment after the sale to buyer; manufacturer specifically told buyer that it could improve the fluoroscopic image quality of the equipment at a time when manufacturer knew that it could not do so and when fluoroscopic image quality was the chief problem with the equipment.

**[11] Sales 178(4)**
343k178(4) Most Cited Cases

Not Reported in Cal.Rptr.2d                                                                                                                Page 3
**Not Officially Published**
(Cal. Rules of Court, Rules 976, 977)

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

Evidence that buyer used the equipment for three years after the purchase did not establish buyer's acceptance of the cardiac catheterization laboratory equipment, and thus, the Commercial Code did not preclude buyer from recovering from manufacturer the purchase price for the equipment; buyer complained about the quality of fluoroscopic image quality consistently during the three-year period, manufacturer repeatedly told buyer it would remedy the problem, and manufacturer did not demand final payment for the equipment during that period. West's Ann.Cal.Com. Code § § 2607, 2608.

**[12] Sales** 442(5)
343k442(5) Most Cited Cases

Buyer of cardiac catheterization laboratory equipment was entitled to recover under the Commercial Code, as damages for manufacturer's breach of warranty, lost profits and related costs. West's Ann.Cal.Com. Code § 2714.

**[13] Damages** 127
115k127 Most Cited Cases

Damages limitation clause of agreement between manufacturer and buyer, regarding sale of cardiac catheterization laboratory equipment, allowed damages in excess of amount paid by buyer if awarded by a court having jurisdiction, but precluded consequential damages or economic loss damages, because the phrase "unless awarded by a court having jurisdiction" modified only the sentence in which it appeared; clause provided manufacturer "will not under any circumstances be liable for consequential, special, incidental, or exemplary damages or economic loss arising out of or related to the transactions contemplated in this agreement, even if [manufacturer] is apprised of the likelihood of such damage occurring. In no event will [manufacturer's] liability to [buyer] (whether based on an action or claim in contract, tort, including negligence, strict liability, or otherwise) arising out of or relating to the transactions contemplated in this agreement exceed the aggregate amount actually paid by [buyer] to [manufacturer] under this agreement unless awarded by a court having jurisdiction."

**[14] Fraud** 60
184k60 Most Cited Cases

Consequential or incidental damages could be awarded, under a fraud theory, to buyer of cardiac catheterization laboratory equipment, despite damages limitation clause of agreement with manufacturer, which purported to exempt manufacturer from liability for consequential or incidental damages relating to the unsatisfactory quality of the equipment. West's Ann.Cal.Civ. Code § 1668; West's Ann.Cal.Com. Code § § 2715, 2721.

**[15] Fraud** 52
184k52 Most Cited Cases

**[15] Sales** 416(1)
343k416(1) Most Cited Cases

**[15] Sales** 440(3)
343k440(3) Most Cited Cases

Evidence regarding manufacturer's prior generation of cardiac catheterization laboratory equipment was relevant, in buyer's action against manufacturer for breach of contract, breach of warranty, and fraud, though the equipment sold to buyer used a charged coupled device (CCD) camera and the prior generation equipment used analog tubes; manufacturer used analog tube equipment as part of its sales campaign, representing to buyer that addition of CCD camera would be an upgrade, and the two generations of equipment shared components.

**[16] Fraud** 54
184k54 Most Cited Cases

Evidence that other buyers, at other sites, had problems with fluoroscopic images and complained to manufacturer was relevant, in action by buyer of cardiac catheterization laboratory equipment against manufacturer, for post- sale fraud; the evidence showed that manufacturer was aware of fluoroscopic imaging problems with its products which manufacturer was unable to remedy, despite manufacturer's post-sale representations to buyer that the unsatisfactory fluoroscopic image quality would be improved by manufacturer, and manufacturer's customer service engineer testified that all of manufacturer's cardiac catheterization laboratories contained the same basic equipment.

**[17] Evidence** 137

Not Reported in Cal.Rptr.2d                                                                      Page 4
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

157k137 Most Cited Cases

Other buyers' complaints about manufacturer's cardiac catheterization laboratory equipment did not constitute "hearsay," in buyer's action for post-sale fraud, relating to manufacturer's representations that fluoroscopic image quality would be improved by manufacturer; such complaints showed that manufacturer had notice of fluoroscopic imaging problems. West's Ann.Cal.Evid. Code § 1200.

**[18] Appeal and Error** ⚷1067
30k1067 Most Cited Cases

Any error was harmless in action for post-sale fraud, as to trial court's failure to give limiting instruction that other buyers' complaints about manufacturer's cardiac catheterization laboratory equipment were admitted only to show that manufacturer had notice of fluoroscopic imaging problems and were not admitted as hearsay to show the truth of the complaints; an adverse witness called to testify by buyer acknowledged his deposition testimony that the "complaints were real." West's Ann.Cal.Evid. Code § 1200.

**[19] Evidence** ⚷539
157k539 Most Cited Cases

Manufacturer's witness was not qualified to testify as expert on fluoroscopic image reconstruction, in action by buyer of cardiac catheterization laboratory equipment, alleging breach of contract, breach of warranty, and fraud relating to unsatisfactory fluoroscopic image quality; witness had simply attended several depositions, observed the trial testimony of several of buyer's witnesses, and reviewed medical records of patients who underwent procedures at buyer's laboratory, but witness had never visited or seen the buyer's laboratory while it was in operation.

**[20] Costs** ⚷194.36
102k194.36 Most Cited Cases

Trial court's award of $459,872 in contractual attorney fees to buyer of cardiac catheterization laboratory equipment was not an abuse of discretion, in action against manufacturer for breach of contract, breach of warranty, and fraud, though buyer requested $1,659,566 in attorney fees; it was possible that some of counsel's work was to some extent duplicative and unnecessary, buyer did not prevail on all of its claims, and its recovery of $1,850,830 before interest did not approach either the $9 million it sought when it filed its trial brief or the $4.646 million it asked for in closing argument. West's Ann.Cal.Civ. Code § 1717.

**[21] Costs** ⚷148
102k148 Most Cited Cases

Contract for sale of cardiac catheterization laboratory equipment, allowing prevailing party in litigation to recover its costs, could be interpreted as allowing the recovery only of statutory costs. West's Ann.Cal.C.C.P. § 1033.5.

APPEAL from the judgment of the Superior Court of Los Angeles County. Jean Matusinka, Judge. Affirmed, with directions.

Keesal, Young & Logan, Samuel A. Keesal, Jr., Michael M. Gless, Dawn M. Schock, Elizabeth P. Beazley and John M. Whelan for Plaintiff and Appellant.

Ford Marrin Esposito Witmeyer & Gleser, John J. Witmeyer III, Edward M. Pinter; Smiland & Khachigian and William M. Smiland for Defendants and Appellants.

NOTT, J.

***1** This action arises from the sale of a cardiac catheterization laboratory (cath lab) by Toshiba America Medical Systems, Inc. (TAMS), and Toshiba Corporation (collectively Toshiba) to Torrance Memorial Medical Center (TMMC). TMMC was dissatisfied with the equipment, removed and stored it, and brought this action against the sellers. A jury trial resulted in a verdict of $1,850,830, plus interest in the amount of $98,650, in favor of TMMC based upon theories of breach of express warranty and misrepresentation, fraud, or concealment in the sale and maintenance of the lab.

Toshiba contends: "I. Judgment cannot be entered in favor of a cause of action for oral warranty, precluded by an integrated written agreement, earlier dismissed with prejudice and unsupported by evidence.... [¶ ] II. TMMC did not prove

Not Reported in Cal.Rptr.2d  Page 5
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

misrepresentation or concealment.... [¶] III. TMMC cannot recover unproven, speculative and excessive damages.... [¶] IV. Judgment should be entered in Toshiba America's favor for the unpaid purchase price and stipulated price of service purchase orders.... [¶] V. The court's erroneous trial rulings were legion and highly prejudicial.... [¶] VI. Because TMMC did not prevail on the contract, the trial court erred in awarding it attorney's fees, costs and prejudgment interest."

In its cross-appeal, TMMC contends that the trial court abused its discretion in the amount of attorney fees and the amount of prejudgment interest it awarded to TMMC. We affirm.

PROCEDURAL HISTORY

TMMC filed its action against TAMS in August 1997. As amended, the complaint alleges against Toshiba counts for breach of contract, breach of express and implied warranties, negligent and intentional misrepresentation, and concealment. TAMS cross-complained to recover the outstanding balance of the cath lab purchase price and for service and parts.

The trial court denied TMMC's motion for summary adjudication of its counts for breach of written contract and breach of implied warranty of fitness for a particular purpose. Toshiba filed two motions for summary adjudication, seeking rulings as to all of TMMC's claims. TMMC dismissed its counts for breach of oral contract and for breach of express oral warranties.

Toshiba and TMMC filed motions in limine to exclude certain evidence prior to trial. The parties filed trial briefs, a joint list of jury instructions, and a list of jury instructions in dispute. Toshiba and TMMC also filed joint statements of disputed and undisputed issues. TMMC moved for pre-judgment interest pursuant to section 3287 of the Civil Code.

The matter was tried to a jury. The parties stipulated to certain undisputed facts. The court denied Toshiba's motion for a directed verdict on its cross-complaint and for a directed verdict on TMMC's breach of contract, implied warranty, and concealment and misrepresentation claims.

The jury made the following findings. Toshiba is not liable for breach of contract (question No. 1), for breach of implied warranties of merchantability and fitness for a particular purpose (question No. 3), or for conspiracy to defraud (question No. 5). Toshiba is liable for breach of express warranty (question No. 2) and for intentional misrepresentation, negligent misrepresentation, fraud or concealment (question No. 4). Toshiba did not act with oppression, fraud, or malice (question No. 8). TMMC is not liable to TAMS for breach of contract (question No. 9). The jury found TMMC's damages to be $1,850,830, and awarded interest in the amount of $98,650 (question Nos. 6, 7). The court awarded TMMC additional prejudgment interest in the amount of $302,363. The trial court awarded TMMC attorney fees and costs in the amount of $537,567.08.

***2** The trial court denied Toshiba's motions to reconsider the order awarding costs and interest to TMMC. The trial court also denied Toshiba's motion for judgment notwithstanding the verdict, for an order modifying or vacating portions of the verdict, or for a new trial. This appeal followed.

FACTUAL BACKGROUND

The parties stipulated to the following facts at the time of trial. In 1992, TMMC decided to purchase new equipment for one of its cath labs to replace its existing equipment. X-ray equipment used in cath labs captures images of a patient's heart and related vasculature and assists doctors in performing both diagnostic and interventional procedures on the heart and surrounding arteries. TMMC solicited bids for the new equipment.

Toshiba submitted a bid for the equipment, a bi-plane cath lab. [FN1] TMMC representatives inspected sites currently using Toshiba equipment in cath labs. TMMC did not inspect a Toshiba cath lab with a CCD camera, however. [FN2] TMMC obtained an evaluation of Toshiba X-ray equipment from MD Buylines. Toshiba's bid, which included a new type of medical imaging camera, known as a CCD camera, was the lowest submitted to TMMC.

> FN1. A bi-plane cath lab can capture images from two different angles at the same time.

> FN2. A CCD camera is a digital camera.

Not Reported in Cal.Rptr.2d                                                                                                              Page 6
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

> According to Toshiba's opening brief, CCD means charged coupled device, a computer chip that responds to light and thus allows images to be directly recorded digitally.

Toshiba received a draft of a document labeled attachment A. (It was Toshiba's position at trial that its bid governed the sale of the cath lab; TMMC took the position that Toshiba accepted TMMC's purchase order, including attachment A.)

Toshiba delivered the bi-plane cath lab to TMMC in July 1994, and completed installation in October 1994. The equipment purchased by TMMC employed a CCD camera. Toshiba submitted invoices to TMMC providing for payment of approximately $1.5 million. The final 20 percent was payable upon acceptance by TMMC. TMMC paid all installments invoiced except the 20 percent due upon acceptance.

TMMC advised Toshiba of fluoroscopic (fluoro) image quality issues. [FN3] Toshiba visited TMMC a number of times to address TMMC's complaints regarding fluoro image quality. TMMC used the equipment from the date of installation through its de-installation in October 1997. During that time, physicians at TMMC performed 1,807 procedures using the cath lab. TMMC successfully performed both diagnostic and interventional procedures using the equipment, even on heavy-set patients and at steep angles. During the same period of time, however, 3,183 procedures were performed on TMMC's older cath lab, which used Philips equipment and did not utilize a CCD camera.

> FN3. According to TMMC's expert, Dr. Lewis Wexler, fluoroscopy is the method by which an X-ray is shone through the patient, and the doctor observes the resultant moving image in more or less real time. The fluoro image is the picture produced by fluoroscopy. Fluoro images are almost always viewed on a video monitor.

TMMC had the Toshiba cath lab equipment inspected and tested by outside experts. Fluoro images of large or heavy patients tend to scatter more radiation than smaller bodies, making the images less clear and more difficult to discern contrasts between blood vessels, medical instruments, and surrounding tissue. Images captured at steep angles tend to produce similar effects because the radiation must pass through a larger portion of the patient's body.

In August 1997, TMMC filed its complaint for damages. TMMC removed the Toshiba equipment from the cath lab in October 1997, and stored the disassembled components. Following de-installation, TMMC installed Siemens X-ray equipment that cost approximately $1.9 million. Total cost, including adjustments to the room and installation, was approximately $2.2 million.

**\*3** Neither Toshiba nor TMMC retained any fluoro images generated by the Toshiba equipment in the TMMC cath lab. The Toshiba cath lab equipment at TMMC was not unsafe for use with patients.

The parties identified the following contractual issues as in dispute: (1) Whether the parties' contract was comprised of TMMC's purchase order, attachment A to the purchase order, and documents incorporated therein or instead Toshiba's price quote; (2) whether Toshiba breached the contract by failing to provide a safe, high quality, reliable, state of the art cath lab capable of performing at a level that exceeded the Philips lab already in use at TMMC; (3) whether Toshiba breached its warranty that its equipment would present high quality fluoroscopic images; (4) whether the cath lab was defective; (5) whether the cath lab was relegated to secondary status because TMMC physicians preferred the older Philips cath lab; and (6) whether TMMC properly rejected the cath lab because it failed to perform at acceptable levels.

The parties identified the following express warranty issues as in dispute: (1) Whether the contract included the documents attached to TMMC's purchase order; (2) whether Toshiba breached its warranties that its cath lab would present high quality fluoro images, that Toshiba would upgrade the system to reach acceptable performance levels within 30 days of notice by TMMC of the deficiency, and that Toshiba would furnish any upgrade that corrected a defect in the equipment; (3) whether Toshiba breached its warranty that its fluoro images would allow clear visualization of objects such as fine-grade wires and low contrast balloon catheters; (4) whether Toshiba breached its warranty that the cath lab would be free from all defects; (5) whether

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in Cal.Rptr.2d                                                                                                                  Page 7
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

the Toshiba lab was relegated to secondary status because TMMC physicians preferred the older Philips cath lab; and (6) whether TMMC properly rejected the cath lab because it failed to perform at acceptable levels.

The parties identified the following disputed issues as to implied warranties: (1) Whether Melissa Martin's report that the cath lab met the radiation control requirements of the State of California but that its images were not consistent with normal fluoro images showed that the equipment was defective; (2) whether TMMC's use of the cath lab for three years establishes that the machine was fit for its ordinary purpose; (3) whether the cath lab performed at industry levels; (4) whether the implied warranties were disclaimed; (5) whether TMMC had a particular purpose for the cath lab that differed from its ordinary purpose; and (6) whether the cath lab was unfit for the purpose for which it was sold to Toshiba.

The parties identified the following disputed issues as to fraudulent inducement: (1) Whether Toshiba made any intentionally false oral or written representations with regard to the performance of the cath lab; (2) whether TMMC was a sophisticated purchaser who did not rely upon Toshiba's representations regarding the product; (3) whether TMMC would have purchased the cath lab, had it known the true facts; and (4) whether TMMC received an inferior cath lab.

**\*4** The parties identified the following disputed issues as to post-contract fraud: (1) Whether Toshiba's statements and actions in response to TMMC's complaints amounted to actionable fraud; (2) whether Toshiba advised TMMC that the lab could be fixed; and (3) whether TMMC justifiably relied to its detriment upon Toshiba's statements that the cath lab could be fixed.

The parties identified the following disputed issues as to TMMC's obligation to pay the remaining balance of the purchase price and the cost of service incurred: (1) Whether TMMC ever accepted the cath lab; and (2) whether TMMC was required to pay for service provided by Toshiba.

The parties identified the following disputed issues as to damages: (1) Whether TMMC was limited to the difference at the time and place of acceptance between the value of the cath lab and the value it would have had if it had been as warranted; (2) whether TMMC was entitled to recover its purchase price, installation and de-installation costs, maintenance costs, and lost profits; and (3) whether TMMC was entitled to punitive damages.

The record, viewed in the light most favorable to the judgment, shows the following. In 1992, TMMC had two cath labs, a 15-year-old Siemens lab and a 3-year-old Philips lab. TMMC decided to replace the older lab with a cath lab with digital capabilities. Toshiba invited TMMC's Dr. Hoffman and other TMMC representatives to observe Toshiba cath labs in use at Saddleback and Indiana hospitals. Those cath labs did not have CCD cameras. The Toshiba representative told Dr. Hoffman that TMMC would receive an upgrade to the CCD feature. Toshiba said that the CCD camera was state of the art equipment. Another Toshiba representative told Dr. Hoffman that he didn't think there would be a problem with the Toshiba cath lab performing at least as well as the Philips lab. Toshiba did not tell TMMC that Toshiba was having problems with the cath lab's fluoro image quality.

The CCD camera represented a technological departure from the analog tube system then used industry-wide. Toshiba did not have a functioning cath lab with a CCD camera in the United States in 1992. Fluoro image quality was Toshiba's leading problem with the CCD camera from 1992 to 1996.

In October 1992, Toshiba submitted a quote to TMMC for the purchase of the cath lab. The quote contained price, terms, and a limitation on warranties and liability. In order to be binding, the quote had to be signed by an authorized Toshiba representative. Neither Toshiba nor TMMC signed the quote.

TMMC countered with a purchase order and attached documents, referred to as attachment A, dated January 6, 1993. The purchase order was contingent upon Toshiba's acceptance of TMMC's terms and conditions, including those contained in the attached documents. Representatives of TMMC and Toshiba reviewed and modified the TMMC purchase order prior to its finalization. TMMC signed the purchase order it provided to Toshiba.

**\*5** The purchase order's terms were different from those of the quote. Under the quote, the final 20 percent payment was due upon installation, but under

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in Cal.Rptr.2d                                                                                      Page 8
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

the purchase order, the last 20 percent was only due when TMMC formally accepted the cath lab. The purchase order modified Toshiba's disclaimer of warranties and limitation of liability and expressly incorporated certain Toshiba brochures and other documents. The purchase order confirmed TMMC's understanding that it was receiving state of the art equipment. After TMMC purchased the Toshiba lab, Toshiba's invoices for payment were consistent with the payment terms of the purchase order and inconsistent with the quote.

A cath lab is utilized by a cardiologist to perform heart procedures by inserting catheters and wires into the patient's coronary arteries. During procedures, the X-ray equipment makes three kinds of images: fluoro, playback, and cine. The cardiologist typically looks at fluoro images while manipulating the wires and catheters into the proper location. The cardiologist takes playback pictures, moving digital images, and studies them. They are the diagnostic images. He or she takes cine pictures, in this case film images, to record the patient's condition. The Toshiba cath lab's playback images were acceptable, and its cine images were excellent. The fluoro images, however, were fuzzy and below the level of clarity of the older Philips cath lab.

Installation of the cath lab was completed and procedures on patients began in October 1994. A TMMC physicist, Melissa Martin, tested the cath lab and, in a January 1995 report, found that it did not meet minimal standards of fluoro image clarity. After Toshiba had adjusted the equipment, she retested and found the cath lab to be acceptable. The March report states: "The high contrast and low contrast resolution on this unit are performing at the levels which are consistent with a high resolution system but are not delivering the sharp black and white contrast expected of a new cardiac cath lab. The images are visible and sharp and useable but are not consistent with normal fluoroscopy contrast images."

TMMC cardiologists, radiologists, and radiologic technologists complained of poor fluoro image quality, as well as shut downs, lock-ups and freezing of the lab during procedures. The cardiologists could not clearly visualize catheter guide-wires and balloons inserted in their patients' bodies.

Toshiba was unable to remedy the recurring problems. Toshiba replaced the original CCD camera and other key image train equipment, but the problems with image quality persisted. Toshiba nevertheless continued to represent that it could fix the problem.

Due to the recurring problems with the Toshiba unit, TMMC doctors preferred to use the Philips lab. Toshiba's experts opined that this preference was a subjective matter and the result of the staffs' inexperience with the new technology. On five to seven occasions, TMMC cardiac patients were moved from the Toshiba lab to the Philips lab in mid-procedure due to the poor fluoro image quality of the Toshiba lab.

*6 In July 1997, TMMC informed Toshiba that the cath lab would be de-installed because it was not adequate to perform its intended clinical purposes and Toshiba had failed to remedy the problem. In October 1997, TMMC removed the lab and placed it in storage. Before removing the cath lab, TMMC hired an independent expert to test it. He concurred with the physicians using the lab that the fluoro imagery was unacceptable. In March 1998, TMMC installed a new Siemens cardiac lab without a CCD camera.

TMMC introduced evidence regarding the following categories of damages: $1,200,058 (purchase price); $620,498 (installation); $26,769 (maintenance); $16,692 (engineering consultant); $50,707 (de-installation); $24,988 (storage); $10,236 (lab analysis experts); and $977,306 (interest on out-of-pocket payments). TMMC also introduced evidence regarding lost profits in the amount of $2,696,774, based upon its position that TMMC lost patients to a nearby facility, Little Company of Mary, during the time that TMMC was utilizing the Toshiba cath lab.

DISCUSSION

I. Standard of Review

The judgment will be upheld if supported by substantial evidence. (See _Foreman & Clark Corp. v. Fallon_ (1971) 3 Cal.3d 875, 881, 92 Cal.Rptr. 162, 479 P.2d 362.) The contention that the evidence does not support the findings requires the party challenging the findings to demonstrate that there is no substantial evidence in their support. A recitation of only the challenger's evidence is not a sufficient demonstration. Unless all the material evidence on the point is set forth in their brief, the challenger is

Not Reported in Cal.Rptr.2d                                                                                               Page 9
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

deemed to have waived the point. (*Ibid.*)

The trial court's denial of Toshiba's motion for judgment notwithstanding the verdict is also reviewed for substantial evidence. (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703, 38 Cal.Rptr.2d 413.) The denial of Toshiba's motion for new trial and evidentiary rulings are reviewed for abuse of discretion. (See *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 858-859, 236 Cal.Rptr. 778; *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1522-1523, 3 Cal.Rptr.2d 833.) Jury instructions are reviewed de novo to determine if the instructions read as a whole fairly state the law. (*Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 654, 155 Cal.Rptr. 843.)

II. Oral Warranty

Toshiba contends that judgment could not be entered in favor of a cause of action for oral warranty because any oral warranty is precluded by an integrated written agreement, the claim was earlier dismissed with prejudice, and liability for oral warranty is unsupported by the evidence.

Toshiba's position fails. TMMC was precluded from proving a prior or contemporaneous oral agreement contradicting the terms of the written agreement. (See Code Civ. Proc., § 1856, subd. (a); *Banco Do Brasil, S.A. v. Latian, Inc.* (1991) 234 Cal.App.3d 973, 1000, 285 Cal.Rptr. 870.) TMMC, however, did not rely upon oral agreements to support its express warranty claim. Rather, it relied upon the express written warranties contained in the contract itself.

**\*7** In separate counts, TMMC alleged breach of express written and express oral warranties. The claim for breach of express written warranties was based upon documents which were included in TMMC's purchase order. The statements relied upon included that the cath lab would be a state of the art facility, that it would be free from defects, that it would pass clinical acceptance testing, and that the CCD camera technology represented an improvement over analog tube camera technology. The breach of express oral warranties claim was based upon statements made by sales representatives that the CCD camera cath lab technology represented an improvement over older analog cath lab technology, was superior to TMMC's Philips cath lab, and was state of the art equipment that would serve as lead cath lab for use in the most demanding interventional procedures. TMMC subsequently dismissed its oral warranty claim with prejudice.

Even where there are several counts, a general verdict will stand if the evidence supports it on any one sufficient count. (See *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673, 117 Cal.Rptr. 1, 527 P.2d 353.) The evidence of Toshiba's express written warranties and their breach fully supports the jury's finding against Toshiba for breach of express warranty. The trial court properly denied Toshiba's motion for a directed verdict on this ground.

[1] Toshiba also failed to show that instruction pursuant to BAJI No. 9.50 misled the jury. The trial court instructed the jury with BAJI No. 9.50, which states that an express warranty may be oral or in writing. Although it correctly states the law, the instruction arguably should have been modified to omit the reference to oral warranty, since TMMC had dismissed its oral warranty count.

Instructional error in a civil case requires reversal only where it seems probable that the error prejudicially affected the verdict. The reviewing court considers the nature of the error and the likelihood of actual prejudice as reflected in the trial record, taking into account the state of the evidence, the effect of other instructions, the effect of counsel's arguments, and any indications by the jury itself that it was misled. (*Rutherford v. Owens- Illinois, Inc.* (1997) 16 Cal.4th 953, 983, 67 Cal.Rptr.2d 16, 941 P.2d 1203.)

We conclude that any error in instructing the jury with BAJI No. 9.50 was harmless. The jury's rejection of TAMS's cross-complaint demonstrates that it found TMMC's terms and conditions, including the written warranties, to control the transaction. Before reading BAJI No. 9.50, the trial court told the jury that TMMC was claiming breach of express written warranties, making less likely the possibility that the jury was misled by the inclusion of the word oral in the instruction. Toshiba has not shown that it is probable that the jury based its breach of warranty finding upon evidence of oral misrepresentations.

III. Misrepresentation or concealment

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

Toshiba contends that TMMC's pre-contract fraud claims are precluded by the finding that Toshiba did not breach the contract and that TMMC failed to present substantial evidence of fraud. The elements of fraud are (a) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (b) knowledge of falsity (scienter); (c) intent to deceive and to induce reliance; (d) justifiable reliance; and (e) resulting damage. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* . (1998) 68 Cal.App.4th 445, 481, 80 Cal.Rptr.2d 329.) Fraudulent intent is the element that distinguishes fraud from actionable negligent misrepresentation. (*Id.* at p. 482, 80 Cal.Rptr.2d 329.)

A. *Fraud inducing the purchase*

**\*8** [2] The jury found that Toshiba was not liable to TMMC for breach of contract, but that it was liable to TMMC based upon breach of express warranty. The express written warranties in issue were contained in the contract. Although technically inconsistent, the jury verdicts were harmonized by the trial court in a reasonable way. (See *Delos v. Farmers Group, Inc., supra,* 93 Cal.App.3d at p. 661, 155 Cal.Rptr. 843 [a verdict should be interpreted by the trial or appellate court so as to uphold it and to resolve apparent inconsistencies].) It concluded that the jury had found against TMMC on its contract claims other than the express warranty claims. This determination is consistent with the jury's finding no breach of implied warranties. When viewed in that way, the verdicts do not preclude pre-contract misrepresentation in the form of express statements incorporated into the contract and other statements consistent with the contract's express terms. (See *Banco Do Brasil, S.A. v. Latian, Inc., supra,* 234 Cal.App.3d at p. 1009, 285 Cal.Rptr. 870 [an exception to the parol evidence rule permits evidence of fraud where the false promise is independent of or consistent with the written instrument] .)

B. *Scienter*

TMMC's fraud claims rested on the notion that Toshiba did not intend to perform its contract; that is, that Toshiba knew the equipment did not have a clear fluoro image and knew that it could not remedy the defect. Fraud may consist of a promise made without any intention of performing it. (Civ.Code, § 1572; see *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 367, 66 Cal.Rptr.2d 921.)

[3] Toshiba contends that TMMC presented no evidence that Toshiba lacked the intention to live up to its statements regarding the cath lab. Toshiba, however, has failed to provide a fair statement of all of the evidence upon this and other factual issues. [FN4] To the extent Toshiba's contention is based upon lack of substantial evidence, it has waived the issue. (See *Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881, 92 Cal.Rptr. 162, 479 P.2d 362.)

> FN4. The clerk's transcript in this case contains more than 5,300 pages; the reporter's transcript contains more than 4,200 pages.

[4] Even assuming that Toshiba has not waived the issue, its contention is not supported by the record. A former Toshiba manager stated that he first knew that Toshiba was experiencing fluoro image quality problems with its cath labs in 1992. That evidence would support an inference that when Toshiba marketed the cath lab as capable of providing the highest quality fluoro image, it knew at a minimum that the information available to it did not support its assertion. (See *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 415, 11 Cal.Rptr.2d 51, 834 P.2d 745 [scienter is satisfied where an accountant does not believe a statement and makes it without knowing whether it is true or false]; *Locke v. Warner Bros., Inc., supra,* 57 Cal.App.4th at p. 367, 66 Cal.Rptr.2d 921 [fraudulent intent must often be established by circumstantial evidence]; *Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 994, 149 Cal.Rptr. 119 [pattern of behavior supported finding that contractor promised to complete construction by a certain date without intending to perform].) Moreover, Toshiba had not found a solution to the problem by 1994. Thus, there was evidence that Toshiba knew that it could not correct the fluoro image difficulties when it represented to TMMC that it would do so.

C. *False statement of material fact*

**\*9** [5] Toshiba contends that because it delivered merchantable goods fit for their particular purpose and because the parties entered into an integrated contract, TMMC cannot show that Toshiba made a

Not Reported in Cal.Rptr.2d                                                                                     Page 11
**Not Officially Published**
(Cal. Rules of Court, Rules 976, 977)

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

false statement of material fact. We disagree.

The jury apparently found that while the cath lab was a marketable product, Toshiba did not live up to its express warranties in connection with the sale. Those express warranties included that the Toshiba cath lab would provide a fluoro image of the highest quality then available. Thus, under the express warranties, Toshiba was held to a standard of quality higher than that the equipment be marketable.

[6] Moreover, the parol evidence rule in general does not preclude proof of fraudulent oral misrepresentations. (See Code Civ. Proc., § 1856, subd. (g); _Price v. Wells Fargo Bank_ (1989) 213 Cal.App.3d 465, 483, 261 Cal.Rptr. 735.) Parol evidence, however, cannot be introduced to show promissory fraud if the false promise contradicts the language of an integrated contract. (See _Price v. Wells Fargo Bank, supra,_ 213 Cal.App.3d at p. 486, 261 Cal.Rptr. 735; _Banco Do Brasil, S.A. v. Latian, Inc., supra,_ 234 Cal.App.3d at p. 1009, 285 Cal.Rptr. 870.) Toshiba did not show that the false promises were contrary to the terms of the agreement. In fact, most of the promises were contained in attachment A to the agreement.

[7] In addition, Toshiba asserts that the representation that its equipment would be at least as good as the Philips lab in use at TMMC was not a false statement of material fact, but rather an expression of opinion about future performance. We disagree. Under some circumstances, expressions of professional opinion are treated as representations of fact. (_Bily v. Arthur Young & Co., supra,_ 3 Cal.4th at p. 408, 11 Cal.Rptr.2d 51, 834 P.2d 745 [accountant]; _Furla v. Jon Douglas Co._ (1998) 65 Cal.App.4th 1069, 1080-1081, 76 Cal.Rptr.2d 911 [statement couched as opinion by one having special knowledge may be treated as an actionable misstatement of fact].) Moreover, a statement that implies the existence of justifying facts is actionable. (See _Southern Cal. etc. Assemblies of God v. Shepherd of Hills etc. Church_ (1978) 77 Cal.App.3d 951, 960, 144 Cal.Rptr. 46 [where information regarding the right to continued use of a driveway was peculiarly within defendants' knowledge, their statement that an easement would arise in favor of the plaintiff was actionable].)

Knowledge of the cath lab's qualities and its own inability to remedy the products' failings were facts peculiarly within Toshiba's knowledge. Toshiba's assurances implied that it knew of no facts incompatible with its statements. TMMC provided evidence from which the jury could infer that facts known by Toshiba did not justify its representations.

D. *Justifiable reliance*

Toshiba asserts that because Dr. Hoffman stated that he does not rely solely upon what salespeople tell him about equipment and because TMMC had extensive experience purchasing cath labs and other medical equipment, justifiable reliance presented an issue of law. Nonsuit may be granted on a fraud claim where there is no proof of reliance on the alleged misrepresentation. (_Hadland v. NN Investors Life Ins. Co._ (1994) 24 Cal.App.4th 1578, 1586, 30 Cal.Rptr.2d 88.) Again, however, Toshiba has failed to provide a fair and complete statement of the facts. TMMC did present evidence that it was not expert in the CCD technology being purchased and relied upon Toshiba's statements regarding the quality of fluoro image to be expected from the CCD camera. TMMC was unaware of Toshiba's problems with fluoro image quality at other installations. The issue was therefore one for the jury.

E. *Post-sale fraud*

*10 [8][9] Toshiba asserts that there is no independent cause of action for a seller's conduct that delays rejection of goods, and that the issue is governed solely by sections 2607, subdivision (2) [FN5] and 2608, subdivisions (1) and (2) [FN6] of the California Commercial Code. Toshiba has provided no case authority for this proposition. Section 2607 deals with the effect of acceptance of goods; section 2608 with revocation of acceptance. TMMC put on evidence that it never formally accepted the cath lab. The jury apparently agreed, finding that TMMC owed nothing on the purchase contract. Thus, the statutes are inapplicable.

> FN5. Section 2607, subdivision (2) of the California Commercial Code provides: "Acceptance of goods by the buyer precludes rejection of the goods accepted and, if made with knowledge of a nonconformity, cannot be revoked because of it unless the acceptance was on the reasonable assumption that the

Not Reported in Cal.Rptr.2d                                                                                               Page 12
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

nonconformity would be seasonably cured. Acceptance does not of itself impair any other remedy provided by this division for nonconformity."

FN6. Section 2608, subdivisions (1) and (2) of the California Commercial Code provide: "(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it [¶ ] (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or [¶ ] (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. [¶ ] (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it."

TMMC put on evidence that during the approximately three years it utilized the Toshiba cath lab, it received numerous assurances from Toshiba that the fluoro image quality would be improved. As a result, it delayed rejecting the cath lab. During that time, TMMC suffered economic harm because it was losing business to a rival hospital. Toshiba at the time knew that it could not improve the fluoro image quality while using the CCD camera. The issues presented jury questions, and Toshiba has not shown that TMMC failed to present substantial evidence to support the verdicts.

F. *Post-sale concealment*

[10] Toshiba contends that TMMC failed to prove that Toshiba had a duty to disclose the existence of complaints concerning image quality from other customers. Whether failure to disclose the existence of other customer complaints against its product is fraudulent depends upon the volume and accuracy of those complaints. (See *St. Patrick's Home v. Laticrete Intern.* (1999) 264 A.D.2d 652, 696 N.Y.S.2d 117, 122 [failure to disclose four complaints not actionable].) Here, TMMC's position was that Toshiba specifically told TMMC that it could improve the image quality of the cath lab at a time when Toshiba knew that it could not do so and when fluoro image quality was the chief problem with the product. Evidence of the complaints was offered as circumstantial evidence of Toshiba's knowledge. Toshiba's acts were therefore actionable.

Toshiba also asserts that any complaints regarding the image quality were mere statements of subjective opinions about the equipment. TMMC's position was that the equipment produced fluoro images that lacked the degree of clarity to be expected from state of the art equipment. Toshiba's characterization is contrary to TMMC's evidence, and the jury apparently accepted TMMC's position.

Toshiba asserts that TMMC failed to prove reliance, causation, or damages. Toshiba has failed to present a fair and complete statement of facts regarding this issue. TMMC put on evidence that it relied upon Toshiba's assurances in continuing to utilize the Toshiba cath lab while losing business to a competitor. Toshiba has not shown that it should have prevailed as a matter of law.

IV. TMMC's damages

Toshiba challenges the jury's damages findings. The amount of damages is a fact question, committed first to the discretion of the jury and then to the discretion of the trial judge on a motion for new trial; an award of damages will not be disturbed if it is supported by substantial evidence. (See *Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078, 81 Cal.Rptr.2d 46.) The evidence is insufficient only when no reasonable interpretation of the record supports the figure. (*San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 931, 62 Cal.Rptr.2d 121.)

A. *Acceptance of the cath lab*

**\*11** [11] Toshiba contends that as a matter of law TMMC's evidence of causation and damages consisting of the equipment purchase price, expenses for installing and removing the equipment, and lost profits was inadmissible because TMMC had acted in a way inconsistent with the seller's ownership of the goods pursuant to California Commercial Code sections 2606 and 2607. Section 2606, subdivision

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in Cal.Rptr.2d                                                                                                 Page 13
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

(c) provides that acceptance of goods occurs when the buyer does "any act inconsistent with the seller's ownership." Section 2607 states the effect of acceptance. Toshiba takes the position that because TMMC used the Toshiba cath lab for three years, it had acted in a way inconsistent with the seller's ownership of the goods and could not recover the purchase price as damages.

We disagree. TMMC put on evidence that it complained about the quality of the cath lab continuously over the three-year period of use. Toshiba repeatedly told TMMC that it would remedy the problems. There was evidence that because of the sophistication of the equipment and the need to train staff in its use, it was not expected that the cath lab would be functioning optimally within the first months. Toshiba did not demand final payment for the lab during this period, thereby acknowledging that TMMC had not formally accepted the lab. The issue was one of fact for the jury. (See _Troensegaard v. Silvercrest Industries, Inc._ (1985) 175 Cal.App.3d 218, 228-229, 220 Cal.Rptr. 712 [buyer of mobile home did not accept the home she used for a year before filing suit, where she complained of the defect, gave notice of rescission, and demanded a replacement]; _Ibrahim v. Ford Motor Co._ (1989) 214 Cal.App.3d 878, 897, 263 Cal.Rptr. 64 [question of right to rescind is generally a question of fact]; _Garetto v. Almaden Vineyards_ (1953) 118 Cal.App.2d 99, 102, 257 P.2d 477 [unless delay is palpably unreasonable, whether it results in an acceptance of goods presents a question of fact].) Thus, California Commercial Code sections 2606 and 2607, which concern what constitutes acceptance of goods and the effect of acceptance, do not require a different outcome.

[12] In addition, California Commercial Code section 2714, subdivision (1) provides that a buyer who proves breach of warranty is entitled to recover as damages "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner that is reasonable." This has been held to include lost profits and other related costs. (_Serian Bros. Inc. v. Agri-Sun Nursery_ (1994) 25 Cal.App.4th 306, 313-314, 30 Cal.Rptr.2d 382 [diseased peach trees].)

Toshiba also challenges the admission of expert testimony regarding lost profits. The admission of evidence at trial lies within the trial court's discretion, which will not be disturbed absent a showing of abuse of discretion. (_Korsak v. Atlas Hotels, Inc., supra,_ 2 Cal.App.4th at pp. 1522-1523, 3 Cal.Rptr.2d 833.) Here, Toshiba urges that the methodology offered by the expert, Craig Leach, a financial officer with TMMC, was faulty. The reasonableness of the assumptions underlying the analysis, however, was a matter for the jury's consideration in weighing the evidence. (See _Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co._ (1996) 47 Cal.App.4th 464, 489, 54 Cal.Rptr.2d 888.) Toshiba extensively cross-examined Mr. Leach regarding his methodology and assumptions. Toshiba's expert economist, Robert Sherwin, testified that Mr. Leach's underlying assumption was false. Toshiba has not shown abuse of discretion.

B. *Damages limitation clause*

**\*12** Toshiba contends the damages limitation clause precluded recovery of incidental and consequential damages, including economic loss. Neither party has cited to any extrinsic evidence concerning interpretation of the clause; we interpret the parties' contract de novo. (See _Delucchi v. County of Santa Cruz_ (1986) 179 Cal.App.3d 814, 820-821, 225 Cal.Rptr. 43; _Medical Operations Management, Inc. v. National Health Laboratories, Inc._ (1986) 176 Cal.App.3d 886, 891, 222 Cal.Rptr. 455.) In so doing, we give a reasonable interpretation to the parties' words. The damages limitation clause appeared in Toshiba's price quote. TMMC, in its purchase order, modified the provisions by adding "unless awarded by a court having jurisdiction" to the last sentence. The jury apparently found that TMMC's purchase order was accepted by Toshiba.

[13] As modified, the damages limitation clause states: "9. Limitation of Liability. Toshiba will not under any circumstances be liable for consequential, special, incidental, or exemplary damages or economic loss arising out of or related to the transactions contemplated in this agreement, even if Toshiba is apprised of the likelihood of such damage occurring. In no event will Toshiba's liability to [TMMC] (whether based on an action or claim in contract, tort, including negligence, strict liability, or otherwise) arising out of or relating to the transactions contemplated in this agreement exceed the aggregate amount actually paid by [TMMC] to Toshiba under this agreement unless awarded by a court having jurisdiction."

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in Cal.Rptr.2d                                                                                         Page 14
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

Applying ordinary rules of grammar, we conclude that "unless awarded by a court having jurisdiction" only modifies the sentence in which it appears. This interpretation is appropriate in that any uncertainty as to the meaning of the language was caused by TMMC, which added the phrase. (See Civ.Code, § 1654.) We therefore interpret the provision as allowing damages in excess of the amount paid by TMMC if awarded by a court having jurisdiction, but precluding consequential damages or economic loss. Such a provision is enforceable and precludes certain categories of damages sought by TMMC, absent unconscionability or failure of essential purpose. (Cal .Comm.Code, § 2719, subd. (3).) The clause is worded broadly, applying to damages "arising out of or relating to the transactions contemplated in this agreement." Its scope, however, is limited by the rule precluding an agreement to exempt a party from responsibility for fraud. (Civ.Code, § 1668; *Klein v. Asgrow Seed Co.* (1966) 246 Cal.App.2d 87, 100, 54 Cal.Rptr. 609 [where seed company warranted the quality of its tomato seed knowing it also contained a rogue strain, its statement of limitation of liability was void as against public policy].)

Subdivision (1) of section 2715 of the California Commercial Code defines incidental damages as those "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Subdivision (2)(a) defines consequential damages as "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise" and "(b) [i]njury to person or property proximately resulting from any breach of warranty." (See *S & R Metals, Inc. v. C. Itoh & Co. (America)* (9th Cir.1988) 859 F.2d 814, 818 [purchase price, reasonable cost of transportation back to seller, storage and handling and 7 percent interest were not consequential damages for sale of defective steel, although transportation and storage costs were incidental damages].)

*13 [14] Here, the basis for the jury's award is not clear. The amount awarded, $1,850,830, was approximately the amount TMMC paid for the cath lab ($1,200,058) plus the cost of installing the machinery ($620,498). TMMC sought $2,696,774 in lost profits. Thus, it does not appear that the jury awarded economic loss. Even assuming consequential or incidental damages were awarded, however, those damages are allowable on the fraud theory. (See *Clark Equipment Co. v. Wheat* (1979) 92 Cal.App.3d 503, 529, 154 Cal.Rptr. 874 [where both contract and fraud legal theories are submitted to the jury, the verdict will be sustained if supported by either theory].) [FN7] Section 2721 of the California Commercial Code provides: "Remedies for material misrepresentation or fraud include all remedies available under this division for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy." Where the damage award is based upon a reasonable basis of computation and supported by substantial evidence, it will be upheld. (See *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873-874, 274 Cal.Rptr. 168.)

> FN7. In its reply brief, Toshiba asserts that economic damages for fraud are unavailable under the economic loss rule. (See *Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 403 P.2d 145 [economic damages not available in a strict liability or a negligence action].) Contentions raised for the first time in a reply brief are deemed waived. (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 595, 101 Cal.Rptr.2d 86.) In any event, Toshiba's only California authority extending the economic loss rule to preclude recovery of economic damages for fraud is an unpublished federal district court case. (*Standard Platforms, Ltd. v. Document Imaging Systems Corporation* (N.D.Cal. Nov. 15, 1995, Civ. 93-20993 SW) 1995 WL 691868.) We do not find that authority persuasive.

TMMC's recovery does not result in TMMC's receiving more than it would have had the warranties been performed by Toshiba. TMMC was required to purchase a new cath lab only three years after purchasing the Toshiba cath lab. TMMC paid a higher purchase price for the new equipment, and was without a second cath lab during the transition.

Not Reported in Cal.Rptr.2d  
**Not Officially Published**  
**(Cal. Rules of Court, Rules 976, 977)**

Page 15

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

Toshiba has not shown error.

V. Toshiba's cross-complaint

Toshiba contends that it proved as a matter of law that TMMC owed the contract balance because Toshiba did not breach the agreement, TMMC exercised dominion over the equipment, and TMMC requested but did not pay for certain service. Toshiba fails to mention that TMMC presented evidence tending to show that it never formally accepted the cath lab, that the remaining balance was for that reason not due, and that the parties' contract required Toshiba to provide the service and parts supplied free of charge under these circumstances. By failing to recite a fair presentation of this evidence, Toshiba has waived the issue which is, in any event, a question of fact for the jury.

VI. Trial rulings

Toshiba contends that the trial court erred in failing to order a new trial due to numerous errors of law. (Code Civ. Proc., § 657, subd. (7).)

A. *Instructional error*

Toshiba contends the following instructions were erroneously read to the jury: BAJI Nos. 10.90, 10.91, 9.50. As to BAJI Nos. 10.90 and 10.91, Toshiba asserts that the warranty charges were improper because the fully integrated agreement precluded any claim other than breach of contract. As noted above, the express warranty claims were based upon written warranties contained in the agreement. Thus, the contention fails. As to BAJI No. 9.50, which refers to both oral and written warranties, the instruction correctly states the law and, as previously discussed, Toshiba has failed to show that the jury was misled by the reference to oral warranty.

**\*14** Toshiba takes the position that the trial court should not have instructed the jury on fraud in the inducement, or on misrepresentation or concealment post-sale. As discussed above, fraud in the inducement and post-sale misrepresentation or concealment were supported by substantial evidence and properly a part of TMMC's case.

Toshiba also asserts that (1) the instructions regarding delay in rejection of goods read by the trial court were generic fraud instructions and failed to conform to sections 2607, subdivision (2) and 2608, subdivisions (1) and (2) of the California Commercial Code; (2) the trial court failed to instruct about the contract limitation on damages; and (3) the trial court failed to inform the jury in conformity with California Commercial Code section 2607, subdivision (1) [FN8] that TMMC was required as a matter of law to pay the remaining 20 percent of the purchase price and the cost of parts and service provided because it had exercised dominion over the cath lab; and (4) the trial court allowed the jury to use an improper verdict form.

> FN8. Subdivision (1) of section 2607 of the California Commercial Code provides: "The buyer must pay at the contract rate for any goods accepted."

The trial court rejected a series of special instructions offered by Toshiba on the grounds that they went into extreme detail and contained argument. In connection with the fraud claims, the court instead read BAJI Nos. 12.30 (introductory instruction), 12.31 (intentional misrepresentation), 12.32 (expression of opinion), 12.35 (concealment), 12.36 (nondisclosure of known facts), and 12.37 (active concealment of known facts). Toshiba urged the jury in closing argument that TMMC had accepted the equipment by exercising dominion over it. Toshiba has not demonstrated that the fraud instructions were inconsistent with sections 2607 or 2608 of the California Commercial Code. Toshiba has not shown either that they failed to correctly state the law or that the jury was misled by any misstatement.

The trial court read BAJI No. 10.91 regarding general damages for breach of contract. That instruction provides that loss of profits may be recovered for a breach of contract. The trial court also instructed the jury regarding contractual agreements, and Toshiba argued in closing argument that the parties did not include attachment A in their agreement. The trial court refused to instruct the jury that consequential damages were precluded by the parties' contract, and informed Toshiba that it could argue its position to the jury. Similarly, the trial court refused to instruct the jury that TMMC was required to pay the remaining 20 percent of the purchase price and the cost of parts and service it had ordered.

Not Reported in Cal.Rptr.2d                                                                 Page 16
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

Toshiba's positions involved issues of fact. It has not shown that the instructions given failed to correctly state the law or that the jury was misled by any misstatement.

Toshiba also asserts that its verdict form, which required the jury to answer specific factual questions, would have avoided the error of allowing the jury to find no liability for breach of contract and also that Toshiba was not entitled to recover the remaining balance and cost of service on the cath lab. Toshiba, however, has failed to show either that the instructions and verdict forms used were incorrect or that their wording misled the jury.

**\*15** Toshiba contends that a question asked by the jury about question No. 2 (breach of express warranty) demonstrates that the jury was misled. The jury asked a question which provoked the trial court to state, "I'm inclined to send it back in and ask them to clarify the question because it doesn't make any sense. [¶ ] It doesn't comply or conform to the verdict form at all. [¶ ] That is what I will do ." The jury subsequently reached a verdict. Toshiba, however, has failed to inform this court where in the record the jury question itself appears. Toshiba has therefore not shown error.

B. *Evidentiary error*

Toshiba contends the trial court erred in admitting certain evidence over its continuing objection. According to Toshiba, those documents include trial exhibits numbered 45-51, 66-67, 69-70, and 35-43, that were objectionable because they referred to problems regarding vacuum tube cath lab equipment, equipment not made by Toshiba, and problems reported at other Toshiba customers' sites without proof of the specific circumstances involved.

We review the trial court's evidentiary rulings for abuse of discretion. (See *Korsak v. Atlas Hotels, Inc., supra,* 2 Cal.App.4th at p. 1523, 3 Cal.Rptr.2d 833.) Toshiba has the burden on appeal of demonstrating that the trial court prejudicially abused its discretion in admitting the evidence, resulting in a miscarriage of justice. (See *People v. Waidla* (2000) 22 Cal.4th 690, 717- 718, 94 Cal.Rptr.2d 396, 996 P.2d 46; *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853-854, 139 Cal.Rptr. 888.) In order to preserve the right to challenge on appeal the erroneous admission of evidence, an appellant must make a timely and proper objection clarifying the specific ground for the objection. (See Evid.Code, § 353, subd. (a); *People v. Waidla, supra,* 22 Cal.4th at p. 717, 94 Cal.Rptr.2d 396, 996 P.2d 46; *Pineda v. Los Angeles Turf Club, Inc.* (1980) 112 Cal.App.3d 53, 60, 169 Cal.Rptr. 66.)

[15] Toshiba has not shown that it timely objected to the specific documents on the grounds now asserted. Assuming nevertheless that it has preserved its objections, we conclude that Toshiba has not demonstrated that the trial court prejudicially abused its discretion. With regard to documents which Toshiba asserts relate to its prior generation cath labs which used analog tubes (exhibits 47-49), Toshiba used the analog tube cath labs as part of its sales campaign. Toshiba represented that the addition of a CCD camera would be an upgrade. In addition, there was evidence that the two systems shared components. Toshiba has not shown that the evidence was irrelevant.

[16] In addition, evidence of post-sale fluoro image complaints and problems at other sites and with other similar equipment (exhibits 45-46) was offered to show that Toshiba was aware of fluoro imaging problems with its products which Toshiba was unable to remedy. The trial court allowed Toshiba to present evidence addressing whether the problems documented were applicable to TMMC's system. The evidence was properly admitted as proof that Toshiba was aware of fluoro imaging problems with its products.

**\*16** [17] Similarly, post-sale documents relating to problems with other sites and internal Toshiba documents regarding complaints about Toshiba's equipment (exhibits 45-46, 50-51, 66-67, 69-70, 35-43) were relevant to demonstrate that the fluoro imaging problem with Toshiba cath labs was pervasive and that Toshiba knew that it was unable to cure the problem. Although Toshiba asserts that any complaints reported were site-specific, a Toshiba customer service engineer testified that all Toshiba cath labs contain the same basic equipment. To the extent the evidence showed that Toshiba had notice of the problems, they were not hearsay. (Evid.Code, § 1200.)

[18] Internal Toshiba documents concerning marketing issues and priorities (exhibits 35-43) identify Toshiba's number one vascular product issue

Not Reported in Cal.Rptr.2d    Page 17
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

to be fluoro image quality. The documents were relevant to demonstrate that Toshiba knew the cath lab had fluoro image problems. To the extent they showed that Toshiba had notice of the issues, they were not hearsay. They could also be considered party admissions that Toshiba considered fluoro imaging to be its number one problem with the product. (Evid.Code, § 1220.) Toshiba asserts that the trial court erred in failing to give a limiting instruction that the documents were not proof of the truth of their contents. (Evid.Code, § 355.) Any error in connection with the ruling was not prejudicial. Dr. Volz, who was called as an adverse witness by TMMC, acknowledged that he had given the following deposition testimony: " 'The complaints were real. They were not a misuse of the equipment. Whatever. They were real complaints.' " He also testified that it was his understanding in 1993 that fluoro image quality was the greatest concern of TAMS with regard to the cath lab system purchased by TMMC. Toshiba has not shown prejudicial error.

[19] Toshiba also contends the trial court erred in limiting its expert witness, Ronald Karlsberg, from opining about the performance of the Toshiba cath lab at TMMC. The trial court has an obligation to contain expert testimony within the area of the professed expertise, and to require adequate foundation for the opinion. (See *Korsak v. Atlas Hotels, Inc., supra,* 2 Cal.App.4th at p. 1523, 3 Cal.Rptr.2d 833.) Dr. Karlsberg testified regarding the quality of the Toshiba cath lab he used and about the quality of Toshiba cath labs generally. He would have testified regarding the quality of image at the TMMC cath lab based upon his attendance at several depositions, his observation of the trial testimony of several of TMMC's witnesses, and his review of medical reports and records of patients who underwent procedures at the cath lab. There was no evidence that Dr. Karlsberg was qualified to testify as an image reconstruction expert based upon these sources. Dr. Karlsberg had never visited or seen the Toshiba cath lab at TMMC while it was in operation. The trial court did not abuse its discretion in precluding the testimony.

Toshiba also asserts in passing that the trial court erred in allowing the testimony of Thomas Bogle, a former Toshiba national vice-president of sales, as to whether Toshiba could have solved TMMC's complaints by substituting an analog camera for a digital camera. The testimony referenced, however, was Mr. Bogle's recollection of a Toshiba project to improve fluoro image, Project X, not Mr. Bogle's technical opinion as to how the problem could have been remedied. In addition, as Toshiba notes in its appellants' opening brief, its scientifically qualified witnesses contradicted the notion that one could simply replace a CCD camera with an analog camera.

C. *Sufficiency of the evidence*

**\*17** The sufficiency of the evidence to support the findings reflected in question Nos. 2, 4, and 6 has been thoroughly discussed above.

D. *Damages*

The adequacy of the record to support the damages awarded TMMC and the failure to award damages to Toshiba has been thoroughly discussed above.

VII. Award of attorney fees, costs, and prejudgment interest

Toshiba contends the trial court erroneously denied its motion for attorney fees and awarded attorney fees, costs, and prejudgment interest to TMMC. Toshiba's contention fails. It is premised upon Toshiba's interpretation of the jury's responses to question Nos. 1 and 2 and is contrary to the reasonable interpretation of the trial court. According to the trial court, the jury found that Toshiba breached express warranties contained in the contract. A warranty is a part of the contract of sale. [FN9] (See *A.A. Baxter Corp. v. Colt Industries, Inc.* (1970) 10 Cal.App.3d 144, 153, 88 Cal.Rptr. 842.) Toshiba's position also ignores the fact that the jury found against TAMS on its contract claims against TMMC. In deciding whether a party prevailed on the contract, the trial court compares the relief awarded on the contract claims with the parties' demands on those same claims and their litigation objectives. (See *Pacific Custom Pools, Inc. v. Turner Construction Co.* (2000) 79 Cal.App.4th 1254, 1272, 94 Cal.Rptr.2d 756.) Thus, Toshiba did not prevail on the contract, and the trial court properly awarded attorney fees to TMMC.

> FN9. Because the judgment was based upon both breach of warranty and fraud, TMMC was not limited to an interest award under section 3288 of the Civil Code. The trial

court had discretion to award interest pursuant to section 3287, subdivision (b) of the Civil Code.

VIII. The amount of attorney fees awarded to TMMC

[20] TMMC contends the trial court abused its discretion in awarding less than the full amount of attorney fees and costs TMMC sought. We disagree.

The trial judge is in the best position to determine the reasonableness of the award of attorney fees. (*LeVine v. Weis* (2001) 90 Cal.App.4th 201, 214, 108 Cal.Rptr.2d 562.) TMMC's purchase order provides for the recovery of "reasonable costs and expenses, including attorney fees, to the party justly entitled thereto.... [I]f it is in the interest of justice to do so, [the court may] award the full amount of costs, expenses and attorney fees paid or incurred in good faith." Section 1717 of the Civil Code states that where a contract provides for attorney fees, reasonable attorney fees shall be fixed by the court and shall be an element of the costs of suit.

TMMC sought attorney fees in the amount of $1,659,566. The trial court awarded $459,872. The amount sought included attorney fees in the total amount of $662,290 paid to three different law firms, plus a 25 percent contingent fee. The trial court awarded approximately 25 percent of the $1,850,830 damages for breach of warranty. It may be that, as Toshiba asserted below, counsel's work was to some extent duplicative and unnecessary. Furthermore, TMMC did not prevail on all of its claims, and its recovery did not approach either the $9 million it sought at the time it filed to its trial brief or the $4.646 million it asked for in closing argument. TMMC has not shown abuse of discretion.

IX. Costs award

**\*18** [21] TMMC contends the trial court erred in failing to award all of its reasonable costs incurred in good faith in the litigation. TMMC sought $163,829 in costs, and the trial court awarded $77,695.08. The trial court disallowed the amount of $86,133.92, which represented nonstatutory costs. (See Code Civ. Proc., § 1033.5.) TMMC has not shown that in so doing the trial court abused its discretion. The trial court could properly interpret the parties' agreement for reasonable costs to include only statutory costs. (See *Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1625, 28 Cal.Rptr.2d 878 [where contract provides for attorney fees and costs, prevailing party limited to recovery allowable under section 1033.5]; *Fairchild v. Park* (2001) 90 Cal.App.4th 919, 931, 109 Cal.Rptr.2d 442 [same]; but see *Bussey v. Affleck* (1990) 225 Cal.App.3d 1162, 1167, 275 Cal.Rptr. 646 [contractual provision for costs is not limited by section 1033.5].) Our Supreme Court, in *Davis v. KGO-T.V., Inc.* (1998) 17 Cal.4th 436, 446, 71 Cal.Rptr.2d 452, 950 P.2d 567, determined that expert fees are not available as costs in an action pursuant to the Fair Employment and Housing Act (Gov.Code, § 12900 et seq.). It noted, but did not decide, the issue presented here. (*Davis v. KGO-T.V., Inc., supra,* at p. 446, fn. 5, 71 Cal.Rptr.2d 452, 950 P.2d 567.)

X. Prejudgment interest

TMMC contends the trial court erred in awarding prejudgment interest on the damages award based upon the finding that TMMC's damages were uncertain. Where damages are found to be uncertain, the trial court has discretion to award prejudgment interest, but from no earlier than the date the action was filed. (See Civ.Code, § 3287, subd. (b).) When damages are certain, the court must award prejudgment interest from the first day a liquidated claim existed. (See *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828, 76 Cal.Rptr.2d 743.)

Damages are deemed certain or capable of being made certain when there is essentially no dispute concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability. (See *Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1172, 286 Cal.Rptr. 146.) Here, the basis of computation of damages was hotly contested. While the amount of some items claimed as damages, such as the amount paid to Toshiba by TMMC, were agreed to, others were not. TMMC has not shown that the trial court erred.

XI. Attorney fees on appeal

Both parties have filed motions to recover attorney fees on appeal. As the prevailing party, TMMC is entitled to its attorney fees on appeal. The trial court

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in Cal.Rptr.2d  Page 19
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**

**(Cite as: 2002 WL 453913 (Cal.App. 2 Dist.))**

shall determine the amount of such fees when it determines costs on appeal. (See *Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498, 191 Cal.Rptr. 134.)

### DISPOSITION

The judgment is affirmed with directions to the trial court to determine the amount of attorney fees to be awarded Torrance Memorial Medical Center for legal services rendered on this appeal. Torrance Memorial Medical Center shall recover its costs of appeal.

We concur: BOREN, P.J., and DOI TODD, J.

Briefs and Other Related Documents (Back to top)

• 2002 WL 32137422 (Appellate Brief) Corrected Respondent's/Cross-Appellant's Brief (Jan. 02, 2002)

• 2001 WL 34144605 (Appellate Brief) Respondent's/Cross-Appellant's Brief (Jul. 02, 2001)

• 2001 WL 34148834 (Appellate Brief) Appellants' Opening Brief (Apr. 02, 2001)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works