## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC.,<br>　　　　　　　　Plaintiff,<br><br>TOSHIBA AMERICA MEDICAL SYSTEMS, INC.<br>　　　　　　　　Plaintiff/Intervener,<br><br>　　　　v.<br><br>DESOTO DIAGNOSTIC IMAGING, LLC., et al.<br>　　　　　　　Defendants and Counter-Claimants | CIVIL ACTION NO. 2:02CV2810 |

## **ORDER**

**AND NOW**, upon consideration of Defendants' Motion for Summary Judgment Based on Plaintiff's Reliance on the Master Lease, and any response thereto, it is hereby **ORDERED** that the Motion is **GRANTED**, and that all claims of Plaintiff De Lage Landen Financial Services, Inc. against Defendants are hereby **DISMISSED WITH PREJUDICE**.

　　　　　　　　　　　　　　　　　　BY THE COURT:


　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Honorable Ronald L. Buckwalter

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., <br>                       Plaintiff, <br><br> TOSHIBA AMERICA MEDICAL SYSTEMS, INC. <br>                       Plaintiff/Intervener, <br><br>                       v. <br><br><br> DESOTO DIAGNOSTIC IMAGING, LLC., et al. <br>                       Defendants and Counter-Claimants |  <br><br><br><br><br><br><br><br><br> CIVIL ACTION NO. <br> 2:02CV2810 |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON PLAINTIFF'S RELIANCE ON THE MASTER LEASE**

**I. INTRODUCTION**

The form on which Plaintiff De Lage Landen Financial Services, Inc. ("DLL") bases all of its claims against Defendants is a document, dated February 17, 2000, entitled "Master Lease Agreement." DLL prepared that document. By its terms, that document "shall not be binding upon Lessor or become effective unless and until Lessor executes the Agreement." In preparing the "Master Lease Agreement," DLL listed Toshiba America Medical Systems, Inc. ("TAMS") as the Lessor, and both TAMS and DLL have admitted that TAMS was the original Lessor. It is undisputed that TAMS never executed the "Master Lease Agreement." Accordingly, by its terms, and under binding precedent and hornbook law, that document never became effective, and summary judgment must be entered in Defendants' favor with respect to all claims asserted by DLL under the Master Lease Agreement.

## II. UNDISPUTED FACTS CONCERNING DLL[1]

As set forth in DLL's response to Defendants' Motion to Compel Discovery, DLL regularly provides financing under a "private label name" that utilizes the name of the vendor with whom it has a contract, rather than its own name:

> As is well known from other discovery in this case, DLL regularly participates in program agreements with vendors and manufacturers under which it provides financing under a private label name utilizing the name of the vendor or manufacturer. In this case DLL utilized the name Toshiba America Medical Credit.

DLL Mem. of Law Opp'g Defs. Mot. to Compel Disc. at page 8.

According to its corporate representatives at Rule 30(b)(6) depositions, the reasons for use of the private label are varied. Zebulon Stewart testified that a private label enables "[m]anufacturers who don't have their own financing companies [to] present to the customer what seems to be a seamless financing solution" and added that Toshiba would not tell its customer that DLL was providing the financing "[b]ecause then you are taking away that competitive advantage. You are giving that away and—I mean that's my answer." Stewart Dep. at page 22, line 3 to line 6; id. at page 28, line 22 to page 29, line 7 (Exhibit "A" hereto). Another Rule 30(b)(6) designee of DLL, Don Flassing, testified that it "would likely be true" that use of a private label name would reduce the questioning from the lessee regarding who was providing the financing. Flassing Dep. at page 59, lines 6-10 (Exhibit "B" hereto).

Another DLL employee, Jake Hornung, testified that DLL only notifies lessees of its involvement in a transaction after a "default" has occurred. Hornung Dep. at page 21,

---

[1] The facts set forth in this Section, which are not in dispute, are set forth as background only.

2

lines 6-14; id. at page 33, lines 9-15 (Exhibit "C" hereto). While DLL admits to "utilizing" the name of the vendor in its choice of the private label name, corporate designee Mr. Stewart said that the revelation, after default, of the DLL name is used to "show how serious" DLL is about enforcing a "hell or high water" provision, and added that DLL is so "serious" about this that "we're letting [the lessee] know that they are not dealing with the manufacturer; they are actually dealing with a third-party finance company." Stewart Dep. at page 196, line 11 to page 197, line 6 (Exhibit "A" hereto) (emphasis added).

DLL has, on at least one occasion (interestingly, exactly 3 weeks prior to the date its employee executed the Master Lease Agreement) registered a private label name with the Pennsylvania Department of State. Ex. D (registration of "Medcredit" as fictitious name in connection with "medical equipment leasing/financing" on 12/7/00).[2] DLL did not, however, register any of the following names with the Pennsylvania Department of State: "Toshiba America Medical Credit", "Toshiba Medical Credit" and/or "TAMC." Id.; see also Ex. E. When asked about its authority to use these names, DLL did not mention the State of Pennsylvania, but instead replied that TAMS gave such authority. DLL Ans. to Defs. First Set of Interrogatories at ¶ 12 (Exhibit "F" hereto).

In the context of its private label agreements, DLL sometimes will pay points to the vendor it is working with as a "marketing consideration." Sparta Dep. at page 26, lines 7-17 (Exhibit "G" hereto). The payment of points by DLL to the vendor "may or may not be blind to the customer." Id. DLL did pay points to TAMS in connection with this transaction. Pinner Dep. at page 13, lines 4-7 (Exhibit "H" hereto).

---

[2] DLL's violations of Pennsylvania's Fictitious Names Act is set forth at greater detail in a separate Motion to Dismiss.

3

DLL prepared the Master Lease Agreement and all related documents. Sparta Dep. at page 15, line 12 to page 18, line 19; id. at page 44, line 8 to page 45, line 6. However, "DLL" does not appear anywhere in the Master Lease Agreement or any of the related attachments. See Ex. I.³ The entity listed in the box for Lessor signature in the Master Lease Agreement is "Toshiba America Medical Systems, Inc." Id. at 4. The person that signed in the Lessor box, however, was Lisa Sparta. Id. It is undisputed that Ms. Sparta never worked for TAMS, but was instead an employee of DLL. TAMS Ans. to Defs. Amended Counterclaims at ¶ 17; DLL Ans. to Defs. Amended Counterclaims at ¶ 17 ("It is admitted that on or about December 29, 2000 Lisa Sparta signed the Master Lease, and that Lisa Sparta has never been a director of Toshiba America Medical Systems, Inc."); Sparta Dep. at page 22, lines 4-11 ("I don't work for Toshiba. I work for DLL") (Exhibit "G" hereto). Ms. Sparta signed the Master Lease Agreement on December 29, 2000, which is more than 10 months after its date of February 17, 2000, and more than 6 months after Lessee signed. Ex. I at pages 2, 4. December 29, 2000 was a Friday, and was the last business day of calendar year 2000.

DLL did not disclose its true name to any Defendant until March 15, 2002. DLL Ans. to Defs. Counterclaims at ¶ 67 ("It is admitted that prior or [sic] March 15, 2002 DLL did not advise defendants of the name De Lage Landen Financial Services Inc.") By that time, most of the equipment at issue in this case had already been de-installed

---

³ Unfortunately, Defendants' copy of the Exhibits to DLL's Complaint is so blurry that it is, at a minimum, difficult to read. The most difficult of these documents to read, by far, is pages 1-4 of the Master Lease Agreement. Defendants have a much more readable copy of the terms of the Master Lease Agreement, although that copy had not yet been signed by Ms. Sparta. Accordingly, in the interests of convenience and completeness, Defendants have attached, at the end of page 4 of DLL's version of the Master Lease Agreement, the more readable version of those same 4 pages (only). Though the remainder of the documents which form Exhibit A to DLL's Complaint collectively form the Master Lease Agreement, DLL Complaint at ¶ 9, Defendants have not attached an extra copy of those pages because DLL's failure to ensure compliance with its own condition precedent on page 4 renders those pages ineffective and irrelevant.

4

from Desoto's facility.  On March 15, 2002, DLL sent letters to Defendants representing that DLL was the assignee of a lease from "Toshiba Medical Credit."  Ex. J; see also DLL Ans. to Defs. Amended Counterclaims at ¶ 24.  These letters were sent on DLL letterhead.  Ex. J.  One year later, and in contradiction of its March 15, 2002 letters and its Complaint (which claimed that DLL was the assignee of TAMS) DLL sent letters to Defendant Desoto Diagnostic Imaging, LLC. ("Desoto") representing that DLL was the purchaser of the rights of yet a third entity, which DLL called "Toshiba America Medical Credit."  Exhibit K ("Please be advised that the above referenced Contract with Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc. has been assigned to De Lage Landen Financial Services, Inc. ('Purchaser')"  (emphasis added); see also DLL Ans. to Defs. Amended Counterclaims at ¶ 26.  Though DLL did not date or sign this letter, DLL has admitted in its pleadings that it sent this letter "on or about March 14, 2003."  Id.  Neither TAMS nor DLL has ever sent such a letter to any Defendant representing that DLL was the assignee of TAMS.

In response to interrogatories, DLL conceded that the letters referenced above, which were sent through the United States mail, were false.[4]  DLL stated that, contrary to the plain words of their own letters, there was no assignment between "Toshiba America Medical Credit (TAMC)" and DLL because DLL is "Toshiba America Medical Credit."

> Objection.  This interrogatory incorrectly assumes that there was an 'assignment' of the Master Lease and Guarantees from TAMC to DLL.  No such assignment occurred.  TAMC is the private label name used by DLL in connection with the Lease at issue.
> . . .

---

[4]  Knowingly sending false materials through the United States mail as part of a scheme to defraud may constitute a criminal violation of 18 U.S.C. §§ 1341-1342.

5

> Objection. This interrogatory is objected to on the grounds that it assumes, incorrectly, that TAMC is a separate and distinct legal entity from DLL. As set forth previously, TAMC was the private label name used by DLL pursuant to the contract documents. As such, there were no payments made by DLL to or for the benefit of TAMC.

DLL Ans. to Defs. First Set of Interrogatories at ¶¶ 9-11, 19 (Exhibit "F" hereto). Naturally, DLL could not have assigned a lease to itself, and DLL could not have purchased a lease from itself, facts which DLL admits. Id. at ¶ 19.

### III. APPLICABLE STANDARDS OF LAW

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### IV. ARGUMENT

A. By Its Terms, the Master Lease Agreement Never Became Effective

*1. DLL Prepared the Master Lease Agreement*

It is undisputed that DLL prepared the Master Lease Agreement. TAMS Ans. to Defs. Amended Counterclaims at ¶ 14 ("TAMS admits that the Master Lease was drafted by DLL"); see also Sparta Dep. at page 16, line 19-page 17, line 9 (Exhibit "G" hereto).

*2. TAMS is the Lessor under the Master Lease.*

In preparing the Master Lease Agreement, DLL listed TAMS as the Lessor and, moreover, included a box for TAMS, as Lessor, to sign. Ex. I at page 4. The listing of TAMS as the Lessor was in accordance with the Master Contract Financing Program

Agreement ("MCFPA") between TAMS and DLL.[5] The MCFPA provides that DLL "will, for each Contract, prepare and forward all necessary Contract documents to TAMS or Lessee . . . . All documentation shall be on a private label basis and <u>will reflect TAMS as the Lessor</u>") Ex. L at pages 3-4, ¶ 2.3(a) (emphasis added); <u>id.</u> at pages 16-17, ¶ 6.1 (DLL "will service all Contracts on a private label basis in the name of TAMS so that the lease financing program will at all times appear to Lessees to be a proprietary program of TAMS.") TAMS and DLL have confirmed that TAMS was the Lessor. <u>See, e.g.,</u> DLL Crossclaim against TAMS at ¶ 8 ("TAMS entered into the Master Lease with DDI"); TAMS' Ans. to DLL's Crossclaim at ¶ 8 ("TAMS entered into the Master Lease with DeSoto Diagnostic Imaging, LLC"); Mem. of Law in Support of TAMS' Motion to Intervene at 1 ("TAMS was the original lessor of the medical diagnostic equipment . . .; TAMS then assigned that lease to DLL"); TAMS Ans. to Defs. First Amended Counterclaims at ¶ 25 ("TAMS admits that both it and DLL have filed Complaints in this matter. . . . [I]t is admitted that the Complaints state, correctly, that TAMS leased equipment to Desoto and assigned all of its right, title, and interest in the relevant lease to DLL.")

   *3. It is Undisputed That TAMS Never Signed the Master Lease Agreement.*

On page 4 of the Master Lease Agreement, the box above the area set aside for TAMS' signature is, on its face, meant for signature by the Lessee. Ex. I at page 4. Contained within the Lessee box is the following provision:

> You agree to all of the Terms and
> Conditions contained in both sides of this
> Agreement, and in any attachments to same
> (all of which are included by reference) and

---

[5] DLL has admitted that it is the successor to Tokai Financial Service, Inc., the original party to this agreement with TAMS. DLL Ans. to Defs. First Set of Interrogatories at ¶ 4. (Exhibit "F" hereto)

> become part of this Agreement. . . .
> **Agreement shall not be binding upon Lessor or become effective unless and until Lessor executes the Agreement.**

<u>Id.</u> at 4 (emphasis added).

The only signature in the Lessor box is that of Lisa Sparta, who is identified as "Director" of TAMS. <u>Id.</u> TAMS and DLL have conceded in their pleadings that Ms. Sparta never worked for TAMS and was never an employee of TAMS. TAMS Ans. to Defs. Amended Counterclaims at ¶ 17 ("TAMS admits that the Master Lease was signed by Lisa Sparta on December 29, 2000. TAMS further admits that Lisa Sparta has not been an employee of TAMS at any time"); DLL Ans. to Defs. Amended Counterclaims at ¶ 17 ("It is admitted that on or about December 29, 2000 Lisa Sparta signed the Master Lease, and that Lisa Sparta has never been a director of Toshiba America Medical Systems, Inc.") Accordingly, it is undisputed that TAMS never signed the Master Lease Agreement. As such, the Master Lease Agreement, by its terms, never became effective. DLL has admitted that the Master Lease Agreement includes all documents it attached as Exhibit A to its Complaint. DLL Complaint at ¶ 9; <u>see</u> <u>also</u> Ex. I at page 4 (all attachments to the Master Lease Agreement "are included by reference . . . and become part of this Agreement.") Thus, all of DLL's claims which relate to the Master Lease Agreement must be dismissed, and none of the documents which collectively form the Master Lease Agreement can be given any effect.

    B. <u>Binding Precedent and Hornbook Law Confirm That DLL's Claims Relating to the Master Lease Must Be Dismissed.</u>

In addition to the governing terms of the Master Lease Agreement, binding precedent and hornbook law demonstrate, beyond any doubt, that summary judgment

8

must be entered in Defendants' favor.  DLL's insistence that the Master Lease Agreement would not be effective until and unless TAMS signed (combined with the undisputed fact that TAMS never did sign) defeats DLL's claims.  Capital Assocs. Int'l, Inc. v. Knoll Int'l, Inc., Civ. No. 90-5518, 1991 U.S. Dist. LEXIS 11285 (E.D. Pa. Aug. 14, 1991).  Capital Associates involved two sophisticated corporations.  Plaintiff was a seller/lessor who sent a form contract to defendant.  Id. at *4.  Plaintiff included a cover letter stating that defendant should sign and return the form contract to plaintiff, who would return a fully executed copy.  Id. at *4-5.  Defendant signed and returned the form contract to plaintiff, who delayed in signing the agreement because plaintiff had not yet approved defendant for financing.  Id. at *5-6.  Before plaintiff signed, defendant revoked its offer.  Id. at *6.  This Court rejected plaintiff's claim that its submission of a form contract was an offer that defendant accepted when defendant signed the agreement, id. at *6-8, and found, as a matter of law, that the objective manifestations of the parties' intent were that both parties were required to sign the documents in order for there to be a contract.  Id. at *7 ("Looking at the parties' intent by the objective circumstances, I find as a matter of law that both parties were required to sign the documents in order for there to be a contract.")  Accordingly, this Court granted summary judgment in favor of defendant.  Id. at *10.

In this case, DLL included the condition precedent that TAMS sign in the contract itself, as opposed to in an accompanying cover letter.  Ex. I at 4.  The Master Lease Agreement is dated February 17, 2000, id. at 2, and was signed by Lessee on June 9, 2000.  Id. at 4.  No person signed in the Lessor box until December 29, 2000.  Id.  December 29, 2000 was a Friday, and was therefore the final business day of calendar

9

year 2000. DLL employee Dave Begy testified that there were depreciation-related tax benefits that "would be gone" if the transaction was not funded prior to the end of the calendar year. Begy Dep. at page 30, line 8 to page 31, line 10.

By including the condition that the Master Lease Agreement would not be binding until and unless it was executed by TAMS, DLL cannot now argue that its submission of the form contract to Desoto was an offer. Technographics, Inc. v. Mercer Corp., 777 F.Supp. 1214, 1216 (M.D. Pa. 1991) (inclusion of a clause by drafter that contract would not be formed until and unless signed by corporate representative "converts what would have otherwise been an offer into a proposal or preliminary negotiations.") Moreover, though DLL has brought its claims against Defendants as the assignee of TAMS, DLL cannot argue that it had any power to accept Desoto's offer to TAMS (the signed agreement Desoto returned, awaiting the signature of TAMS, the listed Lessor), or that TAMS somehow assigned a "right to accept" to DLL because hornbook law provides that only TAMS, as the offeree, could accept. Restatement (Second) of Contracts § 52 (1981) ("An offer can only be accepted by a person whom it invites to furnish the consideration"); 2 Williston on Contracts § 6:27 (4th ed.) ("an offer made to one person cannot be accepted by another, even though the offeree purports to assign it <u>and this is true despite the fact that upon acceptance, the former offeree might assign his rights under the contract thereby formed</u>. As the court in one leading case stated, 'A party has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent.' . . . Whether in fact it makes any difference to the offeror with whom he will contract is irrelevant; he may be as willing to deal with one person as with another, but despite the fact that it may be of no importance to him with

10

whom he deals, only the person to whom an offer is made may accept it.") (emphasis added); see also Centre Area Trans. Auth. v. Common of Pennsylvania, Unemployment Compensation Bd., 531 A.2d 1172, 1173, n.3 ("An offer creates a power of acceptance in a specified offeree to transform the offeror's promise into a contractual obligation") (citations omitted); Ott v. Home Sav. & Loan Assoc., 265 F.2d 643, 646-47 ("Indeed, it is hornbook law even in the realm of bilateral contracts that a revocable offer cannot be accepted by anyone other than the offeree.  And the offeree, in whom the power of acceptance lies by virtue of the offer, has no assignable rights.")

The Third Circuit has ruled that, where the drafter of an agreement has failed to ensure compliance with its own conditions precedent to contract formation, that party may not claim the benefits of the contract. Infocomp, Inc. v. Electra Prods., Inc., 109 F.3d 902, 905 (3d Cir. 1997).  The Third Circuit added that this "principle . . . remains the unchallenged law of Pennsylvania." Id. at 906.  Indeed, the Pennsylvania Supreme Court has applied the same rule. Franklin Interiors v. Wall of Fame Management Co., 511 A.2d 761 (Pa. 1986).  The Pennsylvania Supreme Court explained the 2 primary reasons for enforcing the rule:  (1) it is presumed that a drafter will "know[] the effect of the unambiguous terms and conditions of its own document" and (2) "[o]ur rules of construction . . . require that a written instrument must be strictly construed against its maker." Id. at 762-63.

Infocomp involved a buyer of a defective "computer image setting system." Infocomp, supra, at 904.  The manufacturer of the equipment was not mentioned in the contract forms. Id.  The form contract provided that it would not be "valid, effective or binding" unless signed by an authorized agent of the supplier who prepared the form. Id.

11

The buyer complained that the equipment did not work, and the supplier made several attempts to repair. Id. These efforts to repair did not satisfy the buyer, who continued to insist the equipment did not work, and requested a full refund approximately one year after it made a down payment. Id. The supplier/drafter was unable to prove at trial that it had complied with its forms' requirement that an official of its home office sign the document as a condition to it becoming an effective and binding contract. Id. at 905. As a result, the Third Circuit vacated the district court's judgment to the extent that judgment prevented buyer from claiming and proving damages under Pennsylvania's adoption of the UCC, which the district court had held were lost under a limitation of liability clause in the ineffective form contract. Id. at 909. The Third Circuit also remanded for a retrial on damages consistent with its opinion. Id.

      Pennsylvania courts have held that, in situations where the contract was signed by an employee of the drafter company who was not from the "home office," even that signature was insufficient to enable the drafter company to claim the benefits of a contract that included an express condition precedent that an officer from the home office sign. Cuchi v. Rollins Protective Servs. Co., 546 A.2d 1131, 1131 (Pa. Super. 1988), rev'd on other grounds, 574 A.2d 565 (Pa. 1990). In this case, DLL insisted that TAMS, the Lessor, sign as a condition precedent to contract formation, but did not comply with its own requirement and instead had Ms. Sparta, a DLL employee, sign on the last business day of the calendar year 2000.

      As it is undisputed that TAMS, the admitted and listed Lessor under the Master Lease Agreement, never executed the Master Lease Agreement, by its terms and by application of binding precedent and hornbook law, that document, and all "attachments

12

to same (all of which are included by reference) and become part of this Agreement," never became effective: "Agreement shall not be binding upon Lessor or become effective unless and until Lessor executes the Agreement." Ex. I at 4; see also Infocomp, supra, at 908 ("written contract never came into existence. The proposed written agreement was never accepted according to its own explicit terms.") Accordingly, summary judgment must be entered in Defendants' favor for all claims by DLL that relate to the Master Lease Agreement.

B. All of DLL's Claims Relate to the Ineffective Master Lease.

DLL has correctly admitted that its standing to pursue all of its claims hinges on the ineffective Master Lease Agreement. DLL Mem. of Law in Opp. to Defs' Mot. to Amend at 3 ("Without the [Master] Lease, DLL would not be a party to this case as either a plaintiff or a defendant.")[6] Even a cursory review of DLL's Complaint confirms that all of DLL's claims against Defendants must be dismissed, as set forth in more detail below.

*1. Count I of DLL's Complaint is Based on the Master Lease.*

DLL's first Count is for breach of the Master Lease Agreement. DLL Complaint at ¶¶ 15-18. As discussed above, there is no dispute that, by its terms and the application of binding precedent and hornbook law, the Master Lease Agreement never became effective. Accordingly, this Count must be dismissed.

*2. Count II is Based on "Guarantees" Under the Master Lease.*

DLL's Second Count against Defendants is based on supposed guarantees "of the Master Lease obligations of DDI to DLL." Id. at ¶ 20. Moreover, DLL's "wherefore" clause for this Count seeks recovery of "the balance due under the Master Lease and

---

[6] Defendants do not agree that the failure of DLL's claims has any effect on Defendants' claims against DLL.

13

other charges due thereunder." Id. at page 4. As discussed above, there is no dispute that, by its terms and the application of binding precedent and hornbook law, the Master Lease Agreement never became effective. Accordingly, this Count must be dismissed.

*3. Count III is Based on Return of Equipment Which Has already Been Returned and an Alleged Breach of the Master Lease.*

In Count III, DLL seeks: (1) return of an "Asteion/VF36kw, Serial #00602189 plus all parts and accessories" and (2) alleged damages that are claimed based on Desoto's "dismantling" of equipment "in contravention of the Master Lease." There is no dispute that the so-called "Retained Equipment" is no longer in possession of Desoto, and did not suffer any damage in connection with its removal, which was accomplished by TAMS. See, e.g., Ex. N (DLL authorized TAMS to pick up such equipment in August, 2002, 3 months after filing its Complaint); see also TAMS Ans. to Defs. Second Set of Interrogatories at 25 (noting that TAMS did de-install, pack, transport and store the Asteion at DLL's request) (Exhibit "O" hereto). To the extent this Count seeks relief for a breach of the ineffective Master Lease Agreement, it must be barred for the reasons set forth at length above. Moreover, there is no competent evidence to establish that Desoto damaged any of the so-called "Dismantled Equipment" during the removal of such equipment, as it is admitted that none of the equipment has even been staged, or run, in the years since it was de-installed at Desoto's facility. Levin Dep. at page 34, lines 12-22 ("as everyone in this room is aware, the issue of valuation of this equipment is difficult insofar as it has not been staged") (Exhibit "P" hereto).

*4. Count IV of DLL's Complaint is Based on a Document Executed "To Induce TAMS to Enter into the Master Lease."*

In Count IV, DLL seeks recovery based on a so-called "Debt Subordination Letter." DLL admits that Dr. Carvel executed this document "in order to induce TAMS to enter into the Master Lease." DLL Complaint at ¶ 29. As it is admitted that TAMS never entered into the Master Lease Agreement, this claim must be dismissed.

*5. Count V is Based on a "Master Lease Agreement Addendum."*

DLL's final Count seeks relief, once again, under a document that DLL admits was executed "[i]n accordance with and in furtherance of the terms of the Master Lease." Id. at ¶ 32. Moreover, by this Count, DLL seeks a return of unspecified "Collateral." In addition to the fact that the "Master Lease Agreement Addendum" cannot be enforced for the reasons that it (1) was a supoesed addendum to a document that, but its terms, never became effective; and (2) was allegedly executed "in furtherance of the Master Lease" Agreement, this Count must also be dismissed because there is no evidence that Desoto is in possession of anything that could be covered by this document even if it were effective.

## IV. CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court grant summary judgment in favor of Defendants on all Counts of DLL's Complaint, and grant such further relief as the Court deems appropriate.

Respectfully Submitted,

By: _____
William Matthews
Signature Code WM782
For SAUL EWING LLP

15

        Center Square West
        1500 Market Street, 38th Fl.
        Philadelphia, PA 19102-2186
        (215) 972-7106

        Kyle P. Tate
        for TATE LAW FIRM
        9085 Sandidge Center Cove
        Olive Branch, MS 38654
        (662) 893-8833

        Lynanne B. Wescott
        The Wescott Law Firm P.C.
        Two Penn Center Plaza,
        Suite 200
        Philadelphia, PA 19102
        (215) 755-6330

        Attorneys for Defendants
        DeSoto Diagnostic
        Imaging, LLC, *et al*

Dated:  April 12, 2004

## **CERTIFICATE OF SERVICE**

I certify that I am this day serving a copy of the attached Defendants' Motion for Summary Judgment Based on Plaintiff's Reliance on the Master Lease upon the persons and in the manner indicated below:

Service by *hand delivery* to:

    Mr. John Chesney
    Ms. Julianne Peck
    Mr. Jonathan Sturz
    DRINKER BIDDLE & REATH LLP
    One Logan Square
    18th & Cherry Streets
    Philadelphia, PA 19103-6996

    Mr. Peter Boyer
    Ms. Rosetta B. Packer
    MCCARTER & ENGLISH, LLP
    Mellon Bank Center, Suite 700
    1735 Market Street
    Philadelphia, PA 19103-7501

                                        William Matthews

Dated: April 12, 2004