I.  STATEMENT OF UNDISPUTED FACTS..............................................................................2

II.  LEGAL ARGUMENT ...................................................................................................4

    POINT I .................................................................................................................4

    SUMMARY JUDGMENT IS APPROPRIATE WITH RESPECT TO
    PLAINTIFF'S AFFIRMATIVE CLAIMS AGAINST
    DEFENDANT DESOTO DIAGNOSTIC IMAGING, LLC ...................................4

        A.    Summary Judgment For De Lage Landen Financial
              Services, Inc. Is Consistent With Generally Applicable
              Summary Judgment Standards.......................................................................4

        B.    Summary Judgment Should Be Entered Against Defendant,
              DeSoto Diagnostic Imaging, LLC And In Favor of DLL for
              Breach of the Master Lease...........................................................................7

    POINT II ..............................................................................................................13

    PARTIAL SUMMARY JUDGMENT IS APPROPRIATE WITH
    RESPECT TO DISMISSAL OF DEFENDANTS'
    COUNTERCLAIMS AGAINST PLAINTIFF ...................................................13

        A.    Defendants' Counterclaim IV Should Be Dismissed As
              Defendants Are Not Third Party Beneficiaries To The
              Master Contract Financing Program Agreement. ......................................13

        B.    Defendants' Counterclaim V Should Be Dismissed As the
              Evidence of Record Does Not Support a Claim of Fraud
              Against DLL ...............................................................................................15

        C.    Defendants' Counterclaim VI Should Be Dismissed As
              DLL And TAMS Were Not Engaged In A Civil Conspiracy
              To Commit Fraud........................................................................................18

        D.    Defendants' Counterclaim VII For Breach Of The
              Covenant of Good Faith And Fair Dealing Is Legally
              Insufficient. ...............................................................................................22

        E.    Defendants' Counterclaim VIII Should Be Dismissed As
              Defendants Have No Claim Under the Tennessee
              Consumer Protection Act............................................................................24

             1.    The Tennessee Act only applies to acts that take
                    place in trade or commerce in whole of in part in
                    Tennessee. ..................................................................................25

2.   TAMS and DLL Did Not Engage in Fraudulent or
     Deceptive Acts Within the Meaning of the
     Tennessee Act ................................................................................25

3.   Private Label Agreements are Specifically Excluded
     From the Tennessee Act...................................................................27

4.   The Statute of Limitations in the Tennessee Act Has
     Run ...................................................................................................28

E.   Defendants' Counterclaim IX Should Be Dismissed As To
     DLL Because DLL And TAMS Are Neither Partners, Joint
     Venturers Nor Agents Acting On Behalf Of The Other. ...........................28

1.   DLL And TAMS Are Not Partners Under The
     Uniform Partnership Act And Pennsylvania Law ........................29

2.   Defendants Failed to Demonstrate That DLL And
     TAMS Are Engaged In A Joint Venture Under
     Pennsylvania Law. ..........................................................................32

3.   TAMS And DLL Are Not Agents For One Another
     Because There Was No Agreement For The
     Creation Of A Fiduciary Relationship. ..........................................34

III.  CONCLUSION...............................................................................................36

# TABLE OF AUTHORITIES

## CASES

12th Street Gym v. General Star Indemnity Co.,
    93 F.3d 1158, 1165 (3d Cir. 1996) .......................................................................... 5

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242, 248 (1986).......................................................................................... 4

Advanced Power Systems v. Hi-Tech Systems, Inc.,
    801 F.Supp. 1450 (E.D.Pa. 1992) ........................................................................... 18

Barbet v. Ostovar,
    273 Pa.Super 256, 265, 417 A.2d 636, 641 (1979)................................................. 28

Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc.,
    931 F.Supp. 377, 386 (E.D.Pa. 1996) ............................................................... 18, 21

Basile v. H & R Block, Inc.,
    563 Pa. 359, 761 A.2d 1115, 1120 (2000) ............................................................. 34

Beavers v. Wesr Penn Power Co.,
    436 F.2d 869 (3d Cir. 1971) ................................................................................... 32

Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.,
    264 F.Supp.2d 394, 401 (E.D. Pa. 2002) ......................................................... 13, 21

Caplan v. Fellheimer Eichen Braverman & Kasky,
    884 F.Supp. 181, 184 (E.D.Pa. 1995) ............................................................... 18, 20

Casey v. GAF Corp.,
    2003 Pa.Super. 222, 828 A.2d 362, 367 (2003)..................................................... 34

Coram Healthcare Corporation v. Aetna U.S. Healthcare, Inc.,
    94 F.Supp.2d 589 (E.D. Pa. 1999) ................................................................... 15, 16

Cottman Transmission Systems, Inc. v. Melody,
    869 F. Supp. 1180, 1184 (E.D. Pa. 1994) ................................................................ 6

Dixie Groceries, Inc. v. Albany Business Machines,
    156 Ga.App. 36, 274 S.E.2d 81, 83 (1980)............................................................... 8

Drysdale v. Woerth,
    1998 WL 966020 *3 (E.D.Pa.) ............................................................................... 22

Duquesne Light Co. v. Woodland Hills School Dist.,
  700 A.2d 1038, 1055 (1997) ............................................................... 31

Equal Opportunity Employment Commission v. Pathmark Inc.,
  1998 WL 57520, *6 (E.D.Pa.) ............................................................ 22

Falbo v. State Farm Life Insurance Col,
  1997 WL 116988 (E.D. Pa. 1997) ...................................................... 15

First National Bank of Atlanta v. Harrison,
  408 F.Supp. 137, 140 (N.D.Ga. 1975) .................................................. 8

Ganzevoort v. Russell,
  949 S.W.2d 293, 297 (Tenn. 1997) ............................................... 23, 25

General State Authority v. Coleman Cable & Wire Company,
  27 Pa.Cmwlth 385, 388-89, 365 A.2d 1347 (1976) .............................. 7

Gilbert v. Feld,
  842 F.Supp. 803 (E.D. Pa. 1993) ....................................................... 20

Goldinger v. Boron Oil Co.,
  375 F.Supp. 400, 413 (W.D.Pa. 1974), aff'd mem., 511 F.2d 1393 (3d Cir. 1975) ................. 4

Goodway Marketing, Inc. v. Faulker Advertising Assoc., Inc.,
  545 F.Supp. 263 (E.D.Pa. 1982) ........................................................ 34

Groover v. Torkell,
  645 S.W.2d 403, 409 (1982) ............................................................... 25

Guy v. Liederbach,
  501 Pa. 47, 459 A.2d 744 (1983) ....................................................... 12

I.C.D. Indus. v. Fed. Ins. Co.,
  879 F. Supp. 480, 483 (E.D. Pa. 1995) ................................................ 4

In re Jackson,
  28 B.R. 559, 562-63 (1983) .......................................................... 28, 30

Jaskey Fin. and Leasing v. Display Data Corp.,
  564 F.Supp. 160 (E.D.Pa. 1983) .......................................................... 6

JHE, Inc. v. Southeastern Pennsylvania Transportation Authority,
  2002 WL 1018941 *6-7 (Pa.Com.Pl. 2002) ......................................... 22

Keeler v. International Harvester used truck Center,
  317 Pa.Super. 244, 246-47, 463 A.2d 1176, 1178 (1983) ...................... 32

Kiewit Eastern Co., Inc. v. L&R Construction Co., Inc.,
    44 F.3d 1194, 1199 (3d Cir. 1995) .................................................................... 4-5

Kirshon v. Friedman,
    349 Pa. 171, 178, 36 A.2d 647, 650 (1944) ........................................................ 29, 30

Klaxon Co. v. Stentor Electric Mfg. Co.,
    313 U.S. 487, 497, 61 S.Ct. 1020, 1022 85 L.Ed. 1477 (1941) ............................... 6

Landau v. Western Pennsylvania National Bank,
    445 Pa. 217, 224, 282 A.2d 335, 339 (1971) ...................................................... 18

Lincoln Ave. Industrial Park v. Norley,
    450 Pa.Super. 621, 677 A.2d 1219 (1996) .......................................................... 35

Maguire v. Shubert,
    722 A.2d 1087, 1092 (Pa.Super. 1998) .............................................................. 18

McKeeman v. Corestates Bank, N.A.,
    2000 Pa.Super. 117, 751 A.2d 655, 660 (2000) ................................................... 18

McRoberts v. Phelps,
    391 Pa. 591, 598-99, 138 A.2d 439, 443 (1958) ............................................ 31, 32, 33

Meade v. Florida Infusion Services, Inc.,
    120 F.Supp. 499, 501 (E.D. Pa. 2000) ................................................................ 6

Michael v. Shiley, Inc.,
    46 F.3d 1316, 1333 (3d Cir. 1995) ..................................................................... 14

Morris v. Mack's Used Cars,
    824 S.W.2d 538, 540 (Tenn. 1992) .................................................................... 23

Muchow v. Schaffner,
    180 Pa.Super. 413, 421, 119 A.2d 568, 572 (1956) ........................................... 30, 32

Murphy v. Burke,
    454 Pa. 391, 395, 311 A.2d 904, 907 (1973) ...................................................... 28

National Equipment Rental v. J&I Carting, Inc.,
    73 A.D.2d 666, 423 N.Y.S.2d 205 (2d Dept. 1979) .............................................. 8

Northhampton Brewery v. Lande,
    138 Pa.Super. 235, 238, 10 A.2d 583, 584 (1940) ............................................... 30

Paul Revere Protective Life Ins. Co. v. Weis,
    535 F.Supp. 379, 383 (E.D.Pa. 1981) ................................................................. 4

Philadelphia Savings Fund Society v. Deseret Management Corp.,
    632 F.Supp 129, 136 (E.D.Pa. 1985) ............................................................. 8, 9, 10

Provident Trust Co. of Philadelphia v. Rankin,
    333 Pa. 412, 416, 5 A.2d 214, 216 (1939) ............................................................. 30

R. Contino, Legal and Financial Aspects of Equipment Leasing Transactions, 29,
    87-88 (1979) ............................................................................................................. 8

Roadway Package System, Inc. v. Kayser,
    1999 WL 817724, *3 (E.D.Pa.) .............................................................................. 6

Scarpitti v. Weborg,
    530 Pa. 366, 370, 609 A.2d 147 (1992) .......................................................... 12, 13

Schoonejongen v. Curtiss-Wright Corp.,
    143 F.3d 120, 129 (3d Cir.1998) ............................................................................. 4

Scott v. Purcell,
    490 Pa. 109, 117 n.8, 415 A.2d 56, 60 n.8 (1980) ............................................... 34

Shaffer v. Procter & Gamble,
    412 Pa.Super. 630, 638, 604 A.2d 289, 293 (1992) ........................................ 18, 19

Smith v. Commonwealth Nat'l Bank,
    384 Pa. Super. 65, 557 A.2d 775 (Pa. Super. Ct. 1989) ......................................... 6

Snellbaker v. Hermann,
    315 Pa.Super. 520, 526-27, 462 A.2d 713, 716 (1983) ................................... 31, 32

Spires v. Hanover Fire Insurance Co.,
    364 Pa. 52, 57, 70 A.2d 828(1950) ................................................................. 12, 13

Stradling v. Southland Corp., 924 F.Supp 38, 40 (E.D. Pa. 1996) ................................ 4

Thompson Coal Co. v. Pike Coal Co.,
    488 Pa. 198, 211, 412 A.2d 466, 472 (1979) ....................................................... 20

U.S. v. USX Corp.,
    68 F.3d 811, 826 (3d Cir. 1995) ............................................................... 31, 32, 33

United States v. 717 S. Woodward St., 2 F.3d 529, 533 (3d Cir. 1993) .................... 3, 4

USX Corp. v. Prime Leasing, Inc.,
    988 F.2d 433 (3d Cir. 1993) .................................................................................. 22

Vogel v. Berkley,
    354 Pa. Super. 291, 511 A.2d 878, 881 (1986) ...................................................... 4

Wagman v. Carmel,
    601 F.Supp. 1012, 1017 (E.D. Pa. 1985 ................................................................ 32

Watkins v. Kmart Corp.,
    1998 WL 355525 *3 (E.D. Pa.) ............................................................................ 6

West Virginia v. Hassett (In re OPM),
    21 B.R. 993, 1005-08 (Bankr. S.D.N.Y. 1981) .................................................. 8, 9

Wilkins v. Heebner,
    331 Pa.Super. 491, 498, 480 A.2d 1141, 1145 (1984)........................................ 33

Wittekamp v. Gulf & Western, Inc.,
    991 F.2d 1137, 1142 (3d Cir. 1993) .................................................................... 14

Yezbak v. Croce,
    370 Pa. 263, 267-68, 88 A.2d 80, 82 (1952).................................................... 34

Zuback v. Bakmaz,
    346 Pa. 279, 282, 29 A.2d 473 (1943) .......................................................... 29, 30

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ......................................................................................................... 3

R. Contino, Legal and Financial Aspects of Equipment Leasing Transactions, 29,
    87-88 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Restatement (Second) of Contracts §302 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..12

Tennessee Consumer Protection Act,
    T.C.A. §§47-18-101 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 26, 27

Pennsylvania Uniform Partnership Act
    15 Pa. C.S.A. §§830-8305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28, 29

IN THE UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| De Lage Landen Financial Services, Inc. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | CIVIL ACTION NO. 02-CV-2810 |
| Toshiba America Medical Systems, Inc. | : | |
| | : | |
| Intervenor | : | Honorable Ronald L. Buckwalter |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| DeSoto Diagnostic Imaging, LLC., Randon | : | |
| J. Carvel, Lynn T. Carvel, Delta Radiology, | : | |
| P.C. and Zobar Properties, LLC. | : | |
| | : | |
| Defendants. | | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DE LAGE LANDEN
FINANCIAL SERVICES, INC.'S MOTION FOR SUMMARY
JUDGMENT AGAINST DEFENDANTS**

---

**McCARTER & ENGLISH, LLP**
Rosetta B. Packer (Attorney ID No. 28357)
Peter J. Boyer (Attorney ID No. 25517)
Kevin J. Burke (Attorney ID No. 87214 )
Mellon Bank Center
1735 Market Street, Suite 700
Philadelphia, PA 19103
(215) 979-3800

Attorneys for Plaintiff
De Lage Landen Financial Services, Inc

## I. <u>STATEMENT OF UNDISPUTED FACTS</u>

The evidence of record reveals the following facts to be undisputed.

On or about February 17, 2000 Defendant DeSoto Diagnostic Imaging, LLC ("DDI") by its Chief Manager, Lynn Carvel, executed and delivered to Toshiba America Medical Credit, ("TAMC") a program of Toshiba America Medical Systems, Inc., ("TAMS"), a Master Lease Agreement and related schedules and attachments (collectively, the "Master Lease") whereby DDI leased from TAMC certain medical equipment described therein.  See, Exhibit C.[1]

The name Toshiba America Medical Credit was a name utilized by DLL, as successor to Tokai Financial Services, Inc. ("TFS") pursuant to a Master Contract Financing Program Agreement with TAMS dated July 19, 1996 (the "Program Agreement"). Exhibit A, Section One, page 2.  The Program Agreement provides, in pertinent part:

> "Notwithstanding anything to the contrary contained herein, the parties agree to operate the business of leasing equipment as provided in this Program Agreement using the Program Identifier, Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc."

Exhibit A, Section One, page 2.  In Section 6.1 of the Program Agreement, it provides:

> 6.1 Servicing of Contract.
>
> (a)  <u>TFS [now DLL] will service all contracts on a private label basis in the name of TAMS so that the Lease Financing Program will at all times appear to lessees to be a proprietary program of TAMS</u>.  TFS shall provide general administrative services, including billing and collecting all payments, fulfilling the obligations as lessor under the contract, the enforcement of TFS rights under the contract including any guarantee and/or this agreement and the taking of such other actions that may be necessary to protect TFS's rights and interests in and to the contracts including any guarantee or equipment.  TFS shall invoice

---

[1] Plaintiff is submitting as part of its motions for Summary Judgment, an Appendix containing all evidence referenced in its summary judgment motions.  Unless otherwise stated, Exhibit References are to the Appendix of Exhibits In Support of Plaintiff's Motion for Summary Judgment being filed herewith.

each lessee for all amounts due under a contract in the name
TAMS and will direct the lessee to make payments to the lockbox
established in the name of TFS.  TFS's collection personnel will
perform collection activities in the name of TAMS in accordance
with the power of attorney set forth in Section 8[2] and TFS will bill
and collect applicable use and property tax in the name of TAMS,
however, TFS shall report and remit said taxes to the appropriate
tax authorities on TFS returns.

In order to secure the obligations of DDI to TAMC, defendants/related parties Randon J.

Carvel, Lynn T. Carvel, Delta Radiology, P.C. and Zobar Properties, LLC (collectively, the

"Guarantor Defendants") executed and delivered to TAMC their respective blanket personal

guarantees (collectively, the "Guarantees").  Exhibits D, E, F, and G.

The leased equipment was accepted by DDI by the execution of two documents entitled

"Lessee Information" which were executed by Lynn Carvel, Chief Manager of DDI on

December 27, 2000 and Randon Carvel, C.O.O. of DDI on April 30, 2001, respectively (the

"Acceptance Documents").  The identical documents provide in pertinent part:

> "On behalf of the Lessee, I hereby certify that all of the equipment
> ("Equipment") referred to in Master Lease Schedule 01 [and 02]
> issued pursuant to that certain Master Lease Agreement dated as of
> February 17, 2000, by and between DeSoto Diagnostic Imaging
> LLC ("Lessee") and Toshiba American Medical Credit, a program
> of Toshiba American Medical Systems, Inc. ("Lessor") have been
> delivered to and been received by Lessee, that all installation or
> other work necessary prior to the use thereof has been examined by
> the Lessee and it is in good operating order and condition and in all
> respects satisfactory to Lessee . . . "

Exhibits M.

---

[2] Section 8 of the Program Agreement provides:  "TAMS hereby constitutes TFS its true and lawful attorney with
full power in the name of TAMS to lawfully ask, require, demand, receive, compound and give acquittance for any
and all Payments and claims for money due or to become due under any Contract or any related Guaranty; to
endorse any checks or other instruments delivered to the lockbox or otherwise received by TFS and constituting
Payments or other sums legally due TFS under this Agreement and to bill and collect from Lessee applicable use
and property tax."  Exhibit A, Page 21.

The Master Lease provides, <u>inter</u> <u>alia</u>:

> "7.
>
> ASSIGNMENT:…Lessor may at any time assign all or part of any interest in this Agreement or any Lease and in each item of Equipment and monies to become due to Lessor hereunder; and Lessor may grant security interests in the Equipment, subject to the Lessee's rights therein…" (Exhibit "C")

Upon receipt of the signed Acceptance Documents, DLL funded the purchase price and commenced collecting lease payments under the private label name TAMC.

On or about February 1, 2002, DDI defaulted upon its obligations under the Master Lease by, <u>inter alia</u>, failing to make lease payments when due and by de-installing and removing the leased equipment prior to the end of the lease term.  Exhibit Q, ¶ 64.

On May 10, 2002, DLL commenced this diversity action by filing a Complaint against Defendants.  DLL's Complaint sets forth five causes of action alleging that DDI and the Guarantor Defendants are liable to DLL for an amount in excess of $3.25 million for the various breaches of the Master Lease and Guaranties described above.

## II.  <u>LEGAL ARGUMENT</u>

### <u>POINT I</u>

### <u>SUMMARY JUDGMENT IS APPROPRIATE WITH RESPECT TO PLAINTIFF'S AFFIRMATIVE CLAIMS AGAINST DEFENDANT DESOTO DIAGNOSTIC IMAGING, LLC</u>

#### A.    **Summary Judgment For De Lage Landen Financial Services, Inc. Is Consistent With Generally Applicable Summary Judgment Standards**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>Fed. R. Civ. P</u>. 56(c).  An issue is genuine only if there is evidence from which a reasonable trier of fact could find in favor of the non-moving party, viewing the record as a whole in light of the evidentiary burden the law

places on that party.  United States v. 717 S. Woodward St., 2 F.3d 529, 533 (3d Cir. 1993).  A

factual dispute is material only if it might affect the outcome of the suit under the governing law.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  While DLL bears the initial burden

of pointing out the absence of genuine issues of material fact, the burden then shifts to

Defendants to come forward with evidence through affidavits, depositions, or admissions

showing that a genuine issue exists.  I.C.D. Indus. v. Fed. Ins. Co., 879 F. Supp. 480, 483 (E.D.

Pa. 1995).  The non-movant must make a showing sufficient to establish the existence of every

element essential to his case.  Anderson, 477 U.S. at 255.  If the non-moving party's evidence,

when viewed in the context of all of the evidence, could not be credited by a rational juror,

summary judgment may be granted.  717 S. Woodward St., 2 F.2d at 533.

    The ultimate question in determining whether a motion for summary judgment should be

granted, is "whether reasonable minds may differ as to the verdict." Schoonejongen v. Curtiss-

Wright Corp., 143 F.3d 120, 129 (3d Cir.1998). "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment." Anderson, 477 U.S. at 248.

    Summary judgment is appropriately used for interpreting a contract whose terms are

considered by opposing parties to be clear and unambiguous, despite a disagreement between the

parties as to what the agreement provides.  Paul Revere Protective Life Ins. Co. v. Weis, 535

F.Supp. 379, 383 (E.D.Pa. 1981), citing Goldinger v. Boron Oil Co., 375 F.Supp. 400, 413

(W.D.Pa. 1974), aff'd mem., 511 F.2d 1393 (3d Cir. 1975).  See also, Stradling v. Southland

Corp., 924 F.Supp 38, 40 (E.D. Pa. 1996).  However, disagreement between parties over proper

interpretation of a contract does not necessarily mean that the contract is ambiguous.  Vogel v.

Berkley, 354 Pa. Super. 291, 511 A.2d 878, 881 (1986).  Whether contract provisions are clear or

ambiguous is a question of law for the Court.  Kiewit Eastern Co., Inc. v. L&R Construction Co., Inc., 44 F.3d 1194, 1199 (3d Cir. 1995).  "A contract is ambiguous only if it is reasonably susceptible to different constructions and capable of being understood in more than one sense."  12th Street Gym v. General Star Indemnity Co., 93 F.3d 1158, 1165 (3d Cir. 1996).

In the present case, the Master Lease, the Program Agreement, the Guarantees and the Acceptance Documents are not, as a matter of law, ambiguous or open to two reasonable alternative meanings.  Therefore, any dispute as to the interpretation of these agreements can be properly resolved in the context of this summary judgment motion.

Based on the foregoing, the following material facts are undisputed: (1) DLL's predecessor-in-interest, TFS, and TAMS entered into the Program Agreement whereby TFS agreed to provide financing for medical equipment leased and/or sold by TAMS under the program name TAMC; (2) TAMC and defendant DDI entered into the Master Lease whereby TAMC leased to DDI certain medical equipment as described in the Master Lease; (3) the obligations of DDI under Master Lease were unconditionally guaranteed by the Guarantor Defendants; and (4) DLL had the unconditional right to assign the Master Lease.

Additionally, the uncontroverted evidence proves that DDI accepted the equipment and utilized the subject medical equipment in accordance with the Master Lease and that DDI defaulted on the Master Lease by, inter alia, failing to make timely payments in accordance with the terms of the Master Lease.  Exhibit Q, ¶ 64.  DDI and the Guarantors failed to reimburse DLL for the amounts due and owing under the Master Lease.  Exhibit L.

Based on the foregoing undisputed facts, plaintiff, DLL has clearly demonstrated an entitlement to the outstanding monies due and owing from Defendants under the Master Lease. Accordingly, DLL's motion for partial summary judgment should be granted.

**B.    Summary Judgment Should Be Entered Against Defendant, DeSoto Diagnostic Imaging, LLC And In Favor of DLL for Breach of the Master Lease**

Pursuant to Paragraph 24 of the Master Lease, the parties agreed to and consented to the application of Pennsylvania law to this action.  A federal district court exercising diversity jurisdiction must apply the choice of law rules of the forum state in determining what jurisdiction's law to apply in that particular case.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497, 61 S.Ct. 1020, 1022 85 L.Ed. 1477 (1941).  In Pennsylvania, courts traditionally uphold the intent of the contracting parties and will enforce a choice of law provision in a contract as long as the transaction bears a reasonable relationship to the state whose law is governing.  See, Meade v. Florida Infusion Services, Inc., 120 F.Supp. 499, 501 (E.D. Pa. 2000); Watkins v. Kmart Corp., 1998 WL 355525 *3 (E.D. Pa.) (parties choice of Michigan law to govern was reasonable as contract was signed, at least in part, in Michigan, and Kmart was a Michigan corporation with principal place of business in Michigan); Cottman Transmission Systems, Inc. v. Melody, 869 F. Supp. 1180, 1184 (E.D. Pa. 1994) (holding choice of law provision was valid and application of Pennsylvania law was reasonable as contract was negotiated in Pennsylvania, made with a Pennsylvania corporation, executed by all parties in Pennsylvania and defendants were required to make payments to Pennsylvania for a period of fifteen years).  See also, Roadway Package System, Inc. v. Kayser, 1999 WL 817724, *3 (E.D.Pa.) citing Smith v. Commonwealth Nat'l Bank, 384 Pa. Super. 65, 557 A.2d 775 (Pa. Super. Ct. 1989).  As such, Pennsylvania courts will honor contractual choice of law provisions where parties have sufficient contacts to that state.  Cottman Transmission Systems, Inc., 869 F. Supp at 1184, citing Jaskey Fin. and Leasing v. Display Data Corp., 564 F.Supp. 160 (E.D.Pa. 1983).

In the <u>present</u> case, the undisputed evidence demonstrates that the underlying transaction bears a reasonable relation to the Commonwealth of Pennsylvania.  DLL's predecessor-in-interest, and DLL, maintain offices in the Commonwealth of Pennsylvania.  Exhibit A, p. 27; C, p. 3.  Part of the Master Lease was executed in Pennsylvania and all of the payments to be made by Defendants over a period of sixty-three months in accordance with the terms of the Master Lease were to be sent to Pennsylvania.  Exhibit C, ¶ 2.  The parties have sufficient and substantial contacts to Pennsylvania.  Accordingly, the parties' contractual choice of Pennsylvania law is valid and should be applied to this contract action.

It is well-settled in Pennsylvania that in order to establish a cause of action for breach of contract, a plaintiff must prove: (1) the existence of a contract (including its essential terms), (2) a breach of duty imposed by the contract, and (3) damages as a result of the breach.  <u>General State Authority v. Coleman Cable & Wire Company</u>, 27 Pa.Cmwlth 385, 388-89, 365 A.2d 1347 (1976).

In this matter, Count I of Plaintiff's Complaint asserts a claim against defendant DDI for breach of the Master Lease.  The undisputed evidence supports Plaintiff's claim of breach.  First, it is undisputed that DDI executed the Master Lease.  Exhibit C, page 3, Exhibit "T", paragraph 2.

Second, DDI admittedly breached the Lease Agreement by failing to make the required monthly payments due and owing to DLL.  Exhibit Q, ¶ 64.

Paragraph 4 of the Master Lease states:

> "…If the Equipment is not properly installed, does not operate as intended by the Vendor and/or Manufacturer, <u>or is unsatisfactory for any reason</u>, Lessee shall make any claim on account thereof solely against the Vendor and/or Manufacturer and shall, nevertheless, pay Lessor all Lease payments under the Lease and shall not set up against Lessee's obligations any such claim as a

defense, counterclaim, set-off or otherwise…." (emphasis supplied)

The Master Lease further provides that "[DDI's] obligation to pay such Lease payments shall be absolute and unconditional and is not subject to any abatement, set-off, defense or counter-claim for any reason whatsoever."  Exhibit C, Section 2 "Term and Rent".  This language, sometimes referred to as a "hell or high water" clause, is not unusual in the equipment leasing industry.

Courts have uniformly given full force and effect to "hell or high water" clauses, even in the face of a contention that the party seeking to enforce the clause is in default.  Philadelphia Savings Fund Society v. Deseret Management Corp., 632 F.Supp 129, 136 (E.D.Pa. 1985), citing West Virginia v. Hassett (In re OPM), 21 B.R. 993, 1005-08 (Bankr. S.D.N.Y. 1981).  See also, National Equipment Rental v. J&I Carting, Inc., 73 A.D.2d 666, 423 N.Y.S.2d 205 (2d Dept. 1979); Dixie Groceries, Inc. v. Albany Business Machines, 156 Ga.App. 36, 274 S.E.2d 81, 83 (1980); First National Bank of Atlanta v. Harrison, 408 F.Supp. 137, 140 (N.D.Ga. 1975).  Moreover, these courts have found that clauses containing unconditional promises or "hell or high water" provisions are strictly enforceable.  Id.  The practical consideration enforcing these provisions as a matter of law is essential to the equipment leasing industry and denying these provisions would deny the financer meaningful security for outright loans to the lessor.  Philadelphia Savings Fund Society, 632 F.Supp. at 136, citing In re OPM, 21 B.R. at 1007.  See also, R. Contino, Legal and Financial Aspects of Equipment Leasing Transactions, 29, 87-88 (1979).

In West Virginia v. Hassett (In re OPM), OPM leased computer equipment to the plaintiff, West Virginia.  OPM, 21 B.R. at 997-98.  The leases were subsequently pledged to the defendant (Hassett) as security for OPM's indebtedness.  Id. at 998.  The plaintiff later filed suit alleging that OPM failed to tender monthly payments of maintenance fees in accordance with the

lease and thereby terminating the defendant's rights to receive the lease payments.  Id.  The

defendant counterclaimed alleging that plaintiff failed to make the monthly lease payments in

accordance with the master lease.  Id.  Pursuant to the terms of the master lease, plaintiff was

required to pay all amounts due and owing to OPM's assignee under the lease "notwithstanding

any defense, offset or counterclaim whatever whether by reason of breach of such Equipment

Schedule or otherwise which it may or might now hereafter have against the Lessor…"  Id.  at

999.  The master lease also stated that the lessee's obligation to an assignee would continue until

all amounts were paid in full.  Id.

    The court determined that the plaintiff's absolute and unconditional promise to tender

lease payments to OPM or its assignee must be given full force and effect.  Id. at 1005.  In

reaching this conclusion, the court looked to other jurisdictions and found that courts have

uniformly given full force and effect to "hell or high water" clauses, even if the party enforcing

the provision was in default.  Id.  1006-07.

    This Court followed the opinion of the bankruptcy court in OPM in the case of

Philadelphia Savings Fund Society v. Deseret Management Corp.  In that case, the lessee had an

unconditional duty to make monthly payments to the lessor's assignee, notwithstanding any

defense, offset or counterclaim, by reason of breach of equipment schedules that it may or might

now or hereafter have against the lessor.  Philadelphia Savings Fund Society, 632 F.Supp. at 135.

This Court determined that, based upon the "hell or high water" provision in the master lease, the

lessee had an unconditional obligation to tender the monthly payments.  Id. at 136.  In reaching

this conclusion, this Court relied upon the opinion of the court in OPM and those cases cited

therein with regard to the enforceability of "hell or high water" provisions in contracts.  Id.  at

136.

In the present case, defendant DDI absolutely and unconditionally agreed to make monthly payments to TAMC in accordance with the terms of the Master Lease. The "hell or high water" provision" in Paragraph 4 of the Master Lease (as stated above) contains virtually identical language to the language this Court considered in Philadelphia Savings Fund Society as well as the language the bankruptcy court considered in OPM. Although this Court construed the lease documents in accordance with New York law in Philadelphia Savings Fund Society, application of Pennsylvania law in this matter results in the same conclusion. DLL provided the financing for the Master Lease and had no obligations with regard to the maintenance or operation of the leased equipment. The "hell or high water" clause can be interpreted as essential to DLL, as lease payments were the only means to assure repayment of the financing made available to DDI. Failure to uphold this provision would be contrary to the intent of the parties and change the agreed upon terms of the Master Lease.

Finally, the evidence establishes that DLL has been damaged by DDI's admitted breach of the Master Lease because DLL has been deprived of the monies it is owed under the Master Lease in an amount in excess of $3,250,000. Exhibit "L". DLL's role was to finance the transaction between DDI and TAMS and pursuant to the terms of the Master Lease, it was agreed that DLL is/was "NOT RESPONSIBLE FOR THE PERFORMANCE, MAINTENNANCE OR SERVICING OF THE EQUIPMENT AND LEASES SAME 'AS-IS.'" Exhibit C, Paragraph 3 (emphasis in original). The Master Lease further provides: "Lessee has selected both the Equipment and the Supplier from whom Lessor covenants to purchase the Equipment at Lessee's request". Exhibit C, Paragraph 4.

Defendant, DDI has clearly benefited as DLL performed its duties under the Master Lease by purchasing the leased equipment requested by DDI. DDI has failed to tender the

required monthly payments.  In addition, DLL has been further damaged by DDI's attempts to avoid its debt obligation in this litigation, by incurring significant counsel fees and wasting an inordinate amount of time in the prosecution of their claims and the defense of baseless counterclaims.[3]

Thus, based on the undisputed evidence of record, there exists no genuine issue of material fact regarding defendant DDI's unconditional obligations to tender monthly payments to DLL pursuant to the terms of the Master Lease and their breach thereof.  Plaintiff has sustained damage of $2,928,590 plus accruing interest and counsel fees in excess of $400,000.  (Exhibit "L").  Accordingly, summary judgment should be granted in favor of DLL on Count I of the Complaint.

---

[3] Defendants were represented by counsel with regard to the leasing of the equipment and consulted with counsel with regard to the terms and provisions in all documents executed by Defendants, including the Master Lease.  See, Exhibit T, No. 13 and Exhibit V.

## POINT II

## PARTIAL SUMMARY JUDGMENT IS APPROPRIATE WITH RESPECT TO DISMISSAL OF DEFENDANTS' COUNTERCLAIMS AGAINST PLAINTIFF

**A.    Defendants' Counterclaim IV Should Be Dismissed As Defendants Are Not Third Party Beneficiaries To The Master Contract Financing Program Agreement.**

Pursuant to Defendants' Counterclaim IV, Defendants allege a third party beneficiary claim for breach of contract of the Program Agreement against TAMS and DLL.  Pursuant to Section 14.8 (b) of the Program Agreement, the parties agreed that the Program Agreement was executed and to be construed in accordance with laws of the Commonwealth of Pennsylvania.  Exhibit A, paragraph 14.8(b)  For the reasons set forth above, the parties' choice of law is reasonable and it is therefore appropriate for this Court to apply the laws of the Commonwealth of Pennsylvania.

It is well settled under Pennsylvania law that both contracting parties must have expressed an intention that a third party be a beneficiary and the intention must affirmatively appear in the contract itself in order for a third party to have standing to recover on a contract, Scarpitti v. Weborg, 530 Pa. 366, 370, 609 A.2d 147 (1992), citing Spires v. Hanover Fire Insurance Co., 364 Pa. 52, 57, 70 A.2d 828(1950), unless "circumstances are so compelling that the recognition of the beneficiary's rights must be appropriate to effectuate the intention of the parties, and the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance."  Scarpitti v. Weborg, 530 Pa. at 371, citing Guy v. Liederbach, 501 Pa. 47, 459 A.2d 744 (1983).  See also Restatement (Second) of Contracts § 302 (1979).

Applying the <u>Spires</u> test, the Defendants do not have standing to recover under the Program Agreement between DLL and TAMS. Clearly, there is no express provision in the Program Agreement which designates lessees of equipment as beneficiaries of the Program Agreement. Nor did TAMS or TFS ever express an intention that Lessees were to be beneficiaries. See, Exhibit A.

Pursuant to the second test, the courts have the discretion to decide whether the circumstances are so compelling that recognition of the beneficiary's right is necessary to effect the intention of the parties. <u>Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.</u>, 264 F.Supp.2d 394, 401 (E.D. Pa. 2002), citing <u>Scarpitti</u>, 530 Pa. at 373. In the present case, the clear purpose of the Program Agreement was for TFS to provide private label financing for TAMS to facilitate TAMS' sale and lease of its equipment. A third party beneficiary relationship was not contemplated by the parties. No rights were conferred upon lessees. The Program Agreement, if anything, gave purchasers or lessees of TAMS' equipment the option to seek financing through TAMS. However, purchasers or lessees were not given a right to receive financing as a result of the Program Agreement. Lessees needed to qualify as creditworthy as well as accept all of the terms of the financing that was offered. Moreover, pursuant to Section 6.5(a) of the Program Agreement, "TAMS customers shall always have the right to use their own leasing/financing source." As a result, the Program Agreement did not manifest an intention to confer a right on any lessee, including DDI. Accordingly, DDI fails to meet the requirements of the first part of the <u>Scarpitti</u> test.

Even if this Court were to determine that the Program Agreement manifests an intention to confer a right upon the DDI, the DDI cannot meet the second part of the second test. The Defendants did not assume the benefits and obligations of the contract. There is no obligation of

14

DLL to finance or pay money to DDI.  The only obligation of DLL is to provide financing under the strict requirements of the Program Agreement.  The purpose of the Program Agreement was to enable TAMS to provide purchasers of the equipment with the option to obtain financing directly from TAMC.

Finally, in the event that this Court determines that DDI is a third party beneficiary of the Program Agreement, DDI's claims are against TAMS for breach of express warranties and/or breach of its Servicing Agreements with TAMS.[4]  Exhibit P.  Defendants have failed to prove a claim against DLL.  Thus, based on the undisputed evidence of record, there exists no genuine issue of material fact regarding DDI's claim for an alleged breach of the Program Agreement to which it was not a party.  Accordingly, summary judgment should be granted in favor of DLL and dismiss Counterclaim IV of the Defendants' First Amended Counterclaims.

**B.    Defendants' Counterclaim V Should Be Dismissed As the Evidence of Record Does Not Support a Claim of Fraud Against DLL**

As a matter of law, defendants' claim of fraud, as set forth in Count V of the Counterclaim, must fail.  To establish a claim of fraud under Pennsylvania law, a plaintiff must prove the following by clear and convincing evidence: (1) a material misrepresentation of fact (2) that is false (3) made with knowledge of its falsity (4) which is intended to induce the receiver to act, (5) and upon which the party justifiably relies.  See Wittekamp v. Gulf & Western, Inc., 991 F.2d 1137, 1142 (3d Cir. 1993), Michael v. Shiley, Inc., 46 F.3d 1316, 1333 (3d Cir. 1995).  Defendants have elicited no facts to prove any of these elements; they merely recite such claims without any factual support, alleging that DLL and TAMS' actions "constituted an unlawful act."  Exhibit Q, Counterclaim VI.  DLL is in the business of private

---

[4] TAMS and DDI entered into separate servicing contracts for the equipment to which DLL is not a party.  Exhibit P.

label financing.  The transactions in this matter so reflect.  Defendants' mere allegations do not amount to the clear and convincing evidence required to establish a claim of fraud.

Count V of defendants' complaint is based upon the contention that DLL and TAMS jointly deceived and defrauded DDI by

> Falsely represented that TAMS was a single source for equipment sales, service and financing and that TAMS sales, service or credit would respond should problems arise with the equipment. (Counterclaim Paragraphs 115-117)

> Concealing from Defendants the relationship between TAMS and DLL so as to deceive Defendants into believing that Defendants would be contracting only with TAMS (Counterclaim Paragraph 119); and

> Working secretly with each other to secure an inflated interest rate finance deal for DLL and to secure an undisclosed points payment for TAMS.  (Counterclaim paragraph 120).

Each of these contentions is without merit.

First, it is well settled under Pennsylvania law that where, as here, the parties have entered into an integrated agreement, parol evidence is inadmissible to show fraud in the inducement of a contract.  Coram Healthcare Corporation v. Aetna U.S. Healthcare, Inc., 94 F.Supp.2d 589 (E.D. Pa. 1999); Falbo v. State Farm Life Insurance Col, 1997 WL 116988 (E.D. Pa. 1997).  As the Court noted in Coram Healthcare, in granting summary judgment dismissing claims of fraud in the inducement based on the parol evidence rule:

> The Master Agreement between Coram and Aetna is . . . fully integrated.  . . . The second clause provides, "This Agreement . . . constitutes the complete and exclusive contract between the parties . . .  and supersedes any and all prior contemporaneous oral and written communications or proposals not expressly included herein." . . .The contract, as written, contains the parties' understanding of the payment schedule, the amount of consideration, and the base utilization rate.  Being both unambiguous and fully integrated, the Master Agreement "must be held to express all of the negotiations, conversations, and

> agreements made prior to its execution, and . . . oral testimony . . .
> [is not admissible to explain or vary the terms of the contract. . . .
>
> Under the Pennsylvania parol evidence rule . . . Coram's evidence
> of fraudulent misrepresentations in the inducement made prior to
> the execution of the Master Agreement is inadmissible, whether
> the claims sounds in tort or contract.

94 F.Supp 2d at 595.

Here as in <u>Coram Healthcare</u>, the Master Lease (Exhibit "C") has an integration clause which provides as follows in paragraph 25:

> This Agreement and each Lease hereunder contain the entire
> agreement and understanding between Lessee and Lessor relating
> to the subject matter of each lease.  No agreements or
> understandings shall be binding on the parties hereto unless set
> forth in writing and signed by the parties. . .

Here, as in <u>Coram Healthcare</u>, defendants seek to assert the existence of contract terms that are directly contradicted by the language of the Master Lease.  Defendants assert that they were deceived into believing that the Lessor would respond should problems arise with the equipment, a contention that is directly contrary to the express language of the Master Lease, which provides, at paragraph 4:

> "…If the Equipment is not properly installed, does not operate as
> intended by the Vendor and/or Manufacturer, <u>or is unsatisfactory
> for any reason</u>, Lessee shall make any claim on account thereof
> solely against the Vendor and/or Manufacturer and shall,
> nevertheless, pay Lessor all Lease payments under the Lease and
> shall not set up against Lessee's obligations any such claim as a
> defense, counterclaim, set-off or otherwise…." (emphasis
> supplied)(Exhibit "C")

Defendants contend that they were misled into believing that they were contracting only with TAMS and that TAMS was a single source for equipment, sales, service and financing[5].  The Master Lease (Exhibit "C") provides, in the very first paragraph:

> This MASTER LEASE AGREEMENT . . . is by and between Toshiba America Medical Credit, a program of Toshiba America Medical Systems, Inc., with Lease Processing Center located at 1055 Westlakes Drive, Berwyn, Pennsylvania 19312 ("Lessor").

Finally, DDI contends that TAMS and DLL worked together to secure an inflated interest rate which included, in part, paying an undisclosed points payment from DLL to TAMS.  As a matter of law, this contention must fall as well.  The transaction between TAMC and DDI was a lease.  It was not a loan with a stated rate of interest.  DDI was offered lease terms that it accepted.  There is and can be no contention that DDI was in fact charged more than it agreed to pay.  The fact that DLL paid a credit fee to TAMS in accordance with the terms of the Program Agreement is not a ground for a claim of fraud.  Such a payment is no more a fraud on the lessee than is a broker's commission paid by the seller in a real estate transaction.

Based upon the undisputed facts of record, Defendants' fraud claim should be dismissed as a matter of law.

### C.    Defendants' Counterclaim VI Should Be Dismissed As DLL And TAMS Were Not Engaged In A Civil Conspiracy To Commit Fraud.

Pursuant to Defendants' Counterclaim VI, Defendants allege a claim against DLL and TAMS for Civil Conspiracy to Commit Fraud.  Pursuant to Section 14.8 (b) of the Program Agreement, the parties agreed that the Program Agreement was executed and to be construed in

---

[5] The undisputed evidence of record is that TAMS was, in fact, a single source for sales, service and financing and it performed all of those functions for DDI, including bringing DDI to the attention of TAMC, its financing program, which at the time was administered by DLL pursuant to the Program Agreement.   Both prior to and subsequent to its Program Agreement with DLL, TAMS utilized other financing sources for its TAMC financing program.  Dep of K Abbott (March 9, 2004) at 17, 40, 128-29 (Exhibit "Z").

accordance with laws of the Commonwealth of Pennsylvania.  For the reasons set forth above, the parties' choice of law is reasonable and it is therefore appropriate for this Court to apply the laws of the Commonwealth of Pennsylvania

Under Pennsylvania law, a civil conspiracy is "a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." Landau v. Western Pennsylvania National Bank, 445 Pa. 217, 224, 282 A.2d 335, 339 (1971) (citations omitted).  There must also be an overt act done in pursuance of the common purpose and actual legal damage.  See McKeeman v. Corestates Bank, N.A., 2000 Pa.Super. 117, 751 A.2d 655, 660 (2000), citing Maguire v. Shubert, 722 A.2d 1087, 1092 (Pa.Super. 1998).  Proof of malice, i.e., the intent to injure absent justification, must also be present.  See Shaffer v. Procter & Gamble, 412 Pa.Super. 630, 638, 604 A.2d 289, 293 (1992), Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc., 931 F.Supp. 377, 386 (E.D.Pa. 1996) (stating that malice and lack of justification are essential parts of a civil conspiracy).  Moreover, a claim for civil conspiracy can proceed only when there is a cause of action for the underlying act.  See Caplan v. Fellheimer Eichen Braverman & Kasky, 884 F.Supp. 181, 184 (E.D.Pa. 1995) (holding that because the underlying civil claims against the plaintiff had been dismissed, no claim for civil conspiracy could stand).

To establish a claim for civil conspiracy under Pennsylvania law, the party making the claim must demonstrate that the alleged co-conspirators came together for the express purpose of committing either a criminal act or intentional tort.  See Advanced Power Systems v. Hi-Tech Systems, Inc., 801 F.Supp. 1450 (E.D.Pa. 1992).  Defendants advance the following in support of their civil conspiracy claim:

> TAMS and DLL agreed by and between themselves to
> intentionally misrepresent themselves to Defendants as a single

source or sales, service and financing . . . and thereby defraud
Defendants.  TAMS and DLL intentionally concealed their
relationship and obligations to each other and worked secretly to
*inter alia,* secure an inflated interest rate finance deal . . . and
thereby defraud Defendants . . . [t]he actions . . . were done so
intentionally, willfully, maliciously, outrageously and in bad faith
. . . the actions . . . constituted an unlawful act to defraud
Defendants.

Exhibit Q, Counterclaim VI.  Defendants' civil conspiracy claim fails for two reasons: first,

because Defendants have not and cannot demonstrate an underlying criminal act, and second,

because there is no evidence of malice.

Proof of malice requires proof of an intent to cause injury without justification.  In

Shaffer v. Proctor & Gamble, supra, far more egregious facts than those alleged here were found

not to give rise to a claim for civil conspiracy.  On preliminary objections to the complaint (the

equivalent of a Rule 12 (b)(6) motion to dismiss in federal court) the Court accepted as true

allegations that as plaintiff's employer, Proctor and Gamble had improperly disciplined her for

inability to work because of a medical condition resulting from a job related injury, interfered

with her ability to receive medical care and to share transportation at a time when driving her

own vehicle was difficult, threatening termination, canceling appointments made by the plaintiff

with her medical care providers, and other conduct that could be generally described as denying

plaintiff adequate medical care as a result of which her condition worsened.  The Court, while

describing the conduct alleged as "egregious", nevertheless dismissed the conspiracy claim,

holding that the conduct was justified in that it could be understood in terms of P&G's concern

for its own economic interest and therefore did not satisfy the element of malice required.

In this

case, the conduct complained of pales in comparison to that alleged in Shaffer v P&G.

Accordingly, as a matter of law, summary judgment should be entered dismissing Defendants' conspiracy claim, with prejudice.

Defendants claim that DLL and TAMS conspired to defraud Defendants. For the reasons set forth in pages 15 through 18, <u>infra</u>, they have not and cannot prove fraud under Pennsylvania law. Because there is no evidence of an underlying fraudulent or criminal act, Defendants' claim for civil conspiracy must fail. <u>See Caplan</u>, 884 F.Supp. at 184; <u>Gilbert v. Feld</u>, 842 F.Supp. 803 (E.D. Pa. 1993) (holding that civil conspiracy claim failed in the absence of any valid claim for any of the underlying torts). There is ample evidence, notably the Program Agreement, demonstrating that DLL and TAMS came together for legitimate business purposes, namely, to finance the sale and lease of medical equipment. See, Exhibit A.

It is important to note that Defendants' claims regarding a "conspiracy" lack any substance when considered in light of the assignment clause of the Master Lease. Exhibit C, Paragraph 7. Had TAMS been the original Lessor (instead of TAMC), TAMS could have, at any time, assigned the Master Lease to an unrelated third party who would have the absolute right to enforce the provisions of the Master Lease, as DLL does. The rights of the Lessor, be it DLL, TAMC or a third party assignee, under the Master Lease are clear and unambiguous.

In <u>Thompson Coal Co. v. Pike Coal Co.</u>, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979), the court held that the civil conspiracy claim failed where there were no facts indicating that appellee, an attorney, acted solely to injure appellants, and, to the contrary, there were ample facts demonstrating that appellee acted solely to advance the legitimate business interests of his client. In that case, the court found that summary judgment was properly entered below because appellants failed to indicate any fact that would substantiate the allegation that the attorney combined with other individuals with the unlawful intent to injure the appellants. <u>See id.</u> Such

is the case here.  The Program Agreement demonstrates that DLL and TAMS came together to engage in a series of legitimate business transactions relating to the financing of medical equipment.  Defendants' contention that DLL and TAMS combined with the unlawful intent to injure Defendants is without proof.

Defendants likewise failed to prove that TAMS and DLL acted with malice.  Their bare allegations that TAMS and DLL acted intentionally, willfully, maliciously, outrageously and in bad faith are insufficient to demonstrate malice.  Moreover, Defendants have uncovered no facts to substantiate their claims.  There is no evidence that TAMS and DLL acted with any malice.  To the contrary, as set forth above, the evidence clearly demonstrates that TAMS and DLL acted for a legitimate business purpose.  Because malice is an essential element of a civil conspiracy claim, see Barmasters, 931 F.Supp. at 386, Defendants' civil conspiracy claim must fail.

Because it is clear that there is no genuine issue of material fact as to an agreement between TAMS and DLL to engage in criminal activity, summary judgment should be granted in favor of DLL and dismiss Counterclaim VI of the Defendants' First Amended Counterclaims.

**D.    Defendants' Counterclaim VII For Breach Of The Covenant of Good Faith And Fair Dealing Is Legally Insufficient.**

Pursuant to Counterclaim VII of Defendants' First Amended Counterclaims, Defendants allege that DLL and TAMS breached the implied covenants of good faith and fair dealing.  Pursuant to Section 14.8 (b) of the Program Agreement, Section 24 of the Master Lease and Section 8.3 of the Guarantees, the parties agreed that the agreements were executed and to be construed in accordance with laws of the Commonwealth of Pennsylvania.  For the reasons set forth above, the parties' choice of law is reasonable and it is appropriate for this Court to apply the laws of the Commonwealth of Pennsylvania with regard to Defendants' claim for breach of the implied covenant of good faith and fair dealing.

Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing. Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc., 246 F.Supp.2d 394, 400 (E.D. Pa. 2002) (holding that Pennsylvania law precludes an independent claim for breach of implied covenant of good faith and fair dealing). See also, Drysdale v. Woerth, 1998 WL 966020 *3 (E.D.Pa.). While this Commonwealth has recognized a general duty of good faith and fair dealing in the performance of a contract, a claim for breach of such covenant cannot be raised as an independent action. Drysdale, at *3; See also, Equal Opportunity Employment Commission v. Pathmark Inc., 1998 WL 57520, *6 (E.D.Pa.); JHE, Inc. v. Southeastern Pennsylvania Transportation Authority, 2002 WL 1018941 *6-7 (Pa.Com.Pl. 2002) (holding that a breach of the covenant of good faith is nothing more than a breach of contract claim and separate causes of action cannot be maintained for each).

Moreover, even in this limited context, the implied covenant of good faith and fair dealing may not be invoked where any one of the following conditions is met: (1) the plaintiff has an independent cause of action to vindicate the same rights with respect to which the plaintiff invokes the duty of good faith; (2) imposition of the "implied" duty would be inconsistent with contractual rights, or limitations on contractual obligations, that are specifically covered in the written contract or; (3) there is no confidential or fiduciary relationship between the parties. See USX Corp. v. Prime Leasing, Inc., 988 F.2d 433 (3d Cir. 1993).

In this case, all three conditions are met. In support of their claim for breach of the implied covenant of good faith and fair dealing, Defendants incorporate and rely upon the same facts that they alleged in support of their other causes of action. Most importantly, imposition of the "implied" duty in the manner suggested by Defendants would be inconsistent with the

contractual provisions on the Master Lease referenced earlier in this brief.  Finally, there is no proof that there existed a confidential relationship between the parties.

At the outset of this case, this Court dismissed claims of breach of the implied covenant of good faith and fair dealing asserted by DLL against TAMS in its crossclaim, based upon the same principles of law now argued by DLL herein.  Order of Court dated December 19, 2002 (Exhibit "Y").  For the same reason, summary judgment should be granted in favor of plaintiff dismissing Counterclaim VII of Defendants' First Amended Counterclaims.

>   **E.    Defendants' Counterclaim VIII Should Be Dismissed As Defendants Have No Claim Under the Tennessee Consumer Protection Act.**

Pursuant to Defendants' Counterclaim VIII, Defendants allege that "[t]he conduct by TAMS and DLL set forth in the preceding paragraphs constitutes unfair or deceptive acts within the meaning of the Tennessee Consumer Protection Act, T.C.A. §§ 47-18-101 et seq. and 1001 et seq. (the "Tennessee Act").  Exhibit Q, Paragraph 136.  One of the express purposes of the Tennessee Act is to "protect consumers . . . from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state."  § 4718102(2).  The statute permits a private right of action for "[a]ny person who suffers an ascertainable loss of money or property . . . as the result of the use . . . by another person of an unfair or deceptive act or practice."  § 47-18-109(a)(1).  Tennessee courts have made clear that the Tennessee Act "is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices."  Ganzevoort v. Russell, 949 S.W.2d 293, 297 (Tenn. 1997), quoting Morris v. Mack's Used Cars, 824 S.W.2d 538, 540 (Tenn. 1992).

The thrust of Defendants' allegations is that TAMS and DLL "intentionally concealed from Defendants the existence of the Program Agreement and . . . intentionally concealed that DLL was involved in the equipment transaction between TAMS and DDI . . . this was done,

*inter alia*, so as to prevent Defendants from learning that TAMS was not a single source for

sales, service and financing, as had been previously warranted." Exhibit Q, Paragraph 23.

Defendants have no claim under the Tennessee Act for four reasons: first, because the

alleged fraudulent or deceptive practices did not take place in whole or in part Tennessee;

second, because Defendants have not demonstrated that TAMS and DLL engaged in any

fraudulent or deceptive acts; third, because the nature of the agreement between TAMS and DLL

i.e. private label financing is specifically excluded from the prohibited acts listed in the statute;

and fourth, because the applicable statute of limitations has run.

1.    **The Tennessee Act only applies to acts that take place in trade or commerce in whole of in part in Tennessee.**

The Tennessee Act is not applicable to the case *subjudice* because it specifically refers to

acts that take place in trade or commerce "*in part* or *wholly within* [Tennessee]" (emphasis

added). None of the facts upon which Defendants rely in making a claim under the Tennessee

Act occurred either in part or in whole in Tennessee, nor have Defendants proved such. At the

time of the signing of the Master Lease, the Defendant DDI, Delta Radiology, and Zobar

Properties were all citizens of Mississippi. Plaintiff is a Michigan corporation with a place of

business in Pennsylvania. Mr. and Dr. Carvel reside in Memphis, Tennessee, and have not

alleged that any of the acts on which this Counterclaim is based occurred in whole or part in

Tennessee. Therefore, by its express language, the Tennessee Act does not apply. Moreover, the

Tennessee Act does not apply because the Program Agreement, to which the Defendants make

repeated reference in their Counterclaims, specifically states that the Program Agreement will be

construed in accordance with the laws of the Commonwealth of Pennsylvania. Exhibit A,

Paragraph 14.8(6).

2.    **TAMS and DLL Did Not Engage in Fraudulent or Deceptive Acts Within the Meaning of the Tennessee Act**

The Tennessee Act lists some thirty-three specific acts that constitute unfair or deceptive acts or practices, all of which involve some form of misrepresentation with respect to goods or services, such as false advertising, representing that a repair is needed when it is not, and turning back the odometer on a motor vehicle.  § 47-18-104(b)(9),(10),(13),(16),(17),(22),(23),(29)(33). There is also a general catchall provision for "engaging in any other act or practice which is deceptive to the consumer or to any other person."  § 47-18-104(b)(27).  The Tennessee Act does not define the terms "unfair" and "deceptive."  Rather, it states that in determining the statute's intended meaning, a court should look to opinions concerning a similar provision in the Federal Trade Commission Act.[6]  § 47-18-115 (1995).  The Supreme Court of Tennessee found that a deceptive act or practice for the purpose of the Tennessee Act involves a "material representation or practice likely to mislead a reasonable consumer" or the "concealment, suppression, or omission of a material fact."  Ganzevoort, 949 S.W.2d at 299.  In that case, the court also noted that a claim under the Tennessee Act must be evaluated in light of the facts and circumstances of each situation.  See id.

Claims under the catchall provision of Tennessee Act have arisen in a myriad of circumstances.  For example, in Groover v. Torkell, the plaintiff brought an action against the United Services Automobile Association alleging that the defendant violated the Tennessee Act by failing to provide him an opportunity to purchase higher than minimum uninsured motorist coverage.  In that case, the court found that the defendant did not commit acts rising to the level of "deceptive practices" because "the concept of 'deceptive' carries with it an element of intent which we do not find present in this case."  645 S.W.2d 403, 409 (1982).  In Steed Realty v. Oveisi, the court found that a seller of real estate violated the Tennessee Act by promising that

---

[6] "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."  15 U.S.C. § 45(a)(1).

nearby roads would be improved and water and electricity hook-ups would be made available, holding that such misrepresentations constituted a deceptive act on which the purchasers relied in buying the property.  823 S.W.2d 195, 201 (1991).  Similarly, in <u>Smith v. Scott Lewis Chevrolet</u>, the court upheld a jury's verdict finding that the seller of a used truck violated § 47-18-104(b)(27) when he negligently represented to the buyer that the truck he was selling had never been in a wreck when, in fact, it had, and the buyer relied on that misrepresentation in his decision to purchase the truck.  843 S.W.2d 9 (1992).

These cases indicate that an intentional or negligent misrepresentation is essential to a claim made under the Tennessee Act.  Such requirements preclude Defendants from raising a valid claim under the Tennessee Act.  There was simply no misrepresentation and no intent to deceive the Defendants as to DLL's identity, nor can any intent to deceive be inferred from the existence of a private label agreement.  Additionally, because Defendants' claim must be evaluated under the facts and circumstances of this case, the court should consider the fact that the Defendants were sophisticated consumers[7] and that a private label agreement is a routine and commercially accepted means of providing financing in leasing transactions.  Defendants' assertion that they were deceived, under these circumstances, is even more difficult to fathom.

**3.      Private Label Agreements are Specifically Excluded From the Tennessee Act**

One of the specifically enumerated unfair or deceptive practices is one "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services.  <u>This subdivision</u> . . . <u>does not prohibit the private labeling of goods and services</u>."  (emphasis supplied) §47-18-104(b)(2).  The financing provided under the

---

[7] Dr. Carvel's extensive education background includes a B.A. in Chemistry from the University of Arkansas, an M.D. from the University of Arkansas and a four year internship at Methodist Hospital.  Exhibit U, 9:14 to 9:22.  Dr. Carvel is also a party to numerous real estate and business transactions including a two million dollar loan

Program Agreement is expressly excluded as a prohibited act under the Tennessee Act. Defendants have offered no factual basis, nor legal argument as to why this express exclusion should not apply.

      **4.**      **The Statute of Limitations in the Tennessee Act Has Run**

Finally, § 47-18-110 provides that a claim brought under the Tennessee Act must be brought within one year from a person's discovery of the unlawful act or practice, but in no event more than five years after the date of the transaction giving rise to the claim. Defendants' Counterclaim is barred under this provision. Defendants own pleading states that DLL sent a letter to the Defendants dated March 15, 2002 "wherein DLL introduced itself to Defendants for the first time and states in part that 'Be advised Toshiba Medical Credit has assigned your lease to [DLL]." Exhibit Q, Counterclaims, Paragraph 24. Defendants filed their counterclaim on September 22, 2003, approximately 18 months after their discovery of the alleged unlawful or deceptive practice. Defendants have advanced no argument as to why the one year statute of limitations should not apply here. Accordingly, any such claim would be barred by the statute of limitations expressly set forth in the Tennessee Act itself.

For the reasons set forth above, summary judgment should be granted in favor of DLL and dismiss Counterclaim VIII of Defendants' First Amended Counterclaims because there is no genuine issue of material fact, and the Tennessee Act does not apply.

      **E.**      **Defendants' Counterclaim IX Should Be Dismissed As To DLL Because DLL And TAMS Are Neither Partners, Joint Venturers Nor Agents Acting On Behalf Of The Other.**

Pursuant to Counterclaim IX of Defendants' First Amended Counterclaims, Defendants allege that TAMS and its agent/partner/joint venturer, DLL breached a duty to sell and deliver

---

transaction to Zobar Properties, lease transactions involving the property, Exhibit X, 11:10 to 26:10 and ownership of Lynn T. Carvel, PLLC, Exhibit W, 8:16 to 8:20.

the equipment in conformity with express and implied warranties of the Master Lease and the

Program Agreement.  Pursuant to Section 14.8 (b) of the Program Agreement, Section 24 of the

Master Lease and Section 8.3 of the Guarantees, the parties agreed that the agreements were

executed and are to be construed in accordance with laws of the Commonwealth of

Pennsylvania.  For the reasons set forth above, the parties' choice of law is reasonable and it is

appropriate for this Court to apply the laws of the Commonwealth of Pennsylvania with regard to

Defendants' Counterclaim IX.

**1.    DLL And TAMS Are Not Partners Under The Uniform Partnership Act And Pennsylvania Law**

In its First Amended Affirmative Defenses and First Amended Counterclaims,

Defendants allege that TAMS was acting as an agent/partner/joint venturer for and/or with DLL

at all times relevant to the counterclaims.  Exhibit Q, Paragraphs 34, 69, 71.  Defendants aver

that DLL and TAMS were "undisclosed partners in the sale and financing of the equipment

under a so-called private label agreement."  Exhibit Q, Paragraph 69.  Relying on this contractual

arrangement as indicia of a partnership, joint venture, or agency relationship between DLL and

TAMS, Defendants claim that the acts of TAMS are imputed to DLL and vice versa.  Exhibit Q,

Paragraph 71.

The Uniform Partnership Act, 15 Pa.C.S.A. §§ 8301-8365, which has been adopted by

Pennsylvania, defines a partnership as "an association of two or more persons to carry on as co-

owners a business for profit."  15 Pa.C.S.A. § 8311(a).  Pennsylvania law provides that the

existence of a partnership depends on the intention of the parties as being partners, and no formal

or written agreement must be executed in order for a valid partnership to exist.  See Barbet v.

Ostovar, 273 Pa.Super 256, 265, 417 A.2d 636, 641 (1979); Murphy v. Burke, 454 Pa. 391, 395,

311 A.2d 904, 907 (1973) (stating that "there is no requirement that partnership agreements be in

writing"). Although the law does not require that a partnership agreement be in writing, such an agreement must nonetheless "be composed of the clear, mutual assent on the part of two or more persons." In re Jackson, 28 B.R. 559, 562-63 (1983).

Under Pennsylvania law, there are clearly defined circumstances under which a partnership is deemed to exist:

> (1) [. . .] [P]ersons who are not partners as to each other are not partners as to third persons.
>
> (2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property or part ownership does not of itself establish a partnership whether or not the co-owners share any profits made by the use of the property.
>
> (3) The sharing of gross returns does not of itself establish a partnership whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
>
> (4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no inference shall be drawn if the profits were received in payment . . .

15 Pa.C.S.A. § 8312. The burden of proof lies with the party seeking to prove the existence of the partnership. See id., citing Zuback v. Bakmaz, 346 Pa. 279, 282, 29 A.2d 473 (1943); Kirshon v. Friedman, 349 Pa. 171, 178, 36 A.2d 647, 650 (1944). Such burden cannot be met by conjecture, but rather must be satisfied by competent evidence. See id.

In light of the standards articulated above, Defendants have failed to carry their burden of proof and demonstrate that TAMS and DLL are partners. Most importantly, the clear and unambiguous terms of the Program Agreement demonstrate that TAMS and DLL did not intend to act as partners. In the Program Agreement, TAMS and DLL specifically state that they are "separate entities, who have entered into this Agreement for independent business reasons. Neither [DLL] nor TAMS have acted, act, or shall be deemed to have acted or act, as an agent

for the other."  Exhibit A, Paragraph 14.1.  DLL and TAMS each stated in discovery that they were not partners, but were acting separately throughout the course of the transaction.  See, TAMS' Answers to DLL's First Set of Interrogatories Nos. 17-18 (Exhibit S); see also, TAMS' Responses to DLL's First Request for Admissions Nos. 32 through 41 (Exhibit R).  Defendants have offered no facts demonstrating any kind of agreement between TAMS and DLL to act as partners.  Rather, they have offered mere conjecture, which is insufficient to carry their burden of proof.  Clearly, Pennsylvania law as set forth in <u>Zuback</u> and <u>Kirshon</u> demands a high standard with respect to this requirement.  Defendants point to no evidence of an agreement between TAMS and DLL, let alone anything that would rise to the level of "clear, mutual assent" as required by <u>In re Jackson</u>.

Furthermore, none of the enumerated statutory elements applies to the relationship between TAMS and DLL.  Pennsylvania courts regard the fourth enumerated element, the sharing of profits, to be "an indispensable requisite" for a partnership.  <u>Provident Trust Co. of Philadelphia v. Rankin</u>, 333 Pa. 412, 416, 5 A.2d 214, 216 (1939); <u>Muchow v. Schaffner</u>, 180 Pa.Super. 413, 421, 119 A.2d 568, 572 (1956) (holding that the fact that plaintiff and workers did not share in profits "precludes any assertion of a partnership relation"); <u>Northhampton Brewery v. Lande</u>, 138 Pa.Super. 235, 238, 10 A.2d 583, 584 (1940).  Here, Defendants have failed to make a showing that DLL and TAMS share the profits of their transactions.  To the contrary, the Program Agreement demonstrates a traditional financing arrangement.  Without a showing that the indispensable requisite of profit sharing is present, Defendants' allegation that TAMS and DLL are partners cannot succeed under Pennsylvania law.

Defendants similarly cannot prove that any of the other statutory elements apply.  TAMS and DLL are not co-owners of any property, and therefore do not share any profits derived from

common property; they do not share gross returns; and neither shares in the profits from any business with the other. The mere existence of a contract between the parties does not create a partnership.[8]

Here, Defendants have failed to meet their burden of proof with respect to the alleged partnership between TAMS and DLL. It is therefore appropriate to enter summary judgment in favor of the Plaintiff finding that no partnership existed between DLL and TAMS, and that DLL is not liable for the acts or omissions of TAMS.

### 2. Defendants Failed to Demonstrate That DLL And TAMS Are Engaged In A Joint Venture Under Pennsylvania Law.

A joint venture is an association of persons or corporations who by contract, express, or implied, agree to engage in common enterprise for their mutual profit. See Duquesne Light Co. v. Woodland Hills School Dist., 700 A.2d 1038, 1055 (1997). The essential element is an agreement between the parties to share in the profits or losses of the venture. See also U.S. v. USX Corp., 68 F.3d 811, 826 (3d Cir. 1995) (stating that "the *sine qua non* of a joint venture is a contract . . . that is, an actual *agreement* between the parties.") (citations omitted). Such agreement need not be expressly stated, but may be implied from the acts and conduct of the parties. See McRoberts v. Phelps, 391 Pa. 591, 598-99, 138 A.2d 439, 443 (1958). A joint venture is not a status imposed by law; rather, it is a relationship voluntarily assumed and arising wholly from contract. See Snellbaker v. Hermann, 315 Pa.Super. 520, 526-27, 462 A.2d 713, 716 (1983), citing 2 Williston on Contracts 557, § 318A (3d ed. 1959). Thus, the existence of a joint venture depends on what the parties intended in associating together. See id.

---

[8] TAMS agrees that no partnership exists between it and DLL. Exhibit R, Nos. 32-41; Exhibit S, Nos. 17-18.

To constitute a joint venture under Pennsylvania law, the party alleging the existence of the joint venture must demonstrate that the following elements are present:

> (1) Each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money;
>
> (2) Profits must be shared among the parties;
>
> (3) There must be a joint proprietary interest and a right of mutual control over the subject matter of the enterprise;
>
> (4) Usually, there is a single business transaction rather than a general and continuous transaction.

Keeler v. International Harvester used truck Center, 317 Pa.Super. 244, 246-47, 463 A.2d 1176, 1178 (1983), See Beavers v. Wesr Penn Power Co., 436 F.2d 869 (3d Cir. 1971); see also McRoberts, 391 Pa. at 600, 138 A.2d at 444 (defining a joint venture as an association of parties . . . to engage in a single business enterprise for profit"). The fourth element is generally what distinguishes a joint venture from a partnership. See Snellbaker, 315 Pa.Super. at 526-27, 462 A.2d at 716; Muchow v. Schaffner, 180 Pa.Super. 413, 420-21, 119 A.2d 568, 571 (1956) (characterizing a joint venture as an association which "relat[es] to a single transaction"); Wagman v. Carmel, 601 F.Supp. 1012, 1017 (E.D. Pa. 1985) (stating that a joint venture is usually formed to undertake a single business transaction).

DLL and TAMS were not joint venturers because the crucial element, the *sine qua non*, is absent. See U.S. v. USX Corp., 68 F.3d 811, 826 (3d. Cir. 1995); McRoberts v. Phelps, 391 Pa. 598-99, 138 A.2d 439, 443 (1958). There was no agreement between DLL and TAMS to engage in a joint venture, or, more importantly, to share profits or losses, and Defendants have not provided any facts from which it could be inferred that any such agreement did exist. As noted above, both in discovery and in the Program Agreement, DLL and TAMS agreed that they were separate entities with separate business purposes. Exhibit A, Paragraph 14.1. The mere fact that

DLL and TAMS had a business relationship by virtue of the Program Agreement does not satisfy the requirement set forth in USX Corp. and McRoberts that there must be an agreement between the purported joint venturers to characterize their relationship as such.

Moreover, the other elements identified above are not satisfied, and Defendant cannot set forth any arguments alleging such. See Wilkins v. Heebner, 331 Pa.Super. 491, 498, 480 A.2d 1141, 1145 (1984) (holding that parties were not engaged in a joint venture because "there is not one iota of evidence that [the alleged joint venturers] shared a joint proprietary interest in or right of control" over the property at issue). Additionally, as articulated above, one of the defining characteristics of a joint venture is that it is usually related to a single business transaction. That is not the case here; rather, DLL and TAMS had an ongoing financing relationship as set forth in detail in the Program Agreement. The very language of the Program Agreement clearly details that DLL and TAMS entered into a contract that contemplated an ongoing series of transactions. Further, the Program Agreement provides that under certain circumstances, TAMS must indemnify DLL for its losses. The parties never contemplated a sharing of losses. DDI can not point to any competent evidence of an agreement for the sharing of profits or losses between DLL and TAMS, because there is none.

Accordingly, summary judgment should be entered for the Plaintiff because, for the reasons set forth above, Defendants have failed to carry their burden of proof with respect to their claim that DLL and TAMS were engaged in a joint venture.

> **3.     TAMS And DLL Are Not Agents For One Another Because There Was No Agreement For The Creation Of A Fiduciary Relationship.**

Defendants also assert that TAMS and DLL are agents for each others, and are thus liable for the other's acts. Exhibit Q, Paragraph 34. Under Pennsylvania law, the three necessary elements of an agency relationship are: "(1) the manifestation by the principal that the agent shall

act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." Casey v. GAF Corp., 2003 Pa.Super. 222, 828 A.2d 362, 367 (2003); Basile v. H & R Block, Inc., 563 Pa. 359, 761 A.2d 1115, 1120 (2000). An agency relationship results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary. See id. Pennsylvania law does not require that the parties explicitly state their intention to create an agency relationship, but their intention must be clear from their conduct. See Goodway Marketing, Inc. v. Faulker Advertising Assoc., Inc., 545 F.Supp. 263 (E.D.Pa. 1982). The burden of proof establishing an agency relationship rests on the party who asserts it. See id. at 267; Scott v. Purcell, 490 Pa. 109, 117 n.8, 415 A.2d 56, 60 n.8 (1980); Basile, 563 Pa. at 367, 761 A.2d at 1120. It is not necessary to set forth direct evidence of the specific authority if it can be reasonably inferred from the circumstances. See Scott, 490 Pa. at 117 n.8, 415 A.2d at 60 n.8, citing Yezbak v. Croce, 370 Pa. 263, 267-68, 88 A.2d 80, 82 (1952).

Under Scott, direct evidence is not required; however, Defendants have also failed to make any showing that an agency relationship can be inferred from the circumstances surrounding this transaction. In fact, the evidence clearly demonstrates that DLL and TAMS did not intend to act as agents for one another. In the Program Agreement, TAMS and DLL specifically agree that they are "separate entities, who have entered into this Agreement for independent business reasons. Neither [DLL] nor TAMS have acted, act, or shall be deemed to have acted or act, as an agent for the other." Exhibit A, Paragraph 14.1. This language indicates that the first element of an agency relationship, the manifestation by the principal that the agent shall act for him, cannot exist here, because the parties expressly set forth their intent that they would not act as an agent for the other. Without the first element, the other two elements are

inapposite, and Defendants cannot prove them.  <u>See Lincoln Ave. Industrial Park v. Norley</u>, 450 Pa.Super. 621, 677 A.2d 1219 (1996) (defining agency as a relationship that results from consent of one person that another may act on his behalf).

Therefore, because Defendants have failed to carry their burden of proof with respect to proving that an agency relationship existed between DLL and TAMS, Defendants' claims that DLL and TAMS were agents for the other and therefore liable for the other's actions must fail, and summary judgment should be entered in favor of Plaintiff.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, plaintiff respectfully requests the entry of summary judgment in its favor and against Defendants as follows:

1. against defendant DDI in the amount of $2,928,590, plus per diem interest at the rate of $984.53 per day from April 2, 2004, plus counsel fees and costs in an amount to be determined by the Court.

2. against all Defendants dismissing Count IV of Defendants' Counterclaim with prejudice.

3. against all Defendants dismissing Count V of Defendants' Counterclaim, with prejudice.

4. against all Defendants dismissing Count VI of Defendants' Counterclaim, with prejudice.

5. against all Defendants dismissing Count VII of Defendants' Counterclaim, with prejudice.

6. against all Defendants dismissing Count VIII of Defendants' Counterclaim, with prejudice.

7.    against all Defendants dismissing Count IX of Defendants' Counterclaim, with
      prejudice.

                                        **Respectfully submitted**
                                        **McCARTER & ENGLISH, LLP**


_____
_____
_____
_____
_____

                                        Rosetta B. Packer (Attorney ID No. 28357)
                                        Peter J. Boyer (Attorney ID No. 25517)
                                        Kevin J. Burke (Attorney ID No. 87214 )
                                        Mellon Bank Center
                                        1735 Market Street, Suite 700
                                        Philadelphia, PA 19103
                                        (215) 979-3800

                                        Attorneys for Plaintiff

Dated: April 12, 2004


                                                                    De

Lage Landen Financial Services, Inc

37

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| De Lage Landen Financial Services, Inc. | : | |
| | : | CIVIL ACTION NO. 02-CV-2810 |
| Plaintiff | : | |
| and | : | HON. RONALD L. BUCKWALTER |
| | : | |
| Toshiba America Medical Systems, Inc. | : | |
| | : | |
| Intervenor | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| DeSoto Diagnostic Imaging, LLC., Randon | : | |
| J. Carvel, Lynn T. Carvel, Delta Radiology, | : | |
| P.C. and Zobar Properties, LLC. | : | |
| | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I, Peter J. Boyer, Esquire, hereby certify that on April 12, 2004, I caused a true copy of the foregoing Plaintiff's Motion for Partial Summary Judgment as to **Defendants DeSoto Diagnostic Imaging, LLC, Randon J. Carvel, Lynn T. Carvel, Delta Radiology, P.C. and Zobar Properties, LLC**, and Memorandum of Law, Appendix of Exhibits and Proposed Form of Order in support thereof, to be served by First Class mail upon the following counsel in this action:

John Chesney, Esquire

Drinker Biddle & Reath, LLP

One Logan Square

18th & Cherry Streets

Philadelphia, PA  19103
            **Via Overnight Mail**

William Matthews, Esquire
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102
**Via Overnight Mail**

Kyle P. Tate, Esquire

Tate Law Firm
        9085 Sandidge Center Cove
        Olive Branch, MS 38654
        **Via Overnight Mail**

_____

_____

**PETER J. BOYER**
PH1: 477683.01