## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : |
| Plaintiff, | : |
| | : |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC. | : |
| Plaintiff/Intervener, | : |
| | : |
| v. | : CIVIL ACTION NO. 2:02CV2810 |
| | : |
| DESOTO DIAGNOSTIC IMAGING, LLC., et al. | : |
| Defendants and Counter-Claimants | : |
| | : |

## ORDER

**AND NOW**, upon consideration of De Lage Landen Financial Services, Inc.'s Motion for Summary Judgment Against Guarantor Defendants, De Lage Landen's Motion for Summary Judgment against all Defendants, and Plaintiff/Intervenor Toshiba America Medical Systems, Inc.'s Motion for Summary Judgment, and Defendants' response thereto, it is hereby **ORDERED** that all such Motions are **DENIED** in their entirety.

BY THE COURT:

_____
Honorable Ronald L. Buckwalter

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>DELAGE LANDEN FINANCIAL<br>SERVICES, INC.,</td><td>:<br>:</td><td></td></tr>
<tr><td style="text-align:center">Plaintiff,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>TOSHIBA AMERICA MEDICAL<br>SYSTEMS, INC.</td><td>:<br>:</td><td></td></tr>
<tr><td style="text-align:center">Plaintiff/Intervener,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td style="text-align:center">v.</td><td>:</td><td>CIVIL ACTION NO. 2:02CV2810</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>DESOTO DIAGNOSTIC IMAGING, LLC., et al.</td><td>:</td><td></td></tr>
<tr><td style="text-align:right">Defendants and Counter-<br>Claimants</td><td>:<br>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

**DEFENDANTS' OPPOSITION TO DE LAGE LANDEN
FINANCIAL SERVICES, INC.'S MOTIONS FOR SUMMARY JUDGMENT
AGAINST GUARANTOR DEFENDANTS AND AGAINST ALL
DEFENDANTS, AND TO TAMS' MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

One undisputed fact defeats the claims of Plaintiff De Lage Landen Financial

Services, Inc. ("DLL") against Defendants, and may also resolve DLL's claims against

Intervenor/Plaintiff Toshiba America Medical Systems, Inc. ("TAMS").  All of DLL's claims

against Defendants arise under a document entitled "Master Lease Agreement."  That document

unambiguously lists TAMS in the signature box for the "Lessor", and includes the following

condition precedent in the signature box of "Lessee":  "Agreement shall not be binding upon

Lessor or become effective unless and until Lessor executes the Agreement."  Ex. 1 at page 4.

All parties admit that TAMS did not sign the Master Lease Agreement.  That undisputed

fact renders the Master Lease Agreement and all related documents ineffective by their terms and

by application of binding precedent and hornbook law, and mandates entry of summary

judgment in favor of Defendants on DLL's claims.  That single, undisputed fact also may require

entry of summary judgment in favor of DLL on its claims against TAMS.  DLL filed a claim,

and has sought summary judgment, against TAMS on the basis that if TAMS' failure to take "any

action" resulted in the Master Lease Agreement becoming unenforceable, TAMS, rather than

Defendants, would be liable to DLL for its full damages.

   As set forth in Defendants' Motion for Summary Judgment Based on Plaintiff's

Reliance on Master Lease ("Defendants' Motion for Summary Judgment"), DLL prepared the

Master Lease Agreement, and, in the Master Contract Program Financing Agreement

("MCPFA"), DLL and TAMS specifically agreed to list TAMS as the Lessor.  Ex. 2 at page 3-4,

§ 2.3(a).  DLL and TAMS both judicially admitted in their pleadings that TAMS was the Lessor.

DLL Crossclaim against TAMS at ¶ 8 ("TAMS entered into the Master Lease with DDI"); Mem.

of Law in Support of TAMS' Motion to Intervene at 1 ("TAMS was the original lessor of the

medical diagnostic equipment . . .; TAMS then assigned that lease to DLL").  Although DLL

prepared the Master Lease Agreement, TAMS had the right to approve the form of the Master

Lease Agreement before it was used.  Ex. 2 at page 4, § 2.3(b).  Where a drafter of a contract

inserts a condition precedent to the formation of a contract, and fails to comply with its own

terms, the drafter may not claim the benefits of the contract.  Infocomp, Inc. v. Electra Prods.,

Inc., 109 F.3d 902, 905 (3d Cir. 1997); Franklin Interiors v. Wall of Fame Management Co., 511

A.2d 761 (Pa. 1986).  Such conditions precedent are strictly construed against the drafter.  Cuchi

v. Rollins Protective Servs. Co., 546 A.2d 1131, 1131 (Pa. Super. 1988), rev'd on other grounds,

574 A.2d 565 (Pa. 1990) (holding that where the contract was signed by an employee of the

drafter company who was not from the "home office," even that signature was insufficient to

enable the drafter company to claim the benefits of a contract that included an express condition precedent that an officer from the home office sign).

Though DLL has claimed, at times, to be the assignee of TAMS with respect to the Master Lease Agreement with Desoto Diagnostic Imaging, LLC ("Desoto"), see e.g. DLL Complaint at ¶ 12, the law is clear that TAMS could not assign "the right to accept" the Master Lease Agreement to DLL, even if TAMS enjoyed a right to assign the Master Lease Agreement after execution.  2 Williston on Contracts § 6:27 (4th ed.) ("an offer made to one person cannot be accepted by another, even though the offeree purports to assign it and this is true despite the fact that upon acceptance, the former offeree might assign his rights under the contract thereby formed.  As the court in one leading case stated, 'A party has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent.' . . . Whether in fact it makes any difference to the offeror with whom he will contract is irrelevant; he may be as willing to deal with one person as with another, but despite the fact that it may be of no importance to him with whom he deals, only the person to whom an offer is made may accept it.") (emphasis added); see also Centre Area Trans. Auth. v. Common of Pennsylvania, Unemployment Compensation Bd., 531 A.2d 1172, 1173, n.3 (Pa. Commw. 1987) ("An offer creates a power of acceptance in a specified offeree to transform the offeror's promise into a contractual obligation") (citations omitted); Ott v. Home Sav. & Loan Assoc., 265 F.2d 643, 646-47 (9th Cir. 1958) ("Indeed, it is hornbook law even in the realm of bilateral contracts that a revocable offer cannot be accepted by anyone other than the offeree.  And the offeree, in whom the power of acceptance lies by virtue of the offer, has no assignable rights.")  Accordingly, TAMS needed to sign the Master Lease Agreement for it to be effective.

The only person to sign in the Lessor box in the Master Lease Agreement was Lisa Sparta, who signed as a purported "Director" of TAMS. Ex. 1 at page 4. However, Ms. Sparta testified, and both DLL and TAMS have admitted, that she never worked for TAMS. Ex. 3 at page 23, lines 5-13, see also TAMS Ans. to Defs. Amended Counterclaims at ¶ 17 ("TAMS admits that the Master Lease was signed by Lisa Sparta on December 29, 2000. TAMS further admits that Lisa Sparta has not been an employee of TAMS at any time"); DLL Ans. to Defs. Amended Counterclaims at ¶ 17 ("It is admitted that on or about December 29, 2000 Lisa Sparta signed the Master Lease, and that Lisa Sparta has never been a director of Toshiba America Medical Systems, Inc."). Accordingly, the Master Lease Agreement never became effective, and all of DLL's claims against Defendants must be summarily dismissed.

TAMS has attempted to use the contractual practice of inserting a condition precedent requiring signature by Toshiba as both a sword and a shield. In its Motion for Summary Judgment against Defendants, TAMS argued that (1) even though it did not execute the Master Lease Agreement with Desoto, Desoto is nevertheless bound by all of its terms, including and especially those disclaimers of warranty contained in the Master Lease Agreement and (2) TAMS is not bound by the express warranties TAMS made to Desoto in various Purchase Orders it submitted to Desoto, because, while Desoto signed those documents and therefore, made "technically 'binding' offers that TAMS could have 'accepted', . . . TAMS never signed the Purchase Orders." TAMS Br. at 6. The Purchase Orders contain the following term as Paragraph 5, entitled "Acceptance by Toshiba": "This Agreement will not be binding on Toshiba unless and until it is accepted by Toshiba as evidenced by the signature of an authorized representative of Toshiba on the face of this document." Ex. 4 at TAMS 1174, ¶ 5. TAMS uses its failure to sign the Purchase Orders, which contain numerous express warranties, Ex. 5, as a

springboard to argue that it did not provide any warranties to Desoto, and that none of the warranties contained in the Purchase Orders can be given any effect.

Both TAMS and DLL have decided that they are now dissatisfied with their pleadings and therefore attempted to pull off a monumental shift of positions without explanation or notice to the Court, all as part of their latest joint effort to deceive. The critical fact both TAMS and DLL tried to rewrite was the judicial admission that TAMS was the lessor of the defective medical equipment that is at the heart of this case. Throughout the initial pleadings, DLL and TAMS averred that TAMS entered into a Master Lease Agreement with Defendant Desoto Diagnostic Imaging, LLC ("Desoto"), by which TAMS leased certain medical equipment to Desoto and that TAMS later assigned that lease to DLL. See, e.g., Mem. of Law in Support of TAMS' Motion to Intervene at 1 ("TAMS was the original lessor of the medical diagnostic equipment . . .; TAMS then assigned that lease to DLL"); DLL Complaint at ¶¶ 9, 12. Realizing that each may have greater legal rights, and that Defendants may have less rights, if DLL rather than TAMS were actually the lessor, TAMS and DLL set out in their Summary Judgment Motions to rewrite those admissions and act as though they never occurred. In fact, both TAMS and DLL now claim that DLL, which brought suit as the purported assignee of TAMS, directly entered into a lease with Desoto, and that TAMS did not lease the equipment it supplied to Defendants. This was probably done to explain away the critical failure of TAMS and/or DLL to have TAMS sign the Master Lease Agreement. The ineffectiveness of the Master Lease Agreement defeats all of DLL's claims against Defendants, gives Desoto much broader rights to revoke acceptance of the medical equipment, and severely hampers the efforts of TAMS and DLL to defend against Defendants' counterclaims.

As if rewriting history were not enough for TAMS and DLL, each also ignored numerous critical facts in their pursuit of summary judgment. For example, neither mentioned that (1) Donny Jenkins, a <u>current</u> TAMS employee who serviced the equipment at Desoto, candidly referred to some of the equipment as "crap", Jenkins Dep at page 216, lines 14-19 (Ex. 6); or (2) this equipment required over 200 service calls in the approximately 14 months it was installed at the Desoto facility, TAMS' Ans. to Defs. Amended Counterclaims at ¶ 54; or (3) TAMS conceded that the service it provided was "inappropriate" and harmed the equipment. <u>Id.</u> at ¶ 51 (decision of TAMS customer service engineer to apply baby oil to the MRI machine, on which he was not even trained, was "inappropriate . . . because it interfered with the photosensitivity of the part.")

For the reasons set forth in this Memorandum of Law, Defendants respectfully request that this Court deny all three (3) Motions for Summary Judgment of DLL and TAMS directed at Defendants.

## A. **DLL and TAMS Attempted to Rewrite Binding Judicial Admissions**.

### 1. **DLL Copied, Pasted and Altered Paragraph 9 of Its Complaint.**

The opening of DLL's two (2) Motions for Summary Judgment against Defendants is the most insulting way DLL tried to disavow its binding judicial admissions. In the opening of each brief, DLL represented to the Court that it was "undisputed" that TAMC (a fictitious name DLL used to defraud Defendants), rather than TAMS, leased medical equipment to Defendants. In doing so, DLL did not mention to the Court that it was dramatically changing its position, or offer any explanation for the change. Rather, DLL essentially lifted Paragraph 9 from its Complaint and made one major, unannounced change by carefully erasing the letter "S" at the end of "TAM" and replacing it with the letter "C."

Paragraph 9 of DLL Complaint reads as follows:

On or about February 17, 2000, defendant DDI executed and
delivered to Toshiba America Medical Credit, a program of
Toshiba America Medical Systems, Inc. ("TAMS"), a Master
Lease Agreement and related attachments (collectively, the
"Master Lease"), whereby DDI leased from TAM*S* certain
equipment more fully described therein.  A true and correct copy
of the Master Lease is attached hereto, made a part hereof and
marked Exhibit "A".

(Emphasis added.)

The beginning of DLL's Memorandum of Law in Support of its Motion for Partial

Summary Judgment Against Guarantor Defendants is nearly identical::

The evidence of record reveals the following facts to be undisputed.

On or about February 17, 2000 defendant DeSoto Diagnostic
Imaging, LLC ("DDI") executed and delivered to Toshiba America
Medical Credit ("TAMC"), a program of Toshiba America
Medical Systems, Inc. ("TAMS"), a Master Lease Agreement and
related attachments (the "Master Lease") whereby DDI leased from
TAM*C* certain equipment described therein. (Exhibit "C").

(Emphasis added).[1]

Having read Defendants' Motion for Summary Judgment, and obviously realizing

that its deception has been caught, DLL, in its response to Defendants' Motion for Summary

Judgment, again recited the same basic story, but ended its sentence prematurely, thereby

omitting the critical phrase "whereby DDI lease from TAM_ . . .":

The evidence of record reveals the following facts to be
undisputed.

On or about February 17, 2000 Defendant Desoto Diagnostic
Imaging, LLC ("DDI") . . . executed and delivered to Toshiba
America Medical Credit ("TAMC") a program of Toshiba America

---

[1]    TAMS also incorrectly stated that Desoto signed the Master Lease Agreement in February, 2000.  TAMS
Br. at 7.  Even a simple review of the document shows that Desoto actually signed on June 9, 2000.  Ex. 1
at page 4.

> Medical Systems, Inc. ("TAMS"), a Master Lease Agreement and
> related schedules and attachments (collectively, the "Master
> Lease"), attached hereto as Exhibit A.

DLL Br. Opp'g Defs. Mot. for S.J. at 1.

The change from TAM**_S_** to TAM**_C_** is a material misrepresentation of fact, and stating that it is "undisputed" that "TAMC" leased the equipment to Desoto cannot be justified. DLL's action in recently revising this language again to completely avoid discussion of the Lessor after receiving Defendants' Motion for Summary Judgment, rather than openly acknowledging its actions, confirms that DLL is asking this Court to enter summary judgment on the basis of a known misrepresentation. "TAMC" is not mentioned anywhere on page 4 of the Master Lease Agreement (the signature page), and DLL is not mentioned at all in the entire document or any of its related attachments. See Ex. 1. Though incredibly not mentioned by either TAMS or DLL in their Briefs, TAMS is the only entity listed in the signature box for "Lessor" in the Master Lease Agreement. Id.

Sadly, this is not the first time that DLL has brazenly lied about its status in connection with this case. On March 15, 2002, DLL sent letters to Defendants representing that DLL was the assignee of "Toshiba Medical Credit." Ex. 7. Two months later, DLL filed their Complaint, judicially admitting that DLL was the assignee of TAMS, which admitted that it was the original lessor of the equipment to Desoto. DLL Complaint at ¶ 12; Mem. of Law in Support of TAMS' Mot. to Intervene at 1. On March 14, 2003, and in the midst of this litigation, DLL sent a letter purporting to inform Defendants that it was the purchaser of the lease from yet a third entity, this one called "Toshiba America Medical Credit." Ex. 8. DLL admitted, in answers to interrogatories, that its letters were false, and replied that no such assignment or purchase

occurred because TAMC and "Toshiba Medical Credit" are fictitious names for DLL, and DLL could not have assigned a lease to itself.  Ex. 9 at ¶¶ 9-11, 19.

      2.      **TAMS Rewrote Paragraph 8 of Its Answer to DLL's Crossclaim.**

TAMS' repudiation of its identical judicial admission, i.e. that it was the Lessor of the equipment, was just as certain and blatant, as is clear from a comparison of Paragraph 8 of TAMS' Answer to DLL's Crossclaim and page 9 of TAMS' Summary Judgment Brief. Paragraph 8 of TAMS' Answer to DLL's Crossclaim reads as follows: "TAMS entered into the Master Lease with DeSoto . . ."  (emphasis added).  Directly contradicting this admission, TAMS represented in its Brief that "DLL entered into the Master Lease Agreement with DeSoto." TAMS Br. at 9 (emphasis added).

Despite having judicially admitted to entering into a lease with Desoto, TAMS used the repudiation of its binding admission as a springboard for its fanciful theory that Desoto did not enter into any contractual relationship with TAMS related to the acquisition of the equipment, meaning, in TAMS' stated view, that (1) Desoto entered into a "finance lease" and (2) TAMS did not provide any warranties to Defendants:

> DeSoto elected to acquire Toshiba medical imaging equipment by entering into a finance lease with DLL.  Under that standard commercial arrangement . . . DeSoto did not establish any contractual relationship with TAMS in connection with its acquisition of the equipment.  Thus, TAMS did not make any warranties to DeSoto with regard to the equipment, oral or written, express or implied.

TAMS' Br. at 2 (emphasis added) (emphasis in original omitted).

Indeed, TAMS' undisputed failure to sign the Master Lease Agreement renders that document ineffective.  Whether TAMS' failure to sign its Purchase Orders from Desoto renders the warranties contained in those documents ineffective will be discussed at greater

length below, in the Section related to TAMS' request for dismissal of Defendants' counterclaim

for breach of warranty.

### 3.    DLL Still Admits That It Was Not the Lessor.

Notwithstanding the attempted revision of their binding judicial admissions, DLL

again admitted that its role under its Master Contract Financing Program Agreement ("MCFPA")

with TAMS was not to directly enter into leases with lessees (as it and TAMS are now claiming

it did with respect to Desoto) but rather, "to provide financing for medical equipment leased . . .

by TAMS," DLL Br. against Defs. at 6 (emphasis added); see also DLL Mot. for S.J. against

TAMS at 8 ("DLL merely provided financing for customers of TAMS, relying entirely on

TAMS to lease . . . the equipment") (emphasis added).  Perhaps hoping that it could avoid any

analysis of the issue, DLL mentioned execution of the Master Lease Agreement in its Brief, but

cryptically stated that "it is undisputed that [Desoto] executed the Master Lease", DLL Mot. for

S.J. against Defs. at 8, without, tellingly, stating that the document had been "executed" by

anyone else, namelyTAMS, the listed Lessor.[2]  Id.  Moreover, DLL and TAMS both openly

contemplated the possibility that this Court would not allow them to refute their binding

admissions, but proffered that it did not really matter if, as both admitted in their pleadings,

TAMS were the Lessor:  "Had TAMS been the original Lessor (instead of TAMC), TAMS could

have . . . assigned the Master Lease."[3]  Id. at 21; see also, e.g., TAMS Br. at 10, n.18 (falsely

---

[2]    At several other portion in both of DLL's Briefs against Defendants, DLL attempted to dodge the issue of who was the Lessor by simply referring to "the Lessor" rather than by mentioning TAMS by name and/or by discussing execution again, without stating who executed.  See, e.g., id. at 8 (some unidentified "Part of the Master Lease Agreement was executed in Pennsylvania"); id. at 17 ("Defendants assert that they were deceived into believing the Lessor would respond . . .").

[3]    This scenario was the precise one DLL pled had occurred in its Complaint.  DLL Complaint at ¶ 9 ("DDI leased from TAMS"); id. at ¶ 12 ("TAMS assigned all of its right, title, and interest in and to the Master Lease . . . to plaintiff, DLL.")  Naturally, if TAMS were not, as it suggests, even a party to the Master Lease Agreement, TAMS Br. at 24 ("TAMS is not a party to the Master Lease") (emphasis in original), and, if as DLL newly claims, TAMS was not the original Lessor, TAMS would not have been able to assign anything to DLL in connection with the Master Lease Agreement.

claiming that "it makes no *legal* difference whether DeSoto entered into the Master Lease with TAMS or DLL") (emphasis in original); <u>id.</u> at 25 ("even if TAMS *were* the Lessor under the Master Lease Agreement") (emphasis in original).  While Defendants do not wish to give away too much of their trial strategy, Defendants will briefly explain how preventing TAMS and DLL from reversing their position on the Lessor of the equipment has an incredible impact on this case, which is of course the reason TAMS and DLL tried to rewrite history and repudiate their admissions.  Defendants trust that DLL and TAMS would not blatantly try to deceive the Court if TAMS' status as Lessor truly made no difference.

      **B.**    <u>**TAMS Is the Lessor of the Equipment.**</u>

      The Master Lease Agreement, which DLL prepared, TAMS Ans. to Defs. Amended Counterclaims at ¶ 14 ("TAMS admits that the Master Lease was drafted by DLL"); <u>see also</u> Ex. 3 at page 16, line 19-page 17, line 9, contains a signature box for the Lessor, and preprinted into that space are the words "Toshiba America Medical Systems, Inc."  Exhibit 1 at page 4.  The listing of TAMS as the Lessor in the Master Lease Agreement was not a mistake, which is clear based on several facts, none of which were mentioned in the briefs of either TAMS or DLL.  First, the MCPFA between TAMS and DLL provides that DLL "will, for each Contract, prepare and forward all necessary Contract documents to TAMS or Lessee . . . .  All documentation shall be on a private label basis and <u>will reflect TAMS as the Lessor</u>")  Ex. 2 at pages 3-4, ¶ 2.3(a) (emphasis added).  Second, TAMS was entitled to review and approve all documentation to be used by DLL prior to such use.  <u>Id.</u> at page 4, ¶ 2.3(b).  Third, both TAMS and DLL have admitted in their pleadings that TAMS was, indeed, the Lessor.  <u>See</u>, <u>e.g.</u>, DLL Crossclaim against TAMS at ¶ 8 ("TAMS entered into the Master Lease with DDI"); TAMS' Ans. to DLL's Crossclaim at ¶ 8 ("TAMS entered into the Master Lease with DeSoto Diagnostic

Imaging, LLC"); Mem. of Law in Support of TAMS' Motion to Intervene at 1 ("TAMS was the original lessor of the medical diagnostic equipment . . .; TAMS then assigned that lease to DLL"); TAMS Ans. to Defs. First Amended Counterclaims at ¶ 25 ("TAMS admits that both it and DLL have filed Complaints in this matter. . . .  [I]t is admitted that the Complaints state, correctly, that TAMS leased equipment to Desoto and assigned all of its right, title, and interest in the relevant lease to DLL.")  Fourth, DLL and/or TAMS filed UCC-1 forms in the State of Mississippi in January, 2001, approximately 2 weeks after Ms. Sparta signed the Master Lease Agreement, and that UCC-1 form expressly lists the Lessor as "Toshiba America Medical Systems, Inc."  Exhibit 10 at § 2.

DLL clearly recognized the significance of this UCC-1 filing, as evidenced by the fact that DLL failed to produce this document in discovery, and falsely claimed, in response to Defendants' interrogatories, that all existing UCC filings had been produced.  Ex. 9 at ¶ 33 (in response to a question relating to the details of "all UCC financing statements filed regarding the Equipment," DLL responded "Existing UCC financing statements were produced as part of DLL's response to request for documents.")  Moreover, on one of the UCC filings DLL <u>did</u> produce, it placed its Bates labeling sticker directly over the listing of TAMS as the "secured party" at the bottom of the page, notwithstanding the availability of ample free space on which there was no writing.  Ex. 11 (<u>compare</u> DLL 206 <u>with</u> filed version of same document, which is the next page of Ex. 11).  Under all these facts, it is clear that (1) TAMS is the lessor, (2) TAMS and DLL knew this fact and the significance of it; and (3) both TAMS and DLL have attempted to obtain summary judgment against Defendants on the basis of known misrepresentations.

### C.    The Effect of Enforcing TAMS and DLL's Judicial Admissions.

#### 1.    The Master Lease Agreement is Ineffective.

If DLL and TAMS are permitted at this late stage to repudiate their binding judicial admissions that TAMS is the Lessor, Defendants will be severely prejudiced and this entire case will dramatically affected.  As set forth above (and in Defendants' Motion for Summary Judgment), the Master Lease Agreement contains a condition precedent that if the Lessor (TAMS) did not sign the Agreement, it would be of no effect:  "Agreement shall not be binding upon Lessor or become effective unless and until Lessor executes the Agreement."  Ex. 1 at page 4.  There is no dispute that TAMS did not execute the Agreement, and, as explained in Defendants' Motion for Summary Judgment, this failure bars DLL and TAMS from relying on that document.

#### 2.    Desoto Did Not Enter Into a "Finance Lease."

TAMS conclusorily stated in its opening paragraph that Desoto "entered into a finance lease (known as the Master Lease Agreement) with . . . DLL."  TAMS Br. at 1.  It is not surprising that TAMS did not analyze the law on finance leases, and chose to instead simply make this announcement.  By law, the very first condition to creating a finance lease is that "the lessor does not select, manufacture, or supply the goods."  13 Pa. C.S.A. § 2A103(a) (definition of "finance lease").  TAMS admitted that it supplied the goods, both in prior pleadings and again in its brief.  TAMS Ans. to Mot. for Change of Venue at ¶ 4 ("There is no dispute that TAMS delivered the designated equipment leased by Desoto"); TAMS Br. at 2, 3 (openly describing itself as "supplier").  Thus, since TAMS was both the Lessor and supplier of the equipment, even if the Master Lease Agreement were effective, it would not be a "finance lease."  While Defendants believe that the facts of this case entitled Defendants to revoke the equipment when they did whether this is a finance lease or not, the law is clear that lessees under a non-finance

lease enjoy much greater rights with regard to revocation of acceptance.  See 13 Pa. C.S. §

2A517.  Given the overwhelming number and nature of the problems Desoto experienced with

the defective equipment (none of which were mentioned by DLL or TAMS, an omission that is

stunning given that TAMS requested summary judgment on Defendants' breach of warranty

claims), neither TAMS nor DLL want Defendants to have a broad right to revoke, and,

interestingly, though both moved for summary judgment on Defendants' counterclaims, neither

briefed the concept of revocation at all, presumably because both know that the facts on

revocation do not permit summary judgment against Defendants' counterclaims.

### 3.      DLL's Claims Against Defendants Must Be Dismissed.

That DLL and TAMS would, without explanation or even notice, attempt to

discreetly disavow their judicial admissions that TAMS leased the equipment to Desoto not only

belies the numerous contentions of both DLL and TAMS that it would not matter if TAMS were

the Lessor, it requires dismissal of DLL's claims against Defendants because, as explained in

greater detail in Defendants' Motion for Summary Judgment, all of DLL's claims against

Defendants are based on the ineffective Master Lease Agreement.  DLL did not dispute this in its

opposition to Defendants' Motion for Summary Judgment.

### D.      DLL Argued for the Sanctity of Judicial Admissions.

Ironically, the same day DLL filed its Motions for Summary Judgment against

Defendants, in which DLL tried to copy, paste and alter its judicial admissions, DLL filed a

Motion for Summary Judgment against TAMS on the basis that TAMS was estopped from

denying its binding judicial admissions:

> It is well settled that judicial admissions are factual assertions in
> pleadings that bind the party who made them and the cause of
> action in which they are filed.  See, e.g., Glick v. White Motor
> Company, 458 F.2d 1287 (3rd Cir. 1972).  In addition, statements
> by parties in their briefs are treated as binding judicial admissions.

> Apach v. Dismuke, 134 F.Supp.2d 682, 693 (E.D. Pa. 2001); Financial Federal Credit Inc. v. Callender, 2003 WL 22858378 (E.D.Pa. 2003).
>
> Moreover, the doctrine of Judicial Estoppel acts as a rule of consistency which prevents litigants from maintaining inconsistent positions as their interests change. Judicial estoppel focuses on the relationship between the litigant and the judicial system, and seeks to preserve the integrity of the system. Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 (3d Cir.), *cert. denied,* 488 U.S. 967, 109 Ct. 495, 102 L.Ed.2d 532 (1988); Delgrosso v. Spang & Co., 903 F.2d 234 (3rd Cir. 1990). The underlying purpose of the doctrine, as articulated by the Third Circuit Court of Appeals, is applicable here:
>
>> To permit a party to assume a position inconsistent with a position it had successfully relied upon in a past proceeding "would most flagrantly exemplify… playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate"…
>
> Delgrosso, 903 F.2d at 241.

DLL Mot. for S.J. against TAMS at 5-6.

DLL must be held to the same law and standards it relied on in its Motion for Summary Judgment against TAMS, and its attempt to repudiate its judicial admissions solely to avoid, and/or to obtain, summary judgment should not be tolerated. TAMS was the Lessor, but did not sign the Master Lease Agreement, rendering that document of no effect. Accordingly, and in light of the fact that all of DLL's claims against Defendants arise under the Master Lease Agreement, summary judgment must be entered in Defendants' favor on all of DLL's claims.

Given the existence of numerous common issues contained within the three summary judgment motions filed against Defendants by TAMS and DLL, Defendants submit a consolidated response to all such motions, namely, DLL's Motion for Partial Summary Judgment

Against Guarantor Defendants, DLL's Motion for Summary Judgment against all Defendants, and TAMS' Motion for Summary Judgment.

## II.    APPLICABLE STANDARDS OF LAW

To determine whether summary judgment is appropriate, the Court must determine whether any genuine issue of material fact exists.  An issue is "material" if the dispute "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Of course, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Anderson</u>, 477 U.S. at 255.  A court must not consider the credibility or weight of the evidence presented, even if the quantity of the moving party's evidence far outweighs that of the nonmovant.  <u>Big Apple BMW, Inc. v. MBW of N. Am. Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Summary judgment is inappropriate when a case will turn on credibility determination, <u>id.</u>, and/or on state of mind, <u>see</u> <u>Riehl v. Travelers Ins. Co.</u>, 772 F.2d 19, 24 (3d Cir. 1985) ("issues of knowledge and intent are particularly inappropriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of the parties"); <u>see</u> <u>also</u> <u>Big Apple BMW, Inc.</u>, <u>supra</u>, 974 F.2d at 1363.  Moreover, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Id.</u>; <u>Anderson</u>, 477 U.S. at 255.

## III.    TENNESSEE IS THE APPROPRIATE LAW TO APPLY.

Both DLL's and TAMS' choice of law arguments[4] fail to consider the interest and relationship analysis required by Pennsylvania choice of law rules, and fatally rely on the terms

---

[4]      DLL brief at 7-8, TAMS brief at 22-23.

of the ineffective Master Lease Agreement.    Since it is well-settled that the conflicts of law

analysis method of the forum state dictates which substantive laws shall apply, the first real

question in approaching a conflicts of law problem generally in Pennsylvania is: what

methodology to utilize in a choice of law analysis.    The answer given in one diversity case in the

Eastern District of Pennsylvania:

> In a diversity case we determine the choice of law by applying the
> choice-of-law rules of the forum state, Pennsylvania. (Citations
> omitted). Pennsylvania has adopted a "flexible approach" to the
> choice of law issues "which combines a relationship and interest
> analysis." Id. (citing Griffith v. United Airlines, Inc., 416 Pa. 1,
> 203 A.2d 796 (Pa. 1964)); Gould Inc. v. Continental Cas. Co., 822
> F. Supp. 1172, 1175 (E.D. Pa. 1993) (holding Pennsylvania's
> choice-of-law rules require the court to "perform a governmental
> interest analysis along with the significant relationships approach
> set forth in the Restatements (Second) of Conflicts of Laws").
> "However, before a choice of law question arises, there must
> actually be a conflict between the potentially applicable bodies of
> law." (Citations omitted) If there are no differences between the
> laws of Maryland and Pennsylvania relevant to this case, the court
> should avoid the choice of law question and can refer
> interchangeably to the applicable laws of Maryland and
> Pennsylvania. Id.  But see Furman Lumber, Inc. v. Mountbatten
> Sur. Co., Inc., Nos. 96-7906, 96-8168, 96-8352, 1997 WL 539685,
> at *8 (E.D. Pa. August 6, 1997) ("In the absence of a conflict, the
> Court applies the law of the forum state...."). If the court identifies
> a conflict of laws with respect to any particular issue, the court
> must follow Pennsylvania's choice of law rules to determine which
> law to apply. (Citation Omitted).

Manor Care, Inc. v. The Continental Insurance Company, and Philco Insurance Company, The

Continental Insurance Company v. HCR Manor Care, Inc., No. Civ. A. 01-CV-2524, 2003 WL

22436225, at *4 (E.D. Pa. Oct. 27, 2003).

While the federal courts in the Eastern District have given direction with conflicts

of law analyses, Pennsylvania law on the issue has led one commentator to remark that "[n]o

state has a more convoluted, eclectic approach to choice of law than Pennsylvania. United Brass

Works, Inc. v. American Guarantee and Liability Insurance Company, 819 F. Supp. 465 (W.D.

Pa. 1992) *citing* Gregory E. Smith, "Choice of Law in the United Sates," 38 *Hastings L.J.* 1041

(1987). The United Brass Works court, in making such a statement, also gave direction: "Under

the federal approach, a court should first look to the Second Restatement [on Conflicts of Law]"

Id. at 469. "Under the federal interpretation of Pennsylvania's choice of law rules, a court should

also undertake an inquiry into whether one state has a greater policy interest than another." Id. at

470.

      Having stated what is essentially a two part test under the flexible approach, i.e.,

Restatement 2nd and the "Interests Analysis" (with what appears to be the "flexibility" to include

other approaches,) the next question is whether such analysis applies in the specific instance, to

both tort and contract conflicts.

> In Melville v. American Home Assurance Co., 584 F.2d 1306,
> 1311-1313 (3d Cir. 1978), this court determined that the "flexible
> conflicts methodology" combining interest analysis and
> Restatement Second of Conflicts of Laws contacts theory
> employed by the Pennsylvania Supreme Court in the tort case of
> Griffith [citation omitted], is to be extended to contracts actions.
> Thus, under Pennsylvania choice-of-law principles, the place
> having the most interest in the problem and which is the most
> intimately concerned with the outcome is the forum whose law
> should be applied. Griffith, 416 Pa. at 22. 203 A.2d at 805-806.

Bankers Trust Company v. Bethlehem Steel Corporation, 752 F.2d 874, 881, 882 (3d Cir. 1984)

(emphasis added).

      Further articulating this stance is the Third Circuit's decision in Pollard v.

Autotoe, Ltd., 852 F.2d 67, 70 n. 3 (3d Cir. 1988). "Pennsylvania would apply the law of the

place with the most significant contacts with, and the most interest in, the dispute. (Citation

omitted)….." In Pollard, the contract was formed in the same state where the company was

incorporated and where the company had its headquarters. The employment at issue was also in the same state and that is the state's law that the court applied.

In this case Defendants were approached in Tennessee by TAMS sales people and, as learned in discovery, DLL employees pretending to be from TAMS. The sales and marketing activities leading up to Dr. Carvel's signature on the Master Lease Agreement occurred in Tennessee. Dr. Carvel signed the Master Lease Agreement in Tennessee based on, as has been shown in discovery, misrepresentations. The Carvels also signed the individual and corporate guarantees in Tennessee. Indeed, TAMS and DLL employees came to the Carvels' home in Memphis to "celebrate" the signing. Dave Steiff of TAMS confirms that he and Dave Begy (secretly with DLL)[5] were at the Carvels. The down payment was a check written on a Tennessee bank. Monthly payments were made from a Tennessee bank. The individual defendants live in Tennessee. Both TAMS and DLL are active corporations in Tennessee.[6] Thus any torts that occurred relating to the events surrounding the attempted formation of the contract occurred in Tennessee between Tennessee citizens[7] and their companies. See Ex. 12.

Tennessee law also provides more protections to its citizens than does Pennsylvania law. For example, unlike Pennsylvania, proving conspiracy in Tennessee does not require proof of malice, as discussed below in the Section relating to Defendants' Count for civil conspiracy. Tennessee also provides more exceptions to the parol evidence rule than does Pennsylvania. Finally, Tennessee's Consumer Protection Act ("TCPA") is much broader than

---

[5]      Note in Exhibit 13 that Mr. Begy's business card boldly proclaims "Toshiba" but in much smaller letters it says Toshiba America Medical Credit, which is the name DLL used.

[6]      Although DLL may be an active corporation, there was no compliance with the Assumed Name laws in Tennessee, nor was there compliance with the Fictitious Name laws in Pennsylvania.

[7]      The Carvels are the stockholders of the defendant companies and in signing the "Master Lease" were Tennessee citizens acting on behalf of those companies.

Pennsylvania's Act, and shields both individual and corporate citizens from just the type of wrongs committed by TAMS and DLL, who came into Tennessee and caused tortious acts to occur. Moreover, and as explained below, the TCPA explicitly states that any contractual provision purporting to require the application of laws from another jurisdiction to claims under the TCPA is void as a matter of public policy. TCA § 47-18-113(b). There is no question that under both the relationship analysis and the interest analysis, Tennessee has a greater interest in the outcome of this case. Tennessee's Consumer Protection Act is quite clear that it was enacted to promote the policy of "protect[ing] consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." See id. at § 47-18-102(2). Tennessee certainly has an interest in the questionable activity in this case and for this additional reason, all tort claims in this case should be decided under Tennessee law.

As to the contract claims, TAMS has admitted that they are governed by the Uniform Commercial Code. TAMS Br. at 30. Since the Tennessee version of the UCC is substantially the same as the Pennsylvania UCC, and in accordance with the law expressed above, this Court can generally use either state's contract law.[8]

Under any scenario, Defendants' tort claims should, based on the above conflicts analysis, be analyzed under Tennessee substantive law because both the relational analysis and the interest analysis demonstrate that Tennessee has a strong interest in protecting its citizens from activities such as those engaged in by DLL and TAMS.

---

[8]     As DLL and TAMS have already briefed Pennsylvania law, and to the extent Defendants have not identified a substantive difference in the contract law of Pennsylvania or Tennessee, Defendants have briefed certain issues under Pennsylvania law.

IV.    **ARGUMENT**

    A.    **DLL's Motions for Summary Judgment on Its Affirmative Claims Must Be Denied.**

        One of DLL's Motions for Summary Judgment is directed to all Defendants.  In that Motion, DLL seeks summary judgment on its affirmative claims, and summary judgment on Defendants' counterclaims.  As TAMS has filed a separate Motion for Summary Judgment against Defendants' counterclaims, Defendants have combined the analysis of their counterclaims below, and this Section of this Memorandum relates solely to DLL's affirmative claims.

        1.    **The Master Lease Agreement, on Which DLL Bases Its Claims, is Ineffective.**

        The underpinnings of DLL's Motion to recover sums allegedly due under the Master Lease Agreement is based on several misrepresentations of fact and/or incorrect assumptions of law.  Fundamentally, DLL hinges its Motion on the assumptions that (1) it is entitled to pursue this action notwithstanding its failure to comply with the Pennsylvania Fictitious Names Act and (2) the Master Lease Agreement is effective.  However, as plainly set forth in Defendants' Motion to Dismiss and Motion for Summary Judgment, DLL is barred from pursuing any claim and the Master Lease Agreement never became a binding and effective document, for all the reasons which have already been set forth at length.

        Though not mentioned in its Brief against Defendants, DLL's Motion for Summary Judgment against TAMS reveals that DLL knows that there are an additional bases on which the Court must refuse to grant summary judgment for DLL's claims against all Defendants, i.e., the Master Lease Agreement may have been tainted by fraud and TAMS may have failed to meet its warranty obligations.  DLL has argued that, if these facts are found by the jury, that would entitle DLL to recover all of its damages from TAMS:

> Should the trier of fact determine that TAMS (i) failed to perform such maintenance and warranties as agreed to between TAMS and [Desoto]; or (ii) failed to provide all required service and/or maintenance for the leased equipment or (iii) took any action or failed to take any action which caused the Master Lease or the Guaranties to become invalid, cancelable, or unenforceable, then DLL is entitled to judgment against TAMS for its damages including attorneys fees and costs.

DLL Mot. for S.J. against TAMS at 7.

Naturally, DLL cannot be entitled to a double recovery from TAMS and Defendants, and if the jury needs to determine any of these facts, each of which DLL posits could entitle it to judgment for its full damages against TAMS, there is no basis for the entry of summary judgment against Defendants at this time.  Instead, DLL must await the decision of the jury to determine (1) if it is entitled to any damages; (2) if so, the amount of those damages; and (3) whether TAMS is responsible for such damages.

Remarkably, DLL, on page 27 of its Brief against all Defendants, states that "[t]here was simply no misrepresentation and no intent to deceive Defendants as to DLL's identity."  If that were true, there would have been no reason for DLL to engage in any of the following:

- adopting, and failing to register, fictitious names rather than using its own name;

- selecting as its fictitious name one that is so close to the name of the entity with which it is secretly working, i.e., selecting "Toshiba America Medical Credit" for contracts it is to service for "Toshiba America Medical Systems, Inc.";

- planting its employee, David Begy, in the TAMS office in Atlanta to give the appearance that, as TAMS represented to Defendants, TAMS was "the whole ball of wax" when it came to sales, service and financing (Ex. 13; see also Ex. 14 at page 17, lines 17-23 and Ex. 15 at page 114, lines 14-21);

- enabling Mr. Begy to send facsimile transmissions to Dr. Carvel, including the transmission of the document on which TAMS and DLL base their argument that Dr. Carvel "accepted" the equipment, on TAMS letterhead (Ex. 16);

- having Lisa Sparta, a DLL employee who never worked for TAMS, sign the Master Lease Agreement as a purported "Director" of TAMS on the final business day of calendar year 2000 to enable DLL to "book" the transaction in time to enable DLL to claim depreciations on its taxes (Ex. 1 at page 4; Ex. 14 at page 30, line 8 to page 31, line 10);

- requiring Dr. Carvel to sign a UCC filing that listed "Toshiba America Medical Systems, Inc." as the secured party (Ex. 11);

- using a Bates labeling sticker to block out the listing of TAMS as the secured party at the bottom a document produced in this litigation (Id.);

- failing to produce UCC filings that DLL submitted to the State of Mississippi on January 10, 2001 that listed TAMS as the Lessor, and citing the address of TAMS as Berwyn, PA (DLL's address) (Ex. 10);

- falsely representing to Defendants that it had produced all UCC filings (Ex. 9 at No. 4);

- waiting until after de-installation of the equipment at the Desoto facility before first mentioning the name of DLL to Defendants (DLL Ans. to Defs. Counterclaims at ¶ 67;

- sending a false letter through the U.S. mail to Defendants representing that DLL was the assignee of Toshiba Medical Credit and directing that Defendants pay over $3 Million dollars to an entity Defendants had never heard of (Ex. 7);

- in the midst of litigation that it had filed 10 months earlier as the assignee of TAMS, sending another false letter through the U.S. mail to Defendants representing that DLL was the "purchaser" of a lease from Toshiba America Medical Credit (Ex. 8); and

- in its latest Motions, copying, pasting, and altering its judicial admissions and misrepresenting to the Court that it is "undisputed" that, contrary to Paragraph 9 of its Complaint, binding admissions of TAMS, the listing in the signature box in the Master Lease Agreement and the UCC filings it made with the State of Mississippi, the Lessor is not really TAMS, but TAMC, a fictitious name for DLL.

In addition to, and aside from, the binding judicial admissions of DLL and TAMS and the binding precedent and hornbook law that prevents DLL and TAMS from claiming any benefits under the Master Lease Agreement, there would still be a factual issue concerning the effectiveness and validity of the Master Lease Agreement.  The signature boxes of that document clearly suggest that Desoto was entering into an agreement with TAMS as Lessor.  If the Court finds that TAMS is the Lessor, the Agreement is ineffective because it was never signed by TAMS.  If, on the other hand, the Court finds that, contrary to the plain listings in the signature boxes, TAMS was not a party to this agreement, and that this was actually, as DLL and TAMS now contend, an agreement between Desoto and DLL, there is a factual issue as to whether Desoto's signature to the document was procured by this intentional misrepresentation.  Again, recall that the listing of TAMS as the Lessor was not a mistake, as the MCPFA contemplated that TAMS would be listed as the Lessor. Ex. 2 at pages 3-4, § 2.3(a).  Additionally, DLL is not mentioned anywhere in the Master Lease Agreement, and DLL failed to register the fictitious

names of "Toshiba America Medical Credit" or "TAMC." <u>See</u> Defendants' Motion to Dismiss.

Dr. Carvel reasonably believed that she was entering into a transaction with TAMS, and clearly

had no intention of entering into an agreement with DLL, who has admitted to concealing its

name from Defendants until March 15, 2002.  DLL Ans. to Defs. Amended Counterclaims at

¶ 67.  If TAMS is not the Lessor, then the Master Lease Agreement was, quite simply, not what

it purported to be, <u>i.e.</u>, a lease between Desoto as Lessee and TAMS as Lessor.  TAMS appears

by itself in the signature box.  Critically, DLL has admitted that the jury may determine that the

lease is unenforceable, and has argued that this would entitle DLL to judgment against TAMS,

not Defendants:  "[DLL] seeks entry of a judgment against TAMS, as a matter of law, pursuant

to the unambiguous provisions of the [MCPFA], in the event the trier of fact find[sic] that TAMS

breached its warranties to [Desoto] or rendered the lease unenforceable.  In such case, [DLL] is

entitled to judgment against TAMS, for all of its losses and counsel fees and costs."  DLL Mot.

for S.J. against TAMS at 9.

　　　　Sidestepping any analysis of another issue precluding the entry of summary

judgment against Defendants, <u>i.e.</u>, revocation, DLL did not inform the Court that the provisions

of Pennsylvania's adoption of the UCC relating to "hell or high water" finance leases "remain

subject to the obligations of good faith . . . and the lessee's revocation of acceptance."  Comments

to 13 PA C.S.A. § 2A407.  Thus, even if this were a "finance lease" (it clearly is not because

TAMS both leased and supplied the equipment), in addition to showing that there was no

material issue of fact concerning whether DLL and TAMS had complied with their obligations of

good faith (imposed by law, as noted in 13 Pa. C.S.A. § 1203), DLL would also need to show

that there was no material issue of fact concerning whether Desoto properly revoked the lease.

As the issue of revocation is tied to impairment of value, failure to cure defects, and timeliness,

such revocation is an intensely factual question. Having failed to brief that issue at all, DLL has failed to meet its initial burden of identifying an area on which there is no disputed issue of material fact, precluding the entry of summary judgment.

As this was not a finance lease, Defendants are entitled to broad powers of revocation (providing further motive to DLL and TAMS' attempted disavowal of their binding admissions, and explaining TAMS' obsession with referring to the lease as a "finance lease.") A non-finance lease can be revoked by a lessee where the lessee accepted "a lot or commercial unit whose nonconformity substantially impairs its value to the lessee if the lessee has accepted it (1) except in the case of a finance lease, on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or (2) without discovery of the nonconformity if the lessee's acceptance was reasonably induced either by the lessor's assurances or, except in the case of a finance lease, by the difficulty of discovery before acceptance." 13 Pa. C.S.A. § 2A517(a). On the same day TAMS and DLL filed their Motions for Summary Judgment, TAMS, who leased and supplied the goods, sent an "urgent" letter to Desoto notifying Defendants that there is an inherent problem with the CT scanner TAMS leased to Desoto. Ex. 17. As it is obvious that Desoto could not have been expected to discover defects in TAMS' equipment which TAMS itself is still uncovering, the issue of revocation must go to the jury, precluding summary judgment on DLL's claims against Defendants. Given the overwhelming amount of evidence indicating that the equipment was riddled with defects which TAMS was unable to cure, see, e.g., Ex. 18, DLL could not, even had it tried, establish as a matter of law that the equipment did not have any non-conformities, that such non-conformities did not substantially impair its value to Desoto, or, in short, any reason why Desoto could not revoke its acceptance.

In addition to the sheer volume of the service calls, TAMS itself sent Defendants a letter setting forth literally pages worth of product defect issues, some of which TAMS claimed to have "accomplished," and still other "remaining items." Id. It is not surprising that neither TAMS nor DLL mentioned this letter, which not only shows the pervasiveness of the equipment defects, but also the amount of time TAMS had been working on those problems (8 weeks as of August 16, 2001, 6 months before de-installation), the "unusually long period [it took for TAMS] to diagnose and resolve several MR issues", "the level of cooperation shown by [Desoto]," the acknowledgement and extension of the warranty (which TAMS has denied existed) and the fact that the problems involved such "extraordinary issues" that TAMS needed to invest more into its relationship with Desoto, whose actions and attitude were "much appreciated" by TAMS. Id. Neither TAMS nor DLL mentioned any of the problems with the equipment.

Incredibly, DLL also did not mention that DLL has asserted claims against TAMS for "the balance due under the Master Lease Agreements and related Guaranties" on the bases that (1) TAMS made unauthorized warranties and representations to Defendants (Count II of DLL"s Crossclaim); (2) TAMS acted with fraud in dealing with Desoto and fraudulently induced Desoto to sign the Master Lease Agreement (Count III of id.); (3) TAMS' failed to properly maintain and service the equipment TAMS leased to Desoto (Count IV of id.); and (4) TAMS failed to ensure that the Master Lease Agreement and related documents would be valid and enforceable (Count V of id.). Having done so, DLL recognized that there are material issues of fact that could invalidate the Master Lease Agreement and/or entitle Defendants to judgments on DLL's claims. Clearly, DLL cannot seek double recovery of the balance allegedly due under the Master Lease Agreement from both Defendants and TAMS, and, as DLL has not dropped its claims against TAMS (in fact, DLL has sought summary judgment on such claims), it is obvious

that (1) granting Defendants' Motion for Summary Judgment does not leave DLL without any remedy for the amounts it claims and (2) even if Defendants' Motion for Summary Judgment is denied, the jury must decide the factual issues that determine whether DLL is entitled to any recovery and, if so, whether that recovery should come from TAMS as a result of, inter alia, its failure to properly maintain and service the equipment and/or its failure to ensure that the Master Lease Agreement was enforceable.

As a final point, under no circumstance could DLL be entitled to summary judgment for the amounts it is seeking. For example, even if the Master Lease Agreement were effective, that document imposes on Lessor a mandatory obligation to dispose of the equipment. Ex. 1 at ¶ 15 (in the event of a default by the lessee, "Lessor may, at its option, use, ship, store, or repair any and all items of Equipment . .  removed [from lessee's facility] and shall sell, lease, or otherwise dispose of any such Equipment") (emphasis added). Moreover, after disposing of the equipment, the lessor must credit the lessee for sums recovered:  "In the event Lessor disposes of the Equipment, Lessor shall give Lessee credit for any sums received by Lessor from the sale or lease of the Equipment after the deduction of the expenses of sale or lease." Id. (emphasis added).  It is undisputed that DLL and/or TAMS did ship and store the equipment removed from Desoto's facility (thereby triggering the obligation to "sell, lease or otherwise dispose") and that DLL and/or TAMS have breached this obligation by failing to dispose of any of the equipment. Remarkably, not a single piece of the equipment has been sold or leased in the more than 2 years since de-installation. Ex. 19 at page 286, lines 18-20; id. at page 289, lines 17-20.  Thus, the amount DLL seeks to recover is too high.  Naturally, once the equipment was sold, and the resulting deduction was made to the amount claimed to be owed, DLL would also have to stop

calculating interest on that eliminated portion of damages, rendering DLL's calculation of interest faulty.

In short, DLL is not entitled to summary judgment on its claims against Defendants because (1) the Master Lease Agreement is ineffective; (2) in addition, there is still a material dispute of factual issues concerning whether there was fraud that could render the Master Lease Agreement ineffective; (3) DLL has also failed to meet its burden of identifying that there is an absence of a material dispute as to whether (a) DLL and TAMS have met their duties of good faith and (b) Desoto has properly revoked any claimed "acceptance" of the equipment; (4) the jury needs to decide whether TAMS is responsible for DLL's damages, rather than Defendants and (5) under any scenario, the amount DLL seeks is too high.

### 2.     **DLL's Claims Against Guarantor Defendants Must Be Denied.**

As set forth in Defendants' Motion for Summary Judgment, DLL's claims against the Guarantor Defendants, on which DLL has moved separately for summary judgment, must be dismissed because they seek recovery solely of amounts due under the ineffective Master Lease Agreement.  On this point at least, DLL has not changed its position, as its Brief in support of its Motion against the "guarantor defendants" confirms that DLL is only seeking recovery of amounts due under the ineffective Master Lease Agreement.  DLL Br. against Guarantor Defs. at 8 (requesting partial summary for sums purportedly "due under" the Master Lease Agreement). Obviously, no amounts can be "due under" an ineffective document, and, as explained above, there are factual issues which preclude a finding at this stage that there was any breach of an obligation by any Defendant, because of the issues of fraud and revocation.  If anything, it is clear that the Master Lease Agreement never became effective, entitling Defendants to summary judgment on this Count.

In their Motion, DLL acknowledges, in its discussion of <u>Parker Hannifan</u> on page 6, that a contract will not always be enforced where there are "allegations of fraud."  DLL Br. against Guarantor Defs. at 6.  Surprisingly, though, DLL failed to mention that this case <u>does</u> involve allegations of fraud which could render the guarantees null and void.  As DLL failed to show no absence of material fact on fraud (and has maintained this cause of action itself against TAMS), it has failed to meet its burden, and summary judgment is not appropriate.

DLL also raised yet another issue that prevents entry of summary judgment on this Count:  failure of consideration.  On page 8, DLL states that the "Guaranty Agreement recited that it was being given to induce the Lessor to enter into the lease." <u>Id.</u> at page 8.  DLL did not try to identify who exactly "the Lessor" was, and failed to prove, because it cannot, that TAMS, the listed Lessor, actually did sign the Master Lease Agreement.  As TAMS argued in its Brief, failure of consideration may be a defense to a breach of contract claim.  TAMS Br. at 33-34.

Finally, as set forth at length above, even if the Court finds that the Master Lease Agreement is not rendered ineffective there are numerous factual issues, including the existence of fraud, the lack of good faith of TAMS and DLL, and the rights of Defendants to revoke acceptance of the equipment, that must first be determined by the jury, making summary judgment, on DLL's behalf at least, inappropriate.  Accordingly, Defendants ask that the Court deny DLL's Motion for Summary Judgment Against Guarantor Defendants.

**B.    DLL's and TAMS' Motions for Summary Judgment in Connection with Defendants' Counterclaims Must Be Denied.**

**1.    <u>Breach of Contract</u>**.

TAMS seeks summary judgment as to Count I of Defendants' counterclaims, which is for TAMS' delivery of non-conforming goods.  Incredibly, though, TAMS makes no

argument that the goods it leased and supplied were conforming, or performed at all, and TAMS simply ignored the over 200 service calls on the defective equipment. See Ex. 20. It is undisputed that TAMS leased and supplied goods to Defendants, yet TAMS nevertheless argues that it never formed any contract with Defendants in connection with Defendants' acquisition of the medical equipment. If the Court agrees with Defendants' argument that DLL is barred from pursuing its claims based on DLL's reliance on the ineffective Master Lease Agreement, Defendants acknowledge that their first counterclaim, insomuch as it relates to the Master Lease Agreement, may be dismissed on identical grounds.

However, unlike DLL, Defendants did not relate their entire contractual claim to the Master Lease Agreement. Instead, Defendants' claim under Count I is much broader and includes all representations and warranties made by TAMS to Defendants, including express warranties made prior to Desoto's execution of the Master Lease Agreement and "post-agreement warranties promises, assurances, and representations made by TAMS to Defendants." Defs. Counterclaim at ¶ 73. Defendants' claims also relate to TAMS' failure to deliver goods that performed to the level of quality promised, and to cure and/or correct the equipment. Id. at ¶¶ 76-77. TAMS admits that over 200 service calls were placed on the equipment. TAMS Ans. to Defs. Amended Counterclaims at ¶ 54.

TAMS' Brief essentially relies on 2 arguments with respect to this Count. First, TAMS repudiates its binding judicial admissions and declares that it did not enter into any agreement with Desoto. If this is true, then DLL's claims against Defendants must be dismissed, as DLL has asserted that it is the assignee of the lease between TAMS and Defendants. DLL Complaint at ¶¶ 9-12. DLL cannot be the assignee of a contract that was never created, and, as discussed above, TAMS was incapable of assigning the "right to accept" the Master Lease

Agreement to DLL.  Second, TAMS argues that the terms of the ineffective Master Lease

Agreement bar Defendants from bringing a breach of contract claim against TAMS.  TAMS

simply ignores any contractual relief that Defendants seek beyond the terms of the ineffective

Master Lease Agreement.  Accordingly, as TAMS has failed to identify any area on which

summary judgment is appropriate with respect to those claims, such claims must advance to trial.

Obviously, as the Master Lease Agreement and all related attachments are of no

effect, TAMS' reliance on the provisions of such documents as a sword to prevent Defendants

from advancing their claims against TAMS is misplaced.  TAMS' use of its failure to meet a

condition precedent to contract formation in connection with the Purchase Orders, see TAMS Br.

at 6 and Ex. 4 at TAMS 1174, ¶ 5, along with TAMS' attempted repudiation of its judicial

admissions that it was the Lessor, reveals that TAMS knows that the Master Lease Agreement is

not effective because, as TAMS admits, it never signed the Master Lease Agreement.  As a final

note, it is odd that TAMS would rely on the terms of the ineffective Master Lease Agreement to

support its Motion on this Count because TAMS itself stated that this document did not control

this transaction: "Article 2A of the Uniform Commercial Code . . . governs this transaction."

TAMS Br. at 30.

In addition, TAMS' discussion of the law on disclaimers of express and implied

warranties is misleading at best.  In the numerous pages TAMS spends trying to convince the

Court of the bizarre proposition that TAMS did not provide any warranties to Defendants,

TAMS admits each of the facts necessary to show that TAMS did make express warranties to

Defendants.  Express warranties do not need to be set forth in writing, and no formal words are

required to create an express warranty.  13 Pa. C.S. § 2A210.  All affirmations of fact or

promises made by TAMS to Desoto which relate to the goods and became part of the basis of the

bargain created "an express warranty that the goods will conform to the affirmation or promise." Id.  The same is true of any description of the goods or any sample or model.  Id.

TAMS admitted several key facts showing that it made affirmations and promises to Desoto prior to Desoto's execution of the Master Lease Agreement, and that Desoto's principal has testified that she relied on those promises.  Specifically, TAMS admits that its salesman, David Steiff, "went over the purchase orders with Dr. Carvel and Mr. King in detail so that there could be no mistake as to what DeSoto was and was not ordering."  TAMS Br. at 6.  TAMS also admitted that "there is no dispute that TAMS' standard product warranties . . . were communicated to Desoto prior to its entry into the Master Lease."  Id. at 27.  Obviously, then, there is at least a factual issue as to whether all affirmations and promises contained on those documents, including the very specific representations in the Purchase Orders, became part of the basis of the bargain.  This is especially true given that TAMS also admitted that Desoto testified to having relied on these documents.  Id. at 27-28.  Yet, attempting to use its failure to sign the Purchase Orders as a shield, TAMS argues that such documents did not create binding warranties because TAMS did not sign them:  "While these purchase orders were, technically, binding 'offers' that TAMS could have 'accepted', all parties understood that DeSoto was not going to purchase the equipment it needed from TAMS. . . .  Thus, TAMS never signed the Purchase Orders."  Id. at 6.

Presumably relying on Paragraph 5 of the "Terms and Conditions of Sale" located on the Purchase Orders which states that "This Agreement shall not be binding on Toshiba unless and until it is accepted by Toshiba as evidenced by the signature of an authorized representative of Toshiba on the face of this document," Ex. 4, TAMS contends that the only warranty Desoto

could enforce are those set forth in another document, namely, TAMS' "standard product warranty." <u>See</u> Ex. 21.

   While, as set forth above and in Defendants' Motion for Summary Judgment, the law is clear that a drafter's failure to comply with its own express condition precedent to contract formation prevents the drafter from receiving the benefits of its document, the law is very different on the singular issue of the disclaimer of express warranties.  TAMS states that the "law is clear that express and implied warranties may be disclaimed."  TAMS Br. at 25.  Contrary to TAMS' argument, Article 2A of the UCC provides that purported disclaimers are "inoperative" to the extent they are inconsistent with an express warranty.  13 Pa. C.S. § 2A214(a) (words tending to "negate or limit" an express warranty should be construed, where reasonable, as consistent with the warranty but "negation or limitation is inoperative to the extent that the construction is unreasonable.")  Thus, TAMS is prevented from making express warranties to its lessees, such as those contained in the Purchase Orders, and then disclaiming those warranties, as it attempted to do to Desoto in the Master Lease Agreement and elsewhere.  TAMS did not cite a single case for the proposition that a disclaimer of an express warranty was valid.  Perhaps this is because the law is clear that where an attempted negation or limitation of an express warranty is inconsistent with the warranty, the disclaimer is void, and the warranty remains.  <u>Pocono Artesian Waters Co. v. Leffler Sys.</u>, Civ. No. 90-1928, 1991 U.S. Dist. LEXIS 1951, at *7 (E.D. Pa.Feb. 19, 1991) (denying summary judgment as to express warranty claim; "Occidental responds by asserting that all express warranties were disclaimed in the brochure . . .  and on the back of the order acceptance form.  However, any such disclaimer of warranty would be inconsistent with the terms of the warranty itself, and thus void).  Accordingly, TAMS' premise that Defendants cannot pursue claims for breach of express warranty because of a purported

disclaimer of those warranties is fatally at odds with the law, and Defendants' claims for breach of contract, as they relate to express warranties, including but not limited to those set forth in the Purchase Orders and TAMS "standard product warranty" must advance to trial.

TAMS also did not provide a fair description of the law with regard to limitation of remedies, and the supposed effectiveness of TAMS' attempt to limit Defendants' remedies to repair and replacement by TAMS. TAMS states that its warranty obligations are limited by the ineffective Master Lease Agreement. Even if the Master Lease Agreement were effective, Article 2A provides that where "circumstance cause" an exclusive or limited remedy to fail of its essential purpose or be unconscionable, such limitation will not be enforced, and the lessee may seek its remedies under Article 2A. 13 Pa. C.S. § 2A503(b). At a minimum, there is a material factual dispute as to whether TAMS' purported limited warranty was unconscionable or failed of its essential purpose.

Consider the following facts, none of which TAMS even mentioned:

- TAMS' equipment required over 200 service calls in the approximately 14 months it was installed at the Desoto facility (TAMS Ans. to Defs. Counterclaims at ¶ 54; see also Ex. 20);

- TAMS worked for months on a multitude of product issues, and admitted its failure to have a locally trained engineer as well as "conced[ing] that the unusually long period to diagnose and resolve several MR issues has caused more downtime than expected" (Ex. 18 at TAMS 2068);

- TAMS' own employee referred to the nuclear medicine camera TAMS leased and supplied to Desoto as "crap" (Ex. 6 at page 216);

- TAMS has judicially admitted that "the equipment from time to time required maintenance, servicing and repairs and that TAMS provided such services" (TAMS Ans. to Defs. Counterclaims at ¶ 37);

- TAMS has admitted that the decision of its employee to use baby oil on the MRI machine, on which he had not even been trained, was "inappropriate . . . because it interfered with the photosensitivity of the part" (Id. at ¶ 51); and

- TAMS has failed to even suggest that it solved or cured any of the problems that caused service calls to be made, and certainly cannot prove that it did so as a matter of law.

In short, TAMS' reliance on the Master Lease Agreement cannot justify its request for summary judgment because (1) Defendants' Count I includes claims not arising under that document; (2) that document is ineffective, precluding TAMS' reliance on its disclaimers; (3) under any circumstance, any purported limitation or disclaimer of an express warranty is void to the extent it is inconsistent with the express warranty; and (4) TAMS has failed to even argue, let alone prove as a matter of law, that its putative limitation of Desoto's implied warranty rights was not unconscionable or did not fail of its essential purpose, presumably because of the overwhelming number and nature of service calls and problems its equipment caused, and its admitted provision of "inappropriate" service.

### 2.    **Breach of Warranties**.

Inexplicably, TAMS argues that Defendants' counterclaim must be dismissed because TAMS claims it did not provide any warranties to Desoto.  As set forth above, TAMS admitted all facts necessary to the creation of express warranties, and even sent a letter informing Desoto that TAMS would extend the warranty TAMS now claims never existed in the first place.

Ex. 18 at TAMS 2068-2069.  TAMS' argument is disingenuous, as TAMS is asking this Court to

impose an ludicrous reading on TAMS' "standard warranty" so as to rule, as a matter of law, that

its warranty was provided to DLL rather than Defendants, and rule, as a matter of law, that

TAMS leased and supplied medical equipment worth millions of dollars to Defendants without

giving any warranty.

The absurdity of TAMS' position that it did not provide any warranty to

Defendants is easily illustrated by a cursory analysis of TAMS' "standard" product warranty.

The document entitled "Toshiba Product Warranty and Services Coverage" provides the

following under the heading "System Warranty Terms":

> Toshiba America Medical Systems, Inc. (TAMS) warrants to
> Customer that the product(s) to be delivered hereunder will be free
> from defects in material, manufacturing, workmanship and title. . . .
> The warranty period shall commence on the date the Product is
> delivered to Customer.

Ex. 21.

Though the term "Customer" is not defined, TAMS' suggestion that "Customer"

means DLL rather than Desoto is illogical.  If Desoto had no right to return the equipment, as

TAMS contends, then the warranty would never commence while Desoto was in possession,

because the "warranty period shall commence on the date the Product is delivered to the

Customer."  Id.  TAMS also provided that the remedies contained in this warranty "are

conditional upon Customer promptly notifying TAMS . . . of any defect or nonconformance."

Id. TAMS clearly cannot say that it understood that DLL, rather than Desoto, bore the

responsibility of notifying TAMS of the numerous problems with the equipment TAMS leased

and supplied to Defendants. While further analysis of the usage of the term "Customer" in this

document would illustrate the absurdity of TAMS' position even more, Defendants trust that the

point has been made, and will not belabor this issue.

Within even the "standard" warranty document, TAMS provided to Desoto warranties (1) that the equipment was free from defects in material, manufacturing, workmanship and title; (2) to "correct any . . . failure" of a product to meet "any warranty"; (3) to provide "free of charge any upgrades, including software required to correct any defect in the warranted products"; and (4) that TAMS would repair or replace defective parts. Id. Inherent in the warranty to repair defects is the notion that the defects will actually be repaired, i.e., fixed. TAMS has not attempted to show that there is an absence of material fact on whether the equipment it provided was free of such defects, or that TAMS fulfilled its obligations to repair or replace defective parts. Instead, TAMS falsely stated that "Desoto does not allege, nor does it have any evidence" that TAMS breached its warranties. The sheer fact that the equipment required over 200 service calls is at least evidence of (1) defect in the material, manufacturing, and workmanship of the equipment and (2) TAMS' inability, after numerous opportunities, to repair such defects. As such, there is simply no justification for TAMS' request for summary judgment on this Count, which was presumably asserted solely in the hopes that Defendants would tip off some of the more egregious defects that Defendants will highlight for the jury at trial. Indeed, even DLL admitted that this claim must go to the jury: "Whether and the extent to which TAMS failed to sell equipment which functioned properly and/or failed to properly service the equipment will be presented to and decided by the jury in this matter." DLL Mot. for S.J. against TAMS at 9.

TAMS later appears to soften from the position that it did not provide Desoto with any warranties, however, and argue instead that Desoto may have some warranties, but that those warranties are limited. Some of the implicit underpinnings of TAMS' arguments with regard to this Count, none of which are legally correct, are that (1) TAMS can disclaim express warranties

it has made; (2) that its "remedy" of repair and replace did not fail of its essential purpose with respect to Desoto, even though it is undisputed that the equipment warranted by TAMS required the placement of over 200 service calls in the approximately 14 months the equipment was at the Desoto facility; and (3) TAMS has an unlimited right to repair and/or replace equipment.  As TAMS attempted to mix Defendants' contract claims with Defendants' warranty claims, the first two of these arguments are addressed above.

The third argument is a mysterious twist in which TAMS seems to argue that Desoto could only claim the benefits of the warranties provided by TAMS during such time as the medical equipment was located at Desoto's facility.  In doing so, TAMS implicitly argues that it has an unlimited right to cure its defective equipment, and that once a lessee revokes acceptance because, as here, TAMS has been unable to cure after a reasonable opportunity to do so, TAMS is somehow free from all responsibility for its failure to cure product defects and the lessee cannot sue TAMS.  As expected, such a wild position is not the law.  13 Pa. C.S. § 2A517(a) (lessee may revoke acceptance where he has accepted "on the reasonable assumption its non-conformity would be cured and it has not been seasonably cured"); 13 Pa. C.S. § 2A503(b) (notwithstanding purported limitation of remedy, lessee may seek remedies provided in UCC where remedies provided fail of essential purpose).

TAMS' argument, in fact, has already been made and rejected in the Superior Court of Pennsylvania.  In Barrack v. Kolea, 651 A.2d 149 (Pa. Super. 1994), a builder relied on a "repair or replace" limitation of warranty that is similar to the one on which TAMS relies.  The builder contracted with buyers to provide an expensive home.  Settlement occurred on June 28, 1990, but there were many problems with the home.  Builder spent the entire Summer and Fall working on the numerous defects in the home, but never fixed all of the problems.  By

January, 1991, the buyers became incensed at the builder's inability to cure the defects.

Litigation commenced on February 1, 1991.

As TAMS is now arguing, the builder claimed that its obligations were limited to

the terms of the warranty, which called for repair and replacement.  Builder argued that buyers'

"only recourse then if [builder] breached the contract by not constructing the house 'in a first

class, workmanlike manner' would be to allow [builder] to cure the defect."  The Court found

this argument to be "without merit."  Like TAMS, the builder relied on a series of cases for the

proposition that exclusive remedy clauses are "generally" enforceable.  Without disagreeing with

that proposition, the Court found that such "clauses are not interpreted to mean, however, that an

innocent party's sole remedy would be to allow the breaching party unlimited attempts to cure

the defect, to have unlimited bites at the apple, so to speak."  The court added that the most an

exclusive remedy clause granted was a reasonable period to cure, which depends on the

circumstances:  "At most we interpret the exclusive remedy clause in the contract before us as

requiring [buyers] to give [builder] a reasonable time to cure defective materials and

workmanship. . . .  [T]he definition of a reasonable time to cure depends upon the attending

circumstances."  Ultimately, the Court held that the "remedy available to [buyers] under the

warranty failed in its essential purpose."  Barrack is hardly a unique decision.  See also, e.g.,

Cabinetmakers Supply v. Rieber, 1990 Phila. Cty. Rptr. LEXIS 30 (Jan. 31, 1990)

(nonconformities and seller's failure to cure same justified buyer's revocation of acceptance and

finding that limited remedy of repair or replace failed of its essential purpose).

In addition, the builder in Barrack tried to make the same faulty argument

concerning damages that TAMS has made.  The builder argued, inter alia, that because there

was no evidence that the roof had caused any harm, or ever would cause a harm, buyers had

failed to prove any cognizable damages.  The Court, however, rejected this argument:  "[Builder]

argue that actual damages were not proven.  [Buyers] introduced sufficient evidence that the roof

was defective.  Second, the measure of damages is not physical damage to [buyers] or their roof,

but their loss of the benefit of the bargain.  [Builder's] mistake is in confusing harm with damage.

[Buyers] may not have suffered a harm, but they have been damaged by not receiving what they

had contracted to receive:  a roof of superior quality."  Similarly, in addition to the actual

damages Defendants have set forth, including some of the more than $500,000 Defendants paid

for the defective equipment, Defendants were harmed by not receiving their benefit of the

bargain, as is clear from the number of service calls, TAMS' admitted inability to service or

resolve product issues, and TAMS' further admission that it provided "inappropriate" service that

"interfered with the photosensitivity" of one of the pieces of equipment.  TAMS Ans. to Defs.

Counterclaims at ¶ 51.  TAMS' claim that Defendants have not sufficiently set forth recoverable

damages is absurd.

        While TAMS seeks judgment as a matter of law that Defendants were not entitled

to revoke acceptance, courts have not identified a hard and fast guideline for a reasonable period

of time within which revocation must occur, but rather have categorized this question as a

question of fact for the a jury to decide.  Cardwell v. Int'l Housing Inc., 423 A.2d 355, 362 (Pa.

Super. 1980); see also Vandenberg v. Siter, 204 A.2d 494 (Pa. Super. 1964); see also Smith v.

Penbridge Assoc., Inc. 655 A.2d 1015 (Pa. Super. 1995).  Instead, TAMS places the cart before

the horse and argues that Desoto breached its obligations by de-installing the equipment after

TAMS was unable to cure the numerous deficiencies in the equipment.  According to TAMS'

reasoning, even if, as was the case, TAMS was incapable of fixing its defective equipment,

Defendants were stuck with it, and were limited in their rights to allowing TAMS to continue to

do what it had consistently failed to do:  fix the problems.  This, too, is not the law.  See, e.g.,

Wheeling Stamp Co. v. Birdsboro Steel Foundry & Mach. Co., 245 F.2d 752 (3d Cir. 1957)

(reversing judgment in favor of seller who claimed buyer of defective machinery was required to

give seller additional chances to cure after parties had spent years in pursuit of satisfactory

performance; "It was entirely reasonable for the buyer to give notice of rescission when months

of additional work in its plant were followed by a noticeably unsatisfactory production run.")

   The Cardwell Court noted that when a seller attempts to cure defects in a product,

"a buyer will not be penalized for affording the seller an opportunity to correct the defects and

the time for revoking acceptance 'should extend…beyond the time in which notification of

breach much be given, beyond the time for discovery of non-conformity after acceptance and

beyond the time for rejection after tender."  Cardwell, 432 A.2d at 362 (citing U.C.C. § 2-605,

comment 4).  TAMS did not mention any of the facts showing that Desoto gave TAMS

numerous opportunities to cure (as evidenced in part by the more than 200 service calls, as well

as TAMS letter announcing that it had been working on numerous issues for 8 weeks as of

August 16, 2001).  Exs. 20, 18.  As the issue of whether Defendants reasonably and properly

revoked acceptance of the equipment is an intensely factual question, this is not an appropriate

matter for summary judgment.

   **3.**  **Breach of Service Agreements**.

   TAMS moved for summary judgment on Defendants' counterclaim relating to

TAMS' breach of its service agreements with Defendants.  Interestingly, TAMS claims that the

service agreements never became effective because they were not to commence until "the

expiration of the one-year warranty."  Earlier in its brief, TAMS denied that it had provided any

warranty to Defendants.  TAMS failed to inform the Court that TAMS itself asserted a claim

against Defendants for breach of the service agreements.  If such agreements never commenced,

then Desoto could not owe anything to TAMS under those agreements. TAMS' argument

defeats its own claims.

Moreover, TAMS falsely implies that Desoto did not make any payments to

TAMS in connection with service and warranty coverage. In truth, TAMS has acknowledging

receipt of 2 such payments in TAMS' answers to DLL interrogatories. In response to DLL

interrogatory 4, which asked TAMS to identify payments Desoto made to TAMS, including

payments related to any warranty or service agreements, TAMS stated that Desoto paid TAMS

$568.17 and $930.00 in connection with invoices dated July 11, 2001 and August 13, 2002.

Ex. 22 at No. 4.

Finally, and as noted above, TAMS' failure to properly service the equipment not

only admittedly harmed the photosensitivity of the MRI machine, TAMS Ans. to Defs.

Counterclaims at ¶ 51, it also caused Defendants to not receive the benefit of their bargain.

There is sufficient evidence of damages to require this claim to advance.

### 4.     <u>Third Party Beneficiary</u>.

DLL opposed this claim primarily on the basis that the MCPFA did not express an

intention to benefit Defendants. However, DLL's Crossclaim against TAMS, and TAMS'

arguments in its Summary Judgment brief, establish that this claim must be submitted to the jury.

DLL's Crossclaim confirms that if TAMS failed to meet its warranty obligations to Desoto, then

DLL is entitled to recover its damages from TAMS, rather than Defendants. DLL Mot. for S.J.

against TAMS at 9 (arguing that if the jury decides that "TAMS breached its warranties to

[Desoto] or rendered the lease unenforceable," then TAMS would be required to pay all of DLL's

damages under the MCPFA). In addition, TAMS has expressly argued that the MCPFA was

intended to, and did benefit Desoto: "the <u>purpose and effect of the [MCPFA] and the program it</u>

<u>created was precisely to allow TAMS to offer customers a single source for sales, service, and</u>

financing.  Indeed, as the record shows, Desoto received financing from DLL precisely because of that integrated program, because DLL required TAMS to provide credit enhancements as a condition to financing Desoto's equipment acquisition. . . . TAMS undisputedly provided benefits to DLL and, indirectly, to Desoto, in connection with the transaction."  TAMS Br. at 10-12 (emphasis added) (emphasis in original omitted).

Without identifying every single provision of the MCPFA that indicates that there is at least an issue of fact on the intensely fact-dependent question of whether TAMS and DLL's successor intended to benefit lessees, as is plain from the following selection of provisions, this cannot be decided as a matter of law against Defendants:

- Section 2.7:  DLL required to provide lessees "with competitive rates and terms for all Contracts;

- Section 5.2(c):  TAMS represents that it will not commit fraud in connection with the "execution, delivery or assignment of the Contract";

- Section 6.3:  "TAMS agrees to provide all required service and/or maintenance for the equipment"; and

- Section 7:  DLL undertakes to "thoroughly investigate each allegation made by a Lessee that TAMS has failed to comply with its material representations and warranties affecting the Lessee.

Ex. 2.

As DLL noted, the question of whether Desoto is a third party beneficiary remains within the sound discretion of this court to determine that "the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties." Blue Mountain Mushroom Co. Inc. v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394, 401 (E.D.

Pa. 2002).  DLL's reliance on <u>Blue Mountain Mushroom</u> to support its position that this court should grant DLL summary judgment on Desoto's third party beneficiary claim is curious, to say the least.  If the holding of that case were followed, DLL's Motion must be denied, as the <u>Blue Mountain</u> court denied a similar motion for summary judgment.  In doing so, the court held that a third party beneficiary claim cannot be decided on summary judgment where "there are still material facts in dispute" regarding the intentions of the contracting parties.  <u>Id</u>.  As intent is almost always a factual issue, and as both TAMS and DLL have expressed that the MCPFA was intended to, did, and/or may benefit Desoto in terms of receiving financing, obtaining service and/or being freed from DLL's damage claims, neither TAMS nor DLL are entitled to summary judgment on this Count.

     5.     **<u>Fraud</u>**.

     A brief review of the averments made by TAMS is instructive in considering whether any of Defendants' tort claims should survive summary judgment.  These acts form the basis of those claims.  As TAMS admits, at the beginning of the relationship it allowed DeSoto to sign Purchase Orders which TAMS never signed, at footnote 9 asserts these are not valid contracts since TAMS did not sign them, but allowed Dr. Carvel to rely on the warranties on the reverse of those orders when she made DeSoto's order for Toshiba equipment.  <u>See</u> TAMS Br. at 6; <u>see</u> <u>also</u> <u>id</u>. at 16, where it flatly disclaims these warranties.  TAMS then asserts that Dr. Carvel was on notice from a Fair Market Value equipment proposal that the Lessor would be someone other than TAMS.  However, TAMS admits that Dr. Carvel has said she does not know if there is any difference between TAMS and TAMC.  <u>Id</u>. at 7-8.  TAMS does not argue, nor can it, that anyone ever told Dr. Carvel there was an undisclosed party in the deal, or that anyone explained that TAMS and TAMC were completely different entities.  TAMS claims that DeSoto was familiar with finance leases because it considered entering a finance lease with Citicorp for

Phillips equipment.  Id. at Footnote 14.  The difference there of course is that the outside funding

service was fully disclosed.  In addition, TAMS admits that under the MCPFA (of which

Dr. Carvel was unaware) that it assigned its rights to DLL and washed its hands of the matter,

something Dr. Carvel specifically did not want to happen.  Id. at 9.

          TAMS claims private label agreements are common in the medical equipment

industry.  If there was no intent to mislead customers, why not simply disclose DLL?

Footnote 18 of TAMS' Brief proves this point.  TAMS claims there is no legal difference

whether Defendants contracted with TAMS or DLL, although for the reasons set forth in the

previous discussion about finance leases, it does make a legal difference.  TAMS further reveals

its arrogance  when it avers that "DeSoto's subjective understanding is irrelevant" because it was

seeking credit.  Id. at 11.  On the contrary, deception is actionable under the TCPA and knowing

deception is fraud.  A review of the business cards attached at Exhibit 13 show that all of them

are emblazoned with "Toshiba" and it is undisputed that no one told De Soto about DLL until

after de-installation, when DLL popped out from its hiding place to announce to Defendants

"that they are not dealing with the manufacturer; they are actually dealing with a third-party

finance company."  Ex. 23 at page 197, lines 4-6 (emphasis added).  Moreover, that third-party

does not care about the equipment problems, and is claiming that it must be paid "come hell or

high water."  Id.  In another bid to justify their actions, TAMS asserts that there is no evidence

that the secret points payment was passed on to DeSoto.  TAMS Br. at 11.  That statement is

false.  As Dana Pinner testified, that payment results in an inflated rate for the customer. Ex. 24

at page 10, lines 6-15.  TAMS then blames the victim, saying Defendants never asked for an

explanation of the components of the interest rate--the commercial equivalent of "don't ask, don't

tell."  TAMS also posits that the MCPFA (which DeSoto never saw) allowed DeSoto to finance

any way it wished.  There is no evidence that that option was disclosed, likely because DeSoto thought it was financing with Toshiba (as TAMS and DLL desired it would think) and it would not be in TAMS' and DLL's best interest to steer DeSoto elsewhere for financing.  Indeed, DLL's 30(b)(6) representative testified that would "likely be true" that private label financing limits the questions the customer may ask about financing.  Ex. 25 at page 58, lines 3-10.

Remarkably, TAMS whines that Defendants have charged it with fraud for "0.25% of the amount financed," an "amount not sufficiently material to justify DeSoto's repudiation of its $2.5 million lease."  TAMS Br. at 12, n. 21.  So, apparently a little fraud is OK, so long as TAMS makes its millions.

One of TAMS' final arguments fits squarely within the parameters of the TCPA. TAMS argues that De Soto purchased the equipment "as is." TAMS Br. at 14.  For the reasons set forth in the TCPA section below, such disclaimers do not shield a seller from liability under the TCPA.  Similarly, TAMS argues that Defendants cannot measure damages against TAMS by the supposed obligations under the lease.  TAMS got $2.5 million for the equipment, DLL has the equipment and Defendants have nothing --except months of problems with TAMS' equipment.  Nowhere in TAMS' brief does it disclose that the equipment had numerous problems.  Dr. Carvel simply cannot be criticized for wanting her $2 million investment to work properly.  TAMS also avers that DeSoto had no damages from any breach of warranties.  Of course TAMS fails to mention that Dr. Carvel was forced to purchase a second set of equipment at further expense because TAMS' equipment just did not perform.

With these facts in mind, De Soto addresses each of the tort claims in turn. Both DLL and TAMS move to dismiss Defendants' fraud claims.  DLL argues that Defendants' fraud claim against it fails for two reasons:  conversations prior to signing the Master Lease, which has

an integration clause, are barred by the parol evidence rule, thus there is no fraud in the inducement; and DLL's payment of an undisclosed fee to TAMS was in accordance with the terms of a contract between them and therefore not a basis for a fraud claim by Defendants.

Similarly, TAMS argues that Defendants' claim that TAMS' and DLL's representations that TAMS was a single source for sales, service and financing were false material misstatements that Defendants relied on cannot stand because there was a "private label" relationship between DLL and TAMS.  TAMS also claims that "private label" arrangements are common and lawful, particularly in Tennessee.  In addition, TAMS argues that Defendants cannot prove all elements of a fraud claim, specifically that the statements Defendants claim are false (that TAMS was a single source for sales, service and financing) are in fact true, that Defendants have suffered no damages and that TAMS had no duty to disclose that DLL was the entity supplying the financing under a private label relationship.

*a.        Parol Evidence Is Admissible On The Facts Of This Case.*

If the Master Lease Agreement is ineffective, then there is no written, integrated contract and no parol evidence issue.[9]  Moreover, if the contract terms are not effective, Tennessee law should apply to both contract and tort issues because, as set forth in the conflict of laws analysis above, all activities relating to the contract occurred in Tennessee.  Under Tennessee law, fraud creates an exception to the parol evidence rule.  See, e.g., Haynes v. Cumberland Builders, Inc. 546 S.W.2d 228, 231 (Tenn. Ct. App. 1976) (parol evidence rule has no application to a case involving a fraudulent misrepresentation which induces the execution of a contract).

---

[9]       For the reason set forth below describing the Tennessee Consumer Protection Act ("TCPA"), even if the Master Lease Agreement survives, parol evidence will not bar prior misrepresentations for purposes of a claim under the TCPA.

If the Master Lease survives summary judgment, then there is a factual issue as to whether or not statements made prior to formation are a part of that contract, a situation specifically mentioned in <u>Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc</u>., 94 F. Supp. 2d 589 (E.D. Pa. 1999), a case cited by DLL.  In citing <u>Coram</u>, DLL quotes sections helpful to itself while missing critical distinguishing factors literally right between the text it quotes. Specifically, at pages 16-17 of its brief, DLL quotes language purportedly similar to the language of the Master Lease Agreement in this case regarding integration clauses and how they could preclude parol evidence. The next line, which is missing from DLL's Brief, reads as follows: *"[T]he presence of these integration clauses is not dispositive."* <u>Id</u>. at 595 (emphasis added). <u>Coram</u> goes on to say that the "fact that the prior representations and oral agreements alleged by Coram 'are specifically dealt with in the written contract' also indicates full integration…" <u>Id</u>.

Pennsylvania has an exception to the parol evidence rule, and that is for claims of fraud in the execution of the contract.  <u>See</u> <u>Horizon Unlimited, Inc. v. Silva</u>, 1998 U.S. Dist. LEXIS 2223, at *11-12 (E.D. Pa. 1998); <u>Regent National Bank v. Dealers Choice Auto. Planning</u>, 1997 U.S. Dist. LEXIS 19219 (E.D. Pa. November 26, 1997) at *15; <u>HCB Contractors, v. Liberty Place Hotel Assocs</u>., 652 A.2d 1278 (Pa. 1995).  Fraud in the execution may occur, for example, when a party executes an agreement because it was led to believe that the document being signed contained terms that were in fact omitted.  <u>See</u> <u>Straight Arrow Prods. v. Conversion Concepts, Inc.</u>, 2001 U.S. Dist. LEXIS 19859 (E.D. Pa. December 3, 2001) at *14. The parol evidence rule is not applicable where the parol testimony establishes that the written contract did not come into existence because a condition precedent to its existence as a contract never occurred.  <u>See</u> <u>Lewis v. Mears</u>, 297 F.2d 101 (3d Cir. 1962).  For the reasons set forth above, and in Defendants' Summary Judgment Motion, that is the situation here.

In this case DLL points out that the Defendants assert that there are contract terms that they believed were incorporated that were not. Specifically, DLL says that Defendants believed that the Lessor would respond if problems arose with the equipment. Thus even DLL recognizes that there is a factual issue whether any prior statements are part of the contract resulting in full integration and as a result summary judgment is not appropriate.

In Tennessee, as in Pennsylvania, the parol evidence rule serves to secure the integrity of contracts. However, in Tennessee, unlike Pennsylvania, the application of the parol evidence rule includes many exceptions. See Huffine v. Riadon, 541 S.W. 2d 414 (Tenn. 1976); see also 32A C.J.S. Evidence § 1194. One such exception to the parol evidence rule is that extrinsic evidence is admissible to show fraud or mistake. Id. When parol evidence is offered not to vary or disavow the terms of the contract, but to show an alleged fraud, the Tennessee courts are hesitant to exclude the evidence. See Maxwell v. Land Dev., Inc., 485 S.W. 2d 869, 877 (Tenn. Ct. App. 1972); Rentenbach Eng'g Co. v. General Realty, Ltd, 707 S.W. 2d 524, 527 (Tenn. Ct. App. 1985); Decatur County Bank v. Dick, 969 S.W. 2d 393, 397 (Tenn. Ct. App. 1997). As the court in Textron Financial Corp. v. Powell, No. N2001-02588-COA-R3-CV, 2002 Tenn. App. LEXIS 713 at *14, (October 8, 2002) noted, the "rule has been considerably relaxed by the courts 'in order that fraud may be thwarted, mistakes corrected, accidents relieved against, trusts set up and enforced, and usury exposed and eliminated.'" (citations omitted).

Tennessee also recognizes claims of fraud in the inducement which occurs when a party claims representations were fraudulently made and that but for them the party would never have entered into the agreement, see Haynes v. Cumberland Builders, Inc., supra, and claims for promissory fraud which embodies a promise of future action without the present intention to carry out the promise. See Shahrdar v. Global Hous., Inc., 983 S.W.2d 230, 237 (Tenn. Ct. App.

1998).  Whether a party has a present intent to defraud another is a question of fact.  <u>Keith v.</u>

<u>Murfreesboro Livestock Mkt., Inc.</u>, 780 S.W.2d 751, 754 (Tenn. Ct. App. 1989).

      In sum, parol evidence is admissible in this case.

      *b.*     *DLL's Secret Payment to TAMS.*

      DLL also asserts that its payment of an undisclosed $ 8,424.37 fee to TAMS was

proper because DLL and TAMS agreed together that it would be paid.  Unfortunately, neither

company disclosed the secret fee to Defendants.  DLL analogizes the fee to a broker's

commission.  It is undisputed that the fee was paid from DeSoto's funds (Ex. 24 at page 10,

lines 6-9).  A broker's commission would be paid from a buyer's funds.  The difference, of

course, is that in the case of a broker's commission, it is disclosed on the settlement sheet at

closing.  Here, no disclosure of the secret payment was made.  DLL employee Dana Pinner

testified that the customer's rate is inflated to cover the points and that the customer would not

necessarily know that.  <u>Id</u>.  It is submitted that this payment is more like a kickback than a

commission, particularly because DLL itself was hidden from Defendants.  In regard to the

secret payment, both TAMS and DLL state that DeSoto was "offered lease terms that it

accepted" or "accepted the terms of financing" (DLL Br. at 18, TAMS Br. at 39) and avers that

DeSoto was not charged more than it agreed to pay.  <u>Id</u>.  This reasoning begs the question of

whether DeSoto would have agreed to accept the terms if it had known of the fee, and is

ineffective to support a summary judgment motion.  Clearly if a payment was secret, any

decisions made about it were not "accepted," rather the decision was imposed.  There is a factual

issue as to whether this payment is a fraud on Defendants.

      *c.*     *Private Label Agreements.*

      After making the sweeping statement that private label agreements are

commonplace and are recognized "throughout the country" TAMS cites no law to support its

claim. TAMS Br. at 35.  TAMS then claims that two states have "expressly" declared that such arrangements are "fair and lawful," and that those states are Alabama and Tennessee. Unfortunately for TAMS, the one case found in Alabama addressing a "private label" issue, was reversed by the appellate court after a lower court entered summary judgment, finding that it was a question of fact as to whether there was a duty to disclose the private labeling.  TAMS, of course, did not mention that in its Brief.

        In <u>Cowen v. MS Enterprises, Inc</u>., 642 So. 2d 453 (Ala. 1994), the Supreme Court of Alabama reversed the trial court's entry of summary judgment because a material issue of fact existed.  Dr. Cowen had paid a fee to MS on the assumption that MS manufactured their own product.  In fact, the product was some else's product made for MS under private label.  MS neglected to tell Dr. Cowen this, notwithstanding the $25,000 association fee she was charged to acquire the product.  The court held that "the defendants misrepresented Medslim as a 'unique product' when in fact the product was available under a different name.  Therefore, the jury could reasonably determine that the defendant's failure to disclose the repackaging— 'private labeling'—of Medslim until after Cowen had paid the association fee, if such a failure occurred, was a concealment of a material fact."  The court also noted that the Alabama Code provided that "suppression of a material fact which the party is under an obligation to communicate constitutes fraud."  <u>Id</u>. at 457.  Finally, in contravention of TAMS' argument that private labeling is an accepted practice, the court held that the question as to whether MS had a duty to disclose the repackaging before Dr. Cowen joined the business is a factual question for the jury.  <u>Id</u>.

        Similarly, the laws of both Pennsylvania and Tennessee require the public registration of fictitious names or assumed names of companies.  <u>See</u> Defendants' Motion to Dismiss; T.C.A. § 48-14-101(d)(2) (a corporation authorized to do business in Tennessee may

adopt an assumed corporate name, but may not transact business in that name without registration). There is no dispute that DLL did not properly register either TAMC or Toshiba America Medical Credit in either Pennsylvania or Tennessee but proceeded to do business with Defendants anyway, misleading Defendants as to who it really was. Even the current TAMS' web site makes it appear that TAMC is TAMS. Ex. 26. It can be inferred that DLL made a deliberate decision to avoid publicly disclosing its true name. Private labeling is simply not a secret use of a name that could be used as a means to defraud. Nor is it to be used as a subterfuge when there is a legitimate contractual dispute.

> d.    *There is a Factual Issue Whether TAMS Had a Duty to Disclose DLL.*

Like the Cowen defendant, TAMS also argues that there was no duty to disclose that DLL was in the deal. TAMS Br. at 40. After citing several cases, none of which holds that whether there is a duty to speak is a matter of law and therefore a matter for summary judgment, TAMS states, with no legal support, that private labeling is recognized to be "entirely lawful" and there is no duty to disclose. TAMS also points to the availability of legal counsel to Dr. Carvel prior to her entering into any agreements. Of course that legal counsel was similarly misled, there is no evidence that TAMS disclosed DLL to counsel. Nothing in the documents would indicate to counsel that DLL was an undisclosed third party in the deal. The Tennessee Supreme Court has held that "each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it." Simmons v. Evans, 185 Tenn. 282, 206 S.W.2d 295, 296 (Tenn. 1947). Whether or not there is a duty to disclose is, as TAMS concedes, based upon the relationship between the parties and the scope of one party's reliance on the other, leaving factual issues that must be decided by a jury.

A case from Tennessee is instructive.  Hughey v. Rainwater Partners, 661 S.W.2d 690, 691 (Tenn. App. 1983) holds that "Where a broker acts as an intermediary between a seller and a purchaser, the broker is under a duty to deal fairly and honestly with both parties."  In its brief at pages 37-38 and footnote 40, TAMS declares it was what it purported to be, a single source for sales, service and financing.  Then it tries to define that statement to avoid liability here and says it "supplied equipment from the manufacturer, provided service options to be performed by [TAMS] personnel and provided financing to its customers through its Program Agreement with DLL, d/b/a as TAMC."  If indeed TAMS was simply an intermediary putting the pieces together, that fact was never revealed to defendants, as TAMS admits.  TAMS knew that a single source was important to defendants, and TAMS also admittedly knew that it was omitting to tell defendants relevant information in that regard.  "As a general rule, a party may be held liable for damages caused by his failure to disclose material facts to the same extent that a party may be liable for damages caused by fraudulent or negligent misrepresentation."  Gray v. Boyle Inv. Co., 803 S.W.2d 678, 683 (Tenn. App. 1990) (quoting Macon County Livestock Market, Inc., v. Kentucky State Bank, Inc., 724 S.W.2d 343, 349 (Tenn. App. 1986)).  Finally, if there was a single source, there would have been no secret points payment from the financing source to the sales source.

In this case the contract documents were essentially nonnegotiable.  TAMS insisted that it was a single source for all of Defendants' needs.  Ex. 15 at page 114, lines 13-20.  Here, it is clear that because of the secret information held by TAMS and DLL, those parties had the power to take advantage of Defendants, and did so.  As TAMS noted in its brief at page 36, "the private label agreement between TAMS and DLL worked exactly as it was supposed to."

Indeed it did, and the Defendants were misled.  As a result, whether TAMS and DLL had a duty to disclose is also a question for the fact finder.

>    **6.    Civil Conspiracy.**

DLL makes two arguments regarding civil conspiracy:[10] first that the MCPFA is proof that DLL and TAMS came together to "engage in a series of legitimate business transactions" and therefore summary judgment should be granted.  DLL relies on Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A. 2d 466 (1979) (holding that summary judgment was proper where an appellant failed to indicate any fact that would substantiate the allegation that the attorney there combined with others with unlawful intent to injure).  Next, DLL argues that Defendants have not shown malice on the part of DLL and/or TAMS and therefore summary judgment should be granted.  TAMS makes similar arguments, adding that the sole purpose of the conspiracy must be to harm Defendants.

In this case, the type of facts contemplated by Thompson Coal that are necessary to assign liability are abundant.  The MCPFA is an agreement to combine efforts which is kept secret from lessees.  DLL and TAMS have specific unlawful intent, i.e. their agreement is, in part, to create the false appearance that the financing program is a proprietary program of TAMS, Ex. 2 at page 16, § 6.1, when in fact it was a pact between TAMS and DLL to covertly work together.  DLL did not register TAMC or Toshiba America Medical Credit as a fictitious or assumed name either in Pennsylvania or Tennessee.  Registration is required in both states.  Defendants simply had no way of learning that TAMC was really DLL, not TAMS.  In addition, Defendants' principals were informed that TAMS was a single source of sales, service and

---

[10]    In several footnotes in TAMS' brief, it claims that certain defendants have made no allegations against TAMS and therefore summary judgment is warranted.  On the contrary, fraudulent statements made to Lynn or Randon Carvel necessarily apply to Desoto, Delta Radiology and Zobar Properties because of the nature of these organizations and because of the guarantees signed by these defendants as a result of the actions of TAMS and DLL.

financing without disclosing DLL and, as set forth above, the companies worked together to secure the undisclosed $ 8,424.37 payment for TAMS from DLL. Ex. 27. The question of whether DLL and TAMS had unlawful <u>intent</u> in their combination is a factual issue requiring resolution by a jury.

DLL's second argument, and one of TAMS' arguments, relies on <u>Shaffer v. Proctor & Gamble</u>, 412 Pa. Super. 630, 604 A.2d 289 (1992) for the proposition that Defendants cannot prove malice. Whether or not DLL and TAMS acted with malice is certainly a fact in dispute. While "malice" is a requirement for proving civil conspiracy in Pennsylvania, <u>Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc.</u>, 931 F. Supp 377, 386 (E.D. Pa. 1996), it is a term only secondarily mentioned in some Tennessee cases on the issue, <u>see</u>, <u>e.g.</u>, <u>Merritt v. Wilson County Board v. First American National Bank</u>, 656 S.W.2d 846 (Tenn. Ct. App. 1983); <u>Frankenbach v. Rose</u>, No. M2002-02073-COA-R3-CV, 2004 WL 221319 (Tenn. Ct. App. Nov. 6, 2003). There is no requirement in Tennessee law that a party prove "malice" as an essential element of civil conspiracy. <u>Frankenbach</u>, <u>supra</u> (holding that a civil conspiracy is a "combination between two or more persons to accomplish, by concert, an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.") (citation omitted); <u>Lipman v. First National Bank</u>, No. 01A01-9803-CH-00139, 1999 WL 51875 (Tenn. Ct. App. Feb. 5, 1999) (same). Nevertheless, there is malice aplenty in this case. Three examples will suffice. Toshiba knew in March of 1999 that the Digital Gamma Camera Systems had a problem. In fact the FDA Enforcement Report dated March 3, 1999 listed a recall on that piece of equipment. The reason listed was "the detector's motion not stopping, and therefore, the patient may receive an injury from the force." TAMS sold this equipment to defendants anyway without revealing the problem and the machine crushed one of Dr. Carvel's elderly patients.

((Ex. 29)  Next, Don Flassing testified that the reason Toshiba used private label financing is that it likely reduces the questioning from the customer regarding who the financier is.  When asked if it was fair to say that it might benefit Toshiba because the customer would feel like they were dealing with a single source for sales, service and finance, Mr. Flassing responded "I believe that would be an accurate assessment."  (Ex. 25 at p. 58-59)  Finally, Dave Steiff, a Toshiba sales rep, spoke at length about making misrepresentations to customers and said that Dr. Carvel was not an isolated incident.  (Ex. 15 at p. 181-188)  DLL's and TAMS' intent and whether they had malicious intent is a question for the jury.

### 7.    **Implied Covenant of Good Faith and Fair Dealing**.

It is well-settled under the UCC that there is an implied duty of good faith and fair dealing which must be read into, and become part of, Defendants' claims for breach of contract.  TAMS has stated that this agreement is governed by the UCC.  TAMS Br. at 30.  Section 1203 of Pennsylvania's adoption of the UCC specifically provides, "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."  13 Pa. C. S. § 1203.  Though this Count was not as artfully titled as it could, or should, have been, this Count was pled as an additional breach of contract action, and covers some breaches of contract by TAMS not covered by Count I of Defendants' Counterclaims, as well as pleading a breach of contract action against DLL.  As neither TAMS nor DLL have satisfied their initial burden to entitle either to summary judgment on this Count, and merely relied on the title of the Count rather than the notice of the claims provided in the Count, it must advance.

### 8.    **Tennessee Consumer Protection Act**.

TAMS complains that Defendants do not have a claim under the Tennessee Consumer Protection Act ("TCPA") arguing that the only possible claim would be one that attacks the agreement between DLL and TAMS, which TAMS styles as the private label

agreement. TAMS also avers that even if a claim could be made, Defendants have suffered no damages.[11] DLL additionally argues that the TCPA applies only to acts that take place in Tennessee, that private label agreements are excluded from the TCPA and that the statute of limitations bars this claim.

TAMS points to provisions in the TCPA that it claims make private labeling "not an unfair or deceptive practice" TAMS Br. at 46. The subdivisions cited, § 47-18-104(b)(2) and (3), provide that causing confusion or misunderstanding in certain instances is deceptive, but "does not prohibit the private labeling of goods and services." This language is a far cry from declaring private labeling "fair" or "nondeceptive." Rather only those two provisions out of the entire list of possible deceptive acts simply say they do not prohibit private labeling.

TAMS neglects to refer to the definitions of "goods" and "services" in § 47-18-103. "Goods" are tangible chattels. Here the equipment did not contain a private label, it was what it purported to be—imaging equipment from Toshiba--therefore that definition does not apply in this case. "Services" is defined as "work, labor or services including services furnished in connection with the sale or repair of goods…" Here, there was no sale of goods, rather there was a lease. While there was an ineffective attempt at a repair of goods, there is no dispute that was performed by TAMS. It is unclear from TAMS' brief how the facts of this case fit into the restrictions of the definitions. Moreover, there certainly are other provisions of the TCPA that apply to this case, a sampling of which are set forth below:

> (b)(1) Falsely passing off goods or services as those of another
> (b)(5) Representing that goods or services have sponsorship, approval, characteristics,…that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have
> (b)(27) Engaging in any other act or practice which is deceptive to the consumer or to any other person

---

[11]     Damages are briefed separately below.

Therefore, the two provisions cited by TAMS to absolve it from liability under the TCPA by the use of private labels, are not sufficient to do so.

Both DLL and TAMS argue that Pennsylvania law should apply to tort claims in this case because that is the forum set forth in the ineffective Master Lease Agreement. However, the provisions of the TCPA specifically anticipate, and defeat such an argument. At Section 47-18-113(b) it states: "Any provision in any agreement or stipulation, verbal or written, restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state with respect to any claim arising under or relating to the Tennessee Consumer Protection Act and related acts set forth in this title is void as a matter of public policy…" This state law provision requires that the tort claims be decided under Tennessee law.

"The Tennessee Consumer Protection Act is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." Morris v. Mack's Used Cars, 824 S.W.2d 538, 540 (Tenn. 1992); Tenn. Code Ann. § 47-18-102(2) (1995). The Act was enacted "to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce…, [t]o encourage and promote the development of fair consumer practices; [and]…[t]o declare and to provide for civil legal means for maintaining ethical standards of dealing between persons[12] engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state." Id.

In Morris, the seller sold the purchaser a truck "as is." The seller knew it was a reconstructed vehicle which reduced the fair market value 30 to 50 percent. The seller's defense

---

[12] The definition of "person" means a natural person, individual, governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized. Tenn. Code Ann. § 47-18-103(9)

was that the disclaimer contained in the bill of sale protected it from liability under the TCPA.

The Tennessee Supreme Court ruled that the Uniform Commercial Code imposes an obligation

of good faith in the performance of every contract which may not be disclaimed, and that

disclaimers permitted by Tenn. Code Ann. § 47-2-316 (Tennessee's codification of the UCC

sales provisions) do not defeat separate causes of action under the TCPA.  The court stated:  "to

allow the seller here to avoid liability for unfair or deceptive acts or practices by disclaiming

contractual warranties under the U.C.C. would contravene the broad remedial intent of the

Consumer Protection Act."  A case decided by the Tennessee Court of Appeals after <u>Morris</u> held

that an "as is" disclaimer does not effectively disclaim all prior representations under the TCPA

as a matter of law.  <u>Smith v. Scott Lewis Chevrolet, Inc.</u>, 843 S.W.2d 9 (Tenn. App. 1992).

      The Tennessee Supreme Court has made it clear that the liability provisions and

remedies codified in the TCPA cannot be waived by any contract or agreement, including

warranties.  It held that to allow the seller in <u>Morris</u> to "avoid liability for unfair or deceptive acts

by disclaiming contractual warranties under the UCC would contravene the broad remedial intent

of the Consumer Protection Act." <u>Id</u>. at 540; <u>see also</u> Tenn. Code Ann. § 47-18-113.  In sum,

warranty disclaimers do not prevent application of the TCPA as it is a separate and distinct cause

of action for unfair or deceptive acts or practices.

      The Tennessee Legislature did not define "unfair" and "deceptive" in the TCPA.

The Tennessee Supreme Court has held that the same definition does not apply in every case,

"consistent with the varying provisions of the Act defining unfair and deceptive acts in particular

situations."  <u>See</u> <u>Ganzevoort v. Russell</u>, 949 S.W. 2d 293 (Tenn. 1997) (citation omitted).  <u>Smith</u>

found that an unfair or deceptive act need not be willful or knowingly made to recover actual

damages under the TCPA, that the Act also contemplates negligent conduct and that a jury could

find that negligent misrepresentation constituted "any other act or practice which is deceptive to the consumer." Smith, supra, at 12-13 (citing Haverlah v. Memphis Aviation, Inc. 674 S.W.2d 297 (Tenn. App. 1984)); see also Menuskin v. Williams, 145 F.3d 755, 767-68 (6th Cir. 1998) (TCPA does not require deceptive intent and plaintiff may recover damages even for negligent violations). As a result, summary judgment cannot be entered because necessary facts in this case are disputed.

    *a.*   *Acts Within Tennessee and the Statute of Limitations.*

    DLL argues that no acts occurred in Tennessee. On the contrary, as set forth in the Conflict of Laws Section above, most of the representations meant to mislead defendants occurred in Tennessee. DLL also argues that Defendants' TCPA claim must be dismissed on statute of limitations grounds. DLL cites the one year limitation in § 47-18-110 and declares that Defendants filed its TCPA counterclaim on September 22, 2003, over a year after DLL says Defendants discovered DLL's and TAMS' deceptive practices on or about March 15, 2002. That is the date when DLL admits it sent a letter to Defendants stating that Toshiba Medical Credit (whoever that is) assigned DeSoto's lease to DLL. See Ex. 7. That, of course, was untrue because DeSoto did not have a lease with "Toshiba Medical Credit." Then, in March 2003 (clearly within one year of the filing of Defendants' Amended Counterclaims), DLL sent another letter stating that the contract with "Toshiba America Medical Credit, a program of" TAMS had been assigned to DLL as "purchaser". Ex. 8. That also was untrue. At a minimum there is a factual issue as to when Defendants discovered it had been deceived and summary judgment is not appropriate. Fraudulent concealment will toll the statute of limitations for a TCPA claim. See French v. First Union Securities, 209 F. Supp. 2d 818, 826 (M.D. Tenn. 2002).

    In addition, DLL fails to mention that Defendants filed its original answer and counterclaims on August 15, 2002, about 5 months after Defendants received the March 2002

letter.  Within the allegations of the counterclaim was the conduct and transaction at issue as well

as a fraud claim.  Defendants amended their counterclaims on September 22, 2003 asserting

additional claims, including a claim under the TCPA.  Federal Rule of Civil Procedure 15(c)

allows relation back of amendments if they arise out of the same "conduct, transaction, or

occurrence set forth or attempted to be set forth in the original pleading…."  Id.  Accordingly,

Defendants' TCPA claim is not barred by the statute of limitations.

### 9.      **Declaratory Judgment.**

TAMS declares at pages 47-48 of its brief that Defendants are not entitled to a

declaratory judgment because Defendants did not properly revoke, and in fact could not revoke

because the Master Lease Agreement is a finance lease which bars revocation.  On the contrary,

for the reasons set forth above, the Master Lease Agreement, if it is anything, is certainly not a

finance lease.  Under the UCC, 13 Pa. C.S. § 2A517 or T.C.A. § 47-2A-517, Defendants have

the right to revoke, and they did.  See Ex. 28.  Therefore, it is Defendants who are entitled to a

declaratory judgment because TAMS does not argue that Defendants did not revoke (nor can

they), they only argue that Defendants could not revoke because the lease was a finance lease.

TAMS does not even inform the Court that even finance leases can be revoked.  See 13 Pa. C.S.

§ 2A517; see also Comments to 13 Pa. C.S. § 2A407.  A decision on whether to entertain a

declaratory judgment falls squarely within a trial court's discretion, which has been described as

"very wide."  Southern Fire & Cas. Co. v. Cooper, 200 Tenn. 283, 292 S.W.2d 177, 178 (1956).

The primary purpose of a declaratory judgment is to settle and afford relief from uncertainty with

respect to right and other legal relations.  Defendants revoked the equipment and are entitled to a

declaratory judgment to this effect.

10.    **Damages.**

In Lorentz v. Deardan, 834 S.W.2d 316 (Tenn. App. 1992) buyers brought an action for recission based upon misrepresentation.  In that case the court measured actual damages by the recission amount in awarding damages under the TCPA.  One of the issues in Lorentz concerned the meaning of actual damages under that statute.  See TCPA at § 47-18-109(a)(1).  Recission is available under the TCPA.  See, e.g. Haverlah v. Memphis Aviation, Inc., 674 S.W.2d 297 (Tenn. App. 1984).  The Lorentz court found, relying on the opinion in Spence v. Moody, No. 86-198-II, 1987 WL 20039 (Tenn. App. Nov. 18, 1987), that the measure of damages in actions for rescission based upon common law fraud, breach of warranty, or violations of the TCPA differs from the measure of damages applicable to breach of contract actions.  A purchaser may pursue its UCC remedies as well as its non-Code remedies.  In addition to actual damages the TCPA empowers a court to grant whatever additional relief it deems necessary and proper.  Id. at 318-319.  Thus a defrauded buyer in Tennessee has an "absolute right" to rescind a contract of sale and is entitled to recover the purchase price paid.  Id.

A recent case, Shin Yi Lien v. Couch, 2004 Tenn. App. LEXIS 108, M2002-01625-COA-R3-CV (Tenn. App. Feb. 23, 2004), also discussed the measure of damages in a contract action where misrepresentations were made before the purchase of emu chicks.  The Lien court noted that a claim under the TCPA is a distinct cause of action.  It highlighted Dixon v. Bryan, 1998 Tenn. App. LEXIS 847, No. 01A01-9707-CV-00371 (Tenn. Ct. App. Dec. 15, 1998) where the court considered a defendant's claim that the plaintiff's execution of the contract precluded recovery for deceptive acts based upon notice in the contract of the allegedly misrepresented fact.  The Lien court held that even though the plaintiffs paid only the deposit on a contract, their loss could be the entire contract amount.

> The jury found that Big Ridge's unfair or deceptive practices, such as the "bait and switch" violation, caused a loss to the Liens. That loss originated in the contract…The fact that they had not paid the full contract price before trial should not preclude their recovery since the contract was not rescinded and they have an enforceable obligation to pay it…

Lien, supra, at *26.

In Tennessee, it has been held that an individual induced by fraud to enter into a contract may elect between two remedies. He may treat the contract as voidable and sue for the equitable remedy of rescission or he may treat the contract as existing and sue for damages at law under the theory of deceit in the ordinary case. The former is a contract action, while the latter is grounded in tort. Justice v. Anderson County, 955 S.W.2d 613, 616 (Tenn. App. 1997) (citing Vance v. Schulder, 547 S.W.2d 927, 931 (Tenn. 1977). The plaintiffs in this case sought both contractual remedies and compensatory and punitive damages, for example under the TCPA.

The Restatement (Second) of Torts at § 549 sets forth the proper measure of damages for fraudulent misrepresentation. In a case of fraud, the measure of damages is to compensate the injured party for actual damages by attempting to place that party in the same position that he or she would have been in had the fraud not occurred. See Harrogate Corp. v. Systems Sales Corp., 915 S.W.2d 812, 817 (Tenn. App. 1995). This does not end the analysis, however, for in Tennessee "a party may be held liable for damages caused by his failure to disclose material facts to the same extent that a party may be liable for damages caused by fraudulent or negligent misrepresentations." Macon County Livestock Mkt. Inc. v. Ky. State Bank, Inc., 724 S.W.2d 343, 349 (Tenn. Ct. App. 1986) (citations omitted).

Therefore, based on the factual disputes about damages TAMS acknowledges in its brief (and listing what it purports to be a complete list of what Defendants are and are not

claiming as damages at pages 18-20, but omitting to include the sums paid or to be paid for the

equipment, which were also mentioned in Defendants' answers to interrogatories at 15—see

TAMS Ex. 30 at page 9), the ineffectiveness of the Master Lease, Tennessee tort law and the

warranty issues briefed above, there are significant factual issues in dispute, barring summary

judgment.

## V.     CONCLUSION

        For the reasons set forth above, Defendants respectfully request that this Court

deny the respective Motions for Summary Judgment by TAMS and DLL directed against

Defendants, and grant such further relief as the Court deems appropriate.

                Respectfully Submitted,


                By:        WM782
                     William Matthews
                     Signature Code WM782
                     For SAUL EWING LLP
                     Center Square West
                     1500 Market Street, 38th Fl.
                     Philadelphia, PA 19102-2186
                     (215) 972-7106

                     Kyle P. Tate
                     for TATE LAW FIRM
                     9085 Sandidge Center Cove
                     Olive Branch, MS 38654
                     (662) 893-8833

                     Lynanne B. Wescott
                     The Wescott Law Firm P.C.
                     Two Penn Center Plaza,
                     Suite 200
                     Philadelphia, PA 19102
                     (215) 755-6330

                     Attorneys for Defendants
                     DeSoto Diagnostic
                     Imaging, LLC, *et al*

Dated:  April 29, 2004

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am this day serving a copy of the attached Defendants' Opposition To De Lage Landen Financial Services, Inc.'s Motions For Summary Judgment Against Guarantor Defendants and Against All Defendants, and to TAMS' Motion For Summary Judgment upon the persons and in the manner indicated below:

Service by *hand delivery* to:

      Mr. John Chesney
      Ms. Julianne Peck
      Mr. Jonathan Sturz
      DRINKER BIDDLE & REATH LLP
      One Logan Square
      18th & Cherry Streets
      Philadelphia, PA 19103-6996

      Mr. Peter Boyer
      Ms. Rosetta B. Packer
      MCCARTER & ENGLISH, LLP
      Mellon Bank Center, Suite 700
      1735 Market Street
      Philadelphia, PA 19103-7501

                              WM782
                        William Matthews

Dated: April 30, 2004