**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DELAGE LANDEN FINANCIAL SERVICES, INC.,
Plaintiff,

TOSHIBA AMERICA MEDICAL SYSTEMS, INC.
Plaintiff/Intervenor,

v.

DESOTO DIAGNOSTIC IMAGING, LLC., RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC

Defendants.

CIVIL ACTION NO. 2:02CV2810

HON. RONALD L. BUCKWALTER

**ORDER**

AND NOW, this _______ day of ___________, 2004, upon consideration of the Motion of Plaintiff De Lage Landen Financial Services, Inc. for Partial Summary Judgment against Toshiba America Medical Systems, Inc. ("TAMS") and TAMS' opposition thereto, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

______________________________
Ronald L. Buckwalter, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC., Plaintiff, | : | CIVIL ACTION NO. 2:02CV2810 |
| | : | HON. RONALD L. BUCKWALTER |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC. Plaintiff/Intervenor, | : | |
| v. | : | |
| DESOTO DIAGNOSTIC IMAGING, LLC., RANDON J. CARVEL, LYNN T. CARVEL, DELTA RADIOLOGY, P.C. and ZOBAR PROPERTIES, LLC Defendants. | : | |

**TOSHIBA AMERICA MEDICAL SYSTEMS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff De Lage Landen Financial Services, Inc. ("DLL") has moved for partial summary judgment on three Counts of its Crossclaim against Plaintiff-Intervenor Toshiba America Medical Systems, Inc. ("TAMS"). Specifically, DLL argues that it is entitled to judgment on Count I of its Crossclaim (which seeks to recover a $375,000 "recourse" obligation) and on Counts X and XII of its Crossclaim which advance, respectively, contractual and common law indemnification claims for the full amount of "damages" that DLL might suffer in the event that Defendants' breach of the Master Lease and Guarantees were to be excused.

DLL's motion should be denied as it relates to TAMS' claimed $375,000 "recourse" obligation because either: (1) TAMS' obligation to provide "recourse" is contingent, as a matter

of law, upon DLL's failure to obtain compensation in full from Defendants for their breach of their obligations to DLL or alternatively (2) the question of whether TAMS is obliged to provide "recourse" *whether or not* DLL is fully compensated for Defendants' breach is one of fact to be determined by the jury.

DLL's motion should be denied as it relates to Counts X and XII of the Crossclaim because it is not, in fact, a motion for summary judgment. By its terms, the motion asks the Court to enter a "judgment" as to what the situation will be "if" certain things eventuate at trial. As such, the motion is either a request for an advisory opinion or, perhaps more accurately, is in the nature of a request for jury instructions which should be addressed once the evidence in the case has been submitted. Simply stated, there is no basis for entering a "judgment" in DLL's favor on its indemnity claims at this point because only a trial can determine DLL's need for indemnity, the basis upon which any indemnity would be available and the scope of any available indemnity.

## II. FACTUAL BACKGROUND

DLL and TAMS agree that the Master Contract Financing Program Agreement (the "Program Agreement"), under which DLL agreed to offer financing to customers for Toshiba medical imaging equipment under the private label name Toshiba America Medical Credit ("TAMC"), governs the contractual relationship between them.[1] As contemplated by the Program Agreement, Defendant DeSoto Diagnostic Imaging, LLC ("DeSoto") leased a variety of Toshiba medical diagnostic imaging equipment from DLL (under the private label name TAMC). The other defendants, Randon J. and Lynn T. Carvel (DeSoto's principals), and Delta

[1] The Program Agreement was originally between TAMS and Tokai Financial Services, Inc. Tokai subsequently assigned all of its right, title and interest in this agreement to Plaintiff DLL.

Radiology and Zobar Properties, each executed and delivered Guarantees to DLL to secure Desoto's performance under the Lease.

The equipment was installed at DeSoto, and DeSoto began operations, on or about December 18, 2000. DeSoto used the equipment for the purpose of providing diagnostic imaging services for about fourteen months, then unilaterally de-installed all of the equipment (except the CT System) and defaulted on and repudiated its lease obligations to DLL. The CT system was later de-installed at the direction of DLL on account of DeSoto's breach of its obligations under the Master Lease.

**A. The "One-Off Recourse" Payment**

It is undisputed that, when DeSoto sought to acquire Toshiba equipment to operate its imaging facility, DLL required credit enhancements from TAMS as a condition of providing financing to DeSoto, which was a start-up business without any established track record.[2] The purpose of these credit enhancements was to limit or cap the risk that DLL would incur in providing financing to an untested, start-up company. The specific credit enhancements required by DLL in conjunction with the lease of equipment by DeSoto are set forth in the Program Application Approval Form, provided to TAMS by DLL pursuant to §2.1(b) of the Program Agreement.

As set forth in the Application Approval Form under the heading "Section II: Credit Support", DLL required TAMS to provide recourse to supplement DeSoto's credit application:

> TAMS to provide one-off recourse payment as follows: Months 1-24 in the amount of $375M; in months 25-36 in the amount of

[2] As the record shows, DeSoto received financing from DLL in large part because of the credit enhancements provided by TAMS. *See* Exhibit 1, March 9, 2004 Deposition of Kevin Abbott ("Abbott Dep.") at 13:7-25.

> $350M; in months 37-48 in the amount of $325M; and in months 49-54 in the amount of $175M.

(Exhibit 2, Application Approval Form).

In short, TAMS agreed to participate in the credit risk in an amount that would decrease as lease payments were made and as DLL's outstanding exposure on its loan to DeSoto correspondingly decreased. The main point, for present purposes, is that it is undisputed that the recourse undertaking was contemplated as a means by which TAMS would provide "*Credit* Support", *i.e.*, would participate in the risk that DeSoto would prove *unable* to make payments under the Master Lease.

**B. <u>Indemnification under the Program Agreement</u>**

Pursuant to the terms of the Program Agreement, DLL and TAMS agreed to indemnify each other for the occurrence of certain events in connection with the lease of medical equipment to DeSoto. § 9.1(a) of the Program Agreement sets forth TAMS' agreement and provides:

> TAMS agrees to indemnify and hold harmless TFS [DLL] and its affiliates, subsidiaries, employees, officers and agents from any and all losses, claims, liabilities, demands and expenses ("Losses") whatsoever (including without limitation, reasonable attorneys' fees) sustained by TFS [DLL] in connection with or in any way related to the breach by TAMS of any of TAMS [sic], warranties and representations.

(Exhibit 3, Master Contract Financing Program Agreement § 9.1(a)).

Basically, this provision contemplates that if TAMS is found to have breached any warranties and representations to DLL, TAMS will be required to indemnify DLL for damages resulting from such breach. At this point, it is undisputed that there has been no determination that TAMS breached any warranty or representation made to DLL, much less that any such breach has resulted in damage to DLL. Until such a determination is made (and TAMS believes no such determination will ever be made), DLL can have no right to "indemnity" and, therefore,

no right to a "judgment" against TAMS. In short, DLL's motion is premature and summary judgment cannot be granted in its favor on its claims for indemnification.

## III. APPLICABLE LEGAL STANDARD

Summary judgment is appropriate only where the moving party can demonstrate conclusively "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In addition, the Court must accept the non-movant's version of genuinely disputed facts as true, and resolve conflicts in the non-movant's favor. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Under these standards, DLL is not entitled to summary judgment against TAMS on any of its claims.

## IV. ARGUMENT

### A. DLL Is Not Entitled to Summary Judgment on Count I (Breach of Contract)

Recourse in the context of lease financing can take many forms. (*See* Exhibit 4, February 25, 2004 Deposition of Raymond Crouse at 28:9-14). In the DeSoto transaction, it took the form of an agreement by TAMS to provide credit support in the form of "one-off recourse." The Application Approval Form, which reflects this credit support, is silent as to what events and circumstances will trigger TAMS' obligation to make a recourse payment during "months 1-24."

DLL proffers one reading of this silence: according to DLL, if the lessee defaults, TAMS has an immediate obligation to pay DLL the recourse amount *regardless* of whether DLL can be, or is, made whole without "recourse" to any payment from TAMS. TAMS disagrees. TAMS, on the other hand, believes that its obligation is to indemnify DLL for any *actual* losses DLL

sustains up to a maximum of $375,000 if a default occurs in months 1-24 of the lease, but not to indemnify DLL for amounts that it is fully entitled and able to recover from the breaching lessee, DeSoto, and its guarantors. If *only* TAMS' interpretation is reasonable, DLL is not entitled to summary judgment because it remains to be seen whether it will be made whole by Defendants. If *both* DLL's and TAMS' interpretations are reasonable then DLL is not entitled to summary judgment because the issue of what circumstances give rise to an immediate obligation on TAMS' part to pay DLL is one for the trier of fact.

"Under Pennsylvania law, ambiguous writings are interpreted by *the fact finder*." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980) (applying Pennsylvania law) (citing *Brokers Title Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174 (3d Cir. 1979)) (emphasis added). Whether a contract is clear or ambiguous is a matter of law for the court to decide. *Id*. at 1011. As the Supreme Court of Pennsylvania has explained, "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 201, 519 A.2d 385, 390 (1986) (citations omitted). Thus, a court must look at the words of the agreement and the alternative interpretations offered by the parties to determine if both are reasonable in light of the circumstances surrounding the formation and completion of the agreement. *Id*. If both of the suggested meanings are reasonable, interpretation will be left for a fact finder, making summary judgment inappropriate. *Id.*

While DLL argues that "there is no ambiguity as to the meaning of the agreement as it relates to Plaintiff's claims for the recourse payment", and that TAMS is obligated to make the recourse payment simply because of DeSoto's "default under the lease within the first 24 months of the lease term", the parties' agreement does not compel this conclusion. Indeed, TAMS

would submit that DLL's interpretation is considerably *less* reasonable than the one TAMS proffers. In this regard, the Program Agreement contains no provision subrogating TAMS to DLL's rights against a defaulting lessee to the extent TAMS might "front" the "recourse" amount to DLL prior to any determination of whether DLL can be made whole by pursuing legal remedies against the lessee. Had the intention of the parties been that TAMS would pay the recourse amount to DLL regardless of whether DLL ultimately suffered any loss as the result of a default, one would have expected to see a subrogation provision in order to avoid the correlative risks (1) that DLL might enjoy a double recovery or "windfall" or (2) that TAMS might be required to provide "recourse" where DLL does not in fact suffer any ultimate loss.

It is TAMS' position that no subrogation provision appears in part because the recourse obligation was a *credit* enhancement, that is, it was intended to operate as a "stop loss" to ensure that DLL's *credit* risk was capped. Where a lessee defaults because it *cannot* pay (that is, because it proves not to have been creditworthy), DLL's loss is, by definition, certain and it is undisputed that, in such situations, TAMS has readily made agreed upon recourse payments to DLL. Here, however, DeSoto's default is not the result of any inabilility to pay; rather, DeSoto simply elected to repudiate its contractual obligation to make lease payments to DLL. Given that DLL has effective legal remedies for this deliberate breach of contract, it is not yet clear that DLL will ultimately suffer *any* loss as a result of DeSoto's breach that cannot and will not be fully compensated by a judgment against DeSoto.

DLL's own testimony recognizes that the recourse provision was principally intended to be a credit enhancement and that the facts of this case are highly atypical. Indeed, it is undisputed that the circumstances of DeSoto's default are unique in the experience of DLL and TAMS in dealing with each other under the Program Agreement. Prior instances of default

under lease transactions governed by the Program Agreement were the result of a lessee's *inability* to make lease payments due to financial constraints.[3] In those cases, the breach resulted in actual loss to DLL in that recovery from the lessee was not feasible.[4] In the present case, the circumstances are quite different. DeSoto was perfectly able to make the lease payments, was fully obliged to make such payments, but consciously elected to renege on its duty to do so. DeSoto's willful breach of its contractual obligation is something for which DLL can, and should, be made whole in this action.

In the past, TAMS has made recourse payments to DLL where a lessee has defaulted because of an inability to make further lease payments. In those cases, TAMS recognized that the recourse obligation was triggered because DLL suffered a loss upon default, since the lessee was unable (as opposed to merely unwilling, as is the case with DeSoto) to make payment.[5] Such payments merely recognized the purpose for which the recourse obligation was created – to put a cap on the *actual* losses that DLL could suffer. As Kevin Abbott, TAMS' Vice President, stated during his deposition: "[a]gain, in these other instances it's been from an inability to pay. There is these other customers, you weren't going to get any money out of them. Nothing has

---

[3] The fact that only DeSoto has been sufficiently brazen to renege on its absolute obligation to pay DLL what it owes despite its obligation to do so should not be particularly surprising, since the lease is a "hell or high water" lease that provides DeSoto with no excuse for repudiating its obligations.

[4] Donald Flassing of DLL readily acknowledged that "[t]he DeSoto transaction was different than the other transactions in terms of what caused the event of default." He further stated that "[a]lmost all defaults we deal with are a result of the inability of the customer to pay as opposed to equipment issues." Exhibit 5, February 25, 2004 Deposition of Donald Flassing at 54:8-11; 54:15-18.

[5] Raymond Crouse, DLL's Director of Litigation and Recovery, stated during his deposition that "[r]ecourse is – could come in a number of different ways and structures, but basically the – a third party guarantees a portion of the outstanding balance of a transaction to the lender." Exhibit 4, February 25, 2004 Deposition of Raymond Crouse at 28:9-14.

been brought to our attention in this thing that DeSoto did not have the wherewithal to fulfill their financial obligations of this lease contract. That is what's different about this transaction." Exhibit 1, Abbott Dep. at 36:10-17.

In the present case, DLL has a valid and enforceable lease agreement with DeSoto that contains a "hell or high-water" clause that makes DeSoto's obligation to pay DLL absolute as a matter of law.[6] DLL is, TAMS believes, fully entitled to recover the outstanding balance remaining under the Master Lease, together with any other legally cognizable damages, from DeSoto and/or the Guarantor Defendants pursuant to that contract. If DLL is able (as it should be) to collect all that it is owed under the Master Lease from DeSoto or DeSoto's Guarantors, TAMS should not be required to make any recourse payment because DLL will not have suffered any economic loss. Indeed, even DLL's witness, Mr. Flassing, recognized that TAMS was not *contractually* obliged to pay the recourse amount prior to a determination of whether DLL is able to obtain complete compensation from defendants.[7]

Had the parties intended that TAMS would "front" the amount of the recourse payment, the Program Agreement would surely have contained some form of subrogation agreement to

---

[6] DeSoto's obligations to pay the lease payments are absolute. The Master Lease states that "LESSEE'S OBLIGATION TO PAY SUCH LEASE PAYMENTS SHALL BE ABSOLUTE AND UNCONDITIONAL AND IS NOT SUBJECT TO ANY ABATEMENT, SET-OFF, DEFENSE OR COUNTER-CLAIM FOR ANY REASON WHATSOEVER." Exhibit 6, Master Lease Agreement ¶ 2.

[7] DLL appears to have acknowledged that TAMS does not have a *contractual* obligation to pay the recourse payment at this time. Donald Flassing testified that "I asked for the payment of the one-off recourse really as I guess a good faith between partners or partnership kinds of general business sorts of stuff." Exhibit 5, February 25, 2004 Deposition of Donald Flassing at 33:7-22. In light of the fact that DLL has yet to suffer an actual loss in regard to the unpaid balance under the Master Lease, it appears DLL viewed TAMS' payment of the recourse payment only as a "good faith" gesture between to two companies given their relationship under the Program Agreement, not a payment that was due to DLL as a matter of right.

ensure that, if TAMS paid DLL for a "loss" that it ultimately did not sustain, DLL would not be unjustly enriched at TAMS expense. No such provision exists, TAMS submits, because the intent of the parties was that the recourse obligation would be triggered by circumstances in which DLL's loss was real, actual and final. No such circumstances exist here and, as a matter of law, DLL's entitlement to recourse from TAMS has not ripened. Alternatively, there is an issue of fact as to how the Program Agreement should operate that must be decided by a jury (that is, TAMS' proffered interpretation of the agreement is, at a minimum, a reasonable one), so that summary judgment on Count I of DLL's Crossclaim must be denied.[8]

By way of final comment on this issue, TAMS notes that DLL's argument that TAMS is "judicially estopped" from contesting its obligations under the recourse payment provisions of the Application Approval Form mixes apples with oranges. TAMS has acknowledged that, depending upon whether DLL proves able to recover all it is legally entitled to recover from Defendants, TAMS might have a recourse obligation to DLL at some point. That, however is *all* that TAMS has acknowledged.[9] The issue before the Court on this motion is whether TAMS is obliged as a matter of law to make payment to DLL (1) immediately (2) in the full amount of its maximum recourse obligation (3) despite the fact that TAMS and DLL *both* believe that DLL is entitled as a matter of law to complete recovery of all of its legally cognizable damages from

[8] DLL further asks for prejudgment interest on the recourse payment beginning from June 23, 2002, the date on which DLL sent TAMS an invoice showing the recourse payment due. It has been TAMS' position all along that the DLL's right to recourse payment only matures in the event it is unable to recover from DeSoto the unpaid balance under the Master Lease, an event which has not yet occurred. Thus, prejudgment interest is not an issue the Court should consider at this juncture.

[9] TAMS' 30(b)(6) witness, Nadar Rad, acknowledged, as TAMS does in its pleadings, that "Toshiba may at some point in time – depending on the outcome of the matter –may have to pay a recourse payment to DeLage Landen." Exhibit 7, March 8, 2004 30(b)(6) Deposition of Nader Rad (taken by DeSoto) at 85:6-8.

Defendants. TAMS believes that it does not have such an obligation and has done nothing that would raise a judicial estoppel against its entitlement to maintain that position.

**B. DLL Is Not Entitled to Summary Judgment on Counts X and XII Because DLL's Claim For Indemnification is Premature and Contrary to Law**

DLL's motion for summary judgment on Count X (contractual indemnification) and Count XII (common law indemnification) of its Crossclaim against TAMS must also be denied. Most fundamentally, DLL's motion must be denied because it purports to seek a "judgment" against TAMS despite acknowledging that this "judgment" would be effective only upon the occurrence of certain hypothetical events that have not yet occurred and that may never occur. Specifically, despite the fact that it has not requested declaratory relief in its pleadings, DLL seeks a "judgment" that TAMS "would be " liable to "indemnify" DLL for *potential losses* that DLL has not yet sustained but that it *might* sustain on the *assumption* that TAMS *might* be found to have breached warranties or representations that, at this point, TAMS has not been found to have breached. DLL's motion is actually a motion for an advisory opinion or is, perhaps more accurately, in the nature of a request for jury instructions. The question of whether a jury instruction (such as DLL's motion effectively requests) should be given is not, TAMS submits, one that can or should be answered on the current record. Rather, that question should be addressed only once it is clear what evidence has been offered and admitted at trial and what the legally allowable consequences of such evidence are.

Simply stated, DLL's motion must be denied because it is not a motion for summary judgment at all and is, in any event, premature. In this regard, it is well settled under Pennsylvania law that claims for indemnity for loss do not arise until an indemnitee has suffered *actual loss or damage*. *See Coleman v. City of Bradford*, 415 Pa. 557, 559-60, 204 A.2d 260, 261 (1964); *Burke v. North Huntingdon Township Mun. Auth.*, 390 Pa. 588, 598 n.7, 136 A.2d

310, 315 n.7 (1957); *McClure v. Deerland Corp.*, 401 Pa. Super. 226, 232, 585 A.2d 19, 22-23 (1991). Furthermore, "federal ripeness doctrine advises against adjudication of questions dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Crestar Mortgage Corp. v. Peoples Mortgage Co., Inc.*, 818 F. Supp. 816, 818-19 (E.D. Pa. 1993) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480 (1990)).

Here, DLL seeks a "judgment" that would be wholly dependent upon "contingent future events" that not only "may not occur as anticipated" but that both DLL and TAMS believe will "not occur at all". Indeed, DLL has moved for summary judgment on the (in TAMS' view meritorious) basis that DeSoto is liable to DLL as a matter of law for all damages resulting from DeSoto's repudiation of the Master Lease. That being so, DLL and TAMS agree that the "judgment" DLL seeks in this motion would be dependent upon contingent future events that will not occur – that is, a determination by the trier of fact that TAMS could and somehow did render the lease unenforceable by breaching warranties or representations.[10] Not only has the trier of fact not at this point made any such finding, but DLL and TAMS agree that the trier of fact should not, on the undisputed facts, be allowed to make such a finding.

Relatedly, DLL has yet to suffer any losses or damages for which it could potentially be entitled to relief from TAMS under the indemnification provisions of the Program Agreement. Again, it is DLL's position (which TAMS believes is meritorious) that it should *never* suffer any such damages, because its claims against Defendants are valid and enforceable as a matter of law. Consequently, DLL's request for a summary judgment on its indemnification claims is

[10] On page 9 of DLL's motion, there are references to DDI [DeSoto] seeking judgment against TAMS under the indemnification provisions of the Program Agreement. TAMS assumes this is a typographical error and that it is DLL that seeks such a judgment as DDI [DeSoto] is not a party to the Program Agreement.

premature and would involve an "improper use of judicial resources to adjudicate a question of liability that might prove to be utterly meaningless." *Crestar*, 818 F. Supp. at 821 (denying motion for summary judgment on indemnification claim where movant had yet to suffer any damages). Accordingly, DLL's motion for summary judgment must be denied as to Counts X and XII.

It makes no difference, in this regard, whether principles of contractual or of common law indemnity are at issue. In either case, the proposed "judgment" is premised upon events that might not occur and that the movant agrees *should not* occur. In either case, no loss for which TAMS could be potentially liable to indemnify DLL has occurred. In either case, no summary judgment can be granted to DLL.

With regard to DLL's common law indemnification claims, moreover, there is one more impediment to the relief that DLL seeks. In Pennsylvania, the party seeking common law indemnity must itself be without fault. *See Bird Hill Farms, Inc. v. United States Cargo & Courier Serv., Inc.*, No. 1512 MDA 2002, 2004 PA Super. 66, ¶ 26 (Mar. 16, 2004) (citing *Sirianni v. Nugent Bros., Inc.*, 509 Pa. 564, 506 A.2d 868 (1986)). This is because common law indemnification is a fault shifting mechanism, not a fault sharing mechanism. *See Sirianni*, 509 Pa. at 570-71, 506 A.2d at 871.

In the present case, Defendants have asserted numerous causes of action against DLL alleging that DLL (as well as TAMS) took certain improper actions that rendered the Master Lease unenforceable.[11] TAMS believes these claims are meritless, but at this point the Court has not adjudicated the parties' pending summary judgment motions and the claims have not been

dismissed. If they are dismissed, as TAMS believes they should be, that will in all likelihood lead to summary judgment in DLL's favor against Defendants, thus mooting the instant motion. If, on the other hand, they are not dismissed, then they will provide a possible basis upon which DLL could be prevented from recovering against TAMS in whole or in part on a "common law indemnity" theory because of its own "misconduct". Equally to the point, *any* evidence admitted at trial that might allow a jury to find that DLL was at fault in causing all or some of its own damages could serve to eliminate or to limit DLL's entitlement to common law indemnification. *See Bird Hill Farms*, 2004 PA Super. 66, at ¶ 26 (finding that because party was not without fault, it is not entitled to common law indemnity).

**C. DLL's Motion for Partial Summary Judgment Must Be Denied Because, As Requested, it Would Subject TAMS to Duplicate and Inconsistent Judgments**

Even if not otherwise unavailable, the relief that DLL seeks in its motion would, if granted, improperly provide DLL with a "windfall" while improperly subjecting TAMS to duplicate and inconsistent liabilities. Thus, DLL asks for both $375,000 (plus interest) in recourse fee *and* for indemnification against all losses it would be entitled to recover from Defendants but for conduct of TAMS that might prevent such recovery. Such a result could not be sanctioned by this Court. *See Resources Capital Mgmt. Corp. v. Rouse*, No. 90-7565, 1992 U.S. Dist. LEXIS 8835, at *5 (E.D. Pa. May 28, 1992) (holding that defendants should not be required to place plaintiffs in a better position than they would have been in and "plaintiffs should not be able to reap a windfall at defendants' expense"). Accordingly, and for this

(..continued)

[11] Specifically, Defendants have alleged causes of action for fraud (Count V), civil conspiracy (Count VI), and breach of the covenant of good faith and fair dealing (Count VII) against DLL in which Defendants request rescission of the Master Lease in their prayer for relief.

additional reason, the Court should deny DLL's Motion for Partial Summary Judgment against TAMS.

## IV. CONCLUSION

For all of the foregoing reasons, TAMS respectfully requests that the Court should deny Plaintiff's Motion for Partial Summary Judgment Against TAMS.

Dated: April 29, 2004

____________________________________

John Chesney (Attorney I.D. No. 24458)
Julianne Peck (Attorney I.D. No. 79966)
Jonathan Sturz (Attorney I.D. No. 88153)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700
Attorneys for Plaintiff/Intervenor
Toshiba America Medical Systems, Inc.

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that today I caused a true and correct copy of **Toshiba American Medical Systems, Inc.'s Response to DLL's Motion for Partial Summary Judgment** to be served upon counsel of record for all of the other parties to this proceeding via:

1. first class mail, postage prepaid:

Kyle P. Tate, Esquire
9085 Sandidge Center Cove
Olive Branch, Mississippi 38654

Lynn Wescott, Esquire
The Wescott Law Firm
Two Penn Center Plaza, Suite 200
Philadelphia, PA 19102

William Matthews, Esquire
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102

2. Federal Express:

Rosetta B. Packer, Esquire
MCCARTER & ENGLISH
Mellon Bank Center, Suite 700
1735 Market Street
Philadelphia, PA 19103-7501

Dated: April 29, 2004

______________________________
Jonathan Sturz