**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| DELAGE LANDEN FINANCIAL SERVICES, INC., | : | |
| Plaintiff, | : | |
| | : | |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC. | : | |
| Plaintiff/Intervener, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 2:02CV2810 |
| | : | |
| DESOTO DIAGNOSTIC IMAGING, LLC., et al. | : | |
| Defendants and Counter-Claimants | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2004, upon consideration of the Defendants' Response to Plaintiff De Lage Landen Financial Services, Inc.'s Emergent Motion for Sanctions and to Toshiba America Medical Systems, Inc.'s Motion for Sanctions, it is hereby ordered that both Motions are DENIED.

IT IS SO ORDERED.

_____
United States District Judge

Date:_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELAGE LANDEN FINANCIAL SERVICES, INC.,            Plaintiff, : : : | |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC.        Plaintiff/Intervener, : : : : | |
| v. : | CIVIL ACTION NO. 2:02CV2810 |
| DESOTO DIAGNOSTIC IMAGING, LLC., et al. : Defendants and Counter- : Claimants : | |

**DEFENDANTS' CONSOLIDATED RESPONSE TO PLAINTIFF'S
EMERGENT MOTION FOR SANCTIONS AND FOR OTHER
RELIEF AND TO TOSHIBA AMERICA MEDICAL
SYSTEMS, INC.'S MOTION FOR SANCTIONS**

**I.    INTRODUCTION**.

           Enough is enough.  The false and reckless allegations made to the Court against Mr. Tate and his clients must cease.  Plaintiffs must be directed to stop defaming counsel and properly defend Desoto's counterclaims, if they can.  Defendants have produced <u>every</u> document to which DLL and TAMS are entitled.  Both DLL and TAMS claim that they did not receive financial information concerning whether Desoto profited from its use of the equipment TAMS leased.  This claim is false.  In direct compliance with the Court's discovery orders, Defendants produced all of Desoto's tax returns for the years 2001-2002 (which, despite claims by TAMS and DLL to lack of information, were actually attached as Exhibit 26 to TAMS' Motion for Summary Judgment), and financial statements, and profit and loss statements for the years 2001-

2003.  (See Ex. 1).  Many such documents were produced in September, 2003, months prior to the Court's discovery orders but TAMS falsely tarred Mr. Tate with its first motion for sanctions in the Fall.  At that time, Mr. Tate took the high road and is now suffering for it.

Defendants produced every patient record that related to Desoto's use of the equipment TAMS leased.  (DDI 2900-6944)  Defendants produced documents concerning the replacement equipment on CD and DVD, which obviously can have no effect on whether TAMS' equipment worked.  Defendants produced all required personnel files of Desoto employees.  (DDI 2000-2234 and 10400-11330)  That TAMS and DLL state that documents were not produced does not make it so.  Similarly, that DLL may disagree with the merits of Defendants' appeal on the subpoena issued to an accounting firm in Tennessee, respectfully does not give this Court jurisdiction or allow it to prejudge the merits of that appeal.  Tennessee law is clear, Defendants believe, that the accountant-client privilege bars enforcement of the subpoena.  See, e.g., T.C.A § 62-1-116.

While DLL and TAMS have jointly teamed up to attack Mr. Tate and Defendants on the eve of trial, the record reveals that (1) the instant motions are untimely, as they seek summary disposition of claims past the expiration of this Court's April 12, 2004 deadline for the filing of such motions; (2) DLL's Motion is procedurally defective, as DLL did not certify that it engaged in good faith efforts to resolve the (false) discovery disputes DLL claims require the imposition of sanctions; (3) TAMS has threatened to file this Motion for months, and strategically tried to create an emergency by waiting to file until the middle of trial preparation; (4) the timing of these Motions reveal that TAMS and DLL understand that each is at great risk in this case and know that the faulty equipment is their Achilles heel; and (5) DLL and TAMS themselves have engaged in "scorched earth" tactics which deserve sanction.

TAMS' Motion for Sanctions focused on three types of documents:  (1) financial records purportedly needed to show whether Desoto profited from its use of TAMS equipment (see Ex. 1); (2) patient records purportedly needed to show profits Desoto generated from the Toshiba equipment and/or to show that Desoto engaged in "Medicare fraud" that led to turnover of technologists that resulted in the poor images TAMS' equipment produced (see DDI 2900-6944); and (3) personnel records to which TAMS admits it is not "technically" entitled.  (TAMS never requested these documents, and concedes they are not entitled to them.)

TAMS claims that all of the documents it seeks were ordered to be produced by December 15, 2003, yet fails to offer any explanation as to why it deliberately waited until this time to bring this Motion.[1]  In fact, TAMS announced both on December 5, 2003, in its brief relating to Mr. Igarashi's deposition at page 2, footnote 3, and again on February 13, 2004, in its Motion for Protective Order at page 5, footnote 3, that it "may" bring another motion for sanctions.  Though claiming to have a basis to file such motions as far back as five months ago, TAMS did not do so until Friday night, at 7:50 p.m., on the very last day of April.  (Ex. 4) TAMS and DLL both filed a motion for summary judgment against Defendants, but neither motion was based on any alleged discovery failures, nor did either file Fed. R. Civ. P. 56(f) affidavits.

---

[1]    Lest there be any doubt that TAMS and DLL were trying to sabotage Defendants with the timing of this filing, all parties held a conference on Thursday, April 29, 2004 to discuss scheduling and the conduct of this trial.  During that conference, the parties agreed to make designations by May 4, 2004, a day on which Mr. Tate explained he would be traveling to Philadelphia.  (Ex. 2)  Neither TAMS nor DLL mentioned that each would be filing the instant motions on the very next day.  DLL's request for "emergent" consideration of these Motions under these facts, none of which were disclosed to the Court for consideration in setting the response deadline for Defendants, was improper.  As an additional note on the conference, the parties agreed that, going forward, "no motions or other papers would be served by regular mail."  Id.  Yet, later that very same day, TAMS deliberately went back on its word, but only with respect to Defendants.  (See Ex. 3) (express delivery to counsel for DLL, but regular mail to counsel for Defendants).  TAMS' and DLL's petty gamesmanship should be punished.

DLL, on the other hand, only seeks one type of documents: financial records subpoenaed from nonparty Rhea & Ivy, PLC ("Rhea & Ivy"), an accounting firm in Tennessee. DLL, without informing the Court that the law in Tennessee creates an accountant-client privilege that bars enforcement of such subpoena, which is the principal basis on which Rhea & Ivy has refused to produce the subpoenaed documents, and apparently asks this Court to prejudge the merits of an appeal that is pending in another judicial district and over which this Court, with all due respect, lacks jurisdiction.[2]  Moreover, DLL has Desoto's financial information, as stated above.  Though moving for sanctions under Rule 37 of the Federal Rules of Civil Procedure, DLL fails to include with its papers the mandatory certification that it attempted in good faith to resolve the claimed discovery failures, which renders its Motion procedurally defective.  Finally, because DLL has raised this as an emergency motion defeats TAMS' and DLL's claims that it is too late to remedy the alleged "problems" complained of.   If that were true, and dismissal were the only appropriate sanction, and DLL really is, as it claims, not requesting termination "lightly," why did DLL see fit to request that Defendants be provided with only "short notice" to respond?

II.    **ARGUMENT**.

    A.    **TAMS Has Every Document To Which It Is Entitled**.

On page 5 of its brief, TAMS states that its focus is on three types of documents it describes as "key information that Defendants have failed to produce."  TAMS' Brief at 5. Specifically, these documents are (1) financial information related to profits generated from the

---

[2]    DLL has done so after the U.S.D.C. for the Western District of Tennessee refused DLL's request that counsel for Rhea & Ivy be required to represent on the record, that the requested documents would be produced immediately notwithstanding their right to appeal the Court's decision through the proper channels.

Toshiba equipment; (2) patient records; and (3) personnel records to which TAMS admits it is not "technically" entitled, for the simple reason that TAMS never requested such documents.

       1.    <u>Personnel Records of Non-Desoto Employees</u>

As the first type of document is the same type of document DLL is seeking in its Motion, Defendants will respond to these issues in reverse order, so that the end of this Section can dovetail into the section responding to DLL's brief. TAMS does not say that it received every personnel record to which they were entitled (which it did), but instead focused on records to which they admit they are not entitled. Whether these radiologists were employed by Desoto is hardly a "meaningless technicality" given that TAMS requested the personnel files of Desoto employees, and that is what it got. It is utter bad faith to ask for sanctions against Defendants where TAMS admits that its discovery request does not entitle it to these documents. (TAMS Br. p. 12) Though claiming that the personnel records of the radiologists are "responsive", the fact that these radiologists were not employed by Desoto, which TAMS does not dispute, renders such records <u>un</u>responsive to TAMS' request. Moreover, after Mr. Tate wrote his March 1, 2004 letter to counsel for TAMS, (attached as Exhibit N to TAMS' Brief), TAMS never raised this issue again until it filed this Motion, failing to, as required, engage in the required good faith effort to resolve this issue.

At any rate, much as TAMS cannot be allowed to rewrite its binding judicial admissions that it was both the lessor and supplier of the equipment, TAMS cannot be allowed to rewrite its document requests and this Court's Order to impose new discovery obligations on Defendants at this stage and demand sanctions. That TAMS is moving for the harsh sanctions it is as a result of its failure to obtain documents it never requested, and which were never ordered to be produced, is ridiculous.

2.    <u>Patient Records</u>

The second type of document requested by TAMS is patient records, purportedly needed to develop facts "relating to DeSoto's use of the Toshiba equipment."  TAMS Br. at 9. TAMS asserts that it needs this information to show that Desoto engaged in "Medicare fraud", as if the Court were going to allow a trial within this trial on the issue of Medicare fraud, which has no relevance at all to whether TAMS' equipment worked.  Stretching all bounds of logic, TAMS claims that it needs to show that Desoto engaged in "Medicare fraud" to prove, apparently, that the departure of certain technologists from Desoto resulted in turnover, which in turn created operator error.  This absolutely outrageous allegation is a red herring and is logically disconnected.  TAMS already has the personnel records of all Desoto employees at DDI 002000-002234 and DDI 010400-011330.  Defendants will stipulate to the employment dates of each technologist who ever worked at Desoto.  From that, TAMS can attempt to argue, if it has a legitimate basis, that there was turnover that resulted in operator error.  As the point TAMS tries to make comes back to the fact of turnover, why a technologist left Desoto's employment is completely irrelevant, and trying to use this as a springboard to deliberately blacken a medical doctor's reputation and livelihood with claims of "Medicare fraud" is the most egregious behavior in which any party in this case has engaged.  Requesting, as TAMS has, a judicial finding of "Medicare fraud" is akin to asking this Court to completely strip Dr. Carvel of her Constitutional rights without a hearing.  TAMS' efforts to create a trial within a trial on Medicare fraud is the subject of a separate Motion in Limine.

TAMS only states that Defendants have yet to produce the information relating to Defendants' use of the Toshiba equipment "in a usable format".  In reality, the format is usable, and functions well for Desoto in its business.  The real complaint of TAMS is that the format is

not the one TAMS would prefer. The information produced in the electronic format was duplicative information that had already been disclosed to TAMS in another format, and on paper form. Moreover, it was politely explained in correspondence to TAMS that it was unduly burdensome and unreasonably expensive to attempt to print out this electronic information, which would not have resulted in TAMS receiving any additional responsive information—it would simply present essentially the same information previously disclosed in paper in a different format. It was explained to TAMS in a March 4, 2004 letter that Defendants would have to buy another computer, purchase another very expensive user license for the Medical Manager System, and hire an employee to conduct the printing project that would take several weeks at a minimum. (See Exhibit 5). Such burden, especially in light of the fact that little if any new information could be produced as a result, is not one that the Federal Rules of Civil Procedure requires under any circumstances.

Even after properly disclosing the electronically stored information to TAMS, counsel for Defendants offered several times for TAMS to come into Desoto's facility and review the electronically stored information so that TAMS could once and for all realize that they already had the information they wanted in paper form. (See Ex. N to TAMS' Br. and Ex. 5) TAMS refused to accept the invitation to view the Desoto's electronically stored information in its operational environment.

As to why TAMS cannot read the electronic discovery produced by Desoto, this, too, is a red herring. The Court must be wondering why TAMS does not have the hardware or software to view images from its own equipment. Whatever the reason, TAMS has paper records for every patient Desoto ever saw with TAMS' equipment.[3] TAMS has misled the Court

---

[3]     In addition to the paper billings records mentioned above, Defendants have also disclosed the MRI journal (DDI 659-752), CT journal (DDI 8052-8194 and 8371-8419), Nuclear Medicine journal (DDI 7100-7161)

on this point. The paper documents were produced months ago. Though not mentioned in TAMS' Motion, during a conversation that occurred when Ms. Peck, counsel for TAMS, accepted a ride to the airport from Mr. Tate, Ms. Peck specifically informed Mr. Tate that TAMS was able to open and view all of the CDs and DVDs Defendants produced. Also, though not attached as an Exhibit to TAMS' Brief, Mr. Tate confirmed the contents of that conversation in writing. (See Ex. 5) Ms. Peck later admitted in writing that TAMS had been able to view images from some of the CDs and DVDs produced by Defendants. (See Ex. 6)

Nevertheless, as TAMS admits, these documents were produced months ago, and rather than bringing it to the Court's attention in a timely manner, TAMS sprung it late last Friday. Per TAMS' request, Defendants produced the documents electronically because Desoto is now a paperless facility, and the records were produced as they are kept in the ordinary course of Defendants' business. TAMS claims files are corrupt, but neither Defendants nor the Court have been offered the opportunity to test TAMS' claims that there are corrupt files on their discs, or that TAMS cannot access information. As to those files TAMS claims it is unable to view, TAMS was invited to visit Desoto's facility, refused to accept that invitation, and instead waited until now to complain that it is too late for them to have meaningful access. Such is not a good faith effort to resolve a discovery dispute. Had TAMS acted promptly when the CDs and DVDs were produced "between December 18, 2003 and January 9, 2004," this situation would have never occurred. Naturally, TAMS cannot create its own emergency by failing to act promptly, and cannot blame Defendants for its failure to view the information in its operational environment.

---

and X-Ray journal (DDI 610-632). These journals are a record of each examination performed on the Toshiba medical equipment by date of service and identified by patient name.

To seek harsh sanctions based on TAMS' own failure to act promptly is indicative of the dire straits in which TAMS now finds itself.  As TAMS' documents themselves (as well as the FDA enforcement reports) chronicle the literally hundreds of problems with Toshiba equipment, this Motion must be properly viewed as a desperate ploy to prevent a jury from being informed of TAMS' own damning admissions and documents.  TAMS has judicially admitted to providing inappropriate service that harmed the photosensitivity of the MRI.  TAMS Ans. to Defs. Counterclaims at ¶ 51 (decision of TAMS customer service engineer to apply baby oil to the MRI machine, on which he was not even trained, was "inappropriate . . . because it interfered with the photosensitivity of the part.").  TAMS also sent an "urgent" letter to Defendants, as recently as April 12, 2004, the deadline for the filing of dispositive motions, acknowledging inherent problems with the CT scanner.  (Ex. 7)  Finally, TAMS also sent a letter, prior to the institution of litigation (which has apparently changed TAMS' view) which details literally pages worth of problems at Desoto, many of which TAMS was admittedly unable to resolve.  (Ex. 8) This document also shows that TAMS had been working on these problems for eight weeks as of August, 2001, six months before de-installation of the equipment.  TAMS' carefully pre-planned strategy to delay raising this issue until such time as TAMS could claim it was too late, as well as the absurd and scurrilous "Medicare fraud" attacks against Dr. Carvel, speak volumes about the weakness of TAMS' case.  Otherwise it would not need to employ such slick tactics.

3.    <u>Financial Records</u>

Finally, TAMS requests sanctions resulting from an alleged failure to produce financial information.  TAMS claims it needs to have such information to prove that Desoto profited from its use of TAMS' equipment, which TAMS hopes will, by implication, convince the jury that its equipment really was not <u>that</u> bad.  TAMS already has all of the information to

which it is entitled concerning the finances of Desoto. While Desoto has produced all of its financial and billing records requested, it is important to remind the Court that Desoto is not seeking lost profits in this case. Nevertheless, TAMS already knows the extent to which it alleges Desoto profited from its use of the equipment TAMS leased -- in the very first Paragraph in the Section of TAMS' Brief entitled "Factual and Procedural Background," TAMS argues that Desoto used its equipment "for fourteen months to develop a very profitable business." TAMS Br. at 7. If TAMS did not have the evidence to support such a statement, why would TAMS include it in its Brief to the Court? Is TAMS simply saying this because it believes this to be true, but cannot prove it because it does not have the financial information it requested? Of course not. Instead, and again, though not mentioned in TAMS' Brief, TAMS has such evidence, and affirmatively used it in support of its Motion for Summary Judgment. Indeed, Exhibit 26 to TAMS' Summary Judgment Motion are Desoto's 2001 and 2002 tax returns. (Desoto opened its doors in late December 2000). TAMS also has all of Desoto's profit and loss statements and financial statements (Ex.1) and other documents that relate to Desoto's financial and billing records.

Aside from those financial documents that are discussed below in connection with DLL's Motion, TAMS falsely states that "Defendants have produced nothing that relates to Lynn Carvel, PLLC." TAMS Br. at 8-9. To the contrary, all such documents, with the exception of those which are the subject of the Sixth Circuit appeal concerning the subpoena to Rhea & Ivy, have in fact been produced. Specifically, Defendants produced Desoto's billing records which include Desoto's technical charge and, additionally, Lynn T. Carvel, PLLC's professional charge, in paper form (DDI 002900 through 006944) (See Ex. 9, which is a selection of billing pages produced). Such records reveal the following information: each patient exam performed, the

date of each exam, each exam claimed for reimbursement, the amount and date of reimbursement

for each exam claimed, the equipment used to perform each exam, the name of the insurance

provider, the referring physician, the patient's name, etc.  (See Ex. 9)  These records are the only

records that provide such detailed reimbursement information and are exactly what DLL and

TAMS claim to need and they have it.  As this information was produced in September and

December, 2003, this specious allegation of noncompliance appears to be based on the failure of

TAMS to review its own file, a matter that hardly justifies sanctions against Defendants.

    4.    TAMS Was Satisfied at the Final Day of Desoto's 30(b)(6) Deposition

The testimony given at the fifth day of Desoto's 30(b)(6) deposition conducted

on March 14, 2004 confirms that the former Rad Pro RIS system and MOMS billing system do

not interface with Desoto's new paperless integrated Medical Manager RIS and Billing system

implemented in April of 2003 and that the information sought from the new system regarding the

Toshiba equipment (which was properly disclosed in the format in which it was kept) would be

merely duplicative information of what had already been disclosed.   After almost 45 pages

of testimony from such deposition, TAMS' counsel, Mr. Chesney, appeared satisfied and

admitted that the testimony had "clarified it quite bit".  Mr. Chesney also confirmed that TAMS

is in possession of the Desoto records in paper form.  (See Exhibit 10) (Excerpt from 30(b)(6)

Dep. of Desoto, Vol. V).

    5.    Miscellaneous Claims

Though Defendants' time to respond to these Motions is limited, Defendants also

wish to touch on some of the other complaints made in TAMS' brief.  First, as to its prior Motion

for Terminating Sanctions, Defendants already responded to that, and this Court already denied

that Motion.  The Court will recall that as to each of those vicious allegations, Defendants

provided a response.  As to TAMS' claim that the Court specifically limited the scope of discovery to Toshiba equipment in this case, the Court's Orders do not support TAMS' statement.  In any event, TAMS has done its best to keep Desoto from learning about other TAMS' customers' equipment problems – obviously relevant to inherent defects in the equipment.  Much of the type of equipment Desoto had was subject to FDA enforcement and/or recalls.  (Ex. 11)  On February 19, 2004, the Court granted Defendants' Motion to Compel documents from TAMS concerning Defendants' document requests 108 and 129, each of which requested documents concerning third party problems or complaints with Toshiba equipment that was the same or similar to the equipment TAMS leased to Defendants.  (Ex. 12)  Though TAMS made a limited production, TAMS made numerous redactions to the "product issues list" the Court ordered to be produced, including the redaction of an entire column on every page of the list, as well as redacting entire pages of certain "disclosed" documents.  (A selection of such documents are attached as Ex. 13)  TAMS freely used the tactic of redaction as a tool to avoid disclosure of evidence, and even listed on its privilege log a letter that, as the privilege log indicates, was shared with Linda Harvey, a DLL employee.  (Ex. 14)  As Ms. Harvey works for DLL, this document is not now privileged and if it ever was, TAMS waived any such privilege.  As to Mr. Steiff, Defendants already produced his affidavit which defeats TAMS' argument.  (Ex. 15)  Finally, and contrary to Mr. King's testimony, Dr. Carvel did not offer him a million dollars to work for her.  (Ex. 16) (affidavit of Dr. Carvel).

> ### B.    DLL Has Every Document to Which it is Entitled.

DLL concedes that its Motion relates to its subpoena directed to Rhea & Ivy, and that the enforcement of this subpoena is pending before another court.  DLL's Motion is the result of DLL's failure to follow and/or learn Tennessee procedural rules (and then falsely represented that as Defendants' violation of the rules).  DLL also purported to extend the Order

to require the production of the financial information of all Defendants and even some non-

parties, while this Court's Order clearly applied only to Desoto's financial information.

Moreover, DLL has filed a similar motion in Tennessee.[4]

          1.    <u>DLL's Motion is Procedurally Defective</u>.

        DLL brought its Motion under Rule 37 of the Federal Rules of Civil Procedure.

However, DLL failed to certify that it engaged in a good faith effort to resolve the dispute it has

raised in its Motion, rendering this Motion defective on its face, as is clear from a review of local

rule 26.1(f): "No motion or other application pursuant to the Federal Rules of Civil Procedure

governing discovery or pursuant to this rule shall be made unless it contains a certification of

counsel that the parties, after reasonable effort, are unable to resolve the dispute."  Accordingly,

DLL's Motion, which claims that Defendants have violated rules of court, is prima facie

defective for failure to comply with the local rules of this District.  <u>Naviant Marketing Solutions,

Inc. v. Larry Tucker, Inc</u>., 339 F.3d 180 (3rd Cir. 2003) ("Rule 37(a) *requires* that a party

moving to compel discovery sanctions must submit to the court 'a certification that the movant

has in good faith conferred or attempted to confer with the party not making the disclosure in an

effort to secure the disclosure without court action.'") (emphasis added)

        In addition, this Court imposed an April 12, 2004 deadline for the filing of

dispositive motions.  Accordingly, to the extent DLL (and TAMS) seek disposition of any

claims, their Motions must be dismissed as untimely.

          2.    <u>All Financial Information Relating to Desoto Was Produced Months Ago</u>.

        DLL argues that the information it seeks was compelled by Order of this Court in

December of 2003.  If that is so, why did DLL wait until now to bring this to the Court's

---

[4]    At the time this Brief was being finalized, Defendants learned that a conference call had been scheduled
with Judge Pham in Tennessee for this afternoon.  Defendants will report to the Court if anything occurs
during that call that affects this Brief.

attention, rather than raising it once the alleged failure occurred in December of 2003?  The answer is simple:  because this Court did not order the information DLL is seeking to be disclosed, and because Defendants have produced every document that this Court ordered to be disclosed.

Despite having been caught in their efforts to copy, paste and alter their binding judicial admission that TAMS was the lessor of the equipment, (see Defendants' response to summary judgment motions of TAMS and DLL), DLL cannot help but resort to its old trick of rewriting the history of this case in an attempt to mislead the Court into entering an Order on an improper basis.  DLL admits that its subpoena to the accounting firm required "the production of, inter alia, tax and financial information pertaining to the Defendants and related parties."  DLL Br. at 1 (emphasis added).  On November 7, 2003, this Court ordered the production of "all documents concerning Desoto's annual financial information for the years 2000, 2001 and 2002 to include annual financial statements, profit and loss statements and any other compilation of Desoto's financial information." (Emphasis added).  The Court's Order pertains to Desoto, and not all of the Defendants.  The Desoto records have been turned over.  Defendants also produced the billing records which include Desoto's technical charge and, additionally, Lynn T. Carvel, PLLC's professional charge, in paper form (DDI bates label 002900 through 006944).

DLL now claims that the Defendants' financial information is necessary to determine if profits were generated by Desoto's use of the leased equipment. DLL's brief fails to recognize a crucial distinction in that it equates the Defendants' financial records with Desoto's billing records and tries to confuse the Court into thinking that by previously compelling the production of one category of records (Desoto's billing records), thus the other category is somehow included. This Court compelled the production of Desoto's billing records in order to

allow TAMS and DLL to ascertain the type and number of procedures performed on patients using the faulty Toshiba medical equipment, or as DLL put it, to "do one of two things: (a) support DDI's contention that the equipment failed to perform properly; or (2) support TAMS' contention that the equipment performed in accordance with the manufacturer's specifications." Desoto's billings/records for the time that the Toshiba equipment was at the Desoto facility were disclosed back in September and December, 2003.

Incredibly, DLL does not even mention that TAMS attached Desoto's 2001 and 2002 tax returns as Exhibit 26 to TAMS' Motion for Summary Judgment.  The basis for the Court Order compelling the discovery of Desoto's financial information cannot be logically tied to the other Defendants. The financial information of individual Defendants, Lynn and Randon Carvel, will not demonstrate Desoto's "continued and growing profitability", only Desoto's financial information could show that. Neither would the financial information of defendant Zobar Properties, LLC (which owns the land and building in which the Desoto facility is located), or defendant Delta Radiology, P.C. (the name of the physician group providing medical services to Desoto), show anything that could be used to demonstrate the "continued and growing profitability" of Desoto. Again, only Desoto's financial information would show that, and that information has already been provided.

What DLL must be trying to accomplish by its subpoena to the accountants, and now its Motion for Sanctions, is prejudgment discovery of the so-called guarantors even though (1) there is no claim for punitive damages against any Defendant and (2) there has been no entry of judgment that would allow discovery in aid of execution on the guarantors.5  At any rate, entering the sanctions DLL seeks as a result of its inability to engage in premature discovery in

_____

5       There is, however, a claim for punitive damages against TAMS, but TAMS has refused to produce its clearly relevant financial information.

aid of execution that relates to the guarantor defendants and non-parties to this case would be entirely devoid of any connection to the purported issues as to liability, i.e., whether the equipment worked.

In addition to the tax returns TAMS has already relied on in support of its Motion for Summary Judgment, Defendants also produced the remainder of the documents relating to Desoto's financial information that this Court ordered. (See Ex. 1) DLL's and TAMS' claims that they did not receive such documents does not make it so. Having properly complied with this Court's order to produce Desoto's billing records and Desoto's financial records, Defendants are not in violation of this Court's Order, and neither TAMS nor DLL are entitled to further documents or sanctions.

3.      The Pending Sixth Circuit Appeal.

In addition to requesting the production of documents, DLL's subpoena further attempted to command John A. May, Jr., a partner with the firm of Rhea & Ivy, to appear personally for an oral deposition on November 7, 2003, but failed to include a check for the witness fees required pursuant to F.R.C.P. 45. Procedurally, DLL's subpoena was also improper in that it was not until September 30, 2003, four days after the date of the subpoena that counsel for DLL provided the notice to counsel for defendants required by Fed. R. Civ. P. 45 to be given prior to the service of the subpoena.

Defendants, Rhea & Ivy and Mr. May timely filed their motion to quash the subpoenas on October 29, 2003. Included in the motion were objections filed with regard to all categories of documents requested, in particular to the production of documents from Lynn T. Carvel, MD PLLC, which is not a party to the underlying action, as well as to the production of certain trust documents which are in no way related to the claims and allegations before the presiding court.

Almost five months later, DLL decided to pursue enforcement of its subpoena. On March 11, 2004, the district court in the Western District of Tennessee heard oral argument and denied the motion of Rhea & Ivy and Mr. May to quash DLL's subpoenas and granted DLL's motion to enforce its subpoena. The Court reserved judgment on a number of other issues brought to light by counsel for Defendants wherein it was understood by Counsel for Rhea & Ivy (Scott Crosby, Esq.) and Counsel for Defendants (Holly Brady, Esq.) that they were invited to file motions for reconsideration within ten days thereafter.[6] The principal basis for the motion for reconsideration was that Tennessee provides a strong accountant-client privilege. See, e.g., T.C.A. § 62-1-116.

> (a)    Certified public accountants and public accountants practicing in this state shall not divulge nor shall they in any manner be required to divulge any information which may have been communicated to them or obtained by them by reason of the confidential nature of their employment.

> (b)    Information derived as a result of such professional employment is deemed to be confidential, except that nothing in any section of this chapter shall be construed as modifying, changing or affecting the criminal or bankruptcy laws of this state or of the United States.

See also Federal Ins. Co. v. Arthur Anderson & Co., 816 S.W.2d 328 (Tenn. 1991).

Rhea & Ivy and Defendants believe and maintain that Judge Pham's final order was in error as a matter of law and have, accordingly, properly sought appeal in the Sixth Circuit. This is procedurally proper, as the Tennessee District court has no jurisdiction at this point because the Magistrate's order regarding a miscellaneous case concerning a non party to the main

---

[6]    There has been a dispute among the parties over the Court's instruction at the close of this hearing in that both Defendants' counsel and counsel for Rhea & Ivy and Mr. May independently interpreted Judge Pham's colloquy to invite the filing of a Motion for Reconsideration of his final order, which was done within the ten day time-frame. Upon Judge Pham advising that he did not intend that his order be interpreted as an invitation to file a Motion to Reconsider, Counsel for Rhea and Ivy and Counsel for Defendants properly and timely lodged its appeal.

pending litigation in another district is a final discovery order which can only be appealed the

Sixth Circuit Court of Appeals.  See W.D. TN Local Rule 72.1(g)(3); see also In re Mark

Madden, 151 F.3d 125 (3d Cir. 1998), discussed infra.

>    4.    Defendants and Rhea & Ivy are Not in Violation of the Final Discovery
>          Order of the Western District of Tennessee, Which Has Been Properly
>          Appealed to the Sixth Circuit Court of Appeals.

DLL tries to discredit Defendants by stating "No Order was entered on

March 18, 2004."  A quick look at DLL's Exhibit G remedies this misstatement.  Clearly, on the

face of the Order, Judge Pham's Order was filed on March 17, 2004, and entered on

March 18, 2004:  "This  document entered on the docket sheet in compliance with Rule 55

and/or 32(b) FRCP on 3-18-04".  The fact that DLL is confused over the difference between the

filing and the entering of the order hardly justifies DLL's attacks on Defendants, or the

imposition of draconian sanctions.

With regard to the matter before the United States District Court for the Western

District of Tennessee, neither Defendants nor Rhea & Ivy and Mr. May are in violation of any

order because a proper appeal of such final order has been timely lodged with the Sixth Circuit

Court of Appeals. The information sought by DLL's subpoena is protected by Tennessee's

accountant-client privilege and supporting case law which provides that this is a strong privilege.

(T.C.A. § 62-1-116)

DLL has not properly researched the issues, as the case law is indisputably clear

that a District Court does not have jurisdiction over discovery orders involving non-parties in a

remote jurisdiction which has been properly appealed to the Circuit Court, and thus, even trying

to get this Court to invoke jurisdiction over such a matter is improper.  DLL never requested

financial information during the discovery period through this Court's jurisdiction, waited almost

six months to pursue its subpoena requests from Rhea & Ivy and Mr. May and now complains

that a proper appeal pursuant to the Tennessee accountant-client privilege is somehow misconduct. Defendants are not responsible for DLL's slack in pursuing discovery that Defendants have properly argued is not even discoverable pursuant to the Tennessee accountant client privilege. Clearly DLL is attempting to circumvent the Tennessee and Sixth Circuit Courts' jurisdiction over this matter by now filing this motion in Pennsylvania. This is a simple issue, really, as DLL already has Desoto's financial and billing information.

This Court (and the district court in Tennessee) is without jurisdiction to prejudge the merits of that pending appeal, as explained by the Third Circuit in In re: Mark Madden, 151 F.3d 125 (3d Cir. 1998). The Third Circuit made clear that a discovery order issued in a miscellaneous case filing in a remote jurisdiction regarding a non party is a final order and properly appealable. While in Madden that meant that the Third Circuit would consider the appeal, in this case it means that the Sixth Circuit must be entitled to hear the appeal. In Madden, Titan sued TBS in the United States District Court for the District of Connecticut. In connection with this Connecticut action, Titan issued a subpoena to take the deposition of Mark Madden, a nonparty witness who is employed by WCW, and resided in the Western District of Pennsylvania.

During his deposition, Madden refused to identify the sources of certain of his information. Madden invoked a "journalist's privilege" and the protection of the Pennsylvania Journalist's Shield Law. Titan filed a "Motion to Enforce Subpoena and Otherwise Compel Discovery by a Nonmoving Party." In response, Madden and the WCW interposed the qualified federal common law privilege which protects journalists from revealing their confidential sources.

The Third Circuit's description of the procedural posture, and what that posture means, is instructive <u>and</u> controlling:

> The somewhat unusual procedural posture of this case requires that we discuss briefly our jurisdiction to hear this appeal. We have jurisdiction over "all final decisions of the district courts . . ." 28 U.S.C. § 1291. A final decision of a district court means, with limited exceptions, an order that ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment. <u>Coopers & Lybrand v. Livesay</u>, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978). The typical remedy for one aggrieved by an order denying a discovery request is to await final judgment before appealing. <u>Enprotech Corp. v. Renda</u>, 983 F.2d 17, 20-21 (3rd Cir.1993).
>
> The order appealed from in this case is not a typical discovery order. Although it relates to discovery and the deposition of a nonparty witness, it was not entered by the district court where the case was filed and is currently pending. The district court for the District of Connecticut will ultimately rule on the merits, and an appeal from its final judgment will be heard by the Court of Appeals for the Second Circuit. Other courts have recognized an "exception to the nonfinality of discovery orders where a district court, other than the district court before which the main action is pending, issues an order denying discovery against a nonparty." <u>Hooker v. Continental Life Insurance Co.</u>, 965 F.2d 903, 905 (10th Cir.1992); citing <u>Truswal Sys. Corp. v. Hydro-Air Eng'n, Inc.</u>, 813 F.2d 1207, 1209 (Fed. Cir. 1987). The premise for this exception is that these orders involve nonparties and are issued by district courts other than the one in which the principal action is pending, thereby eliminating any avenue for effective appellate review.
>
> We agree with this premise but believe, rather than as an exception, finality for purposes of our jurisdiction in this circumstance is determined more directly by asking whether the aggrieved entity has any means, other than an immediate appeal before us, to obtain appellate review of the district court's decision. For Titan, the answer is no, because the Court of Appeals for the Second Circuit does not have jurisdiction to review this order of the Western District of Pennsylvania. Were we to reject jurisdiction, appellate review of this order would be impossible. Consequently, because we are the only forum that may review the decision, we deem it final and conclude that we have jurisdiction under 28 U.S.C. § 1291 to review it.

Madden, supra, at 127.

Rhea & Ivy, just like Titan, as a non-party in an ancillary jurisdiction to the main pending action may properly appeal Judge Pham's discovery order entered on the docket of the United States District Court for the Western District of Tennessee on March 18, 2004. It is undisputable that Judge Pham's order is a final order regarding a nonparty located in an ancillary jurisdiction (United States District Court for the Western District of Tennessee) to the pending litigation in the Eastern District of Pennsylvania and properly appealable to the Sixth Circuit Court of Appeals because all of the remedies available in such ancillary jurisdiction (United States District Court for the Western District of Tennessee) were exhausted. See Madden; see also Hooker v. Continental Life Ins. Co., 965 F.2d 903, 904 (10th Cir. 1992); Minpeco, S.A. v. Conticommodity Servs., Inc., 844 F.2d 856, 859 (D.C. Cir. 1988). The bottom line is that the ancillary jurisdiction of the United States District Court for the Western District of Tennessee does not have jurisdiction over Judge Pham's final discovery order because such final order has been timely and properly appealed to the Sixth Circuit Court of Appeals. U.S.D.C. WD TN Local Rule 72.1(g)(3); Rule 4 of the Fed. R. App. Proc. (Sixth Circuit I.O.P.)

DLL's argument that Defendants' counsel has violated the final order of United States District Court for the Western District of Tennessee simply demonstrates their lack of understanding of the law. The law provides for the appeal of a Magistrate Judge's decision directly to the United States Court of Appeals "upon the entry of judgment in any civil case disposed of by a magistrate judge", and that Defendant's notice of appeal and the basis therefore was completely proper. W.D. TN LR 72.1(g)(3). The rule is not limited to parties that "have agreed to a trial before a Magistrate Judge" as DLL suggests. A plain reading of the rule indicates it applies where a magistrate disposes of a civil case with a final order. Obviously,

there would be no trial per se before the Tennessee court, as the parties sought resolution of a discovery order, nonetheless still a civil case. The parties consented to the case being disposed of by Judge Pham, as no objection was made to the Tennessee Court's March 2004 Order of Reference referring the case to the United States Magistrate Judge.

     5.    Defendants' Emergency Motion For Protective Order Did Not Pertain to the Protection of Desoto's Financial Records.

DLL has falsely suggested to the Court that the matter of the production of Defendants' financial records has already been raised, and decided, by the Court in Defendants' Emergency Motion for Protective Order.  A simple review of Defendants' Motion points out that this is simply not true. The basis of Defendants' Emergency Motion for Protective Order was to limit the inquiry by TAMS or DLL into the billing practices of Desoto, based upon TAMS' abusive campaign alleging made-up claims of "Medicare fraud" against Desoto.  Desoto's financial records are not mentioned one time in Defendants' emergency motion.  As set forth above, there is a distinct difference between billing records and financial records.  Billing records indicate the date of the exam performed, the exam performed, the patient identification, and the amount billed for the exam, among other things. The financial records include annual financial statements, profit and loss statements, general ledgers and the like.  Defendants produced all of the billing and financial records relating to Desoto.  This Court's Order denying Defendants' Motion for Protective Order does not give DLL a license to obtain financial information from guarantor defendants and non-parties.

     6.    Defendants' Were Not Charged with Service of the Appeal.

DLL is wrong in stating that Defendants' Notice of Appeal "falsely states that copies were served on counsel of record."  Pursuant to the Federal Rules of Appellate Procedure, "the district clerk must serve notice of the filing of a notice of appeal by mailing a copy to each

party's counsel of record. F.R.A.P. 3(d)(1)."  Defendants did not complete a certificate of service

representing that Defendants served a copy of the notice on counsel of record, as that is not

Defendants' responsibility – the Federal Rules assign the responsibility to the district clerk.  Id.;

see also Rule 25(b) ("Unless a rule requires service by the clerk, a party must, at or before the

time of filing a paper, serve a copy on the other parties to the appeal or review.") (emphasis

added).  Indeed, it appears DLL's argument is somehow based upon the "cc:" notation in the

bottom left-hand corner of the notice form, which is on the on-line court form and is not

something Defendants created.  To construe that as an indication or confirmation that the notice

was supposed to be but was not sent to counsel of record, is wrong.

       7.     <u>Defendants Did Not Act Improperly with Respect to Witnesses</u>.

It is disturbing Defendants have to again ward off phony claims that were denied

many months ago.  The Court may recall that at the time TAMS raised this spurious allegation in

its prior sanctions motion, the witnesses claimed to have been bribed or intimidated had not yet

been deposed.  DLL incorporated TAMS' prior claim that Dr. Carvel attempted to bribe

witnesses.  Once these witnesses were deposed, such allegations were exposed, as happened

during the deposition of Ms. Pam Paulk.  (See Ex. 17).

**C.**    **<u>Sanctions Are Not Warranted</u>.**

Pursuant to Rule 37(a)(4)(A) of the Federal Rules of Civil Procedure, TAMS and

DLL request that this Court sanction Defendants for the alleged discovery violations discussed

above.[7]  In <u>Flaherty v. M.A. Bruder & Sons, Inc.</u>, 202 F.R.D. 137 (E.D. Pa. 2001), Judge Angell

---

[7]    Rule 37(a)(4)(A) provides that "A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling disclosure or discovery as follows: . . . *Expenses and Sanctions.* If a motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure

was presented with a motion similar to the one Defendants have presented in this case, i.e., a motion for the imposition of attorneys' fees as sanctions for alleged discovery failures.  Judge Angell analyzed movant's right to sanctions by considering the following factors:  (1) the extent of a party's personal responsibility; (2) a history of dilatoriness; (3) whether the attorney's conduct was willful; (4) the meritoriousness of the claim; (5) prejudice to the other party; and (6) the appropriateness of other sanctions.  Id. at 141.

TAMS and DLL have alleged no facts establishing that the alleged discovery violations occurred, let alone are the result of dilatory or bad faith conduct by Defendants or its counsel.  The facts of record in this case reveal exactly the opposite.

In analyzing the issue of prejudice to the other party, Judge Angell found that this factor did not weigh in favor of sanctions where there were no delays which caused irretrievable loss of evidence, dimming of witnesses' memories, "or the excessive and possibly irremediable burdens of costs imposed on the opposing party."  Flaherty, 202 F.R.D. at 141.  As in Flaherty, TAMS and DLL cannot establish any prejudice as a result of the alleged discovery violations which are the subject of this Motion and, indeed, waited to raise this until the eve of trial.

However, even if this Court were to agree with TAMS and DLL that Defendants failed to properly follow any discovery rules, such a finding does not mandate the imposition of sanctions.  First, the Court is empowered by Rule 37 to use its discretion in determining whether Defendants' actions were substantially justified, or whether "other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(a)(4)(A).  Moreover, the court in Caruso v. The Coleman Co., 1995 U.S. Dist. LEXIS 5912 (E.D. Pa. Apr. 28, 1995) denied the imposition of sanctions

---

or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust."

even after an express finding that respondent had failed to properly comply with Rule 33(d), and failed to make other disclosures.

As in this case, the movant in <u>Caruso</u> filed a motion for sanctions. The movant asserted numerous discovery failures of the respondent, some dealing with answers to interrogatories, others concerning depositions, and still others relating to document production, including charges that the respondent improperly failed to identify documents pursuant to Rule 33(d). Despite granting movant's motion to compel with respect to several interrogatories and document requests, and making an express finding that respondent had failed to follow Rule 33(d), the court also denied several of movant's other requests. Having found in favor of both parties on various items, and having failed to be persuaded by movant that respondent was not substantially justified in its objections, the court refused to sanction respondent: "In this case, the Court's decision was mixed and neither party was an overall 'winner' or 'loser.' Moreover, it does not appear to this Court that [respondent] was not substantially justified in its objections. Therefore, this Court will not at this time grant sanctions against [respondent.]" <u>Id.</u> at *18-19.

Given the massive amount of discovery that Defendants have produced; the fact that TAMS and DLL have, subsequent to the filing of this Motion, deposed Defendants and asked them to address many of the issues raised in the Motion; and TAMS and DLL's inability to prove any real prejudice to their case, Defendants respectfully requests that the Court deny TAMS and DLL' demand for sanctions.

      **D.**    <u>**The Timing of DLL and TAMS' Motions is Very Revealing**</u>.

In reaction to Defendants' timely Motion for Summary Judgment and Defendants' Motion to Dismiss and Defendants' response to the summary judgment motion of TAMS and DLL, DLL and TAMS now realize that each is at great risk in this case, and have therefore attempted an end run around this Court's scheduling order imposing an April 12, 2004 deadline

for all dispositive motions by seeking disposition of claims based on alleged discovery failures that allegedly occurred long ago. None of these matters were raised in either DLL or TAMS Motions for summary judgment, which DLL and TAMS now apparently believe are inadequate to ensure their success against Defendants. Being unable to argue the facts or the law, DLL and TAMS have decided to argue with opposing counsel.

As set forth in Defendants' Reply Brief in support of their Motion for Summary Judgment, DLL is unable to present any relevant or truthful argument in response to the indisputable fact that the Master Lease Agreement is ineffective by its terms and upon application of binding precedent and hornbook law, which failure mandates entry of summary judgment for Defendants on all of DLL's claims. That Motion in particular has TAMS and DLL concerned, especially since neither can dispute a single fact or distinguish any of the law on which that Motion is based, and, in fact, purport to ignore the defense that the lease is invalid and deceptively imply that Defendants' only defense is that the equipment that required hundreds of service calls in the fourteen months it was located at the Desoto facility was defective. The timing of these sanctions motions is strategic. Having reviewed Defendants' briefs over the last few weeks, DLL realizes that its failure to develop a single relevant argument or fact in opposition to Defendants' Motion should result in summary judgment on its claims against Defendants. If this happens, DLL may bear the burden of proving its claims that TAMS failed to meet its obligations to Desoto in order for DLL to recover its damages from TAMS. Indeed, DLL specifically pled that TAMS failed to perform proper maintenance and service as Count IV of its Crossclaim against TAMS.

Thus, while DLL asks that Defendants be prohibited from introducing evidence that the equipment did not work or that, as TAMS has judicially admitted, TAMS provided

inappropriate service, DLL itself needs to present such evidence in order to prove Count IV of its case against TAMS. However, as is abundantly clear from its repeated admissions that DLL was not particularly active in the discovery on these issues, see, e.g., DLL's 9/15/03 Brief Opp'g Defs. Mot. for Leave to Amend at 8 (DLL "has elected not to participate in depositions of TAMS representatives relating to issues regarding alleged defects in the equipment, not to secure copies of documents and images that have been produced by the parties, and has consciously taken a back seat to counsel for TAMS relating to key allegations of defects or deficiencies in the equipment leased to defendants"), DLL is apparently unprepared to present its case against TAMS. Now recognizing that its onerous contract and "hell or high water" language will not, as expected, carry the day, DLL realizes that it may be unable to recover any damages from Defendants or TAMS and should instead be liable to Defendants for its admitted, wrongful conduct.

TAMS, too, realizes, as set forth in the first Paragraph of Defendants' joint response to the motions for summary judgment of TAMS and DLL, that its undisputed failure to sign the Master Lease Agreement may make it liable for the entire amount of DLL's damages, as TAMS warranted to DLL in the parties' Program Agreement that TAMS would indemnify DLL for any failure of TAMS that resulted in the Master Lease Agreement becoming unenforceable. Accordingly, DLL and TAMS decided to file what is, in essence, motions that are properly viewed as a combination late Motion to Compel/untimely dispositive motion in the transparent hopes that (1) they can sufficiently sully the reputation of Mr. Tate so that the Court will punitively enter judgment on DLL's claims against Defendants even in the absence of an enforceable Master Lease Agreement or (2) allow the claims to proceed under a trial that shields from the jury the literally hundreds of service calls on the defective equipment.

This is, Defendants hope, the final desperate act that DLL and TAMS will resort to in their ongoing attempt to achieve judgment on an improper basis. Defendants trust that this Court will see these scurrilous Motions for what they truly are: desperate and untimely attacks designed to prevent this Court from entering summary judgment that the Master Lease Agreement was not effective and this was not a finance lease because TAMS has judicially admitted that it was both the supplier and lessor of the medical equipment. DLL's and TAMS' extreme measures and deliberate misrepresentations to the Court must not go unpunished.

E.    **The Outrageous Behavior of TAMS and DLL Merit Sanctions.**

In short, while there is no basis for the entry of sanctions against any defendant or defense counsel, DLL and TAMS have engaged in an unyielding pattern of unethical behavior, as the record makes clear:

- DLL Copied, Pasted and Altered Paragraph 9 of its Complaint. See Defendants Opp. to DLL's and TAMS' Motions for Summary Judgment at 6 - 9 (April 19, 2004).

- TAMS Rewrote Paragraph 8 of Its Answer to DLL's Crossclaim. See Defendants Opp. to DLL's and TAMS' Motions for Summary Judgment at 9, 10 (April 19, 2004).

  o The facts rewritten, altered, pasted, copied, etc., here by both TAMS and DLL concern the exact same area of fact. It is submitted that this evidences more than a mere coincidence in the commission of this fraud upon the court. That is, DLL made changes regarding who was the lessor; first saying TAMS, then TAMC, then no mention of either. TAMS, likewise, changed their position from first saying TAMS entered into the lease, then saying DLL entered into the lease, i.e., changes regarding who was the lessor. See Defendants Opp. to DLL's and TAMS' Motions for Summary Judgment at 6 - 10 (April 19, 2004).

- DLL claimed three different versions of the same fact on three different dates. On March 15, 2002, DLL claimed it was the assignee of "Toshiba Medical Credit" Two months later, DLL's complaint judicially admitted it was the assignee of "TAMS." On March 14, 2003, DLL sent a letter to Defendants purporting to inform Defendants it was the purchaser of the lease from "Toshiba America Medical Credit." Defendants Opp. to DLL's

and TAMS' Motions for Summary Judgment at 8, 9 (April 19, 2004).  See Ex.'s 7, 8 of Id.; Defendant's Motion for Summary Judgment at 4, 5 (April 12, 2004).

- Realizing the significance of a UCC-1 form that specifically listed TAMS as the lessor in January, 2001, DLL failed to produce the document in discovery, and falsely claimed, in response to Defendant's interrogatories, that all existing UCC filings had been produced.  See Defendants Opp. to DLL's and TAMS' Motions for Summary Judgment at 12; Id. at Exs. 9, 10 (April 19, 2004).

- On one of the UCC filings DLL did produce, it placed its Bates labeling sticker directly over the listing of TAMS as the "secured party" at the bottom of the page, notwithstanding the availability of ample free space on which there was no writing.  See Defendants Opp. to DLL's Motions for Summary Judgment at 12; Id. at Ex. 1 (April 19, 2004).

- During the deposition of former technologist Deborah May that occurred in Memphis Tennessee on February 10, 2004, Ms. Julianne Peck admitted on the record to have made a threat of a criminal prosecution to an adverse party outside the presence of counsel. Ex. 18 at Pg 241 – 245.

- Ms. Peck also admitted to having improperly instructed an unrepresented witness (Brian Gibbs, former technologist) not to answer a question and then admitted she shouldn't have done it once questioned about the improper behavior. Ex. 19 at Pg 433-436.

- Mr. Chesney's purported to order counsel for Defendants: "I will tell you what to do". Ex. 20.  DDI 30(b)(6) Vol 1 at Pg 19 and 20.

- Mr. Chesney, trying to prevent Defendants' counsel from calling the Court for a ruling during a deposition, stated "that this Court will not take calls" Ex. 20. DDI 30(b)(6) Vol 1 at pg 21.

- DLL adopted, and failed to register, fictitious names rather than using its own name; and

- TAMS engaged in such outrageous behavior at a deposition that the professional videographer voluntarily wrote a statement explaining the improper tactics deployed by Mr. Chesney.  (Ex. 21)

III.    <u>CONCLUSION</u>.

      For the reasons set forth above, DLL's Emergent Motion for Sanctions and TAMS' Motion for sanctions should be denied.  Defendants request that the Court grant such further relief as it deems appropriate.

      Respectfully Submitted,

By:    _____

Kyle P. Tate
for Tate Law Firm
9085 Sandidge Center Cove
Olive Branch, MS 38654
(662) 893-8833

Lynanne B. Wescott
The Wescott Law Firm P.C.
Two Penn Center Plaza, Suite 200
Philadelphia, PA   19102
(215) 755-6330

William Matthews
SAUL EWING LLP
Center Square West
1500 Market Street, 38th Fl.
Philadelphia, PA 19102-2186
(215) 972-7106

Attorneys for Defendants
Desoto Diagnostic
Imaging, LLC, *et al*

Dated:  May 5, 2004

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am this day serving a copy of the attached Response to Plaintiff De Lage Landen Financial Services, Inc.'s Emergent Motion for Sanctions and Toshiba America Medical Systems, Inc.'s Motion for Sanctions upon the persons and in the manner indicated below:

Service by <mark>hand delivery</mark> to:

Mr. John Chesney
Ms. Julianne Peck
Mr. Jonathan Sturz
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

Mr. Peter Boyer
Ms. Rosetta B. Packer
MCCARTER & ENGLISH, LLP
Mellon Bank Center, Suite 700
1735 Market Street
Philadelphia, PA 19103-7501

_____
Kyle P. Tate

Dated: May 5, 2004