## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

DELAGE LANDEN FINANCIAL -        :
SERVICES, INC.,                  :
                                 :
                    Plaintiff,   :
                                 :
TOSHIBA AMERICA MEDICAL          :
SYSTEMS, INC.                    :
                                 :
          Plaintiff/Intervenor,  :      CIVIL ACTION NO. 2:02CV2810
                                 :
          v.                     :
                                 :
DESOTO DIAGNOSTIC IMAGING, LLC,  :
RANDON J. CARVEL, LYNN T. CARVEL,:
DELTA RADIOLOGY, P.C. and        :
ZOBAR PROPERTIES, LLC            :
                                 :
          Defendants and Counter-:
                    Claimants    :
_____

### O R D E R

AND NOW, this       day of May 2004, it is hereby **ORDERED** that all

Motions in Limine filed by Plaintiff and Plaintiff/Intervenor are **DENIED.**


_____
                                                                    J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DELAGE LANDEN FINANCIAL - SERVICES, INC., : | |
| : | |
| Plaintiff, : | |
| : | |
| TOSHIBA AMERICA MEDICAL SYSTEMS, INC. : | |
| : | |
| Plaintiff/Intervenor, : | CIVIL ACTION NO. 2:02CV2810 |
| : | |
| v. : | |
| : | |
| DESOTO DIAGNOSTIC IMAGING, LLC, : | |
| RANDON J. CARVEL, LYNN T. CARVEL, : | |
| DELTA RADIOLOGY, P.C. and : | |
| ZOBAR PROPERTIES, LLC : | |
| : | |
| Defendants and Counter- : | |
| Claimants : | |

**DEFENDANTS' CONSOLIDATED RESPONSE TO ALL MOTIONS
IN LIMINE FILED BY DLL AND TAMS**

Defendants Desoto Diagnostic Imaging, LLC, Randon J. Carvel, Lynn T. Carvel, Delta

Radiology, P.C. and Zobar Properties, LLC ("Defendants"), respond to all eleven Motions in

Limine filed by Plaintiff, De Lage Landen Financial Services, Inc. ("DLL") and

Plaintiff/Intervenor Toshiba America Medical Systems, Inc. ("TAMS").

**I.  DLL'S MOTIONS IN LIMINE SHOULD BE DENIED**

A.  Determination of Reasonable Attorneys' Fees is a Matter for the Court, Not the Jury.

One of DLL's Motions in Limine seeks a determination that the Court, rather than the

jury, shall determine the amount of reasonable attorneys' fees to be awarded should the jury find

that DLL is entitled to such damages.  Defendants do not dispute this point, and request that if

the jury finds that Defendants are entitled to the recovery of attorneys' fees, that the Court, rather than the jury, will determine the amount of reasonable fees to which Defendants are entitled.  As has been set forth at length previously, Defendants believe that binding precedent and hornbook law bar DLL from seeking the benefits of the Master Lease.  Defendants believe this renders DLL's claims for attorneys fees against Defendants moot.

      B.  <u>DLL's Request for Sanctions Related to Alleged Non-Compliance with Discovery.</u>

      As it did only one week earlier, DLL seeks sanctions against Defendants relating to discovery issues, even while DLL's original Motion for Sanctions is pending.  Once again, DLL failed to certify that it had engaged in a good faith effort to resolve the disputes addressed in its Motion, because DLL has not done so.  Thus, DLL's Motion is procedurally defective under Local Rule 26.1(f).  DLL, however, has changed the relief requested, and now no longer seeks disposition of any counts.  That DLL has done so, especially while its Motion for Sanctions, which already requests all of the relief DLL seeks in this Motion, is pending, is indicative of one of the following:  (1) DLL is simply trying to smear Defendants and defense counsel by repeating their scurrilous charges or (2) DLL is now acknowledging, either as a result of this Court's Orders relating to summary judgment or because it realizes that its request for disposition of claims is untimely and in violation of this Court's April 12, 2004 deadline for the filing of such Motions, that disposition of claims is not appropriate.

      Nevertheless, the request DLL now seeks is still inappropriate for several fundamental reasons.  First, Defendants produced every document relating to Desoto's profits generated from the equipment TAMS leased to Desoto.  Second, DLL had more than ample opportunity to question Defendants about their finances at the seven days of Defendant depositions.  Third, Defendants are not claiming lost profits as part of their damages.  Fourth, while DLL claims that

Defendants should be barred from presenting evidence concerning performance of the equipment, the fact is that DLL openly admitted its disinterest in the issues concerning equipment performance, defeating any claim that DLL has been prejudiced in its ability to present this aspect of the case by anything Defendants may have done. See, e.g., DLL's 9/15/03 Brief Opp'g Defs. Mot. for Leave to Amend at 8 (DLL "has elected not to participate in depositions of TAMS representatives relating to issues regarding alleged defects in the equipment, not to secure copies of documents and images that have been produced by the parties, and has consciously taken a back seat to counsel for TAMS relating to key allegations of defects or deficiencies in the equipment leased to defendants"). Fifth, if DLL were correct, and Desoto had failed to present evidence of its profits (which is entirely false, as evidenced by the fact that TAMS relied on Desoto's tax returns as Exhibit 26 to TAMS' summary judgment brief, and described its Trial Exhibit 502, which consists of nearly 10,000 pages, as Desoto billing records[1]), an appropriate sanction would not to bar all evidence relating to equipment performance or Defendants' damages, but to, perhaps, bar Defendants from claiming that Desoto did not profit from its use of the equipment, or, if there were such a claim, barring that aspect of Defendants' damages that related to lost profits. So as to avoid any confusion at all, however, no sanctions are appropriate because DLL has every document to which it is entitled.

DLL's confusion on this point is obvious. Perhaps in reaction to the arguments in Defendants' brief opposing sanctions, DLL now contends, for the first time, that it needs financial and billing records of the so-called guarantors to show whether Desoto profited from its use of TAMS' equipment. DLL offers no explanation for this attempted connection, which

---

[1]    TAMS' indication of the Bates range of such documents is not consistent with Defendants' records concerning their productions. Accordingly, Defendants are not able to ascertain what documents TAMS means to refer to in its Trial Exhibit 502.

confirms Defendants' belief that DLL is simply trying to engage in asset discovery even though they have raised no claim for punitive damages and even though any attempt at discovery in aid of execution is patently premature (as well as extremely presumptuous).  Moreover, there are no billing records of any guarantor that could have anything to do with whether TAMS' equipment worked.  Indeed, Defendants cannot even decipher what DLL could even be referring to in seeking such billing records, as there are no, for example, "billing records" of Randon Carvel.

    C.  DLL's Motion in Limine To Dispose of Defendants' Claim for Punitive Damages

This Motion is untimely, as DLL failed to meet the Court's April 12, 2004 deadline for the filing of dispositive motions.  This Motion also appears to ignore the import of this Court's denial of DLL's Motion for Summary Judgment on Defendants' claims for fraud and civil conspiracy against DLL.  While Defendants do not mean to limit what they will present at trial in any way, Defendants believe that the facts which have already been briefed at length, including but by no means limited to DLL's blatant efforts to deceive Defendants as to DLL's identity; DLL's conspiracy with TAMS to "appear" to be something that it is not, namely a proprietary program of TAMS; the act of DLL employee, Lisa Sparta, to sign the Master Lease as a purported "director" of TAMS so that DLL could obtain depreciation benefits on its taxes; DLL's decision to knowingly send false letters through the U.S. mail concerning the alleged assignment of a lease from DLL to itself; the payment of undisclosed points to TAMS in connection with the financing; and DLL's outright rejection of all offers to purchase the equipment after de-installation and DLL's refusal to sell the equipment during the past two years are sufficiently outrageous to entitle Defendants' claims for punitive damages to be submitted to the jury, and that the Court should not rule, as a matter of law and on the basis of an in limine

motion, that DLL did not possess the required level of intent (which is a factual issue), or that Defendants cannot prove any facts that could justify the award of punitive damages.

D.  <u>DLL's Motion Regarding Burden of Proof on Mitigation</u>

DLL is seeking recovery of sums allegedly due under the Master Lease Agreement and related documents.  Defendants believe that the admissions of TAMS and DLL, combined with binding precedent and hornbook law, demonstrate beyond any doubt that the Master Lease Agreement never became effective, as the condition precedent that the Lessor (TAMS) sign the document was admittedly never met.  As all of DLL's claims hinge on the effectiveness of the Master Lease, Defendants believe that DL is not entitled to any damages against Defendants.

At any rate, even if the Master Lease were effective, and even if TAMS validly assigned its rights and obligations as Lessor to DLL, and even if Desoto defaulted on that lease, the Master Lease Agreement imposes on the Lessor the duty to sell, lease or otherwise dispose of the equipment once, as happened here, the equipment was shipped and stored by TAMS and DLL. Master Lease Agreement at § 14 (in the event of a default by the lessee, "Lessor may, at its option, use, ship, store, or repair any and all items of Equipment . .  removed [from lessee's facility] and <u>shall</u> sell, lease, or otherwise dispose of any such Equipment") (emphasis added). Moreover, after disposing of the equipment, the lessor must credit the lessee for sums recovered: "In the event Lessor disposes of the Equipment, <u>Lessor shall give Lessee credit for any sums received by Lessor from the sale or lease of the Equipment</u> after the deduction of the expenses of sale or lease." <u>Id.</u> (emphasis added).  It is undisputed that DLL and/or TAMS did ship and store the equipment removed from Desoto's facility (thereby triggering the obligation to "sell, lease or otherwise dispose") and that DLL and/or TAMS have breached this obligation by failing to dispose of any of the equipment.  Remarkably, not a single piece of the equipment has been sold

or leased in the more than 2 years since de-installation.  As Desoto is entitled, under the Master

Lease, to a credit for the amounts generated by a disposition, which obligation became

mandatory once TAMS and/or DLL shipped the equipment, and as DLL seeks recovery under

the Master Lease, it is DLL's obligation to prove what its recoverable damages are under that

document.  By the terms of the Master Lease Agreement, DLL cannot recover from Desoto or

any guarantor any amount that should be credited by virtue of a disposition.  DLL cannot claim

that it is Defendants' burden of proof given that it is the Lessor's mandatory obligation to make a

disposition and credit the amount from the disposition to Desoto.  This is an essential element of

DLL's claim for damages under the Master Lease, and DLL's Motion in Limine on this point

must, therefore, be denied.

DLL's argument that it "will not be required to mitigate damages if both it and

Defendants had an equal opportunity to reduce the damages" is inapposite here, as DLL took

possession of the equipment after de-installation, and were in control and/or possession of the

equipment after that time.  Offers were apparently made to DLL, who flatly rejected all such

offers and decided that it would not sell any of the equipment.  DLL also returned checks

Defendants sent in as payment for the CT Scanner, and insisted that DLL recover that piece of

equipment, which DLL then refused to sell.  DLL's attempt to shift the blame for its own failures

should not be tolerated.

## II.  <u>TAMS' MOTIONS IN LIMINE SHOULD BE DENIED</u>

Consistent with its attempts to constantly rewrite the facts to create a picture that supports

the conclusions it wishes to reach, TAMS' Motions in Limine often fall back into the same trap

of rewriting the history of this case, this Court's Orders, and its own admissions.  As set forth in

prior pleadings, TAMS directly contradicted its prior admissions in its summary judgment brief,

such that its prior pleading that "TAMS entered into the Master Lease with DeSoto . . ." changed, without notice or explanation to the Court, into "DLL entered into the Master Lease Agreement with DeSoto." Compare TAMS Ans. to DLL Crossclaim at ¶ 8 with TAMS S.J. Br. at page 9 (emphases added). TAMS then attempted to argue that it did not really matter whether TAMS or DLL were the Lessor, which is false because (1) since TAMS is listed as, and has admitted to being, the Lessor under the Master Lease, TAMS' failure to sign that document renders it ineffective and (2) under any scenario, the fact that TAMS is both Lessor and supplier under the lease defeats TAMS' and DLL's claim that Desoto entered into a "finance lease." 13 Pa. C.S. §2A103(a) (definition of finance lease requires that lessor does not supply the goods under the lease). As TAMS has admitted to being both Lessor and supplier, there is no finance lease, and Desoto enjoyed the full right to revoke the equipment provided in 13 Pa. § 2A517, rather than the more limited right provided to finance lessees under that same statute.

Similarly, in response to TAMS' most recent Motion for Sanctions, Defendants informed the Court that, contrary to the charges levied against them, Defendants had produced all of Desoto's billing records. TAMS failed to inform the Court that it planned to list nearly 10,000 pages of Desoto billing records as its trial Exhibit 502, which Defendants discussed above. Instead, TAMS hoped this Court would bar claims and/or evidence based simply on TAMS' representations. In its Motion relating to other TAMS' customers, TAMS falsely quoted this Court's Order, and failed to provide an ellipses to even provide notice that TAMS was intentionally omitting critical language that defeated its argument. The lesson is clear: simply because TAMS says something does not make it so.

A.  <u>TAMS' Motion in Limine to Exclude Evidence of Oral Representations</u>

One of TAMS' seven Motions in Limine is titled "Motion in Limine to Exclude Testimony Regarding Alleged Oral Representations in Connection with the Sale and Leasing of the Equipment."  In reality, TAMS is asking this Court to (1) ignore the principles of <u>stare decisis</u> and rule that the Master Lease is a valid contract notwithstanding TAMS' admitted failure to meet the condition precedent that the document would not be effective unless signed by TAMS and (2) disregard the fact that Defendants have pled that there was fraud in the execution, and have developed sufficient evidence to present this issue to the jury.

TAMS' Motion is based entirely on the parol evidence rule, yet to reach that rule, TAMS needed to write that "the [Master Lease] agreement is signed by all parties, the terms are unambiguous and there is no reference to any other documents."  TAMS Br. at 3.  First, TAMS is specifically listed as the "Lessor" in the signature box, but the only signature in that box belongs to Lisa Sparta, who TAMS and DLL have admitted never worked for TAMS.  As there are no other signatures other than Dr. Carvel's, TAMS did not sign the Master Lease, rendering that document ineffective by its terms, and refuting TAMS' claims that all parties signed that document.  TAMS' continued efforts to rewrite the history concerning its failure to execute the Master Lease is very telling.

Second, while TAMS argues that the Master Lease is unambiguous, this is plainly not true.  DLL and TAMS have argued that, notwithstanding the listing of TAMS in the Lessor box, the Lessor is Toshiba America Medical Credit, "a program of" TAMS, based on the language just above Section 1 of the Master Lease.[2]  Obviously, if the Lessor is listed alternatively as

---

[2]    TAMS falsely claims that "DLL identified itself, perfectly properly, as TAMC."  TAMS Br. at 3, n.2.  As explained in Defendants' Motion to Dismiss, DLL was required to register the fictitious name of TAMC with the Pennsylvania Department of State, but did not do so.  Moreover, DLL used the fictitious name of

TAMC, "a program of TAMS" on the first page and simply TAMS in the signature box, there either is no ambiguity that TAMS is the Lessor, or there is an ambiguity which by well-established principles of contract construction must be resolved against DLL and TAMS. Under the Program Agreement between TAMS and DLL, DLL was responsible for the preparation of all Contract documents, and TAMS had the right to review all such documents before use. Program Agreement at pages 3-4, §§ 2.3(b)-(c). The scheme hatched by TAMS and DLL was for DLL to use the fictitious name "TAMC" so that, in the words of the Program Agreement, "the lease financing program will at all times <u>appear</u> to Lessees to be a proprietary program of TAMS." <u>Id.</u> at page 16, § 6.1(a) (emphasis added). Indeed, even though DLL was a separate company, DLL and TAMS wanted to make DLL appear to be a program of TAMS, and the listing of TAMS as Lessor was not a mistake, but was required under the Master Lease Agreement. <u>Id.</u> at page 3-4, § 2.3(b) (requiring DLL to prepare all documents, which "shall be on a private label basis and will reflect TAMS as the Lessor.") Even if both had not in this case judicially admitted that TAMS was the Lessor, TAMS and DLL cannot intentionally list TAMS as the Lessor, obtain lessees' signatures, then deny that TAMS was the Lessor.

Third, contrary to TAMS' claim that "there is no reference to any other documents," the Master Lease references numerous other documents, and DLL even pled in its Complaint that all documents grouped together as Exhibit A to its Complaint collectively formed the Master Lease Agreement. DLL Complaint at ¶ 9. Indeed, in the same signature box that TAMS wishes to avoid because it imposed on them the duty to execute, the Master Lease provides that all attachments to the Master Lease "are included by reference . . . and become part of this Agreement."

---

TAMC in a manner that defrauded Defendants (and in a way that perhaps violated criminal provisions of the United States Code regarding the use of the United States mail system).

TAMS made no effort to distinguish any of the binding precedent or hornbook law previously recited by Defendants for the proposition that the Master Lease Agreement never became effective.  Naturally, if the Master Lease Agreement is not effective or binding, the parol evidence rule has no place in this case, and TAMS' Motion must be denied.

Even if the Master Lease were effective, however, Defendants are not, as TAMS claims, "try[ing] desperately to ignore" TAMS' contention that there is no claim for fraud in the execution because TAMS' claim is, once again, false.  According to TAMS, "fraud in the execution applies to situations where parties agree to include certain terms in an agreement, but such terms are not included."  TAMS Br. at page 2-3.  In this case, much more than that has been alleged.  Indeed, Defendants have alleged that TAMS represented that it was the "single source" for sales, service and financing.  Instead, DLL was actually the financing source, who made secret points payments to TAMS (the sales and service source).  DLL and TAMS conspired to list TAMS as the Lessor and include a provision that the Master Lease would not be effective unless TAMS executed the agreement.  However, DLL had its employee, Lisa Sparta, sign as a purported "Director" of TAMS when, in fact, she was never employed by TAMS.  The net effect is that Desoto signed a document that, if TAMS and DLL's arguments are to be believed, was not what it purported to be, namely, a lease agreement with Desoto as Lessee and TAMS as Lessor that would only become effective if TAMS signed it.  TAMS and DLL argue that this document was actually a lease between Desoto and DLL that became effective when signed by DLL, even though TAMS is the listed Lessor and DLL never appears anywhere in the document. Desoto signed the document as an offer to TAMS, which, by law, only TAMS was entitled to accept.  For TAMS and DLL to argue that the Master Lease was anything else is to argue that there is a jury issue on fraud in the execution.  TAMS acknowledges that if there are claims of

fraud in the execution, parol evidence is admissible.  Accordingly, for all reasons contained in

this Section, TAMS' Motion in Limine with respect to oral representations must be denied.  See

Lewis v. Mears, 297 F.2d 101 (3d Cir. 1962) (parol evidence rule not applicable where parol

testimony establishes that written contract did not come into existence because condition

precedent to its existence as contract never occurred).

     B. <u>TAMS' Motion in Limine to Exclude Evidence Concerning Other Customers</u>.

     In this Motion, TAMS claims that Defendants were unhappy with Court orders and

therefore acted in violation of those Orders.  This is ironic because, to reach that argument,

TAMS had to rewrite three Orders by this Court to fit its desired position.  In its first footnote,

TAMS intimated that this Court punished TAMS for trying to work with Defendants concerning

the production of documents ordered to be produced by December 15, 2003.  In doing so, TAMS

ignored the fact that its Motion for Sanctions was denied "because, <u>inter</u> <u>alia</u>, it was not filed in a

timely manner.  Toshiba could have properly filed this motion as early as December, 2003, but

for unexplained reasons, waited until the eve of trial."  May 6, 2004 Order.  The Court did not

express the other reasons for the denial of TAMS' Motion, which TAMS now ignores.  The

Court also made no finding that Defendants violated any Order of this Court, and, while

referencing December as a time by which TAMS could have brought its Motion, this hardly

suggests that the Court was even considering compliance with any of its Orders, especially since,

as previously argued by Defendants, TAMS had been threatening to file another Motion for

Sanctions since December 5, 2004 (weeks before Defendants were required to comply with the

Court's December 2, 2004 discovery orders).

     The second Order TAMS rewrites (or perhaps, more aptly, invents) is the "Order" that

ruled that the only relevant evidence in this case is evidence that, in a narrow sense, relates to the

obligations of the parties, and whether or not those obligations were met. If such an order existed, of course, then TAMS would be in violation of it by seeking to examine areas relating to how Desoto billed its procedures to its patients, Medicare, and insurers. Defendants believe and have moved for preclusion of such evidence, but, rather than trying to ascribe a new Order to this Court as support, have instead argued that such evidence is irrelevant and inflammatory. This Court has not issued any blanket order to the effect presented by TAMS, and instead, <u>inter alia</u>, granted Defendants' Motion to Compel TAMS to disclose documents relating to third party complaints. <u>See</u> February 19, 2004 Order. However, even if this Court had issued the Order TAMS suggests, its argument would still be flawed because TAMS had an obligation to provide equipment that was free of defects, and the evidence it seeks to exclude by this Motion will tend to show that the equipment was inherently defective.

Rather than issuing a blanket Order preventing any discovery from other TAMS customers, this Court ordered that Defendants could depose TAMS customers upon good cause shown. <u>See</u> February 17, 2004 Order. This Order is the third one TAMS tried to rewrite, but it is by far the most egregious attempt at deception TAMS committed (at least in this wave of briefing). The plain and unambiguous terms of that Order relate solely to discovery, a fact TAMS tried to obscure by editing: "Defendants shall not issue any subpoenas to, <u>or otherwise seek to take discovery of</u>, past or present TAMS customers except pursuant to Order of this Court upon good cause shown." (emphasis added). In typical TAMS' fashion, TAMS eliminated that portion of the Order Defendants underlined above, yet did not even include an ellipses to let the Court know that it was omitting any language: the Court "prohibited DeSoto from issuing subpoenas to 'past or present TAMS customers except pursuant to Order of this Court upon good cause shown.'" TAMS Br. at 4. TAMS simply eliminated the reference to

discovery because that would defeat TAMS' false charge that Defendants "deliberately violated this Court's February 17, 2004 Order" by issuing trial subpoenas.  TAMS also omitted the sentence which followed its fraudulent quotation, which sentence further confirmed that the Court's Order related to subpoenas for depositions, and not trial:  "Such order may issue after the court has considered a motion of Defendants with respect to TAMS' customers which Defendants wish to <u>depose</u> and TAMS response thereto."  <u>Id.</u> (emphasis added)

Defendants did not, as TAMS notes, pursue depositions from these witnesses during discovery after the Court's Order, but that was more a function of prioritizing a busy deposition schedule than a function of waiving a right to call such individuals as witnesses at trial.  No such waiver occurred, and this Court's Order does not prohibit Defendants from putting on their case, which includes claims that TAMS' equipment was inherently defective.

In short, this Court has not ruled that Defendants cannot introduce evidence of problems experienced by other customers of TAMS with the same and/or similar equipment that TAMS leased to Defendants.  The records that were produced pursuant to subpoena came in many months ago, and were produced to TAMS many months ago.  Many of TAMS' customers have voluntarily agreed to come and discuss the problems they had with the same or similar equipment as TAMS leased to Defendants, which evidence will, Defendants believe, relate to Defendants claim that TAMS breached its warranty to Defendants by leasing equipment that was inherently defective (TAMS admits that its "standard warranty" promises that its equipment will be free from defects).  Contrary to TAMS' "interpretations" and revisions of this Court's Orders, this Court has not ruled that Defendants cannot use records and witnesses that relate to the issue of whether TAMS provided defective equipment to Defendants, and Defendants have not violated any of this Court's Orders.

Finally, TAMS omitted another critical fact of which this Court should be aware in deciding this Motion:  Defendants have informed TAMS that Defendants will not call any of the these customers as part of Defendants' case-in-chief.  Thus, Defendants will only call such witnesses if needed as rebuttal witnesses.  If called, Defendants believe that such witnesses could establish that the equipment leased by TAMS to Desoto was inherently defective.  Defendants respectfully submit that this Court should reject TAMS' efforts to deceive the Court into believing that it has already entered orders that prohibit Defendants from putting on their case at trial.

    C.  <u>TAMS' Motion to Exclude Certain Testimony by Dr. Lynn Carvel</u>

TAMS moves in limine to exclude Dr. Lynn Carvel's testimony regarding image quality problems, Toshiba equipment problems and TAMS' service deficiencies.  In support it cites the Federal Rules of Evidence on experts and notes, correctly, that Dr. Carvel has not been designated as an expert.  However, TAMS concedes that Dr. Carvel is qualified to testify as to her personal knowledge of the facts relating to the Toshiba equipment problems, but TAMS confuses facts with what they style as "scientific, technical or other specialized knowledge."  For the same reason that a physician in a medical malpractice case can be a fact witness and not an expert, so too Dr. Carvel is qualified to testify, for example, as to her observation of the Toshiba images, including any artifacts or flaws in the image and whether, when any issues with the equipment occurred, they were resolved by TAMS.  <u>See</u> <u>DeSanto v. Rowan Univ</u>., 224 F. Supp 2d 819 (D.N.J. 2002) citing <u>Heller v. Shaw Indus. Inc</u>., 167 F.3d 146, 159 n.8 (3d Cir. 1999)  Thus, the testimony to be given by Dr. Carvel is allowed by Fed. R. Evid. 701 and not barred by Fed. R. Evid. 702.

TAMS notes that in depositions Dr. Carvel acknowledged she could not identify the causes of the problems with the equipment TAMS leased to Desoto. Dr. Carvel was deposed on six different days and TAMS had more than sufficient opportunity to ask her whatever it liked in regard to the images made by Toshiba equipment. There were hundreds of service calls from Desoto to TAMS, with many problems admittedly going unresolved. Dr. Carvel is clearly competent to testify to all of the facts surrounding all of those calls, her observations, and whether the problems were resolved by TAMS or continued to occur.

D. <u>TAMS' Motion to Exclude Tape Recorded Telephone Conversations</u>

TAMS complains that fifteen tape recorded telephone conversations are listed on Desoto's exhibit list. Desoto has listed recordings that it wishes to admit into evidence, but not all fifteen will be used. The transcripts of a number of conversations are attached to TAMS' brief. Five of those recordings included at Exhibit A are inaudible or irrelevant and will not be used. Two of the conversations listing "unknown female and unknown male" are Dr. Carvel talking to Jesse Jacobs, Paul King or Donnie Jenkins. There was a full and fair opportunity at deposition for TAMS to explore these tapes.

In addition to the tape transcripts, Desoto has deposition testimony where the speaker on the tape listens to the tape, authenticates the tape and admits that it is a fair representation of the conversation. TAMS attended each of these depositions and had a full and complete opportunity to question the witness about the conversation and cross examine the witness about the tape. Although TAMS insists on using the words "surreptitiously recorded" in reference to the tapes as if it were illegal to do so, TAMS has conceded that it is not illegal to record conversations in Tennessee or Mississippi.

As TAMS points out in regard to TAMS' employee, Donnie Jenkins, Dr. Carvel thought it necessary to protect herself from TAMS' employees changing their story about the faulty Toshiba equipment, and the conversation was recorded. TAMS argues that this particular conversation is unreliable. On the contrary, the conversations are quite candid, and not at all flattering to TAMS. Nevertheless, citing Fed. R. Evid. 801(c), TAMS asserts that these statements are hearsay because they are out of court statements. Unfortunately for TAMS, these conversations were also confirmed under oath at deposition and TAMS had the opportunity to cross-examine. TAMS can simply read in its cross examination of these witnesses, or call them at trial. In addition there is a proper foundation for admission of the tapes under Fed. R. Evid. 804(b)(1) as many of the people on the tapes are outside the subpoena range of this Court..

TAMS also protests the admission of these verified and authenticated tape recordings on the basis of hearsay in that they are not party admissions under Fed. R. Evid. 801(d)(2)(D). Specifically, TAMS states Michael Smith was not an employee at the time the statements were made. Mr. Smith was also deposed and questioned about the tape and it is admissible under 804(b)(1) as well.

Dr. Carvel's conversation with "Ron," a TAMS employee, is clearly relevant and admissible under Fed. R. Evid. 801(d)(2)(D) as Ron is instructing Dr. Carvel how to work through a problem with Toshiba equipment.

The Donnie Jenkins conversation is particularly damaging to TAMS and is admissible under Fed. R. Evid. 801(d)(2)(D) and 804(b)(1). Mr. Jenkins is a TAMS service engineer who serviced some of Desoto's equipment. The only argument TAMS offers is that he was not acting in his capacity as a TAMS employee, i.e. that his conversation was not within the scope of his employment. On the contrary, Mr. Jenkins testified he was on a service call at the time but was

not sure if it was after hours, but that he was a Toshiba employee "24/7" (see p.179-81, 319-320 Donnie Jenkins dep). TAMS also protests the inclusion of the statements made by another TAMS employee, Michael O'Barr to Mr. Jenkins and passed along to Desoto, but that conversation is admissible under Fed. R. Evid. 805 because it is also admissible under 801(d)(2)(D) as well as 804(b)(1). Mr. O'Barr was deposed at length about the dozens of service calls related to the faulty equipment. TAMS had ample opportunity to question Mr. O'Barr at deposition.

TAMS also complains about the conversation between Desoto's administrator at the time, Paul King and Great Plains Medical Center, another TAMS customer. During the period of time that Desoto was having problems with its Toshiba equipment, Mr. King asked TAMS for names of other of their customers with similar equipment to discuss problems or fixes to that equipment. That is why he called Great Plains—at the invitation of TAMS and that fact is mentioned on the transcript. In fact contrary to TAMS assertions, this Court did not completely bar discovery from TAMS' other customers, rather it decided to examine third party discovery on a case by case basis. There were no Orders forbidding calling TAMS customers to trial. TAMS just does not like what its customers have to say about Toshiba equipment and want to exclude it.

TAMS disputes the authenticity of the tape transcripts, but they provide no factual basis for that dispute. Finally, TAMS also argues generally that the transcripts should be stricken because they present generalized hearsay problems. This argument is similarly unavailing. First and foremost, the transcripts present no more hearsay difficulties than any other document offered to place a statement into context. Moreover, some of the transcripts do not have to meet the definition of hearsay under the Federal Rules of Evidence where they are not offered to prove

the fact of the matter asserted, but simply to demonstrate that the statements were made, and Desoto's response to them, including state of mind of the speaker and actions taken by Desoto. *See* Fed R. Evid. 801(c). Similarly, these statements could be used to attack the credibility of witnesses on cross-examination.

TAMS' final argument is that the tapes should be excluded under Fed. R. Evid. 403. They should not. The tapes are directly relevant to the issues in the case and will be helpful to the jury in understanding the facts of the case.

E.  Defendants' Expert Witness Testimony Should Be Admitted

TAMS moves to strike all of defendants experts. The first attack is on the experts' qualifications. Courts should liberally interpret the requirement that an expert be qualified by his knowledge, skill, experience, training or education. In re Paoli R.R., 35 F.3d 717, 741 (3d Cir. 1994). As to Dr. Jason K. Morris, the chief complaint is that he is a radiologist. TAMS own imaging expert, Dr. Winkler, is a radiologist. As radiologists, these doctors have seen literally thousands of images and can opine on the quality of them. Dr. Morris' opinion about the quality of the radiological images was reached after studying many images and comparing them with other images to come to his conclusion.

TAMS also criticizes James C. Long, a technologist who opines about the Toshiba image quality and his opinion that problems with images were not caused by technologists. As a technologist himself he see hundreds and hundreds of images and knows when there is a defect in those images and how a technologist can cause a problem with an image. He is certainly qualified to render his opinion.

TAMS then turns its attention to Joseph D. Strain, asserting that his opinion about the quality of service by TAMS service employees was deficient. On the contrary, Mr. Strain

worked for several years as a service engineer. Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." "[A]t a minimum, a proffered expert witness…must possess skill or knowledge greater than the average layman…" <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir. 1998).

Next TAMS argues that Desoto's proposed expert testimony is not reliable. The reliability factor is satisfied when the proposed testimony is based upon "good grounds." <u>Robert Billet Promotions, Inc. v. IMI Cornelius, Inc</u>., Civ. A. No. 95-1376, 1998 WL 151806 at *2 (E.D. Pa. 1998). TAMS believes Dr. Morris' report does not reflect a methodology. On the contrary, his report sets forth that the technique he used compared the Toshiba images with images taken on equipment bought to replace the Toshiba equipment. He also reviewed the brochures and specifications for the separate modalities and compared those descriptions with the actuality of the images. Mr. Long reviewed the MRI images as well as the service records to determine whether the problems he recognized in the images were caused by, basically, operator error. Mr. Long noted that when Application Specialists tested the equipment they encountered the same problems seen by technologists. Mr. Strain determined, after an analysis of the service calls, that TAMS service was inadequate because of the unusually large number of service-related problems with the equipment. From a review of materials produced by Toshiba itself Mr. Strain determined that service personnel were not properly trained and that the equipment could not maintain a consistent quality image.

Finally, TAMS claims that defendants' experts lack relevance, because of lack of reliability, and they invade the province of the Court. Testimony is relevant if it aids the finder of fact in determining any fact at issue. Each of these experts offer testimony about issues

directly relevant to this case—the poor image quality of the films produced by Toshiba equipment, whether a technologist caused the problems and the level of service provided by TAMS' service people. Dr. Morris and Mr. Long both have the expertise to point out the defects in the Toshiba images, which should help the jury understand the problems Desoto had using this equipment. Without the guidance of a radiologist and a technologist, the jury likely will not understand what they are looking at. Mr. Strain can explain service issues, how they are resolved and why they are not.

     F. <u>Defendants' Damage Claims Are Proper</u>

TAMS claims that any warranty Desoto had (and TAMS denies it had any at all) was limited to repair or replacement of the equipment. On the contrary, in <u>Barrack v. Kolea</u>, 651 A.2d 149 (Pa. Super. 1994) a builder relied on a similar repair or replace warranty and spent an entire summer and fall working to repair defects in a home. After being sued, builder argued that buyers' only recourse was to allow builder to cure the defect. The court found that argument to be without merit, holding that such repair or replace clauses are not interpreted to mean that the sole remedy is to allow unlimited opportunities to cure, only a reasonable period to cure. Ultimately the court held that the remedy failed of its essential purpose. This issue was briefed in greater length in Defendants' opposition to TAMS' motion for summary judgment.

TAMS also claims that none of Desoto's damages resulted from breach of the repair or replace warranty (if, of course, there was a warranty). Essentially TAMS claims it sold the equipment and washed its hands of it, both in regard to DLL and Desoto. The <u>Barrack</u> court addressed this issue as well, holding that the measure of damages was not physical damage to the buyers or their house, rather it was the loss to buyers of the benefit of their bargain, finding that the builder's mistake (like TAMS) was in confusing harm with damage. Desoto clearly

delineated its losses in relationship to its loss of its benefit of the bargain, including in excess of $500,000 in lease payments made on defective equipment.  TAMS also argues that certain elements of Desoto's damages arise from its breach of the lease.  As explained in Desoto's summary judgment motion, Desoto had the right of revocation, thus this argument fails.  In regard to certain specific damages, Dr. Carvel and Mr. Carvel will be able to testify as to how much of their time was spent trying to cope with all the problems caused by Toshiba equipment. Dr. Carvel can explain, based on her experience, how much of Paul King's time (Desoto's administrator) was taken up with equipment issues.  Thus, just because TAMS says these damages are "completely arbitrary" does not make it so.  Indeed many of these damage figures have documentary support.

TAMS then addresses the secret points payment of $8,424.37 passed on as a cost in the Desoto deal, claiming Desoto had no evidence that the payment was passed along to Desoto.  As set forth in Desoto's summary judgment brief, Dana Pinner, a DLL employee confirmed in essence that the payment was passed along to the customer and that it was not disclosed to the customer.  Thus the fact that Dr. Carvel knew the interest she paid did not reflect that she knew it was inflated by the points payment.  The documents exchanged between TAMS and DLL reflect the points payment in the Desoto deal.

Consistent with the provision for damages under the Tennessee Consumer Protection Act, should the jury find in Desoto's favor, it could award the entire amount of the contract—in excess of $2.5 million.  The Court could then treble that amount and award Desoto its attorneys fees.  See Lorentz v. Deardoan, 834 S.W.2d 316 (Tenn. App. 1992) (rescission action, damages measured by rescission amount); Shin Yi Lien v. Couch, 2004 Tenn. App. LEXIS 108, M2002-01625-COA-R3-CV (Tenn. App. Feb. 23, 2004) (plaintiff who paid only deposit on contract

could recover entire amount of contract because of claim against plaintiff); T.C.A. § 47-18-109(a)(3) and (e)(1). Desoto will ask the jury to award the entire amount of the contract plus interest and attorney fees claimed by DLL to cover the eventuality that there is a claim over against it. Similarly, under the TCPA, TAMS could be liable for the same damages as DLL and Desoto awarded its attorneys fees by the Court. None of Desoto's damage claims can be dismissed on any basis set forth in TAMS' motion in limine.

    G. <u>TAMS' Motion in Limine to Exclude the Testimony of Certain Witnesses</u>

    In typical form, TAMS again presents a disingenuous argument to the Court in its motion in limine to exclude the testimony of "witnesses identified on the last day of discovery" even going so far as to represent to the Court with feigned alarm that the witnesses disclosed in Defendants' Second Supplemental Initial Disclosures Pursuant to Rule 26(a)(1) were "completely unknown to TAMS". This is simply not the case.

    Of the individuals identified in Defendants' supplemental initial disclosures of which TAMS' complains, John Carrol of MRImaging at Garden City was identified in a letter from Brian Turnbull of TAMS to Dr. Lynn Carvel on November 20, 2001 as a contact individual for references on the Excelart MRI. This document was disclosed as TAMS 1146 – 1148, and was used as a deposition exhibit in the deposition of Charlie Ryan. John Carrol was discussed during the deposition of Paul King. Mr. Carrol is known to TAMS, and has been for at least three years.

    Dina Reimund, Jennifer Gibson, Katsuhiro Ito, Koji Ito, Hirokazu Noguski, and Richard Moen were disclosed by letter of November 18, 2003 to TAMS and DLL, a copy of which is attached hereto as Exhibit B. These individuals are not "completely unknown to TAMS", and Defendants did not wait until the final day to mention these individuals to TAMS.

Barry McAllister was deposed on February 9, 2004 and was cross-examined by counsel for TAMS.  On February 13, 2004, TAMS' filed a Motion for Protective Order regarding the scheduled depositions of Donald Owens, M.D., Steve Strobbe, M.D. and Linda Goins, of which Dr. Strobbe's deposition was partially conducted wherein counsel for TAMS participated. These individuals are not "completely unknown to TAMS".

Tony Gay, David Harrell, Mike Powers, and Cyndy Toso were all at one time TAMS employees whose existence and identity are clearly known to TAMS. Tony Gay, David Harrell and Mike Powers were also identified in the deposition of Raymond Ruskowski on March 4, 2004. Cyndy Toso was discussed during at least three different depositions, on November 5, 2003, February 20, 2004 and March 10, 2004. These individuals were also identified repeatedly in TAMS' own disclosures. Clearly the only way for TAMS to "be in the dark as to their existence or identities" would be if TAMS had failed to review its own disclosures and deposition transcripts. These individuals are known by TAMS.

Oxford Instruments was first subpoenaed by TAMS on October 21, 2003. In response to that subpoena, documents identifying Jim Delaney, Thomas Freund, Dan Gambogi, Joe McKenzie, Jerry Smith and Rowdy Teague were forwarded to Defendants by TAMS on or about November 7, 2003.  Lindgren RF Enclosures was also subpoenaed by TAMS on October 21, 2003. In response to this subpoena, Lindgren sent copies of the documents disclosed to TAMS to the Defendants, wherein Jim Meuth was disclosed therein. Again, clearly the only way for TAMS to "be in the dark" as to the existence or identity of these individuals would be if TAMS had failed to review its own documents.

TAMS' disclosures 17614-17622 identify both Kevin Fogerty, M.D. and Steve Friedenberg, M.D. of Radiology & MRI of Bethlehem, Inc. These individuals are known to

TAMS, as TAMS disclosed the documents to the Defendants whereby their identity was ascertained.

TAMS' Image Quality Review (TAMS 233 - 262) was disclosed in discovery, and identified the National Medical Imaging and Providence Hood River sites. Defendants sent subpoenas to these sites on December 9, 2003, and on January 19, 2004, forwarded the documents received from Jean Sheppard at Providence Hood River. As Jean Sheppard is listed as a representative of Providence Hood River, it is clear that TAMS is not "in the dark" on this one.

Likewise, Siemens Medical Systems was identified early on in discovery as the supplier of Desoto's replacement equipment and for TAMS to now assert its existence has not been made known to it during the discovery process is absurd. Similarly, Christopher Rute was listed as a representative of Siemens, who TAMS has been well-aware of all along.

Lastly, Defendants identified five past or present patients of Desoto who are likely to have discoverable information to be used at trial. Of the five, TAMS cannot deny knowledge of Ms. Cloyce Shearin, as she was a patient who was injured by the Toshiba equipment, and her injury was discussed at length during deposition. Ms. Shearin was identified early on in discovery by the Defendants, as well as in TAMS 2741-2744 on Mike O'Barr's potential complaint form. The other four patients were only confirmed as being able to participate in the trial of this matter in Philadelphia within the days before Defendants' supplemental disclosures were made. It is completely unreasonable and insincere for TAMS to argue that Defendants "hid" this information for years. Only until a firm trial date was set could Defendants even begin to ask these particular witnesses to travel to Pennsylvania to testify, and then the individual patient witnesses had to make the necessary arrangements in order to come testify.

Witness by witness, it is clear that TAMS' argument is disingenuous, as the witnesses were not "completely unknown" to TAMS. Many of the witnesses listed had been previously disclosed, previously subpoenaed or previously deposed. If TAMS is truly in the dark, that is clearly through no fault of the Defendants and TAMS' motion in limine to exclude these witnesses' testimony should be denied.

## III. <u>CONCLUSION</u>

For the reasons set forth above, Defendants request that this Court deny all eleven

Motions in Limine filed by DLL and TAMS, and grant such further relief as the Court deems

appropriate.

Respectfully submitted,

_____
Kyle P. Tate, AR Bar No. 95097
TATE LAW FIRM
9085 Sandidge Center Cove
Olive Branch, MS 38654
(662) 893-8833

Lynanne B. Wescott
The Wescott Law Firm P.C.
Two Penn Center Plaza, Suite 200
Philadelphia, PA 19102
(215) 755-6330

William Matthews
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
(215) 972-7106

Attorneys for Defendants Desoto Diagnostic
Imaging, LLC, Randon J. Carvel, Lynn T.
Carvel, Delta Radiology, P.C. and Zobar
Properties, LLC

Dated: May 12, 2004

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the forgoing response and accompanying

papers were served today upon counsel of plaintiff and plaintiff/intervenor by telecopy and U.S.

First Class mail addressed as follows:

John Chesney, Esq.                    Peter J. Boyer, Esq.
Drinker Biddle & Reath, LLP           McCarter & English, LLP
One Logan Square                      Mellon Bank Center
18th & Cherry Streets                 Suite 700
Philadelphia, PA 19103-6996           1735 Market Street
                                      Philadelphia, PA 19103-7501


                              _____
                              Kyle P. Tate, AR Bar No. 95097
                              TATE LAW FIRM
                              9085 Sandidge Center Cove
                              Olive Branch, MS 38654
                              (662) 893-8833

                              Lynanne B. Wescott
                              The Wescott Law Firm P.C.
                              Two Penn Center Plaza, Suite 200
                              Philadelphia, PA   19102
                              (215) 755-6330

                              William Matthews
                              SAUL EWING LLP
                              Centre Square West
                              1500 Market Street, 38th Floor
                              Philadelphia, PA 19102-2186
                              (215) 972-7106

                              Attorneys for Defendants Desoto Diagnostic
                              Imaging, LLC, Randon J. Carvel, Lynn T.
                              Carvel, Delta Radiology, P.C. and Zobar
                              Properties, LLC


Dated: May 12, 2004