**OBJECTION TO PLAINTIFF / INTERVENOR
TOSHIBA AMERICA MEDICAL SYSTEMS, INC.'S
<u>DEPOSITION DESIGNATIONS</u>**

*Statement of Objection*:

Defendants Desoto Diagnostic Imaging, LLC., Randon J. Carvel, Lynn T. Carvel, Delta Radiology, P.C., and Zobar Properties, LLC. (Defendants) object[1] to the admission or use, regardless of purpose, of the following excerpts[2] from the respective depositions proposed for designation by Toshiba America Medical Systems, Inc. (TAMS). Defendants do not object to any sections that Defendants themselves designated or counter designated.

The bases for objection are twofold. Defendants stand upon and renew their previous objections stated in the following depositions. Defendants also object to the designations on the additional bases stated in the right column.

Defendants incorporate into this Statement of Objection, all objections heretofore or contemporaneously made including, but not limited to, those included or covered by Defendants' Motions in Limine.

Defendants object to the video deposition of Paul King since the third day of the deposition of Paul King was videotaped. At that time Defendants objected based upon the court's ruling in Pam Paulk's deposition that "[I]f the first of the deposition was already done focusing on the witness, that's the way the second part's going to be done, and that's my ruling." (Deposition of Pam Paulk, Feb. 3, 2004 at 177 lines 8 – 16 and 179 lines 12 – 16).

---

[1] Not limiting our right to object at a later time.

[2] Referring to those excerpts we identify with objections.

*Objected Upon Deposition Designations Proposed by TAMS*:

1. <u>DEPOSITION OF PAUL KING, VOLUME I (Nov. 17, 2003).</u>

| Page | Line | Deposition Designation Testimony (Objections Renewed) | Objection. |
|------|------|-------------------------------------------------------|------------|
| 6 to 8 | 24 1 | Q.  Okay.  Could you provide your work history for the last ten years?<br>    A.  Could I provide it?<br>    Q.  Yes.<br>    A.  '93, I started in at Magnolia Regional Health Center, Corinth, Mississippi.  Director of Radiology Services there.  Stayed till August of '97.  August of '97, I went to Delta Medical Center in Memphis, Tennessee as their director of ancillary services.  Some time in '99, I was approached by two entrepreneurs to start an imaging center.  Started that process.  In the meantime, quit Delta Medical and went to work for Baptist Memorial Hospital East as an MR tech.  Subsequently got in a little trouble because I worked for the entrepreneurs.  Baptist didn't like that aspect of it.  So I quit and went back to Delta Medical Center.  Worked there until November of -- or actually October of 2000.<br>    November -- in October, I had a heart attack, and I was out about four weeks.<br>    Q.  In November of 2000?<br>    A.  October 31st of 2000.<br>    Q.  Okay.<br>    A.  December -- somewhere in December, started working for Desoto Diagnostic Imaging.  I worked there until they changed the name, and I subsequently left.  Went back to Magnolia Regional Health Center where I've been since June of 2002. | |
| 16 | 1 to 16 | Q.  So you moved from Delta Medical Center over to Desoto Diagnostic Imaging?<br>    A.  No.<br>    Q.  Okay.<br>    A.  During that time frame, I moved --<br>    Q.  We're talking about 1997 or so?<br>    A.  No.  1997, I was at Delta.<br>    Q.  Okay.<br>    A.  In '99 or early 2000, my time was being consumed by the involvement with these two entrepreneurs to build an imaging center.  And it was total involvement on all of our parts to build this facility and build this company. | |

| | | | |
|---|---|---|---|
| | | Q.  Would that be Dr. Carvel and Randon Carvel?<br>A.  That would be Dr. Carvel and Randon Carvel.<br>Yes. | |
| 18 | 4<br>to<br>14 | Q.  Were you a registered MRI technologist?<br>A.  I am.<br>Q.  How many years of experience do you have as an<br>MRI technologist?<br>A.  Sixteen years.<br>Q.  Are you registered in any other modality?<br>A.  I'm a registered radiographer as well.<br>Q.  Is that it?<br>A.  Uh-huh (affirmative response).<br>Q.  Is that yes?<br>A.  Yes. | |
| 28<br>to<br>29 | 12<br>23 | Q.   And what occurred in October of 2000, why you<br>left Delta?<br>A.  I had a heart attack.<br>Q.  Okay.  Did they fire you?<br>A.  No.<br>Q.  How did it come about that you left Delta?<br>A.  I left in -- with my heart attack, I was out<br>for four whole weeks.  We were supposed to start<br>operation some time in early November.<br>Q.  And you say we.  Who is --<br>A.  The Carvels.<br>Q.  Okay.  So how did that come about you leaving<br>Delta?  Did you decide to go over there and get ready<br>with the Carvels?  Is that what happened?<br>A.  Yes.<br>Q.  Now, did you receive any pay during the four<br>weeks in which you were off for your heart attack?<br>A.  I received two weeks of pay from Delta and two<br>weeks of pay from the Carvels.  But during the time of<br>my heart attack, I also worked for the Carvels during<br>that four weeks.<br>Q.  What were you doing for them?<br>A.  Calling employees, answering questions for<br>them, where our process was.<br>Q.  Helping them set up operations?<br>A.  Trying to let them understand what I had.<br>Q.  What do you mean as far as what you had, your<br>knowledge?<br>A.  We were all responsible for a piece of the<br>operation.<br>Q.  Okay.  And what piece were you responsible<br>for? | |

|   |   |   |   |
|---|---|---|---|
|   |   | A.  TechnologistS, equipment.<br>Q.  Anything else?<br>A.  Huh-uh (negative response).<br>Q.  No?<br>A.  No. |   |
| 46<br>to<br>53 | 22<br><br>19 | Q.  Okay.  And then when you went full time with the Carvels, what was your pay scale?<br>    A.  Money life scale was 67,000 a year.<br>    Q.  Okay.  How much of an increase was that from your employment at Delta?  I believe you testified earlier you were making 52,000 at Delta?<br>    A.  I started at 52,000.  I was making 56 when I left.<br>    Q.  Okay.  So you got 11,00 --<br>    A.  So it was an 11,000-dollar increase.<br>    Q.  Okay.  And what were your job duties at Desoto Diagnostic Imaging working for the Carvels?<br>    A.  I was their administrator, their PACS administrator, human resources director, staff coordinator, MRI technologist, general building superintendent.<br>    Q.  What else?<br>    A.  And a board member.<br>    Q.  Is it fair to say you ran the operations of DDI?<br>    A.  With limitations that Lynn provided, yes, I did.<br>    Q.  What limitations would those have been?  Do you recall?<br>    A.  She was the ultimate control.<br>    Q.  What does that mean?<br>    A.  It meant that if she didn't like the direction of things, that she'd change that direction.<br>    Q.  So if you had the company going in a certain direction, Dr. Carvel had the ability to change that direction?<br>    A.  Absolutely.<br>    Q.  But day-to-day operations, would you be in charge of the day-to-day operations?<br>    A.  Yes.<br>    Q.  Okay.  And would those day-to-day operations include -- what would those things include?  Describe for me.<br>    A.  Ordering supplies, making sure the staffing matrix was appropriate.<br>    Q.  What does that mean? |   |

A.   Staffing matrix means that according to procedural load versus employing on site.

Q.   What else?

A.   Transportation.

Q.   Anything else that you can think of?

A.   Running the RIS and -- RIS, which is the radiology information system, and also the PACS, which is the picture archive communications system.  I was responsible for all the archive of data, push and all of the information to different resources.

Q.   Did you interview job applicants?

A.   Yes, I did.

Q.   Did you make hiring decisions?

A.   With the approval of Lynn, yes, I did.

Q.   But as far as interviewing the potential employee, would you conduct the interview and then take that information to Dr. Carvel?  Is that how it worked?

A.   I would take that interview -- interview and interviewee to Dr. Carvel, and she'd interview them after that.

Q.   And would you make a recommendation for hire --

A.   I would.

Q.   -- to Dr. Carvel?  You would?

A.   I would.

Q.   Okay.  And Dr. Carvel would generally follow your lead --

A.   She did.

Q.   -- of those recommendations?  She did?

A.   Yes.

Q.   Now, I believe you mentioned earlier that you were in charge initially in the workup of getting the DDI facility ready, you were in charge of the technologists?

A.   That's correct.

Q.   Does that mean locating technologists for hire?

A.   That's correct.

Q.   And did you do that?

A.   I did.

Q.   And who did you hire right off the bat?

A.   The number one goal or the prerequisite that I involved myself in was making sure that each modality had a registered technologist for that modality in it.

Q.   Is a registered technologist something different than just a regular technologist?

A.   A registered technologist in the modality of
operation.  So if it was nuclear medicine, he would be
registered in that field, nuclear field.  If it was
mammography, she would be registered in the mammography
field, and all the way through the facility with all of
the resources.

Q.   So a registered technologist in a particular
modality would have a heightened education or
capabilities?

A.   They'd have advanced credentials and be
trained in that modality.

Q.   Okay.  And how do they gain those advanced
credentials?

A.   Some go to school for it.  There's different
courses offered.  On-the-job training for some, and then
they get to challenge the registry.  And if they
challenge and pass, they become registered.  It doesn't
mean they're qualified to do it.  The qualifications
come with the experience on the job.

Q.   Did you interview the potential technologist
applicants regarding their experience for the job?

A.   I did.

Q.   Okay.

A.   Yes, I did.

Q.   And the technologists that you hired at the
time, were you satisfied that they were adequately
trained?

A.   I was 100 percent satisfied.

Q.   And what were the names of the technologists
that you initially hired for DDI?

A.   Rick Staubach, nuclear medicine.

Q.   Okay.

A.   Cindy Holmes, mammography.

Q.   Okay.

A.   May Vokaty, ultrasonography, Joanne Tucker,
radiography.  And there's one more, and I can't remember
her name.  Debbie Powers, CAT scan.  And then I, with my
credentials, covered the MRI.

Q.   Was Joanne Tucker also hired as an MRI
technologist?

A.   Joanne was -- I was training Joanne at a
facility prior to.  So she had MRI knowledge.  She was
not registered in that field.  Therefore, she was
registered in radiography and put in that camp at a
lower pay.

Q.   Okay.  But she could do MRI scans at the time?

| | | |
|---|---|---|
| | | A.  Yes, she could.<br>Q.  And you say you were working with her at a different facility.  Where was that?<br>A.  That was Delta Medical Center.<br>Q.  And she did MRI scanning at Delta Medical?<br>A.  Yes, she did.<br>Q.  How long did she do MRI scanning at Delta Medical Center?<br>A.  A year.<br>Q.  And what piece of machinery did Joanne work on at the time?<br>A.  GE Contour .5.<br>Q.  Did Joanne Tucker also work on the mobile MRI for the Carvels?<br>A.  She did.<br>Q.  She did?  And is that for a three or four-month period, just like yourself?<br>A.  I can't remember the actual time frame.  It was -- it was probably at least two of those months.  The training aspect was greater than a normal person can take.  And a good MRI tech, even with a good one, it'll take three or four weeks to train you adequately on a piece of equipment.<br>Q.  Okay.  But you worked with her closely to try to get her up to speed?<br>A.  Yes.<br>Q.  Do you feel like she was up to speed pretty quickly?<br>A.  No.<br>Q.  No?  And how did you have that opinion?<br>A.  You have a piece of self-confidence about yourself.  She never exhibited the self-confidence to be by herself.<br>Q.  Are you saying at that time with the mobile MRI, or are you saying throughout her employment with DDI?<br>A.  I think throughout the employment all the way up to the very end, which at that point, once I left, she became a lot more self-confident and is running a system and teaching that system today. | |
| 61<br>to<br>62 | 16<br><br>11 | .  Isn't it true that that magnet wasn't actually installed until December of 2000?<br>A.  I was not there when it was installed.<br>Q.  How were the Carvels supposed to know anything about installation?<br>A.  Because I had gone over it with Lynn | |

| | | | |
|---|---|---|---|
| | | extensively.<br>Q.  And what was Lynn's knowledge about installation?<br>A.  She knew nothing about it.<br>Q.  Okay.<br>A.  But I also worked with Randon, too, to make sure the RF shielding was appropriate, the magnet installation was appropriate, and please, oh, by the way, take pictures of this installation.<br>Q.  And what did Randon at the time know about installation?<br>A.  He knew nothing, as well, but he was a construct -- he had had his license in construction and whatever he has to have his license in to manage that. Neither one knew anything.  But I was out at the time. | |
| 64 | 15<br>to<br>24 | Q.  Who replaced Mr. Marks on the local level?<br>A.  On a what?<br>Q.  On a local level, the Memphis rep.<br>A.  Donnie Jenkins and Greg -- I can't remember Greg's last name -- they were the two local FEs for nuc and CT and radiography.<br>Q.  Is that Greg Stalcup?<br>A.  Stalcup.  That's correct.  Greg Stalcup.  They replaced him for eyes on.  Ray Ruskosky, who is out of Birmingham, replaced him for the local. | |
| 65 | 9<br>to<br>22 | Q.  So there's a period of time there was no local service engineer for the MRI at DDI; is that correct?<br>MR. CHESNEY:  Objection.  Contradicts what the witness' testimony was just one second ago.<br>A.  I said that Greg Stalcup and Donnie Jenkins acted as the local field service engineers for all the modalities.  Their specialty was in other arenas, but as far as the MRI goes, locally, there was no absolute FE for local service.<br>Now, I don't know what the definition of local is. Birmingham is about three hours away, and that's fairly local when you look at FE and service response times. Most of the vendors I deal with now are two and a half to three hours out from the hospital I'm at today. | Use of the excerpt is Misleading.  FRE[3] 106 competence. |
| 67<br>to<br>68 | 17<br>1 | Q.  Isn't it true that when Toshiba sold the MRI equipment to DDI that they told them they would have qualified and competent service engineers to work on the equipment?<br>MR. CHESNEY:  Objection.  Leading. | Use of the excerpt is Misleading.  FRE 106 competence. |

---

[3] (Federal Rules of Evidence, Rule #)

| | | | |
|---|---|---|---|
| | | Objection to the form.<br>　　A.　That was our request to Toshiba, and our understanding was that we would have those individuals. And indeed, they did throw modality specialist FEs at all modalities there, and Randy being one of those. | |
| 79 to | 9 to 20 | Q.　Okay.　And Wendy McDonald, was she the applications for MRI?<br>　　A.　She was.<br>　　Q.　And do you know what her background was?<br>　　A.　She was an MRI technologist registered in that field.<br>　　Q.　Did you feel she was a competent applications person at that time?<br>　　A.　I did a little background check on her.　She had actually done the applications turnover at Saint Francis Hospital, who owned Excelarts as well.　And they felt very comfortable with her expertise. | Use of the excerpt is Misleading.　FRE 106 competence. |
| 82 to 84 | 7 23 | 82<br>7　　Q.　Okay.　And just briefly, what is the<br>8　responsibilities for applications?<br>9　　A.　From which side?<br>10　　Q.　From Toshiba side.<br>11　　A.　Responsibilities of applications, the first<br>12　initial visit -- and they're broken up in two visits.<br>13　You get initial visit and then advanced visit.　The<br>14　first initial visit was general operations of the piece<br>15　of equipment; that is, from starting the machine from<br>16　ground up, powering up, logging in, understanding what<br>17　your log-in phrases may be, understanding what some<br>18　potential error reporting cycle problems may be, general<br>19　operations for the bread and butter things like the<br>20　backs and heads are.　She trained for a week or so on<br>21　build protocols into the system and showed how to access<br>22　those protocols and do day-to-day scanning, running<br>23　single to noise QA and things like that.<br>24　　Q.　And you say Ms. McDonald built the protocols<br>25　and put them in the system?<br><br>83<br>1　　A.　Toshiba comes already formatted with<br>2　protocols.　But Ms. McDonald came in and put in some of<br>3　her more specialized protocols into the system.　As MR<br>4　people go, you build your own sequences.　You know they<br>5　work.　And you try to share that across the spectrum.<br>6　And she shared hers from different sites of Excelarts.<br>7　Each piece of equipment manages its own protocol base. | |

8      Q.   So the protocols with various systems may be a
9   little bit different --
10     A.   Yes.
11     Q.   -- system to system?
12     A.   Yes, they would.
13     Q.   Was there ever a necessity while you were at
14   Desoto Diagnostic Imaging to, say, tweak the protocols?
15     A.   My fetish is that I tweak every system that
16   I'm on regardless if it's there or not.  Yes, I tweaked.
17     Q.   And that's based on your experience?
18     A.   That's based on my experience.
19     Q.   And you were capable of doing that tweaking?
20     A.   I was.
21     Q.   And did you do it well?
22     A.   I did it very well.
23     Q.   And if Mike O'Barr stated that the reason the
24   image quality at DDI was poor was because the personnel
25   at DDI was improperly tweaking the protocols, would he

                                    84
1   be lying?
2          MR. CHESNEY:  Objection.
3    Mischaracterizes Mr. O'Barr's testimony.
4      A.   I'd say it's a false statement to some extent.
5   If I was there doing it, yes, it would be a misleading
6   statement that he made.  But if it was one of my other
7   technologists -- technologists as they set today -- and
8   this is universal.  This is just not with DDI or Baptist
9   or anyone -- they're button pushers.  And unless they're
10  trained appropriately -- and the only two companies out
11  there that gave a technologist a chance to learn real
12  systems was Toshiba and Siemens.  They forced you to
13  understand what you were doing.  They didn't allow you
14  to be a button pusher.
15     But the technologists I acquired -- certainly,
16  Joanne was a button pusher because she learned
17  buttonology to get through an exam.  And she's back on
18  the GE system with her buttonology again.  So you know,
19  she can train that system.  She can do that.
20     But Debbie May, when she came on, she had some
21  flexibilities.  But as a whole, you've got to have a lot
22  of devotion to that practice before you understand it.
23  I'm done.

| 89 | 12 | Q.  Okay.  Let me show you Exhibit Number 5. |  |
| to |  |        (WHEREUPON, THE ABOVE-MENTIONED |  |
| 91 | 17 |        DOCUMENT WAS MARKED AS EXHIBIT NO. 5 |  |

TO THE DEPOSITION, AND IS HERETO
ATTACHED.)

Q.  (BY MR. TATE)  Do you see on this
particular report at the top it has the caller name
as Debbie Powers?

A.  Yes.

Q.  And it references in the case summary the
Excelart; is that correct?

A.  That's what it -- that's what it's saying in
here.

Q.  Did Debbie Powers do MRI?

A.  She did not.

Q.  Can you explain why Debbie Powers would be
calling about the MRI, or could that, in fact, maybe
have been a mistake?

A.  I believe at this time -- all the techs ran
into a universal usage mechanism at our facility.  They
did laundry.  They washed the floors if they had to.
Anything -- they picked up laundry.  They just did a
variety of things.

Q.  Do you think maybe you had asked her or
somebody in MRI had asked her to place the call,
possibly?

MR. CHESNEY:  Objection.  Calls for
speculation.

Q.  (BY MR. TATE)  Do you think it would be a
possibility?

A.  Well, Debbie had just gotten back from -- we
sent her out to California to CT school to train on the
Asteion.  And I think she probably had just gotten back,
and it wasn't a whole lot of business quite for her at
that point.  So you know, she was -- and I don't know.
Maybe someone did ask her to make this call for them.

Q.  Okay.  What was the problem with this
particular case report?

A.  Well, it's saying here that patient heart
monitor inoperative.

Q.  What does that mean?

A.  I don't know what that means because this
appears to have some deliverance to the CT scanner.  But
you know, it's to Randy Marks.  Looks like he received
that part in.  The heart monitor itself was just --
maybe it was our cardiac gating system for the Excelart.
And I think --

MR. CHESNEY:  Excuse me.  I'm sorry.
Finish your answer.

| | | | |
|---|---|---|---|
| | | A. I think we talked about before that that system was inoperable. And there was no emphasis put on it. There was no need by us at the time. But there was no emphasis put on it to get that system operational. And you know, you don't know until the day you need it. And then if it's not operational, you know it at that point. So I think that's why this order was placed. | |
| 120 to 123 | 23 18 | Q. I'll ask you to take a look at Exhibit 14.<br>(WHEREUPON, THE ABOVE-MENTIONED DOCUMENT WAS MARKED AS EXHIBIT NO. 14 TO THE DEPOSITION, AND IS HERETO ATTACHED.)<br>Q. (BY MR. TATE) Is this a call placed on January 29th, 2001, Mr. King?<br>A. Uh-huh. Yes, it is.<br>Q. Does it have to do with the Excelart?<br>A. Yes.<br>Q. And does it look like a call made by Ms. Tucker?<br>A. Yes.<br>Q. Okay. And do you -- can you tell from looking at this what the problem was?<br>A. It appears that she was having a lot of noise in her image acquisition.<br>Q. Would that be a legitimate call to make if there was noise in the imaging acquisition?<br>A. Not at first, no.<br>Q. Not at first?<br>A. Not at first.<br>Q. But by the time Ms. Tucker made the call, would that be an appropriate call to make?<br>MR. CHESNEY: Objection. Assumes facts not in evidence, calls for speculation, no showing of personal knowledge.<br>A. No, it wouldn't.<br>Q. (BY MR. TATE) So what did Ms. Tucker do wrong?<br>A. When she had the noise occur, she should have went back and put her phantom in, rescanned the phantom, recalibrated the piece of equipment. And at that point if she still had the noise and it existed, then she could have called the FE at that time.<br>A lot of this is tech dependent. This is probably one of the most tech dependent pieces of equipment out there. If you've got noise, it's for a reason. You put somebody in there with silk on, you put somebody in | |

| | | |
|---|---|---|
| | | there with a bra strap that has a piece of metal on it, bullet in your pocket, anything, it's very sensitive to that -- to a problem. The doors open, say, for instance, a leak in the RF shielding, for instance. All these problems will exist. And until you identify them, you're spinning your wheels calling the FE in because when he gets there, just like what she states here, unable to duplicate upon arrival, that problem goes away because that patient has gone away.<br><br>    Q.  How do you know that Ms. Tucker didn't go through any of the processes before she made this call?<br><br>    A.  My assumption is that there's very few that will when you look out there at the technologist pool. And she was so inexperienced with this. Even though she had the proper training from Wendy, the inexperience of Joanne -- she was not the best tech. She was being trained to be the best tech. Her unsurety or -- she freaked out a lot of times. If something happened, she recorded it. She put it down, because to solve a problem was a very difficult task for her at that time. Now, it's made her a better person because I pushed and pushed and pushed her to do the right thing here. Look at the problems, identify why we had those problems, so when you see the lots of noise, if we continue seeing that, and she has done her job, which I don't see it stated here that phantom scanned and then phantom images are brought up.<br><br>    Q.  But you don't know she didn't do that; is that right, for certain?<br><br>    A.  I would be 99.9 percent certain.<br><br>    Q.  But based on this document, you can't tell.<br><br>    A.  I would be 99.9 percent certain. | |
| 131 to 133 | 24 4 |     Q.  (BY MR. TATE) Well, let me rephrase it for you. Were they having the same problems that you were having?<br><br>        MR. CHESNEY:  Objection. Vague and ambiguous.<br><br>    A.  They didn't really have the -- they had some of the same general problems, but they had no problems with those particular problems. They had already resolved the direction that they needed to go in. So when I asked them pointed questions, oh, yeah, we've seen that. So I had to really dig after them to give me the answers that I was looking for. Are you having these type problems? Oh, yes. We've seen that.<br><br>    Q.  Okay. And then how was your conversations | |

| | | | |
|---|---|---|---|
| | | with Branda Schones?<br>    A.  Pretty much the same.  Recalling<br>conversations, it would be very difficult to do.  But in<br>general, we talked about the resolution of the white dot<br>artifact and how did they resolve that for them.  She<br>said they pretty much didn't, but you know, they got<br>over it using double nex.  That was the solution.  And<br>she didn't understand what white dot artifact was.  But<br>when I went into detail explaining it to her, she<br>understood, yeah, we've seen that.<br>    Q.  Did she call it the ping pong artifact?<br>    A.  She might have called it a ping pong artifact.<br>That's where you got a difference between good<br>technologists and the better technologist.<br>    Q.  As far as terminology goes?<br>    A.  No.  As far as identification of an<br>artifactual problem. | |
| 137<br>to<br>138 | 10<br><br>11 | Q.  So it was a Toshiba coil?<br>    A.  No.<br>        MR. CHESNEY:  Objection.<br>    Q.  (BY MR. TATE)  No?<br>    A.  No, it was not.<br>        MR. CHESNEY:  Mischaracterizes the<br> witness' testimony.<br>    Q.  (BY MR. TATE)  I'm confused.<br>    A.  Toshiba has what they call a license plate<br>coil.  If you bought their configuration, it would only<br>do thoracal lumbar, on lumbar and then thoracic, and<br>then you'd have to take that coil and put another device<br>so you could do the cervical area.<br>    So they contract with people like American<br>Scientific -- and GE does this, Siemens does this.<br>Everybody uses this same coil.  But the configuration<br>was configured as far as the harness and the hookup for<br>Toshiba to hook into their system and be turned on via<br>their system parameters.<br>    Q.  Okay.  So but the coil was actually sent to<br>the facility by Toshiba; is that correct?<br>    A.  That's correct.<br>    Q.  So is it fair to say that Toshiba didn't<br>manufacture the coil but provided and supplied the coil<br>to the customer?<br>    A.  That is correct.<br>    Q.  Okay. | |
| 141 | 14<br>to | Q.  Some of the image quality was such that it was<br>difficult to do an interpretation? | |

| | | | |
|---|---|---|---|
| | 25 | A.  Two percent.<br>Q.  What other problems would the image quality cause?<br>A.  Well, there's no other problems image quality would cause other than the fact that there may be a missed interpretation.  But that would be it.  Again, we were receiving good data.  It just wasn't that beautiful data that we wanted to put out in that facility.<br>Q.  So poor quality image, though, could result in a misrepresentation in a particular situation? | |
| 144<br>to<br>145 | 18<br><br>2 | A.  I forgot the question.  Well, I will say this to that statement, there's probably -- out of all the units out there, only 40 percent will produce an adequate image.  The other 60 percent produce what we produced because of the poor technologist that's operating the system, no education that's formulated behind those technologists, and them just being, quite frankly, button pushers and no identifiers to it.  So that is a quality issue across our environment, MR environment. | |
| 145<br>to<br>146 | 13<br><br>6 | Q.  Did you spend more time in the MRI room trying to produce quality images -- strike that.<br>Did you spend more time in the MRI room more than you would have liked at DDI?<br>A.  No, I did not.<br>Q.  Did you enjoy spending time in the MRI?<br>A.  I enjoyed it.  That was my relaxation point.<br>Q.  So you scanned a lot of patients yourself or assisted in the scanning?<br>A.  I would try to.  I'd stay over late.  I was there when the first patient got there and left when the last patient left and sometimes afterwards.<br>Q.  And you just felt that was your obligation?<br>A.  My obligation was Desoto Diagnostic Imaging as a whole.  I wear all types of hats, and I fulfilled all my responsibilities to all those hats.  So I felt like on my relief side of things, which is the MRI, I should have a little fun every once in a while.  So fun was to uncover the problem. | |
| 147 | 2<br>to<br>12 | Q.  And what percentage of your time do you think you were spending in the MR and/or with MR situations at DDI?<br>A.  Kyle, I can't categorize that into percentages because my dedication was 100 percent for the whole facility.  And to break it out into percentage points -- you know, I had PACS that I dealt with.  I had the human | |

| | | |
|---|---|---|
| | | resources side I dealt with.  I never let any of those projects go day.  So in a 12-hour day, that I did a lot of, 10, 11, 12 hour days, I probably spent three and a half, four hours a day over in the MR suite. | |
| 170 to 173 | 7 18 | Q.   Did you ever ask anybody at TAMS or Toshiba why DDI was sold the three nex feature but was not able to use it?<br>        MR. CHESNEY:  Objection.  Assumes facts not in evidence.<br>     A.   There was no reason to ask that question.  All the equipment has -- you can go to do 12 nex on these pieces of equipment.  Six nex is way overkill; three nex, I hate using; four, I will use.  But I hate using three nex in anything.  It's an odd factor.<br>     Q.   But it was an option that was sold to DDI; is that correct?<br>     A.   Yes, it was.<br>     Q.   And that was an option that actually was not being able to be used; is that correct?<br>        MR. CHESNEY:  Objection.  That assumes facts not in evidence and mischaracterizes the witness' previous testimony.<br>     A.   That's incorrect because three nex was very much used.  If you wanted to enhance IECs or to look at pituitary stalks and things like that, you used the three nex value.  It's usually in that surface coil arena that you didn't want to use an odd nex value.  And at that point, you'd get that white dot artifact that would occur.<br>     Q.   (BY MR. TATE)  Okay.<br>     A.   But if you knew about it on the front end, you planned for it.  Just like John is saying here, they didn't care, they just planned for it.<br>     Q.   So you'd use the three nex feature to try to eliminate the white dot artifact.<br>     A.   No.<br>     Q.   Okay.  So explain that.<br>     A.   I'd use the three nex to enhance the image quality because looking at smaller parts with little pituitary glands or the fifth and sixth cranial nerves as they came out, something that's real fine and definitive, you'd actually bump those next values up.  And again, if you go more than six, it's really overkill, and five is overkill.  So really, four is your value, four and anything below four.<br>     Q.   But it is true, as you testified earlier, that | |

| | | |
|---|---|---|
| | | Toshiba told you not to use the three nex; correct?<br>        MR. CHESNEY:  Objection.<br>    Mischaracterizes --<br>    Q.  (BY MR. TATE)  On spines?<br>    A.  No.  I said not to use odd next.<br>    Q.  Would that be a number three?  Is number three<br>an odd number?<br>    A.  I guess it would be.<br>    Q.  Did they tell you not to use odd nex on spines<br>to eliminate --<br>    A.  They did not say not to use the nex, odd nex.<br>If the white dot interfered with our information we're<br>trying to gather, then we -- they suggested that we go<br>to an even nex value.  So it was never suggested that we<br>don't use it.  But if it interfered, then don't use it.<br>    Q.  Okay.  Is it fair to say that Toshiba<br>suggested not to use the odd nex on spine exams to<br>eliminate the white dot artifact?<br>        MR. CHESNEY:  Objection.<br>    Mischaracterizes the witness' previous testimony.<br>    A.  It never --<br>        MR. CHESNEY:  Don't flap your hand at me.<br>        MR. TATE:  I didn't flap my hand at you.<br>        MR. CHESNEY:  Yes, you did.<br>        MR. TATE:  No, I did not.<br>        MR. CHESNEY:  I sat here watching you.<br>You're telling an untruth on the record again.  More<br>to the point, don't flap your hand.<br>        MR. TATE:  I'm not flapping my hand at<br>you.<br>        MR. CHESNEY:  I'm simply making an<br>objection to your question.  No reason to flap your<br>hand.<br>        MR. TATE:  I'm not flapping my hand at<br>you, John.  I'm not even paying attention to you.<br>        MR. CHESNEY:  You're not doing -- you're<br>not flapping your hand anymore.  You're doing very<br>well.  Keep it up.<br>    A.  The odd nex -- Toshiba never informed us not<br>to use odd nex.  The odd nex was one of those -- not<br>using it was one of the fixes if we didn't want to see<br>that problem exist.  And indeed, once we went to a<br>shorter coil sequence, we got rid of that white dot<br>artifact, and that was truly a short board elliptical<br>artifact that was pulling itself into the field. | |
| 185 | 1 | Q.  Is it common practice in the medical industry | |

| | | | |
|---|---|---|---|
| | to 17 | that technologists would be having to do manual scans with an MRI?<br>    MR. CHESNEY: Objection. Vague and ambiguous, overbroad, lack of showing of personal knowledge to answer that question as phrased.<br>    Q. (BY MR. TATE) Based on your experience.<br>    MR. CHESNEY: Same objection.<br>    A. My experience is that manual scans should be something that's taught from the get go for all technologists. When you're dependent on the computer to do your autoscanning for you or autotuning for you, then you become that button pusher once again. But a manual scan from the '96s back were very predominant focus for MR technology. From '97 forward, it became an autotune, hey look, you can just push this button, and it will tune itself. So is that the answer? | |
| 202 to 203 | 4<br>1 |     Q. (BY MR. TATE) Okay. Fair enough. Did Jesse Jacobs ever concede that you were right that the phantom was not moving?<br>    MR. CHESNEY: Objection. Mischaracterizes the witness' previous testimony. He never suggested that Mr. Jacobs said the phantom was moving.<br>    A. He never -- I mean, I think he conceded to the point. I think there's a paragraph down here that he makes a statement. However, the intermittent ghosting started rearing its little head on Thursday evening and Friday morning. Back up in another sentence up there, he also says that especially with the FSC of 17 echo and 100 AT with flow cup, except on one case that had ghosting, and that was corrected after repeat scanning. And that's, indeed, what we had to do. We had to go back and repeat, change a few factors, you repeat it, change our phasing coding a little bit. He does say the head muscular skeletal work was very nice. And it was. They bought us another coil and a QDC spine and a QD spine coil. So they got away from that American Scientific coil, which cleaned up some of that white dot artifact. That was a fix, and it was a good fix. | |
| 206 to 207 | 7<br>11 |     Q. And who was responsible for the Arctic Chill problems, the valve in backwards?<br>    A. The Arctic Chill Company.<br>    Q. Okay. But did Toshiba hire that Arctic Chill Company?<br>    A. They hired that company. That's the company they worked with. Now, I don't know if that's an H & H | |

| | | | |
|---|---|---|---|
| | | problem.  That might be actually a builder problem there.  Bu indeed if it is, you know -- but I know Toshiba contracted with Arctic Chill to supply -- to integrate with their scanners.<br>    Q.  So Toshiba bought the arctic chill?<br>       MR. CHESNEY:  Objection.<br>    A.  I don't know who bought the arctic chill.  I just know --<br>       MR. CHESNEY:  Sorry.  My objection is it mischaracterizes the witness' testimony and assumes facts not in evidence.<br>    A.   The arctic chill was one of those products that's used by Toshiba pretty exclusively.<br>    Q.  (BY MR. TATE) Okay.  And as far as the checkout of proper city water bypass system, who would be the responsible party for that?<br>       MR. CHESNEY:  Objection.  Lack of showing of personal knowledge.<br>    A.  I don't know who would be responsible for that.  I would think the foreman on the job for the builder would have been responsible for the city water bypass stuff because he's responsible for bringing that stuff to the house. | |
| 215 to 216 | 17 14 | Q.  (BY MR. TATE) Okay.  Looking at the failures on this -- regarding the CT scanner, I believe it mentions reconstruction of images very slow.  What does that mean?<br>    A.  It means that we didn't have enough RAM and not enough gig in the system to reconstruct.  The acquisition was done in a timely frame, but once the raw data was there, the reconstruction took probably three to four minutes more.<br>    Q.  Was it your belief on the front end, based on Toshiba's representations, that the reconstructions would occur faster than that?<br>       MR. CHESNEY:  Objection.  Vague and ambiguous.  Assumes facts not in evidence.<br>    A.  When I looked at this scanner, at the time we didn't have faster scanners than this.  This was an average scanner out on the market, and it could -- it reconstructed at an average rate.  You know, it was not a big problem for us, but it was a problem because we thought that it should be reconstructing a little faster than what it's doing.  But when you compared it across the market at the same similar scanners, the reconstruction rates were similar. | Use of the excerpt is Misleading.  FRE 106 competence. |

| 219 to 221 | 6 8 | Q.  (BY MR. TATE) Okay.  Fair enough.  Let's look at the next page of the exhibit regarding the nuclear medicine modality.  And if you could just take a look at this particular page and tell me if you would agree that it's a fair and accurate representation of your opinion and belief at the time that you wrote this, that would be good enough.<br><br>       MR. CHESNEY:  Objection.  Vague and ambiguous and overbroad.<br>              (BRIEF PAUSE)<br>     Q.  (BY MR. TATE)  Have you read through this?<br>     A.  Yes.<br>     Q.  At the time you wrote this, would you say that's a fair and accurate representation of what you believed at the time?<br><br>       MR. CHESNEY:  Same objection.<br>     A.  The promises were.  You know, when you say reduce time to do cardiac, they told us this particular camera, when we went to Pensacola, would scan at about 18 to 20 minutes of cardiac because it was a dual head scanner.  It's wasn't a variable angle.  We couldn't afford a variable.  The adequate support personnel, we got phone support.  We didn't have the -- we didn't have that support we thought we should have.<br><br>     I had a registered tech in there at one point.  He seemed to function adequately on this system.  But I'm ignorant when it comes to nuclear medicine and profess to be very ignorant.  Don't want to know anything about it, don't care to know anything it.  Although I've been plagued with it in all the modalities -- all the companies I've worked with.<br><br>     The ability to do all the common protocols, that was a promise, as well, and that didn't come through because we lacked a couple of collimators to do those galliums or those bones.  We were able to do the bones; we weren't able to do the galliums.  And that limited us somewhat because our cardiac business wasn't as strong as we thought it was going to be originally.  And we had no worklist management on it as well.<br><br>     We did have 33 service calls.  I don't know if that's an appropriate statement.  I believe some of it was tech related.  Because again, when you throw a technologist that's not fluent in nuclear medicine into an environment like that, it's like throwing them into MR.  They don't know that you're not supposed to have a bullet in your pocket, pocket knife in your pocket, | Use of the excerpt is Misleading.  FRE 106 competence. |

| | | | |
|---|---|---|---|
| | | things like that.  And they allow that to go through.  So some of this -- again, when the technologist was present who was registered in that field and had the education that it took, he sat and monitored the process.  And I think that he didn't have any failures.  At least, he didn't report any failures to us at the time frame he was there. | |
| 222 | 12 to 18 | Q.  Would that be a legitimate call, though, that he made?<br>    A.  My techs were instructed any kind of failure of the equipment, they need to call about it immediately, whether it's just a general button that's fallen off or whatever the case was.  Our intent was to maintain this as a show site and a Taj Majal. | FRE 106 competence. |
| 225 to 226 | 24 11 | Q.  (BY MR. TATE)  Did Toshiba represent on the front end that you could do sectional imaging that you referred to?<br>    A.  They did --<br>        MR. CHESNEY:  Objection.  Excuse me.<br>    Vague and ambiguous.<br>    A.  They did in the TOMO.  TOMOs as they stand today, there's a few that are attached directly, integrated through the table and the overhead tube and crane.  But this particular one was one that you had to hook up to the table side and then hook a fulcrum to that.  And it's very labor intensive.  We could use it.  It was usable. | FRE 106 competence. |
| 227 to 228 | 24 21 | Q.  Okay.  And I'm confused.  What did Toshiba expect DDI to pay for with respect to the damage that the Toshiba applications person caused?<br>        MR. CHESNEY:  Object --<br>    A.  I don't believe they --<br>        MR. CHESNEY:  Excuse me.  Objection.<br>    Mischar --<br>    A.  They didn't --<br>        MR. CHESNEY:  I'm sorry.<br>        THE WITNESS:  No that's all right.<br>        MR. CHESNEY:  Excuse me.<br>    Mischaracterizes the witness' testimony.  He didn't say that Toshiba said anybody had to pay for anything.  That's a complete misrepresentation.<br>    A.  No.  Toshiba didn't say that DDI would pay for that.  They would replace that.  They would replace the mechanism, but they wouldn't replace the actual TOMO device itself.  That was a package we had bought with the system.  We only -- I think in all fairness, we | |

| | | | |
|---|---|---|---|
| | | probably only saw one of these tables in the operation, and it was from a distance. It was actually not in operation when we saw it. We never physically put our hands on it. | |
| 232 to 233 | 1 8 | Q. Okay. Now, on the last page of Exhibit 246, would these be additional failures regarding the R&F room? <br><br> A. Well, we had 34 service calls that we placed. And again, we documented each little incident as a service call from inception. That was 12/18. You see we opened the doors on the 18th. And of course, my instructions to the technologists at that point is to be -- to chronical this and be a good historian, and some did, and some didn't. Whether they were big problems or little problems, they were problems. <br><br> Q. Okay. And the fluoro images are either too bright, white? What does that say? <br><br> A. Yeah. They're too bright white or too dark with exposure. That was -- that was, indeed, a calibration on the fluoro tube itself. Plumicon and -- from what I understand, the plumicon actually accepts image to light from the radio receptors and at that point puts it up on screen for viewing and for printing. And the plumicon needed adjusting, and actually, I guess they did do the adjustment. <br><br> We had this occur two or three times. You'll see this especially when what they call the bright light signal comes in, that patient moves off of the center of that cell, and then the intensifier hits a bright spot. And it kind of bleeds itself over and sort of like looking into a light and seeing that stuff after the fact. Because you can't focus very well. <br><br> Q. Okay. <br><br> A. That really is not a -- that's not a great big problem. All equipment does it. All fluoro equipment does it to some extent when you lose the center focus on that. | |
| 236 | 1 to 21 | Q. Do you recall the specific nature of this particular exam that had taken place, what was involved? <br><br> A. If I'm not mistaken, this was a pediatric case. Very difficult to put a catheter in. Catheter was a very small cryo. And of course, the MPs that we do, it would be difficult. And that's why you see that the amount of MBA mass was so minimal as it stood there. <br><br> Q. Was it an uncomfortable situation for the child? | |

| | | | |
|---|---|---|---|
| | | A.   Very uncomfortable situation for the child. To repeat this exam, it would have been unnecessary, in my opinion.  I think we probably did have to repeat it or didn't get an image out of it at that time.  So we got an AP image.  You could probably what she needed to see.  But the urethra is best viewed on the lateral side of that, and that's the picture that plumed on her.<br><br>This is not a daily occurrence common event, but it is a common event that occurs with R&F equipment.  I mean, it just -- not necessarily that that -- theirs was bad.  It's just that it just happened at that particular event. | |
| 237 to 238 | 9 16 | Q.   Okay.  Could you describe the other R&F problems that you encountered when you were at DDI? MR. CHESNEY:  Objection.  Vague and ambiguous, overbroad.<br><br>A.   We had a couple of wall buckies go out on us.  And again, that's not uncommon for this kind of thing to occur.  It's just that it was an inconvenience because that's the only room we had at the time.  And you'll see that event occurring.  I mean, I have it on a daily basis where I am.  So it's not an uncommon occurrence, but we did have two go out on us and the receptors in those two.  I think we actually had one receptor in our table bucky as well go out, and he wad to replace that.<br><br>So we had some mechanical situations that occurred, none that are not as common as they are as the sun comes up during the day.  I mean, they're very common throughout the radiology world.  Again, it's a brand new piece of equipment.  And you expect some failures, but you expect immediate repair for those failures.<br><br>Q.   Was the immediate repair occurring with the failures?<br><br>A.   For the most part, they were.  The buckies were replaced in a fairly timely frame.  I think the wall bucky was the one that -- which stretches out a little longer than we'd like for it to have.  The battery problem being one of those things nobody had an answer for.  That became an inconvenience.  Because if Joanne hadn't have been so fluent on that piece of equipment, people like myself or Brian or anyone else couldn't have brought that system back up.  They would struggle bringing it up because, again, you adopt a piece of equipment in that facility, and you own it, and you know how to baby it to bring it along. | |
| 241 | 5 | Q.   Okay.  Is it fair to say that there were | |

| to 243 | 6 | multiple ongoing problems with the R&F room since it was installed at DDI to when it was removed from DDI? |
|---|---|---|

          MR. CHESNEY:  Objection.  Vague and
  ambiguous, also duplicative.

    A.  With my knowledge of this type of system and
x-ray in general, over this time frame, there was not an
excessive amount of problems.  There were some problems
associated with it but not an excessive amount.  You are
expected to have this kind of problem throughout.

    Q.  (BY MR. TATE)  Did they ever fix -- did
Toshiba ever fix the problems with the R&F suite?

          MR. CHESNEY:  Objection.  Vague and
  ambiguous, overbroad.

    A.  Depends on what you mean by fix.  They put
three batteries in the memory, and they did work on the
problem to resolve it.  And we did have an FE there to
control the situation, and he was pretty much accessible
all the time.  So if we called him, he would run down
there and see us.  As far as the tomography goes, we
just elected not to use that anymore.  So it was out of
site, out of sound kind of theory.

    With these TOMO -- I mean, with the collimator and
the light problems and the pluming, they did address
that, and they had it where it was functional.  Would I
buy one of these tables today?  I would not.  So it was
not -- it was not meant to be a heavy throughput piece
of equipment.  It was meant to be a radiology piece of
equipment for low volume, and what's what our intent
was.

    Q.  And who was the FE that worked on the x-ray
system?

    A.  Greg Stalcup.

    Q.  Did they ever fix -- did Toshiba ever fix the
fluoro problem that Dr. Carvel experienced with the
pediatric patient?

    A.  It was my --

          MR. CHESNEY:  Objection.  Excuse me.  I'm
  sorry.  Objection.  Vague and ambiguous as to fluoro
  problem.

    A.  It was my understanding that Greg Stalcup did
come in and do the calibrations that were needed to
adjust the plumicon or the camera tube to make those
necessary travel adjustments when table movement
occurred.

    Q.  (BY MR. TATE)  So it was your
understanding that those repairs were made?

| | | |
|---|---|---|
| | | A.  Yes.<br>Q.  And they were successful repairs?<br>A.  I think they had a failure, and then they repaired, and then they were successful.  So the first attempt was not a complete repair. | |
| 297[4] to 298 | 17 to 18 | Q.  Okay.  I want to start by asking you some   09:24:18<br>questions about the negotiations and the process that   09:24:20<br>led up to DeSoto's actual purchase or lease of medical   09:24:24<br>equipment when you were starting out the facility.       09:24:30<br>       Fair enough?                     09:24:31<br>A.  Yes.                       09:24:32<br>Q.  Okay.  You had mentioned in your deposition     09:24:32<br>yesterday that there was -- that there were some oral   09:24:34<br>RFPs I think is how you described them --             09:24:38<br>A.  That's correct.               09:24:40<br>Q.  -- in connection with that process?           09:24:41<br>       Could you tell us a little bit what you       09:24:43<br>meant by oral RFPs?                     09:24:46<br>A.  Normally, a written RPF is sent out to a   09:24:48<br>vendor, a selected vendor.  Instead, we contacted       09:24:51<br>orally three vendors we wanted to deal with.  And       09:24:56<br>those were General Electric, Philips Medical Systems,   09:24:59<br>and Toshiba of America.               09:25:03<br>Q.  Okay.                       09:25:06<br>A.  And at that time we told them verbally what we   09:25:07<br>were going to do, what our intentions were, as far as   09:25:12<br>opening up an imaging center, freestanding, all       09:25:15<br>digital, paperless, filmless.               09:25:18<br>       With that -- that piece of information,       09:25:25<br>they were to put us together a comprehensive package,   09:25:28<br>covering R & F, ultrasound, mammography, MRI, and       09:25:31<br>nuclear medicine, and CT.               09:25:39 | |
| 305 to 308 | 15 to 25 | Q.  (BY MR. CHESNEY) Carry on, Mr. King.  Can you 09:31:17<br>answer the question?                     09:31:18<br>A.  At no time was all three vendors in the same   09:31:22<br>room.  There were separate communications with each       09:31:25<br>vendor.                       09:31:27<br>Q.  And who communicated with each vendor?         09:31:27<br>A.  I did.                     09:31:29<br>Q.  Okay.  Did you, as a result of these       09:31:32<br>communications, receive any kinds of proposals from       09:31:35<br>the potential vendors?                     09:31:38<br>       MR. TATE:  Same objection.  This goes       09:31:39 | |

---

[4] Plaintiff Intervenor TAMS' Deposition Designations fail to mention that Volume II of the Paul King deposition starts at page 292 and occurs not on November 17, 2003 but on November 18, 2003.

beyond the scope of direct examination.                09:31:41
   A.  We asked for equipment proposals, first --    09:31:45
first option, first proposals.                09:31:51
   Q.  Can you tell me what you mean by "first        09:31:58
option, first proposals"?                09:32:00
   A.  We wanted to look at what they had on their   09:32:01
top-of-the-line, first line, and the proposals that     09:32:04
came with that.                09:32:07
   Q.  When you say "top-of-the-line," what do you    09:32:11
mean by "top-of-the-line"?  Highest-performing        09:32:13
equipment or something?                09:32:16
     MR. TATE:  Objection.  That            09:32:17
mischaracterizes the witness's previous testimony.     09:32:18
     MR. CHESNEY:  Sure.                09:32:20
   Q.  (BY MR. CHESNEY)  What do you mean by        09:32:20
"top-of-the-line"?                09:32:21
   A.  The best-performing equipment.            09:32:22
   Q.  "Best-performing" meaning what?            09:32:29
   A.  Best up-time, user-friendly, reproducibility,   09:32:31
service time, support for those pieces of equipment.    09:32:46
   Q.  Okay.  Did you receive a proposal from GE?    09:32:54
   A.  We did.                09:32:57
     MR. TATE:  Objection.  That goes beyond the  09:32:58
scope of direct.                09:32:59
   Q.  (BY MR. CHESNEY)  What did GE propose by way   09:33:00
of MR?                09:33:02
     MR. TATE:  Same objection.            09:33:03
   A.  GE proposed a 1.5 Horizon.            09:33:06
   Q.  That's a 1.5 Tesla MR?                09:33:16
   A.  1.5 Tesla MR.                09:33:19
   Q.  What did GE propose by way of CT?        09:33:22
     MR. TATE:  Make the same objection.  It        09:33:24
goes beyond the scope of direct and this line of     09:33:25
questioning is irrelevant.                09:33:28
   A.  A Prospeed.                09:33:29
   Q.  What were the specs on the Prospeed?        09:33:32
     MR. TATE:  Objection.  Mischaracterizes the  09:33:35
witness's previous testimony and assumes facts not in  09:33:36
evidence, lack of personal knowledge.            09:33:39
   A.  The ability to do cardiac scoring, body        09:33:42
scanning, full line of diagnostic procedures that a     09:33:45
normal and customary and imaging practices.        09:33:54
   Q.  Is that what you asked for, or is that what    09:33:57
they proposed?                09:33:59
   A.  That's what we asked for.            09:34:00
   Q.  Okay.  What were the specs of the CT equipment 09:34:01

| | | | |
|---|---|---|---|
| | | that they proposed?                              09:34:04<br>        MR. TATE:  Objection.  Assumes facts not in 09:34:05<br>evidence.  This witness has not testified to any specs  09:34:07<br>regarding the CT, would lack personal knowledge        09:34:10<br>regarding that, and goes beyond the scope of direct,    09:34:13<br>and is not relevant to this particular case.        09:34:16<br>    Q.  (BY MR. CHESNEY)  Did GE make a proposal,      09:34:18<br>Mr. King, with regard to CT?                    09:34:20<br>    A.  GE submitted a full-line proposal to us.      09:34:21<br>    Q.  Including a CT scanner?              09:34:24<br>        MR. TATE:  Objection.  Mischaracterizes the 09:34:26<br>witness's testimony.  He did not testify in that        09:34:28<br>manner.  It would go beyond the scope of direct, and    09:34:31<br>he would lack personal knowledge to testify to that.    09:34:33<br>    Q.  Go ahead, Mr. King.                  09:34:35<br>    A.  GE submitted a full package of equipment      09:34:37<br>options for us for the particular pieces of equipment   09:34:43<br>we asked for.                          09:34:49<br>    Q.  All right.  Did that include a CT scan?      09:34:49<br>    A.  It included a CT scanner as well.          09:34:52<br>    Q.  What was the CT scanner being proposed?      09:34:53<br>    A.  The Prospeed.                      09:34:55<br>    Q.  The Prospeed.                      09:34:56<br>        And what number of heat units does the      09:34:57<br>Prospeed have?                          09:34:59<br>        MR. TATE:  Objection.  Mischaracterizes the 09:34:59<br>witness's previous testimony.  He's never testified     09:35:01<br>with respect to any matter pertaining to the question.  09:35:03<br>It's an irrelevant question, goes beyond the scope of   09:35:08 | |
| 310<br>to<br>311 | 16<br><br>18 | Q.  (BY MR. CHESNEY)  Did you refer yesterday to  09:36:36<br>the fact that the Toshiba scanner you bought had 3.5   09:36:38<br>million heat units?                      09:36:41<br>    A.  Yes, I did.                      09:36:42<br>    Q.  And that you referred to it as being a      09:36:42<br>3.5/900K?  Do you recall that?              09:36:49<br>        MR. TATE:  Objection.  Mischaracterizes the 09:36:51<br>witness's testimony.                    09:36:53<br>    A.  Yes, I do.                      09:36:55<br>    Q.  Okay.  What do you mean by 3.5 million heat   09:36:57<br>units?                              09:37:00<br>    A.  X-ray tubes are rated at heat capacity.  You   09:37:04<br>can exceed -- you cannot exceed that heat capacity.     09:37:07<br>So 3 1/2 million heat units is as much as you can --    09:37:13<br>actually, 2.9 million heat units is as much as you can  09:37:17<br>run those heater -- those tubes up to.              09:37:20<br>        The cooling factor is what made the        09:37:24 | Relevance under FRE<br>401, 402, & 403. |

| | | | |
|---|---|---|---|
| | | difference. If you can cool faster, you can scan  09:37:26<br>faster.  09:37:29<br>  Q.  And what is the cooling factor affected by?  09:37:29<br>Is that the 900K that you're talking about?  09:37:31<br>  A.  That's the 900K.  09:37:34<br>  Q.  Okay.  And the Toshiba CT scanner was a  09:37:35<br>3.5/900K in that respect --  09:37:39<br>  A.  That's correct.  09:37:40<br>  Q.  -- is that correct?  09:37:41<br>   Okay.  And what was the Prospeed?  09:37:41<br>  A.  The same. | |
| 313<br>to<br>319 | 3<br><br>4 | Q.  Okay.  Fair enough.  So forget about that.  09:39:07<br>   Let's ask about the nuclear medicine  09:39:07<br>camera.  Did GE make a nuclear medicine camera?  09:39:09<br>   MR. TATE:  Objection.  It's irrelevant,  09:39:12<br>it's beyond the scope of direct, lack of personal  09:39:13<br>knowledge.  09:39:17<br>  A.  Yes, they did.  09:39:17<br>  Q.  And what did they propose, sir?  09:39:18<br>   MR. TATE:  Same objection.  09:39:20<br>  A.  I don't remember the exact piece of equipment. 09:39:21<br>  Q.  You don't remember the name?  09:39:24<br>  A.  I don't remember the name.  I just remember  09:39:25<br>that it was an inferior piece of equipment.  09:39:27<br>  Q.  When you say "inferior," inferior to what?  09:39:30<br>   MR. TATE:  Objection.  You're asking the  09:39:33<br>witness to speculate.  The witness has no personal  09:39:34<br>knowledge regarding --  09:39:37<br>  A.  To the other two vendors' proposals.  09:39:38<br>  Q.  Okay.  Is it basically correct, from what you 09:39:41<br>said yesterday, that there are three types of nuclear  09:39:43<br>cameras:  single-head, fixed dual-head, and  09:39:46<br>variable-head cameras?  09:39:49<br>   MR. TATE:  Objection.  It mischaracterizes  09:39:49<br>the witness's testimony.  09:39:51<br>  A.  My expertise is not in nuclear medicine.  That 09:39:54<br>statement seems to be true.  In my understanding,  09:39:58<br>there are fixed, there are dual-heads, and there are  09:40:03<br>variables.  09:40:07<br>  Q.  Fair enough.  09:40:07<br>   Was the nuclear camera that GE proposed a  09:40:07<br>single-head camera?  09:40:10<br>   MR. TATE:  Objection.  It's going beyond  09:40:10<br>the scope of direct.  These line of questioning is  09:40:12<br>absolutely irrelevant to this case.  09:40:14<br>  A.  They proposed a single and a variable.  09:40:20 | Relevance under FRE<br>401, 402, & 403.  Lack<br>of personal knowledge.<br>Hearsay.  Lack of<br>foundation.<br>Calls for an expert<br> witness.  The witness<br> is not competent to<br>opine. |

Q.   Okay.  And did you come to the point of          09:40:24
deciding which of those you were going to take?          09:40:27
A.   We had asked for -- for proposals with cost    09:40:31
associated with those proposals.                    09:40:37
Q.   And did you get them?                    09:40:38
A.   Yes.                              09:40:40
Q.   Okay.  And was one or other unaffordable of    09:40:41
the GE?                                09:40:45
A.   Yes.                              09:40:45
MR. TATE:  Objection.                    09:40:45
Q.   (BY MR. CHESNEY)  Did you say "yes," sir?    09:40:46
MR. TATE:  I was making an objection.        09:40:48
MR. CHESNEY:  Go ahead.                09:40:49
MR. TATE:  Assuming facts not in evidence.    09:40:49
The witness has never testified in that manner, so    09:40:52
you're mischaracterizing his previous testimony.  And   09:40:54
this obviously goes beyond the scope of direct        09:40:57
examination.                          09:40:59
Q.   (BY MR. CHESNEY)  Was your answer "yes,"      09:41:00
Mr. King?                              09:41:02
A.   Yes, it was.                        09:41:02
Q.   Thank you.                        09:41:03
And was it the variable-head camera that    09:41:03
was unaffordable?                        09:41:06
MR. TATE:  Objection.  Lack of personal        09:41:07
knowledge, mischaracterizes the witness's previous      09:41:09
testimony.                            09:41:12
A.   At the particular time that we sent out these   09:41:13
RFPs, there was nothing unaffordable to us.          09:41:16
Q.   Is that because you didn't impose any          09:41:19
financial limitations on the RFPs at the time?        09:41:21
A.   At that time.                        09:41:24
Q.   Okay.  Fair enough.                    09:41:25
There came a point, I take it, when the      09:41:26
variable camera was unaffordable then --          09:41:28
MR. TATE:  Objection.                    09:41:30
Q.   (BY MR. CHESNEY)  -- is that correct?        09:41:31
MR. TATE:  Mischaracterizes the witness's    09:41:32
testimony, assumes facts not in evidence, lack of        09:41:33
personal knowledge, beyond the scope of direct        09:41:36
examination.  It's not relevant.              09:41:37
A.   Once we received all three packages from all   09:41:40
three vendors that we RFP'd, we looked at those        09:41:43
packages and made the decision to go with particular    09:41:48
pieces of equipment.  We had -- we asked for inclusive  09:41:53
products, a mammo be included.  Some could, some      09:41:58

couldn't provide that.  Looked at the PACS as well,      09:42:01
who could provide that, who couldn't provide that.      09:42:08
　　　So it was a total comprehensive package      09:42:10
that we were looking for, but the cost had to be      09:42:12
within a certain margin as well.  We had no financial   09:42:14
constraints at the time, but we knew it would be      09:42:18
imposed with those financial constraints.      09:42:21
　　Q.  Okay.  So is it fair to say you began by      09:42:23
looking for equipment by giving the proposed vendors a  09:42:26
wish list of what you would like to have in the      09:42:29
facility?      09:42:31
　　　MR. TATE:  Objection.  Mischaracterizes the  09:42:32
witness's previous testimony.  He did not testify that  09:42:33
way.      09:42:35
　　A.  I guess it could be classified as a wish list. 09:42:40
But these were pretty much the prerequisites for      09:42:42
building a center to have success in that center.      09:42:46
　　Q.  Okay.  But, for example, it wasn't a      09:42:49
prerequisite that you have a variable-head camera as   09:42:54
opposed to a single-head camera, I take it?      09:42:56
　　　MR. TATE:  Objection.  Lack of personal      09:42:58
knowledge.  It's a hypothetical.  Mischaracterizes the 09:42:59
witness's previous testimony, assumes facts not in      09:43:02
evidence, asking the witness to speculate.      09:43:04
　　A.  At that time we -- we specified none of the   09:43:07
above.  We wanted to see what the proposals were.      09:43:11
　　Q.  Okay.  And eventually the first proposal you  09:43:13
accepted, subject to getting the financing arranged,   09:43:18
was Philips, was it not?      09:43:21
　　　MR. TATE:  Objection.  Assuming facts not   09:43:23
in evidence, mischaracterizes any testimony that's      09:43:26
been given in this particular case, and lack of      09:43:28
personal knowledge.      09:43:30
　　A.  Philips Medical was a vendor of choice once we 09:43:33
went through the process.      09:43:37
　　Q.  And am I not correct, sir, that the nuclear   09:43:37
medicine camera that Philips proposed and that was      09:43:41
going to be part of the package you intended to buy      09:43:43
from Philips was a single-head nuclear camera?      09:43:46
　　　MR. TATE:  Objection.  Assumes facts not in  09:43:49
evidence, lack of personal knowledge, mischaracterizes  09:43:51
the witness's previous testimony.      09:43:53
　　A.  I'm not sure that's correct.      09:43:54
　　Q.  You don't recall whether it was or wasn't?  09:43:56
　　A.  I don't recall.      09:43:58
　　Q.  Okay.  Fair enough.      09:43:59

| | | | |
|---|---|---|---|
| | | With regard to the R & F room, what did GE  09:44:01<br>propose?                                    09:44:09<br>    MR. TATE: Objection. It's irrelevant,      09:44:09<br>it's beyond the scope of direct, assumes facts not in   09:44:10<br>evidence.                          09:44:14<br>    A.  GE proposed a Legacy with a 12-inch II.  I,    09:44:16<br>letter I.                          09:44:30<br>    Q.  E-Y-E?                     09:44:35<br>    A.  No.  I.  And an overhead tube and crane with   09:44:37<br>an upright bucket.                     09:44:40<br>    Q.  Was that a different or similar configuration  09:44:48<br>to the one that you eventually got from Toshiba?       09:44:50<br>    MR. TATE: Objection.  Asking for       09:44:53<br>speculation, assuming facts not in evidence.        09:44:55<br>    A.  They -- all the vendors had the same       09:45:04<br>prerequisite as far as specifications went.  The II      09:45:09<br>was important to get 12 or 14.  I believe Toshiba       09:45:11<br>supplied a 14.  And Philips was supplying a 14 or a      09:45:16<br>15.                            09:45:19<br>    Q.  Okay.  And is a 14 somewhat better than a 12?  09:45:20<br>    MR. TATE: Objection.  Mischaracterize the  09:45:23<br>witness's previous testimony.  He did not testify in   09:45:25<br>that manner.                        09:45:27<br>    A.  A 14 is not better.  A 14 just covers more     09:45:29<br>area.                            09:45:31 | |
| 327<br>to<br>329 | 16<br><br>12 | Q.  (BY MR. CHESNEY)  What was the reason you went 09:54:40<br>with Philips?                       09:54:42<br>    A.  We asked for a full-line package.  And GE and  09:54:42<br>Philips were the only two that can supply us with a     09:54:49<br>full line.  When I say full line, that was        09:54:51<br>mammography, the CTs, the nuke, the MRI, the x-ray,    09:54:56<br>and also -- also the PAC systems.  They had their own   09:55:00<br>PACS as well as -- and GE as well did.  So both had     09:55:04<br>full line.  Toshiba, the third vendor, didn't have      09:55:08<br>full line.  And they had to go and -- and partner with  09:55:12<br>a PACS company and then partner with a mammo --        09:55:15<br>mammography company.                   09:55:20<br>    Q.  And AGFA was the PACS company you're referring 09:55:21<br>to that Toshiba worked with; is that correct?        09:55:25<br>    A.  That's correct.               09:55:26<br>    Q.  Okay.  Very good.              09:55:28<br>        So GE and Philips provided you with        09:55:28<br>full-line proposals, correct?              09:55:32<br>    A.  That's correct.               09:55:33<br>    Q.  Why did you choose Philips rather than GE?     09:55:33<br>    A.  I've had extensive experience with Philips.     09:55:36 | Misleading. |

| | | | |
|---|---|---|---|
| | | I've bought them in the past, been very happy with 09:55:40 their service, been very happy with the product. I 09:55:42 replaced $2 1/2 million worth of GE equipment with 09:55:47 Philips equipment in the facility I'm at today. I did 09:55:50 that in '94, '95, '96, and '97. 09:55:54<br><br>    Q. Now, I think you said that originally when you 09:56:17 contacted the potential vendors you didn't put any 09:56:22 financial limitation on how they should structure 09:56:26 their response, is that fair to say? 09:56:29<br><br>    A. That's correct. 09:56:30<br><br>    Q. I think you also said that you did realize 09:56:32 that at some point there would be financial 09:56:34 limitations on what you could purchase though, is that 09:56:37 also true? 09:56:39<br><br>        MR. TATE: Objection. Mischaracterizes the 09:56:39 witness's previous testimony. 09:56:40<br><br>    A. The entrepreneurs that I was working for at 09:56:43 that time gave me no limitations. We put the package 09:56:47 together. And it's easier to start from the top and 09:56:50 come down than it is to start from the bottom and go 09:56:52 up. 09:56:54<br><br>    Q. Fair enough. 09:56:57<br>      And is that how you approached the 09:56:58 purchase of equipment, starting from the top that is 09:57:00 and going down, as might be necessary with regard to 09:57:03 financial limitations? 09:57:06 | |
| 330 to 333 | 22 25 | Q. (BY MR. CHESNEY) After going through the RFP 09:59:00 process, you selected Philips as your proposed vendor? 09:59:03 "You" being DeSoto. Is that correct? 09:59:06<br><br>        MR. TATE: Objection, as to the RFP process 09:59:08 and the meaning of the RFP process. 09:59:09<br><br>    A. We called our prospective vendors to let them 09:59:14 know that -- let them know that we were going to the 09:59:19 RSNA and that we wanted to look at their equipment 09:59:25 again, and two weeks after we returned from the RSNA, 09:59:27 we would be making a selection; that they needed to 09:59:31 have their proposals in order, and we would need to 09:59:34 see some equipment while we were visiting. 09:59:39<br><br>    Q. Okay. Fair enough. 09:59:44<br>      And did you then go to the RSNA? 09:59:45<br><br>    A. We did. 09:59:47<br><br>    Q. Who all went to the RSNA? 09:59:48<br><br>    A. Dr. Carvel, Randon Carvel, myself, and my 09:59:50 wife. 09:59:57<br><br>    Q. Okay. And did you view the equipment of each 10:00:00 vendor at the RSNA? 10:00:03 | Misleading. Lack of personal knowledge. |

A.  We -- we viewed several pieces of equipment    10:00:05
not on our RFP list.    10:00:10
Q.  When you say your "RFP list," could you    10:00:14
explain what you mean by that?    10:00:17
A.  We only had three that we initially issued the 10:00:18
RFP to.  But vendors are like hawks, and they hear you  10:00:21
putting a request out and they come rolling in the    10:00:24
door.  So we had one or two that came in the door late 10:00:26
that had packages they wanted to put together and show 10:00:29
us as well.    10:00:32
Q.  Okay.  I'm following you now.    10:00:33
    My question really was that when you went   10:00:35
to the RSNA, did you look at the equipment that you    10:00:37
were thinking about that had been proposed by the    10:00:39
three vendors you had spoken to?    10:00:42
A.  We looked at two of the three vendors.    10:00:44
Q.  Which two?    10:00:46
A.  Philips and GE.    10:00:46
Q.  You didn't look at Toshiba?    10:00:47
A.  We went -- we looked at the Toshiba magnet.   10:00:49
Q.  Okay.    10:01:04
    MR. TATE:  Just to clarify, when you say    10:01:04
"we" I'm not sure who "we" is.    10:01:06
    THE WITNESS:  Dr. Carvel and I looked at    10:01:09
the Toshiba magnet.    10:01:10
    MR. CHESNEY:  Okay.  That's fine.    10:01:11
    THE WITNESS:  I don't know.  Randon might    10:01:13
have been there too, because we got to listen to the    10:01:15
quietness of the magnet.  Toshiba at that time didn't   10:01:17
have one of two things, enough service personnel to go  10:01:24
around, enough sales personnel to go around to be    10:01:27
shared among us and --    10:01:30
Q.  (BY MR. CHESNEY)  Is this at the RSNA you're   10:01:31
talking --    10:01:33
A.  This is at the RSNA.    10:01:33
    So we kind of got put back on the back    10:01:35
burner and sat down in a chair and waited a little    10:01:38
while before --    10:01:40
Q.  All right.    10:01:40
    I'm sorry.  I'm sorry.  Go ahead.    10:01:41
A.  We waited on vendors to -- those -- those    10:01:41
vendors to come to us.    10:01:44
Q.  Isn't it true that actually Dave Steiff made a 10:01:46
special appointment for DeSoto to attend the Toshiba    10:01:49
booth before the RSNA show got very active and that    10:01:55
you were unable to make that appointment?    10:01:59

| | | | |
|---|---|---|---|
| | | A.  That is correct.                              10:02:00<br>Q.  And is that one of the reasons you had to then 10:02:02<br>sit around, as you put it?                         10:02:05<br>    MR. TATE: Objection. Speculation.        10:02:06<br>    MR. CHESNEY: Fair enough. I'll withdraw    10:02:10<br>that question.                        10:02:12<br>Q.  (BY MR. CHESNEY) After the RSNA, did DeSoto   10:02:23<br>select a vendor?                        10:02:27<br>A.  We selected the only vendor that felt         10:02:28<br>comfortable enough to have confidence in us to build    10:02:34<br>this project.                        10:02:37<br>Q.  And who was that?                    10:02:39<br>A.  Philips Medical System.                10:02:40 | |
| 334<br>to<br>335 | 23<br><br>11 | Q.  Okay.  Now, you say GE submitted astronomical  10:03:42<br>quotes?                        10:03:45<br>A.  Yes.                        10:03:46<br>Q.  Could you just expand on what you mean by       10:03:46<br>"astronomical"?                    10:03:53<br>A.  Over any of the quotes that we had, they were  10:03:53<br>probably $500,000 more.                    10:03:53<br>Q.  In total?                    10:03:56<br>A.  In total.                    10:03:56<br>Q.  Okay.  For the equivalent modalities --        10:03:57<br>A.  Yes.                        10:03:59<br>Q.  -- that were being offered by the other        10:04:00<br>vendors?                        10:04:02<br>A.  Yes. | Relevance under FRE<br>401, 402, & 403. |
| 337<br>to<br>340 | 4<br><br>23 | 337<br>4    Q.  Fair enough.                    10:05:28<br>5        All right.  Okay.                10:05:31<br>6        So Toshiba and Philips after the RSNA made  10:05:43<br>7  timely quotes --                    10:05:49<br>8    A.  That's correct.                10:05:50<br>9    Q.  -- correct?                    10:05:50<br>10        And GE did not make a timely quote?        10:05:51<br>11    A.  That is correct.                10:05:54<br>12    Q.  And when it did, it was a quote that you      10:05:54<br>13  viewed as astronomical, correct?                10:05:56<br>14    A.  That is correct.                10:05:59<br>15    Q.  Okay.  After Toshiba and Philips made their   10:06:01<br>16  quotes, you then selected Philips as the vendors,       10:06:03<br>17  correct?                        10:06:06<br>18        MR. TATE: Objection. Mischaracterizes the  10:06:07<br>19  witness's previous testimony.                10:06:09<br>20        MR. CHESNEY: Okay. I'll rephrase it.      10:06:10<br>21    Q.  (BY MR. CHESNEY)  After Toshiba and Philips    10:06:14 | Relevance under FRE<br>401, 402, & 403. |

22  submitted their timely quotes after the RSNA, did you   10:06:15
23  select a vendor?                           10:06:19
24      A.  We selected on the total package concept, and   10:06:20
25  Philips was the only one of those two that had a total   10:06:24

                           338
1   package.                                  10:06:26
2       Q.  So who did you select?              10:06:27
3       A.  Philips Medical System.             10:06:28
4       Q.  Okay.  Then what happened in your dealings   10:06:30
5   with Philips?                              10:06:32
6       A.  We started to tune that package with -- with   10:06:33
7   our equipment needs.  We started looking at those   10:06:39
8   really, really closely to make sure that those were --   10:06:44
9   things that we had been promised were in that quote.   10:06:47
10  And later, Randon started arranging the financing   10:06:54
11  side.  We had several meetings with them concerning --   10:07:02
12  concerning the finance side.  I wasn't involved in   10:07:05
13  that portion of it too much.  Not enough to -- to give   10:07:14
14  you any -- any idea that I knew what was going on on   10:07:17
15  the finance.  I didn't understand it.          10:07:22
16      Q.  Okay.  You say, however, that you were   10:07:25
17  involved in the equipment side, is that fair?   10:07:27
18      A.  That's correct.  That is correct.     10:07:29
19      Q.  And I think you said tuning the equipment or   10:07:31
20  tuning the equipment needs.  I wasn't quite clear.   10:07:33
21  One or the other.                          10:07:36
22      A.  Tuning the list of -- of accessories, the   10:07:37
23  applications of the piece of equipment, what we needed  10:07:40
24  to see, and the habitus of a particular area, can it   10:07:42
25  penetrate that, and those type questions had to be   10:07:46

                           339
1   answered then.                             10:07:48
2       Q.  Now, you talked about the habitus.  Just so   10:07:55
3   the record is clear, by "habitus" do you basically   10:07:58
4   mean patient size?                         10:08:02
5       A.  The patient size in north Mississippi is   10:08:03
6   larger than up North or out West or out East.  For our  10:08:08
7   class of folks, we're ranging from two to 350 in   10:08:13
8   weight class.                              10:08:17
9       Q.  Okay.  And does that affect the ease with   10:08:26
10  which such people can be scanned in various   10:08:32
11  modalities?                                10:08:34
12          MR. TATE:  Objection.  Mischaracterizes the  10:08:34
13  witness's previous testimony.                  10:08:36

| | | | |
|---|---|---|---|
| | | 14      MR. CHESNEY: I'm just asking.              10:08:37<br>15      MR. TATE:  Assumes facts not in evidence.    10:08:38<br>16      MR. CHESNEY:  Fine.                    10:08:39<br>17   Q.  (BY MR. CHESNEY)  I'm just asking you a       10:08:40<br>18  question.                          10:08:42<br>19   A.  Yes, it does.                    10:08:42<br>20   Q.  Okay.  How does it affect that?          10:08:43<br>21   A.  It affects it simply because the penetration   10:08:48<br>22  of a product is designed to only go so deep.        10:08:53<br>23  Sonographywise, if you don't have the additional band   10:09:05<br>24  width to -- to go to depths of 3 or 4 inches into the   10:09:08<br>25  organ base, you can't very well identify the shadows    10:09:11<br><br>                          340<br>1  or the organ itself.  The fat obliterates.  Size of      10:09:15<br>2  the patient looking at particular organs obliterates.    10:09:22<br>3        If you're doing a CT, your heat units         10:09:26<br>4  absorbed by the fat, because it takes more to get to      10:09:30<br>5  penetrate.  X-ray is the same way, it takes more to      10:09:33<br>6  penetrate.  And any time you're giving more radiation,   10:09:37<br>7  you're -- that's simply what you're doing, you're        10:09:41<br>8  radiating the body with more radiation.             10:09:44<br>9        MR is the same way.  You know, you larger     10:09:45<br>10  folks have a tendency to ground out the system by        10:09:51<br>11  touching the edges of the bore.  The crispness, the      10:09:54<br>12  clarity of the image on all aspects of imaging with      10:10:11<br>13  larger patients is real critical because of their size   10:10:11<br>14  and the amount of fat and dense muscle and large bone    10:10:11<br>15  that they may carry.                    10:10:14<br>16   Q.  Okay.  So that's basically what you mean by     10:10:21<br>17  patient habitus?                      10:10:23<br>18   A.  That's correct.              10:10:24<br>19   Q.  I got you.  Okay.                10:10:25<br>20        Back to Philips.              10:10:27<br>21   A.  Okay.                  10:10:28<br>22   Q.  Philips was the initial selection as DeSoto's   10:10:29<br>23  vendor, correct? | |
| 341<br>to<br>344 | 4<br><br>25 |                          341<br>4   Q.  (BY MR. CHESNEY)  After you selected Philips    10:10:42<br>5  as a proposed vendor, it's fair to say, is it not,       10:10:43<br>6  that Philips did not end up supplying DeSoto with the    10:10:50<br>7  equipment?                        10:10:56<br>8   A.  That is correct.                10:10:56<br>9   Q.  Give me your best understanding as to how that   10:10:58<br>10  came about.                        10:11:00<br>11        MR. TATE:  Objection.  Speculation, lack of   10:11:01 | Lack of personal<br>knowledge.  FRE 106<br>competence. |

12    personal knowledge, beyond the scope of the direct    10:11:03
13    examination.                        10:11:05
14        Go ahead.                        10:11:07
15     A.  I'm not as familiar with the financial side as 10:11:08
16    I would like to have been at the time.  I just        10:11:11
17    understand that we were required by our first pick    10:11:14
18    vendor to acquire a CON for the state of Mississippi    10:11:20
19    for MRI services, and that was a contingent on that    10:11:24
20    purchase.                        10:11:28
21     Q.  And -- I'm sorry.            10:11:34
22     A.  We elected not to -- to put ourselves in that  10:11:35
23    jeopardy.  We knew we could get the CON.  But when the  10:11:41
24    finance company put those restraints on us, we elected  10:11:45
25    not to deal with them at -- at that point.            10:11:49

                        342
1     Q.  Okay.  Were there other restrictions that the  10:11:51
2    finance company was imposing, to your understanding,    10:11:54
3    that made them unacceptable?            10:11:57
4     A.  I have no idea.                10:11:58
5     Q.  Isn't it true that the Philips financing was, 10:12:01
6    in fact, asking Dr. Carvel to guarantee Philips a        10:12:04
7    larger share of DeSoto's initial revenues than        10:12:10
8    Dr. Carvel was agreeable with?            10:12:13
9        MR. TATE:  Objection.  Absolutely        10:12:15
10    irrelevant.  He lacks personal knowledge, asking him    10:12:18
11    to speculate beyond the scope of direct examination.    10:12:20
12     A.  A lot of the financial portion of this I        10:12:23
13    wasn't involved in.  My package was the technologist    10:12:26
14    and the equipment.  Theirs was the finance side.        10:12:29
15     Q.  I understand.                10:12:32
16        I'm just asking --            10:12:33
17     A.  Again, I understood nothing about what -- even 10:12:34
18    the meetings I sat in on, they were very Greek to me.   10:12:37
19     Q.  Okay.  Okay.                10:12:43
20        What's your understanding as to why DeSoto  10:12:47
21    ultimately did not take delivery of Philips equipment?  10:12:50
22        MR. TATE:  Objection.  Asked and answered.   10:12:53
23     A.  We were on a critical timeline, and the CON    10:12:57
24    constraint was the only one I knew of at the time.     10:13:02
25    We -- we were fixing to go up for our CON in February   10:13:06

                        343
1    and -- and the timeline is that we wanted to be open    10:13:09
2    by the end of that year.                10:13:16
3     Q.  Was that February of 2000?            10:13:20

4      A.   It was February of 2000.                    10:13:22
5      Q.   And DeSoto wanted to be open by the end of    10:13:29
6  2000?                                    10:13:32
7      A.   That's correct.                       10:13:32
8      Q.   Okay.  After the deal with -- proposed deal   10:13:36
9  with Philips broke down, what happened next in terms   10:13:40
10 of DeSoto's efforts to get equipment?            10:13:42
11     A.   The -- the absolute breakdown occurred with   10:13:44
12 Philips is when we lost our sales guy and his boss,    10:13:47
13 who was the salesperson spearheading that decision.    10:13:53
14 And once those two people fell out, we had nobody to   10:13:57
15 take care of us with Philips.                   10:13:59
16          Then the finance side kind of went sour    10:14:03
17 because of the CON constraints.  I think we could have  10:14:05
18 lived with one if we would have had the other two      10:14:08
19 pieces of their operation in place.  But our two       10:14:13
20 salespeople, our primary and -- and his boss, both had  10:14:17
21 left the service, which kind of left us out in the     10:14:20
22 lurch.                         10:14:25
23          So with that happening, we decided to call  10:14:25
24 our second choice, which was Toshiba, even after we    10:14:32
25 had heard the comments that he had made out in the     10:14:38

                              344
1  general medical public about our project being a flop  10:14:40
2  and it was just a pipe dream and we would never       10:14:45
3  succeed.                       10:14:48
4          That was the other decision we went with    10:14:51
5  Philips for is because they believed that our project  10:14:53
6  would succeed.  Toshiba, GE -- GE absolutely didn't    10:14:55
7  believe it would succeed.  And Toshiba had its doubts  10:14:59
8  as well.                       10:15:01
9      Q.   Toshiba did make you a proposal, correct?    10:15:03
10     A.   They did make a proposal, yes.            10:15:05
11     Q.   And Toshiba actually financed the project for 10:15:07
12 you, correct?                      10:15:09
13     A.   I think once they saw that they had a second  10:15:09
14 opportunity, they came back to play.  And they knew    10:15:13
15 that we had -- we had already purchased a lot, we had  10:15:15
16 already applied for our CON, we had already met with a  10:15:18
17 builder, this project was going forward.  And I think  10:15:22
18 the -- they recognized at that point that these guys   10:15:26
19 are for real and -- and that that time they wanted to  10:15:29
20 play a little bit.                   10:15:32
21          Even GE came back at that point and wanted  10:15:33
22 to play a little bit, but we wouldn't play with them.  10:15:35

| | | |
|---|---|---|
| | | 23    Q.  Well, this was all a pretty fast turnaround    10:15:39 |
| | | 24  between the RSNA show and the point where you started   10:15:44 |
| | | 25  to get Toshiba back in the picture; is that right?    10:15:48 |

348
to
350

18
8

348

18    Q.  (BY MR. CHESNEY)  Do you have a recollection   10:19:52
19  as to when you told Toshiba that they would have an     10:19:54
20  opportunity to sell the equipment despite the fact      10:20:00
21  that you had originally decided to go with Philips?     10:20:03
22        MR. TATE:  Objection.  Lack of personal      10:20:05
23  knowledge, goes beyond the scope of direct.        10:20:08
24    A.  I don't have the exact time frame, but I know  10:20:10
25  that Lynn and I had talked and she was upset that we     10:20:13

349

1  couldn't -- we couldn't go with this vendor of choice.  10:20:17
2  And she asked my opinion, and I told her that's the     10:20:20
3  reason I put together those three vendors, and that     10:20:22
4  was GE, Philips, and Toshiba.  And Toshiba certainly    10:20:25
5  came in there with their -- with a good quote.  And if  10:20:28
6  they could supply the PAC side of that, I think we      10:20:31
7  need to go with them.            10:20:34
8    Q.  And subsequently to that discussion with       10:20:38
9  Dr. Carvel, did you then go back to Toshiba and tell    10:20:41
10  them that they would have an opportunity to sell the    10:20:44
11  equipment?                10:20:46
12    A.  Within a very short time frame, I called Dave  10:20:47
13  Steiff up and I told him that I had heard that he had   10:20:49
14  been out talking about us, bad-mouthing us at other     10:20:52
15  facilities.  And he kind of stammered a little bit and  10:20:56
16  fell over his own feet with -- with some kind of       10:21:02
17  rhetoric comment.  But this was from reputable people   10:21:05
18  in my respect.  But I told him that he had a chance to  10:21:09
19  come back in here at this point and put this bed back   10:21:12
20  together, this quote back together, and resubmit       10:21:15
21  another package to us.            10:21:16
22    Q.  Okay.  And after your discussion with        10:21:18
23  Mr. Steiff, did he in fact put together another        10:21:20
24  package for you?             10:21:23
25    A.  He put together another package.         10:21:24

350

1    Q.  Right.                10:21:26
2        The record won't show this, but you appear  10:21:28
3  to be emphasizing "another"?            10:21:30
4    A.  Another, yes.            10:21:31
5    Q.  And that's because it was a different package  10:21:34

| | | | |
|---|---|---|---|
| | | 6  than the original package?                          10:21:36<br>7   A.  In my opinion, it was.                        10:21:37<br>8   Q.  Okay.  Well, tell us why that was your        10:21:39 | |
| 353<br>to<br>354 | 7<br><br>16 | 353<br>7    Q.  With regard to the nuclear cameras, what did   10:25:23<br>8  you look at at Pensacola?                         10:25:25<br>9    A.  We looked at all three cameras.  They were all 10:25:27<br>10  in the room.  Talked to the techs and got their        10:25:30<br>11  impression of -- of the scanning of those -- the        10:25:33<br>12  scanning techniques and the type of exams that those    10:25:35<br>13  could do.                              10:25:38<br>14    Q.  When you say "all three cameras," do you mean  10:25:39<br>15  single-head, fixed dual-head, variable head?          10:25:42<br>16    A.  That's correct.                        10:25:44<br>17    Q.  Okay.  Okay.                        10:25:47<br>18        Are you dry?                      10:25:48<br>19    A.  No.  Go ahead.                        10:25:50<br>20    Q.  Okay.  And when you say we looked, who is      10:25:53<br>21  "we"?                              10:25:54<br>22    A.  Dr. Carvel and I did.                    10:25:55<br>23    Q.  Okay.  I forgot to ask you, was Mr. Carvel     10:25:57<br>24  there or not, do you recall?                   10:26:00<br>25    A.  He was.                          10:26:01<br><br>354<br>1    Q.  Okay.  Just to save time down the road, is it 10:26:01<br>2  fair to say that DeSoto was not looking to Mr. Carvel  10:26:06<br>3  to make any technical judgments about the equipment    10:26:10<br>4  they were going to be using at the facility?          10:26:13<br>5    A.  Randon was the finance guy.  So if it        10:26:18<br>6  concerned finance, yes, he had the -- he -- he had the  10:26:22<br>7  decision there.                         10:26:25<br>8    Q.  Fair enough.                        10:26:26<br>9        But in terms of technical characteristics   10:26:27<br>10  and performance characteristics of the equipment, that  10:26:29<br>11  wasn't something Mr. Carvel was involved?          10:26:32<br>12    A.  No.                            10:26:34<br>13    Q.  Okay.  Okay.                        10:26:36<br>14        So you went to Pensacola and you looked at  10:26:36<br>15  these three cameras.  Was one of them the 7200?       10:26:39<br>16    A.  Yes, it was.                        10:26:43 | Lack of personal<br>knowledge. |
| 361<br>to<br>366 | 9<br><br>25 | 361<br>9        I think you said that the techs there told  10:49:10<br>10  you that the 7200 could only do hearts by using a      10:49:12<br>11  single-head; is that correct?                  10:49:17<br>12    A.  That's correct.                      10:49:18 | Speculation.  Lack of<br>personal knowledge.<br>FRE 106 competence. |

13    Q.  Okay.  Did they tell you how long that took,    10:49:19
14  roughly?                                    10:49:21
15    A.  They did not.                         10:49:21
16    Q.  Did anyone tell you that it took about 18 to    10:49:22
17  20 minutes?                                 10:49:25
18    A.  I don't recall anyone telling me that.    10:49:26
19    Q.  You don't recall anybody telling you that --    10:49:28
20    A.  I don't recall that.                   10:49:30
21    Q.  -- when you were at Pensacola?        10:49:31
22    A.  Yeah.                                  10:49:33
23         MR. TATE:  And we're talking about the    10:49:33
24  Pensacola employees; is that correct?       10:49:35
25         MR. CHESNEY:  That is correct.       10:49:36


                    362
1    Q.  (BY MR. CHESNEY)  They just told you that they    10:49:38
2  avoided doing it because it could only be acquired in    10:49:41
3  one head?                                    10:49:44
4    A.  No.  They -- they had a specified regimen for    10:49:46
5  doing exams and the -- all the hearts were done on the    10:49:50
6  variable angle, and the bones were done on the    10:49:53
7  dual-head, and some of the long and other specs were    10:49:58
8  done on the single-head.  They had a pretty set    10:50:02
9  protocol for doing things.                   10:50:05
10    Q.  All right.  Did they tell you how long it took    10:50:06
11  to do hearts on the variable-head camera?    10:50:08
12    A.  I don't recall them telling me that either.    10:50:13
13    Q.  Okay.  Okay.                          10:50:28
14         Let us return to the process again by    10:50:36
15  which DeSoto was acquiring equipment for its new    10:50:42
16  facility.                                   10:50:46
17    A.  Okay.                                 10:50:46
18    Q.  You had said that Mr. Steiff, after you    10:50:48
19  recontacted him and told him that he had an    10:50:51
20  opportunity again to provide a quote, provided you    10:50:54
21  with a different proposal than the first one; is that    10:50:59
22  correct?                                    10:51:01
23    A.  In my opinion, it was a different one.  It was    10:51:02
24  another one altogether.                     10:51:05
25    Q.  Okay.  Can you tell us how it differed from    10:51:08


                    363
1  the first one, as best you can?              10:51:09
2         Well, let me ask you.  I think -- did it    10:51:12
3  differ in price?                            10:51:14
4         MR. TATE:  Objection.  Lack of personal    10:51:20

5   knowledge.                          10:51:22
6        MR. CHESNEY: Let's do it the easy way.    10:51:24
7    Q.  (BY MR. CHESNEY) Just tell us, as best you    10:51:27
8   can, how it differed from the original proposal that    10:51:28
9   was made by Toshiba.                 10:51:30
10       A.  I can't remember if it differed in price.  All 10:51:31
11  of them differed in price.  That was what the        10:51:33
12  fine-tuning process was all about.              10:51:36
13       Q.  Fair enough.                    10:51:41
14            Tell us the best you can about how it did  10:51:42
15  differ from the original proposal.              10:51:44
16       A.  The guidelines that we set on the original    10:51:49
17  proposal were that we would -- we had issued the      10:51:51
18  workless management, which was in on the first quote.  10:51:56
19  We had issued the habitus statement, which was the    10:52:00
20  large patient statement.  We had issued the          10:52:04
21  integration between the PACS and the imaging         10:52:09
22  equipment.  And price was certainly a constraint as    10:52:16
23  well.                        10:52:20
24       Q.  Okay.  When did price come to be a constraint? 10:52:35
25            MR. TATE: Objection.  Asks for          10:52:38

                                 364
1   speculation, mischaracterizes the witness's previous    10:52:39
2   testimony.                       10:52:42
3        A.  The pricing was not my arena of concern.      10:52:44
4        Q.  That wasn't my question.           10:52:52
5            You had said that pricing was a          10:52:54
6   constraint.  Presumably you, therefore, at some point  10:52:56
7   came to know that pricing was a constraint, correct?   10:52:58
8            MR. TATE: Objection.  Mischaracterizes the 10:53:00
9   witness's previous testimony, asked and answered.      10:53:02
10       A.  When the -- I don't recall exactly how this    10:53:07
11  happened.  But the two entrepreneurs told me that at   10:53:12
12  one point along the way, once we received our         10:53:18
13  packages, that we had limited amount of monies that we 10:53:21
14  needed to try to stay within, but if the financing arm 10:53:24
15  of any of those companies could make this happen, then 10:53:28
16  we could -- we could utilize their quotes.           10:53:32
17       Q.  If the financing arm of the company you were  10:53:37
18  dealing with could make a deal happen within the      10:53:40
19  amount you wanted to stay within, you could use their 10:53:44
20  quotes; is that correct?              10:53:47
21            MR. TATE: Objection.  Mischaracterizes the 10:53:47
22  witness's previous testimony.              10:53:49
23       A.  It's my understanding.           10:53:50

24     Q.   Okay.  And was that amount $2.5 million for     10:53:51
25  equipment?                                10:53:56

365

1     A.   I thought the amount was 2.9 million, myself.  10:54:01
2  So I -- again, I -- the finance side of that was not a  10:54:05
3  great concern of mine.  I was putting together a        10:54:09
4  package.                                  10:54:13
5     Q.   Okay.  Did 2.9 include all modalities?        10:54:14
6     A.   My understanding, 2.9 was our -- our bottom    10:54:20
7  line, that we couldn't go any more over 2.9.        10:54:23
8     Q.   Was that for everything?            10:54:26
9     A.   That was for everything.            10:54:27
10     Q.   Would that include mammo?            10:54:28
11     A.   Mammo.                      10:54:29
12     Q.   Did that include PACS?                10:54:30
13     A.   PACS.                      10:54:31
14     Q.   Was it all ancillary equipment that you       10:54:33
15  needed?                      10:54:41
16          MR. TATE:  Objection.  Lack of personal      10:54:41
17  knowledge.                      10:54:42
18     A.   I don't know what ancillary equipment that you 10:54:44
19  would be referring to, because each one of the      10:54:47
20  modalities came with the ancillary equipment necessary  10:54:50
21  to operate that equipment.                10:54:55
22     Q.   You mean on the quote you received, each       10:54:58
23  modality specified what components would come with      10:55:02
24  that modality; is that correct?            10:55:04
25     A.   That means that -- yes, that's correct.       10:55:07

366

1     Q.   Okay.  Fair enough.              10:55:15
2          Now, I'm sorry, but I'm still trying to     10:55:17
3  figure out how the second quote that was made by       10:55:20
4  Toshiba was, in your opinion, different from the       10:55:24
5  original quote was made by Toshiba.            10:55:28
6     A.   The second quote didn't include workless       10:55:29
7  management, as we looked at it at a later date.        10:55:32
8     Q.   Okay.  Anything else?              10:55:36
9     A.   Workless management was one.  Integration --   10:55:37
10  seamless integration to the PACS environment, the       10:55:41
11  import-export mechanism.  Vascular package that was on  10:55:46
12  the first quote that we -- we understood it to be on    10:55:55
13  the first quote, that was one of the prerequisites      10:55:59
14  again that we could do CTAs.  We bought a vitreal       10:56:02
15  workstation as well, to enhance that CTA capability.    10:56:07

| | | |
|---|---|---|
| | | 16  It wasn't for the magnet, that was for the CT side.    10:56:12 |
| | | 17  These are things that we had requested from all three  10:56:20 |
| | | 18  vendors on the front end.                    10:56:24 |
| | | 19        We -- within the first quote, we          10:56:26 |
| | | 20  recognized that these prerequisites were met.  And      10:56:33 |
| | | 21  then we subsequently chose Philips.  And then, of      10:56:38 |
| | | 22  course, when we elected to go with another vendor      10:56:41 |
| | | 23  other than Philips, Toshiba was brought back to the    10:56:45 |
| | | 24  table.  And what we were originally requesting wasn't   10:56:51 |
| | | 25  in that package.                      10:56:56 |

| 369 to 370 | 2 20 | 369 |
|---|---|---|
| | | 2    Q.  (BY MR. CHESNEY)  I believe you said yesterday 10:59:35 |
| | | 3  that you wanted to make sure that DeSoto's techs would  10:59:37 |
| | | 4  make every legitimate call that they could to the      10:59:41 |
| | | 5  Toshiba service people; is that correct?          10:59:45 |
| | | 6    A.  That is correct.              10:59:47 |
| | | 7    Q.  And was one of those reasons -- was one of the 10:59:48 |
| | | 8  reasons for that, if I remember you correctly -- and   10:59:51 |
| | | 9  if I don't, please tell me -- that you wanted to make   10:59:54 |
| | | 10  sure the service people understood that they needed to  10:59:56 |
| | | 11  be responsive to DeSoto's needs?              10:59:58 |
| | | 12    A.  That was one of the reasons, yes.        11:00:01 |
| | | 13    Q.  And was that, in part, because historically    11:00:03 |
| | | 14  you have felt that you have to do that to make sure     11:00:08 |
| | | 15  service people do what you need them to do?        11:00:10 |
| | | 16    A.  Yes, I did.                11:00:13 |
| | | 17    Q.  And is it fair to say that that was a        11:00:14 |
| | | 18  perception you had not particularly about Toshiba      11:00:16 |
| | | 19  service people but service people in the industry in    11:00:18 |
| | | 20  general?                  11:00:20 |
| | | 21    A.  Service people in general.          11:00:21 |
| | | 22    Q.  Okay.  Now, you were asked a number of      11:00:24 |
| | | 23  questions by Mr. Tate yesterday relating to specific    11:00:26 |
| | | 24  service calls that were made, do you recall --        11:00:29 |
| | | 25    A.  Yes.                  11:00:31 |
| | | |
| | | 370 |
| | | 1    Q.  -- some of those questions?          11:00:31 |
| | | 2        And I think with regard to some of them    11:00:34 |
| | | 3  you said that you thought they were equipment issues,   11:00:36 |
| | | 4  correct?                  11:00:39 |
| | | 5    A.  Yes.                  11:00:39 |
| | | 6    Q.  And I think you said some of them you thought  11:00:39 |
| | | 7  could be operator issues?              11:00:42 |
| | | 8    A.  Yes.                  11:00:43 |
| | | 9    Q.  Is it fair to say that you felt that your      11:00:44 |

| | | | |
|---|---|---|---|
| | | 10  techs should call in an issue when they had a problem,  11:00:48<br>11  whether or not they knew if it was an operator or an    11:00:52<br>12  equipment issue?                            11:00:57<br>13      A.  Yes.                        11:00:58<br>14          MR. TATE:  Again, I want to make an        11:00:58<br>15  objection.  That would assume facts in evidence, lack    11:01:01<br>16  of personal knowledge, and goes beyond the scope of      11:01:03<br>17  direct.                            11:01:05<br>18      Q.  (BY MR. CHESNEY)  And did you, in fact, tell    11:01:06<br>19  them to do that?                        11:01:08<br>20      A.  I did.                        11:01:11 | |
| 371<br>to<br>373 | 23<br><br>5 | 371<br>23  Q.  Okay.  And did there come a point at which you 11:02:58<br>24  understood that Mr. Begy or whoever was perhaps his      11:03:01<br>25  superior had placed a financing limitation on how much  11:03:07<br><br>372<br>1  equipment could be financed?                11:03:14<br>2          MR. TATE:  Objection.  Lack of personal        11:03:16<br>3  knowledge.                        11:03:17<br>4      A.  The only knowledge I would have -- would have  11:03:22<br>5  had of that would have been from Randon or Lynn.        11:03:25<br>6      Q.  Okay.  That's fine.                11:03:28<br>7          What did they tell you?                11:03:29<br>8      A.  That we did have a limitation as far as our    11:03:31<br>9  overall structure went and this was -- my            11:03:34<br>10  understanding was $2.9 million for total equipment.      11:03:38<br>11      Q.  And did they also tell you that there was a    11:03:42<br>12  $2.5 million financing limit that TAMC was able to      11:03:46<br>13  provide?                        11:03:52<br>14      A.  No, sir, they did not.            11:03:52<br>15      Q.  Did they ever tell you that one reason it was  11:04:00<br>16  important to have the DeSoto facility up and          11:04:05<br>17  operational by the end of 2000 was to avoid any        11:04:08<br>18  potential increased cost in financing the equipment?    11:04:12<br>19      A.  Yes, they did.                11:04:15<br>20      Q.  Okay.  Tell us what you can recall about that. 11:04:18<br>21  Forgive me.                        11:04:22<br>22          First they, by the way, I mean Dr. Carvel    11:04:22<br>23  or Mr. Carvel.  Did you understand that?            11:04:24<br>24      A.  I did understand it.                11:04:26<br>25      Q.  Okay.                        11:04:28<br><br>373<br>1      A.  The only conversations that I can remember,    11:04:28<br>2  again, the financial portion was not mine to handle,    11:04:30 | Hearsay.  Lack of<br>personal knowledge.<br>Misleading. |

| | | | |
|---|---|---|---|
| | | 3   was that if we got it up and we were operational by     11:04:33<br>4   the end of the year, then we would have a cumulative     11:04:36<br>5   savings over the life of the project.                         11:04:42 | |
| 372[5] | 15<br>to<br>25 | 372<br>15    Q.  Did they ever tell you that one reason it was  11:04:00<br>16   important to have the DeSoto facility up and           11:04:05<br>17   operational by the end of 2000 was to avoid any       11:04:08<br>18   potential increased cost in financing the equipment?     11:04:12<br>19    A.  Yes, they did.                            11:04:15<br>20    Q.  Okay.  Tell us what you can recall about that. 11:04:18<br>21   Forgive me.                                   11:04:22<br>22          First they, by the way, I mean Dr. Carvel   11:04:22<br>23   or Mr. Carvel.  Did you understand that?           11:04:24<br>24    A.  I did understand it.                       11:04:26<br>25    Q.  Okay.                                 11:04:28 | Hearsay.  Lack of<br>personal knowledge.<br>Misleading. |
| 373<br>to<br>374 | 21<br>15 | 373<br>21    Q.  Okay.  Prior to October 31st, had any Toshiba  11:05:49<br>22   equipment begun to be installed at DeSoto, to your       11:05:55<br>23   knowledge?                                11:05:58<br>24    A.  I remember seeing the nuke cameras come         11:06:02<br>25   through the windows, that we had to insert them          11:06:06<br><br>374<br>1   through the window at the time before we could board    11:06:09<br>2   it up.  But installation either hadn't begun or was      11:06:11<br>3   just in its preliminary state of setting foundation        11:06:18<br>4   and things.                                  11:06:21<br>5    Q.  Okay.  And was there still construction going  11:06:23<br>6   on to the facility while this was happening?             11:06:25<br>7    A.  Yes, there was.                          11:06:27<br>8    Q.  And who was doing that construction?           11:06:28<br>9    A.  H & H Building.                          11:06:31<br>10    Q.   And what was H & H Building doing at the time  11:06:34<br>11   when you -- up until the time you had your heart         11:06:38<br>12   attack?                                    11:06:40<br>13    A.  They were finishing up internal projects,       11:06:42<br>14   mudding walls, painting, laying flooring, putting in     11:06:50<br>15   doorjambs.                                 11:06:57 | |
| 375<br>to<br>376 | 9<br>16 | 375<br>9    Q.  Okay.  In connection with putting this         11:08:01<br>10   facility together, was it necessary to put in           11:08:04<br>11   shielding for the MR room?                       11:08:07<br>12    A.  That is correct.                          11:08:08<br>13    Q.  Okay.  Do you know who put the shielding in?  11:08:09 | Lack of personal<br>knowledge.<br>Speculation.<br>Misleading. |

---

[5] This is duplicative to the section designated preceding it.

| | | |
|---|---|---|
| | | 14    A.  Lindgren Shielding Company.              11:08:12<br>15    Q.  Okay.  Did you -- well, in terms of when you  11:08:23<br>16  were able to be on site, were you able to observe any  11:08:27<br>17  of the shielding work going on?                11:08:29<br>18    A.  The shielding work had already just about    11:08:35<br>19  completed when I got to come into the facility.      11:08:39<br>20    Q.  And just for the record, can you explain why  11:08:48<br>21  shielding is necessary in an MR facility?          11:08:52<br>22    A.  The MR equipment itself operates on radio    11:08:56<br>23  frequencies.  And we elect to introduce our own radio  11:09:01<br>24  frequencies to excite the hydrogen atoms and collect  11:09:04<br>25  that energy back.  The shielding prevents radio      11:09:08<br><br>376<br>1  frequency waves from entering into the room, not      11:09:12<br>2  entering it or exiting the room.  But entering into    11:09:15<br>3  the room and you get a lot of these frequencies from   11:09:18<br>4  CB radios, RF towers, FM stations sometimes can go    11:09:21<br>5  down on that band width, very unlikely, because they   11:09:27<br>6  operate at such a high pitch.                  11:09:30<br>7        The shielding itself prevented that from    11:09:31<br>8  happening in any cracks or any holes, and that        11:09:35<br>9  shielding can give you a little bit of a problem.      11:09:37<br>10  Should be identified as well.                11:09:39<br>11    Q.  What kind of problems can result if the      11:09:44<br>12  shielding isn't what it should be?            11:09:47<br>13    A.  If you have integrity loss of the shielding,  11:09:50<br>14  you can have -- you can have artifact problems on the  11:09:53<br>15  image quality, some tuning problems can occur.      11:10:00<br>16  That's -- that's pretty much it with the shielding.    11:10:12 | |
| 376<br>to<br>378 | 25<br><br>20 | 376<br>25        Now, after the Toshiba MR was removed from  11:10:43<br><br>377<br>1  DeSoto --                        11:10:48<br>2    A.  Yes.                      11:10:50<br>3    Q.  -- did Lindgren come in to do any additional  11:10:51<br>4  work?                        11:10:54<br>5    A.  They did.                  11:10:54<br>6    Q.  What did they come in to do?          11:10:55<br>7    A.  Each magnet had its own standard for a room    11:10:57<br>8  size and consideration.  We had to lift the roof in    11:11:05<br>9  one portion, had to run new cabling where Toshiba ran  11:11:08<br>10  underground, we ran overhead when the next magnet came  11:11:13<br>11  in.  We also ran a chiller, which is a water-chilled    11:11:16<br>12  device, into that room as well.              11:11:19 | Relevance under FRE<br>401, 402, & 403.<br>Hearsay.  Speculation.<br>FRE 106 competence. |

| | | | |
|---|---|---|---|
| | | 13        So they -- they made sure the integrity of 11:11:20<br>14  the room was solid. They made sure that the cabling   11:11:24<br>15  that ran in their raceways was adequate and not      11:11:29<br>16  touching, which would cause some kind of arcing     11:11:35<br>17  problem, if you -- if you had some. Made sure that    11:11:38<br>18  the wall structure and the ceiling structure were     11:11:42<br>19  of -- of their prerequisite for their shielding and    11:11:46<br>20  their room. And then, of course, the material used    11:11:50<br>21  was copper and make sure the copper was of their     11:11:53<br>22  grade.                     11:11:57<br>23    Q. At that point did Lindgren -- Lindgren      11:11:58<br>24  discover that there was actually a hole in the       11:12:01<br>25  shielding that had been at DeSoto?            11:12:04<br><br>                           378<br>1    A. Yes, they did.                11:12:06<br>2    Q. And did they inform you of that?        11:12:07<br>3    A. Yes, they did.                11:12:08<br>4    Q. Did you look at the hole?        11:12:10<br>5    A. I did.                11:12:12<br>6    Q. What size was it?          11:12:13<br>7    A. The size of a softball.        11:12:15<br>8    Q. Did they offer you any thoughts as to how that 11:12:22<br>9  hole got there?              11:12:25<br>10    A. The gentleman I talked to suggested it looked  11:12:31<br>11  like maybe a two-by-four went through it.       11:12:34<br>12    Q. And where exactly was this hole in the     11:12:44<br>13  shielding?              11:12:47<br>14    A. Above the door entrance to the window side,   11:12:52<br>15  between the window and the door in that crawlspace    11:12:57<br>16  there.               11:13:00<br>17    Q. Is that on the outer wall of the building, or 11:13:02<br>18  the outer wall?              11:13:05<br>19    A. Inner wall.            11:13:06<br>20    Q. Inner wall of the building, okay.     11:13:07 | |
| 386<br>to<br>388 | 25<br><br>3 |                            386<br>25    Q. Okay. But if I understand you correctly --   11:27:20<br><br>                           387<br>1  well, tell me, is it correct that this issue of the   11:27:21<br>2  bucky, as you put it I think, getting in the way can   11:27:25<br>3  be dealt with by having the operator manipulate the   11:27:29<br>4  equipment?              11:27:32<br>5    A. That is correct.          11:27:32<br>6    Q. Okay. You also talked with Mr. Tate yesterday 11:27:37<br>7  about some battery failures that occurred with regard  11:27:40 | |

| | | |  |
|---|---|---|---|
| | | 8   to the R & F equipment.  Do you recall that?        11:27:42<br>9      A.  Yes, sir.                              11:27:46<br>10     Q.  And I think -- well, let me ask you, do you    11:27:46<br>11   know specifically how those batteries work and are      11:27:50<br>12   powered?                              11:27:54<br>13     A.  No, sir.  That was the first encounter I ever  11:27:55<br>14   had with a battery of that size, which is a little     11:27:58<br>15   watch-type battery, a Lithium battery, maintaining       11:28:02<br>16   some kind of software load or procedural load in -- in  11:28:06<br>17   a system that already has a surge protector on it,      11:28:12<br>18   already -- already has a battery backup.  I've never     11:28:16<br>19   encountered a little battery going out like that in      11:28:19<br>20   any other piece of equipment.                     11:28:21<br>21     Q.  So you don't know why that happened in this     11:28:24<br>22   instance?                              11:28:26<br>23     A.  I have no earthly idea.                   11:28:27<br>24     Q.  Is it correct that when these batteries         11:28:28<br>25   failed, Toshiba replaced them for you?             11:28:31<br><br>388<br>1      A.  That is correct.                       11:28:33<br>2      Q.  Did they -- did they do that without charge?  11:28:35<br>3      A.  They did.                           11:28:37 | |
| 389<br>to | 4<br>to<br>10 | 389<br>4      Q.  And the -- the tomo unit you bought from      11:29:48<br>5   Toshiba I think had to be attached and unattached if    11:29:51<br>6   it was being used or not used?                  11:29:53<br>7      A.  That is correct.                       11:29:55<br>8      Q.  Okay.  And is it fair to say that you were       11:30:03<br>9   aware of that when you purchased the R & F unit?        11:30:04<br>10     A.  We were.                           11:30:07 | |
| 390<br>to<br>392 | 7<br>18 | 390<br>7      Q.  Do you recall an incident in which the nuclear  11:38:25<br>8   camera, some portion of it, came in contact with a     11:38:31<br>9   patient and bruised a patient's arm?                11:38:33<br>10     A.  Yes, I do.                          11:38:35<br>11     Q.  Okay.  Do you know who the operator of the     11:38:37<br>12   equipment was at that time?                    11:38:39<br>13     A.  May Vokaty.                         11:38:42<br>14     Q.  Now, were you there when that happened on      11:38:43<br>15   site?                               11:38:45<br>16     A.  I was on site.                       11:38:45<br>17     Q.  Okay.  Do you have an opinion as to how that   11:38:52<br>18   incident occurred?                         11:38:55<br>19        MR. TATE:  Objection.  Speculation, lack of  11:38:56<br>20   personal knowledge.  I believe the witness testified    11:38:57 | Speculation. |

21    that he was on site.  He did not testify that he was    11:38:59
22    present when the incident occurred.  So it would be    11:39:02
23    mischaracterizing his testimony.                              11:39:05
24        A.   May was not an experienced nuclear med tech,    11:39:11
25    and I think the -- maybe the lack of attendance at the    11:39:14

391

1    time might have been a factor.                          11:39:23
2        Q.   When you say "lack of attendance," what do you    11:39:34
3    mean?                           11:39:35
4              MR. TATE:  Objection.  Speculation.          11:39:38
5        A.   This piece of equipment rotates around the        11:39:42
6    body.  And indeed there was a robo contour center        11:39:44
7    switch that gave you a sense a -- false sense of          11:39:50
8    security that it would stop once it contacted the        11:39:53
9    body.  But with that false sense, personal attendance    11:39:55
10    by the camera might could have prevented it and might    11:40:03
11    not have prevented it, simply because the camera was    11:40:08
12    in contact with the body and it was somewhere in the    11:40:10
13    range of the robo contour center switch.            11:40:14
14              The presence of a senior nuclear medicine    11:40:20
15    tech or a trained individual I would -- in my opinion,    11:40:24
16    quite possibly could have prevented it.  But I can't    11:40:29
17    be 100 percent certain that that would have occurred    11:40:32
18    as well.                              11:40:36
19        Q.   When this event did occur, did you take some    11:40:36
20    steps to try to find out how it happened?          11:40:39
21        A.   Yes, we did.                    11:40:41
22        Q.   Okay.  Did you, among other things, take any    11:40:42
23    steps to try to find out whether the patient had been    11:40:45
24    in any way restrained or positioned so as to prevent    11:40:48
25    contact with the camera?                    11:40:51

392

1        A.   Yes, I did.                    11:40:52
2        Q.   What did you find out?              11:40:53
3              MR. TATE:  Objection.  Calls for hearsay,    11:40:58
4    lack of personal knowledge.                    11:40:59
5        A.   Found out that the patient was placed in a    11:41:02
6    supine position, which is a face-up position, and the    11:41:06
7    hands were put behind the head in a relaxed manner.    11:41:10
8    This particular patient had an arthritic, frozen-type    11:41:16
9    shoulder on the left side, was unable to put her hands    11:41:21
10    completely up behind her head.  We try not to use    11:41:25
11    restraints in any form or fashion.  This particular    11:41:31
12    patient did not have a restraint, nor a support    11:41:35

| | | |
|---|---|---|
| | | 13  mechanism placed there for her comfort or convenience,  11:41:38<br>14  which allowed her arm to be in -- in some type of        11:41:43<br>15  position for contact.  But, again, the robo contour       11:41:47<br>16  was -- was on and the center switch was activated on a  11:41:51<br>17  very sensitive measure, that if it touched, the           11:41:56<br>18  scanner stopped itself.                   11:42:00 | |
| 393<br>to<br>397 | 21<br><br>17 | 393<br>21    Q.   (BY MR. CHESNEY)  Mr. King --            11:42:39<br>22    A.   Yes, sir.                     11:42:41<br>23    Q.   -- at the time of this incident, you were the  11:42:41<br>24  administrator of DeSoto; is that correct?            11:42:43<br>25    A.   That is correct.                   11:42:44<br><br>394<br>1    Q.   And did you believe it was part of your duty   11:42:44<br>2  to look into this incident to try to determine what      11:42:47<br>3  had happened?                       11:42:49<br>4    A.   Yes, I did.                     11:42:50<br>5    Q.   And did you do that as part of your duties at  11:42:50<br>6  DeSoto?                         11:42:52<br>7    A.   Yes, I did.                     11:42:53<br>8    Q.   And did you speak with May Vokaty who was the  11:42:53<br>9  tech in charge of the equipment at the time?         11:42:57<br>10    A.   Yes, I did.                     11:42:58<br>11    Q.   Okay.  And did you obtain from her the       11:42:59<br>12  information that you just recited to us as to the        11:43:02<br>13  patient positioning and restraint?              11:43:04<br>14    A.   Yes, I did.                    11:43:06<br>15    Q.   Okay.  Very good.                 11:43:08<br>16        You say that this patient had a frozen      11:43:10<br>17  shoulder on the left side; is that right?           11:43:14<br>18    A.   That's a loose term.  But arthritic shoulder,  11:43:18<br>19  frozen shoulder, unable to lift it above her head in    11:43:22<br>20  any nonrestrictive manner.                 11:43:24<br>21    Q.   And was it the left arm of the patient that   11:43:26<br>22  came in contact with the camera?              11:43:28<br>23    A.   I believe it was.               11:43:30<br>24    Q.   Okay.  Now, you said that the robo contour was 11:43:34<br>25  on; is that right?                   11:43:37<br><br>395<br>1    A.   I'm not sure.                   11:43:40<br>2    Q.   Again though, that's what you learned from     11:43:41<br>3  your investigation?                   11:43:43<br>4    A.   My understanding is that the robo contour was  11:43:44<br>5  on.                       11:43:47 | Lack of personal<br>knowledge.<br>Speculation. |

6     Q.   Okay.  And are you aware that the robo contour 11:43:48
7   is designed so that there's a certain distance at each  11:43:52
8   end where it is not sensitive in order to allow scans   11:43:57
9   to be conducted properly?                       11:44:02
10    A.   Not until that incident occurred.          11:44:03
11    Q.   You didn't know that until then?        11:44:05
12    A.   No, sir.                       11:44:06
13    Q.   Okay.  And, again, is it fair to say you're    11:44:08
14   not a nuclear medicine expert?                 11:44:10
15    A.   Absolutely.                11:44:12
16    Q.   And was Dr. Carvel a nuclear medicine expert  11:44:13
17   when you bought the nuclear camera?              11:44:16
18    A.   No, sir.                  11:44:17
19    Q.   How do you know that?            11:44:17
20        MR. TATE:  Objection, as to what expert     11:44:23
21   means in the context of the question.            11:44:24
22    A.   I don't know for a fact that she was not an   11:44:28
23   expert, other than the fact that neither one of us      11:44:30
24   seemed to have any great knowledge about nuke.       11:44:33
25    Q.   Now, Ms. Vokaty was operating the camera at    11:44:37

396

1   the time of this incident, correct?              11:44:40
2     A.   Yes, she was.                  11:44:41
3     Q.   And do you recall that this incident was in   11:44:42
4   maybe about the third week in July?             11:44:45
5     A.   I don't recall the time frame.          11:44:49
6     Q.   Okay.  If I told you it was in the latter part 11:44:52
7   of July, would you have -- July 2001, would you have    11:44:54
8   any reason to doubt that?                   11:44:59
9     A.   If I --                   11:45:01
10        MR. TATE:  Objection.  Lack of personal     11:45:02
11   knowledge, asked and answered.                11:45:03
12    A.   My answer in the report reflects that, yes, I  11:45:05
13   would agree.                     11:45:08
14    Q.   Okay.  And are you aware that Ms. Vokaty     11:45:09
15   didn't begin to be trained on the nuclear camera until  11:45:12
16   earlier in July?                    11:45:16
17    A.   Yes, I am.                  11:45:18
18    Q.   Okay.  And do you know who attempted to train  11:45:19
19   her?                         11:45:22
20        MR. TATE:  Objection.  As far as the        11:45:23
21   characterization of the question attempted, I think     11:45:25
22   that's inappropriate.                 11:45:27
23    A.   Dr. Carvel was in -- in attendance for that    11:45:31
24   training session.                  11:45:35

| | | | |
|---|---|---|---|
| | | 25    Q.  You say she was in attendance.  Was she    11:45:36<br><br>397<br>1  training?                11:45:39<br>2    A.  She was training, yes.        11:45:39<br>3    Q.  Okay.  And you say "that training session."  11:45:42<br>4  What do you mean by "that training session"?    11:45:44<br>5    A.  There were several -- May just wasn't thrown  11:45:49<br>6  in there and trained one day.  She was trained on    11:45:53<br>7  several days of scanning.        11:45:57<br>8    Q.  How was she trained?        11:45:59<br>9    A.  Again, by Dr. Carvel and with some support by  11:46:01<br>10  online applications, and eventually by -- if I -- I    11:46:10<br>11  can't recall these dates, but we have a contract    11:46:16<br>12  employee that would come in and do some contract apps  11:46:20<br>13  for us.              11:46:23<br>14    Q.  And if Ms. Vokaty testified that her training  11:46:24<br>15  took place through July and August, would you disagree  11:46:28<br>16  with that?        11:46:30<br>17    A.  I would not disagree.        11:46:32 | | |
| 398<br>to<br>401 | 4<br><br>14 | 398<br>4    Q.  (BY MR. CHESNEY)  Is it correct from your    11:46:52<br>5  recollection, Mr. King, that Ms. Vokaty had not been  11:46:53<br>6  fully trained on the nuclear camera at the time of the  11:46:56<br>7  incident we've been talking about?        11:47:00<br>8        MR. TATE:  Objection, as -- as far as the    11:47:02<br>9  meaning of "fully trained." I think it's      11:47:04<br>10  inappropriate.           11:47:06<br>11    A.  I don't believe she had adequate training at   11:47:10<br>12  that time.          11:47:13<br>13    Q.  Fair enough.        11:47:14<br>14       Did you ever have any experience      11:47:19<br>15  personally with Dr. Carvel's operation of the nuclear  11:47:21<br>16  camera?            11:47:23<br>17    A.  Other than her troubleshooting it, no.    11:47:30<br>18    Q.  Did she ever try to do any scan of you on the  11:47:33<br>19  nuclear camera?         11:47:36<br>20    A.  No, she did not.        11:47:39<br>21    Q.  Is scan an appropriate term, by the way?    11:47:42<br>22    A.  That is.        11:47:44<br>23    Q.  Did she ever try to perform a procedure on you  11:47:46<br>24  on the nuclear camera?         11:47:50<br>25    A.  She gave the order for the technologist to    11:47:51<br><br>399<br>1  perform that procedure on me.        11:47:53 | | Speculation.  Hearsay. |

2    Q.   Okay.  Which technologist?  Was it May Vokaty? 11:47:56
3    A.   I don't -- I don't believe -- it may have been 11:48:03
4  May, but we had a couple other folks we were training   11:48:05
5  in that area at the time.  Pam Curry and -- I don't    11:48:08
6  know.  Cindy Holmes might have been there at that        11:48:16
7  time.                    11:48:21
8    Q.   Okay.  And was Dr. Carvel instructing these    11:48:25
9  people as to how to perform the procedure on you?      11:48:29
10         MR. TATE:  Objection, as far as the term of 11:48:33
11  "instructing" and the meaning of instructing.        11:48:35
12         MR. CHESNEY:  Fair enough.  I'll withdraw    11:48:38
13  it.                    11:48:40
14    Q.   (BY MR. CHESNEY)  What was Dr. Carvel's        11:48:40
15  participation in this procedure?         11:48:41
16    A.   She gave the type of procedure to be performed 11:48:46
17  on me.  She gave that order for that type of          11:48:58
18  procedure.                  11:49:01
19    Q.   Did she show the tech anything about how to    11:49:01
20  position you on the table or to position you for the    11:49:03
21  procedure or anything like that?            11:49:06
22    A.   Second phase of it, yes.  There are two        11:49:07
23  phases.               11:49:11
24    Q.   Okay.  And is it correct that that second    11:49:11
25  phase of the procedure did not turn out properly?      11:49:15

                         400
1         MR. TATE:  Objection.  Assuming facts not    11:49:18
2  in evidence.              11:49:20
3    A.   Each radiologist has their own parameter of    11:49:23
4  what's appropriate for them to do an interpretation    11:49:26
5  off of.  My limited amount of information or knowledge 11:49:28
6  of nuke med led me to believe from other nuke techs    11:49:38
7  that that was -- was an inappropriate exam, that I      11:49:44
8  should have been in the same position for both exams.  11:49:50
9    Q.   So in speaking with knowledgeable nuclear    11:49:51
10  medicine technologists, you were led to understand    11:49:54
11  that you had been improperly positioned for one part    11:49:57
12  of the exam; is that correct?            11:49:59
13    A.   I was led to believe that some radiologists    11:50:01
14  have a different method of interpretation, if they're  11:50:05
15  comfortable with that, that's their prerogative to use  11:50:12
16  that method.                11:50:14
17    Q.   And that was different from the one that    11:50:14
18  Dr. Carvel for -- that instructed the tech to use for  11:50:17
19  you, correct?            11:50:20
20    A.   Yes, it was.            11:50:21

| | | | |
|---|---|---|---|
| | | 21    Q.  Okay.  And these were experienced nuclear    11:50:22<br>22  medicine techs who were telling you about this        11:50:24<br>23  different --                              11:50:27<br>24    A.  Yes, it was.                        11:50:27<br>25    Q.  -- position?  Okay.                    11:50:28<br><br>                             401<br>1        Let's talk a bit about the Excelart --    11:50:29<br>2    A.  Okay.                              11:50:55<br>3    Q.  -- MR.                            11:50:56<br>4        As I recall your testimony when you were    11:51:01<br>5  speaking with Mr. Tate yesterday, I think you said      11:51:04<br>6  that other than some focused items, I think that was    11:51:09<br>7  the term that you used, Toshiba was able to resolve    11:51:12<br>8  issues that arose concerning the Excelart?          11:51:16<br>9        MR. TATE:  Objection.  That          11:51:18<br>10  mischaracterizes the witness's previous testimony.      11:51:19<br>11    Q.  (BY MR. CHESNEY)  Is that a fair statement of  11:51:21<br>12  your view of things as it related to the Excelart?      11:51:23<br>13    A.  With the exception of a few very critical      11:51:27<br>14  problems, yes.                          11:51:31 | |
| 410<br>to<br>411 | 22<br><br>8 |                              410<br>22    Q.  Okay.  So if I understand you, there were one  12:02:12<br>23  or two issues where there were white dots in head    12:02:14<br>24  studies, but that you believe was relating to the      12:02:18<br>25  positioning of the patient?                    12:02:21<br><br>                             411<br>1    A.  I think that was positioning of the patient,    12:02:21<br>2  yes.                              12:02:23<br>3    Q.  Fair enough.                        12:02:24<br>4        So the ones that you couldn't fully        12:02:24<br>5  attribute -- or couldn't attribute necessarily to the    12:02:27<br>6  position of the patient were all lumbar spine studies;  12:02:27<br>7  is that right?                          12:02:30<br>8    A.  They were all spine studies.            12:02:30 | Speculation.  Lack of<br>personal knowledge. |
| 414<br>to<br>415 | 10<br><br>2 |                              414<br>10  Q.  Are you saying you opened up the field of view  12:06:15<br>11  to larger than the spine, in part, in order to make    12:06:17<br>12  sure that you maintained good image quality?        12:06:21<br>13    A.  That's correct.                      12:06:23<br>14    Q.  Okay.  Is it also correct that the white dot    12:06:24<br>15  artifact didn't appear in the image on the spine?      12:06:27<br>16        MR. TATE:  Objection.  Mischaracterization  12:06:31<br>17  of his testimony.                        12:06:33<br>18    A.  That is correct.  It would not appear in the  12:06:34 | FRE 106 competence. |

|        |    |                                                                                          |                        |
|--------|----|------------------------------------------------------------------------------------------|------------------------|
|        |    | 19   actual bony structure itself, unless the patient was      12:06:36                   |                        |
|        |    | 20   malpositioned.  If a patient was positioned off          12:06:39                    |                        |
|        |    | 21   center, which we use the belly button as a center        12:06:44                    |                        |
|        |    | 22   point and the xyphoid tip as the center point, if the    12:06:47                    |                        |
|        |    | 23   center line didn't strike those two points, which is     12:06:50                    |                        |
|        |    | 24   the center of your breast plate and your belly button,   12:06:52                    |                        |
|        |    | 25   and they -- for some reason it scooted over, at that     12:06:55                    |                        |
|        |    |                                   415                                                     |                        |
|        |    | 1   point it was in jeopardy of having a white dot            12:06:59                    |                        |
|        |    | 2   artifact occur.                       12:07:01                                        |                        |
| 417 to 418 | 25 23 | 417<br>25   Q.   Okay.  Now, my question really relates to who  12:10:21<br><br>418<br>1   it was, if you recall, who told you that you weren't    12:10:26<br>2   seeing it and can you recall --                   12:10:29<br>3      A.  I don't recall --              12:10:31<br>4      Q.  -- who that was?              12:10:32<br>5      A.  -- who that was.              12:10:33<br>6      Q.  Okay.  Is it not fair to say, Mr. King, that   12:10:34<br>7   actually what you were told by Toshiba applications     12:10:37<br>8   people was that they were not able to replicate it and  12:10:40<br>9   see it for themselves?               12:10:44<br>10     A.  That is correct.              12:10:46<br>11     Q.  Okay.  And did you not then send to Toshiba    12:10:47<br>12  some images that you believed contained this white dot  12:10:51<br>13  artifact?                       12:10:54<br>14     A.  I didn't send those.  The FE pulled those down 12:10:55<br>15  on MOD and sent them.                   12:10:58<br>16     Q.  The "FE" meaning the field engineer?        12:10:59<br>17     A.  Field engineer.              12:11:02<br>18     Q.  And who was that?              12:11:02<br>19     A.  I can't recall who that was.          12:11:03<br>20     Q.  Okay.  And was Toshiba then able to see what   12:11:05<br>21  it was that you were talking about?           12:11:08<br>22     A.  They saw it on my images.          12:11:12<br>23     Q.  Right.                  12:11:13 | Vague.  FRE 106 competence. |
| 419 to 420 | 20 13 | 419<br>20     Q.  Am I correct also that there was a point at     12:12:05<br>21  which you say there was a good fix to the white dot      12:12:09<br>22  artifact involving a change of the coil that you         12:12:13<br>23  used --                     12:12:14<br>24         MR. TATE:  Objection.  Mischaracterizes --  12:12:14<br>25     Q.  (BY MR. CHESNEY) -- do you recall that?       12:12:16 |                        |

| | | | | |
|---|---|---|---|---|
| | | 420 | | |
| | | 1    MR. TATE: -- the witness's testimony.    12:12:16 | | |
| | | 2    A.  That is correct.                 12:12:18 | | |
| | | 3    Q.  And what was the change of the coil?        12:12:19 | | |
| | | 4    A.  The coil was to put in what they called a QD   12:12:23 | | |
| | | 5  coil.  QD coil's -- only purpose for that QD coil was   12:12:27 | | |
| | | 6  the lumbars and thoracics.  The reason we had the CTL   12:12:33 | | |
| | | 7  coil is because the patient never had to be moved from   12:12:37 | | |
| | | 8  that coil, they could have their cervical, thoracic,    12:12:39 | | |
| | | 9  and lumbar scanned.  When we got the QD coil put in      12:12:43 | | |
| | | 10  place, when we had a lumbar and/or a thoracic and a     12:12:46 | | |
| | | 11  cervical, we had to get the patient completely up off   12:12:50 | | |
| | | 12  the table, put them back down, and do the cervical on   12:12:53 | | |
| | | 13  a different coil altogether.        12:12:56 | | |
| 430 to 431 | 8 25 | 430 | FRE 106 competence. | |
| | | 8    Q.  And just to kind of orient us and the        13:09:51 | | |
| | | 9  transcript, could you tell us just briefly again what   13:09:54 | | |
| | | 10  exactly is a prescan failure, as simply as you could   13:09:57 | | |
| | | 11  describe it for somebody like me who doesn't know?     13:10:00 | | |
| | | 12    A.  Prescan failure is like turning a crank --     13:10:03 | | |
| | | 13  trying to crank up your car and it turns over and over  13:10:05 | | |
| | | 14  and over and never actually cranks up, so the engine    13:10:08 | | |
| | | 15  is never running.                 13:10:13 | | |
| | | 16    Q.  And in the context of an MR machine, what       13:10:19 | | |
| | | 17  exactly happens and, equally importantly, what doesn't  13:10:24 | | |
| | | 18  happen that you want to happen?                 13:10:29 | | |
| | | 19    A.  In the MR bore itself, the patient is        13:10:30 | | |
| | | 20  inserted.  Once the patient is inserted, their        13:10:35 | | |
| | | 21  demographic information is put into the computer, the   13:10:37 | | |
| | | 22  weight of the patient, which is -- has to be very,       13:10:40 | | |
| | | 23  very precise, and then the system is asked to start     13:10:45 | | |
| | | 24  its prescan.  Prescanning is the exactation of the      13:10:50 | | |
| | | 25  atoms within that isocenter field and asking to        13:10:53 | | |
| | | | | |
| | | 431 | | |
| | | 1  receive back a certain amount of information before it  13:10:57 | | |
| | | 2  can go forward and start to scan.                 13:11:02 | | |
| | | 3    Q.  What kind of information is the machine        13:11:04 | | |
| | | 4  seeking?                 13:11:06 | | |
| | | 5    A.  It's seeking hydrogen atom information,        13:11:08 | | |
| | | 6  precessing atoms in large volumes.             13:11:13 | | |
| | | 7    Q.  You say precessing or processing?        13:11:18 | | |
| | | 8    A.  Precessing.                 13:11:20 | | |
| | | 9    Q.  Precessing?                 13:11:21 | | |
| | | 10    A.  Spinning around.                 13:11:22 | | |
| | | 11    Q.  And you had said yesterday, I believe, that   13:11:34 | | |

| | | |
|---|---|---|
| | | 12  you think it's important for MR techs to be trained in  13:11:36<br>13  doing manual scans as opposed to always relying on      13:11:39<br>14  auto scanning -- auto prescanning; is that correct?      13:11:43<br>15      A.  That is correct.                              13:11:46<br>16      Q.  And why do you believe that's important?      13:11:47<br>17      A.  With the auto prescan cycle, you can have a      13:11:49<br>18  patient say, for instance, who is -- is dehydrated,      13:11:53<br>19  the hydrogen atom content is probably looser than      13:11:58<br>20  normal, not as many there.  Out of the billions that      13:12:04<br>21  you have, maybe it's only one billion of those, and it  13:12:08<br>22  just has got no signal coming back.  At that point,      13:12:11<br>23  once -- once you start to procedure and the -- the      13:12:15<br>24  auto prescan doesn't scan itself, you can go into      13:12:18<br>25  manual and try to adjust for that body habitus.      13:12:22 | |
| 435<br>to<br>438 | 9<br><br>8 | 435<br>9      Q.  Okay.  Now, I think you answered this question 13:16:41<br>10  yesterday, but I just want to make sure it's on the      13:16:43<br>11  record, and so I'm going to try to point to what I      13:16:46<br>12  think you said and correct me if it's wrong.      13:16:48<br>13      A.  Okay.                              13:16:51<br>14      Q.  Am I correct that it would take about three or 13:16:51<br>15  four minutes to do a manual scan if the automatic      13:16:54<br>16  prescan failed?                          13:16:58<br>17      A.  Approximately about three to four minutes,      13:16:58<br>18  yes.                                  13:17:00<br>19      Q.  Okay.  Now, you talked about some of the      13:17:05<br>20  things that could cause a prescan failure being      13:17:07<br>21  patient habitus and so forth?                13:17:11<br>22      A.  Right.                          13:17:12<br>23      Q.  Could bad coil connections also do that?      13:17:13<br>24      A.  They can.  They could.              13:17:15<br>25      Q.  Would having a drift in your center frequency 13:17:18<br><br>436<br>1  do that?                              13:17:21<br>2      A.  That's what the manual prescan's all about, to 13:17:22<br>3  pull that frequency back in line.              13:17:26<br>4      Q.  Okay.  And do you have any sense, to the      13:17:29<br>5  extent DeSoto experienced prescan failures, as to the   13:17:37<br>6  number of those prescan failures total?          13:17:43<br>7      A.  I can't tell you how many there were.  I know  13:17:48<br>8  there were numerous scan failures.              13:17:50<br>9      Q.  I take it they would have been reported to      13:17:54<br>10  Toshiba?                              13:17:56<br>11      A.  Yes, they would have been.          13:17:56<br>12      Q.  Okay.  Do you have any -- would you have any  13:18:00 | |

13  ability to quantify the causes of those prescan        13:18:03
14  failures?                                13:18:09
15        MR. TATE:  Objection.                    13:18:10
16    Q.  (BY MR. CHESNEY)  For example, the total      13:18:10
17  number of failures you had would be a hundred percent.  13:18:12
18  Could you assign percentages to those failures for any  13:18:16
19  particular cause?                          13:18:21
20        MR. TATE:  Objection.  Calls for an expert   13:18:22
21  opinion.                              13:18:24
22    Q.  (BY MR. CHESNEY)  Yeah.  If you can, that's    13:18:25
23  fine.  I'm not asking you for stuff you can't do.      13:18:26
24    A.  There's only one real defined reason that we   13:18:29
25  were given by some of the engineers, and that was in   13:18:32

                    437
1  Toshiba's coil configuration the adapter tail or the   13:18:36
2  connector piece to the magnet board itself had 15 pins  13:18:41
3  in it.  And pins are just the like on the back of your  13:18:46
4  computer and they're usually nine pin, ten pin,       13:18:51
5  fifteen pin.  These are 15 pins.  A couple of those    13:18:54
6  pins had -- had been pushed in and possibly dislodged  13:18:57
7  from the wiring mechanism there or corroded over, not  13:19:04
8  forming a good contact inside the -- the female       13:19:10
9  connector piece.                         13:19:14
10        So if I had to quantify that, I would say   13:19:16
11  that's probably 70 percent of the reasons for the     13:19:20
12  prescan failure.                         13:19:23
13    Q.  Fair enough.                       13:19:23
14        And was that fixed once these pins were   13:19:25
15  replaced?                             13:19:28
16    A.  Once it was identified as that.  I had a     13:19:29
17  tendency myself of showing the techs they could go in  13:19:31
18  and actually it's like raising a hood up on the      13:19:34
19  engine, looking at it really hard and shutting the    13:19:37
20  hood and it cranks up for you.  But I would blow on    13:19:39
21  the connector pieces, because it had a tendency to    13:19:45
22  coat them with some -- some little bit of moisture or  13:19:45
23  whatever the -- whatever it was coating, and then it   13:19:49
24  would function after that.  But the pins were so      13:19:49
25  destroyed at that point, that you had to really do a   13:19:54

                    438
1  hard physical connection.  And if they did that      13:19:56
2  physical connection appropriately, they could usually  13:20:00
3  scan.  But it was -- it was more exertion in         13:20:02
4  footpounds than needed for the brittle piece of      13:20:07

| | | | |
|---|---|---|---|
| | | 5  equipment.  Very brittle.                              13:20:10<br>6    Q.   And so the pins, I take it, were replaced?     13:20:12<br>7    A.   The pins were replaced and so were the        13:20:14<br>8  receiver connectors.                            13:20:17 | |
| 439<br>to<br>441 | 22<br><br>6 | 439<br>22    Q.   Is it true that if there is variation in the   13:22:22<br>23  power that's coming into a facility from the power      13:22:27<br>24  company that could cause RM errors?              13:22:29<br>25      A.   Power can -- can certainly be an enhancer of   13:22:31<br><br>440<br>1  that RM error.                                  13:22:34<br>2     Q.   And is it fair to say that the power supply in 13:22:35<br>3  Olive Branch was not good?                       13:22:39<br>4          MR. TATE:  Objection.  Asking the witness      13:22:40<br>5  to speculate, lack of personal knowledge, assumes       13:22:43<br>6  facts not in evidence.                           13:22:45<br>7     A.   My experience with the electrical company       13:22:47<br>8  there was that the population had outgrown their    13:22:51<br>9  ability to supply pure power.                     13:22:55<br>10    Q.   And, in fact, you had some discussions with    13:22:57<br>11  that electrical company concerning that, did you not?   13:22:59<br>12    A.   Yes, we did.                              13:23:02<br>13    Q.   And was that because of some concerns that     13:23:03<br>14  DeSoto had about the power that was being supplied to   13:23:05<br>15  the facility?                                   13:23:07<br>16    A.   Yes, it was.                              13:23:08<br>17    Q.   Okay.  Is it also true, Mr. King, that the RM 13:23:08<br>18  errors tended to appear most frequently at particular   13:23:11<br>19  times of the day?                                13:23:13<br>20    A.   It was a real sporadic occurrence of the RM    13:23:19<br>21  error, but they did seem to present themselves about 3  13:23:23<br>22  or 4 o'clock in the evening more than -- than the       13:23:29<br>23  morning hours.                                  13:23:31<br>24    Q.   Okay.  And was that coincident with any peak   13:23:33<br>25  usage in the area of the power, as you understood it?   13:23:37<br><br>441<br>1          MR. TATE:  Objection.  Lack of personal       13:23:40<br>2  knowledge, asking the witness to speculate.          13:23:42<br>3     A.   It's my understanding from the power company   13:23:43<br>4  that they felt like they had a high usage factor        13:23:46<br>5  around that time, due to the population in that         13:23:49<br>6  service area.                                    13:23:55 | Lack of personal<br>knowledge.<br>Speculation.  Lack of<br>foundation.  Hearsay. |
| 443<br>to | 12 | 443<br>12    Q.   Were these RM errors intermittent and sporadic 13:26:43 | Speculation. |

| 445 | 20 | |
|---|---|---|

13  in nature?                                    13:26:46
14       MR. TATE:  Object to the form of the    13:26:48
15  question.  Assumes facts not in evidence.    13:26:49
16    A.  For a period of about a week or so, they   13:26:52
17  were -- they were everyday occurrence.  They started   13:26:58
18  sporadic.  Then for about a week, they occurred on a   13:27:07
19  daily basis.  We addressed the issue.  And some of the   13:27:11
20  boards reseated and then they went sporadic again.  So   13:27:19
21  over about a two-week frame, yeah, we had sporadic on   13:27:23
22  the first side, a week of continuous, and then another   13:27:26
23  sporadic run of those.                          13:27:30
24    Q.  You say another sporadic run.  For how long?   13:27:33
25    A.  Probably about three or four days.         13:27:36

                                    444
1     Q.  Okay.  And then what?                  13:27:38
2     A.  It just -- it kind of just ended.      13:27:39
3     Q.  Okay.  So was this -- was this one continuous   13:27:42
4   period of time you're talking about, incidentally?   13:27:46
5     A.  One continuous.                         13:27:48
6     Q.  Well, forgive me.  I'll back up.         13:27:50
7         I think you said there was roughly a week   13:27:52
8   when they were fairly frequent, then there was a   13:27:55
9   period when they were sporadic, then I think there was   13:28:01
10  a fix made then that was somewhat more sporadic and   13:28:05
11  then they disappeared, is that generally right?   13:28:08
12       MR. TATE:  Object.  Object to the form of   13:28:11
13  the question.                                13:28:13
14       MR. CHESNEY:  Fair enough.              13:28:14
15       MR. TATE:  Mischaracterizes the witness's   13:28:15
16  testimony.                                  13:28:17
17    Q.  (BY MR. CHESNEY)  Why don't you characterize   13:28:17
18  the time frame of the RM errors what you were   13:28:19
19  experiencing?                               13:28:21
20    A.  I'm really not very clear on the time frame.   13:28:21
21    Q.  Just the best you can give us.           13:28:24
22       MR. TATE:  I think the witness has answered   13:28:25
23  he's not clear on the time frame, so . . .   13:28:26
24    A.  When you're having that kind of error occur,   13:28:28
25  it seemed like a lifetime because, again, my practice   13:28:31

                                    445
1   was to take care of the patient and also to produce a   13:28:35
2   procedure for the facility.                   13:28:39
3     Q.  Okay.  It seemed longer than it was because of   13:28:42
4   that?                                       13:28:44

| | | | |
|---|---|---|---|
| | | 5      MR. TATE:  Object.          13:28:44 | |

5        MR. TATE:  Object.          13:28:44
6     Q.  (BY MR. CHESNEY)  Is that fair to say?     13:28:45
7        MR. TATE:  Objection.  Mischaracterizes the  13:28:47
8 witness's testimony.                13:28:48
9        MR. CHESNEY:  Well, actually, fair enough.   13:28:49
10      Let me ask you this way.       13:28:50
11    Q.  (BY MR. CHESNEY)  Did the RM errors actually   13:28:52
12 last for a lifetime, Mr. King?         13:28:53
13        MR. TATE:  Object to the form of the     13:28:55
14 question, as far as the lifetime.  Does anything last  13:28:56
15 for a lifetime, Mr. Chesney?           13:28:59
16    A.  No, it didn't last a lifetime.       13:29:03
17    Q.  Okay.  How long did it last?       13:29:06
18    A.  I would say a couple weeks or --     13:29:07
19    Q.  Okay.             13:29:11
20    A.  Give or take a couple of weeks.      13:29:12

---

**474 to 476**    **13 2**    **Speculation.**

474

13    Q.  (BY MR. CHESNEY)  Mr. King, we were talking    14:24:31
14 about this image degradation late in 2001 issue --      14:24:33
15    A.  Yes, sir.            14:24:38
16    Q.  -- that was one of the things related to the    14:24:38
17 MR.                14:24:40
18     I think you said that when you did your    14:24:47
19 Q and As on a daily basis with the phantom --       14:24:52
20    A.  Yes.             14:24:56
21    Q.  -- you were getting acceptable results; is    14:24:56
22 that correct?             14:24:58
23    A.  They seemed to be acceptable.  On occasion    14:24:58
24 they would elevate a little bit.         14:25:01
25    Q.  Okay.  Elevate, meaning the number would get   14:25:02

475

1 higher than 60, up to about 72 or something?     14:25:05
2    A.  Yeah.  I can't remember the exact numbers, but  14:25:08
3 if I -- we were looking back at those files, they were   14:25:11
4 60 or so was an appropriate number.       14:25:13
5    Q.  A lower number is better in this regard; is   14:25:16
6 that right?            14:25:20
7    A.  To a point.  You know, I don't think you can   14:25:21
8 get perfect, you know, zero.  You can get 30s and     14:25:23
9 lower decimals.           14:25:28
10    Q.  But my only point is, 60 is pretty good, from   14:25:31
11 what you're telling me?          14:25:35
12    A.  It seemed to be the average for them, yes.    14:25:36
13    Q.  Seventy-two is less good?        14:25:38
14    A.  It's less.           14:25:40

| | | | |
|---|---|---|---|
| | | 15    Q.   Fifty would be better than sixty; is that    14:25:40<br>16  right?                                14:25:42<br>17    A.   That is correct.                    14:25:43<br>18    Q.   That's the reason why I was asking.       14:25:43<br>19         Okay.  And what do these numbers mean, 50,  14:25:45<br>20  60, 72, whatever they would be?             14:25:49<br>21    A.   Those are numbers that are described by each  14:25:51<br>22  vendor, each vendor's piece of equipment for       14:25:53<br>23  acceptable noise limits within the system.  So       14:25:56<br>24  Toshiba's may be different from GE's, and GE's may be  14:26:00<br>25  different from Philips, but what's acceptable physics-  14:26:04<br><br><div align="center">476</div><br>1  wise in their piece of equipment for obtaining the      14:26:07<br>2  proper image data.                        14:26:11 | |
| 477<br>to<br>481 | 12<br>8 | 12    Q.   Okay.  When you did your Q and As, am I       14:27:55<br>13  correct that you did these on a daily basis?        14:27:57<br>14    A.   Yes, we did.                        14:27:59<br>15    Q.   And one reason was to get the proper centering  14:28:00<br>16  frequency?                             14:28:03<br>17    A.   That's correct.                    14:28:03<br>18    Q.   And another reason was to make sure that you   14:28:04<br>19  were achieving proper signal?                 14:28:06<br>20    A.   That's correct as well.  The third reason      14:28:11<br>21  was --                                 14:28:14<br>22    Q.   I was getting to that.               14:28:14<br>23         Was another reason to make sure the        14:28:17<br>24  signal-to-noise ratio was acceptable?             14:28:19<br>25    A.   That's correct.                      14:28:21<br><br><div align="center">478</div><br>1    Q.   Okay.  And was there another reason?        14:28:22<br>2    A.   There was another underlying reason.        14:28:23<br>3    Q.   Which was?                         14:28:25<br>4    A.   All magnets in the country, you try to get     14:28:27<br>5  them certified through the American College of        14:28:31<br>6  Radiography.  And if you can show continuous records    14:28:35<br>7  of quality assurance where you've run daily         14:28:38<br>8  frequencies and they're at acceptable levels, then you  14:28:41<br>9  can present yourself for certification to the American  14:28:45<br>10  College of Radiography.  And that -- that gives you     14:28:49<br>11  the same certification as mammography has, which is     14:28:52<br>12  a -- kind of a marketing strategy.              14:28:55<br>13    Q.   And do you have any understanding as to what   14:29:03<br>14  results you would have to show from these Q and As to   14:29:08 | Relevance under FRE<br>401, 402, & 403.<br>Speculation. |

15  achieve certification for the MR equipment?          14:29:11
16    A.  Continuous -- 90 percent continuous signal      14:29:14
17  noise levels within acceptable limits described by the  14:29:17
18  ACR.  We don't do that in my facility currently.  But  14:29:20
19  we were trying to achieve something greater at that    14:29:27
20  standard, something that only one or two sites in      14:29:31
21  Memphis had.                                 14:29:33
22    Q.  Which was this certification by the American   14:29:35
23  College of Radiography?                      14:29:37
24    A.  That is correct.                      14:29:39
25    Q.  And the American College of Radiography       14:29:39

                          479
1  employs, as you understand it, a standard based upon   14:29:43
2  the Q and A results that you're able to obtain --      14:29:46
3    A.  Yes.                               14:29:49
4    Q.  -- over a period of time with your equipment?  14:29:49
5    A.  They look at that as one of their factors.    14:29:53
6    Q.  Are you aware of what other factors they look  14:29:59
7  at?                                     14:30:02
8    A.  The other factors are their own imposed        14:30:02
9  factors, where they require you to purchase another   14:30:06
10  device from them and scan that one for about three     14:30:10
11  months, and then you show the numbers or procedures    14:30:13
12  you do, and that in relation to the -- your own        14:30:16
13  phantom and the phantom device that they require to be  14:30:24
14  scanned, all those three components are -- are -- are  14:30:30
15  a part of that certification process.            14:30:34
16    Q.  I'm not sure I got the three.            14:30:38
17         One is the Q and As that you do on a        14:30:39
18  regular basis, correct?                      14:30:42
19    A.  We have to show a track record there.        14:30:43
20    Q.  And that's -- that's with your own phantom or  14:30:44
21  with the manufacturer's phantom?                14:30:47
22    A.  That was the -- we start out by -- we have to  14:30:49
23  show that we have kept a consistent record.         14:30:51
24    Q.  Okay.  And then is the second one using an ACR  14:30:54
25  phantom, is that what I understand?             14:30:59

                          480
1    A.  You can buy the phantom --                 14:31:00
2    Q.  Okay.                             14:31:02
3    A.  -- from a -- there's only one source in the    14:31:02
4  United States that sells that particular item and you  14:31:04
5  have to buy it through that source.  And then they     14:31:06
6  give you prerequisites for scanning that phantom and   14:31:09

| | | | |
|---|---|---|---|
| | | 7  then you submit your data.                    14:31:12<br>8    Q.  Nice little monopoly to have.          14:31:13<br>9    A.  Very much.                              14:31:16<br>10   Q.  I don't think I fully understood the third    14:31:19<br>11  factor that you mentioned.  So could you just tell us   14:31:21<br>12  again?                          14:31:24<br>13    A.  What was the third factor?            14:31:25<br>14   Q.  I think -- for certification I thought it had  14:31:26<br>15  something to do with the number of scans you did or     14:31:28<br>16  something.                      14:31:30<br>17    A.  The number and type of patients that you do.  14:31:30<br>18  That's -- that -- that also plays a part for -- if      14:31:33<br>19  you're trying a new technologist, they've got to be     14:31:38<br>20  trained on X type -- X number of head procedures, X     14:31:41<br>21  number of back procedures, X number of knees.  So the   14:31:44<br>22  only way that -- that the newer technologist can get    14:31:48<br>23  certified in that registry is to prove that they've     14:31:51<br>24  scanned those.  And ACR requires some -- some listing   14:31:54<br>25  of that data as well to show that that machine can      14:31:58<br><br>                                481<br>1  scan backs and can scan heads and can scan joints.      14:32:00<br>2    Q.  And are you aware of whether the ACR requires, 14:32:05<br>3  in order to certify a facility in a particular          14:32:10<br>4  specialty, that the facility also have certain          14:32:14<br>5  practices and policies that it follows with regard to   14:32:16<br>6  its internal operating guidelines?              14:32:19<br>7    A.  I have no clue.                      14:32:22<br>8    Q.  Okay.  Then I won't ask you.          14:32:26 | |
| 499<br>to<br>501 | 16<br><br>2 | 499<br>16   Q.  Now, did Mr. Johnson eventually prove        14:55:01<br>17  successful in resolving these image degradation         14:55:06<br>18  problems?                       14:55:09<br>19      MR. TATE:  Object to the form, as far as      14:55:09<br>20  the meaning of "proved successful."             14:55:11<br>21    A.  I believe this started on like Thursday with  14:55:13<br>22  Jacobs present and Johnson.  I think O'Barr might have  14:55:19<br>23  been there too.  But they worked through the weekend    14:55:21<br>24  starting on Friday and Saturday and Sunday, my         14:55:34<br>25  understanding.  And on Monday we did have some         14:55:37<br><br>                                500<br>1  successful imaging without problem.             14:55:40<br>2    Q.  Okay.  And was that in October or November?   14:55:47<br>3    A.  I don't recall.  This is when Jacobs made his  14:55:50<br>4  visit.  And it's in the -- and I read that yesterday    14:55:57 | Vague.  Speculation.<br>FRE 106 competence. |

5  as well.  So I know it's in the service call because    14:55:59
6  he was there reporting on his applications report.    14:56:03
7  And in his report he did say it raised its ugly head    14:56:05
8  on that day.  And it did, and it wasn't -- wasn't    14:56:09
9  motion.    14:56:13
10    Q.  I think he said it raised his little head    14:56:14
11  perhaps; is that right?    14:56:17
12        MR. TATE:  I think he said ugly head.    14:56:17
13        MR. CHESNEY:  I think it was little.    14:56:19
14        MR. TATE:  On December 7th, I believe.    14:56:19
15        MR. CHESNEY:  Was it?    14:56:22
16    Q.  (BY MR. CHESNEY)  In any event, that's in the    14:56:26
17  report of Mr. Jacobs --    14:56:26
18    A.  That's correct.    14:56:26
19    Q.  -- you were talking with Mr. Tate about    14:56:30
20  yesterday; is that correct?    14:56:30
21    A.  Yes.  That's correct.    14:56:30
22    Q.  Okay.  That's fine.    14:56:30
23        So Mr. Johnson and some other people    14:56:36
24  worked over the weekend.  And they, I take it, were    14:56:38
25  able to resolve the issue that was manifested in the    14:56:41

501

1  form of an apparent movement; is that correct?    14:56:46
2    A.  That's correct.    14:56:49

| 503 | 8 | 503 | Vague.  Relevance |
| to | | 8    Q.  Did DeSoto experience a pretty high level of  15:12:12 | under FRE 401, 402, & |
| 505 | 19 | 9  turnover of technologists, in your experience?    15:12:16 | 403.  Speculation. |
| | | 10        MR. TATE:  Object to the form of the    15:12:19 | |

10        MR. TATE:  Object to the form of the    15:12:19
11  question, as far as the meaning of "high level of    15:12:20
12  turnover."    15:12:23
13    A.  We had a large number of turnover.    15:12:27
14    Q.  Do you have any knowledge or understanding as  15:12:35
15  to why?    15:12:37
16        MR. TATE:  Objection.  Speculation.    15:12:39
17    A.  An imaging center is a different place to    15:12:43
18  work.  If you've worked in a hospital, it's a lot    15:12:46
19  faster paced, a lot more customer friendly, a lot more  15:12:49
20  demands are put on you to meet certain criteria set by  15:12:56
21  the -- by the institution.  You have direct contact    15:13:00
22  with your immediate supervisors.  In this case we had  15:13:09
23  the direct contact with the owners.  So a more    15:13:14
24  critical eye was put on the performance, and some    15:13:17
25  technologists performed less efficiently under that    15:13:25

504

1  eye.                                      15:13:27
2      Q.  Performed less efficiently, did you say?    15:13:30
3      A.  That's correct.                    15:13:33
4      Q.  Why would they perform less efficiently?    15:13:34
5      A.  Coming from facilities that govern over the    15:13:41
6  employee, you have a set -- a set of parameters that    15:13:47
7  you follow.  And when you're given an opportunity to    15:13:49
8  think for yourself and don't know how to think for    15:13:54
9  yourself and, therefore, a little more hesitant about    15:13:58
10  performing an exam or acquiring the data you think    15:14:01
11  that you should be acquiring, then your efficiency    15:14:04
12  level goes down.                          15:14:09
13          Personalities.  Personalities is -- is a    15:14:13
14  little different from anyone else that I've ever met.    15:14:15
15  My personality is the same.  So we had several    15:14:18
16  personalities in the upper management position that    15:14:23
17  had conflict at times with -- with folks, with the    15:14:26
18  employees.  Our desire was to get the best, most    15:14:29
19  productive work out of each and every employee.    15:14:38
20      Q.  Presumably that would be most people's wish in 15:14:44
21  employment situation, correct?                15:14:47
22      A.  You would think.                  15:14:48
23      Q.  You would think.                  15:14:48
24          Now, you said I think that one of the    15:14:50
25  issues was where people might be less confident about    15:14:55

                            505
1  making decisions --                        15:14:58
2      A.  That's correct.                    15:14:59
3      Q.  -- on their own?                    15:15:00
4          Wouldn't that be one of the reasons you    15:15:01
5  would want to have people registered in one specific    15:15:03
6  modality, because they would be more likely to be    15:15:06
7  confident?                              15:15:08
8          MR. TATE:  Objection.  Assuming facts not    15:15:10
9  in evidence.                            15:15:12
10      A.  That is -- that was my intention by hiring    15:15:16
11  those -- those people into those spots, yes.    15:15:19
12      Q.  Okay.  And had you worked with those people    15:15:22
13  before?                                15:15:24
14      A.  No.  I only worked with one.        15:15:29
15      Q.  Which one?                        15:15:30
16      A.  Joanne Tucker.                    15:15:31
17      Q.  Okay.  So you had never worked with any of the 15:15:33
18  others?                                15:15:36
19      A.  That is correct.                  15:15:36

*Objected Upon Deposition Designations Proposed by TAMS*:

1. <u>DEPOSITION OF PAUL KING, VOLUME III (March 5, 2004).</u>

| Pages | Line & Deposition Designation Testimony (Objections Renewed) | Objection. |
|---|---|---|
| 7 -13 | 7<br>24    Q.  Mr. King, I would like to go back a little bit<br>25   and try to understand a little bit better the origins, if<br><br>8<br>1  you will, of what became DeSoto Diagnostic Imaging.<br>2     A.  Okay.<br>3     Q.  I think that is something which in your<br>4  previous testimony you've described as being a project<br>5  that you became involved in with the Carvels?<br>6     A.  That's correct.<br>7     Q.  And when you talk about "the Carvels," just for<br>8  the record to make it clear, who do you mean?<br>9     A.  Lynn and Randon Carvel.<br>10    Q.  Now, at the outset of the project, what was Mr.<br>11  Carvel's involvement in it?  What was he supposed to do<br>12  in connection with the project?  What was his role?<br>13       MR. TATE:  Objection, lack of personal<br>14  knowledge.<br>15       MR. CHESNEY:  Fair enough.<br>16  BY MR. CHESNEY:<br>17    Q.  Were you involved from the outset with the<br>18  project getting started?<br>19    A.  Yes, I was.<br>20    Q.  And did you deal with Dr. Carvel and Mr. Carvel<br>21  in order to get that started?<br>22    A.  Yes, I did.<br>23    Q.  And as a result of your dealings with them, did<br>24  you develop an understanding of what the role of each of<br>25  you would be in developing this project and carrying it<br><br>9<br>1  forward?<br>2       MR. TATE:  Objection, lack of personal<br>3  knowledge.<br>4     A.  Yes.<br>5       MR. TATE:  And if the witness doesn't mind, just<br>6  give me an opportunity to make an objection and do the<br>7  same for the other attorneys.<br>8     MR. CHESNEY:  Fair enough.<br>9  BY MR. CHESNEY: | Hearsay.  Lack of personal knowledge. Speculation. |

10      Q.   What was Mr. Carvel's role to be as the project
11  was beginning?
12        MR. TATE:  Objection, speculation.
13        THE WITNESS:  My understanding of what his role
14  was was to set up the finances and the legals for the
15  company, acquire the property.
16  BY MR. CHESNEY:
17      Q.   When you say property, you mean real estate?
18      A.   Real estate.
19      Q.   Did he have some background in financing that
20  you were aware of that made him suitable to do that for
21  DeSoto?
22        MR. TATE:  Objection, lack of personal knowledge
23  and speculation.
24      A.   Not that I am aware of.
25      Q.   Did he, in fact, take responsibility for those

                              10
1  areas of setting up the business?
2        MR. TATE:  Objection, lack of personal
3  knowledge, speculation.
4      A.   To my knowledge, he did, yes.
5      Q.   What did he do by way of taking care of the
6  financing and the legals and the real-estate aspects of
7  the business as you understand it?
8        MR. TATE:  Objection, assuming facts not in
9  evidence, lack of personal knowledge, speculation.
10      A.   It's my understanding that he met with
11  real-estate representatives to find a piece of property
12  to build an imaging center on.  He has also met with the
13  bankers, AmSouth, and some others I don't know about.
14      Q.   To your knowledge, did DeSoto, in fact, incur
15  some financing obligations with respect to the real
16  estate that it was obtaining to operate the imaging
17  center?
18        MR. TATE:  Objection, lack of personal
19  knowledge, speculation.
20      A.   It's my understanding that they did incur some
21  financing obligations, yes.
22      Q.   How did you come to that understanding?
23      A.   As we talked, as a member of three, I was a
24  member of the three persons there, Randon, Lynn and
25  myself, we talked a little bit about what they had to go

                              11
1  through to get the property and what they had to put up

2   and how much they had to finance at that point.
3      Q.   Now, at some point I believe Mr. Carvel quit
4   his previous job and actually took up formal employment
5   with DeSoto Diagnostic Imaging; am I right about that?
6         MR. TATE:  Objection, assuming facts not in
7   evidence, lack of personal knowledge.
8      A.   That is correct.
9      Q.   Now, do you have any knowledge or information
10  as to why Mr. Carvel quit his previous job?
11        MR. TATE:  Objection, hearsay, speculation, lack
12  of personal knowledge.
13     A.   Randon told me personally that he had lost all
14  his accounts here in Memphis and went virtually from a
15  hundred and fifty or so thousand dollars down to his last
16  check of a hundred and fifty dollars.
17     Q.   When you say he told you, was this in terms of
18  his annual income, this hundred and fifty thousand
19  dollars?
20     A.   That's right.
21        MR. TATE:  Objection, hearsay.  Mr. King, if you
22  wouldn't mind just giving just a pause, okay?
23        THE WITNESS:  Okay.
24        MR. TATE:  Did the court reporter get my
25  objection?  Okay.

                          12
1   BY MR. CHESNEY:
2      Q.   Did Mr. Carvel tell you which accounts he had
3   lost?
4         MR. TATE:  Objection, hearsay, lack of personal
5   knowledge, speculation.
6      A.   One of the major accounts he had told me about
7   was the Methodist Systems here in Memphis, Tennessee.  I
8   wasn't -- didn't care to know of any more.
9      Q.   Fair enough.  What was Mr. Carvel's previous
10  employment, if you know?
11        MR. TATE:  Objection, speculation, lack of
12  personal knowledge.
13     A.   He sold -- he worked for Standard Textiles,
14  which sold linens, sheets, pillow cases, gowns, things
15  like that, to a hospital setting.
16     Q.   When Mr. Carvel came to work for DeSoto
17  Diagnostic Imaging, what were his duties?
18        MR. TATE:  Objection, assuming facts not in
19  evidence.
20     A.   We all had a hodge-podge of duties when we

21  started this process.  He acted in, as much as his
22  knowledge would allow him to, in a CFO position, the
23  marketing position.  He acquired a construction license
24  through the State of Tennessee so he could be a primary
25  on any constructions that we did.  Payroll clerk.  We all

                                    13
1  did very numerous amount of things.  It's really
2  difficult to say exactly what each one of us did, because
3  it was so numerous.
4      Q.  What you've described was basically --
5      A.  This is basic.
6      Q.  The work that he did?
7      A.  That's correct.
8      Q.  Fair enough.  Other than talking to Mr. Carvel
9  about his loss of business and reduction in income, did
10  you ever see any evidence that what he was telling you
11  was true with regard to the lower income that he was
12  experiencing?
13        MR. TATE:  Objection, assuming facts not in
14  evidence, lack of personal knowledge, speculation.
15      A.  I wouldn't know how to judge what I had thought
16  was there.  I know he had a company car, and that company
17  car was being given back to Standard Textile.  They only
18  had two vehicles at that time and had to purchase another
19  vehicle.  So, from what I saw, I didn't see them in any
20  real distress.
21      Q.  But he had to give back a vehicle that the
22  employer had previously provided, as you understood it?
23        MR. TATE:  Objection, speculation, lack of
24  personal knowledge.
25      A.  That is correct.

| 15 – 17 | 15 | Speculation.  Lack of personal knowledge. |
|---|---|---|

3      Q.  Now, is it fair to say that by the time you
4  came to actually purchase equipment DeSoto was subject to
5  limitations in terms of what it could finance that
6  affected what it could and couldn't purchase?
7        MR. TATE:  Objection, vague and ambiguous,
8  assumes facts not in evidence, mischaracterizes the
9  witness' previous testimony, if that is what you are
10  trying to do.
11      A.  My knowledge, there was some limitations that
12  was put on us, both the building, real estate, and
13  equipment to vend inside.
14      Q.  What was your understanding of the limitation
15  with regard to the equipment?

16      MR. TATE:  Objection, lack of personal
17  knowledge. BY MR. CHESNEY:
18      Q.  In terms of the amount?
19        MR. TATE:  Objection, asked and answered as
20  well.
21      A.   My understanding was we were limited for total
22  equipment involvement at $2.9 million.
23      Q.  Did that include the mammography unit?
24      A.  It did.
25      Q.  Did that include the purchasing of Agfa Pacs?

16

1        MR. TATE:  Objection, asked and answer.  We are
2  not here today to rehash all the testimony Mr. King has
3  already given.  So, if you are just trying to clarify, I
4  don't know what you're trying to clarify.  He testified
5  in great detail regarding all this.  And, Mr. King, if
6  that is the case, I believe you can state that you have
7  already testified to that.
8        MR. CHESNEY:   I will note for the record that
9  the next time Mr. Tate purports to instruct the witness,
10  we will call the judge, and we will seek sanctions.
11        MR. TATE:  I'm absolutely not instructing.
12  Anybody can speak to the witness.  I don't represent him.
13  You don't represent him.  Mr. Gaier doesn't represent
14  him.  All these questions have been gone over.  I'm
15  objecting, asked and answered.  It's ridiculous to waste
16  time and everybody's money to rehash the same questions
17  over and over and over.
18  BY MR. CHESNEY:
19      Q.  Do you have the question in mind, Mr. King, or
20  would you like the reporter to read it back?
21      A.  Please, read it back.
22        (Whereupon, the reporter read back the requested
23  portion of the record.)
24        MR. TATE:  Same objections as well.
25        THE WITNESS:  Yes, it did.

17

1  BY MR. CHESNEY:
2      Q.  Approximately what was the cost of the
3  mammography unit, if you recall?
4        MR. TATE:  Objection, speculation.
5  BY MR. CHESNEY:
6      Q.  If you know?
7      A.  Somewhere in the range of ninety-six thousand

| | | |
|---|---|---|
| | 8   dollars.<br>9       Q.   And if you know ,what was the cost of the Agfa<br>10  Pacs system?<br>11           MR. TATE:  Objection, speculation.<br>12      A.   About four hundred and eighty thousand dollars.<br>13      Q.   As a result of these limitations and what was<br>14  going to be financed, were there some changes made in<br>15  terms of what the equipment would consist of that you<br>16  were purchasing?<br>17           MR. TATE:  Objection, vague and ambiguous.<br>18      A.   Yes, there were.<br>19      Q.   Were some things not purchased that originally<br>20  you would have liked to purchase as a result of these<br>21  financing limitations?<br>22           MR. TATE:  Objection, speculation.<br>23      A.   Yes, there were.<br>24      Q.   Do you recall last time in your deposition you<br>25  talked about Mr. Steiff, who was the salesman for TAMS, | |
| 18 – 24 | 18<br>20      Q.   Let me ask you this question.  Would it be fair<br>21  to say, Mr. King, recognizing that you are under oath and<br>22  that your testimony is important, would it be fair to say<br>23  that as you sit here today testifying under oath --<br>24           MR. TATE:  I believe the witness -- under oath.<br>25  BY MR. CHESNEY:<br><br>                              19<br>1       Q.   -- you couldn't really distinguish between<br>2   representations that Mr. Steiff may have made about the<br>3   equipment that was originally contemplated to be<br>4   purchased by DeSoto and the actual equipment that you<br>5   were able to purchase in connection with the financing<br>6   limitations once they came into play?<br>7            MR. TATE:  Objection, vague and ambiguous, a<br>8   triple compound question, assuming facts not in evidence,<br>9   lack of personal knowledge, mischaracterizes any previous<br>10  testimony the witness has ever given.  If you can<br>11  understand the question.<br>12           THE WITNESS:  If I understand what you are<br>13  asking me is that from the very first quote they provided<br>14  us to the last quote they provided us there was a lot of<br>15  things going on in between.  Toshiba wasn't our very<br>16  first choice in this selection process.  So, we had all<br>17  the vendors quote it.  We picked a vendor, and then we<br>18  went after their product.<br>19           Once that vendor proved not to be able to | Speculation.<br>Misleading. |

20  finance for us, then we went after our secondary pick,
21  which was Toshiba at this point.  Some of that due to
22  financing limitations, we had to reduce some things.  Our
23  wish list was pretty broad, and to keep from sacrificing
24  quality, we reduced some of the product itself.
25  BY MR. CHESNEY:

                              20
1       Q.  That is what I had understood from your
2   previous testimony.
3       A.  That's correct.
4       Q.  My question is, would it be fair to say that
5   you could not sitting here today fairly distinguish
6   between which representations Mr. Steiff might have made
7   about the products as it was originally thought you would
8   buy them and the products as you actually ended up buying
9   them?
10          MR. TATE:  Objection, assuming facts not in
11  evidence, asked and answered, mischaracterizes the
12  witness' previous testimony.  He was very specific.
13      A.  I would say the second quote we were just
14  assuming that it would ride on the very first quote that
15  was given to us, and some of the limitations allowed us
16  to go in and negotiate some pullout of pieces of
17  equipment that would reduce the price.  Some of the
18  product we didn't feel like we touched, but they didn't
19  represent themselves in the end like we thought they
20  should.
21      Q.  The products, you mean?
22      A.  That's correct.
23      Q.  Do you recall that there was a meeting when you
24  got down to figuring out precisely what you could and
25  couldn't buy at Dr. Carvel's home, which involved, I

                              21
1   think, among other people, you, Mr. Steiff and Dr.
2   Carvel, to talk about the equipment you were purchasing?
3          MR. TATE:  Objection, this is not a 30 (b)(6)
4   deposition.  Your reference to you is vague and
5   ambiguous.  Mr. King, do not speak on behalf of DeSoto
6   Diagnostic Imaging.  Just for the record, I would object
7   to any line of questioning in which you would try to
8   insert that.
9       A.  I was present at a meeting, the finalization
10  for equipment purchase, yes.
11      Q.  Do you recall, was that a meeting at Dr.

12  Carvel's home?
13     A.  Yes, it was.
14     Q.  You were there at the meeting obviously.  Was
15  Dr. Carvel there?
16     A.  Yes, she was.
17     Q.  Was Mr. Steiff there?
18     A.  Yes, he was.
19        MR. TATE:  Objection as to vague and ambiguous.
20  I believe the question said something about final
21  meeting, and the meaning of final being vague and
22  ambiguous.
23  BY MR. CHESNEY:
24     Q.  Do you recall whether anyone else was there?
25     A.  Yes, I do.

                          22
1     Q.  Who else was there?
2     A.  Randon Carvel was there.  I believe a
3  representative from H&H was there, I can't remember his
4  name, and an architect from H&H was there.
5     Q.  To begin generally, give us your best
6  recollection of what took place at that meeting?
7        MR. TATE:  Again, objection, vague and ambiguous
8  which meeting we are talking about, assuming facts not in
9  evidence.
10        THE WITNESS:  The meeting I'm talking about is
11  one that we were trying to finalize our architectural
12  plan for the equipment that we had purchased, and that
13  was the reason for Toshiba being present, a salesperson
14  from the Toshiba side, the architect from the H&H
15  building side, the president of the H&H company, and our
16  CFO or finance person, Randon Carvel, and Dr. Carvel, of
17  course, our CEO or however she was listed at that point,
18  person in charge, and myself, to decide at that point
19  what we could put in the facility and what was feasible
20  on purchase and what it was going to cost us at a final
21  end.
22        We had a lot of electrical we had to take care
23  of and some prior distribution units for the bigger
24  equipment that we were trying to hash out that either
25  Toshiba would pay or we would pay or the builder would

                          23
1  pay, who is going to pay that thirty or thirty-five
2  thousand dollars apiece for those pieces of equipment.
3  BY MR. CHESNEY:

4       Q.   So, was one of the things that was meant to
5    happen at this meeting is you were going to finalize
6    exactly what the features and components would be of the
7    equipment you were buying from Toshiba; is that correct?
8          MR. TATE:   Objection, assuming facts not in
9    evidence.
10       A.   That is correct.
11       Q.   Mr. Steiff testified that at a meeting at Dr.
12   Carvel's at which you, he and Dr. Carvel were present,
13   that you went through the order forms to talk about each
14   modality and what it was you were going to buy with
15   respect to each modality; would you agree with that?
16         MR. TATE:   Objection, vague and ambiguous, not a
17   proper question, leading, mischaracterizes Dave Steiff's
18   testimony.  Mr. Chesney is not here to testify today.  He
19   doesn't have the transcript to read Mr. King.  So, as far
20   as trying to reiterate exactly what Mr. Steiff said, I
21   would object to that, assuming facts not in evidence.
22       A.   At that meeting that I attended, we did go over
23   our wish list with Dave Steiff and optioned some things
24   out for purchase later if we felt like we should purchase
25   them.

                              24
1       Q.   Was that the meeting at which the final
2    features and components of the various modalities were
3    decided on that you would purchase?
4          MR. TATE:   Objection, asked and answered.
5       A.   That is correct.

25 – 26                       25
9       Q.   Was Toshiba the only vendor that was willing or
10   able to provide you with financing for the project?
11       A.   They were the only vendor that we were looking
12   at that would provide us.  We looked at GE and --
13       Q.   Philips?
14       A.   Philips.  Now, they were able to provide the
15   financing, but it was with a reduction of the equipment
16   as well.  All the vendors could provide us with the
17   equipment.  All of the vendors would finance for us.  But
18   we couldn't get our full product package if we went with
19   GE or Philips.
20       Q.   Did you mean that they wouldn't finance all
21   modalities?
22         MR. TATE:  Objection, mischaracterizes the
23   witness' previous testimony.
24       A.   They would finance all modalities if we wanted

| | | |
|---|---|---|
| | 25  to increase our capabilities.  We didn't have the | |
| | <div align="center">26</div>1  capabilities of going over $2.9 million mark.  We had set<br>2  that mark as our absolute level for all pacs and all<br>3  imaging.  GE came in at like $3.6 million, and Philips<br>4  was really close, too, came in at about the two nine mark<br>5  as well.  But meeting with the Citicorp people, they<br>6  wanted us to obtain our CON for the MRI system prior to<br>7  financing.<br>8        We didn't want that contingent put on us at that<br>9  point, so it wasn't a case that they wouldn't finance us,<br>10  it was a case that we felt like they put a contingency on<br>11  us that we weren't going to live with.  There's always a<br>12  risk of losing the CON.  We were going to build the<br>13  imaging center regardless of the other modalities.<br>14        So, when Philips elected to put the contingency<br>15  on us, we decided to go after our second choice, and that<br>16  was the Toshiba product.<br>17    Q.  Fair enough.  Just to clarify a little bit some<br>18  of your previous testimony, you had talked about giving<br>19  oral descriptions to the potential vendors of what it was<br>20  you wanted when you were trying to see whether they might<br>21  be appropriate to finance the project.  At any time, did<br>22  you ever give anyone a written description of what it was<br>23  that you wanted, any of the vendors?<br>24        MR. TATE:  Objection, vague and ambiguous.<br>25    A.  No, we did not. | |
| 28 – 32 | <div align="center">28</div>9    Q.  My question is this, Mr. King, did you ever<br>10  have any discussions with any of the technologists at<br>11  DeSoto about any concerns they had about procedures they<br>12  were being asked to do by Dr. Carvel?<br>13        MR. TATE:  Objection, hearsay, relevance.<br>14    A.  Yes, I did.<br>15    Q.  Can you give us a general description of such<br>16  conversation as you remember them, then we will get more<br>17  specific.<br>18        MR. TATE:  Same objection, hearsay and<br>19  relevance.<br>20    A.  Are you asking me about the procedures they<br>21  were doing or the procedures they were not comfortable<br>22  doing; is that the question?<br>23    Q.  Both really.<br>24        MR. TATE:  Objection, vague and ambiguous,<br>25  hearsay, relevance. | Multiple / Compound.<br>Relevance under FRE<br>401, 402, & 403. |

29

1     A.   Some of the techs weren't comfortable doing
2   some of the nuclear medicine exams, the hearts, or doing
3   injections of radio-pharmaceuticals or cardiolyte or
4   denisons which could stress the heart out, and, of
5   course, treadmill walking those guys to stress the heart.
6   They weren't comfortable.  They were never trained in
7   that operation prior to being at DeSoto Diagnostic
8   Imaging, but they were required to do that.
9        MR. TATE:  Also, objection, lack of personal
10   knowledge, speculation.
11   BY MR. CHESNEY:
12     Q.   Was one of your jobs to be the person in charge
13   of the techs?
14     A.   That is correct.
15     Q.   And was one of your jobs to make yourself aware
16   of what it was that they were doing and were being asked
17   to do as part of their job?
18     A.   That is correct.
19     Q.   And did you, in fact, make yourself aware of
20   what they were doing and being asked to do as part of
21   their job?
22     A.   One hundred percent of the time.
23     Q.   And is the testimony you are giving now based
24   on that aspect of your performance of your duties?
25        MR. TATE:  Objection, lack of personal

30

1   knowledge, hearsay, relevance.
2     A.   Yes, it is.
3     Q.   Was there ever an occasion when a nuclear
4   medicine technician who had been hired by DeSoto stayed
5   only for a very short time because of the concern they
6   had about practice in the nuclear medicine area?
7        MR. TATE:  Objection, vague and ambiguous,
8   relevance.
9     A.   Yes, there were.
10     Q.   Do you recall who that was?
11     A.   Yes, I do.
12     Q.   Who was it?
13     A.   Linda Kroncke.
14     Q.   Would you spell her name?
15     A.   L-I-N-D-A K-R-O-N-C-K-E.
16     Q.   Okay.  Do you know where Ms. Kroncke is today?
17   I mean not literally today, but do you know where she is

18  working or living at the moment?
19      A.  When she came to us, she came from Germantown
20  Methodist, and my understanding, the day after she came
21  to us, she quit and went back to her original job at
22  Germantown Methodist.
23      Q.  So, she stayed only for one day?
24      A.  One day.
25      Q.  And what is your understanding of why she

31

1  stayed only one day?
2      MR. TATE:  Objection, speculation, hearsay,
3  relevance.
4      A.  Linda was a registered nuke med tech with
5  senior experience that Lynn had known and we recruited
6  via Lynn's request.  She knew of her personally and
7  worked with her.  When Linda came in, we gave her a
8  general orientation of the equipment.  She pretty much
9  knew how to work the equipment.  It wasn't a whole lot of
10  orientation she needed because of her senior experience.
11      Her concerns were that we would be doing hearts
12  without physician representation there.  And that day we
13  had, that particular one day, Dr. Carvel had left the
14  building and there was no physician present in the
15  building prior to us needing someone there to do the
16  hearts, stress the hearts out.
17      MR. TATE:  Objection, lack of personal
18  knowledge.
19  BY MR. CHESNEY:
20      Q.  Were you there that day?
21      A.  Yes, I was.
22      Q.  When you say there was no physician there, you
23  mean that Dr. Carvel had left the building; is that
24  correct?
25      A.  That is correct.

32

1      Q.  But that nuclear medicine procedures involving
2  hearts were still going on; is that correct?
3      A.  That is correct.
4      Q.  And that these procedures involved the
5  injection of materials into the hearts to stress the
6  hearts for purposes of a test; is that what you are
7  saying?
8      A.  Materials injected, we injected several
9  different materials that particular day.  We injected a

| | | |
|---|---|---|
| | 10  material that would identify wall failure, injectional<br>11  fraction failure in a heart, we would stress them out on<br>12  the treadmill, and once they were stressed out on that<br>13  treadmill, they could go into failure.<br>14      Q.  Okay.<br>15      A.  But the actual radio-pharmaceutical wasn't --<br>16  that we used that day didn't stress the heart, the<br>17  treadmill stressed the heart. | |
| 33 – 45 | 33<br>20  Q.  If I understand you correctly, it was Ms.<br>21  Kroncke's concern this material had been injected without<br>22  a doctor being on the premises?<br>23      MR. TATE:  Objection, speculation, vague and<br>24  ambiguous as far as material.<br>25      A.  For the injection of the radio-pharmaceutical,<br><br>34<br>1  that is correct.<br>2      Q.  Did Ms. Kroncke inject the material herself?<br>3      MR. TATE:  Objection, lack of personal<br>4  knowledge.<br>5      A.  Yes, she did.  Nuclear medicine techs had the<br>6  authorization to inject materials under a physician's<br>7  guidance.<br>8      Q.  I understand that.  Does that require a<br>9  physician to be on premises?<br>10      MR. TATE:  Objection, speculation, lack of<br>11  personal knowledge.<br>12      A.  Anytime a foreign body is injected into a body,<br>13  a human body, a physician has to be present for that<br>14  somewhere in the actual facility itself, doesn't have to<br>15  be on the same floor, can be in the facility itself.<br>16      Q.  But Ms. Kroncke's concern was that Dr. Carvel<br>17  was not in the facility when this injection was done,<br>18  correct?<br>19      MR. TATE:  Objection, mischaracterizes his<br>20  previous testimony.<br>21      A.  That is correct.<br>22      Q.  To your knowledge, did May Vokaty ever inject<br>23  patients for nuclear medicine studies when Dr. Carvel was<br>24  not physically in the facility?<br>25      MR. TATE:  Objection, relevance.<br><br>35<br>1      A.  Yes, she did.<br>2      Q.  Did Dr. Carvel know about that? | Calls for an expert<br>witness.  The witness is<br>not competent to opine.<br>Relevance under FRE<br>401, 402, & 403.  Lack<br>of personal knowledge.<br>Speculation.  Hearsay. |

3      MR. TATE:  Objection, speculation, lack of
4  personal knowledge.
5    A.  Yes, she did.
6    Q.  Did you ever have any other discussions with
7  any technologists at DeSoto over any other concerns they
8  had about things they were being asked to do at the
9  facility?
10      MR. TATE:  Relevance.
11      MR. CHESNEY:   At the facility.
12      MR. TATE:  Hearsay.
13      THE WITNESS:  Yes, I did.
14  BY MR. CHESNEY:
15    Q.  Could you describe those for us?
16      MR. TATE:  Objection, relevance, hearsay.
17    A.  Had conversation with my MR people and also the
18  radiographic people that -- the MR side, we were
19  injecting or contrasting everybody that walked in the
20  facility.  These were direct orders from Dr. Carvel to do
21  that, whether they needed it or not, whether they showed
22  pathology or not, we injected.  She was, to my knowledge,
23  present for most all of those.  I can't really tell you
24  if she was not or was, but to my knowledge, she was
25  pretty much present for all those.

<div align="center">36</div>

1    Q.  She being Dr. Carvel?
2    A.  Dr. Carvel or a physician of her contract.  In
3  the radiographic area May Vokaty has actually performed
4  GIs, which are gastrointestinal exams, with barium being
5  administered and without a physician present, and I can't
6  recall any more other than that.
7    Q.  Let's talk a little bit about the -- I think
8  you said injection of contrast or contrasting either one.
9  What would you call it, contrast?  You don't have to wait
10  forever.  If he has an objection, he will speak quickly.
11      MR. TATE:  Yeah, I'll look up.
12    A.  The word contrast in our profession is used in
13  really two different aspects.  One is oral and one is
14  intravenous.  The intravenous is of course -- both
15  require a physician's order, physician to be present
16  before administered, but the intravenous is one that we
17  do a direct stick into a vein, pull up a qualified
18  administration of contrast medium and inject it into that
19  vein.
20    Q.  I think in your previous answer you said that
21  this was being done by Dr. Carvel's orders on everyone

22  who walked in the door whether they needed it or not,
23  whether they showed pathology that required it or not.
24  Is that a general fair statement of what your previous
25  testimony was?

37

1       MR. TATE:  Objection, mischaracterizes the
2  witness' testimony.  Your question was what the
3  technologist had purportedly conveyed to him, and that
4  was his response.  So, I, again, object to the
5  mischaracterization of the witness' previous testimony.
6  BY MR. CHESNEY:
7    Q.  Go ahead.
8    A.  I have lost the question.
9       MR. CHESNEY:  Can you read it back.
10      (Whereupon, the court reporter read back the
11  requested portion of the record.)
12      MR. TATE:  Same objection, mischaracterizes --
13      MR. CHESNEY:  I will withdraw that.  You're
14  quite correct, Mr. Tate.  That wasn't an appropriate
15  question.
16  BY MR. CHESNEY:
17    Q.  The question should have been, first of all,
18  were the concerns that the techs expressed to you about
19  the administering of contrast that it was being done by
20  Dr. Carvel's orders on everyone who walked in the door
21  whether they needed it or not?
22      MR. TATE:  Objection, assuming facts not in
23  evidence, hearsay, relevance.
24    A.  Yes, it was.
25    Q.  And to your knowledge, why did that actually

38

1  happen?
2    A.  To my knowledge, it was the techs' concern that
3  they were injecting all their patients.
4       MR. TATE:  Objection, lack of personal
5  knowledge, hearsay.
6  BY MR. CHESNEY:
7    Q.  Was that actually taking place, the things the
8  techs said they were concerned about?
9       MR. TATE:  Objection, lack of personal
10  knowledge, hearsay.
11    A.  Yes, it was.
12    Q.  How do you know that?
13    A.  I oversaw the whole operation and actually

14  tried to stop the process at one point.  Lynn called me
15  on the overhead speaker.  I was back in the MR CT area at
16  the time.  She asked me to call her.  I called her from
17  the MR console.  At that point she told me my techs were
18  not charging -- were not contrasting everybody, were not
19  charging for a 3-D multiplanar reconstruction charge, and
20  I told her at that point I had advised them not to do
21  that.
22          At that point, she told me I had lost concept of
23  revenue.  She told me, I want your techs to do that.  I
24  said, if you want my techs to do that, you'll need to
25  tell them yourself of put it on the speaker phone.  At

39

1  that point, she proceeded to tell the two techs that sat
2  there to contrast and charge every patient that walked in
3  there.
4      Q.  Did you believe that was an inappropriate
5  instruction?
6      A.  It was very inappropriate.
7      Q.  You also mentioned in your answer something to
8  do with 3-D multiplanar reconstruction or a charge for
9  that.  Could you expand a litte bit about what that --
10  what you were referring to in your answer?
11          MR. TATE:  Objection, assuming facts not in
12  evidence, mischaracterizes the witness' previous
13  testimony, vague and ambiguous as to the meaning of what
14  charge is.
15          MR. CHESNEY:  Did I say charge?
16          MR. TATE:  Yeah.  The witness has already
17  testified he knows nothing about billing, he knows
18  absolutely zero information about billing, so you are
19  assuming facts not in evidence as far as trying to use
20  the word, charge.
21          MR. CHESNEY:  I appreciate your effort to try
22  to back the witness off -- after testifying about things
23  he actually does know, but you are mischaracterizing what
24  he said.  More to the point, I will withdraw the
25  question, so there is no basis for an objection.

40

1  BY MR. CHESNEY:
2      Q.  And I will ask you the following question:  Do
3  you recall in your previous answer, Mr. King, making a
4  reference to 3-D multiplanar reconstruction?
5      A.  Yes, I do.

6    Q.  Can you tell us what you were referring to when
7  you mentioned that in your answer?
8    A.  3-D multiplanars or 3-D MPR's have been given a
9  code by the Medicare-Medicaid organization for payment.
10  What they are, in CT there is a lot of 3-D multiplanar
11  that can go on.  It requires a physician's order, a
12  referring physician's order, to do that process.
13       In MR, the only thing that is chargeable in a
14  3-D multiplanar is angio, which is probably one of the
15  very few procedures MR does.  You have to put it in a
16  format to look at it in a 360 degree rotation both left
17  and right and front to back, so that is truly a 3-D MPR.
18       What we were doing was, Toshiba, along with all
19  the other MR vendors out there, would allow you -- when
20  you start scanning a patient you get what they call a
21  locator image.  On that locator image, you get what they
22  call a sagittal plane.  That's left and right plane,
23  about three slices in it; an axial plane, top to bottom,
24  there's three slices in it, and a coronal plane, there's
25  three slices front to back.

41

1       Now, with that you locate the description of
2  anatomy that you want to image.  That is why we were
3  charging for our 3-D MPRs.
4    Q.  Let me see if I understand your answer.  Are
5  you saying you were charging for having done a 3-D MPR,
6  when, in fact, all that had happened was there was a
7  generation by the system of a 3-D locator image?
8       MR. TATE:  Objection, vague and ambiguous, lack
9  of personal knowledge.
10    A.  There was no 3-D locator image generated.  It
11  was a three-plane localizer generated.
12    Q.  I beg your pardon.  A three-plane localizer?
13       MR. TATE:  Same objections.
14  BY MR. CHESNEY:
15    Q.  Now, a 3-D localizer, is that the same thing as
16  a 3-D MPR reconstruction?
17    A.  No, it's not.
18    Q.  But if I understand you, you're saying that
19  DeSoto charged for it as if it was the same thing?
20       MR. TATE:  Objection, lack of personal
21  knowledge.
22    A.  Yes, they did.
23    Q.  How do you know that?
24    A.  With conversations I had with Lynn Carvel and

25   Jennifer Sneed.  At that point, Jennifer was the billing

42

1   agent for them.  I had one of my coders come to me one
2   day, Sue Barger, and tell me that was totally illegal but
3   Lynn had assured us that it was legal and she was going
4   to continue doing it.
5        MR. TATE:  Objection.  All this is hearsay.
6   BY MR. CHESNEY:
7        Q.  You say you had a conversation with Lynn about
8   this, Lynn Carvel?
9        A.  Yes, I did.
10       Q.  Can you tell us what that conversation was as
11   best you can recall it?
12       MR. TATE:  Objection, hearsay.
13       A.  She had asked me what these were that we were
14   doing on the front end.  I told her they were three-plane
15   localizers.  She said, is that like a 3-D?  No, it's not,
16   it's a three plane.  So, it could be construed as a 3-D?
17   No, it couldn't, but that is what we charge for it anyway
18   because we required it on the front end.
19       A 3-D MPR request has to be generated by a
20   referring physician and we never had -- the time I was
21   there, we never received one order for a 3-D MPR.
22       MR. TATE:  Did you say MPR?
23       THE WITNESS:  MPR.
24   BY MR. CHESNEY:
25       Q.  If I am correct, are you also saying that you

43

1   charged for 3-D MPRs even although you, in fact, didn't
2   do those?
3        MR. TATE:  Objection, lack of personal
4   knowledge.
5        A.  In the MRI setting, that is correct.
6        Q.  You had previously said that in the CT -- I beg
7   your pardon -- in the CT setting those were chargeable,
8   and I believe you did do them, in fact; is that correct?
9        A.  We did do those in CT.  They were chargeable,
10   and, again, they required an order to produce that 3-D
11   MPR.
12       Q.  To your knowledge, in the CT setting were they
13   only done when you received a physician's order?
14       MR. TATE:  Objection, lack of personal
15   knowledge.
16       A.  No, they weren't.

17    Q.  How do you know that?
18    A.  Personal observation.
19    Q.  From your personal observation and doing your
20  job of being in charge of the technologists at the
21  clinic?
22    A.  That's correct.
23    Q.  In one of your previous answers you had said
24  something about conversation with Dr. Carvel in which she
25  said to you you had lost your sense of or perspective of

                                44
1  revenue, something to that general effect.  Do you recall
2  generally --
3        MR. TATE:  Objection, vague and ambiguous.
4  BY MR. CHESNEY:
5    Q.  -- that comment?
6    A.  I do.
7    Q.  Could you put that conversation a little bit
8  more in context for us and tell us as best you can recall
9  exactly what it was that Dr. Carvel said to you, if you
10  don't mind?
11        MR. TATE:  Objection, hearsay.
12    A.  That was exactly what she said to me.
13    Q.  Could you repeat it, because I'm just not sure
14  I understood it, and I may have an additional question
15  about it, just as best you can recall?
16    A.  I can't remember the exact date.  I was back in
17  the MR CT area.  Lynn had paged me overhead to call her
18  number.  I did.  She told me at that point my techs were
19  not charging for the 3-Ds or contrasting the patients
20  anymore.  I told her at that point I had advised them not
21  to.
22        She told me at that point that I had lost
23  perspective of revenue.  I told her, fine, Lynn, if that
24  is the case, you need to tell them, because I'm not going
25  to tell them.  So, I put her on speaker phone at that

                                45
1  point, and she administered the order to the two
2  technologists who were there at that time.
3    Q.  Now, the technologists who worked at DeSoto, I
4  want to talk to you a little bit about them if I may.
5  You, I believe, were involved as you said in your
6  previous sessions in hiring the technologists who were
7  initially brought to work for the operation when it
8  started; is that correct?

| | | |
|---|---|---|
| | 9    A.  I was involved in all the hiring and<br>10  terminations of employees.<br>11    Q.  And I believe from your previous session it's<br>12  correct that when you hired technologists, you hired<br>13  technologists who were registered in the particular<br>14  modality that they were going to specialize in at DeSoto;<br>15  is that correct?<br>16    A.  That is correct.<br>17    Q.  Why did you want to have technologists who were<br>18  registered in the particular specialty they would be<br>19  operating in at DeSoto?<br>20    A.  The reason, one of the bigger reasons, was the<br>21  marketing aspect of it.  Knowing that you had a<br>22  registered technologist performing that exam on you would<br>23  have been a plus in strategically marketing our facility.<br>24  The knowledge base that they brought to the table, they<br>25  could go ahead and cross-train, and our intent was to | |
| 48 – 69 | 48<br>1    Q.  Okay.  I think there is a woman that we<br>2  mentioned before, May Vokaty, who, I think, is still with<br>3  DeSoto unless she has left within the last few weeks, who<br>4  was, I believe, registered in mammography, am I correct,<br>5  May Vokaty?<br>6    A.  That's incorrect.<br>7    Q.  Oh, I'm sorry.  Does May Vokaty have any<br>8  registrations that you are aware of?<br>9    A.  Yes, she does.<br>10    Q.  Was it ultrasound?<br>11    A.  She is a registered radiologic technologist and<br>12  ultrasonographer.<br>13      MR. TATE:  Can you repeat that?<br>14      THE WITNESS:  She's a registered radiologic<br>15  technologist and an ultrasonographer.<br>16  BY MR. CHESNEY:<br>17    Q.  The first one, the registered radiologist?<br>18    A.  Radiologic technologist.<br>19    Q.  Registered radiologic technologist, is that the<br>20  basic qualification to be a technologist in --<br>21    A.  That is the basic requirement for a<br>22  registered -- through the American Registry of Radiologic<br>23  Technology program, which is universally accepted.<br>24    Q.  That is not a registration in a particular<br>25  modality was my question; is that right?<br><br>49<br>1    A.  Yes, it is.  It's a registration in the | Relevance under FRE<br>401, 402, & 403.<br>Asked and answered.<br>Lack of personal<br>knowledge.<br>Speculation. |

2  production of radiation, radiology, x-rays themselves.
3      Q.  Oh, okay.  So, for example, if she was
4  operating the R&F room, she would be operating that as
5  someone registered in that modality; is that fair to say?
6      A.  No, sir.  Technologists can do limited fluoro.
7  Fluoro is an active constant radiation that is produced
8  to look at internal components of the body.  To introduce
9  foreign media into that body and fluoro that, that is
10  called a diagnostic exam.  Technologists cannot do
11  diagnostic fluoroscopy.
12      Q.  Just for the jury, what are your actual
13  registrations as a technologist?
14      A.  I am a radiographer and an MR technologist.
15  I've got background in CT, and the other is management.
16      Q.  Now, I want you --
17          MR. TATE:  I'm sorry.  I didn't hear that.
18  Background in?
19          THE WITNESS:  Radiography, MR, and I have a
20  background in CT, about five years in CT, and I never
21  registered in that modality, but I'm efficient enough to
22  operate the system, and then just management, general
23  management.
24  BY MR. CHESNEY:
25      Q.  Now, I want you to focus on the period during

                              50
1  which the Toshiba equipment was installed at DeSoto,
2  which runs, I guess, with regard to everything except CT,
3  from roughly December 2000 until around February or so in
4  2002.  Is that consistent with your recollection?
5      A.  That is correct.
6      Q.  During that period, you always had a registered
7  MR tech because you were always there, correct?
8      A.  That is correct.
9      Q.  In the area of CT, when you first hired a
10  technologist for CT, you hired a registered tech who was
11  registered in that modality?
12      A.  That's correct.
13      Q.  Do you recall who that was?
14      A.  Debbie Powers.
15      Q.  When you hired a technologist for the nuclear
16  medicine operation at DeSoto, you hired a technologist
17  who was registered in that modality; is that correct?
18      A.  Yes, I did.
19      Q.  Do you recall who that was?
20      A.  Rick Stobaugh.

21    Q.  Did you hire Ms. Vokaty?
22    A.  Yes, I did.
23    Q.  Was she there from the beginning of the
24  operation?
25    A.  Yes, she was.

51

1    Q.  And just for clarity, remind us again what her
2  modality registration was?
3    A.  She was a radiographer and an ultrasonographer
4  registered under ARDMS, which is American Registry of
5  Diagnostic Medical Sonographers.  It's a requirement in
6  most facilities.
7    Q.  Okay.  Did you hire a technologist to perform
8  mammography?
9    A.  Yes, I did.
10    Q.  And was that person registered in that
11  modality?
12    A.  Yes, she was.
13    Q.  And who was that, by the way?
14    A.  Cindy Holmes.
15    Q.  Is mammography a modality in which an operation
16  is required to have the technologist registered in the
17  specialty to your knowledge?
18       MR. TATE:  Objection, vague and ambiguous, the
19  meaning of registered, I don't think it's a term he
20  understands, but go ahead.
21    A.  Yes, it is.
22    Q.  Did you understand the term "registered" as I
23  used it in the previous question?
24    A.  Yes, I did.
25    Q.  What did you understand it to mean, so we'll

52

1  all be on the same page?
2    A.  Registered means that they have had the
3  appropriate amount of education, qualified by the MQSA
4  and FDA to produce radiation to the breast.
5    Q.  Now, with regard to the R&F operation at
6  DeSoto, did you hire a technologist who was registered in
7  that modality, or is there such a thing for R&F --
8    A.  All my techs were registered in that modality.
9    Q.  Is that the basic qualification to be --
10    A.  That is the basic qualification.
11    Q.  Fair enough.
12    A.  But I did hire a person for that and

13  cross-trained them in another area.
14     Q.  Fair enough.  Who was that?
15     A.  Jo Ann Tucker.
16     Q.  Based on your previous testimony, Jo Ann was
17  someone who was cross-trained in MR, correct?
18     A.  The facility Lynn and I came from, I was in the
19  process of training Jo Ann in MR.  She was not registered
20  in that modality, but she was -- she had one year of
21  experience, and we needed a radiographer, and she could
22  do the radiography portion as well as do some of the MR
23  as well.
24     Q.  My question, however, was just am I correct,
25  the discipline in which you were cross-training her was

                                53
1  MR, is that correct, at DeSoto?
2     A.  That's correct.
3     Q.  All right.  Again, focusing on the period when
4  the Toshiba equipment was installed at DeSoto, did there
5  come a point when Ms. Powers left DeSoto?
6     A.  Yes, it did.
7     Q.  Do you have a rough recollection of when that
8  was?
9     A.  Six weeks after she was hired.
10     Q.  Did her replacement have registration in the CT
11  modality specialty?
12        MR. TATE:  Objection as far as -- just to the
13  form and objection as to vague, ambiguous as to
14  registration.
15        MR. CHESNEY:  Well, that's fine.  We'll make it
16  simpler.  I want you to understand, Mr. King, so it will
17  help Mr. Tate understand.
18        MR. TATE:  I just want the jury to understand.
19        MR. CHESNEY:  Well, I think you want the jury
20  not to understand, but let's not argue.
21        MR. TATE:  No, we do want the jury to
22  understand, but I don't think you understand.
23  BY MR. CHESNEY:
24     Q.  Okay.  Will you understand, Mr. King, that when
25  I ask you if a tech was registered in a particular

                                54
1  modality that I will mean by that registered in the sense
2  that you previously described as having a qualification
3  as a technologist that pertained specifically to that
4  modality that is recognized by a national body?

5    A.  I do.
6    Q.  Fair enough.
7        MR. TATE:  Again, objection, vague and ambiguous
8    regarding the registration.
9        MR. CHESNEY:  Good luck.
10       MR. TATE:  What?  Are you afraid to ask him that
11   question, if you have to be registered?  That is my
12   objection.  If you're talking about good luck as far
13   as -- my objection is vague and ambiguous as to
14   registration, because you are not making it clear to the
15   jury on what registration means or if you have to be
16   registered.  So, if you want to smart off to me, that's
17   fine.  That's the point, and I will clean that up, so go
18   ahead.
19       MR. CHESNEY:   That is not an objection to the
20   form of the question.
21       MR. TATE:  Actually it is, so go ahead.
22       MR. CHESNEY:  I'm beginning to believe that
23   maybe you really believe that.  It's just possible that
24   maybe you actually believe that.
25       MR. TATE:  Whatever you think.

55

1        MR. CHESNEY:  Just possible.
2    BY MR. CHESNEY:
3    Q.  Okay.  Back to CT.  When Ms. Powers left, do
4    you recall who replaced her, if anyone?
5    A.  Cindy Holmes was her replacement.  She also was
6    registered in the CT modality.  So, she had triple
7    registries behind her.  She replaced as a part-time
8    person, because we were actively recruiting a full-time
9    person in that slot.
10   Q.  Did you succeed in recruiting a full-time
11   person?
12   A.  Yes, we did.
13   Q.  Who was that?
14   A.  Brian Gibbs.
15   Q.  Was Brian registered in CT?
16   A.  Yes, he was.
17   Q.  Do you recall whether Brian left DeSoto during
18   the period that the Toshiba equipment was installed
19   there?
20   A.  Yes, he did.
21   Q.  How long did Brian work for?
22   A.  Just under five months.
23   Q.  And did anyone replace Brian when he left?

24      A.  Yes, they did.
25      Q.  Who was that?

                                56
1       A.  Pam Kure.  Pam Paulk, I think, is her name now.
2       Q.  When you say Kure, is that K-U-R-E?
3       A.  K-u-r-e at the time, and Paulk now, P-A-U-L-K.
4       Q.  Was Pam registered in CT?
5       A.  Yes, she was.
6       Q.  How long did Pam work for DeSoto?
7          MR. TATE:  Objection, lack of personal
8   knowledge.
9   BY MR. CHESNEY:
10      Q.  If you know?
11      A.  She was there when I left.
12      Q.  When exactly was it you left?  Just give us
13  your last date there so we can put it in context.
14      A.  I believe it was somewhere around June 10.
15      Q.  Did Cindy Holmes leave DeSoto to your
16  knowledge?
17      A.  Yes, she did.
18      Q.  Do you know when she left roughly?
19      A.  I don't know the exact time she left.
20      Q.  Do you recall roughly how long she worked at
21  DeSoto before she left?
22      A.  Probably about nine months.
23      Q.  Okay.  Mr. Stobaugh, I think you said, was the
24  first tech hired in the nuclear medicine area, and he was
25  registered in that modality, correct?

                                57
1       A.  Yes, he was.
2       Q.  Mr. Stobaugh, did he leave DeSoto?
3       A.  Yes, he did.
4       Q.  How long did he work there?
5          MR. TATE:  Objection, mischaracterizes previous
6   testimony, assuming facts not in evidence.
7       A.  I think about six days.
8       Q.  About six days?
9       A.  Sixty days.
10      Q.  I'm sorry.  When he left, was anyone hired to
11  replace him?
12          MR. TATE:  Again, objection, assuming facts not
13  in evidence.
14      A.  No, it wasn't.  We were recruiting.  We were in
15  the process of recruiting someone.

16    Q.   Did you eventually recruit someone to replace
17 him?
18    A.   Recruited Linda Kroncke.
19      MR. TATE:  I'm sorry.  I didn't hear you.
20      THE WITNESS:  We recruited Linda Kroncke.
21 BY MR. CHESNEY:
22    Q.   Okay.  Did she set a DeSoto record by lasting
23 only one day?
24      MR. TATE:  Objection, vague and ambiguous.
25    A.   I had about three people that set that record.

                          58
1    Q.   Who were the others?
2    A.   A couple of clerks that I had, I mean, I can't
3 remember their names, our files.
4      MR. TATE:  Did you say clerks?
5      THE WITNESS:  Clerks.
6 BY MR. CHESNEY:
7    Q.   So, these were not technologists, these were
8 clerical staff?
9    A.   That's correct.
10    Q.   Okay.  Did Ms. Kroncke set the record for
11 technologists?
12      MR. TATE:  Objection, vague and ambiguous,
13 whatever set the record means.
14 BY MR. CHESNEY:
15    Q.   It terms of shortness of stay at DeSoto?
16    A.   She had the shortest amount of tenure there,
17 yes.
18    Q.   Was she the first person who was recruited
19 after Mr. Stobaugh left to replace him in the nuclear
20 medicine area?
21    A.   Yes, she was.
22    Q.   After she came and went, did anyone replace her
23 in the nuclear medicine area?
24    A.   After Rick had left, May replaced Rick.
25    Q.   May Vokaty?

                          59
1    A.   May Vokaty.  Then Cindy was trained around
2 there as well to replace May, and, of course, there was
3 May and Cindy.  After Cindy left, somewhere in that time
4 frame Linda came on for the one day and she left.  Then
5 Pam Kure, Pam Paulk came on, and she was trained around
6 there as well from CT by May and Dr. Carvel.  And so the
7 nuclear medicine show out there was ran by a sonographer,

8   mammographer, and a CT tech.
9        MR. CHESNEY:  Are you going to change paper?
10  Just before you do that, could you read back his answer?
11  I just wanted to get the last part of the answer.
12       (Whereupon, the court reporter read back the
13  requested portion of the record.)
14       THE VIDEOGRAPHER:  We're going off the record.
15  The time is approximately 10:18.  This concludes tape one
16  to the videotaped deposition of Mr. Paul King.
17       (Whereupon, a recess was taken.)
18       THE VIDEOGRAPHER:  We are going back on the
19  record.  The time is approximately 10:38.  This is the
20  beginning of tape two to the videotaped deposition of
21  Mr. Paul King.
22  BY MR. CHESNEY:
23    Q.  Okay.  We were speaking, Mr. King, about the
24  nuclear medicine operation at DeSoto, and I think you
25  said that it was being run at one point by technologists,

                                  60
1   none of whom was actually a nuclear medical specialist,
2   is that correct, it came to be ran that way?
3        MR. TATE:  Objection, vague and ambiguous.
4     A.  None of the technologists that were running it
5   during that time frame you're talking about had ever
6   experienced nuclear medicine except for a two- or
7   three-week rotation while they were in school.
8     Q.  Now, I think you said that May Vokaty was
9   purporting to train the other technologists in this area
10  of operation; is that correct?
11    A.  I said Lynn Carvel and May Vokaty were, yes.
12    Q.  And was May Vokaty among the techs who to your
13  knowledge did not have prior experience with nuclear
14  medicine before coming to DeSoto except in their rotation
15  as basic radiographers?
16       MR. TATE:  Objection, vague and ambiguous.
17    A.  Yes, she was.
18    Q.  How about Dr. Carvel, to your knowledge did she
19  have experience and expertise in nuclear medicine before
20  you installed a nuclear medicine camera at DeSoto?
21       MR. TATE:  Objection, lack of personal
22  knowledge.
23    A.  To my knowledge, she only had interpretable
24  experience, she interpretated (sic) the image.  She was
25  the diagnostician there.

61

1   Q.  So, she had diagnostic experience interpreting
2   nuclear medicine images, but not otherwise in operating
3   the nuclear medicine equipment; is that what you're
4   saying?
5       MR. TATE:  Objection, lack of personal
6   knowledge, mischaracterizes the witness' testimony.
7   A.  To my knowledge, that is correct.
8   Q.  And what is the basis of your knowledge to that
9   effect?
10   A.  Prior to the opening of this project, I had to
11   put another camera in the facility that I was the
12   director of, which is Delta Medical Center in Memphis,
13   Tennessee.  Going to Lynn pursuing the device, she didn't
14   know anything about the camera.  Of course, we
15   subsequently put a camera in place.  When we started to
16   buy this particular camera, I had advised her I knew very
17   little about the nuke, and her response was the same, she
18   knew very little about nuke.  So, it was very difficult
19   for us to buy a product that was comprehensive enough to
20   satisfy our needs.
21   Q.  To your knowledge, did Dr. Carvel ever receive
22   any formal training in how to operate the Toshiba nuclear
23   camera that was installed at DeSoto?
24   A.  To my knowledge, the applications had come in
25   at one point and trained May and Lynn.  Lynn was in and

62

1   out of the room receiving some of that training.
2   Q.  Now, this was not the training that took place
3   in conjunction with the installation of the equipment on
4   the front end, was it?
5   A.  That's correct.  It was not the training.
6   Q.  So, this was some additional training that
7   Toshiba tried to provide; is that correct?
8       MR. TATE:  Objection, mischaracterizes the
9   witness' previous testimony.
10   A.  Yes, it was.
11   Q.  Was that after Mr. Stobaugh left?
12   A.  Yes, it was.
13   Q.  Other than that training, are you aware of Dr.
14   Carvel ever having had any formal training in how to
15   operate the nuclear camera?
16   A.  To my knowledge, she had no formal training.
17   Q.  Just going through the various modalities, Ms.
18   Vokaty I think was, you said, a registered ultrasound

19  technologist, correct?
20      A.  I said she was a registered radiologic
21  technologist and a registered sonographer as well.
22      Q.  Okay.  When you say registered sonographer,
23  does that mean you are registered in what is commonly
24  called ultrasound?
25      A.  Ultrasound.

                              63
1      Q.  Yeah, okay.  Now, once Ms. Vokaty began to take
2  on additional responsibilities related to nuclear
3  medicine, was anyone else brought in to assist in the
4  area of ultrasound, any other technologist?
5          MR. TATE:  Objection, assuming facts not in
6  evidence, mischaracterizes the witness' previous
7  testimony.
8      A.  There was no other technologist brought in for
9  ultrasound at that time.
10     Q.  Am I correct though that Ms. Vokaty did at one
11  point began to undertake responsibilities for nuclear
12  medicine from a technologist's point of view?
13     A.  Yes, she did.
14     Q.  So, she basically had to try to handle both
15  ultrasound and nuclear medicine at some point?
16          MR. TATE:  Objection, vague and ambiguous as to
17  what "try" means, assuming facts not in evidence.
18     A.  May was charged with the responsibility of
19  providing service to the ultrasound department and to the
20  nuclear medicine department.
21     Q.  When Cindy Holmes left, did someone replace her
22  in the mammography area?
23     A.  Yes, they did.
24     Q.  Who was that, if you know?
25     A.  Holly Clark.

                              64
1      Q.  And was Holly Clark a technologist who was
2  registered in mammography?
3      A.  Yes, she was.
4      Q.  And do you know how long Holly Clark worked for
5  DeSoto?
6      A.  About a month, month and a half.
7      Q.  And when she left, did anyone replace her as
8  the technologist in charge of the mammography operation?
9      A.  The replacement of Holly occurred through one
10  of my MR technologists.  She was also registered in

11  mammography, so she just transferred over there and did
12  the mammography as well.
13      Q.  Did you then replace that person in the MR
14  area?
15      A.  That person we had replaced with another
16  person.  I think her name was Erin Singer, and Erin
17  stayed about a month, month and a half maybe.  She was in
18  and out.  It was more of a casual part-time person,
19  someone that Lynn had requested I bring in, excellent
20  technologist, one of the best in the city, one of the
21  best I ever met, but unfortunately had some other quirks
22  about her I wasn't comfortable with, but she could
23  definitely pick up the pace.  She stayed a little while.
24  Debbie was pulled out of MR to mammo- when mammo- was
25  active.

<div align="center">65</div>

1      Q.  Debbie Powers?
2      A.  Debbie May.
3      Q.  Debbie May, I'm sorry.
4      A.  Debbie May.
5      Q.  When did she turn up?
6      A.  Debbie May came in after Brian Gibbs had left.
7  Now, Jo Ann and Debbie were both in MR together.  Debbie
8  had assumed multiple roles herself of mammography, CT,
9  and MR.  Jo Ann's roles were radiography, MR.  Pam's
10  roles were CT, nuclear medicine.  May's roles were
11  ultrasound, nuclear medicine, and some radiography,
12  fluoro.
13      Q.  How would you categorize the amount of turnover
14  of technologists at DeSoto while you were there?
15      MR. TATE:  Objection, speculation.
16      A.  It's a grossly abnormal turnover.
17      Q.  In terms of being grossly less than normal or
18  grossly higher than normal?
19      A.  Higher.
20      MR. TATE:  Objection, vague and ambiguous as to
21  what you are comparing it to.
22      A.  Grossly higher than normal.
23      Q.  You talked earlier about some of the concerns
24  technologists had expressed to you about things they were
25  being asked to do by Dr. Carvel.  Do you have any basis

<div align="center">66</div>

1  for testifying as to whether any of that had any effect
2  on the turnover you were experiencing at DeSoto?

3    MR. TATE:  Objection, speculation, hearsay.

4    A.  Yes, it did.

5    Q.  Can you tell us how it did?

6    A.  Ninety percent of all technologists are a breed

7  of people who will take an order and complete that order.

8  The orders that were being given were falling far above

9  their training.  They felt uncomfortable doing this.

10  They felt like they could be libelous (sic).

11    Q.  Did you say libelous or liable?

12    A.  Liable for it.  And just -- if it wasn't done

13  right, they would pretty much catch a lot of heat from

14  it.  I would have to write them up.  I'd have to counsel

15  them at Lynn's request.  Lynn was very vocal.  She is

16  very vocal in patient areas, which was demeaning to the

17  technologists, and demanding as far as you had to be one

18  hundred percent busy all the time, no rest periods, no

19  laughing, no camaraderie.

20    Q.  So, these were all factors that in your

21  judgment contributed to the abnormally high turnover of

22  technologists; is that correct?

23    MR. TATE:  Objection, vague and ambiguous.

24    A.  Yes.

25    Q.  Did the abnormally high turnover of

67

1  technologists from what you've just -- strike that.  Did

2  -- strike that question.  Did the circumstances you just

3  described relating to technologists being asked to do

4  things that they were not comfortable with, Dr. Carvel's

5  addressing them in ways that were demeaning in public

6  areas, things like that, not allowing laugh periods --

7  not allowing rest periods and not allowing laughing and

8  things like that, did that affect the morale at DeSoto in

9  any way that you were able to observe?

10    MR. TATE:  Objection, relevance, assuming facts

11  not in evidence, mischaracterizes the witness' previous

12  testimony.

13    A.  Yes, it did.

14    Q.  How did it affect the morale?

15    MR. TATE:  Object to the form.

16    A.  On a daily basis each and every employee there

17  was afraid of their job and afraid that they would be

18  terminated because of some problem they might have

19  exhibited, maybe they didn't get the right scan, maybe

20  they didn't charge the right procedure, maybe they didn't

21  do the laundry, maybe they didn't clean out a laundry

22 hamper at the end of the evening, maybe they used too
23 much supplies, pretty much that.
24     Q.  Now, did this affect on the morale and the
25 turnover of technologists at an abnormally high rate, did

68

1 that have an effect on the ability of DeSoto to run its
2 operations properly?
3     MR. TATE:  Object to the form.
4     A.  No, it did not.
5     Q.  How was that avoided at DeSoto?
6     A.  Through my management.
7     Q.  Did you have to spend a good deal of time
8 trying to make sure that these situations didn't affect
9 the operation of the facility?
10     A.  Yes, I did.
11     Q.  Could you describe that by way of a percentage
12 of your time?
13     MR. TATE:  Objection, asked and answered.
14     A.  My responsibilities were as great as or greater
15 than anyone else there including Lynn's.  I was the
16 administrator, the human resource director, the pacs
17 administrator, semimarketing person with Randon, the
18 problem solver for Lynn.  I helped Lynn with some of the
19 MR interpretations.  She did the interpretation, I just
20 told her what we saw and we could visualize back there to
21 help her proceed forward in a timely fashion.  I scanned
22 MR.
23         I visited all my technologists on a daily basis,
24 all my employees on a daily -- found out the concerns
25 they had, made sure all the transcription got out to the

69

1 referring physicians in a timely fashion.  So, to
2 quantify my percentage of time of making sure it ran
3 right is a hundred percent of the time.
4     Q.  When a new technologist would come on board at
5 DeSoto, was it necessary to train them in how DeSoto ran
6 its operations, did its scans, things like that?
7     MR. TATE:  Object to the form, vague and
8 ambiguous as to "ran its operations."
9     A.  Yes, it was.
10     Q.  Was it also necessary to provide them with
11 training in how to operate the particular equipment that
12 was installed at DeSoto?
13     MR. TATE:  Objection, assuming facts not in

| | | |
|---|---|---|
| | 14  evidence.<br>15      A.   If they had no previous training on that type<br>16  of equipment, yes, it was.<br>17      Q.   When you say type of equipment, I take it you<br>18  you mean, for example, if they had no previous experience<br>19  with a Toshiba Asteion scanner you would have to teach<br>20  them the operations of a Toshiba Asteion scanner; is that<br>21  correct?<br>22          MR. TATE:  Object to the form.<br>23      A.   A good CT technologist, they will have to be<br>24  trained on the actual function of the screen, but the<br>25  technology that drives the CT scanner, no. | |
| 73 – 75 | 73<br>4   Q.   Now, you talked at length with Mr. Tate earlier<br>5  on about the MR equipment, but let me ask you a few<br>6  questions about the other modalities and just your<br>7  general impression of the other modalities that were<br>8  installed.  The CT scanner was an Asteion CT scanner; is<br>9  that correct?<br>10      A.   That is correct.<br>11      Q.   And how would you characterize the overall<br>12  operation of the Asteion in terms of its performance?<br>13      A.   On a scale of one to ten, I would say it was an<br>14  eight and a half or a nine.<br>15      Q.   Is that a good score?<br>16      A.   That is an excellent score.<br>17          MR. TATE:  I'm sorry?<br>18          THE WITNESS:  Excellent score.<br>19  BY MR. CHESNEY:<br>20      Q.   How about the nuclear medicine equipment?<br>21      A.   My limited knowledge of nuclear medicine<br>22  affects my judgment on that piece of equipment, but what<br>23  I would know about it, I would think when Rick was there<br>24  he had virtually no problems with it other than in some<br>25  general applications.  And when we would bring in a<br><br>74<br>1  contract person, Jimmy Smith with Syncorp (phonetic), to<br>2  would look at the equipment, he virtually said that there<br>3  was no problems with it.  Of course, with the apps people<br>4  and the field service engineers from Toshiba coming in,<br>5  they really couldn't find a whole lot of problems with it<br>6  as well.<br>7      Q.   You mentioned Jimmy Smith.  Is that a gentleman<br>8  who sometimes is also known as James Smith, or you have<br>9  always known him as Jimmy? | Lack of foundation.<br>Lack of personal<br>knowledge.<br>Speculation.<br>Relevance under FRE<br>401, 402, & 403. |

| | | |
|---|---|---|
| | 10    A.  I have always known him as Jimmy, but James<br>11  would be --<br>12    Q.  I tell you what, just to make sure we're<br>13  talking about the same person, because I think Ms. Vokaty<br>14  talked about someone called James Smith, was Jimmy Smith,<br>15  the person you're talking about, someone who came in to<br>16  DeSoto to work, among other things, in connection with<br>17  the nuclear medicine operation in some respect?<br>18    A.  Jimmy Smith, could be James Smith, but Jimmy<br>19  Smith, as I know him, did quality management for the<br>20  nuclear medicine programs.  He provided license, and<br>21  writing up the documentation for the license, doing the<br>22  surveys, sending that documentation to the state for<br>23  acceptance.<br>24    Q.  It's that Jimmy Smith that you were talking<br>25  about when you described previously his assessment of the<br><br><div align="center">75</div><br>1  nuclear camera?<br>2    A.  That's correct. | |
| 75 – 79 | <div align="center">75</div><br>16    Q.  Now, with regard to the ultrasound unit, did<br>17  that function in accordance with its specifications as<br>18  near as you could tell, generally speaking?<br>19    A.  The ultrasound did function within the<br>20  specifications for that piece of equipment.<br>21    Q.  Did there come a point, Mr. King, when you<br>22  formed the conclusion that Dr. Carvel's goal was to get<br>23  rid of the Toshiba equipment that had been installed?<br>24      MR. TATE:  Objection, relevance, vague and<br>25  ambiguous, lack of personal knowledge, speculation.<br><br><div align="center">76</div><br>1    A.  At some time after eight or nine months or so,<br>2  some of the problems that existed, some of them were<br>3  minor, some of them were major, MR certainly major.  We<br>4  had talked as a three-member team, Randon, Lynn and<br>5  myself, about negotiating the removal of this or the<br>6  upgrade of that MR system.<br>7      And somewhere after that, we had a meeting with<br>8  Toshiba, and Toshiba kind of reared up on their haunches<br>9  and said, we're not going to replace it, but we'll modify<br>10  it.  At that point, Lynn walks out and says, no, we're<br>11  getting rid of the whole thing.  After our meeting that<br>12  is what she had indicated to Randon and myself.  Randon<br>13  and I both told her that it was not a good idea, but I | Calls for an expert witness.  The witness is not competent to opine.  Relevance under FRE 401, 402, & 403.  Lack of personal knowledge. |

14  was going to support Lynn in any kind of effort she had
15  there. Randon was not going to support her, did not
16  support her in it. But I did, because she was my boss.
17  I worked for her. It was our dream. I put it together.
18      Q.  Okay. I'm not sure if that was exactly
19  addressed to the question I asked you, but, nonetheless,
20  it's got some interesting stuff, so we need to explore
21  it. That's the danger of being a witness. You give an
22  answer, we get interested. When you are referring to a
23  meeting at which Toshiba declined to remove the equipment
24  and Dr. Carvel then walked out, was that a meeting as you
25  recall in November of 2001 or thereabouts?

77

1      A.  Somewhere in that frame, I don't remember the
2  exact dates.
3      Q.  That was a meeting that was -- took place at
4  the DeSoto Imaging; is that right?
5      A.  The meeting I'm talking about took place at
6  DeSoto Diagnostics.
7      Q.  Is it fair to say there were a number of people
8  there on the Toshiba side and a number of people there on
9  the DeSoto side at this meeting?
10      MR. TATE:  Objection to the form, vague and
11  ambiguous.
12      A.  Yes, there was.
13      Q.  You said that you and Randon and Dr. Carvel had
14  your own meeting relating to the course of action that
15  DeSoto ought to take in the circumstances; is that right?
16      A.  That's correct.
17      Q.  And that Dr. Carvel's position was that she
18  wanted to insist that the equipment be removed, correct?
19      MR. TATE:  Object to the form, mischaracterizes
20  the witness' previous testimony.
21      A.  She had insisted that we look at that as a
22  course of action.
23      Q.  And I think you said that Mr. Carvel did not
24  support her in that view; is that correct?
25      A.  That is correct.

78

1      Q.  And I think you also said you didn't agree with
2  that course of action yourself; is that correct?
3      A.  That is correct.
4      Q.  And did you and Mr. Carvel tell Dr. Carvel at
5  the time that you didn't agree with that as a proposed

| | | |
|---|---|---|
| | 6  course of action? | |
| | 7     A.  We did. | |
| | 8     Q.  But then eventually you said Dr. Carvel was | |
| | 9  going to insist on that anyway, and, therefore, you | |
| | 10  decided you would support her because she was your boss, | |
| | 11  even although you didn't agree with it; is that right? | |
| | 12       MR. TATE:  Objection, mischaracterizes the | |
| | 13  witness' previous testimony. | |
| | 14      A.  It wasn't eventually.  It was in the same | |
| | 15  meeting we had.  I told Randon that I would support | |
| | 16  anything she needed to do here, and he didn't have to | |
| | 17  support it, but I was going to support it because we were | |
| | 18  three, counted on all three of us deciding to do | |
| | 19  something to make it happen.  And she in my respect was | |
| | 20  our golden goose.  We couldn't do it without her, and I | |
| | 21  was going to support her in every effort she wanted to | |
| | 22  take advantage of.  I did inform her at that time it | |
| | 23  would be a very difficult road, it'd be very nasty.  It | |
| | 24  could be done, and I can do it.  Anything you want me to | |
| | 25  do, I can do. | |
| | | |
| | 79 | |
| | 1     Q.  But you yourself did not agree with that as a | |
| | 2  course of action? | |
| | 3     A.  I did not. | |
| | 4     Q.   Now, is it fair to say that you believed at | |
| | 5  that time that Toshiba and DeSoto could have worked out | |
| | 6  any problems or issues they were having with equipment or | |
| | 7  imaging issues had they both worked together in good | |
| | 8  faith to accomplish that? | |
| | 9       MR. TATE:  Objection, vague and ambiguous, the | |
| | 10  meaning of a lot of those terms in the question, assuming | |
| | 11  facts not in evidence. | |
| | 12     A.  Yes, I did. | |
| | 13     Q.  Did you tell Dr. Carvel that? | |
| | 14     A.  Yes, I did. | |
| 80 – 81 | 80 | Misleading.  Calls for |
| | 20     Q.  But they had said they would in good faith try | an expert witness.  The |
| | 21  to resolve your problems with all the equipment; is that | witness is not |
| | 22  fair to say? | competent to opine. |
| | 23       MR. TATE:  Objection, mischaracterizes the | Relevance under FRE |
| | 24  witness' previous testimony.  I don't think he ever | 401, 402, & 403. |
| | 25  testified they were acting in good faith. | Asked and answered. |
| | | Lack of personal |
| | 81 | knowledge. |
| | 1     A.  Yes, sir. | Speculation.  Hearsay. |

| 81 – 87 | 81 |  |
|---------|-----|--|

81

11    Q.   Mr. King, we talked a little bit earlier about
12  concerns that technologists had expressed to you about
13  things they were being asked to do in connection with the
14  operations at DeSoto.
15        MR. TATE:  Objection, vague and ambiguous.
16    Q.   Did any technologist at DeSoto ever express to
17  you any concerns about the level of involvement they were
18  being asked to have in reading or interpreting images?
19        MR. TATE:  Objection, hearsay.
20    A.   Yes they did.
21    Q.   Can you tell us what conversations you recall
22  with technologists on that subject?
23        MR. TATE:  Same objection, hearsay.
24    A.   Pam Paulk had approached me at one point,
25  because Lynn had wanted her to tell her what she had seen

82

1  on some CT scans and pretty much give her impression of
2  that, and she didn't feel that was her job.  She supplied
3  the data, Lynn should read that data.  Debbie May also
4  expressed that along with Jo Ann.  Lynn constantly asked
5  the MR techs what they saw and what they needed to see.
6  They were very uncomfortable with any form of
7  interpretation themselves.  Those are the only ones that
8  lodged any kind of concerns.
9    Q.   How about you personally, did you ever have any
10  discomfort about the level of involvement you were asked
11  to have with reading or interpreting images?
12    A.   I had discomfort in actually dictating the
13  images -- dictating the information.  But I had no
14  discomfort in sitting and consulting with Lynn on what
15  we saw and helping her and advising her in the
16  description of what should be put down in the
17  interpretation, but I did have discomfort in actually
18  dictating the data myself.
19    Q.   Well, did that ever happen?
20    A.   I attempted to dictate one time, and I was a
21  complete failure.  It takes a special, vocal person.
22  Lynn certainly had the talent for formulating good
23  paragraphs, good interpretations, good impressions.  I
24  know May Vokaty did a lot of interpretations herself.  I
25  watched her.  She was pretty fluent at it as well.  She

83

1  would have made a good radiologist if, indeed, she had

2  the education for it.
3     Q.  When you say May Vokaty did interpretations
4  herself, what do you mean?
5     A.  A lot of the sonographers, radiologists, and
6  this is universal, they will write down their impression,
7  and the radiologist ninety percent of the time will
8  probably take that impression as gospel, but they never
9  actually did dictation.  May would actually do dictation
10  on that system.
11     Q.  Do you mean she would dictate the final report?
12     A.  She would dictate a report that Lynn would
13  review and then send it out, yes.
14     Q.  Now, on the occasion when you did that, did you
15  do that voluntarily, or did Dr. Carvel ask you to do
16  that?
17     A.  Dr. Carvel asked me to do it.
18     Q.  Were you comfortable with doing it?
19     A.  No, I was not.
20     Q.  Why not?
21     A.  I am not a physician.
22     Q.  Do you believe that May Vokaty should have been
23  dictating reports?
24     A.  I don't believe she should have been dictating
25  the reports.  I think her impression was important to the

                                84
1  physician for that interpretation though.
2     Q.  So, there is a difference between sharing your
3  impressions with a physician and actually dictating the
4  reports in your mind?
5     A.  That is correct.
6     Q.  And sharing your impression is appropriate for
7  technologists who are comfortable doing it; is that
8  right?
9     A.  That is correct.
10     Q.  But actually dictating the reports is not?
11     A.  That's correct.
12     Q.  Do you know if any of the other technologists
13  were actually asked to dictate reports, or have you told
14  us everything you know about that?
15        MR. TATE:  Objection, assuming facts not in
16  evidence.
17     A.  I don't think any other technologist was
18  comfortable at all sitting at the talk station, which is
19  the dictation station itself.  It's a verbalized station
20  as opposed to an actual transcriber.

21    Q.  Is that what Ms. Vokaty used to dictate the
22  reports?
23    A.  Yes, she did.
24    Q.  Is that also what Dr. Carvel used to dictate
25  the reports that she dictated?

85

1    A.  Yes, she did.
2    Q.  So, she and May Vokaty were dictating reports
3  into the same system?
4    A.  That's correct.
5    Q.  You said in your earlier testimony that Dr.
6  Carvel at one point had told you that you had lost
7  perspective on revenue when you were having your
8  discussions about the 3-D reconstruction issue, or was
9  that actually about the injection of contrast issue?
10    A.  That was about both of those.
11    Q.  Both of those, okay.  When you were having that
12  discussion, or when she said that to you, did you respond
13  in any way, other than to say, you need to tell the
14  technologists directly if that is what you want them to
15  do?
16    A.  That was my response.
17    Q.  Okay.  Did you have any other discussion with
18  her either then or at any other point as to what she
19  meant about your losing perspective on revenue?
20    A.  I avoided her the rest of that day.
21    Q.  What did you understand her to mean when she
22  said to you that you were losing perspective on revenue?
23      MR. TATE:  Objection, speculation.
24    A.  My understanding of what she meant was the
25  direction of the day, that was a revenue-based operation,

86

1  we had to generate revenue.  My perception was as the
2  administrator was to continue that revenue.  We would do
3  fifteen MR's a day, didn't make any difference, we were
4  going to produce that revenue.
5    Q.  Whether you did it right or wrong?
6      MR. TATE:  Objection, mischaracterizes the
7  witness' previous testimony.
8    A.  In my mind, we were doing it right, with the
9  exception of some of the billing.  All the images were
10  appropriately collected.
11    Q.  Except on the MR you didn't do the 3-D
12  reconstruction, you said, right?

| | | |
|---|---|---|
| | 13    A.   Didn't do the 3-D reconstruction, that's<br>14  correct.<br>15    Q.   But you billed for that anyway?<br>16    A.   That is correct.<br>17    Q.   And certainly on the contrast, on the with or<br>18  without studies, that is with or without contrast, if I<br>19  understand you, what you're saying is it wasn't a case<br>20  where Dr. Carvel didn't do them but billed for them,<br>21  right, she did them and billed for them, correct?<br>22      MR. TATE:  Vague and ambiguous, lacks personal<br>23  knowledge.<br>24    A.   That is correct.<br>25    Q.   And the concern was that she was doing with and<br><br>87<br>1  without studies whether or not they were appropriately<br>2  indicated in the circumstances, is that correct, on<br>3  everybody who walked in the door?<br>4      MR. TATE:  Objection to form, vague and<br>5  ambiguous.<br>6    A.   That is correct. | |
| 90 – 91 | 90<br>3    Q.   Did DeSoto have any other disagreements with<br>4  any other vendors about whether or not DeSoto was<br>5  properly paying things it was meant to pay?<br>6      MR. TATE:  Objection, vague and ambiguous as<br>7  what's properly pay, or who's in the right or wrong, et<br>8  cetera, assuming facts not in evidence.<br>9    A.   It's my understanding from personal experience<br>10  that the secondary company we brought in after we removed<br>11  the Toshiba equipment had problems getting payment as<br>12  well.<br>13    Q.   What was the secondary company you brought in?<br>14    A.   Jim Miller, Incorporated.<br>15    Q.   And what did that company do?<br>16    A.   Provided us with a nuclear medicine camera and<br>17  an R&F room.<br>18    Q.   What were the problems that Mr. Miller<br>19  experienced as you are aware of them?<br>20    A.   We weren't satisfied with the installation.  We<br>21  weren't satisfied in the performance of the equipment.<br>22  Those are the basic main two.<br>23    Q.   And when you say we weren't, you are talking<br>24  about DeSoto?<br>25    A.   DeSoto. | Speculation. |

| | 91 | |
|---|---|---|
| | 1    Q.  Was that you or Dr. Carvel?<br>2    A.  That was she and I both.<br>3    Q.  Okay.  Did you as a result end up paying less<br>4    than you had agreed to pay on a nuclear camera?<br>5    A.  Yes, we did. | |
| 93 – 94 | 93<br>12    Q.  I want to try to clarify a couple of things<br>13    from this morning, because I think we were having a whole<br>14    variety of mathematical errors, and I want to try to see<br>15    if we can clarify the situation.  I think you said that<br>16    you probably did maybe forty-five to fifty percent of the<br>17    MR examinations that were done at DeSoto on the Toshiba<br>18    equipment yourself; is that correct?<br>19    A.  That is correct.<br>20    Q.  Okay.  And my questions is, of those<br>21    examinations that you performed yourself, on what<br>22    percentage were you able to get good acceptable images?<br>23    A.  Well, I would think it would be properly closer<br>24    to a ninety percent ratio.  I always was able to make the<br>25    equipment perform.  I mean, it did have its faults, but a<br><br>94<br>1    good MR technologist can reach in and adjust the<br>2    parameters and get some good image data out of it, so. | Speculation. |
| 94 – 99 | 94<br>23    Q.  Is it true that also Dr. Carvel was unwilling<br>24    to make the equipment available to Toshiba service<br>25    personnel during hours of operation to avoid losing<br><br>95<br>1    revenue from examinations?<br>2    MR. TATE:  Objection, assuming facts not in<br>3    evidence.<br>4    A.  I think from an operational standpoint when the<br>5    procedures were there we were commanded to do the<br>6    procedure of the day, we were not to put them off to the<br>7    next day.  That was a universal agreement between the<br>8    three of us, Randon, myself and Lynn.<br>9    Q.  And did that to some degree make it more<br>10    difficult for the Toshiba servicemen to service the<br>11    equipment?<br>12    A.  Yes, it did.<br>13    Q.  Were you able actually to get the scans done<br>14    that you needed to get done?  In other words, did you<br>15    lose any revenue on the MR operation as a result of the | Speculation.  Vague. |

16  issues you had with its operation?
17      MR. TATE:  Objection, lack of personal
18  knowledge.
19      A.  We never lost any revenue from the operation of
20  the equipment.
21      Q.  Another thing I want to try to clear up a
22  little bit if I could from this morning's examination, we
23  talked a little bit about Mr. Steiff and the early
24  negotiations.  Do you recall that discussion generally?
25      A.  Yes, I do.

                                96
1       Q.  And I want to try to phrase this question as
2   clearly as I can so that you can understand it.  Is
3   somebody coming in here?  Are we good to go?  My question
4   is this, Mr. King, would it be fair to say as you sit
5   here today that you would not honestly be able to
6   distinguish between representations Mr. Steiff might have
7   made about the equipment it was originally contemplated
8   that DeSoto wanted and the actual equipment that it was
9   able to buy in view of financial and other restraints?
10      MR. TATE:  Objection to the form, vague and
11  ambiguous.
12      A.  Yes, I would.
13      Q.  Fair enough.  Were you aware, Mr. King, when
14  DeSoto elected to acquire the Excellart MR that this was
15  a new product for Toshiba?
16      A.  Yes, we were.
17      Q.  Did you from your knowledge in the field expect
18  that a new product involving this kind of complicated MR
19  technology would be likely to have bugs that would have
20  to be worked out as it was brought into operation in the
21  field?
22      A.  Yes, I did.
23      Q.  And did you expect that equipment such as the
24  Excellart, that is new, complex MR technology, would be
25  likely to have more such problems early on than an

                                97
1   established piece of equipment would have?
2       MR. TATE:  Object to the form.
3       A.  I was aware that it should have some problems.
4   The amount of problems that should exist should be
5   somewhere around seven, eight, ten percent range of
6   problems. I think we experienced maybe twelve percent of
7   those problems.  Newer technology like that, I had

8  cautioned against getting the first two or three, but we
9  didn't want to go back to the older Toshiba systems.  The
10 platform was a very difficult one to operate for
11 nonfluent technologists.
12     Q.  Was that the Visart, by the way?
13     A.  The Visart.  So, we elected to go ahead and go
14 with a chance to have a better piece of equipment.
15     Q.  Recognizing that that might involve more bugs
16 on the front end?
17     A.  We were aware that it could possibly have those
18 bugs.
19     Q.  Fair enough.  You left DeSoto in -- when was
20 that, about June of 2002, am I correct?
21     A.  June 10, 2002.
22     Q.  You know the exact date?
23     A.  Yes, I do.
24     Q.  Okay.  Since that time have you been involved
25 with potential buyers of imaging equipment in order to

                              98
1  offer your thoughts as to such equipment as might be
2  appropriate for them to buy?
3      A.  Yes, I have.
4      Q.  In that context, have you ever recommended to
5  anybody since you left DeSoto that they buy Toshiba
6  equipment?
7      A.  Yes, I did.
8      Q.  What Toshiba equipment have you recommended to
9  people that they buy and to whom have you made those
10 recommendations?
11     A.  I consulted with the building of another
12 imaging center about seventy miles south of the Olive
13 Branch lotion in Tupelo, Mississippi with a gentleman
14 named Dr. Mike Curry (phonetic).  He had asked me to
15 evaluate equipment.  Our two evaluating pieces of
16 equipment were Philips and Toshiba.  Looking at the
17 specs, looking at the fixes on the equipment out there,
18 understanding we had problems looking at the revisement
19 of those problems, knowing that they had researched the
20 arena for magnets, we did go ahead and elect to choose
21 from one of those two vendors.
22     Pricing meant a lot to us at that point,
23 performance meant a lot, and having an actual field
24 service engineer in the general area meant a lot, as it
25 does with all sophisticated equipment like this.  It was

| | 99 | |
|---|---|---|
| | 1  my recommendation to him at that point to buy Toshiba<br>2  products.  I bought an MR, a CT, a nuclear bed camera,<br>3  and an ultrasound piece of equipment, new Toshiba. | |
| 100 – 101 | 100<br>4     Q.  Okay.  I am done with that book.  You were<br>5  asked some questions in your previous session, Mr. King,<br>6  about some documents you had written and conversations<br>7  you had had also with some other Toshiba customers around<br>8  the November of 2001 period.  Do you remember that?<br>9     A.  I do.<br>10     Q.  Now, at the point you had those conversations<br>11  with Toshiba customers, is it not true that Dr. Carvel<br>12  had made the decision that she wanted to remove the<br>13  Toshiba equipment?<br>14     A.  It was.<br>15     Q.  Is it not also true that one of the purposes<br>16  for which you were asked or instructed to have those<br>17  discussions was to try and support that decision for Dr.<br>18  Carvel?<br>19        MR. TATE:  Object to the form.<br>20     A.  It was.<br>21     Q.  And is it also not true that at the time that<br>22  you were writing the documents in or about November<br>23  referring to issues or problems with the equipment that<br>24  the same thing is true, which was that you were<br>25  attempting to support Dr. Carvel in her decision to<br><br>101<br>1  remove Toshiba equipment?<br>2        MR. TATE:  Object to the form,<br>3  mischaracterization of the witness' previous testimony.<br>4     A.  Documentation of problems is the manager's<br>5  responsibility regardless of if he foresees a removal of<br>6  equipment, so I would say the documentation that we did<br>7  at that point was a little more exaggerated than normal,<br>8  but the documentation nevertheless occurred pre- and<br>9  post- with all equipment.<br>10     Q.  When you say it was a little more exaggerated,<br>11  is it fair to say that that was because of the fact that<br>12  you were attempting to establish the position that Dr.<br>13  Carvel wanted to establish?<br>14        MR. TATE:  Objection, vague and ambiguous,<br>15  object to the form, assuming facts not in evidence.<br>16     A.  Yes, it was. | Vague.  Form.<br>Hearsay.  Calls for an<br>expert witness.  The<br>witness is not<br>competent to opine.<br>Speculation.  Lack of<br>personal knowledge. |
| 104 – 106 | 104 | |

8    Q.   Now, is it fair to say that Olive Branch has a
9  pretty poor electrical power supply?
10     A.   It's what we have been told.
11     Q.   It's what DeSoto has been told?
12     A.   Yes.
13     Q.   By?
14     A.   The power company.  The growth has seamed out
15  on them.
16     Q.   Now, is it also true -- and I'm not going to
17  ask you to look through documents, I'm just going to ask
18  you if you can testify to this from your personal
19  recollection one way or another.  Is it also true that
20  certain kinds of problems with equipment tended to
21  congregate around peak hours of power usage?
22        MR. TATE:  Objection, vague and ambiguous as to
23  what we're talking about.
24     A.   When we started looking at the problems we were
25  having, we noticed that we started having a lot of these

                              105
1  problems, not all of them but a lot of them, around the
2  three to four to five o'clock time frame.  It was
3  explained to us from the power company that that was the
4  time people got home in the evening, they start cranking
5  up their TV's, their air-conditioners, their heaters,
6  whatever else the case may have been at that time of the
7  year.  And so the power usage went up, which gave us a
8  fluctuation, if you will.
9     Q.   Fair enough.  There was some testimony, I think
10  at some point in your deposition, or it may have been in
11  someone else's, but I think it was in yours, about a hole
12  that was discovered in the shielding for the MR room, and
13  this was discovered in conjunction, I believe, either
14  with the removal of the Toshiba magnet or the
15  installation of the replacement magnet.  Do you have any
16  knowledge of that event?
17     A.   I have knowledge of the hole.  I didn't report
18  the hole.  I think Lindgren, our RF shield manufacturer,
19  reported the hole, when they came down and refitted the
20  room with new RF or new magnet.
21     Q.   Who was responsible for installing the
22  shielding when the DeSoto facility was constructed, if
23  you know?
24        MR. TATE:  Objection, lack of personal
25  knowledge, vague and ambiguous, object to the form as

| | | |
|---|---|---|
| | 106 | |
| | 1  well as far as "responsible." | |
| | 2     A.  Lindgren RF Shielding was the contracting | |
| | 3  company to provide the shielding and they installed the | |
| | 4  room. | |
| | 5     Q.  Okay.  Am I correct that the MR, the Toshiba | |
| | 6  MR, had to be brought into the MR room through a hole in | |
| | 7  the building created for that purpose? | |
| | 8     A.  All MR's are brought in through an entry point. | |
| | 9     Q.  Was the Toshiba MR brought in, as you | |
| | 10  understand it, through the end of the MR room which had a | |
| | 11  window in it? | |
| | 12     A.  It was. | |
| | 13     Q.  Am I correct that that is the opposite end of | |
| | 14  the room from which the hole in the shielding was | |
| | 15  discovered? | |
| | 16     A.  That is correct. | |
| 110 – 112 | 110 | Relevance under FRE 401, 402, & 403. Hearsay.  Leading. |
| | 11  Q.  Mr. King, during the first couple of days of | |
| | 12  your depositions, and I can't remember which day, would I | |
| | 13  be correct, on one of those days you had lunch at a local | |
| | 14  Subway? | |
| | 15     A.  Yes. | |
| | 16     Q.  Would I be wrong in thinking that Dr. Carvel | |
| | 17  approached you during that lunch? | |
| | 18     A.  She did. | |
| | 19     Q.  She did approch you during that lunch? | |
| | 20     A.  Yes, she did. | |
| | 21     Q.  Did Mr. Tate approach you, too? | |
| | 22     A.  Kyle and his friend sat at another table. | |
| | 23     Q.  That was I think -- was that Mr. Rhea | |
| | 24  (phonetic) or whatever his name was? | |
| | 25     A.  Don't know. | |
| | | |
| | 111 | |
| | 1     MR. TATE:  I'll object as far as being vague and | |
| | 2  ambiguous as far as approach, whatever that means. | |
| | 3  BY MR. CHESNEY: | |
| | 4     Q.  Did Dr. Carvel come and talk to you? | |
| | 5     A.  She sat with me at the table and talked with | |
| | 6  me. | |
| | 7     Q.  What did she talk to you about? | |
| | 8     A.  Just about the problems that she had had, and | |
| | 9  asked me would I come back, and I made the comment, you | |
| | 10  couldn't pay me the money you owed me then.  She made the | |
| | 11  comment back that we didn't have the money then, but | |

| | | |
|---|---|---|
| | 12  we've got it now and we can pay you.<br>13      My understanding of the whole process, they owed<br>14  me quite a bit of money, and I walked out of there with<br>15  zero.  It was my own regard to walk out of there with<br>16  zero, because I just had had my fill.<br>17     Q.  Focusing on this conversation at lunch, when<br>18  you say she asked you if you would come back, you mean to<br>19  work at DeSoto?<br>20     A.  Yes.<br>21     Q.  Was it your understanding that she was offering<br>22  something in addition to a salary if you were willing to<br>23  come back?<br>24     MR. TATE:  Objection, vague and ambiguous.<br>25     A.  Well, the comment she had made to me was that<br><br>                   112<br>1  she could offer me quite a bit of money.  She mentioned a<br>2  million dollars at that point over a period of years.<br>3  That is when I made the statement, you couldn't even pay<br>4  me the little money that you owed me and --<br>5     Q.  Okay.  Did she have any other conversation with<br>6  you during that lunchtime about the topic of your coming<br>7  back or --<br>8     A.  No, that was pretty much basically it.  I was<br>9  just a listener at that point.<br>10     MR. TATE:  I'm sorry.  You were what?<br>11     THE WITNESS:  A listener. | |
| 113 – 121 |                    113<br>10     Q.  First of all, what does patient habitus just<br>11  mean as a general proposition in the context of imaging?<br>12     A.  Patient habitus is the size of the patient, the<br>13  height, the description, the general makeup of that<br>14  patient, whether they are large or small or very obese or<br>15  very frail.<br>16     Q.  Is it your understanding that different people<br>17  have different body densities?<br>18     A.  That is correct.<br>19     Q.  Is body density part of what you would talk<br>20  about as patient habitus, or is that something different<br>21  in your view?<br>22     A.  Yeah, that is the same thing.<br>23     Q.  It would be part of patient habitus?<br>24     A.  Yep.<br>25     Q.  Does patient habitus have the ability to affect<br><br>                   114 | Calls for an expert witness.  The witness is not competent to opine.  Relevance under FRE 401, 402, & 403.  Vague.  Speculation. |

1  in any way the ease with which you can acquire certain
2  types of images?
3      A.  Yes, it does.
4      Q.  How does it affect that, if you could give us
5  just a general quick overview?
6      A.  Depends on what you are talking about
7  primarily, but in general, for x-ray you have to use more
8  penetrating factor.  For MR, it's a little more difficult
9  with MR.  The physics of MR requires you to scan longer
10  to excite more tissue, because there is more fat tissue
11  and fat excites out at a higher level of TR and TE, which
12  is the term for like your technique, you have to, like I
13  said, spend a little more time with that.
14          CT is the same way with more radiation on a
15  larger patient, less radiation on the smaller patient.
16  Some patients are so big that you are never going to get
17  a good image on them.  This is affected across all
18  imaging modalities.
19      Q.  Okay.  Let me just follow up briefly on that in
20  a little more detail.  You say there are some patients
21  who are so big that you can't really get a good image on
22  them.  Is that something that is true across modalities?
23          MR. TATE:  Objection, calls for expert opinion.
24      A.  That is correct.
25      Q.  When you say that, do you base that on your

                                115
1  many years as a radiographer and as an MR registered
2  technologist?
3      A.  I do.
4      Q.  Is body size in and of itself a factor that
5  affects your ability to get good quality images, or is it
6  related to the nature of the tissue as well?
7          MR. TATE:  Objection, vague and ambiguous,
8  calling for expert witness as to what situation.
9          MR. CHESNEY:  That's fine.  I withdraw the
10  question.  Start again.
11  BY MR. CHESNEY:
12      Q.  To your understanding, based on your years of
13  experience as a radiographer and an MR registered
14  technologist, does body size in and of itself affect the
15  ease with which you can capture images from a patient?
16          MR. TATE:  Objection, calls for an improper
17  opinion.
18      A.  Yes, it does.
19      Q.  Does the density of a patient's tissue also

20  affect that?
21      A.  Yes, it does.
22      Q.  You had said, I think, that fat excites at a
23  higher level of TR and TE than other types of tissue, is
24  that -- did I understand you correctly?
25          MR. TATE:  Objection, mischaracterizes the

                              116
1  witness' previous testimony, vague and ambiguous. Well,
2  he'll tell me.
3          MR. CHESNEY:  I'm just asking if I understood
4  him correctly.
5          THE WITNESS:  That's correct.
6  BY MR. CHESNEY:
7      Q.  When you say it excites the higher level of TR
8  and TE, would it be fair to say in layman's terms what
9  that means is it takes more power to excite fat than it
10  does to excite other tissue, or if that is not -- let me
11  ask you a different question, because that is trying to
12  have you inform us with your knowledge on the basis of my
13  ignorance, so that is not a good way to do it.
14          Let me ask you instead, if you could, as best
15  you can, describe in laymen's terms what it means when
16  you say that fat excites at a higher level of TE or TR
17  than other tissue?
18          MR. TATE:  Objection, vague and ambiguous as far
19  as the meaning of laymen's terms.
20      A.  An MRI scanner is a big microwave, and we're
21  not exciting all the atoms in the body, we're exciting
22  only the hydrogen atoms and they pulse at a certain radio
23  frequency.  But as like with a microwave, when you put a
24  piece of bacon in a microwave, you're going to cook your
25  meat faster than you'll cook your fat, because it's so

                              117
1  much looser and gelled, and it's just so much -- so many
2  more hydrogen atoms located in the fat.
3          They are looser in the fat than they are in the
4  denser muscle type tissue.  An MR is the same way.  We're
5  exciting the fat, and to get the fat excited and to get
6  through the fat to the more dense tissue, you've got to
7  increase, actually ask for longer times of scan.
8      Q.  Fair enough.  Now, if I understand at least in
9  a general sense, for example, what MR technology
10  involves, it involves what is called precessing hydrogen
11  atoms; is that a correct term?

12       MR. TATE:  Objection, vague and ambiguous, lack
13  of foundation.
14       A.   Precessing hydrogen atoms, your hydrogen atoms
15  are precessing right now, so that is not necessarily MR.
16  The MR actually aligns them in a north and south
17  direction, then we pulse our RF energy into that magnet
18  and relax that atom out of its alignment state, relax it,
19  let it precess back up to a 360 degree rotation, if you
20  will.  We collect that energy as it's reviving itself and
21  getting back up into a vertical plane, if you want to
22  think vertical or horizontal, but it's not really
23  vertical or horizontal.
24       Q.   But then to use what would be more appropriate
25  language, or language you would think would be more

                                118
1  appropriate, if I understand it, the process of MR
2  involves exciting the hydrogen atoms in the body in such
3  a way to align them in a particular direction for
4  purposes of conducting a scan; is that correct?
5       MR. TATE:  Objection, vague and ambiguous.
6       A.   That is correct.
7       Q.   Fair enough.  If I understood your earlier
8  testimony, and correct me if I'm wrong, it is harder to
9  excite hydrogen atoms and have them align in the desired
10  manner in fat than it is in other tissue; is that a fair
11  general statement?
12       A.   That is an incorrect statement.
13       Q.   Okay.
14       A.   It is harder to align them into a denser tissue
15  than it is the fat.  Fat is loaded with hydrogen atoms,
16  and they are all loose like this.  In dense tissue they
17  are all tight, they can't go anywhere, so, therefore,
18  they run against themselves.  Like if you put twenty tops
19  on this table, spun them all, they would all run into
20  each other.  But if you give them the whole table to
21  work, they could spin and spin and spin.  But if you put
22  them in a little bowl, they are only going to spin so
23  long, run into each other and die off.  So, the
24  excitation of that atom requires them to spin enough that
25  you get a signal back off of them.  Fat will spin a long

                                119
1  time.
2       So, is the -- why is it harder to acquire an
3  image from a larger, more obese patient than from a

4  smaller patient?
5      A.  The amount of tissue between the fat and the
6  tissue will prevent you from getting to the more dense
7  tissue.  Then you -- after exciting that, you only have
8  so much depth at a receive coil or a send coil, these are
9  coils that receive that energy that is being deposited by
10  that precessing atom, if you can't get that dense tissue
11  atom signal back out to that coil because you've got two
12  inches of fat there, then you have got to increase it to
13  the point it's gotten through that and spun on out to the
14  denser tissues.
15      Q.  I think if I understood your testimony from
16  your previous sessions, DeSoto anticipated having, and
17  when it opened its operations actually did have, a
18  patient habitus that was larger than would be considered
19  average; is that fair to say?
20      A.  That's correct.
21      Q.  Was it considerably larger than would be
22  considered average?
23          MR. TATE:  Objection, speculation.
24      A.  We looked at our -- did our research on the
25  inhabitants of that community and the North Mississippi

120

1  area, and we found them to probably be twenty percent
2  larger than in other areas of the surburban area,
3  Memphis, Arkansas, other places.  That is real general in
4  population around us.
5      Q.  Now, you gave some testimony in your previous
6  deposition about coils, and in particular about CTL
7  coils?
8      A.  Yes.
9      Q.  CTL, I take it, stands for cervical thoracic
10  lumbar, is that correct, in the coils?
11      A.  That is correct.
12      Q.  And I think there were a number of coils that
13  were involved with the DeSoto Excellart MR, CTL coils
14  that were replaced at various times; is that correct?
15      A.  That is correct.
16      Q.  Now, these coils, I think you said in your
17  previous testimony, were manufactured by -- was it
18  Scientific American or American Scientific?
19      A.  American Scientific, yeah.
20      Q.  Scientific American is a magazine, I guess,
21  right?  American Scientific?
22      A.  That's correct.

23     Q.  There was some testimony to the general effect
24  as I recall it that these are coils made for use in the
25  industry, I think you said something like everybody uses

121

1  them, again, I'm just saying that to orient you --
2      MR. TATE:  I will object to the form.
3  BY MR. CHESNEY:
4      Q.  My actual question is this:  Is it your
5  understanding the American Scientific CTL coils used in
6  the Excellart MR are also coils used by other
7  manufacturers of MR equipment?
8      MR. TATE:  Objection, lack of personal
9  knowledge, lack of foundation.
10     A.  The two places I can tell you from personal
11  knowledge is Toshiba uses them and GE uses them.

| 128 – 131 | | Relevance under FRE 401, 402, & 403. Misleading.  FRE 106 competence. |
|---|---|---|

128

13  keep him happy.  First question is this:  When you were
14  at DeSoto did DeSoto have any staff other than its
15  technologists, Dr. Carvel, Mr. Carvel, who worked there
16  at any time?
17     A.  Yes, they did.
18     Q.  Did it have any additional people who were
19  there generally speaking the whole time you were there,
20  any other classes of employees?
21        MR. TATE:  Objection, vague and ambiguous.
22     A.  Yes, they did.
23     Q.  Can you describe for me what other types of
24  employees were there?  I assume there was some clerical
25  staff?

129

1     A.  Yes, there was.
2     Q.  Typists and things like that.  I'm not thinking
3  about that so much.  I am more interested in terms of
4  people who may have been there providing services in the
5  IS area or in the billing area?
6        MR. TATE:  I object to the form, vague and
7  ambiguous, meaning of IS.
8  BY MR. CHESNEY:
9     Q.  Do you understand what IS means, information
10  systems?  I'm sorry.
11     A.  I'm the information systems guy.  We had a
12  contract person that came in and helped us with the IT
13  portion, but as a general rule, I took care of all the IT
14  stuff, information technology things.  Billing-wise, we

15  had a billing manager and anywhere from one to two
16  billing clerks at any given time.
17      Q.  Who was DeSoto's first billing manager?
18      A.  Rhonda Tschume, T-S-C-H-U-M-E.
19      Q.  Did there come a point when Ms. Tschume left
20  DeSoto to your knowledge?
21      A.  Yes, it did.
22      Q.  When she left, did someone else replace her in
23  the position of billing manager?
24      A.  Yes, they did.
25      Q.  Who was that, if you know?

130

1      A.  I can't recall her name.  She only stayed about
2  three months.
3      Q.  Do you have any understanding as to why she
4  left?
5          MR. TATE:  Objection, calls for speculation.
6      A.  I don't really have a great understanding of
7  that, other than the fact she felt like it was in a mess.
8      Q.  When you say she felt like it was in a mess,
9  can you tell us anything about your understanding as to
10  why she thought it was in a mess?  In what way did she
11  think it was in a mess?
12          MR. TATE:  Objection, lack of personal
13  knowledge, speculation.
14      A.  No, I can't.
15      Q.  Do you have any understanding as to why Ms.
16  Tschume left?
17          MR. TATE:  Same objections.
18      A.  Ms. Tschume and I started in the practice
19  together.  She was the first employee of DeSoto
20  Diagnostic Imaging and I was the second one, even though
21  I had done some consulting work, and we brought her in on
22  our billing practice to begin with.  Her technique of
23  doing accounts receivable, billing out, preparing the
24  Medicare, Blue Cross, all the insurance forms, was not
25  adequate enough to satisfy Lynn or Randon or myself.

131

1      Q.  So, she was let go, Ms. Tschume?
2      A.  She wasn't let go.  She actually resigned on
3  her own, she just didn't show up for work one day.  But I
4  think that the writing on the wall, she read it pretty
5  clearly.

| 134 – 136 | 134 | Relevance under FRE |

| | |
|---|---|
| 22    Q.   When you say that the RIS system could generate<br>23  statistical reports, what kind of statistical reports do<br>24  you understand it could generate?<br>25      A.   A number of each modality imaging -- each | 401, 402, & 403. |

135

1  modality imaged certain parts of the body, brain, C
2  spine, thoracic spine, lumbar spine.  It could break that
3  down to type of body part.  It could break it down to the
4  referring physician, could break it down for the
5  technologist who performed the exam.  It could break it
6  down to the interpreter if we had more than one
7  radiologist, which at some times we did.  It could break
8  it down to the demographic area if we wanted to focus on
9  a particular area.
10      Q.   Could it or did it break it down by modality?
11      A.   Yes, it did.
12      Q.   So, would you be able to generate from the RIS
13  system information as to the quantity of examinations
14  that were performed within given periods of time on each
15  of the modalities in DeSoto?
16      A.   It would do it daily, weekly, monthly, yearly.
17      Q.   How do you know that?
18      A.   Because I had to run those statistical reports.
19      Q.   And did you run them?
20      A.   I did.
21      Q.   Were hard copies kept of those reports?
22      A.   Probably not.  We generated hard copies, but as
23  far as keeping them, they were already in the system for
24  archiving.
25      Q.   So, they were maintained in an electronic form;

136

1  is that correct?
2      A.   That's correct.
3      Q.   Did any of these reports reflect the revenue
4  that was generated from the studies?
5      A.   We didn't obtain the financial portion of that.
6      Q.   But you were able to identify the number of
7  studies and the kind of studies that were performed?
8      A.   That's correct.
9      Q.   With regard to each modality?
10      A.   That's correct.
11      Q.   As far as you know, is that RIS system still at
12  DeSoto?
13      A.   I have no earthly idea.

| | | |
|---|---|---|
| | 14     MR. CHESNEY:  What is the time? | |
| | 15     MR. TATE:  Time to turn him over, because we're | |
| | 16  running out of time. | |
| 152 – 157 | <div align="center">152</div> | |

4    Q.  While you were at DeSoto, were you in charge of
5  the billing department?
6    A.  I was in charge of all the employees.
7    Q.  But as far as in particular the billing
8  department, were you in charge of that, or what was your
9  role, if you can describe it?
10    A.  I was pretty much the overseer.
11    Q.  Okay.  But as far as preparing claim forms and
12  sending such forms out to insurance companies, that sort
13  of thing, you weren't actually hands on with that
14  process, were you?
15    A.  No, I was not.
16    Q.  Okay.  So, you weren't hands on.  Is it fair to
17  say you weren't hands on with coding charges onto these
18  claims forms to be sent to insurance companies; is that
19  fair to say?
20    A.  No, it's not.  I involved myself just from the
21  outside looking in enough to know what was going on.  So,
22  if the employee failed to do their job and I could
23  identify that failure.  But as far as doing that, could I
24  sit down and do it?  No.  Did I know the codes?  Yes.
25    Q.  What was the code for the 3-D reconstruction

<div align="center">153</div>

1  you were talking about earlier?
2    A.  76375.
3    Q.  What number is it?
4    A.  76375.
5    Q.  And what is the definition of that code, if
6  that is the proper one?
7    A.  3-D MPRs, 3-D reconstruction, CT MR recon.
8    Q.  What does that mean?
9    A.  What does it mean?
10    Q.  Yeah.
11    A.  It means pulling the image data into a slab of
12  information that you can cut and dice in multiple planes
13  front to back, top to bottom, left to right, oblique
14  angles, any which angle you may be wanting to manipulate
15  that.
16    Q.  If that is the right code for 3-D
17  reconstruction, what does that code include, what exams?
18    A.  It says CT MR on that.  CT is certainly the

19  usage factor that you would probably maintain if you did
20  them. MR, the only thing that you did 3-D on was
21  angiography. MRA's, you did put those in a 3-D format,
22  nothing else did you put in a 3-D format. You didn't
23  need to look at slab data.
24      Q.  Where did you get this information on, this
25  coding number?

154

1      A.  Medicare, CPT coding, radiology coding books.
2      Q.  What year?
3      A.  2004 -- 2003, 2002, 2001, 2000, they were
4  opened up in 1999 for payment.
5      Q.  So, am I hearing you testify earlier that there
6  was something wrong with billing for a 3-D
7  reconstruction?
8      A.  Yes, it is.
9      Q.  And what is your testimony regarding that?
10         MR. CHESNEY:  Excuse me one second.  As phrased,
11  that question actually mischaracterizes the witness'
12  previous testimony, and, therefore, I object to it.
13         MR. TATE:  I'm trying to make sure the record is
14  clear.
15         MR. CHESNEY:  Overbroad, vage and ambiguous, and
16  mischaracterizes the witness' previous testimony.
17  BY MR. TATE:
18      Q.  Okay.  Again, I think you understand my
19  question.  What did you perceive as being wrong with
20  billing for the 3-D reconstruction and using that code at
21  DeSoto, I guess the 76735 that you have stated?
22      A.  375.
23      Q.  Yeah.
24      A.  The problem with billing that code is that
25  there is two problems with it.  You had to actually do

155

1  it, that is number one, and we did not.
2      Q.  You had to do what?
3      A.  Didn't do the 3-D reconstruction on MRI.  None
4  of that was ever done except for MRA's.  MRA's, we did,
5  but we billed every exam with the 3-D MPR -- MR.  The
6  second one is you have to, and this goes for CT and MRI,
7  you have to have a referring physician's actual order
8  stating that he needed 3-D MPR pulled on that, and at
9  that point you can bill because you have an actual order
10  for that.  The radiologist could not manifest an order

11  for that unless she saw a particular pathology she needed
12  to see.
13       Pathology means a cancer, a tumor, some kind of
14  abnormalities that may have occurred.  In order for her
15  to have seen that or he to have seen that is that they
16  would actually have to see the first images that came out
17  and then call the physician up that referred, ask for an
18  actual order, receive it in writing, and document that.
19     Q.  Now, you are saying you reviewed these Medicare
20  CPT code manuals while you were at DeSoto?
21     A.  I was very familiar with them when I was at
22  Magnolia Hospital from '95 till '97, Delta Medical Center
23  from '97 to '99, and then again as they came up in code
24  form after that.  Here just recently I have been put on
25  the charge master team for our hospital.  Within the last

156

1  year, we have been in constant review of all these.  It's
2  a constant, ever-changing process.
3     Q.  So, is that how you learned the specific number
4  for the 3-D reconstruction here in the last year with you
5  being in your new position?
6     A.  Absolutely.
7     Q.  So, at the time you were at DeSoto, you didn't
8  actually know that particular code number?
9     A.  Yes, I did.
10     Q.  You did?
11     A.  Yes, I did.
12     Q.  Based on what?
13     A.  Based on the billing code.  When I'd go to
14  Jennifer Sneed and ask, and to Sue Barger, who was
15  ya'll's coder as well, and ask what number are we billing
16  this at, and those numbers were given out then.  The
17  numbers have a tendency to change over the years, J codes
18  and things like that would be added to them for
19  additional media you may use, but the codes generally
20  stay somewhere in that range.  So, if it's 76375 this
21  year, it may stay 375.  It may change to 376 depending on
22  the interpretation of that billing agency.
23     Q.  It's your understanding that this 76735 --
24     A.  375.
25     Q.  What is it?

157

1       MR. CHESNEY:  76375.
2  BY MR. TATE:

| | | |
|---|---|---|
| | 3    Q.  Came into existence around 1999?<br>4    A.  I think in 1999 Medicare approved it for<br>5  payment.<br>6    Q.  That specific code?<br>7    A.  That specific code.  I'm not sure about the<br>8  date.  That is just my understanding of when it generally<br>9  came on line.<br>10    Q.  What about in the year 2000?<br>11    A.  It was on line then.<br>12    Q.  You are certain of that?<br>13    A.  Positive.<br>14    Q.  What about 2001?<br>15    A.  Positive.<br>16    Q.  What about 2002?<br>17    A.  Positive.<br>18    Q.  What about 2003?<br>19    A.  Positive. | |
| 158 | <div align="center">158</div>1    Q.  So, it's your testimony you were aware of the<br>2  76375 code for the 3-D reconstruction while at you were<br>3  at DeSoto, correct?<br>4    A.  I was aware of the number and the acquisition<br>5  of that data and what it represented, yes.<br>6    Q.  But as far as actually sitting in the billing<br>7  office and putting it down to paper or sending claims<br>8  out, you didn't do that?<br>9    A.  I never did that.  That was Lynn doing that.<br>10    Q.  Okay.  Along with the billing manager?<br>11    A.  No.  Lynn coded all her own stuff.<br>12    Q.  I thought you testified earlier Sue Barger was<br>13  a coder?<br>14    A.  Sue Barger was a coder after hours.  Lynn, if<br>15  she had it in front of her, she coded it.<br>16    Q.  Dr. Carvel and Sue Barger were doing the coding<br>17  at DeSoto while you were there?<br>18    A.  I would say the primary coder was Lynn.  That<br>19  was a smart thing on her part.  She was a coder.  She was<br>20  a radiologist.  She was our golden goose.<br>21    Q.  Well, I guess my question is, if Dr. Carvel was<br>22  the primary coder, Sue Barger also provided coding at<br>23  DeSoto, correct?<br>24    A.  That is correct. | FRE 106 competence. |
| 173 – 174 | <div align="center">173</div>18    Q.  I'm not talking about -- just for clarity to<br>19  make sure -- Mr. Steiff or anybody, I'm talking about<br>20  your understanding of the representations you just talked | |

| | | |
|---|---|---|
| | 21  about a while ago.  That's what I'm looking for, your<br>22  understanding.<br>23      A.  I think the first proposal we had we asked for<br>24  hearts and we were given those numbers.  Second proposal,<br>25  our eagerness to get into the operation and our short<br><br>174<br>1  time frame to get in the operation probably forced us to<br>2  overlook some of that, and it wasn't intentional.  It was<br>3  just -- in our minds, it proved to be a little<br>4  misrepresented, but indeed we did check off on it.  We<br>5  did know what we were getting.  We got a dual head.  He<br>6  had already told us dual head.  We had already seen it.<br>7  We talked to the techs but without the salespeople<br>8  available when we went to Pensacola.<br>9       So, we knew our dual head would be a little<br>10  longer.  They didn't do hearts on them.  But they could<br>11  do hearts, and it wasn't going to be a problem.  So, when<br>12  you see dual heads, you just automatically assume it's<br>13  going to do it, and those were our assumptions. | |
| 214 - 216 | 214<br>20  BY MR. CHESNEY:<br>21      Q.  With regard to Ms. Kroncke -- is that the right<br>22  pronunciation?  She came in to see you on what would have<br>23  been her second day at DeSoto; is that right?<br>24      A.  She came in, never reported to work, never<br>25  clocked in, just went ahead and told me she had to<br><br>215<br>1  resign.<br>2        MR. TATE:  Objection, hearsay.<br>3  BY MR. CHESNEY:<br>4      Q.  She actually had just left a job to come to<br>5  work at DeSoto the day before; is that correct?<br>6      A.  That's correct.<br>7      Q.  And she had left her previous employment in<br>8  order to do that; is that correct?<br>9      A.  That's correct.<br>10      Q.  She came and worked for one day at DeSoto?<br>11      A.  That's correct.<br>12      Q.  Then the next morning she came in and saw you<br>13  before she went to work; is that right?<br>14      A.  That's correct.<br>15      Q.  And was she upset about the situation?<br>16        MR. TATE:  Objection, assuming facts not in<br>17  evidence. | Relevance under FRE<br>401, 402, & 403. |

18      THE WITNESS:  That was more than two questions.
19  BY MR. CHESNEY:
20      Q.  But they're all going to be done in less time
21  than two questions.  Was she upset about the situation?
22      A.  Yes, she was.
23          MR. TATE:  Again, objection, mischaracterizes
24  the witness' previous testimony, assuming facts not in
25  evidence.  Unless you want to give me a continuing

216

1  objection to all objections regarding this --
2          MR. CHESNEY:  You can have all the objections
3  you want to this.
4          MR. TATE:  Okay, go ahead.
5          MR. CHESNEY:  You can make any objection you
6  want.
7          MR. TATE:  I'm just talking about it's
8  continuing.
9          MR. CHESNEY:  Understood.  No problem.
10  BY MR. CHESNEY:
11      Q.  She was upset.  Did she appear upset?
12      A.  Yes, she did appear upset.
13      Q.  Was she somewhat emotional about the situation?
14      A.  Yes, she was.
15      Q.  In that condition, did she then tell you that
16  she was leaving because of what you previously testified
17  to, her feeling uncomfortable with what she had been
18  asked to do the day before?
19      A.  Yes, she did.
20          MR. CHESNEY:  Thank you.  That's all.
21          THE VIDEOGRAPHER:  This concludes the videotaped
22  deposition of Mr. Paul King, consisting of four tapes.
23  The original tapes of today's testimony will remain in
24  the custody of Alpha Legal Productions, whose address is
25  100 North Main, The Lobby, Memphis, Tennessee  38103.  We